**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice*
*in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364,
## AND 507, AND BANKRUPTCY RULES 2002, 4001, AND 9014
## (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) AUTHORIZING
## THE DEBTORS TO OBTAIN POSTPETITION FINANCING, AND (III) GRANTING
## ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES,

1.      Upon the motion (the "<u>Motion</u>")[2] of the debtors and debtors in possession

(collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>"), for entry of

an interim order and a final order (this "<u>Final Order</u>") under sections 105, 361, 362, 363, 364,

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

503, and 507 of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>"), Rules

2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

"<u>Bankruptcy Rules</u>"), and the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the Eastern District of Virginia (the "<u>Local Bankruptcy Rules</u>"),

seeking:

(a)  authorization for the Debtors to obtain postpetition financing on a superpriority senior secured basis, comprised of term loans (the "<u>DIP Term Loan Facility</u>," and the term loans thereunder, the "<u>DIP Term Loans</u>") in an aggregate principal amount of $311.8 million, consisting of (a) $150 million in "new money" term loans and (b) $161.8 million of "rolled-up" term loans resulting from the conversion of certain outstanding term loans under the Term Credit Agreement (as defined below), pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Debtor-in-Possession Term Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>DIP Term Loan Agreement</u>"), by and among Ascena Retail Group, Inc., as Parent Borrower (the "<u>DIP Parent Borrower</u>"), AnnTaylor Retail, Inc., as Subsidiary Borrower (together with the DIP Parent Borrower, the "<u>DIP Borrowers</u>"), and certain other Debtors, as Guarantors (as defined in the DIP Term Loan Agreement) (in such capacities, the "<u>DIP Guarantors</u>" and, together with the DIP Borrowers, in such capacities, the "<u>DIP Credit Parties</u>"), the lenders party thereto from time to time (the "<u>DIP Term Lenders</u>" and, together with the DIP Term Loan Agent (as defined below), the "<u>DIP Term Loan Secured Parties</u>"), and Alter Domus (US) LLC as administrative agent for the DIP Term Lenders (the "<u>DIP Term Loan Agent</u>"), and, together with any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith, including the Backstop Commitment Letter (as defined below) (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Term Loan Documents</u>")), annexed hereto as **<u>Annex 3</u>**;

(b)  authorization for the DIP Borrowers to incur the DIP Term Loans, and for the DIP Guarantors jointly and severally irrevocably and unconditionally to guaranty, the due and punctual payment in full in cash of all Loan Document Obligations (as defined in the DIP Term Loan Agreement, collectively, the "<u>DIP Term Loan Obligations</u>") when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that

would become due but for the operation of the automatic stay under section 362(a) of the Bankruptcy Code);

(c)     authorization for the Debtors to execute, deliver, and perform under the DIP Term Loan Agreement and all other DIP Term Loan Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Final Order, the DIP Term Loan Documents, and the transactions contemplated hereby and thereby;

(d)     authorization for the Debtors to obtain postpetition financing on a superpriority senior secured basis, comprised of a revolving credit facility (the "DIP ABL Facility," and the revolving commitments (the "DIP ABL Commitments") and loans thereunder, (such loans, together with the DIP ABL Commitments, as the context may require, the "DIP ABL Loans," and the DIP ABL Facility together with the DIP Term Loan Facility, the "DIP Facilities")) in an aggregate principal amount of $400,000,000, which shall include a $200,000,000 sublimit for the issuance of letters of credit, pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP ABL Agreement"), by and among the DIP Credit Parties, the lenders party thereto from time to time (the "DIP ABL Lenders" and, together with the DIP ABL Agent (as defined below), the "DIP ABL Secured Parties," and collectively with the DIP Term Loan Secured Parties, the "DIP Secured Parties"), and JPMorgan Chase Bank, N.A. as administrative agent for the DIP ABL Lenders (the "DIP ABL Agent," and together with the DIP Term Loan Agent, the "DIP Agents"), and, together with any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP ABL Documents," and together with the DIP Term Loan Documents, the "DIP Documents")), annexed hereto as **Annex 4**;

(e)     authorization for the DIP Borrowers to incur the DIP ABL Loans, and for the DIP Guarantors jointly and severally irrevocably and unconditionally to guaranty, the due and punctual payment in full in cash of all Obligations (as defined in the DIP ABL Agreement, collectively, the "DIP ABL Obligations," and together with the DIP Term Loan Obligations, the "DIP Obligations") when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under section 362(a) of the Bankruptcy Code);

(f)     authorization for the Debtors to execute, deliver, and perform under the DIP ABL Agreement and all other DIP ABL Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Final Order, the DIP ABL Documents, and the transactions contemplated hereby and thereby;

(g)     authorization, upon entry of this Final Order, for the Debtors to convert all outstanding ABL Obligations (as defined below) into DIP ABL Obligations;[3]

(h)     authorization for the Debtors to grant to the DIP Agents, on behalf of the applicable DIP Secured Parties, the DIP Liens (as defined in herein) in all DIP Collateral (as defined herein), in each case subject to the terms herein;

(i)     authorization for the Debtors to grant to the DIP Agents, on behalf of the applicable DIP Secured Parties, allowed, superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations in accordance with the terms herein;

(j)     authorization for the Debtors, pursuant to sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code, to (i) use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) and (ii) provide adequate protection to the Prepetition Secured Parties (as defined below) under the ABL Credit Agreement and the Term Credit Agreement (each as defined below and, collectively, the "Credit Agreements");

(k)     authorization to grant the Adequate Protection Liens, DIP Term Loan Liens and DIP ABL Liens (each, as defined below) on, among other property, the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any other similar state law (collectively, the "Avoidance Actions");

(l)     the waiver by the Debtors of any right to surcharge the Prepetition Collateral or DIP Collateral (each, as defined below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law and the waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code against the Prepetition Secured Parties;

---

[3]     Upon entry of this Final Order, any outstanding ABL Obligations (as defined herein) and all accrued and unpaid interest thereon and fees and expenses shall be fully-rolled into the DIP ABL Facility and shall constitute DIP ABL Obligations hereunder.

(m)    the waiver of the equitable doctrine of "marshaling" and other similar doctrines to the extent set forth herein; and

(n)    the waiver of any applicable stay with respect to the effectiveness and enforceability of this Final Order *(*including a waiver pursuant to Bankruptcy Rule 6004(h)).

The Court, having considered the Motion, the DIP Term Loan Documents, the DIP ABL Documents, the *Declaration of Stuart Erickson in Support of the Debtors' Motion for Entry of a Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Granting Related Relief* (the "Erickson Declaration"), the First Day Declaration, the evidence submitted and arguments proffered or adduced at the Interim Hearing held before this Court on July 23, 2020 as it relates to the Debtors' use of Cash Collateral and the Final Hearing held before this Court on September 10, 2020, and upon the record of the Cases; and the Court having entered the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Docket. No. 61] (the "Interim Order"); and adequate notice of the Final Hearing having been given in accordance with Bankruptcy Rule 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the final relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a sound exercise of the Debtors' business

judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

**A.     The Petition Date.**

2.     On July 23, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (this "Court") commencing these Cases.

**B.     Debtors in Possession.**

3.     The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Cases.  On August 3, 2020, the United States Trustee for the District of Virginia (the "U.S. Trustee") appointed an official committee of unsecured creditors in the Cases (the "Creditors' Committee").

**C.     Jurisdiction.**

4.     This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**D.     Notice.**

5.     Notice of the Motion, the relief requested therein, and the Final Hearing was served by the Debtors on the following parties or their counsel:  (a) the United States Trustee for the Eastern District of Virginia; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their counsel; (e) Milbank LLP, as counsel to an ad hoc group of certain Term Loan Secured Parties (as defined below); (f) the United States

Attorney's Office for the Eastern District of Virginia; (g) the Internal Revenue Service; (h) the

office of the attorneys general for the states in which the Debtors operate; (i) the Securities and

Exchange Commission; and (j) any party that has requested notice pursuant to Bankruptcy Rule

2002 (collectively, the "Notice Parties").  Under the circumstances, the notice given by the

Debtors of the Motion, the relief requested therein, and the Final Hearing constitutes due and

sufficient notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c), and (d), and the

Local Bankruptcy Rules.

**E.    Debtors' Stipulations.**

6.    Without prejudice to the rights of any other party (but subject to the rights of

parties in interest as set forth in section GG of this Final Order), the Debtors admit, stipulate,

acknowledge and agree that:

(a)    **ABL Credit Facility:**

(i)    **ABL Credit Agreement:** Ascena Retail Group, Inc. and each of the borrowing subsidiaries party thereto (collectively, the "ABL Borrowers"), the other loan parties party thereto (together with the ABL Borrowers, the "ABL Loan Parties"), the lenders party thereto (the "ABL Lenders"), the issuing banks party thereto, and JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent and collateral agent (in such capacities, the "ABL Agent") and swingline lender (together with the ABL Lenders, the ABL Agent and the other "Lender Parties" identified therein, the "ABL Secured Parties") are parties to that certain Amended and Restated Credit Agreement, dated as of January 3, 2011 (as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, amended and restated, modified, or otherwise supplemented from time to time prior to the Petition Date, the "ABL Credit Agreement").  The ABL Credit Agreement provides for a senior secured asset-based revolving credit facility with a maximum availability of $500,000,000 (subject to a borrowing base composed primarily of credit card accounts receivable and inventory), including a letter of credit sublimit of $200,000,000, with a maturity date of February 27, 2023, springing to 91 days prior to the final scheduled maturity of the Term Credit Facility (as defined below) unless the principal amount of debt outstanding that has a scheduled maturity prior to May 29, 2023 under the

Term Credit Agreement (as defined below) is not more than $150,000,000 and Liquidity (as defined in the ABL Credit Agreement) is at least equal to $150,000,000 (the "<u>ABL Facility</u>").

(ii)    **ABL Obligations:** As of the Petition Date, the ABL Loan Parties were jointly and severally liable and indebted to the ABL Agent and the other ABL Secured Parties in the aggregate principal amount of not less than $230,000,000 in Revolving Loans (as defined in the ABL Credit Agreement) and $103,000,000 in aggregate face amount of undrawn letters of credit, plus any other amounts due and payable under the "Loan Documents" as defined in the ABL Credit Agreement (the "<u>ABL Loan Documents</u>"), including, without limitation, accrued and unpaid interest thereon, reimbursement obligations (contingent or otherwise), fees, costs, expenses and disbursements (including, without limitation, attorneys', accountants', auditors', appraisers', collateral examiners', consultants' and financial advisors' fees and related expenses and disbursements), breakage costs, charges, indemnities, treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, Secured Obligations (as defined in the ABL Credit Agreement), and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith (including all Obligations (as defined in the ABL Credit Agreement)), in each case, as and to the extent provided in, and required to be paid or reimbursed under, the ABL Loan Documents (collectively, the "<u>ABL Obligations</u>"), which shall constitute allowed secured claims under sections 502 and 506 of the Bankruptcy Code against the applicable Debtors' estates. The Debtors acknowledge and agree that (x) the ABL Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable ABL Loan Documents and (y) the ABL Obligations are not subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.[4]

(iii)   **Prepetition ABL Liens:** To secure the ABL Obligations, each of the ABL Loan Parties granted to the ABL Agent, for the benefit of the ABL Secured Parties, properly perfected continuing first and second priority liens and mortgages on, and security interests in (collectively, the "<u>Prepetition ABL Liens</u>"), all Collateral (as

---

[4]    JPMorgan and Ascena Retail Group, Inc. were parties to a certain interest rate swap (the "<u>Swap</u>"), which was terminated on the Petition Date. The parties estimate that, as of the termination, Ascena owed JPMorgan approximately $7.3 million (the "<u>Swap Termination Liability</u>"). The Swap is secured by the same collateral that secures other ABL Obligations. The Swap Termination Liability is accruing interest at the default rate and constitutes an ABL Obligation that, upon entry of this Final Order, shall be rolled-up into the DIP ABL Obligations and, upon entry of this Final Order, the Swap Termination Liability shall be paid in cash in full.

defined in the ABL Credit Agreement, the "Prepetition ABL Collateral").

(b)     **Term Loan:**

(i)     **Term Credit Agreement:**   Ascena Retail Group, Inc., and AnnTaylor Retail Inc. (collectively, the "Term Loan Borrowers"), the lenders party thereto (the "Term Loan Lenders"), and Goldman Sachs Bank USA, as administrative agent and collateral agent (in such capacities, the "Term Loan Agent" and, together with the ABL Agent, the "Prepetition Agents," and the Term Loan Agent together with the Term Loan Lenders and the other "Secured Parties" as defined in the Term Credit Agreement, the "Term Loan Secured Parties" and, together with the ABL Secured Parties and the Incremental Collateral Agent (as defined below), the "Prepetition Secured Parties") are parties to that certain Term Credit Agreement, dated as of August 21, 2015 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time prior to the Petition Date, the "Term Credit Agreement").   Under the Term Credit Agreement, the Term Loan Borrowers initially borrowed $1,800,000,000 in senior secured term loans (the "Term Loans") with a maturity date of August 21, 2022 (the "Term Credit Facility" and, together with the ABL Facility, the "Prepetition Facilities").

(ii)     **Term Loan Obligations:**   As of the Petition Date, the "Loan Parties," as defined in the Term Credit Agreement (the "Term Loan Credit Parties") were jointly and severally liable and indebted to the Term Loan Agent and the other Term Loan Secured Parties in the aggregate principal amount of approximately $1,271,597,089, plus any other amounts due and payable under the Loan Documents (as defined in the Term Credit Agreement, the "Term Loan Documents" and, together with the ABL Loan Documents and the Conditional Assignment Agreement (as defined below), the "Prepetition Secured Credit Documents"), including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, certain expenses (including any attorneys', accountants', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith (including all Loan Document Obligations (as defined in the Term Credit Agreement)), in each case, as and to the extent provided in, and required to be paid or reimbursed under, the Term Loan Documents (collectively, the "Term Loan Obligations," together with the ABL Obligations, the "Prepetition Secured Credit Obligations").   The Debtors acknowledge and agree that (x) the Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Term Loan Documents and (y) the Term Loan Obligations are not subject to any challenge or defense, including, without limitation, avoidance,

disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii) **Prepetition Term Loan Liens:**  To secure the Term Loan Obligations, the Term Loan Credit Parties granted to the Term Loan Agent, for the benefit of all Term Loan Secured Parties, properly perfected continuing first and second priority liens and mortgages on, and security interests in (collectively, the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Liens"), all Collateral (as defined in the Term Credit Agreement, the "Prepetition Term Loan Collateral" and, together with the Prepetition ABL Collateral, the "Prepetition Collateral").

(c) **Relative Priority of Prepetition Liens Under, and Enforceability of, the Prepetition Intercreditor Agreement:**

(i) The ABL Agent, the Term Loan Agent, and the Debtor borrowers, issuers, and guarantors under the Prepetition Secured Credit Documents (collectively, the "Debtor Obligors") are party to that certain ABL Intercreditor Agreement, dated as of August 21, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Intercreditor Agreement"), which sets forth the relative lien priorities and other rights and remedies of the ABL Secured Parties and the Term Loan Secured Parties with respect to, among other things, the Prepetition ABL Collateral and the Prepetition Term Loan Collateral.  The Prepetition Intercreditor Agreement is binding and enforceable against the Debtor Obligors and other parties thereto in accordance with its terms.

(ii) The Prepetition ABL Liens granted by the Debtor Obligors to the ABL Agent to secure the ABL Obligations for the benefit of the ABL Secured Parties pursuant to and in connection with the ABL Loan Documents, including without limitation, the Collateral Documents (as defined in the ABL Credit Agreement), are valid, binding, properly perfected, enforceable, non-avoidable first (as to the ABL Priority Collateral) and second (as to the Term Priority Collateral) priority liens on, and security interests in, the Prepetition Collateral, which are not subject to any challenge, offset, recoupment, claim, counterclaim, objection, defense, contest, avoidance, recharacterization, reclassification, reduction, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law by any person or entity; *provided* that these liens on and security interests in the Prepetition Collateral shall be subject to (w) the Carve Out, (x) liens and security interests granted to secure the Adequate Protection Obligations (to the extent provided below), (y) the terms and provisions of the Prepetition Intercreditor Agreement, and (z) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date

or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the ABL Loan Documents (subparagraph (z), the "ABL Permitted Prior Liens").

(iii)   The liens and security interests granted by the Debtor Obligors to the Term Loan Agent to secure the Term Loan Obligations for the benefit of the Term Loan Secured Parties pursuant to and in connection with the Term Loan Documents, including without limitation, the Collateral Documents (as defined in the Term Credit Agreement), are valid, binding, properly perfected, enforceable, non-avoidable, first (as to the Term Priority Collateral) and second (as to the ABL Priority Collateral) priority liens on, and security interests in, the Prepetition Collateral, which are not subject to any challenge, offset, recoupment, claim, counterclaim, objection, defense, contest, avoidance, recharacterization, reclassification, reduction, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law by any person or entity; *provided* that these liens on and security interests in the Prepetition Collateral shall be subject and subordinate to (w) the Carve Out, (x) liens and security interests granted to secure the Adequate Protection Obligations (to the extent provided below), (y) the terms and provisions of the Prepetition Intercreditor Agreement, and (z) valid, perfected, and unavoidable liens permitted under the Term Loan Documents, to the extent such liens are permitted to be senior to the liens of the Term Loan Agent and exist as of the Petition Date (including, for the avoidance of doubt, valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (subparagraph (z), the "Term Loan Permitted Prior Liens" and, together with the ABL Permitted Prior Liens, the "Permitted Prior Liens").[5]

(d)   **Additional Stipulations**.

(i)   The Debtors acknowledge and stipulate that they are in default of their obligations under the Prepetition Secured Credit Documents as a result of the filing of the Cases, and that an Event of Default has occurred under the Prepetition Secured Credit Documents and is continuing.  As of the Petition Date, therefore, interest will be accruing on the Prepetition Secured Credit Obligations at the rates specified in the applicable Prepetition Secured Credit Documents

---

[5]   Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien (other than, with respect to the ABL Priority Collateral, the Prepetition ABL Liens, and with respect to the Term Priority Collateral, the Prepetition Term Loan Liens) is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties or a Creditors' Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien (other than the Prepetition ABL Liens and the Prepetition Term Loan Liens, as to which any such challenge must be in accordance with section I.GG herein).  The right of a seller of goods to reclaim such goods (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Prior Lien, rather, any such alleged claim shall continue to have the same rights and priority as it had on the Petition Date.

(which, for the avoidance of doubt, with respect to the ABL Obligations includes the default rate under the ABL Loan Documents).

(ii)     The Prepetition Secured Credit Obligations constitute legal, valid, and binding obligations of the applicable Debtor Obligors, enforceable in accordance with their terms (except as subject to the stay of enforcement arising under section 362 of the Bankruptcy Code);

(iii)    No amounts paid at any time to the Prepetition Secured Parties in respect of the Prepetition Secured Credit Obligations and the Prepetition Secured Credit Documents are subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, or subordination or other challenge pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(iv)    All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located and whether existing as of the Petition Date or thereafter, constitutes "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition Secured Parties.

(e)     **No Control**.  None of the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Final Order or the Prepetition Secured Credit Documents.

(f)     **Release**.  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Secured Parties (solely in their capacities as such) and each of their respective successors, assigns, affiliates, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in their capacities as such (all of the foregoing, collectively, the "Releasees"), of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Credit Documents and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Final Order, including, without limitation, (a) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (b) any and all claims and causes of action arising under the Bankruptcy Code, and (c) any and all claims and causes of actions with respect to the validity, priority, perfection, or avoidability of the liens or claims of the Prepetition Secured Parties.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Secured Credit

Obligations that the Debtors may now have or may claim to have against any of the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court's entry of this Final Order.

**F.      Findings Regarding Postpetition Financing and Use of Cash Collateral.**

7.      Good cause has been shown for the entry of this Final Order and for authorization for the Debtors to obtain financing pursuant to the DIP Facilities and DIP Documents, and the use of Cash Collateral as set forth herein.

8.      The Debtors have an immediate need (a) to continue to use Prepetition Collateral, including Cash Collateral; and (b) incur the DIP Obligations to, among other things, fund the orderly continuation of their businesses, fund the Cases, pay their operating expenses, and preserve their going concern value.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Documents are necessary and vital to preserve and maintain the going concern values of the Debtors.  The terms of the proposed DIP Facilities, the other DIP Documents, and this Final Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide reasonably equivalent value and fair consideration.

9.      The Debtors have been unable to obtain financing and other financial accommodations from sources other than the DIP Term Lenders and DIP ABL Lenders on terms more favorable than those provided under the DIP Facilities and the DIP Documents.  The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain adequate credit for money borrowed (a) having priority over administrative expenses of

the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) secured

only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien.

Postpetition financing is not otherwise available without granting the DIP Agents, for the benefit

of themselves and the other applicable DIP Secured Parties and subject to the Carve Out:  (1) the

DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Superpriority Claims (as defined

below), and (3) the other protections set forth in this Final Order.  After considering all

alternatives, including the benefits to the Debtors of the Restructuring Support Agreement, the

Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP

Facilities represent the best financing available to them at this time and is in the best interests of

all of their stakeholders.

10.    Based on the Motion, the First Day Declaration, the Erickson Declaration, and the

record presented to the Court at the Interim Hearing and the Final Hearing, (i) the extension of

credit and other financial accommodations made under the DIP Facilities and the DIP

Documents, (ii) the terms of the DIP Facilities, (iii) the premiums, fees and other amounts paid

and to be paid thereunder, (iv) the terms of adequate protection granted to the Prepetition

Secured Parties, (v) the terms on which the Debtors may continue to use Prepetition Collateral

(including Cash Collateral), and (vi) the Cash Collateral arrangements described therein and

herein, in each case, pursuant to this Final Order and the DIP Documents, (a) are fair, reasonable,

and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably

equivalent value and fair consideration; and (d) represent the best financing available.  The DIP

Facilities and the use of Prepetition Collateral (including Cash Collateral) were negotiated in

good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition

Secured Parties.  The use of Prepetition Collateral (including Cash Collateral) and the credit to

be extended under the DIP Facilities shall be deemed to have been so allowed, advanced, made,

used, and/or extended in good faith, and for valid business purposes and uses, within the

meaning of section 364(e) of the Bankruptcy Code, and the DIP Secured Parties and the

Prepetition Secured Parties are therefore entitled to the protection and benefits of section 364(e)

of the Bankruptcy Code and this Final Order.

11.     The DIP Facilities, the adequate protection granted to the Prepetition Secured

Parties, and the use of Prepetition Collateral (including Cash Collateral) hereunder have been

negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and

their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in

respect of, or in connection with, the DIP Facilities and the DIP Documents, including, without

limitation, all loans and other financial accommodations made to and guarantees issued by the

Debtors pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been

extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is

used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections

offered by section 364(e) of the Bankruptcy Code, and the claims, security interests and liens,

and other rights, benefits, and protections granted to the DIP Secured Parties (and the successors

and assigns thereof) pursuant to this Final Order and the DIP Documents shall each be entitled to

the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or

any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

12.     The terms of the use of the Prepetition Collateral pursuant to this Final Order have

been the subject of extensive negotiations conducted in good faith and at arm's-length among the

Debtors and the Prepetition Secured Parties, and, pursuant to sections 105, 361, and 363 of the

Bankruptcy Code, the Prepetition Secured Parties are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Final Order, and each is entitled to the protection provided under section 363(m) of the Bankruptcy Code.

13.     In light of the Prepetition Secured Parties' agreement that their liens shall be subject to the Carve Out as provided herein and that their Cash Collateral may be used for administrative expenses and to pay claims as agreed and in accordance with the Budget the Prepetition Secured Parties are each entitled to a waiver of (a) any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the provisions of section 506(c) of the Bankruptcy Code.

14.     The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2).  Absent granting the relief sought by this Final Order, the Debtors' estates could be immediately and irreparably harmed.  The use of the Prepetition Collateral in accordance with this Final Order is in the best interest of the Debtors' estates.

**G.      Consent by the Prepetition Secured Parties.**

15.     The Prepetition Secured Parties have consented or are deemed to have consented, as applicable, to the Debtors' use of Prepetition Collateral (including Cash Collateral) and the DIP Secured Parties' entry into the DIP Facilities and the DIP Documents, in each case, solely in accordance with and subject to the terms and conditions of this Final Order and the DIP Documents.

**H.       Entitlement to Adequate Protection.**

16.     The Debtors have agreed, pursuant to sections 361, 362, and 363 of the Bankruptcy Code to provide adequate protection to the Prepetition Secured Parties, as and to the extent set forth in this Final Order, for any diminution in the value of their respective interests in the Prepetition Collateral, including Cash Collateral, for any reason provided for under the

Bankruptcy Code, including from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value").  Based on the Motion, the declarations, and all other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing and Final Hearing, the terms of the adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

**I.      The Motion.**

17.      The Motion is granted on a final basis to the extent set forth herein.  Any objection to, or reservation of rights regarding, the entry of this Final Order to the extent not withdrawn or resolved is hereby overruled on the merits.

**J.      Authorization of the DIP Facilities.**

18.      Subject to the terms and conditions of this Final Order, each of the DIP Credit Parties are hereby authorized to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Facilities and the DIP Documents.  The DIP Documents, as applicable, and this Final Order govern the financial and credit accommodations to be provided to the DIP Credit Parties by the DIP Term Lenders and the DIP ABL Lenders (collectively, the "DIP Lenders") in connection with the DIP Facilities.

19.    The DIP Agreements and each of the other DIP Documents are hereby approved, and all premiums, fees, or expenses payable under the DIP Documents are hereby approved and ratified.

20.    The DIP Borrowers are authorized to incur the DIP Term Loans and the DIP ABL Loans, and the DIP Guarantors are authorized to unconditionally guarantee, on a joint and several basis, all of the DIP Term Loan Obligations and DIP ABL Obligations, and other charges payable in connection with the DIP Facilities, in each case, subject to the terms and conditions set forth in this Final Order and the applicable DIP Documents.

21.    Without limiting the foregoing, and without the need for further approval of this Court, each Debtor is authorized to perform all acts to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of pledge and security agreements, deeds of trust, and financing statements), and to pay all premiums, fees or expenses that may be required, necessary, or desirable for the Debtors to implement the terms of, perform their obligations under, or effectuate the purposes of and transactions contemplated by this Final Order, the DIP Facilities, and the DIP Documents in accordance herewith and therewith, including, without limitation:

(a)    the execution and delivery of, and performance under, the DIP Documents;

(b)    the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case, as the DIP Credit Parties and the requisite DIP Secured Parties may agree (in accordance with and subject to the terms of the applicable DIP Documents), it being understood that no further approval of the Court shall be required for non-material authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents (and for any premium, fees and other expenses (including certain attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in accordance and connection therewith); provided that (i) a copy (which may be provided through electronic mail or facsimile) of the form of any such executed amendments, waivers, or other modifications to and under the DIP Documents is provided to counsel for

the DIP Agents, counsel for the Creditors' Committee (as defined below), and the U.S. Trustee five business days prior to the effectiveness of any such amendment (the "<u>Amendment Effective Date</u>"); provided that executed waivers need only be provided to counsel for the DIP Agents, counsel for the Creditors' Committee and the U.S. Trustee substantially concurrently with the effectiveness thereof, and (ii) neither the Creditors' Committee or the U.S. Trustee has filed an objection to any such executed amendment or other modification prior to the Amendment Effective Date;

(c)    the non-refundable and irrevocable payment (and the ratification of any premiums or fees paid prior to the date of entry of this Final Order, each of which is found to be reasonable and to have been paid in exchange for fair and reasonably equivalent value) of any and all premiums, fees, costs, and expenses payable pursuant to the applicable DIP Documents, including, without limitation, (a) any closing premium or fees, upfront premium or fee, exit premium or fee, prepayment premium or fee, repayment premium or fee, unused line premium or fee, ticking premium or fee, arrangement premium or fees, structuring premium or fee, duration premium or fee, commitment premium or fee, backstop premium or fee, servicing premium or fee, audit premium or fee, appraisal premium or fee, servicing premium or fee, liquidator premium or fee, agency premium or fee, or similar amounts (all of which premiums and fees shall be, and shall be deemed to have been, approved upon entry of this Final Order, and which premiums and fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, under applicable non bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations referred to in the DIP Documents (and in accordance, as applicable, with Section 9.03 of the DIP Term Loan Agreement and Section 9.03 of the DIP ABL Agreement), including all documented actual and reasonable costs, fees, expenses and disbursements of any auditors, accountants, consultants, advisors or appraisers, (collectively, each of the premiums, fees and expenses described in the foregoing clauses, the "<u>DIP Premiums, Fees, and Expenses</u>"), in each case, without the need to file retention or fee applications, and without the need to provide notice to any party or obtain further Court approval; *provided* that the DIP Premiums, Fees, and Expenses incurred after the Effective Date (as defined in the DIP Agreements) by professionals for the DIP Agents or DIP Lenders shall be subject to the review process set forth in paragraph 37 of this Final Order;

(d)    subject to the Carve Out, the granting and perfection of the DIP Liens and the Adequate Protection Liens, the granting of the DIP Superpriority Claims  and the Adequate Protection Claims (as defined below), in each case, as set forth herein and in the DIP Documents; and

(e)    the performance of all other acts necessary, required, or desirable to implement the DIP Facilities and to facilitate the transactions contemplated by the DIP Documents and this Final Order in accordance therewith and herewith.

22.     No DIP Secured Parties shall have any obligation or responsibility to monitor any

Debtor's use of the DIP Facilities, and each of the DIP Secured Parties may rely upon the DIP

Credit Parties' representations that the amount of the DIP Facilities requested at any time and the

use thereof are in accordance with the requirements of this Final Order and the DIP Documents.

**K.     DIP Obligations.**

23.     Upon execution and delivery of the DIP Documents and entry of this Final Order,

the DIP Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of

each of the DIP Credit Parties, and shall be fully enforceable against each of the DIP Credit

Parties, their estates, and any successors thereto, including, without limitation, any estate

representative or trustee appointed in any of the Cases, or any case under chapter 7 of the

Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings

superseding or relating to any of the foregoing and/or upon the dismissal of any of the Cases or

any such successor cases (collectively, the "Successor Cases"), and their creditors and other

parties in interest, in each case, in accordance with the terms thereof and this Final Order.  Upon

execution and delivery of the DIP Documents, the DIP Obligations shall include all loans, letter

of credit reimbursement obligations and any other indebtedness or obligations, contingent or

absolute, now existing or hereafter arising, which may from time to time be or become owing by

any of the DIP Credit Parties to any of the DIP Agents or DIP Lenders, in each case, under, or

secured by, and in accordance with, the DIP Documents or this Final Order, including all

principal, interest, costs, premiums, fees, expenses, and other amounts under the DIP Documents

and this Final Order, and all cash management and bank product exposure and hedging exposure

and obligations to the extent provided under the DIP Documents.   All banking service

obligations and letters of credit issued for the account of the Debtors under the ABL Credit

Agreement shall continue in place and all obligations under or in connection with such banking

20

service obligations and letters of credit are deemed to have been issued under and subject to the

DIP ABL Agreement and constitute DIP ABL Obligations, and the Debtors are authorized to

reimburse in cash any outstanding letter of credit reimbursement obligations upon entry of this

Final Order.  The DIP Credit Parties shall be jointly and severally liable for the DIP Obligations.

No obligation, payment, transfer, or grant of security under the DIP Documents or this Final

Order to the DIP Secured Parties shall be stayed, restrained, voidable, or recoverable under the

Bankruptcy Code or under any applicable law (including, without limitation, under sections 362,

502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer

Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar

state statute or common law), or subject to any defense, reduction, recoupment,

recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim,

offset, or any other challenge under the Bankruptcy Code or any applicable law.

**L.    DIP Roll Up Obligations.**

24.    Upon entry of this Final Order (a) and in accordance with the DIP Term Loan

Agreement, up to $161.8 million of loans outstanding under the Term Credit Agreement (the

"DIP Term Loan Roll Up Obligations") shall be converted into, and shall be deemed converted

into, DIP Term Loans and DIP Term Loan Obligations and shall be entitled to all the priorities,

privileges, rights, and other benefits afforded to the other DIP Term Loans and DIP Term Loan

Obligations under this Final Order and the DIP Term Loan Documents, and (b) and in

accordance with the DIP ABL Agreement, all ABL Obligations outstanding under the ABL

Credit Agreement (the "DIP ABL Roll Up Obligations") shall be converted into, and shall be

deemed converted into, DIP ABL Loans and DIP ABL Obligations and shall be entitled to all the

priorities, privileges, rights, and other benefits afforded to the other DIP ABL Loans and DIP

ABL Obligations under this Final Order and the DIP ABL Documents.  The conversion of the

DIP Term Loan Roll Up Obligations and the DIP ABL Roll Up Obligations is authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Term Lenders and the DIP ABL Lenders to fund, as applicable, (x) the "new money" portion of the DIP Term Loan Facility, and (y) the DIP ABL Facility, and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Secured Credit Obligations.  The DIP Lenders would not be willing to provide the DIP Facilities or extend credit to the Debtors thereunder without the conversion of the DIP Term Loan Roll Up Obligations and DIP ABL Roll Up Obligations as provided herein.

25.    The DIP Agents, as applicable, are hereby authorized and directed to take any and all actions as may be necessary or appropriate to effectuate the conversion of the DIP Term Loan Roll Up Obligations into the DIP Term Loan Obligations and the DIP ABL Roll Up Obligations into the DIP ABL Obligations, including but not limited to the issuance (or the facilitation of the issuance) of the DIP Term Loans or DIP ABL Loans, as applicable, in exchange for the assignment or transfer of the DIP Term Loan Roll Up Obligations and/or DIP ABL Roll Up Obligations and the eventual cancellation of the DIP Term Loan Roll Up Obligations and/or DIP ABL Roll Up Obligations converted into the DIP Obligations.  The Debtors, the DIP Lenders, and the DIP Agents are authorized to take such further actions as are necessary to implement the foregoing.

**M.    No Obligation to Extend Credit.**

26.    The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties under the applicable DIP Documents and this Final Order have been satisfied in full or waived in accordance with the terms of the applicable DIP Documents and/or this Final Order, as applicable.

N.      **DIP Liens.**

27.      Subject and subordinated to the Carve Out as set forth in this Final Order, in order

to secure the DIP Obligations, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of

the Bankruptcy Code, the DIP ABL Agent, for the benefit of itself and the DIP ABL Lenders,

and the DIP Term Loan Agent, for the benefit of itself and the DIP Term Lenders, are hereby

granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and

automatically and properly perfected postpetition security interests in and liens (collectively, the

"DIP Liens") on all real and personal property, whether now existing or hereafter arising and

wherever located, tangible and intangible, of each of the Debtors (the "DIP Collateral"),

including without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts,

accounts, other receivables (including credit card receivables), chattel paper, contract rights,

inventory (wherever located), instruments, documents, securities (whether or not marketable)

and investment property (including, without limitation, all of the issued and outstanding capital

stock or equivalents of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment

(including documents of title), goods, franchise rights, trade names, trademarks, servicemarks,

copyrights, patents, license rights, intellectual property, general intangibles (including, for the

avoidance of doubt, payment intangibles), rights to the payment of money (including, without

limitation, tax refunds and any other extraordinary payments), supporting obligations,

guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions,

indemnification rights, all present and future intercompany debt, fee interests in real property

owned by the Debtors, books and records related to the foregoing, accessions and proceeds of the

foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased

real property; (c) all proceeds of any avoidance actions brought pursuant to Chapter 5 of the

Bankruptcy Code or applicable state law equivalents (including actions brought under section

549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral) (the "Avoidance Actions Proceeds"); (d) the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of the DIP Facilities or the DIP Collateral, and are, therefore, enforceable against parties other than the DIP Agents, DIP Lenders, or the Prepetition Secured Parties) and section 550 of the Bankruptcy Code; and (e) all other DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. Subject to the DIP Documents, (i) Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement), and all products and proceeds of Term Priority Collateral, shall constitute "DIP Term Priority Collateral," and (ii) ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and Avoidance Actions Proceeds, and all products and proceeds of ABL Priority Collateral, shall constitute "DIP ABL Priority Collateral;" *provided*, that DIP Term Priority Collateral shall include Avoidance Actions Proceeds that would qualify as Term Priority Collateral.  For the avoidance of doubt, DIP Collateral does not include the Debtors' real property leases, but only the proceeds, products, and offspring of such real property leases.

28.     The DIP Liens securing the DIP ABL Obligations (the "DIP ABL Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens shall be subject to the Carve Out as set forth in this Final Order and shall otherwise be junior only to: (i) as to the DIP ABL Priority Collateral, the Permitted Prior Liens; and (ii) as to the DIP Term Priority Collateral, (A) the Permitted Prior Liens; (B) the DIP Term Loan Liens (as defined herein); (C) the Prepetition Term Loan Liens; and (D) the Term Loan Adequate Protection Liens (as defined herein).  The DIP Liens securing the DIP Term Loan Obligations

24

(the "DIP Term Loan Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Term Loan Liens shall be subject to the Carve Out and shall otherwise be junior only to: (i) as to the DIP Term Priority Collateral, the Permitted Prior Liens; and (ii) as to the DIP ABL Priority Collateral, (A) the Permitted Prior Liens; (B) the DIP ABL Liens; (C) the Prepetition ABL Liens; and (D) the ABL Adequate Protection Liens (as defined herein). Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. Notwithstanding anything to the contrary herein, the DIP ABL Liens and the ABL Adequate Protection Liens (as defined below) shall not attach to the Debtors' owned real property that was not subject to the Prepetition ABL Liens as of the Petition Date; *provided*, *however*, that the DIP ABL Liens and the ABL Adequate Protection Liens shall attach to the proceeds of such owned real property in accordance with the Prepetition Intercreditor Agreement and the priorities set forth herein.

**O.    DIP Superpriority Claims.**

29.    Subject and subordinated to the Carve Out as set forth in this Final Order, (i) the DIP ABL Agent, on behalf of itself and the DIP ABL Lenders, and (ii) the DIP Term Loan Agent, on behalf of itself and the DIP Term Lenders, are hereby granted on a final basis,

pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations.  The DIP Superpriority Claims granted to the DIP ABL Agent and the DIP Term Loan Agent shall be subject to the Prepetition Intercreditor Agreement and the same priorities set forth herein with respect to the DIP Liens.  Except as set forth herein, the DIP Superpriority Claims shall have priority over any and all other obligations, liabilities and indebtedness of each Debtor (other than the Carve Out) of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code, including, to the extent allowed under the Bankruptcy Code, any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 328, 330, 331, 364, 503(a), 503(b), 507(a) (other than 507(a)(1)), 507(b)), 546(c), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, to the extent provided under section 364(c)(1) of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Superpriority Claims.

**P.     Authorization of Use of Cash Collateral and DIP Collateral.**

30.     The Debtors are hereby authorized to use (x) the Prepetition Collateral, including Cash Collateral, during the period from the Petition Date through and including the Cash Collateral Termination Date (as defined below) and (y) the DIP Collateral, including Cash Collateral constituting proceeds of the DIP Term Loans and the DIP ABL Loans, during the period from entry of this Final Order through and including the DIP Termination Date (as defined below), in each case to: (i) fund working capital, general corporate purposes, the cost of

operating the Debtors' business during the Cases, any payments authorized by an order of this

Court, and administrative costs and expenses of the Debtors incurred in the Cases, in each case

subject to the terms of this Final Order and the budget annexed hereto as **Annex 1** (the

"Budget"); (ii) fund the Carve Out as set forth herein; (iii) fund the permitted administrative

costs of the Cases; (iv) make payments on account of the Adequate Protection Obligations, and

(v) pay the fees and expenses of the ABL Agent, the Term Loan Agent, and the DIP Agents, in

each case, in connection with the negotiation, documentation and provision of postpetition and

exit financing (whether or not such financing is consummated), each as provided herein.  All

post-petition distributions and transfers by a Debtor to any other Debtor (each, a "Debtor

Transferee") shall constitute an allowed administrative expense under sections 503(b)(1) and

507(a)(2) of the Bankruptcy Code against such Debtor Transferee in the aggregate amount of

such distribution or transfer, which administrative expense claim against such Debtor Transferee

shall be junior in all respects to the Adequate Protection Claims against such Debtor Transferee.

For the avoidance of doubt, none of the Debtors will use Cash Collateral in an amount or in a

manner or for a purpose other than those consistent with the categories set forth in the Budget

and this Final Order.  All collections and proceeds, whether from ordinary course collections,

asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be

deposited and applied as required by this Final Order.

      31.    **Budget Maintenance**.  The use of borrowings and letters of credit under the DIP

Facilities and the use of Cash Collateral shall be in accordance with the Budget, depicting on a

weekly and line item basis, (i) projected cash receipts, (ii) projected cash disbursements

(including ordinary course operating expenses, bankruptcy-related expenses (including

professional fees of the Debtors' professionals and advisors), asset sales and any other fees and

expenses relating to the DIP Documents), (iii) net cash flows, (iv) Liquidity (as defined in the DIP Documents) and (v) professional fees and disbursements with respect to the Debtors' professionals, in each case for the first thirteen (13) week period from the Effective Date (as defined in the DIP Documents), and such Budget shall be approved by, and in form and substance reasonably satisfactory to, the DIP Agents and the Required Lenders (as defined in the DIP ABL Agreement) in their sole discretion.  The Budget shall be updated by the Debtors (with the consent and/or at the reasonable request of the DIP Agents) from time to time in accordance with the DIP Documents.  Upon, and subject to, the approval of any such updated budget by the DIP Agents and the Required Lenders in their sole discretion, such supplemental budget shall constitute the then-approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; provided that unless and until the DIP Agents and the Required Lenders approve such supplemental budget in their sole discretion, the then-current Budget shall remain in effect.  No such updated, modified or supplemented budget shall be effective until so approved and once approved shall thereafter be deemed the "Budget".  A copy of any Budget (including any updated Budget or proposed Budget) shall be delivered to counsel for the Creditors' Committee and the U.S. Trustee substantially contemporaneously with the delivery of such Budget to the DIP Agents and the Debtors shall file such updated Budget with the Court if there are any material modifications.  The Debtors shall at all times comply with the Budget, subject to the variances set forth in the DIP Documents.  The Debtors shall provide to the DIP Secured Parties and the Creditors' Committee concurrently all reports and other information as required in the DIP Documents.

**Q.    Disposition of Collateral.**

32.    The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Prepetition Collateral or DIP Collateral other than in the ordinary course of

business, without (subject to the Prepetition Intercreditor Agreement) the prior written consent of

the ABL Agent, the Term Loan Agent, or the DIP Agents, as the case may be (and no such

consent shall be implied, from any action, inaction or acquiescence by the ABL Secured Parties,

the Term Loan Secured Parties, the DIP Secured Parties, or from any order of this Court), except

as otherwise provided for in the ABL Loan Documents (subject to the Prepetition Intercreditor

Agreement), the Term Loan Documents (subject to the Prepetition Intercreditor Agreement), the

DIP Documents (subject to the Prepetition Intercreditor Agreement), or otherwise ordered by the

Court.

**R.    Adequate Protection Obligations.**

33.    **Adequate Protection for ABL Secured Parties.**  Pursuant to sections 361 and

363(e) of the Bankruptcy Code, the Debtors granted pursuant to the Interim Order, and hereby

grant on a final basis, the ABL Secured Parties adequate protection of their interests in all

Prepetition ABL Collateral, including Cash Collateral, to the extent of any Diminution in Value

of the ABL Secured Parties' interests in the Prepetition ABL Collateral (including Cash

Collateral) from and after the Petition Date as follows:

(a)    **ABL Adequate Protection Claims.**    Solely to the extent of any
Diminution in Value in Prepetition ABL Collateral, the ABL Agent (on
behalf of the ABL Secured Parties) was granted pursuant to the Interim
Order and shall continue to have on a final basis allowed joint and several
superpriority claims against each of the Debtors as provided in section
507(b) of the Bankruptcy Code, with priority in payment over any and all
unsecured claims and administrative expense claims against any of the
Debtors, now existing or hereafter arising, of any kind or nature
whatsoever, including, without limitation, administrative expenses of the
kinds specified in or ordered pursuant to sections 105, 328, 330, 331,
503(b), 506(c), 507(a) (other than 507(a)(1)), 507(b), 546(c), 726 (to the
extent permitted by law), 1113, or 1114 of the Bankruptcy Code, and shall
at all times be senior to the rights of the Debtors, and any successor trustee
or any creditor, in the Cases or any subsequent proceedings under the
Bankruptcy Code (the "ABL Adequate Protection Claims"), subject and
subordinate only to the Carve Out and, (1) solely with respect to the DIP
ABL Priority Collateral, the DIP ABL Liens, and (2) solely with respect to

the DIP Term Priority Collateral, (A) the DIP Term Loan Liens, (B) the Prepetition Term Loan Liens, and (C) the Term Loan Adequate Protection Liens and the Term Loan Adequate Protection Claims.

(b)     **ABL Adequate Protection Liens.**  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the ABL Secured Parties in the Prepetition ABL Collateral against any Diminution in Value, the Debtors granted pursuant to the Interim Order and hereby grant, on a final basis, to the ABL Agent, for the benefit of the ABL Secured Parties, without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the ABL Agent of any DIP Collateral, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on all DIP Collateral (all such liens and security interest, the "ABL Adequate Protection Liens").

(c)     **Priority of ABL Adequate Protection Liens.**  The ABL Adequate Protection Liens shall be subject to the Carve Out as set forth in this Final Order and shall otherwise be junior (in order of priority) only to: (i) with respect to the DIP ABL Priority Collateral, (1) the Permitted Prior Liens; (2) the DIP ABL Liens; and (3) the Prepetition ABL Liens; and (ii) with respect to the DIP Term Priority Collateral, (1) the Permitted Prior Liens; (2) the DIP Term Loan Liens; (3) the Prepetition Term Loan Liens; (4) the Term Loan Adequate Protection Liens; (5) the DIP ABL Liens; and (6) the Prepetition ABL Liens.  The ABL Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Debtors' assets.

34.     **Additional Adequate Protection for ABL Secured Parties.**  As additional adequate protection of the ABL Secured Parties' security interests in the Prepetition ABL Collateral, including the Cash Collateral, the Debtors are authorized to provide adequate protection in the form of the following (collectively, together with the ABL Adequate Protection Claims and ABL Adequate Protection Liens, the "ABL Adequate Protection Obligations"):

(a)     **Interest and Other Amounts Due Under ABL Credit Agreement.** From and after entry of the Interim Order, the ABL Agent, on behalf of the ABL Secured Parties, shall receive, to the extent accrued and/or outstanding following entry of the Final Order, cash payment in immediately available funds, (x) promptly upon the entry of this Final Order, all accrued and unpaid amounts (whether accrued prior to or after the Petition Date) in respect of the following, and (y) thereafter, as and when due under existing arrangements or as provided herein (whichever is

earlier): all interest, fees and other amounts (other than principal), including without limitation, any letter of credit fees provided for in the ABL Credit Agreement (in each case, at the default interest rate applicable to Revolving Loans and Letter of Credit Fees (as defined in the ABL Credit Agreement) pursuant to the ABL Credit Agreement or otherwise); provided that notwithstanding anything to the contrary in the ABL Credit Agreement, the Debtors shall not be required to pay any commitment fees required to be paid pursuant to Section 2.12(a) of the ABL Credit Agreement accruing with respect to any period beginning on or after the Petition Date. In the event the value of the Prepetition ABL Collateral is determined to be less than the value of the ABL Obligations, the Debtors and all other parties in interest reserve all rights to seek to recharacterize such interest payments as principal payments. Interest and fees under the ABL Credit Agreement shall be paid on the same dates as currently required by the ABL Credit Agreement.

(b)     **Release of Prepetition Reserve.** Immediately upon the occurrence of the Effective Date (as defined in the DIP ABL Agreement) following entry of the Final Order, the ABL Agent shall release the $75 million reserve implemented on or about July 10, 2020 in full.

(c)     **Prepetition ABL Indemnity Reserve**. Immediately upon entry of the Interim Order, the Debtors were authorized and directed to pay to the ABL Agent, for the benefit of the ABL Secured Parties, $500,000 into a non-interest bearing account maintained at JPMorgan Chase Bank, N.A. (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the ABL Loan Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the ABL Agent and the ABL Lenders related to the ABL Loan Documents, the ABL Obligations, or the Prepetition ABL Liens granted to the ABL Agent, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured, and not subject to the Carve Out, by a first lien on the Prepetition ABL Indemnity Reserve and the funds therein and by a lien on the Prepetition Collateral and the DIP Collateral (subject in all respects to the Prepetition Intercreditor Agreement and this Final Order). Payments of Prepetition ABL Indemnity Obligations shall be made as and when they arise and paid with the Prepetition ABL Indemnity Reserve, without further notice to or consent from the Debtors, the Creditors' Committee, or any other parties in interest and without further order of this Court. The ABL Agent (for itself and on behalf of the ABL Secured Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations not capable of

being satisfied from application of the funds on deposit in the Prepetition ABL Indemnity Reserve.  The Prepetition ABL Indemnity Reserve shall be released at such time as the ABL Obligations are Paid in Full.[6]

35.    **Adequate Protection for Term Loan Secured Parties.**  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors granted pursuant to the Interim Order, and hereby grant on a final basis, the Term Loan Secured Parties adequate protection of their interests in all Prepetition Term Loan Collateral, to the extent of any Diminution in Value of the Term Loan Secured Parties' interests in the Prepetition Term Loan Collateral from and after the Petition Date as follows:

(a)    **Term Loan Adequate Protection Claims.**  Solely to the extent of any Diminution in Value in Prepetition Term Loan Collateral, the Term Loan Agent (on behalf of the Term Loan Secured Parties) was granted pursuant to the Interim Order and shall continue to have on a final basis an allowed joint and several superpriority claim against each of the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against any of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a) (other than 507(a)(1)), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility; *provided* that upon receipt by the Term Loan Lenders of the consideration set forth in the Restructuring Support Agreement, the Term Loan Obligations shall be deemed Paid in Full.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition Secured Credit Obligations (i) the Challenge Period (as defined in this Final Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Period, upon the final, non-appealable disposition of such Challenge; (c) with respect to the DIP ABL Obligations and the ABL Obligations, the ABL Agent and the DIP ABL Agent have received (i) a countersigned payoff letter in form and substance satisfactory to each Agent and (ii) releases in form and substance satisfactory to each Agent, each in its sole discretion; and (d) with respect to the Term Loan Obligations, the Term Loan Lenders have received the consideration set forth in the Restructuring Support Agreement. "Payment in Full" has a meaning correlative thereto.

be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Cases or any Successor Cases (the "Term Loan Adequate Protection Claims" and, together with the ABL Adequate Protection Claims, the "Adequate Protection Claims"), subject and subordinate only to the Carve Out and (1) solely with respect to the DIP Term Priority Collateral, the DIP Term Liens, and (2) solely with respect to the DIP ABL Priority Collateral, (A) the DIP ABL Liens, (B) the Prepetition ABL Liens, and (C) the ABL Adequate Protection Liens and ABL Adequate Protection Claims.

(b)     **Term Loan Adequate Protection Liens.**  As security for and solely to the extent of any Diminution in Value, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Term Loan Agent of any DIP Collateral (as defined below), the following security interests and liens (all such liens and security interests, the "Term Loan Adequate Protection Liens" and, together with the ABL Adequate Protection Liens, the "Adequate Protection Liens" and the Term Loan Adequate Protection Liens together with the Term Loan Adequate Protection Claims, the "Term Loan Adequate Protection Obligations") were granted pursuant to the Interim Order and are hereby granted on a final basis to the Term Loan Agent for the benefit of itself and the other Term Loan Secured Parties, subject and subordinate to the Carve Out.

(i)     **Liens Junior to Certain Existing Liens.**     Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority replacement lien on, and security interest in, ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement), that is subject to (x) the DIP ABL Liens, the Prepetition ABL Liens and the ABL Adequate Protection Liens, (y) the Prepetition Term Loan Liens, and (z) the Permitted Prior Liens; *provided* that the foregoing collateral shall not include assets or property (other than Prepetition Collateral, including Cash Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien would constitute a default or event of default under any of the Debtors' contracts or leases (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable nonbankruptcy law), but shall only include the proceeds thereof.

(ii)     **Liens Senior to Certain Existing Liens.**     Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, the Term Priority

Collateral (as defined in the Prepetition Intercreditor Agreement and including, without limitation, all products and proceeds of Term Priority Collateral); *provided* that such liens and security interests shall not prime (x) the Prepetition Term Loan Liens or (y) the Permitted Prior Liens; *provided further* that the foregoing collateral shall not include assets or property (other than Prepetition Collateral, including Cash Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien would constitute a default or event of default under any of the Debtors' contracts or leases (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable nonbankruptcy law), but shall include the proceeds thereof.

(iii)     **Additional Adequate Protection Liens**. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, (i) a valid, binding, enforceable, fully-perfected non-voidable first-priority lien on, and security interest in any unencumbered tangible and intangible, prepetition and postpetition real and personal property of each Debtor that would qualify as Term Priority Collateral, (ii) a valid, binding, enforceable, fully-perfected non-voidable junior lien on, and security interest in any unencumbered tangible and intangible, prepetition and postpetition real and personal property of each Debtor that would qualify as ABL Priority Collateral, in each case, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, (iii) the proceeds from any sale, termination, or other disposition of any leasehold interests of the Debtors (but not to the leasehold interests themselves); and (iv) a valid, binding, enforceable, fully-perfected non-avoidance junior lien on, and security interest in, any proceeds of Avoidance Actions (*provided* that the Term Loan Adequate Protection Liens shall be senior to the ABL Adequate Protection Liens on proceeds of Avoidance Actions that would qualify as Term Priority Collateral) and the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code.

(iv)     **Status of the Term Loan Adequate Protection Liens.** The Term Loan Adequate Protection Liens shall not be (x) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any lien or security interest arising after the Petition Date, subject and subordinate to the Carve Out, or (y) except as otherwise set forth in clauses (i), (ii) and (iii) of this paragraph 35(b), subordinated to or made *pari passu* with any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise.

36.    **Additional Adequate Protection for Prepetition Secured Parties.**    As additional adequate protection of the Prepetition Secured Parties' security interests in the Prepetition Collateral, including Cash Collateral (the following adequate protections, together with the Term Loan Adequate Protection Obligations and the ABL Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>"):

    (a)    **Fees and Expenses**.  The Debtors are authorized and directed to pay the reasonable and documented invoiced out-of-pocket fees, costs and expenses incurred in connection with the Cases, whether incurred prepetition or postpetition, and in each case, subject to the review procedures set forth in paragraph 37 of this Final Order of: (i)(x) Morgan, Lewis & Bockius LLP, (y) Hunton Andrews Kurth LLP, and (z) Berkeley Research Group (collectively, the "<u>ABL Advisors</u>"), in each case incurred on behalf of the ABL Agent and ABL Lenders in connection with the Cases; (ii)(x) Milbank LLP, (y) one local counsel in the United States and one local counsel in Luxembourg, and (z) Greenhill & Co., LLC (collectively, the "<u>Ad Hoc Term Loan Advisors</u>" and, together with the ABL Advisors, the "<u>Lender Advisors</u>"); (iii) Latham & Watkins LLP and one local counsel in the Eastern District of Virginia incurred on behalf of the Term Loan Agent; and (iv) Holland and Knight LLP and one local counsel in the Eastern District of Virginia incurred on behalf of Alter Domus (US) LLC, in its capacity as incremental collateral agent (in such capacity, the "<u>Incremental Collateral Agent</u>" and together with the Term Loan Agent, the "<u>Term Loan Agents</u>") under that certain Conditional Assignment Agreement, dated as of July 23, 2020, by and between AnnTaylor Loft GP Lux S.à.rl, AnnTaylor Loft Borrower Lux SCS, and the Incremental Collateral Agent (the "<u>Conditional Assignment Agreement</u>") and (v) (x) King & Spalding LLP and (y) McGuireWoods LLP, each as counsel to certain Term Loan Lenders, in each case solely through and including the closing date of the DIP Term Loan Agreement. Hereafter, the Ad Hoc Term Loan Advisors, together with the advisors in the foregoing clauses (iii), (iv) and (v), may be referred to collectively as the "<u>Term Loan Advisors</u>."

    (b)    **Reporting; Budget Approval**.  The Debtors shall comply with the reporting requirements set forth in the DIP Documents, all of which reports shall be provided to the Lender Advisors and the Creditors' Committee concurrently.  In addition, the Debtors shall provide the following additional reporting to the ABL Agent, the Lender Advisors, and the Creditors' Committee concurrently:

    (i)    Commencing the third week following the Petition Date, and tested weekly on a rolling four (4)-week basis (such four (4)-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (as defined below), the "<u>Variance Testing Period</u>"), solely to the extent that

(a) Availability (as defined in the ABL Credit Agreement) plus (b) unrestricted cash and cash equivalents of Ascena Retail Group, Inc. and its restricted subsidiaries that would be reflected on a consolidated balance sheet of Ascena Retail Group, Inc. in accordance with GAAP on such date (other than cash proceeds of any indebtedness being incurred on such date) plus (c) cash and cash equivalents of Ascena Retail Group, Inc. and its restricted subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the ABL Credit Agreement) to the extent duplicative) that are restricted in favor of the ABL Agent (collectively "Liquidity"), is less than $150,000,000, there shall not be any negative variance between the actual net cash flows of the Loan Parties (as defined in the Prepetition Secured Credit Documents) for any Variance Testing Period and the amount described in the line item contained in the Budget (as may be updated pursuant to paragraph 31 of this Final Order) across from the heading "Unlevered Operating Cash Flow, Including Restructuring" during the Variance Testing Period to be greater than 20%.

(ii)     an updated budget immediately upon approval in accordance with paragraph 31, consistent with the form and level of detail set forth in the initial Budget, including the same line-items provided with the initial Budget;

(iii)    no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the ABL Agent and the Consenting Stakeholders in their sole discretion) (a) commencing on the date that is the third Thursday following the Petition Date, a line-item by line-item report setting forth for each line item in the Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Petition Date a report setting forth (i) the Liquidity as of the Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and cash equivalents as of the Friday of the most recently ended calendar week of all non-Debtor subsidiaries on deposit in or credited to any account maintained by such non-Debtor subsidiaries; and

(iv)     no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the ABL Agent and Required Consenting Stakeholders in their sole discretion) of each calendar week commencing on the date that is the third Thursday following the Petition Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by

line-item variance report (each, a "Variance Report"), reasonably acceptable to the ABL Agent and the Required Consenting Stakeholders in their sole discretion, setting forth, in reasonable detail:  (x) any variances between actual amounts for each line item in the Budget for the Variance Testing Period versus projected amounts set forth in the applicable Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Budget that was in effect in respect of each relevant week at the time) and (y) the computations necessary to determine compliance with paragraph 31 and clause (f) of Annex 2, together with a statement from a financial officer of the Parent Borrower certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in actual operating disbursements during the Variance Testing Period (unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the then-approved Budget.

37.    **DIP, ABL and Term Loan Fees and Expenses**.  Payment of all reasonable and out-of-pocket fees and expenses provided for herein for the DIP Agents, DIP Lenders and as adequate protection to the Prepetition Secured Parties (including, without limitation, the fees and expenses of the ABL Advisors and the Term Loan Advisors) shall be subject to the following procedures:  (i) such fees and expenses shall be invoiced and such invoices provided to counsel to the Debtors and the U.S. Trustee (the "Fee Notice Parties"); (ii) such invoices shall not be required to comply with the U.S. Trustee guidelines and the payment of fees and expenses pursuant to such invoices shall not be subject to the filing of fee or administrative expense applications with the Court; (iii) such invoices may be in summary form only and shall not be required to contain time entries; (iv) time entries, if any, included in such invoices may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential,

privileged, or otherwise protected information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, any benefits of the attorney work product doctrine, or any other applicable protection; (v) time detail for such invoices shall be provided to the U.S. Trustee and the Creditors' Committee upon reasonable request, subject to the immediately preceding clause (iv); (vi) if no objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten (10) days after delivery of such invoices (the "<u>Fee Objection Period</u>"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be paid by the Debtors as soon as is reasonably practicable; and (vii) if an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the undisputed portion shall be promptly paid by the Debtors and the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court.  Notwithstanding the foregoing, the Debtors were authorized and directed pursuant to the Interim Order, and are hereby authorized and directed on a final basis, to pay: (i) upon entry of the Interim Order, all reasonable and documented fees, costs, and out of pocket expenses of (a) the ABL Agent (including the ABL Advisors and any outstanding invoices of prior counsel to the ABL Agent incurred in connection with the ABL Credit Agreement) and (b) the Term Loan Advisors and the Term Loan Agent, in each case, incurred on or prior to entry of the Interim Order without the need for any such party to first deliver a copy of its invoice as provided for herein, (ii) all reasonable and documented fees, costs, and out-of-pocket expenses of the ABL Agent in connection with the negotiation, documentation and provision of any postposition or exit financing (whether or not consummated), and (iii) all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Agents, the DIP

Lenders and the Backstop Lenders (as defined in the DIP Term Loan Agreement) in connection

with the negotiation, documentation and provision of the DIP Facilities, and, as applicable, all

fees, premiums, and other amounts payable in connection therewith, including with respect to

that certain Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility

Backstop Commitment Letter, dated as of July 23, 2020 (the "Backstop Commitment Letter"),

by and among Ascena Retail Group, Inc. and the Backstop Lenders; provided that the reasonable

and documented fees and expenses of King & Spalding LLP and McGuireWoods LLP shall be

limited to fees and expenses incurred on and through the closing date of the DIP Term Loan

Agreement.  Notwithstanding anything herein to the contrary, payments of any amounts set forth

in this paragraph 37 shall not be subject to recharacterization, subordination, or disgorgement,

unless expressly provided herein.

**S.    Carve Out.**

38.    Carve Out.  As used in this Final Order, the "Carve Out" means the sum of (i) all

fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee

under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate

(without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to

$200,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to

the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim

order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional

Fees"), other than any restructuring, sale, success, or other transaction fee of any investment

bankers or financial advisors of the Debtors of the Creditors' Committee,[7] incurred by persons or

---

[7]    Any fee due and payable upon consummation of a transaction shall be payable solely from the proceeds
received by the Debtors resulting from such transaction, and provided that the terms and amount of any such fees
shall have been disclosed to the Prepetition Agents and the DIP Agents in writing reasonably promptly after the
same are agreed to by the Debtors, such fees shall be paid free and clear of the liens of the Prepetition Agents and
the DIP Agents.

firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee (including, without limitation, the reasonable out-of-pocket costs and expenses incurred by members of the Creditors' Committee in their capacities as such) appointed pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agents or Prepetition Agents of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $5,000,000 incurred after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition Agents or the DIP Agents, as applicable, to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of a Cash Collateral Termination Event and upon termination of the Debtors' right to use Cash Collateral by the Prepetition Secured Parties or following the occurrence and during the continuation of an DIP Termination Event and acceleration of the DIP Obligations under the DIP Facilities, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

39.    _Delivery of Weekly Fee Statements_.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a

good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the Prepetition Agents and the DIP Agents).  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 40 below.  Solely as it relates to the DIP ABL Agent and the

41

DIP ABL Lenders, any deemed draw and borrowing pursuant to paragraph 40 for amounts under paragraph 38(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in the Weekly Statements timely received by the Debtors prior to the Termination Declaration Date, *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "ABL Professional Fee Carve Out Cap").  For the avoidance of doubt, the DIP ABL Agent and DIP ABL Lenders shall be entitled to maintain at all times a reserve (the "ABL Carve-Out Reserve") in an amount (the "ABL Carve-Out Reserve Amount") equal to the sum of (I) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (II) the Post-Carve Out Trigger Notice Cap, plus (III) the amounts contemplated under (i) and (ii) of paragraph 38 above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "Budgeted Cushion Amount").  In addition, the DIP ABL Agent shall be entitled to maintain a reserve in the amount of a reasonable estimate of other amounts that may be included in the Carve Out or may be payable from any proceeds of a transaction (as described in the footnote set forth above), including amounts which are or may become payable to any investment bankers or

financial advisors of the Debtors or the Creditors' Committee.  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Petition Date, the Debtors shall deliver to the DIP Agents and the Prepetition Agents a report setting forth the ABL Carve-Out Reserve Amount as of such time, and, in setting the ABL Carve-Out Reserve, the DIP ABL Agent shall be entitled to rely upon such reports. Prior to the delivery of the first report setting forth the ABL Carve-Out Reserve Amount, the DIP ABL Agent shall calculate the ABL Carve-Out Reserve Amount by reference to the Budget for subsection (I) of the ABL Carve-Out Reserve Amount.

40.    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the Prepetition Agents or the DIP Agents to the Debtors, with a copy to their lead restructuring counsel, and to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors for DIP ABL Loans under the DIP ABL Agreement in an amount equal to the sum of (x) the amounts set forth in paragraphs 38(i) and 38(ii) above, and (y) the then unpaid amounts of the Professional Fees up to the ABL Professional Fee Carve Out Cap (and such amounts actually advanced shall constitute DIP ABL Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs 38(i) and 38(ii) above, and then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP ABL Loans pursuant to the foregoing clauses (i) and (ii) of this sentence of paragraph 40).  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other

claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for DIP ABL Loans under the DIP ABL Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP ABL Loans) and shall also constitute a demand to the Debtors to utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar-for-dollar basis, the draw requests and applicable DIP ABL Loans and DIP Term Loans pursuant to the foregoing clauses (x) and (y) of this sentence of this paragraph 40).  The Debtor shall deposit and hold such amounts in a segregated account at the DIP ABL Agent in trust to pay such Allowed Professional Fees benefitting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day following the Termination Declaration Date and the deemed requests for the making of DIP ABL Loans as provided in this paragraph 40,  notwithstanding anything in the DIP ABL Agreement to the contrary, including with respect to (1) the existence of a Default (as defined in the DIP ABL Agreement) or Event of Default, (2) the failure of the Debtors to satisfy any or all of the conditions precedent for the making of any DIP ABL Loan under the DIP ABL Agreement (3) any termination of the DIP ABL Loan Commitments following an Event of Default, or (4) the occurrence of the Maturity Date, each DIP ABL Lender with an outstanding Commitment shall make available to the DIP ABL Agent such DIP ABL Lender's pro rata share of such DIP ABL Loans.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth in

paragraph 38 above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the

Post-Carve Out Trigger Notice Cap, until paid in full.  If after payment in full of the Pre-Carve

Out Amounts the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to

clause (c) below, all remaining funds shall be distributed ratably (based on the proportion of the

Pre-Carve Out Trigger Notice Reserve funded by or from the DIP ABL Priority Collateral or the

DIP Term Priority Collateral, respectively) to: (i) the DIP ABL Agent on behalf of the DIP ABL

Lenders unless the DIP ABL Obligations have been Paid in Full, and (ii) the DIP Term Loan

Agent on behalf of the DIP Term Lenders, each in accordance with their rights and priorities

under this Final Order, with any excess paid to the Debtors' other creditors.

(a)     All funds in the Post-Carve Out Trigger Notice Reserve (other than up to $500,000, which may be used to pay Pre-Carve Out Amounts to the extent they exceed the ABL Professional Fee Carve Out Cap) shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts").  If after payment in full of the Post-Carve Out Amounts, the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (c) below, all remaining funds shall be distributed ratably (based on the proportion of the Post-Carve Out Trigger Notice Reserve funded by or from the DIP ABL Priority Collateral or the DIP Term Priority Collateral, respectively) to: (i) the DIP ABL Agent on behalf of the DIP ABL Lenders unless the DIP ABL Obligations have been Paid in Full, and (ii) to the DIP Term Loan Agent on behalf of the DIP Term Lender, each in accordance with their rights and priorities under this Final Order, with any excess paid to the Debtors' other creditors.

(b)     Notwithstanding anything to the contrary in the DIP Documents or this Final Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph 40, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, to the extent of any shortfall in funding prior to making any payments to the DIP ABL Agent or the DIP Term Loan Agent, as applicable.

(c)     Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in this paragraph 40.

(d)    Notwithstanding anything to the contrary in this Final Order, (1) disbursements by the Debtors from the Carve Out Reserve shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (2) subject to the limitations with respect to the DIP ABL Agent and the DIP ABL Lenders set forth in paragraph 39 with respect to the ABL Professional Fee Carve Out Cap above, in no way shall any Budget, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable to the Debtors (which includes, for the avoidance of doubt, the Allowed Professional Fee of the Committee Professionals). For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order or the DIP Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facilities, Prepetition Collateral, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or Prepetition Secured Credit Obligations.

41.    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

42.    <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases. Nothing in this Final Order or otherwise shall be construed to obligate the DIP Secured Parties or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

43.    <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has

been exhausted.   Any payment or reimbursement made on or after the occurrence of the

Termination Declaration Date in respect of any Allowed Professional Fees shall permanently

reduce the Carve Out on a dollar-for-dollar basis.   Any funding of the Carve Out shall be added

to, and made a part of, the DIP Obligations secured by the DIP Collateral and hall be otherwise

entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy

Code and applicable law.

**T.     Indemnification.**

44.     The Debtors shall indemnify and hold harmless the DIP Agents and the DIP

Lenders in accordance with the terms and conditions of the DIP Agreements.   Upon the earlier

of (a) the DIP ABL Obligations being paid in cash in full or (b) conclusion of the DIP

Remedies Notice Period, the Debtors shall pay $500,000 from proceeds of the DIP Collateral

into an indemnity account (the "DIP ABL Indemnity Account") subject to first priority liens

of the DIP ABL Agent (and not subject to the Carve Out), for the benefit of the DIP ABL

Lenders.   The DIP ABL Indemnity Account shall be released and the funds applied in

accordance with this Final Order upon the DIP ABL Obligations being Paid in Full.

**U.     Continuing Effect of the Prepetition Intercreditor Agreement.**

45.     Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor

Agreement, and any other applicable intercreditor or subordination provisions contained in any

of the Prepetition Secured Credit Documents, (i) shall remain in full force and effect, and

(ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured

Parties and DIP Secured Parties (including, for the avoidance of doubt, with respect to the

Adequate Protection Liens, DIP Collateral, and DIP Liens).   Notwithstanding anything to the

contrary set forth in the Prepetition Intercreditor Agreement, the Interim Order or this Final

Order (i) the DIP Secured Parties shall be bound by and subject to the Prepetition Intercreditor

Agreement to the same extent as the Prepetition Secured Parties and (ii) the DIP Obligations shall be deemed to be Prepetition Secured Credit Obligations (as applicable) solely for purposes of determining the rights and obligations of the DIP Secured Parties and the Prepetition Secured Parties.

**V.      Joint and Several Liability.**

46.      Nothing in this Final Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Final Order.

**W.      DIP and Cash Collateral Termination.**

47.      Subject to the procedures set forth in this section W, including the Remedies Notice Period, the Debtors' right to use the Cash Collateral pursuant to this Final Order shall terminate (the date of any such termination, the "Cash Collateral Termination Date") on the occurrence and continuation of any of the termination events set forth in Annex 2 attached hereto (each, a "Cash Collateral Termination Event"), unless waived in writing by the ABL Agent and the Term Loan Agent.

48.      The occurrence and continuance of any "Event of Default" under and as defined in the DIP Term Loan Agreement or the DIP ABL Agreement (including, without limitation, the failure of the Debtors to comply with the Required Milestones set forth in Annex 5 hereto) shall constitute a "DIP Termination Event" under this Final Order (each a "DIP Termination Event," and the date upon which such DIP Termination Event occurs, the "DIP Termination Date"), unless waived in accordance with the terms of the DIP Agreements (as applicable).

49.      Immediately upon the occurrence and during the continuation of a DIP Termination Event, notwithstanding the provisions of section 362 of the Bankruptcy Code,

without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Final Order (and the Remedies Notice Period (as defined below)), each of the DIP Agents and the Prepetition Agents may, upon notice to counsel to the Debtors, counsel to the Creditors' Committee, counsel to the DIP Agents, and counsel to the Prepetition Agents (the date of delivery of such notice, the "DIP Termination Declaration Date"), subject to the Prepetition Intercreditor Agreement: (i) declare all DIP Obligations under the applicable DIP Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Credit Parties under the respective DIP Facility (to the extent any such commitment remains); (iii) terminate the respective DIP Facility and the respective DIP Documents as to any future liability or obligation thereunder, but without affecting and of the DIP Liens or the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Final Order and the DIP Documents to use any DIP Term Priority Collateral (if such notice is delivered by the DIP Term Loan Agent and/or the Term Loan Agent) or DIP ABL Priority Collateral (if such notice is delivered by the DIP ABL Agent and/or the ABL Agent); (v) charge interest at the default rate under the applicable DIP Facility; (vi) enforce any and all rights against the DIP Collateral; and (vii) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Documents, or applicable law.

50.    Immediately upon the occurrence and during the continuation of a Cash Collateral Termination Event, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Final Order (and the Remedies Notice Period (as defined below)), the Prepetition Agents may, as applicable, declare (any such declaration shall, upon delivery by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Creditors'

Committee, the ABL Agent or the Term Loan Agents (as applicable), the U.S. Trustee, and counsel to the DIP Term Loan Agent be referred to herein as a "Cash Collateral Termination Declaration") (a) all ABL Obligations owing under the ABL Loan Documents to be immediately due and payable, (b) all Term Loan Obligations owing under the Term Loan Documents to be immediately due and payable, (c) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice, and (d) a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral; *provided*, *however*, that subparagraph (d) shall only apply to the Term Priority Collateral if the Termination Declaration is delivered by the Term Loan Agent.

51.     The automatic stay in the Cases otherwise applicable to the DIP Secured Parties and/or the Prepetition Secured Parties is hereby modified so that five (5) business days after the DIP Termination Declaration Date or Cash Collateral Termination Date, as applicable (the "Remedies Notice Period"), the DIP Secured Parties and/or the Prepetition Secured Parties shall be entitled to exercise all of their rights and remedies in accordance with the Prepetition Intercreditor Agreement, the DIP Documents, the Prepetition Secured Credit Documents and this Final Order to satisfy the DIP Obligations and the Prepetition Secured Credit Obligations. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing, object to the termination of the consensual use of Cash Collateral on any basis, to contest whether a DIP Termination Event has occurred, seek entry of an order authorizing use of Cash Collateral on a non-consensual basis, seek authority to repay the applicable DIP Obligations, and use Cash Collateral (i) solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget or with the consent of the DIP Agents and the Prepetition Agents,

and (ii) to fund the Carve Out Reserves (as applicable).  Unless the Court orders otherwise, the automatic stay shall automatically be terminated as to the DIP Secured Parties and the Prepetition Secured Parties at the end of the DIP Remedies Notice Period without further notice or order.

52.    Upon expiration of the DIP Remedies Notice Period, the DIP Secured Parties and/or the Prepetition Secured Parties, subject to the Prepetition Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition Collateral and DIP Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Prepetition Collateral and DIP Collateral, *provided*, *however*, in the case of clause (b), the DIP Secured Parties and/or the Prepetition Secured Parties can only enter upon a leased premises after a DIP Termination Event in accordance with (i) a separate written agreement by and between the DIP Secured Parties and/or the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the DIP Secured Parties and/or the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) written consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable DIP Secured Parties and/or the Prepetition Secured Parties on such notice to the landlord as shall be required by this Court; *provided*, *however*, solely with respect to rent due to a landlord of any such leased premises, the DIP Secured Parties and/or the Prepetition Secured Parties, as applicable, shall be obligated only to reimburse the Debtors for the payment of rent of the Debtors that first accrues after the DIP Termination Declaration Date in accordance with paragraph 49 herein that is payable during the period of such occupancy by the DIP Secured Parties and/or the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis;

*provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to

section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to the DIP

Termination Declaration Date through and including any assumption and/or rejection of any

lease.   Nothing herein shall require the DIP Secured Parties and/or the Prepetition Secured

Parties to assume any lease as a condition to the rights afforded in this paragraph.

53.   Subject to the Prepetition Intercreditor Agreement, unless the DIP Agents and

Prepetition Agents have each provided their respective prior written consent, or all DIP

Obligations and Prepetition Secured Credit Obligations (excluding contingent indemnification

obligations for which no claim has been asserted) have been Paid in Full, in any of these Cases

or any Successor Cases, the Debtors shall neither seek entry of, nor support any motion or

application seeking entry of, and otherwise shall object to any motion or application seeking

entry of, any order (including any order confirming any plan of reorganization or liquidation)

that authorizes any of the following:  (i) the obtaining of credit or the incurring of indebtedness

that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of

the DIP Collateral and/or that is entitled to administrative priority status, in each case that is

superior to or *pari passu* with the DIP Liens, Prepetition Liens, the Adequate Protection Liens,

and/or the Adequate Protection Claims except as expressly set forth in this Final Order; (ii) the

use of Cash Collateral for any purpose other than as permitted in this Final Order; (iii) the return

of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account

of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff

or recoupment against any of its prepetition indebtedness based upon any such return of goods

pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of

the DIP Secured Parties' or the Prepetition Secured Parties' rights under this Final Order, the

DIP Documents, the ABL Loan Documents, or the Term Loan Documents with respect any DIP Obligations, ABL Obligations or Term Loan Obligations.  It shall be a DIP Termination Event under this Final Order if, in any of these Cases or any Successor Cases, the Debtors take or fail to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

54.    No Debtor shall object to any DIP Secured Parties or Prepetition Secured Parties credit bidding up to the full amount of the applicable outstanding DIP Obligations or Prepetition Secured Credit Obligations and Adequate Protection Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral or DIP Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

55.    So long as there are any DIP Term Loan Obligations outstanding, with respect to DIP Term Priority Collateral that is secured by DIP Term Loan Liens that in accordance with this Final Order are senior to all liens held by Prepetition Secured Parties with respect to such Collateral, then with respect to such DIP Term Priority Collateral, such Prepetition Secured Parties shall, other than as provided for in the Prepetition Intercreditor Agreement:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Secured Credit Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Term Priority Collateral, including in connection with the Adequate Protection Liens except to the extent required by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Term Priority Collateral or proceeds thereof (until

Payment in Full in cash of all DIP Term Loan Obligations), to the extent such transfer, disposition, sale, or release is authorized under the applicable DIP Term Loan Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Term Priority Collateral unless, solely as to this clause (iii), any of the applicable DIP Term Loan Secured Parties have filed financing statements or other documents in respect of the liens granted pursuant to this Final Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date.

**X.      DIP Premiums, Fees, and Expenses.**

56.      The DIP Credit Parties are authorized to pay, in cash and on a current basis, all DIP Premiums, Fees, and Expenses, as and when due under the DIP Documents and this Final Order, and any prior payments of any such DIP Premiums, Fees, and Expenses is expressly approved and ratified, whether or not the transactions contemplated hereby are consummated, whether incurred or paid prior to, on, or after the Petition Date, and whether or not contained in the Budget and without limitation with respect to the dollar estimates contained in the Budget; *provided* that overages shall not weigh against the DIP Credit Parties in any variance testing related to compliance with the Budget.  Payment of all DIP Premiums, Fees, and Expenses shall not be subject to further review or allowance by the Court.

**Y.      No Marshaling.**

57.      Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, DIP Obligations, or the Prepetition Collateral, as the case may be, and any proceeds of the DIP Collateral or Prepetition Collateral shall be received and applied pursuant to

this Final Order, notwithstanding any other agreement or provision to the contrary; *provided, however*, that notwithstanding anything herein or in the DIP Documents to the contrary, the DIP Lenders and the Prepetition Secured Parties shall use commercially reasonable efforts to satisfy their applicable DIP Liens, Adequate Protection Liens and Adequate Protection Claims granted by this Final Order, if any, from proceeds of the DIP Collateral other than assets that were unencumbered as of the Petition Date (including Avoidance Action Proceeds) before satisfying such liens and claims from such unencumbered assets.

**Z.      Limitation on Charging Expenses Against Collateral.**

58.      Upon entry of this Final Order, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases at any time shall be charged against the DIP Secured Parties or the DIP Collateral, the Prepetition Secured Parties, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the requisite DIP Secured Parties or the affected Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

**AA.    Payments Free and Clear.**

59.      Subject and subordinate to the Carve Out, any and all payments or proceeds remitted to the Prepetition Secured Parties pursuant to the provisions of this Final Order or any subsequent order of this Court shall be irrevocable (subject to section GG of this Final Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

**BB.    Section 552(b) of the Bankruptcy Code.**

60.    Upon entry of this Final Order, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties.

**CC.    Reservation of Rights of the Prepetition Secured Parties.**

61.    Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant hereto is without prejudice to the right of the Prepetition Secured Parties to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties under the Prepetition Secured Credit Documents, the Prepetition Intercreditor Agreement, or under equity or law, and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the Prepetition Secured Credit Documents and/or equity or law in connection with all Events of Default (as defined in each applicable document, and whether arising prior to or after the Petition Date).

**DD.    Debtors' Reservation of Rights.**

62.    Notwithstanding anything to the contrary in this Final Order, the entry of this Final Order and the grant of adequate protection to the Prepetition Secured Parties pursuant to the terms hereof shall be without prejudice to the rights of the Debtors to, following the occurrence of the Cash Collateral Termination Date, seek authority (at any time) to use Cash Collateral and the Prepetition Collateral without the consent of the Prepetition Secured Parties,

and the Prepetition Secured Parties reserve all of their respective rights with respect to contesting any such motion or request by the Debtors or any other person.

**EE.    Perfection of DIP Liens and Adequate Protection Liens.**

63.    The automatic stay under section 362 of the Bankruptcy Code is hereby deemed modified and vacated to the extent necessary to permit the granting and perfection of the DIP Liens and the Adequate Protection Liens.  The ABL Agent, the Term Loan Agent, and the DIP Agents, are each hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted to it hereunder.  Whether or not the ABL Agent, the Term Loan Agent, or the DIP Agents shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of entry of this Final Order.  If the ABL Agent, the Term Loan Agent, or the DIP Agents determine to file any financing statements, notice of liens, or similar instruments, the Debtors will cooperate and assist in any such filings as reasonably requested by the ABL Agent, the Term Loan Agent, or the DIP Agents, as applicable, and the automatic stay shall be modified to allow such filings.

64.    A certified copy of this Final Order may, in the discretion of the ABL Agent, the Term Loan Agent, or the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and recording; *provided* that the Debtors shall reimburse the

ABL Agent, the Term Loan Agent, or the DIP Agents, or their respective designees for the payment of any stamp, intangibles, recording, or similar tax.

**FF. Preservation of Rights Granted Under this Final Order.**

65. Except as expressly provided in this Final Order (including with respect to the Carve Out), no claim or lien having a priority senior to or *pari passu* with those granted by this Final Order to the ABL Agent, the Term Loan Agent, the Prepetition Secured Parties, the DIP Agents, and the DIP Secured Parties shall be granted or allowed, and the Adequate Protection Liens and DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise (other than the Carve Out).

66. Notwithstanding any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, (x) the Adequate Protection Claims, the DIP Superpriority Claims, the other administrative claims granted pursuant to this Final Order and the Adequate Protection Liens and DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Adequate Protection Obligations and DIP Obligations shall have been Paid in Full in cash (and such Adequate Protection Claims, DIP Superpriority Claims, and the other administrative claims granted pursuant to this Final Order and the Adequate Protection Liens and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

67. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification, or vacatur shall not affect: (i) the validity,

priority, or enforceability of any Adequate Protection Obligations or DIP Obligations incurred

prior to the actual receipt of written notice by the ABL Agent, the Term Loan Agent, or the DIP

Agents of the effective date of such reversal, stay, modification, or vacatur; or (ii) the validity,

priority, or enforceability of the Adequate Protection Liens or DIP Liens.  Notwithstanding any

such reversal, stay, modification, or vacatur, any use of the Prepetition Collateral or any

Adequate Protection Obligations or DIP Obligations incurred by the Debtors hereunder prior to

the actual receipt of written notice by the Prepetition Agents of the effective date of such

reversal, stay, modification, or vacatur, shall be governed in all respects by the original

provisions of this Final Order, and the Prepetition Secured Parties and DIP Secured Parties shall

be entitled to all of the rights, remedies, privileges, and benefits granted in section 363(m) of the

Bankruptcy Code.

68.     Subject to section GG of this Final Order, the adequate protection payments made

pursuant to this Final Order shall not be subject to counterclaim, setoff, subordination,

recharacterization, defense, or avoidance in the Cases or any Successor Cases (other than a

defense that the payment has actually been made).

69.     Except as expressly provided in this Final Order, the Adequate Protection

Obligations, the Adequate Protection Claims, the Adequate Protection Liens, the DIP

Superpriority Claims, the DIP Liens and all other rights and remedies of the Prepetition Secured

Parties and DIP Secured Parties granted by the provisions of this Final Order shall survive, and

shall not be modified, impaired or discharged by (i) the entry of an order converting any of the

Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any

other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of

the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived

any discharge as to any remaining Adequate Protection Obligations and DIP Obligations. The terms and provisions of this Final Order shall continue in the Cases and in any Successor Cases, and the Adequate Protection Liens, the Adequate Protection Claims, DIP Superpriority Claims, DIP Liens, and the other administrative claims granted pursuant to this Final Order, and all other rights and remedies of the Prepetition Secured Parties and DIP Secured Parties granted by this Final Order shall continue in full force and effect until all Adequate Protection Obligations and DIP Obligations are indefeasibly Paid in Full in cash. The survival of this Final Order and all provisions thereof pertaining to the ABL Secured Parties and DIP ABL Secured Parties and their respective claims, liens, and interests shall not be impaired in any manner whatsoever whether or not the Global Settlement is approved and/or becomes effective.

**GG.    Effect of Stipulations on Third Parties.**

70.    The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in this Final Order shall be binding on the Debtors, their respective representatives, successor and assigns in all circumstances. The acknowledgments, stipulations, admissions, waivers, and releases contained in this Final Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Creditors' Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee") and any other person acting on behalf of the Debtors' estates, unless (i) a party with requisite standing granted by order of this Court (or another court of competent jurisdiction), has duly filed an adversary proceeding, motion, objection or other pleading (a "Challenge") challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens or the Prepetition Secured Credit Obligations, or asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Claims and Defenses") against any of the Prepetition Secured Parties in connection with any matter related

60

to the Prepetition Collateral, the Prepetition Liens, or the Prepetition Secured Credit Obligations by no later than (a) with respect to the Creditors' Committee, (i) as it pertains to the Claims and Defenses related to the ABL Secured Parties, the earlier of (x) October 2, 2020 and (y) the entry of an order confirming a plan of the Debtors or a sale of substantially all of the assets of the Debtors, or (ii) as it pertains to the Claims and Defenses related to the Term Loan Secured Parties, the date that is the later of (x) the occurrence of the effective date of the Settlement Plan and (y) 30 days after the date the Settlement Plan is either withdrawn by the Debtors, modified in a manner adverse to the Global Settlement, or confirmation of the Settlement Plan is not approved by the Court; (b) with respect to other parties in interest, no later than the date that is 75 days after the Petition Date (the time period established by the foregoing clauses (a) and (b), as applicable, the "Challenge Period"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Cases, then in each such case, the Challenge Period shall be extended for a period of 15 days following such conversion or appointment solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed Challenge.  If no such Challenge is timely filed prior to the expiration of the Challenge Period, without further order of this Court:  (w) the Debtors' acknowledgments, stipulations, admissions, waivers, and releases contained this Final Order shall binding on all parties in interest, including, without limitation, the Creditors' Committee or any Trustee, (x) the Prepetition Secured Credit Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a

61

counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Cases and any Successor Cases; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in section E, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Secured Credit Obligations, the Prepetition Liens on the Prepetition Collateral, and the Prepetition Secured Parties (in their capacities as such) shall not be subject to any other or further challenge and any party in interest (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period) shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action.  If any such Challenge is timely filed as provided above prior to the expiration of the Challenge Period, (i) the acknowledgments, stipulations, admissions, waivers, and releases contained in this Final Order shall nonetheless remain binding and preclusive on any Creditors' Committee and any other party in the Cases or any Successor Cases, including any Trustee, except as to any acknowledgments, stipulations, admissions, waivers, and releases that are specifically and expressly challenged in such Challenge and (ii) any Claims and Defenses not bought in such Challenge shall be forever barred; *provided* that, if and to the extent any challenges to a particular acknowledgment, stipulation, admission, waiver, or release are withdrawn, denied or overruled by a final non-appealable order, such acknowledgment,

stipulation, admission, waiver, or release also shall be binding on the Debtors' estates and all parties in interest.  The Challenge Period may be extended in writing from time to time in the sole discretion of the ABL Agent (with respect to the ABL Loan Documents) and the Term Loan Agent (with respect to the Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest; *provided* that any such motion or application for an order to extend the Challenge Period is filed with the Court prior to the expiration of the Challenge Period.

71.    Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Secured Credit Documents or the Prepetition Secured Credit Obligations.  Notwithstanding anything contained herein to the contrary, the Challenge Period in sub-paragraph 70 above will be tolled for the Creditors' Committee if it formally moves for an order of this Court conferring standing or authority (the "Standing Motion") prior to the expiration of the Challenge Period, from the date the Creditors' Committee so moves until such time as standing is granted or denied pursuant to an order of the Court with regard to such Standing Motion; *provided*, that the Challenge Period: (a) will only be tolled if such Standing Motion attaches the proposed pleadings identifying the specific Challenge(s) that the Creditors' Committee proposes to assert and the defendant(s) against whom such Challenge(s) are proposed to be asserted, and (b) will only be tolled with respect to such Challenge(s) and defendant(s) specifically identified therein.

72.    Notwithstanding anything in this Final Order or the expiration of the Challenge Period, including paragraph 6 (Debtors' Stipulations), but subject to confirmation of the

Settlement Plan, the Creditors' Committee reserves and preserves its right to seek: (i) determination of the value of the Prepetition Collateral securing the Term Loan Obligations; (ii) the scope and extent of any Diminution in Value; (iii) the allocation of Cash Collateral usage post-petition between the Debtors, including payment of professional fees; and (ii) the Exit Conversion set forth in section 2.22 of the DIP Term Loan Agreement, including any issuance of equity or new common shares to be issued by the Debtors under a plan of reorganization.

**HH.    Limitation on Use of Collateral.**

73.    Notwithstanding anything herein or in any other order of this Court to the contrary, no Prepetition Collateral, DIP Collateral or the proceeds of any of the foregoing, including Cash Collateral, or the Carve Out may be used to:  (a) investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (i) against any of the DIP Secured Parties or Prepetition Secured Parties (in their capacities as such) including, without limitation, for the payment for any services rendered by the Professional Persons in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purposes of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Secured Parties to recover on the DIP Collateral or of the Prepetition Secured Parties to recover on the Prepetition Collateral, or seeking affirmative relief against any of the DIP Secured Parties or Prepetition Secured Parties, related to the DIP Documents, the DIP Obligations, the Prepetition Secured Credit Obligations or the Prepetition Secured Credit Documents, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations, the DIP Liens on the DIP Collateral, the Prepetition Secured Credit Obligations, or the Prepetition Liens on the Prepetition Collateral, or

(iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties (in their capacities as such), or their respective liens on or security interests in the DIP Collateral and the Prepetition Collateral that would impair the ability of the DIP Secured Parties and Prepetition Secured Parties to assert or enforce any lien, claim, right, or security interest or to recover on the DIP Obligations and Prepetition Secured Credit Obligations; (b) using or seeking to use Cash Collateral except as provided in this Final Order; (c) objecting to or challenging in any way the legality, validity, extent, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Credit Obligations or the DIP Secured Parties related to the DIP Obligations; (d) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the Prepetition Secured Credit Obligations, the Prepetition Liens, the DIP Obligations or the DIP Liens; (e) prosecuting an objection to, contesting in any manner, or raising any defenses to the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens or DIP Liens or any other rights or interests of any of the Prepetition Secured Parties or DIP Secured Parties related to the Prepetition Secured Credit Obligations, the Prepetition Liens, the DIP Obligations, or the DIP Liens; (f) seeking to modify any of the rights granted to the Prepetition Secured Parties or the DIP Secured Parties hereunder; or (g) paying any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court; *provided* that an amount not to exceed, subject to the Final Order, $250,000 in the aggregate, may be used for allowed fees and expenses incurred solely by the Creditors' Committee in investigating (but not prosecuting or challenging), the Claims and Defenses. Nothing herein shall relieve the Debtors of any obligation to pay all fees and expenses

of the Creditors' Committees' professionals as may be allowed pursuant to the Court or in connection with any requirements under the Bankruptcy Code for payment of all administrative expenses in connection with a plan of reorganization as required under section 1129(a)(9) of the Bankruptcy Code or preclude payment from assets or the proceeds thereof that were unencumbered as of the Petition Date.

## II.    Good Faith under Section 364(e) of the Bankruptcy Code.

74.    Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Final Order and the DIP Documents.

## JJ.    Binding Effect; Successors and Assigns.

75.    The provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases and any Successor Cases, including without limitation, the Prepetition Secured Parties, the Creditors' Committee, the DIP Secured Parties, and the Debtors and their respective successors and assigns (including any Trustee, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the each of the DIP Secured Parties, Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided* that, except to the extent expressly set forth in this Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or extend any financing to any Trustee or similar responsible person appointed for the estate of any Debtor.  For all adequate protection and stay relief purposes throughout the Cases, the Prepetition Secured Parties shall be deemed to have requested relief

from the automatic stay and adequate protection as of the Petition Date.  For the avoidance of doubt, such request will survive termination of this Final Order.

**KK.  Limitation of Liability.**

76.    In permitting the use of the Prepetition Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors.  Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon the ABL Agent, the Term Loan Agent, the DIP Agents, the DIP Secured Parties or the other Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

**LL.  Effectiveness.**

77.    This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of execution of effectiveness of this Final Order.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed and vice versa.

**MM.  Bankruptcy Rules.**

78.    The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

**NN.  Proofs of Claim.**

79.    Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the DIP Documents or the Prepetition

Secured Credit Documents or that would constitute DIP Obligations or Prepetition Secured

Credit Obligations (including, without limitation, the Swap Termination Liability).  The Debtors'

stipulations in section E of this Final Order shall be deemed to constitute a timely filed proof of

claim.  Any order entered by this Court in relation to the establishment of a bar date for any

claim (including without limitation, administrative claims) in any of the Cases or Successor

Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect

to the DIP Obligations or the Prepetition Secured Credit Obligations.  Notwithstanding the

foregoing, each of the DIP Agents, ABL Agent and the Term Loan Agent, on behalf of

themselves and the applicable other DIP Secured Parties or Prepetition Secured Parties, is hereby

authorized and entitled, in its sole discretion, but not required, to file (and amend and/or

supplement, as it sees fit) a single master proof of claim in the Cases for any claims arising under

the applicable Credit Agreements and hereunder (the "Master Proof of Claim").  Any Master

Proof of Claim filed by the DIP Agents, ABL Agent or the Term Loan Agent shall be deemed to

be in addition and not in lieu of any other proof of claim that may be filed by any of the DIP

Secured Parties or Prepetition Secured Parties.  The Master Proof of Claim, if filed, shall not be

required to identify whether any DIP Secured Party or Prepetition Secured Party acquired its

claim from another party and the identity of any such party or be amended to reflect a change in

the holders of the claims set forth therein or a reallocation among such holders of the claims

asserted therein resulting from the transfer of all or any portion of such claims.  The Master

Proof of Claim, if filed, shall not be required to attach any instruments, agreements or other

documents evidencing the obligations owing by each of the Debtors to the applicable DIP

Secured Parties or Prepetition Secured Parties or, which instruments, agreements or other

documents will be provided upon written request to counsel to the DIP Agents, ABL Agent or

the Term Loan Agent.  The provisions of this paragraph 79 and the Master Proof of Claim are intended solely for the purpose of administrative convenience.

**OO.    Global Settlement with Creditors' Committee.**

80.    The informal objections of the Creditors' Committee to this Final Order are resolved pursuant to the terms of this Final Order and the settlement provisions on **Annex 6** hereto, which terms are agreed upon by the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Creditors' Committee (the "Global Settlement") and certain of which terms are approved by this Final Order.  For the avoidance of doubt, the provisions of the Global Settlement relating to the creation of the GUC Trust and the waiver of Avoidance Actions are not being approved by this Final Order, but rather shall be incorporated into the revisions to the *Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and Its Debtor Affiliates* [Docket No. 154] (the "Plan", and as amended to incorporate the Global Settlement, the "Settlement Plan") to be considered at the time of confirmation of the Settlement Plan.

**PP.    Chubb's Reservation of Rights.**

81.    For the avoidance of doubt, (i) to the extent ACE American Insurance Company and/or any of its affiliates (collectively, and together with each of their successors, "Chubb") had valid and enforceable lines and/or security interests on property (including Cash Collateral) of the Debtors as of the Petition Date, such liens and/or security interests shall be senior to any liens and/or security interests granted pursuant to this Final Order, (ii) this Final Order does not grant the Debtors any right to use any property (or the proceeds thereof) held by Chubb as collateral to secure obligations under insurance policies and related agreements; and (iii) nothing, including the DIP Agreements and/or this Final Order, alters or modifies the terms and conditions of any insurance policies issued by Chubb and any agreements related thereto.

**QQ.    Comenity's Reservation of Rights.**

82.    Comenity Bank's, f/k/a World Financial Network Bank (referred to herein as "Comenity") rights of setoff and/or recoupment with respect:  to (a) that certain Amended and Restated Co-Brand and Private Label Credit Card Program Agreement dated December 2, 2013 (as amended and/or modified from time to time, the "Ann Taylor Program Agreement") by and between Comenity and Ann Inc.; (b) that certain Co-Brand and Private Label Credit Card Program Agreement dated June 21, 2019 (as amended and/or modified from time to time, the "Maurices Program Agreement") by and among Comenity, Ascena Retail Group, Inc. and certain affiliates thereof, and Maurices, Incorporated; (c) that certain Private Label Credit Card Plan Agreement for Catherines dated August 12, 2009 (as amended and/or modified from time to time, the "Catherines Plan Agreement") by and between Comenity, as successor in interest to World Financial Network National Bank, and Catherines Stores Corporation; and (d) that certain Private Label Credit Card Plan Agreement for Lane Bryant dated August 12, 2009 (as amended and/or modified from time to time, the "Lane Bryant Plan Agreement," and together with the Ann Taylor Program Agreement, the Maurices Program Agreement, and the Catherines Plan Agreement, the "Program Agreements") by and among Comenity, as successor in interest to World Financial Network National Bank, Lane Bryant, Inc., Outlet Division Management Co., Inc., Petite Sophisticate, Inc., and Sierra Nevada Factoring, Inc.:  (i) shall not be affected, modified, waived, primed, subordinated, or impaired in any way by this Final Order, (ii) shall not be made subject to, subordinated by, or pari passu with any (x) secured financing, security interests, or liens, and/or (y) super priority, administrative, or adequate protection claims.

83.    Comenity's right to use the Debtors' trademarks, service marks, and/or other rights pertaining to the Debtors' names as set forth in the Program Agreements:  (a) shall not be affected, modified, waived, primed, subordinated, or impaired in any way by this Final Order, (b)

shall not be made subject to, subordinated by, or pari passu with any (i) secured financing, security interests, or liens, and/or (ii) super priority, administrative, or adequate protection claims.

84.     The Debtors shall maintain the confidentiality of the Program Agreements and related information as provided therein, and neither the Program Agreements nor any information related to or received by the Debtors in connection with the Program Agreements shall be disclosed to any third party, including, but not limited to, through inclusion in any data room, except as permitted in accordance with the terms of the Program Agreements or by agreement of the parties.

85.     All of Comenity's rights, remedies, claims, defenses, and other relief arising from or related to the Program Agreements (including, but not limited to, those set forth in sections (a), (b), and (c) of paragraph 82 of this Final Order) are expressly preserved and reserved.

**RR.   Provisions Related to Leases.**

86.     For the avoidance of doubt and notwithstanding anything to the contrary contained herein, any loan documents, any other orders of the Court, or otherwise, unless otherwise expressly permitted by the terms of the applicable lease, any liens granted under this Final Order shall not include the Debtors' real property leases, the leased premises, or the Debtors' interests in any such leases or premises, but shall include the proceeds from the disposition of all such leases.

**SS.   Provisions Related to Tax Liens.**

87.     Notwithstanding any other provisions in this Final Order, any agreements approved hereby, or any other orders in the Cases, any statutory liens (collectively, the "Tax Liens") of certain local government taxing authorities (collectively, the "Objecting Local Tax

Authorities")[8] shall not be primed by nor made subordinate to any liens granted to any party

hereby to the extent such Tax Liens are valid senior, perfected, and unavoidable.  To the extent

any of the Debtors' assets subject to the Objecting Local Tax Authorities' Liens are sold,

transferred, or otherwise disposed of, in each case pursuant to and in accordance with any sale

orders authorized by the Court, the Objecting Local Tax Authorities' Liens shall attach to the

proceeds of such assets to the same extent and with the same priority as existed prior to such

sale, transfer, or other disposition.  All parties' rights to object to the priority, validity, amount,

and extent of the claims and liens asserted by the Objecting Local Tax Authorities are fully

preserved.

88.      Notwithstanding any other provisions of this Final Order, any DIP Order, or any

agreements validated by any such orders, from the proceeds of the sale of the Debtors' assets at

store locations within the jurisdictions of the Objecting Local Tax Authorities, the amount

of $1,024,000 shall be set aside by the Debtors in a segregated account (the "Tax Account") as

adequate protection for the asserted unpaid secured claims for the pre-petition taxes owed on any

---

[8]    The Objecting Local Tax Authorities shall mean Allen, Allen ISD, Angelina County, Bexar County, Cameron County, Carrollton, Cypress-Fairbanks ISD, Dallas County, Ector CAD, El Paso, Ellis County, Fort Bend Co WCID # 02, Fort Bend County, Frisco, Galveston County, Grayson County, Gregg County, Harris County, Hidalgo County, Hood CAD, Jefferson County, Kaufman County, Lamar CAD, Lewisville ISD, McAllen, McLennan County, Montgomery County, Nueces County, Parker CAD, Rockwall CAD, San Marcos CISD, Smith County, Stephenville, Stephenville ISD, Tarrant County, and Victoria County (jointly the "Local Texas Tax Authorities," for which $695,000 of the total Tax Account is attributable to their claims);  Bell County Tax Appraisal District, Bowie Central Appraisal District, Brazos County, Denton County, Guadalupe County, Hays County, City of Waco, Midland Central Appraisal District, Taylor CAD, Williamson County (jointly the "Texas Taxing Authorities," for which $95,000  of the Tax Account is attributable to their claims); Alief ISD, Arlington ISD, Brazoria County Tax Office, Carrollton-Farmers Branch ISD, Clear Creek ISD, Cinco MUD #12, City of Garland, City of Grapevine, City of Highland Village, City of Houston, City of Katy, City of Lake Worth, City of Rosenberg, City of Tomball, Crowley ISD, Dickinson ISD, Fort Bend LID #2, Fort Bend ISD, Frisco ISD, Galveston County MUD #54, Garland ISD, Grapevine-Colleyville ISD, Harris County MUD #257, Harris County MUD #358, Harris County WCID #116, Harris County WCID #155, Humble ISD, Katy Management District #1, Lubbock Central Appraisal District, Malcolmson Road UD, Memorial Villages Water Auth., Midland County, Pasadena ISD, Potter County Tax Office, Randall County Tax Office, Richardson ISD, Spring Branch ISD, Spring ISD, Tomball ISD, Tyler ISD, West HC MUD #6, Wichita County, Willowfork DD, Woodlands Metro Center MUD, Woodlands RUD #1 (jointly the "Certain Texas Taxing Entities" for which $211,000 of the Tax Account is attributable to their claims);  and the Maricopa County Treasurer (for which $23,000 of the Tax Account is attributable to its claim).

stores located in the jurisdictions the Objecting Local Tax Authorities prior to the distribution of any proceeds to any other creditor.  The liens of the Objecting Local Tax Authorities shall attach to these proceeds to the same extent and with the same priority as the liens they now assert against the property of the Debtors.  These funds shall be on the order of adequate protection and shall constitute neither the allowance of the asserted claims of the Objecting Local Tax Authorities, nor a cap on the amounts they may be entitled to receive.  Furthermore, the asserted claims and liens of the Objecting Local Tax Authorities shall remain subject to any objections any party would otherwise be entitled to raise as to the priority, validity, or extent of such liens. These funds may be distributed only upon agreement between the Objecting Local Tax Authorities and the Debtors, with the prior consent of the Agent and DIP Agent, or by subsequent order of the Court, duly noticed to the Objecting Local Tax Authorities. All such funds, as applicable, shall be Cash Collateral of the DIP Agents with all rights reserved.

**TT.   Jurisdiction.**

89.    This Court shall retain jurisdiction to enforce the terms of this Final Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Final Order.

**UU.   Controlling Effect of Final Order.**

90.    To the extent any provision of this Final Order conflicts or is inconsistent with any provision of the Interim Order or the Motion, the provisions of this Final Order shall control to the extent of such conflict.  In the event of any conflict or inconsistency between or among the terms or provisions of this Final Order, any of the DIP Documents, unless such term or provision in this Final Order is phrased in terms of "defined in" or "as set forth in" the DIP Documents, the terms and provisions of this Final Order shall govern and control.

Dated: Sep 10 2020
_____

Richmond, Virginia

/s/ Kevin R Huennekens
_____
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: Sep 10 2020

WE ASK FOR THIS:

/s/ Cullen D. Speckhart

**KIRKLAND & ELLIS LLP**                   **COOLEY LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**    Cullen D. Speckhart (VSB 79096)
Edward O. Sassower, P.C.                    *Admitted to practice in New York, Virginia, Missouri and*
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)    *Texas; Not admitted to practice in DC, supervised by*
601 Lexington Avenue                       *members of DC bar*
New York, New York 10022                   Olya Antle (VSB 83153)
Telephone:      (212) 446-4800             *Admitted to practice in Virginia; Not admitted to practice in*
Facsimile:      (212) 446-4900             *DC, supervised by members of DC bar*
-and-                                      1299 Pennsylvania Avenue, NW, Suite 700
John R. Luze (admitted *pro hac vice*)     Washington, DC 20004-2400
300 North LaSalle                          Telephone:      (202) 842-7800
Chicago, Illinois 60654                    Facsimile:      (202) 842-7899
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

### CERTIFICATION OF ENDORSEMENT
### UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Cullen D. Speckhart

**<u>Annex 1: Budget</u>**

**Access Retail Group**
Cash Flow Forecast

($ '000s)

| Week Ending | Week 1 8/22/20 Forecast | Week 2 8/29/20 Forecast | Week 3 9/5/20 Forecast | Week 4 9/12/20 Forecast | Week 5 9/19/20 Forecast | Week 6 9/26/20 Forecast | Week 7 10/3/20 Forecast | Week 8 10/10/20 Forecast | Week 9 10/17/20 Forecast | Week 10 10/24/20 Forecast | Emergence Week Week 11 10/31/20 Forecast | Week 12 11/7/20 Forecast | Week 13 11/14/20 Forecast | 13-Week Period Weeks 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Operating Cash Receipts | $ 52,858 | $ 57,259 | $ 54,889 | $ 54,922 | $ 56,604 | $ 56,604 | $ 56,604 | $ 50,080 | $ 47,362 | $ 46,555 | $ 46,555 | $ 58,116 | $ 63,566 | $ 701,976 |
| Other Receipts | 1,523 | 1,523 | 3,009 | 4,568 | 1,218 | 17,218 | 1,218 | 3,314 | 4,873 | 1,523 | 1,523 | 3,314 | 4,873 | 49,697 |
| **Total Inflows** | $ 54,381 | $ 58,782 | $ 57,899 | $ 59,491 | $ 57,822 | $ 73,822 | $ 57,822 | $ 53,394 | $ 52,235 | $ 48,078 | $ 48,078 | $ 61,429 | $ 68,439 | $ 751,673 |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| Payroll and Benefits | (12,389) | (16,692) | (13,301) | (19,850) | (11,336) | (16,694) | (10,779) | (16,669) | (10,614) | (16,634) | (10,430) | (16,499) | (9,985) | (181,972) |
| Merchandise | (10,421) | (20,379) | (25,379) | (20,000) | (32,330) | (18,287) | (18,287) | (18,287) | (13,787) | (33,351) | (15,299) | (23,349) | (23,349) | (275,005) |
| Other Operating | (18,236) | (17,217) | (13,882) | (22,495) | (18,391) | (92,467) | (41,367) | (14,401) | (23,240) | (18,492) | (13,743) | (36,529) | (20,622) | (351,082) |
| **Total Operating Disbursements** | $ (41,046) | $ (54,588) | $ (52,562) | $ (62,345) | $ (62,057) | $ (127,448) | $ (70,433) | $ (49,358) | $ (49,442) | $ (68,376) | $ (39,472) | $ (76,377) | $ (53,955) | $ (808,059) |
| **Unlevered Operating Cash Flow** | $ 13,335 | $ 4,195 | $ 5,336 | $ (2,855) | $ (4,235) | $ (53,626) | $ (12,611) | $ 4,036 | $ 2,794 | $ (20,898) | $ 8,606 | $ (14,948) | $ 14,484 | $ (56,386) |
| **Restructuring and Debt Related** | | | | | | | | | | | | | | |
| Other Restructuring Costs | (400) | (30,315) | (4,700) | (7,121) | (5,300) | 2,000 | (10,385) | (10,150) | (8,400) | - | (89,250) | - | - | (164,022) |
| Debt Service Costs / Term Loan Receipt | - | 126,461 | (187) | - | - | (3,313) | (1,044) | - | - | - | (5,313) | (119) | - | 116,484 |
| **Levered Net Cash Flow** | $ 12,934 | $ 100,340 | $ 449 | $ (9,975) | $ (9,535) | $ (54,938) | $ (24,040) | $ (6,114) | $ (5,606) | $ (20,898) | $ (85,957) | $ (15,067) | $ 14,484 | $ (103,924) |
| **Cash Bank Balance** | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ 576,961 | $ 589,895 | $ 460,235 | $ 460,684 | $ 450,709 | $ 441,174 | $ 386,235 | $ 362,195 | $ 356,081 | $ 350,475 | $ 329,577 | $ 243,620 | $ 228,553 | $ 576,961 |
| (+/-) Levered Free Cash Flow | 12,934 | 100,340 | 449 | (9,975) | (9,535) | (54,938) | (24,040) | (6,114) | (5,606) | (20,898) | (85,957) | (15,067) | 14,484 | (103,924) |
| (+/-) Revolver Draws / Paydowns | - | (230,000) | - | - | - | - | - | - | - | - | - | - | - | (230,000) |
| **Ending Cash Bank Balance** | $ 589,895 | $ 460,235 | $ 460,684 | $ 450,709 | $ 441,174 | $ 386,235 | $ 362,195 | $ 356,081 | $ 350,475 | $ 329,577 | $ 243,620 | $ 228,553 | $ 243,037 | $ 243,037 |
| **Liquidity** | | | | | | | | | | | | | | |
| Revolver Availability [2] | $ - | $ 232,895 | $ 236,806 | $ 236,806 | $ 236,806 | $ 236,806 | $ 236,806 | $ 173,239 | $ 173,239 | $ 173,239 | $ 148,239 | $ 156,383 | $ 156,383 | $ 156,383 |
| Cash Balance less cash collateral [1] | 589,895 | 370,235 | 370,684 | 360,709 | 351,174 | 296,235 | 272,195 | 266,081 | 260,475 | 239,577 | 176,120 | 161,053 | 175,537 | 175,537 |
| **Total Liquidity** | $ 589,895 | $ 623,130 | $ 607,490 | $ 597,515 | $ 587,980 | $ 533,041 | $ 509,001 | $ 439,320 | $ 433,714 | $ 412,816 | $ 324,359 | $ 317,437 | $ 331,921 | $ 331,921 |
| **Revolver Balance** | | | | | | | | | | | | | | |
| Beginning Balance | $ 230,000 | $ 230,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 230,000 |
| (+/-) Draws (Paydowns) | - | (230,000) | - | - | - | - | - | - | - | - | - | - | - | (230,000) |
| **Ending Balance** | $ 230,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Notes:**
1) Assumes the Company goes cash collateral and does not have access to revolver borrowings until the Final DIP Order when it receives ABL DIP financing
2) Cash balance is adjusted post the assumed Final DIP Order (W/E 8/29/20) to account for the portion of cash collateral included in the borrowing base

## Annex 2: Cash Collateral Termination Events

Any of the following shall constitute a Cash Collateral Termination Event:

(a)   Cross-default to any material prepetition indebtedness that is not stayed by the automatic stay in the Cases;

(b)   An order shall be entered reversing, adversely amending, supplementing, staying, or vacating any material provisions of this Final Order without the prior consent of the ABL Agent and the Term Loan Agent;

(c)   The Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment (other than entry of the Final Order);

(d)   The Court shall have entered an order dismissing any of the Cases absent consent of the Prepetition Secured Parties;

(e)   The Court shall have entered an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, unless the ABL Agent and the Term Loan Agent have consented to such order in writing;

(f)   The Debtors permit the amount of end of day cash and cash equivalents of any of their non-Debtor subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by any such non-Debtor subsidiaries to exceed $45,000,000 in the aggregate for all non-Debtor subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities;

(g)   The Court shall have entered an order authorizing the appointment or election of a trustee or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or any other representative (including any trustee or receiver) with expanded powers relating to the operation of the businesses in the Cases, unless consented to in writing by the ABL Agent and the Term Loan Agent;

(h)   A filing by any Debtor of any motion, pleading, application, or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Credit Facilities or asserting any other cause of action against and/or with respect to the Credit Facilities, the Prepetition Collateral, the Prepetition Agents, any of the Prepetition Secured Parties (or if the Debtors support any such motion, pleading, application, or adversary proceeding commenced by any third party);

(i)   The failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Final Order;

(j)   Except with respect to any financings or related transactions contemplated by the Motion, the filing of a motion by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not

1

otherwise permitted pursuant to this Final Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Prepetition Collateral; or (iii) except as provided in this Final Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

(k)     The entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or the expiration of any Debtor's exclusive right to file a chapter 11 plan;

(l)     The entry of an order amending, supplementing, staying, vacating or otherwise modifying the Final Order or any orders relating to cash management, the filing by a Debtor of a motion for reconsideration with respect to the Final Order or any orders relating to cash management or the Final Order shall cease to be in full force and effect;

(m)     The payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Final Order;

(n)     The existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under this Final Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Final Order;

(o)     Any Debtor shall challenge or file a joinder to a challenge of any payments made with respect to the Prepetition Secured Credit Obligations or the Adequate Protection Obligations;

(p)     The entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Final Order or to obtain any financing under section 364(d) of the Bankruptcy Code (other than as contemplated by the Motion);

(q)     Any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Final Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Final Order;

(r)     The entry of an order applying (i) the "equities of the case" exception under section 552(b) of the Bankruptcy Code to any of the Prepetition

2

Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral; or (ii) requiring any of the Prepetition Secured Parties to be subject to the equitable doctrine of "marshaling";

(s)     The failure of the Debtors to (i) file, within ten (10) business days of the Petition Date, a motion seeking to extend the section 365(d)(4) deadline to 210 days from the Petition Date, or (ii) obtain an order, within fifty (50) days of the Petition Date, an order extending the section 365(d)(4) deadline to 210 days from the Petition Date;

(t)     Solely to the extent that segregated cash pledged in a restricted account pledged in favor of the ABL Agent does not exceed the amount of ABL Obligations then outstanding, the failure of the effective date to occur within one-hundred thirty (130) days of the Petition Date of a plan that provides for the ABL Obligations being Paid in Full on the effective date;

(u)     The automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties; or

(v)     The Court shall have entered an order avoiding, disallowing, subordinating or recharacterizing any claim, lien, or interest held by any Prepetition Secured Party arising under the Credit Agreements, unless (i) the Debtors have sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance or (ii) the Prepetition Agents have consented to such order.

**Annex 3: Form of DIP Term Loan Agreement**

$[311,800,000]

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM CREDIT AGREEMENT

dated as of

September [  ], 2020,

among

ASCENA RETAIL GROUP, INC.,
as Parent Borrower

ANNTAYLOR RETAIL, INC.,
as Subsidiary Borrower

The LENDERS Party Hereto

and

ALTER DOMUS (US) LLC,
as Administrative Agent

# TABLE OF CONTENTS

**Page**

**ARTICLE I**

    **Definitions**

        SECTION 1.01.      Defined Terms     2

        SECTION 1.02.      Classification of Loans and Borrowings     34

        SECTION 1.03.      Terms Generally     34

        SECTION 1.04.      Accounting Terms; GAAP     35

        SECTION 1.05.      Classification of Actions     35

        SECTION 1.06.      Divisions     35

**ARTICLE II**

    **The Credits**

        SECTION 2.01.      Commitments 36

        SECTION 2.02.      Loans and Borrowings     36

        SECTION 2.03.      Requests for Borrowings     37

        SECTION 2.04.      Funding of Borrowings     37

        SECTION 2.05.      Interest Elections     38

        SECTION 2.06.      Termination of Commitments 39

        SECTION 2.07.      Repayment of Loans; Evidence of Debt     39

        SECTION 2.08.      Amortization of Term Loans  40

        SECTION 2.09.      Prepayment of Loans  40

        SECTION 2.10.      Fees    42

        SECTION 2.11.      Interest 42

        SECTION 2.12.      Alternate Rate of Interest     43

        SECTION 2.13.      Increased Costs     44

        SECTION 2.14.      Break Funding Payments     45

i

SECTION 2.15.        Taxes   46

SECTION 2.16.        Payments Generally; Pro Rata Treatment; Sharing of Set-
        offs    50

SECTION 2.17.        Mitigation Obligations; Replacement of Lenders        52

SECTION 2.18.        [Reserved]        53

SECTION 2.19.        [Reserved]        53

SECTION 2.20.        Joint and Several Liability of the Borrowers  53

SECTION 2.21.        Super-Priority Nature of Obligations and Administrative
        Agent's Liens; Payment of Obligations        54

SECTION 2.22.        Conversion to Exit Facility Agreement        55

**ARTICLE III**

**Representations and Warranties**

SECTION 3.01.        Organization; Powers  56

SECTION 3.02.        Authorization; Enforceability; Benefit to Loan Parties
        56

SECTION 3.03.        Governmental Approvals; No Conflicts        56

SECTION 3.04.        Financial Condition; No Material Adverse Change   57

SECTION 3.05.        Properties        57

SECTION 3.06.        Litigation and Environmental Matters        57

SECTION 3.07.        Compliance with Laws and Agreements        58

SECTION 3.08.        Investment Company Status  58

SECTION 3.09.        Taxes   58

SECTION 3.10.        ERISA; Labor Matters        59

SECTION 3.11.        [Reserved]        59

SECTION 3.12.        Subsidiaries and Joint Ventures        59

SECTION 3.13.        Insurance        60

ii

SECTION 3.14.        Federal Reserve Regulations  60

SECTION 3.15.        [Reserved]        60

SECTION 3.16.        Collateral Matters        60

SECTION 3.17.        Use of Proceeds        60

SECTION 3.18.        Approved Budget        61

SECTION 3.19.        Chapter 11 Cases        61

## ARTICLE IV

### Conditions

SECTION 4.01.        Conditions to Effective Date and Availability of the Term
            Loans  62

SECTION 4.02        Conditions to the New Money Loan. 63

## ARTICLE V

### Affirmative Covenants

SECTION 5.01.        Financial Statements and Other Information  64

SECTION 5.02.        Notices of Material Events        67

SECTION 5.03.        Collateral Obligations; Additional Subsidiaries        68

SECTION 5.04.        Information Regarding Collateral        68

SECTION 5.05.        Existence; Conduct of Business        69

SECTION 5.06.        Payment of Obligations        70

SECTION 5.07.        Maintenance of Properties        70

SECTION 5.08.        Insurance        70

SECTION 5.09.        Books and Records; Inspection and Rights    70

SECTION 5.10.        Compliance with Laws        71

SECTION 5.11.        Bankruptcy Matters    71

SECTION 5.12.        Maintenance of Ratings        72

iii

SECTION 5.13.        Certain Post-Closing Collateral Obligations  72

SECTION 5.14.        Reserved        72

SECTION 5.15.        Conference Calls        72

## ARTICLE VI

### Negative Covenants

SECTION 6.01.        Indebtedness; Certain Equity Securities        73

SECTION 6.02.        Liens   74

SECTION 6.03.        Fundamental Changes; Business Activities   76

SECTION 6.04.        Investments, Loans, Advances, Guarantees and
        Acquisitions   76

SECTION 6.05.        Asset Sales        78

SECTION 6.06.        Sale/Leaseback Transactions  79

SECTION 6.07.        Swap Agreements        79

SECTION 6.08.        Restricted Payments; Certain Payments of Indebtedness
        79

SECTION 6.09.        Transactions with Affiliates   81

SECTION 6.10.        Restrictive Agreements        81

SECTION 6.11.        Amendment of Organizational Documents    82

SECTION 6.12.        Financial Covenants   82

SECTION 6.13.        Accounting Changes  83

SECTION 6.14.        Sanctions        83

SECTION 6.15.        Anti-Corruption Laws 83

## ARTICLE VII

### Events of Default

## ARTICLE VIII

### The Administrative Agent

**ARTICLE IX**

**Miscellaneous**

SECTION 9.01.        Notices        93

SECTION 9.02.        Waivers; Amendments        95

SECTION 9.03.        Expenses; Indemnity; Damage Waiver        97

SECTION 9.04.        Successors and Assigns        99

SECTION 9.05.        Survival        103

SECTION 9.06.        Counterparts; Integration; Effectiveness; Electronic
        Execution        104

SECTION 9.07.        Severability        104

SECTION 9.08.        Right of Setoff        104

SECTION 9.09.        Governing Law; Jurisdiction; Consent to Service of Process
        105

SECTION 9.10.        WAIVER OF JURY TRIAL        105

SECTION 9.11.        Headings        106

SECTION 9.12.        Confidentiality        106

SECTION 9.13.        Several Obligations; Nonreliance; Violation of Law        106

SECTION 9.14.        USA Patriot Act Notice        106

SECTION 9.15.        Interest Rate Limitation        107

SECTION 9.16.        Release of Liens and Guarantees        107

SECTION 9.17.        No Fiduciary Relationship        107

SECTION 9.18.        Non-Public Information        108

SECTION 9.19.        Intercreditor Agreement        108

SECTION 9.20.        Acknowledgement and Consent to Bail-In of EEA
        Financial Institutions        109

SCHEDULE:

| | | |
|---|---|---|
| Schedule 2.01 | — | Commitments |
| Schedule 3.05 | — | Real Property |
| Schedule 3.06 | — | Disclosed Matters |
| Schedule 3.12 | — | Subsidiaries and Joint Ventures |
| Schedule 3.13 | — | Insurance |
| Schedule 5.11 | — | Required Milestones |
| Schedule 6.01 | — | Pre-Petition Indebtedness |
| Schedule 6.02 | — | Liens |
| Schedule 6.04 | — | Investments |
| Schedule 6.09 | — | Transactions with Affiliates |
| Schedule 6.10 | — | Restrictive Agreements |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | — | Form of Assignment and Assumption |
| Exhibit B | — | Form of Borrowing Request |
| Exhibit C | — | Form of Guarantee and Collateral Agreement |
| Exhibit D | — | Form of Compliance Certificate |
| Exhibit E | — | Form of Interest Election Request |
| Exhibit F | — | [Reserved] |
| Exhibit G | — | Form of Exit Facility Term Sheet |
| Exhibit H-1 | — | Form of U.S. Tax Certificate for Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes |
| Exhibit H-2 | — | Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes |
| Exhibit H-3 | — | Form of U.S. Tax Certificate for Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes |
| Exhibit H-4 | — | Form of U.S. Tax Certificate for Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes |
| Exhibit I | — | [Reserved] |
| Exhibit J | — | Form of Variance Report |
| Exhibit K | — | Form of Note |

| | | |
|---|---|---|
| Annex A | — | Approved Budget |

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT, dated as of September [  ], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Parent Borrower"), ANNTAYLOR RETAIL, INC., a Florida corporation as debtor and debtor-in-possession (the "Subsidiary Borrower" and, together with the Parent Borrower, the "Borrowers" and each, a "Borrower"), the LENDERS party hereto and Alter Domus (US) LLC ("Alter Domus"), as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers and the other Loan Parties (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Term Credit Agreement dated as of August 21, 2015, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders and Goldman Sachs Bank USA, as the Pre-Petition Agent and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $1,271,597,089 in Loans (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Loan Document Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make or be deemed to have made available to the Borrowers, a senior secured super priority term credit facility of up to $[311,800,000] in the aggregate that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of a term facility to be made available to the Borrowers at any time until the Maturity Date subject to the terms and conditions set forth herein (the "Term Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Loan Document Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement and the limitations and priorities contained in the Loan Documents and the Order.

1

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" means the Person acting as agent under the ABL Credit Agreement, in its individual capacity, and its successors.

"ABL Credit Agreement" means the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated the Funding Date, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the ABL Agent, as administrative agent, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced from time to time through the date hereof.

"ABL Lenders" means the lenders under the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders  and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"Actual Net Cash Flow Amount" means the actual net cash flows of the Loan Parties during the relevant period of determination which corresponds to each of the Budgeted Net Cash Flow Amounts described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring".

"Ad Hoc Committee" means the ad hoc committee of Consenting Stakeholders (as defined in the RSA).

"Ad Hoc Committee Advisors" means Greenhill Partners and Milbank LLP, the advisors of the Ad Hoc Committee.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded to the nearest 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; provided that,

2

notwithstanding the foregoing, in the case of the Term Loans, the Adjusted LIBO Rate shall at no time be less than 1.00% per annum.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter dated as of even date herewith between the Borrowers and Alter Domus.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alter Domus" has the meaning set forth in the introductory paragraph hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1% per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or the Interpolated Screen Rate, as applicable) at approximately 11:00 a.m., London time, on such day for a deposit in dollars with a maturity of one month.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  Notwithstanding the foregoing, in the case of the Term Loans, the Alternate Base Rate shall at no time be less than 2.00% per annum.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 11.75% in the case Eurodollar Term Loans and (ii) 10.75% in the case of ABR Term Loans.

"Approved Budget" means the budget prepared by the Parent Borrower in form and substance reasonably satisfactory to the Ad Hoc Committee Advisors, it being understood and agreed that the budget in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date is deemed reasonably satisfactory to the Ad Hoc Committee Advisors, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01. The initial Approved Budget shall depict, on a weekly and line item

3

basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as <u>Annex A</u> is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders).

"<u>Approved Fund</u>" means any Person (other than a natural person that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Sale</u>" has the meaning set forth in Section 6.05.

"<u>Asset Sale Escrow Account</u>" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of Asset Sales shall be deposited in accordance with Section 2.09.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Automatic Stay</u>" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"<u>Backstop Lender</u>" means each Lender who is party to the Commitment Letter.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" has the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit B or any other form approved by the Administrative Agent.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretative change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Equivalents" means:

(a) marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada, or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada, or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

(b) marketable direct obligations issued by any state of the United States of America or any province of Canada, or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the

time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c)    commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d)    certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e)    repurchase agreements of any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f)    overnight investments with any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g)    other readily marketable instruments issued or sold by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i)    funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j)    in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments in the country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" hearing on a final basis, together with all extensions, modifications and amendments

6

thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means (a) any transaction (including a merger or consolidation) the result of which is that any "person" or "group" (within the meaning of Sections 13(d) and 14(d)(2) of the Exchange Act), other than the Permitted Investor, becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of more than 35% of the total voting power of all classes of the voting stock of the Parent Borrower and/or warrants or options to acquire such voting stock, calculated on a fully diluted basis, and the percentage of the aggregate voting power represented by such voting stock of the Parent Borrower owned by such "person" or "group" then or at any time thereafter exceeds the percentage of the aggregate voting power represented by the voting stock of the Parent Borrower owned by the Permitted Investor or (b) during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.15.

"Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Loan Document Obligations, and (b) the "DIP Collateral" referred to in the Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrowers, the other Loan Parties and the Administrative Agent, substantially in the form of Exhibit C, together with all supplements thereto.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)       the Administrative Agent shall have received from the Borrowers and each Designated Subsidiary (a) either (i) a counterpart of the Collateral Agreement, duly executed and delivered on behalf of such Person, or (ii) in the case of any Person that becomes a Designated Subsidiary after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, together with such documents with respect to such Designated Subsidiary as may reasonably be requested by the Administrative Agent and (b) an Intercreditor Acknowledgement in the form referred to in the Intercreditor Agreement, duly executed and delivered on behalf of such Person;

(b)       all Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement, including Equity Interests in any Luxembourg IP Subsidiary and any first-tier CFC or CFC Holdco, and the Administrative Agent shall, to the extent required by the Collateral Agreement, have received certificates or other instruments representing all such certificated Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)       all other assets, to the extent not constituting Excluded Property, shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement;

(d)       all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to perfect the Liens intended to be created by the Collateral Documents with the priority required by the Collateral Documents shall have been filed,

registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)    each Loan Party shall have obtained all material consents and approvals required in connection with the execution and delivery of all Collateral Documents to which it is a party and the performance of its obligations thereunder; and

(f)    the Loan Document Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Accounts and the proceeds thereof and, on the Effective Date (or such later date as the Required Lenders may agree in its sole discretion), the Borrowers must obtain Control Agreement for the DIP Accounts.

Notwithstanding the foregoing, any Designated Subsidiary formed or acquired after the Effective Date shall not be required to comply with the foregoing requirements prior to the time specified in Section 5.03. The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Restricted Subsidiary, if and for so long as the Administrative Agent (acting at the direction of the Required Lenders), in consultation with the Borrowers, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance or flood insurance, legal opinions, appraisals, surveys or other deliverables in respect of such assets, or providing such Guarantees, shall be excessive in view of the benefits to be obtained by the Lenders therefrom. The Required Lenders may in their sole discretion, grant extensions of time for the creation and perfection of security interests in (including delivery of promissory notes as required by clause (c) above) or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to particular assets or the provision of any Guarantee by any Designated Subsidiary where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

"Collateral Documents" means the Order, Collateral Agreement, and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Loan Document Obligations.

"Commitment" means, with respect to each Lender, such Lender's New Money Commitment and such Lender's Roll-Up Loans Commitment.

"Commitment Letter" means the Commitment Letter dated July 23, 2020, among the Ad Hoc Committee and the Parent Borrower, as such letter agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Required Lenders and (y) (i) if the Term Credit Facility converts to the Exit Facility, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Term Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding obligations under the Term Credit Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

10

"Declined Proceeds" has the meaning set forth in Section 2.09(d).

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (i) in the case of overdue principal of any Loan, 2.0% per annum plus the rate otherwise applicable to such Loan as provided in Section 2.11 or (ii) in the case of any other overdue amount, 2.0% per annum plus the rate applicable to ABR Term Loans as provided in Section 2.11(a).

"Deposit Account" has the meaning set forth in the Collateral Agreement.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Designated Persons" means any person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"DIP Accounts" means the DIP Funding Account and the Asset Sale Escrow Account.

"DIP Funding Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of the Loans shall be deposited and held on the Funding Date and used solely for the purposes set forth in Section 3.17.

"DIP Superpriority Claim" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Order.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof).  Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the

11

terms of such Equity Interests provide that the issuer may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Parent Borrower that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"EEA Financial Institution" means (a) any financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is September [  ], 2020[9].

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, a natural person or the Parent Borrower, any Subsidiary or any other Affiliate of the Parent Borrower.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to Hazardous Materials), or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment,

---

[9] Expected to be two business days after the date the Order is approved.

storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to:    (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of

ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise reasonably be expected to be liable or (m) any event with respect to any Foreign Plan which could reasonably be expected to result in liability to any Loan Party similar to the liability that could arise with respect to an event described in clauses (a) through (l) above.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" has the meaning set forth in Article VII.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Excluded Deposit Account" means (a) [reserved], (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses, (d) any escrow account to the extent the creation of a security interest therein would violate any agreement with a Person other than the Parent Borrower or a Subsidiary, and (e) any fiduciary or trust account.

"Excluded Property" the collective reference to:

(A)    any licenses, franchises, charters and authorizations of a Governmental Authority to the extent a security interest therein under the Loan Documents is prohibited by or would require the consent, license or approval of any Governmental Authority (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(B)    any asset if the granting of a security interest under the Loan Documents in such asset would be prohibited by any (x) law, treaty, rule or regulation (including all applicable regulations and laws regarding assignments of and security interests in, government receivables) or a court or other Governmental Authority or would require the consent, license or approval of any Governmental Authority (other than proceeds thereof, to the extent the assignment of such proceeds is effective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition and the assignment of such proceeds is not prohibited by applicable law and does not require the consent, license or approval of any Governmental Authority) or (y) contractual obligation (only to the extent such restriction is

14

binding on such asset (i) on the Petition Date or (ii) on the date of the acquisition thereof and not entered into in contemplation thereof) (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(C)     any lease, license or other agreement to the extent that a grant of a security interest therein under the Loan Documents would violate or invalidate such lease, license or agreement (except any such lease, license or agreement among Parent Borrower and its wholly-owned Subsidiaries and except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(D)     Equity Interests  in any Person that is not a Subsidiary, in partnerships, in joint ventures and in non-wholly owned Subsidiaries to the extent the pledge or other granting of a security interest under the Loan Documents in such Equity Interests would be prohibited by, or require a consent or approval of unaffiliated third parties or are not permitted under, organizational or governance documents or shareholders' or similar agreements of or with respect to such Person (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order, or other applicable law notwithstanding such prohibition);

(E)     to the extent applicable law requires that a Subsidiary issue directors' qualifying shares, nominee shares or similar shares which are required by applicable law to be held by persons other than a Loan Party, such qualifying shares, nominee shares or similar shares held by Persons other than a Loan Party;

(F)     any United States intent-to-use application for registration of a trademark or service mark prior to the acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use, to the extent and for so long as the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, a Loan Party's right, title or interest therein or any trademark or service mark registration issued therefrom;

(G)     "margin stock" within the meaning of Regulation U;

(H)     Excluded Deposit Accounts; and

(I)     proceeds in an amount not to exceed the Carve Out, if applicable, under the Order.

provided that (a) in the case of clauses 2(y), (3) and (5), such exclusion shall not apply (i) to the extent the prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law or (ii) to proceeds of the assets referred to in such clause, the assignment of which is expressly deemed effective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law and (b) assets described above shall no longer be "Excluded Property" upon termination of the applicable prohibition or restriction described above that caused such assets to be treated as "Excluded Property".

15

"Excluded Subsidiary" means (a) [reserved], (b) any Foreign Subsidiary of the Parent Borrower, (c) any Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary of the Parent Borrower that is a CFC, (d) any CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or contractual obligation in existence on the Petition Date  from providing a Guarantee of the Loan Document Obligations (solely  for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) [reserved], (g) [reserved], (h) [reserved], and (i) any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Required Lenders (confirmed in writing by notice to the Parent Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  In no event shall (i) the Subsidiary Borrower be an Excluded Subsidiary or (ii) any Subsidiary of the Parent Borrower that is a "Subsidiary Loan Party" (under and as defined in the ABL Credit Agreement to the extent applicable) or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the ABL Credit Agreement(to the extent applicable) be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by such Recipient's net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Loan or Commitment (other than an assignee pursuant to an assignment request by the Borrowers under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Commitment or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to a Lender's failure to comply with Section 2.15(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Conversion" has the meaning set forth in Section 2.22.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date consistent in all material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; *provided*, that such credit agreement shall have been made available to the Administrative Agent and all Lenders; provided, further, that upon the satisfaction of waiver of the conditions contemplated by Section 2.22, each Lender hereunder that is a Lender on the Conversion Date hereby authorizes the Administrative Agent to use its executed signature page to this Agreement as an executed signature page to the Exit Facility Agreement without any further action on the part of any such Lender or any other Person.

"Exit Facility Term Sheet" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any defined benefit pension plan, benefit plan, fund (including any superannuation fund) or other similar program that, under the requirements of law of any jurisdiction other than the United States, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle or any of the foregoing sponsored or maintained exclusively by a Governmental Authority) and is directly sponsored and maintained by a Loan Party primarily for the benefit of its employees who are employed and residing outside the United States.

"Foreign Subsidiary" means any Subsidiary of the Parent Borrower, other than a Domestic Subsidiary.

"Funding Date" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"GAAP" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers

17

or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"GS Bank" means Goldman Sachs Bank USA, in its individual capacity, and its successors.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Parent Borrower)).

"Guarantors" means each Subsidiary of the Parent Borrower (other than any Excluded Subsidiary), in each case, until any such Subsidiary (other than the Subsidiary Borrower) is released as a Guarantor in accordance with the Loan Documents.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Parent Borrower or any Restricted Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant

to such purchase price adjustment or earnout is, or becomes, a liability on the balance sheet of the Parent Borrower in accordance with GAAP), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others.  The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  It is acknowledged and agreed that private label and corporate letters of credit issued by the Parent Borrower or any Subsidiary for the making of payment for the purchase of inventory in the ordinary course of business (and in respect of which no financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Parent Borrower or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

"Information" has the meaning set forth in Section 9.12.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Funding Date, by and among the Administrative Agent, the Pre-Petition Agent, the ABL Agent and the Pre-Petition ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as term collateral agent, the Pre-Petition ABL Agent, as ABL collateral agent, and acknowledged by the Loan Parties, as may be supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.05, which shall be, in the case of any such written request, in the form of Exhibit E or any other form approved by the Administrative Agent.

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date applicable to such ABR Loan and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period and the Maturity Date applicable to such Eurodollar Loan.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender participating therein, twelve months) thereafter, as the Borrowers may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. For the avoidance of doubt, no Interest Period shall extend beyond the Maturity Date.

"Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person  or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any cash return representing a return of capital with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on  the applicable Bloomberg screen page that displays such rate  (or, in the event such rate does not appear the applicable Bloomberg screen page, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion)  at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (the "Screen Rate").  If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than zero, the LIBO Rate shall for all purposes of this Agreement be zero.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, at any time, the sum of, without duplication, (a) Availability (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement as in effect on the Funding Date), (b) unrestricted cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries that would be reflected on a consolidated balance sheet of the Parent Borrower in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement, as in effect on the Funding Date) to the extent duplicative) that are restricted in favor of the Administrative Agent or any Lender (or, the Pre-Petition ABL Agent or, to the extent applicable, the ABL Agent, for the benefit of the Administrative Agent pursuant to the Intercreditor Agreement) (which cash and cash equivalents may also secure other Indebtedness together with the Loan Document Obligations).

"Loan Document Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees, premiums (including the Redemption Premium, if any) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees,

premiums (including the Redemption Premium, if any), costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, premiums (including the Redemption Premium, if any), costs, expenses and indemnities are allowed claims in such proceeding.

"Loan Documents" means this Agreement, the Commitment Letter, the Collateral Agreement, the Control Agreement with respect to the DIP Accounts, the other Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, the Administrative Agent Fee Letter, the Order and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"Loan Parties" means the Borrowers and the Guarantors.

"Loans" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"Luxembourg IP Subsidiary" means each of (i) AnnTaylor Loft GP Lux S.à.rl. and (ii) AnnTaylor Loft Borrower Lux SCS.

"Material Adverse Effect" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof, the impacts of COVID-19 on the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate).

"Material Indebtedness" means Indebtedness (other than the Loans and Guarantees under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent Borrower and the Subsidiaries in an aggregate principal amount exceeding $10,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means the date that is the earliest of (i) six months after the Effective Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"Maximum Rate" has the meaning set forth in Section 9.15.

"MNPI" means material information concerning the Parent Borrower, any Subsidiary or any Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act.  For purposes of this definition, "material information" means information concerning the Parent Borrower or its Subsidiaries, or any of their respective securities, that would reasonably be expected to be material for purposes of the United States federal and state securities laws.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the past six years has made or been obligated to make contributions, in each case, if a liability to a Loan Party remains outstanding.

"Net Proceeds" means, with respect to any event, (a) the cash (which term, for purposes of this definition, shall include Cash Equivalents) proceeds (including, in the case of any casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds) received in respect of such event, including any cash received in respect of any noncash proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual fees and out-of-pocket expenses paid in connection with such event by the Parent Borrower and the Restricted Subsidiaries to Persons that are not Affiliates of the Parent Borrower or any Restricted Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an asset, the amount of all payments required to be made by the Parent Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness under the ABL Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on such assets securing the Loan Document Obligations and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Parent Borrower and the Restricted Subsidiaries, and the amount of any reserves established by the Parent Borrower and the Restricted Subsidiaries in accordance with GAAP to fund purchase price adjustment, indemnification and similar contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to the occurrence of such event (as determined reasonably and in good faith

by the chief financial officer of the Parent Borrower).  For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"New Money Commitment" means as to each Lender, its obligation to make a New Money Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption substantially in the form of Exhibit A hereto.  The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be.  The aggregate amount of the New Money Commitments on the date hereof is $150 million.

"New Money Loans" means the loans made pursuant to Section 2.01(a).

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Order" means the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Other Connection Taxes"  means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under , engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, excluding any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

24

"Parent Borrower" has the meaning set forth in the introductory paragraph hereto.

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet delinquent or are being contested in compliance with Section 5.06;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.06;

(c)     pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Parent Borrower and its Restricted Subsidiaries;

(d)     pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)     easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent Borrower or any Restricted Subsidiary or the ordinary operation of such real property;

25

(g)    customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)    Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments, in each case arising in the ordinary course of business;

(i)    Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)    Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)    Liens or rights of setoff against credit balances of the Parent Borrower or any Restricted Subsidiary with credit card issuers or credit card processors to secure obligations of the Parent Borrower or such Restricted Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)    Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

(n)    other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Investor" means David Jaffe (or any member of his family that is actively involved in the management of the Parent Borrower).

"Permitted Variance" means, any variance that does not violate Section 6.12(b).

"Person" or "person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan), (a) that is subject to the provisions of Title IV

26

of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions, in each case of (ii) if a liability to a Loan Party remains outstanding.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Pre-Petition ABL Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of August 21, 2015, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the Pre-Petition ABL Agent, as amended, restated, supplemented, modified, renewed, refunded, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements (in each case with the same or new agents, lenders or institutional investors), including any agreement adding or changing the borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case, through the Petition Date.

"Pre-Petition Agent" means GS Bank, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Petition Date and set forth on Schedule 6.01.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means all "Loan Document Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means Pre-Petition Lender Obligations in respect of principal of "Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prepayment Event" means:

27

(a)    any Asset Sale of the type described in clauses (j) and (k) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Parent Borrower or any Restricted Subsidiary resulting in aggregate Net Proceeds exceeding $500,000; or

(c)    the incurrence by the Parent Borrower or any Restricted Subsidiary of any Indebtedness, other than any Indebtedness permitted to be incurred by Section 6.01.

"Prime Rate" means the rate of interest per annum published by The Wall Street Journal, Money Rates Section as the "Prime Rate", as in effect from time to time.  Each change in the Prime Rate shall be effective from and including the date such change is published. If the Wall Street Journal ceases publication of such rate, in such other nationally recognized financial publication of general circulation as the Administrative Agent may designate based on the Administrative Agent's reasonable determination that the rate so published is comparable to the "Prime" rate published in the Wall Street Journal.

"Private Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that are not Public Side Lender Representatives.

"Public Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that do not wish to receive MNPI.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Redemption Premium" has the meaning set forth in Section 2.09(e).

"Register" has the meaning set forth in Section 9.04(b)(v).

"Related Lender" means with respect to any Person, an Affiliate or any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor or sub-advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

"Required Lenders" means, at any time, Lenders having aggregate Loans (or, prior to the borrowing hereunder on the date hereof, Commitments) representing more than 50.01% of the aggregate principal amount of the Loans (or, prior to the borrowing hereunder on the date hereof, the aggregate Commitments) at such time.

"Required Milestones" means the covenants set forth on Schedule 5.11.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Borrower or any Restricted Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Parent Borrower or any Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Parent Borrower.

"Restructuring Support Agreement" or "RSA" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-up Loans" are the loans made pursuant to Section 2.01(b).

"Roll-up Loans Commitment" means, as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as updated from time to time within 2 days of the Effective Date) under the caption "Roll-up Loans Commitment", as applicable. The aggregate amount of the Roll-up Loans Commitment on the date hereof is [$161.8 million], which amount shall (i) comprise a roll-up and refinancing of the Pre-Petition Loans (including accrued but unpaid interest) approved pursuant to the Order and (ii) be deemed funded by the Lenders pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Parent Borrower or any Restricted Subsidiary whereby the Parent Borrower or such Restricted Subsidiary sells or transfers such property to any Person and the Parent Borrower or any Restricted Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person

operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Screen Rate" has the meaning assigned to it in the definition of "LIBO Rate."

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means (a) the Administrative Agent, (b) [reserved], (c) the Lenders, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of the foregoing.

"Securities Act" means the United States Securities Act of 1933.

"Specified Dispositions" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of the Loan Parties' or their Subsidiaries' and (iii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Parent Borrower to the Required Lenders and agreed to by the Required Lenders, in their reasonable discretion on or prior to the Effective Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders in their reasonable discretion.

"Specified Indebtedness" means any Subordinated Indebtedness and any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Loan Document Obligations; provided that, Indebtedness under the ABL Credit Agreement, to the extent applicable, shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors).  Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Loan Document Obligations.

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Parent Borrower (including, for the avoidance of doubt, the Subsidiary Borrower).

"Subsidiary Borrower" has the meaning set forth in the introductory paragraph hereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent Borrower or any Subsidiary shall be a Swap Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for US federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term.  For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Credit Facility" has the meaning set forth in the Recitals.

"Term Lender" means a Lender with a Commitment or an outstanding Term Loan.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of the Term Loans and the use of the proceeds thereof, (b) to the extent applicable, the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement, (c)  the creation and perfection of the security interests provided for in the Collateral Documents, and (d)  the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Collateral Documents.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.15(e)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"wholly-owned" when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02.    Classification of Loans and Borrowings.    For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type.

SECTION 1.03.    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.    The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."    The word "will" shall be construed to have the same meaning and effect as the word "shall."    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.    The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.    Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04.    Accounting Terms; GAAP.    Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; provided that (a) if the Parent Borrower notifies the Administrative Agent in writing (including via e-mail) that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided that the Borrowers, on the one hand, and the Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed,

and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Parent Borrower or any Restricted Subsidiary at "fair value," as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05.   Classification of Actions.  For purposes of determining compliance at any time with the covenants set forth in Section 6.01 and Section 6.02 (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Section 6.01 and Section 6.02, the Borrowers may, in their sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that (i) the Borrowers may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under the Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(j) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(a).

SECTION 1.06.   Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II

## The Credits

SECTION 2.01.   Commitments.

(a)       Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make, on the Funding Date, Loans to the Borrowers in an aggregate amount not to exceed such Lender's New Money Commitment.  The New Money Commitments in respect of the New Money Loans shall terminate automatically immediately

34

after the making of the New Money Loans on the Funding Date.  Proceeds of the New Money Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

(b)     Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to roll-up and refinance a portion of the Pre-Petition Loans held by such Lender immediately prior to the Effective Date for Roll-up Loans in an aggregate principal amount equal to its Roll-up Loans Commitment, which shall be effected by means of a "cashless roll" by each such Lender.  For the avoidance of doubt, upon the consummation of the "cashless roll", (i) the Roll-up Loans shall be deemed funded on the Effective Date, (ii) the Administrative Agent shall record the Roll-up Loans in the Register and (iii) the Administrative Agent, the Lenders and the Loan Parties each acknowledges and agrees that the Roll-up Loans Commitment shall expire upon such cashless roll-up of the Roll-up Loans on the Effective Date.

SECTION 2.02.    Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)     Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrowers may request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)     At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Borrowing that results from a continuation of an outstanding Eurodollar Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (or such greater number as may be agreed to by the Administrative Agent) Eurodollar Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable thereto.

SECTION 2.03.    Requests for Borrowings.  To request a Borrowing, the Borrowers deliver to the Administrative Agent a Borrowing Request  (delivered by e-mail, hand or facsimile) (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing.  Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

35

(i)      the aggregate amount of such Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

(iii)      whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)      in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)      the location,  number of the account and any other wiring information required by the Administrative Agent of the Borrowers to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    Funding of Borrowings.

(a)      Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly remitting the amounts so received, in like funds, by wire transfer to the DIP Funding Account.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, but shall have no obligation to, in reliance on such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Loans.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays such amount

36

to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05.   Interest Elections.

(a)     Each Borrowing initially shall be of the Type and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03.  Thereafter, the Borrowers may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by delivering (by e-mail, hand delivery or facsimile) an Interest Election Request to the Administrative Agent by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.  Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c)     Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(d)    If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing with respect to any Borrower, or if any other Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, has notified the Borrowers of the election to give effect to this sentence on account of such Event of Default, then, so long as such Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06.    Termination of Commitments.

(a)    Unless previously terminated, the Commitments of each Lender shall automatically terminate and permanently reduce to $0 upon the making of such Lender's Loans pursuant to Section 2.01(a) and (b), as applicable.

SECTION 2.07.    Repayment of Loans; Evidence of Debt.

(a)    The Borrowers hereby unconditionally, jointly and severally, promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section, the accounts maintained by the Administrative Agent shall, absent manifest error, control.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its

38

registered assigns) substantially in the form of Exhibit K attached hereto.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08.    Amortization of Term Loans.

(a)    [Reserved]

(b)    To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(c)    [Reserved]

(d)    Prior to any repayment of any Borrowings under this Section, the Borrowers shall notify the Administrative Agent in writing of such selection not later than 12:00 p.m., New York City time, three Business Days before the scheduled date of such repayment.  Administrative Agent shall promptly notify each Lender of such repayment notification. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest (and premium, if any) on the amounts repaid.

SECTION 2.09.    Prepayment of Loans.

(a)    Subject to the Order and the Intercreditor Agreement, in the event that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries, the Borrowers shall, within three Business Days after such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds subject to the requirements of Section 2.09(e), with application to the Loan Document Obligations set forth in Section 2.09(d) below; provided that any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Asset Sale shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(b)    Subject to the Order and the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of any Prepayment Event (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), the Borrowers shall, on the day such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event," within three Business Days after such Net Proceeds are received), be deposited into the Asset Sale Escrow Account and held in the Asset Sale Escrow Account in accordance with clause (c) below; provided that in the case of a Prepayment Event described in clauses (a) or (b) of the definition thereof, any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Prepayment Event shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(c)     Net Proceeds received in connection with any Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event" (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), and solely to the extent that such Net Proceeds in respect of the applicable Asset Sale constitute Term Priority Collateral, shall be deposited into the Asset Sale Escrow Account.  Notwithstanding anything to the contrary herein, Net Proceeds of any Asset Sale held in the Asset Sale Escrow Account may be used solely, (i) prior to the occurrence of the Conversion Date, to prepay the Loan Document Obligations (including, for the avoidance of doubt, the Redemption Premium) in full in cash (including, for the avoidance of doubt, on the Maturity Date) and (ii) upon the occurrence of the Conversion Date, as directed by the Borrowers.

(d)     Any optional or mandatory prepayment of Borrowings under this Section, shall be applied to reduce the principal amount of the Term Loans to be repaid on the Maturity Date. Notwithstanding the foregoing, any Lender may elect, by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, two Business Days (or such shorter period as may be established by the Administrative Agent) prior to the required prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section or a prepayment pursuant to clause (c) of the definition of "Prepayment Event," which may not be declined), in which case the aggregate amount of the payment that would have been applied to prepay Loans but was so declined shall *first*, be offered to Lenders who did not decline its pro rata share of the prepayment who may elect by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, one Business Day prior to the required prepayment date, to decline all or any portion of such offered prepayment amount and *second*, if declined by such Lenders, may be retained by the Borrowers and shall constitute "<u>Declined Proceeds</u>." For the avoidance of doubt, a Lender shall be deemed to have accepted any prepayment amount offered under this paragraph (d) if such Lender does not deliver a written notice to the Administrative Agent rejecting such prepayment amount in accordance with this paragraph (d).

(e)     In the event that all or any portion of the Loans are repaid or prepaid as a result of (i) [reserved], (ii) a mandatory prepayment pursuant to Section 2.09(a), solely as a result of an Asset Sale of all or substantially all of the assets of the Parent Borrower and its Restricted Subsidiaries (which, for the avoidance of doubt, includes the "Premium" and "Lane Bryant" business lines) or (iii) the repayment of the Loans on the Maturity Date, in each case prior to or without the occurrence of the Conversion Date, such repayments or prepayments will include a premium in an aggregate amount equal to 11.23% of the amount of the loans so prepaid or repaid (the foregoing premium, the "<u>Redemption Premium</u>").

(f)     The Borrowers shall notify the Administrative Agent in writing of any optional prepayment and, to the extent practicable, any mandatory prepayment hereunder by Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of such prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; <u>provided</u> that a notice of prepayment of Borrowings pursuant to paragraph (a) of this Section may state that such notice is conditioned upon the occurrence of one or more events specified therein, in which case such notice may be revoked by the Parent Borrower (by notice to the

40

Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest as required by Section 2.11.

(g)    Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (b) of this Section 2.09, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Parent Borrower or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (b).

SECTION 2.10.    Closing Payments, Premiums and Fees.

(a)    The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Funding Date to each Lender, a closing payment in an amount equal to 2.50% of the aggregate principal amount of such Lender's New Money Loan, which such payment may be treated as original issue discount.  The premium referenced in this clause (a) shall be fully earned on the Effective Date and due and payable in full on the date set forth above.

(b)    The Borrowers agree, jointly and severally, to pay (i) to the Administrative Agent, for its own account, fees and expenses in the amounts and payable at the times and in the manner set forth  in the Administrative Agent Fee Letter, (ii) to the Backstop Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the Commitment Letter and (iii) to the Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the RSA.

(c)    All amounts payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of closing payments, to the Term Lenders entitled thereto.    Amounts paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.11.    Interest.

(a)    The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)    The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)    During the continuance of an Event of Default (i) under clauses (a) or (b) of Article VII, the Borrowers shall pay interest on such past due amounts (after giving effect to any

applicable grace period) owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws and (ii) under any other clause of Article VII, the Borrowers shall pay interest on all outstanding Loan Document Obligations owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(d)     Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).   The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12.   Alternate Rate of Interest.  (i) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)     the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Eurodollar Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Borrowing, and (ii) any Borrowing Request for a Eurodollar Borrowing shall be treated as a request for an ABR Borrowing.

(ii) If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (i)(a) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (i)(a) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than 1.00%, such rate shall be deemed to be 1.00% for all purposes of this Agreement.  Such amendment shall become effective with the prior consent of the Required Lenders and without any further action or consent of any other party to this Agreement.   Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Term Loan Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Term Loan Borrowing, and (y) any Borrowing Request for a Eurodollar Term Loan Borrowing shall be treated as a request for an ABR Term Loan Borrowing.

SECTION 2.13.    Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)      subject any Recipient to any Taxes (other than any (A) Indemnified Taxes or (B) Excluded Taxes) on or with respect to its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount)

then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered.  Notwithstanding the foregoing, if the Parent Borrower reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Parent Borrower to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b)    If any Lender determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as well as a reasonably detailed description of the occurrence giving rise to such event, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)    Notwithstanding the above, a Lender will not demand compensation for any increased cost or reduction set forth in this Section 2.13 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.14.   Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan

other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(f) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event. Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender delivered to the Borrowers and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.15.    Taxes.

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by any applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by the Loan Parties</u>.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the, option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    <u>Evidence of Payment</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)  <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)  <u>Status of Lenders</u>.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)  Without limiting the generality of the foregoing:

(A)  any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)  any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable (in such number of copies as shall be requested by the recipient):

(1)  in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party(x) with respect to payments of interest under any Loan Document, executed

46

copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI (or any successor forms);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms); or

(4)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-3 or H-4, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be

prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered (including any specific documentation required in this Section 2.15(e)) expires or becomes obsolete or inaccurate in any respect, it shall deliver promptly to the Borrowers or Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so.

(f)    <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)    <u>Treatment of Certain Refunds</u>.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect

48

to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.15(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.15(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)    Defined Terms.  For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" includes FATCA.

(i)    Issue Price.  The Borrowers and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Code) of (i) the Loans and (ii) if the Exit Conversion occurs, the loans under the Exit Facility Agreement and, in either case, shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest

(j)    Survival.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.16.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Borrowers shall make each payment required to be made by the Borrowers hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, on or prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to such account as may be specified by the Administrative Agent; provided that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be

49

extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)  Any reduction of the New Money Commitment shall be allocated ratably among the Lenders.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied towards payment of the amounts then due hereunder ratably among the parties entitled thereto, in accordance with the amounts then due to such parties.

(c)  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Person in accordance with the terms of Section 9.04.  The Borrowers consent to the foregoing and agree, to the extent the Borrowers may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.  For purposes of subclause (b)(i) of the definition of Excluded Taxes, a Lender that acquires a participation pursuant to this Section 2.16(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)  Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)      If any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.17.    Mitigation Obligations; Replacement of Lenders.

(a)      If any Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby, jointly and severally, agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b)      If (i) any Lender requests compensation under Section 2.13, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders) and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrowers, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or 2.15) and obligations under this Agreement and the other Loan Documents (or, in the case of any such assignment and delegation resulting from a failure to provide a consent, all its interests, rights and obligations under this Agreement and the other Loan Documents as a Lender) to an Eligible Assignee that shall assume such obligations (which may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b)(i), which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments and (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the

assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment, waiver, discharge or termination can be effected.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply.  Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.18.    [Reserved].

SECTION 2.19.    [Reserved].

SECTION 2.20.    Joint and Several Liability of the Borrowers.  The Loan Document Obligations of the Borrowers shall be joint and several in nature.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all Loan Document Obligations of the Borrowers hereunder and the other Loan Documents, whether now or hereafter existing or due or to become due.  The Loan Document Obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Without limiting the foregoing provisions of this Section 2.20, each Borrower acknowledges and agrees that:

(a)    its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any Borrower during the existence of an insolvency proceeding against any Borrower or otherwise;

(b)    its obligations under this Agreement are independent of the obligations of any other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Borrower or any other Borrower is joined in any such action or actions;

(c)    it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any of all of the following: (i) any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of any other Borrower; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Borrower; (iii) any change, restructuring or termination of the structure or existence of any other Borrower; (iv) the failure of any other person to execute or deliver any other agreement or the release or reduction of liability of any other person with respect to any obligations of the Borrowers under this Agreement; or (v) any other circumstance (including any statute of limitations but other than the Loan Document Obligations having been paid in full) or any existence or reliance on any representation by any other person that might otherwise constitute a defense available to, or a discharge or, any other Borrower;

52

(d)    its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any person upon the insolvency, bankruptcy or reorganization of any other Borrower, all as though such payment had not been made;

(e)    it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future;

(f)    in any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Subsidiary Borrower under this Agreement would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of the any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Borrower, any Loan Document or any other person be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 2.20(g) and any rights of subrogation, indemnity or reimbursement) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceedings; and

(g)    it hereby agrees that to the extent that any Borrower shall have paid more than its proportionate share of any payment made hereunder, such Borrower shall be entitled to seek and receive contribution from and against any other Borrower hereunder which has not paid its proportionate share of such payment; provided that the provisions of this Section 2.20(g) shall in no respect limit the obligations and liabilities of any Borrower to the Administrative Agent and the Lenders, and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount hereunder; provided, however each Borrower agrees that the foregoing rights of contribution as well as any right of subrogation, indemnity or reimbursement that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Borrower until, all Loan Document Obligations have been paid in full.

SECTION 2.21.   Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)    The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Order.

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Court.

SECTION 2.22.    Conversion to Exit Facility Agreement.  The Loans shall be repaid in cash in accordance with the terms hereunder; *provided* that, notwithstanding the foregoing, upon the satisfaction or waiver by the Required Lenders of each of the conditions set forth in the "Conditions to Borrowings" section of the Exit Facility Term Sheet, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Secured Party, the Loans shall be refinanced with loans under the Exit Facility Agreement in accordance with the Exit Facility Term Sheet (the "Exit Conversion").    Upon the Exit Conversion, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Guarantor and each entity assuming the operations and assets of each Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as and converted to a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.22 and to make any changes as required in the Exit Facility Term Sheet, including to increase the facility amount and give effect to any "last out" term loans).  Notwithstanding the foregoing, all obligations of the Borrowers and the Guarantors to the Administrative Agent and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.    Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.22 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby; *provided*, *however*, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Facility Agreement if and to the extent so provided in the Confirmation Order.  Each Lender hereto hereby agrees that, on the Conversion Date, (i) the Administrative Agent (in its capacity as Administrative Agent under the Exit Facility Agreement) may execute and deliver the Exit Facility Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each such Lender and (ii) the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet. On the Conversion Date, the Administrative Agent shall transfer any amounts remaining in the DIP Accounts to an account designated by the Borrowers.

ARTICLE III

Representations and Warranties

Each Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

SECTION 3.01.    Organization; Powers.    The Parent Borrower and each Restricted Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Restricted Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.    Authorization; Enforceability; Benefit to Loan Parties.

(a)      Subject to entry of the Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action.    Subject to entry of the Order, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)      Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.    Each Loan Party has determined that, subject to entry of the Order, the execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.    Governmental Approvals; No Conflicts.    Except for the entry of, and pursuant to the terms of, the Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or will so be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Parent Borrower or any Restricted Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition ABL Credit Agreement, the ABL Credit Agreement to the extent applicable, the Pre-Petition Credit Agreement or other material instrument binding upon the Parent Borrower or any Restricted Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Parent Borrower or any Restricted Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent Borrower or any Restricted Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with the Pre-Petition ABL Credit Agreement, the  ABL Credit Agreement to the extent applicable, or the Pre-Petition Credit Agreement, in the case of clauses (a) (as to the Transactions other than entry

into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation or creation, as applicable, which individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.   Financial Condition; No Material Adverse Change.

(a)   The Borrowers have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (B) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portions of the fiscal year ended November 2, 2019 and February 1, 2020.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)   Since the Petition Date, other than those customarily resulting from the commencement of the Cases and changes set forth in the Parent Borrower's business plan delivered to the Ad Hoc Committee prior to the Petition Date, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.   Properties.

(a)   The Parent Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)   (i) The Parent Borrower and each Restricted Subsidiary owns, is licensed to use, or otherwise has the right to use all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Parent Borrower and the Restricted Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)   Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.   Litigation and Environmental Matters.

(a)   Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Parent Borrower or any Restricted

Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)    Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent Borrower nor any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07.    Compliance with Laws and Agreements.

(a)    The Parent Borrower and each Restricted Subsidiary is in compliance with all laws, including all orders of Governmental Authorities, applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14).  Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the Pre-Petition ABL Credit Agreement or the Pre-Petition Credit Agreement, no Event of Default has occurred and is continuing.

(b)    The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Parent Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Parent Borrower, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers any agent of the Parent Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.    Investment Company Status.    No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.    Taxes.    The Parent Borrower and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the

57

Parent Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  There is no current or proposed tax assessment, deficiency or other claim against the Parent Borrower or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.   ERISA; Labor Matters.

(a)   Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws. On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Borrower's most recent Annual Report on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)   Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Parent Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Parent Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Parent Borrower or any Restricted Subsidiary, or for which any claim may be made against the Parent Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent Borrower or such Restricted Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent Borrower or any Restricted Subsidiary is bound.

(c)   None of the Borrowers or any of their Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA).

SECTION 3.11.   Disclosure.   No reports, financial statements, certificates or other written information (other than forward-looking information, management projections or information of a general economic or industry nature) furnished by or on behalf of the Parent Borrower or any Restricted Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), when delivered and taken as a whole, contains any material misstatement of fact or omits to state any material fact

necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to forecasts and projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time made and at the time so furnished and, if furnished prior to the Effective Date, as of the Effective Date (it being understood that such forecasts and projections may vary from actual results and that such variances may be material).

SECTION 3.12.    Subsidiaries and Joint Ventures.    Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Parent Borrower or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Parent Borrower or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.    All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of any rights contained in organizational documents).    Except as set forth in Schedule 3.12, as of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent Borrower or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13.    Insurance.    Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries as of the Effective Date.    As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.    The Borrowers believe that the insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries is adequate.

SECTION 3.14.    Federal Reserve Regulations.    Neither the Parent Borrower nor any Restricted Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.    No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.    [Reserved].

SECTION 3.16.    Collateral Matters.

(a)    Subject to the entry of the Order, the Collateral Agreement and the Order are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)    Except for the entry of the Order, no filing or other action will be necessary to perfect such Liens.

(c)    The Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral (with such priority as provided for in the Order (including, without limitation, with respect to the Carve Out)) without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

SECTION 3.17.    Use of Proceeds.    Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the New Money Loans will be deposited into the DIP Funding Account and used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the Order or any other order entered into by the Court that is consistent with the RSA, the Order and this Agreement, including, without limitation (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to pay administration costs of the Cases and Claims or amounts approved by the Court in the "first day" and "second day" orders or as required under the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the proceeds of the New Money Loans may be used to prepay or repay the ABL Credit Agreement (to the extent applicable) solely to extent provided for in the Approved Budget then in effect at the date of such prepayment or repayment, and in any event in an aggregate amount during the term of this Agreement not to exceed $50,000,000.

SECTION 3.18.    Approved Budget.    The Borrowers have heretofore furnished to the Administrative Agent the initial Approved Budget.  Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.19.    Chapter 11 Cases.

(a)    The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Order and (ii) the hearing for the entry of the Order. Debtors shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in the Order.

(b)    After the entry of the Order, and pursuant to and to the extent permitted in the Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or

otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Order.

(c)    After the entry of the Order and pursuant to and to the extent provided in the Order, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i) with respect to Indebtedness under the ABL Credit Agreement (to the extent applicable), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Order.

(d)    The Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Order.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, to the extent the Conversion Date shall not have occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

ARTICLE IV

Conditions

SECTION 4.01.    Conditions to Effective Date.  The effectiveness of this Agreement and the obligations of the Lenders to make the Roll-up Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters  as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)    The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(d)      (a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of the representations and warranties qualified as to materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (b) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have  occurred and be continuing.

(e)      The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Parent Borrower, confirming compliance with the conditions set forth in paragraph (d) of this Section.

(f)      The Lenders and the Administrative Agent shall have received the Approved Budget.

(g)      The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)      The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(i)      The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" rules and regulations, including the USA Patriot Act, to include a duly executed IRS Form W-9 or such other applicable IRS Form for each Borrower, at least three Business Days prior to the Effective Date to the extent such information was requested at least 10 Business Days prior to the Effective Date.

(j)      The Collateral Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)      The Administrative Agent shall have received (i) unaudited interim consolidated financial statements of the Parent Borrower for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of June 30, 2020 and (ii) unaudited financial statements for the fiscal quarter ended May 2, 2020.

(l)      Since the Petition Date, other than those events or circumstances arising from the commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m)      (i) the Administrative Agent shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and (ii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall

have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(n)     No trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(o)     The Pre-Petition Agent and the Pre-Petition Lenders shall have each received adequate protection in respect of the Liens securing their respective Pre-Petition Lender Obligations pursuant to the Order.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.   Conditions to the New Money Loan.  The obligations of the Lenders to make the New Money Loans hereunder shall not become effective until the date on or after the Effective Date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent shall have received a written Borrowing Request to include a flow of funds memorandum in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)     The ABL Credit Agreement shall have been duly executed and delivered by each of the parties thereto, and shall be in full force and effect.

(c)     The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(d)     The Administrative Agent, the Ad Hoc Committee and the Ad Hoc Committee Advisors shall have received all fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced at least two Business Days prior to the Funding Date, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Commitment Letter or any Loan Document, in each case, payable from the proceeds of the initial funding of the Term Loans.

The Administrative Agent shall notify the Borrowers and the Lenders of the Funding Date, and such notice shall be conclusive and binding.

ARTICLE V

Affirmative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 5.01.   Financial Statements and Other Information.   The Borrowers will furnish to the Administrative Agent, on behalf of each Lender and, in the case of clauses (e), (f) and (g), to the Ad Hoc Committee Advisors:

(a)       within 90 days after the end of each fiscal year of the Parent Borrower, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year,  all certified by a Financial Officer of the Parent Borrower to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

(b)       within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Borrower, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Parent Borrower as presenting fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)       within 30 days after the end of each of the first two fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in

part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b);

(d)    concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Parent Borrower, (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c) above, that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Section 5.03 and 5.04 have been provided;

(e)    no later than 5:00 p.m. New York City time on the four week anniversary of the Effective Date(or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), and each fourth (4th) calendar week thereafter, an updated budget consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Ad Hoc Committee Advisors in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Ad Hoc Committee Advisors in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Ad Hoc Committee Advisors approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(f)    no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date a report setting forth (i) the Liquidity as of the  Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and Cash Equivalents as of the Friday of the most recently ended calendar week of all non-Loan Party Subsidiaries on deposit in or credited to any account maintained by such non-Loan Party Subsidiaries;

(g)    no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item

variance report (each, a "Variance Report"),substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time), and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in  actual operating disbursements during the Variance Testing Period (in each case unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h)    (i) to the extent applicable, within 1 Business Day of delivery of a Borrowing Base Certificate (as defined in the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable) to the ABL Agent, copy of such certificate and (ii) a copy of each report or forecast delivered under the ABL Credit Agreement, within 1 Business Day of delivery thereof;

(i)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Borrower or any Subsidiary with the SEC or with any national securities exchange, or distributed by the Parent Borrower to its shareholders generally, as the case may be;

(j)    [reserved];

(k)    promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 hereunder in form and substance reasonably acceptable to the Administrative Agent; and

(l)    promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Parent Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (i) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov.  Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02.    Notices of Material Events.  The Borrowers will furnish to the to the Ad Hoc Committee Advisors and the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Borrowers becoming aware of any of the following:

(a)      the occurrence of any Default;

(b)      the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against (other than in connection with the Cases) or affecting the Parent Borrower or any Restricted Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)      the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(d)      (i) as soon as practicable in advance of filing (and to the extent practicable not later than three (3) days prior to the filing thereof) with the Court or delivering (and to the extent practicable not later than three (3) days prior to the delivery thereof) to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and substance reasonably satisfactory to the Required Lenders), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(e)      any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Parent Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Collateral Obligations; Additional Subsidiaries.

(a) Each Borrower will, and will cause the other applicable Loan Parties to comply with the "Collateral and Guarantee Requirement". If any additional Designated Subsidiary is formed or acquired after the Effective Date (or any Excluded Subsidiary becomes a Designated

67

Subsidiary), the Borrowers will promptly notify the Administrative Agent thereof and will, as promptly as practicable, and in any event within 15 days (or such longer period as the Administrative Agent may agree) after such Designated Subsidiary is formed or acquired (or any Excluded Subsidiary becomes a Designated Subsidiary) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Designated Subsidiary and with respect to any Equity Interests in or Indebtedness of such Designated Subsidiary owned by or on behalf of any Loan Party.

(b) Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Order and subject to the Carve Out in all respects, the Loan Document Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases.

(c) The relative priorities of the Liens described in this Section 5.03 with respect to the Collateral shall be as set forth in the Order. In accordance with the Order, all of the Liens described in this Section 5.03 shall be effective and perfected upon entry of the Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any Collateral, as set forth in the Order.

(d) Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Order , the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

SECTION 5.04.   Information Regarding Collateral.

(a)     The Borrowers will furnish to the Administrative Agent promptly (and in any event within 15 days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party or (iv) the organizational identification number, if any, and the Federal Taxpayer Identification Number of such Loan Party, in each case, only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, of such Loan Party.  The Borrowers also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)     If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Borrowers will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Loan Document Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee

Requirement, including to grant and perfect such Lien, all at the expense of the Borrowers. It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels, collateral access agreements or bailee agreements, except to the extent delivered pursuant to the ABL Credit Agreement or related loan documents, (C) enter into Control Agreements in respect of any Excluded Deposit Account, (D) perfect security interests in any assets represented by a certificate of title or (E) enter into any Collateral Documents governed by the law of a jurisdiction other than the United States.

(c)      If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the ABL Credit Agreement, the Pre-Petition ABL Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the ABL Credit Agreement thereof and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05.   Existence; Conduct of Business.  Subject to any required approval by the Court, each Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06.   Payment of Obligations.  To the extent permitted by the Order and the terms thereof, each Borrower will, and will cause each Restricted Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances provided for therein)except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Parent Borrower or such Restricted Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07.   Maintenance of Properties.  Each Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to

do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.    Insurance.    Each Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.    Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as a loss payee thereunder, and the Borrowers will use commercially reasonable efforts to have each such policy provide for at least 30 days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.09.    Books and Records; Inspection and Rights.    Each Borrower will, and will cause each Restricted Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof) (including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Parent Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Borrowers, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.    The Borrowers shall have the right to have a representative present at any and all inspections.

SECTION 5.10.    Compliance with Laws.    Each Borrower will, and will cause each Restricted Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure

statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Restricted Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Order; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or any case stipulation; provided that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; provided, further, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e)    comply with each of the Required Milestones contained on Schedule 5.11 upon the terms and at the times provided for therein.

SECTION 5.12.    Maintenance of Ratings.    The Borrowers will use commercially reasonable efforts to obtain a rating of the credit facilities created hereunder by each of S&P and Moody's within 15 days of the Effective Date, it being understood that there is no obligation to maintain any particular rating at any time.

SECTION 5.13.    [Reserved].

SECTION 5.14.    [Reserved].

SECTION 5.15.    Conference Calls.    The Borrowers will hold and participate in:

(a) a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01.  The Borrowers will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than

two Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(b) weekly conference calls for the Ad Hoc Committee Advisors to discuss financial information delivered pursuant to Section 5.01(f).

Such monthly and weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrowers and the Lenders or the Ad Hoc Committee Advisors, as applicable.

ARTICLE VI

Negative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 6.01.    Indebtedness; Certain Equity Securities.

Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out) and the Pre-Petition Loan Documents;

(b)    Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(c)    unsecured Indebtedness of the Parent Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) such Indebtedness shall not have been transferred to any Person other than the Parent Borrower or any Restricted Subsidiary, (ii) any such Indebtedness owing by any Loan Party to a Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the Loan Document Obligations and the Pre-Petition Lender Obligations and (iii) any such Indebtedness shall be incurred in compliance with Section 6.04;

(d)    Guarantees incurred in compliance with Section 6.04;

(e)    Indebtedness of the Parent Borrower or any Restricted Subsidiary (i) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (ii) assumed in connection with the acquisition of any fixed or capital assets; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) at the time of incurrence thereof shall not exceed $1,000,000;

72

(f)        Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(g)        Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(h)        Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances);

(i)        [reserved];

(j)        Indebtedness under (i) the Pre-Petition ABL Credit Agreement and (ii) if applicable, the ABL Credit Agreement in an aggregate principal amount not to exceed $400,000,000 at any time outstanding;

(k)        Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(l)        [reserved];

(m)        [reserved];

(n)        [reserved];

(o)        [reserved];

(p)        other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000;

(q)        Indebtedness consisting of (i) the financing of insurance premiums and (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)        obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(s)        Indebtedness in the form of Swap Agreements permitted under Section 6.07.

The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the

amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this Section 6.01.

SECTION 6.02.    Liens.    Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, except:

(a)    (i) Liens granted by the Order (including the Carve Out), (ii) Liens created under the Loan Documents or the Pre-Petition Loan Documents;

(b)    Permitted Encumbrances;

(c)    any Lien on any asset of the Parent Borrower or any Restricted Subsidiary existing on the date hereof and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the date hereof and any extensions, renewals and refinancing thereof that do not increase the outstanding principal amount thereof;

(d)    [reserved];

(e)    Liens on fixed or capital assets acquired, constructed or improved by the Parent Borrower or any Restricted Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(e) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)    in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of the creation of such Lien;

(g)    in the case of (i) any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary or (ii) the Equity Interests in any Person that is not a Restricted Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Restricted Subsidiary or such other Person set forth in the organizational documents of such Restricted Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)    Liens solely on any cash deposits, escrow arrangements or similar arrangements made by the Parent Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder;

(i)    Liens on the Collateral securing Indebtedness permitted by Section 6.01(j) and obligations relating thereto not constituting Indebtedness; provided that any such Liens are subject to (x) the Order and (y), if such Liens are on assets of the Loan Parties, the Intercreditor Agreement;

(j)    any Lien on assets of any Foreign Subsidiary (other than any Luxembourg IP Subsidiary); provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01 and obligations relating thereto not constituting Indebtedness;

(k)    other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Indebtedness or other obligations not to exceed $1,000,000;

(l)    non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)    Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders.

SECTION 6.03.    Fundamental Changes; Business Activities.

(a)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Restricted Subsidiary may  (x) merge into the Parent Borrower in a transaction in which the Parent Borrower is the surviving entity and (y) merge into the Subsidiary Borrower in a transaction in which the Subsidiary Borrower is the surviving entity, (ii) any Person (other the Parent Borrower or the Subsidiary Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary and, if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Restricted Subsidiary (other than the Subsidiary Borrower) may liquidate or dissolve if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Restricted Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)    Neither Borrower will, nor will it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Parent Borrower and the Restricted Subsidiaries on the date hereof  and businesses reasonably related or complementary thereto.

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)    Investments in cash and Cash Equivalents;

(b)     Investments existing on the date hereof or contractually committed to as of the date hereof and set forth on Schedule 6.04 and any extensions thereof (but not any additions thereto (including any capital contributions) made after the date hereof) ;

(c)     Investments by the Parent Borrower and the Restricted Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, and (ii) in the case of any such Investments by the Loan Parties in, and loans and advances by the Loan Parties to, Restricted Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the date hereof and permitted by clause (b) above), (A) the aggregate amount of all such Investments (including loans and advances) permitted pursuant to this clause (c) and pursuant to clauses (d) and (e) below, taken together, shall not exceed $10,000,000 and (B) in each case, all such Investments (including loans and advances) shall be (x) made in the ordinary course of business, (y), solely in connection with the operational and compliance needs of the Parent Borrower and its Restricted Subsidiaries and (z) permitted by the Approved Budget (subject to Permitted Variance);

(d)     loans or advances made by the Parent Borrower to any Restricted Subsidiary or made by any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(c) and (ii) the amount of such loans and advances made by the Loan Parties to Restricted Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variance);

(e)     Guarantees by the Parent Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Parent Borrower or any Restricted Subsidiary, solely to the extent (i) arising as a result of any such Person being a joint and several co-applicant with respect to any letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder, in each case, in the ordinary course of business; provided that the aggregate amount of Indebtedness and other obligations of Restricted Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)     [reserved];

(g)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)     [reserved];

(i)     deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)     advances by the Parent Borrower or any Restricted Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(k)      [reserved];

(l)      Investments in the form of Swap Agreements permitted under Section 6.07;

(m)      investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)      other Investments to the extent permitted by and expressly set forth in the Order;

(o)      other Investments in an aggregate amount not to exceed $1,000,000; and

(p)      Investments in respect of actions permitted by Section 6.05(g).

For the purposes of this Section, any unreimbursed payment by the Parent Borrower or any Restricted Subsidiary for goods or services delivered to any Subsidiary shall be deemed to be an Investment in such Subsidiary.

SECTION 6.05.    Asset Sales.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, transfer or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Parent Borrower permit any Restricted Subsidiary to issue any additional Equity Interests in such Restricted Subsidiary (other than to the Parent Borrower or any other Restricted Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

(a)      (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, (iv) dispositions of Cash Equivalents and (v)  use of cash in accordance with the Approved Budget and pursuant to transactions permitted under this agreement, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)      sales, transfers, leases and other dispositions to the Parent Borrower or any Restricted Subsidiary in the ordinary course of business; provided that any such sales, transfers, leases or other dispositions involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)      the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)      dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)      leases or subleases of real property granted by the Parent Borrower or any Restricted Subsidiary to third Persons not interfering in any material respect with the business of

77

the Parent Borrower or any Restricted Subsidiary, including, without limitation, retail store lease assignments and surrenders;

(f)    [reserved];

(g)    in connection with the consolidation of foreign operations of the Parent Borrower and its Subsidiaries, the direct or indirect transfers or other dispositions by any Restricted Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Restricted Subsidiary to (i) with respect to any Luxembourg IP Subsidiary or any non-Loan Party Restricted Subsidiary with the prior consent of the Required Lenders  and (ii) any other Restricted Subsidiary;

(h)    to the extent prior consent of the Required Lenders is received, the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Parent Borrower and its Restricted Subsidiaries;

(i)    other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget; and

(j)    Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)    sales, transfers and other dispositions of assets that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a Responsible Officer of the Parent Borrower reasonably and acting in good faith, of not more than $1,000,000;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b), (c), (d), (g) or (h)) shall be made for fair value.

SECTION 6.06.    Sale/Leaseback Transactions.    Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.    Swap Agreements.    Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Parent Borrower or a Restricted Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness.

(a)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)      the Parent Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Parent Borrower;

(ii)     any Restricted Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Parent Borrower and the Restricted Subsidiaries);

(iii)    the Parent Borrower may make Restricted Payments pursuant to and in accordance with customary stock option plans or other equity or benefit plans for management or employees of the Parent Borrower and the Restricted Subsidiaries in effect from time to time;

(iv)     Restricted Payments made by any Restricted Subsidiary to another non-Restricted Subsidiary to consummate transactions that would otherwise be permitted by Section 6.04(c);

(v)      the Parent Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Parent Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Parent Borrower;

(vi)     Restricted Payments to Parent Borrower on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith;

(vii)    [reserved]; and

(viii)   Restricted Payments made to consummate the transactions permitted by Section 6.05(g).

(b)      Neither Borrower will, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i)      [reserved];

(ii)     [reserved];

(iii)    [reserved];

(iv)     [reserved];

(v)      [reserved];

(vi)      payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Order, as applicable; and

(vii)      [reserved].

(c)      Neither Borrower will, nor will it permit any of the Restricted Subsidiaries to amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.    Transactions with Affiliates.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Parent Borrower or such Restricted Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Parent Borrower and the Restricted Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Parent Borrower or any Restricted Subsidiary, as determined by the board of directors of the Parent Borrower in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate protection payments on account of secured Pre-Petition Indebtedness pursuant to the Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10.    Restrictive Agreements.

(a) Neither Borrower will, nor will it permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (1) the ability of the Parent Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure the Loan Document Obligations or (2) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Parent Borrower or to Guarantee the Loan Agreement; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such restrictions and conditions apply only to such Restricted Subsidiary and to any Equity Interests in such Restricted Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Credit Agreement, Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement, (F) restrictions and conditions imposed

80

by agreements relating to Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted under Section 6.01 and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), provided that such restrictions and conditions apply only to such Restricted Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(e) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Restricted Subsidiary in existence at the time such Restricted Subsidiary became a Restricted Subsidiary and otherwise permitted under Section 6.01 (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), provided that such restrictions and conditions apply only to such Restricted Subsidiary.

(b) Except as permitted pursuant to the terms of this Agreement and the Order and otherwise consented to by the Required Lenders:

(i) Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Order that is adverse to the Lenders.

(ii) Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative Agent, and the Lenders hereunder, except for the Carve Out and, subject to the Intercreditor Agreement, the ABL Credit Agreement to the extent applicable.

SECTION 6.11.    Amendment of Organizational Documents.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12.    Financial Covenants

(a)    The Parent Borrower will not permit Liquidity at any time to be less than $100,000,000.

(b) Commencing after the end of the 3rd week following the Effective Date, and solely to the extent that Liquidity is less than $150,000,000, the Parent Borrower will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

(c) The Parent Borrower will not permit the amount of cash and Cash Equivalents of non-Loan Party Subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by non-Loan Party Subsidiaries to exceed $45,000,000 in the

aggregate for all non-Loan Party Subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities.

SECTION 6.13.   Accounting Changes.  The Parent Borrower will not make any change in the Parent Borrower's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14.   Sanctions.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15.   Anti-Corruption Laws.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing for any purpose which would breach any Anti-Corruption Laws.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

(a)    the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Loan or any fee, premium (including the Redemption Premium, if any) or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation, warranty or certification made or deemed made by the Parent Borrower or any Restricted Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation or warranty qualified by materiality, incorrect);

(d)    the Borrowers shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 or 5.05 (with respect to the existence of any Borrower), 5.11 (including the Required Milestones) or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified

82

in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 7 Business Days after receipt of written notice thereof from the Administrative Agent;

(f)       except as a result of commencement of the Cases or entry into this Agreement, and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, the Parent Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any Material Indebtedness (other than the Loan Document Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)       except as a result of commencement of the Cases or entry into this Agreement and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in any Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Material Indebtedness to become due, or to terminate or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness or (ii) any Indebtedness that becomes due as a result of a voluntary refinancing thereof permitted under Section 6.01; provided, further, that no such event under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, shall constitute an Event of Default under this clause (g) until the earliest to occur of (x) 5 days after the date of such Event of Default (during which period such Event of Default is not waived or cured), (y) the acceleration of the Indebtedness under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, and (z) the exercise of remedies by the ABL Agent in respect of a material portion of the ABL Priority Collateral, to the extent applicable;

(h)       [reserved];

(i)       [reserved];

(j)       [reserved];

(k)       except for any order fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Parent Borrower or any Restricted Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any

action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)    one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(m)    a Change in Control shall occur;

(n)    any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, satisfaction in full of all the Loan Document Obligations (other than contingent indemnification claims) or any act or omission by the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; and

(o)    any Lien purported to be created under any Collateral Document and the Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or Section 9.16 or consented to under Section 9.02, (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement or (iv) as to Collateral constituting real property, to the extent such losses are covered by Lender's title insurance policy and such insurer has not denied coverage;

(p)    the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(q)    any Loan Party shall file a motion in the Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Order, as the case may be, to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders) or provide for the payment of the Loan Document Obligations in full and in cash upon the incurrence of such additional financing;

(r)    an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

(s)     an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Loan Document Obligations upon entry thereof;

(t)     an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), with such consent not to be unreasonably withheld, conditioned or delayed, (i) to revoke, reverse, stay, modify, supplement or amend the Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Loan Document Obligations (other than the Carve Out);

(u)     (i) an application for any of the orders described in clause (r) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(v)     the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(w)     any Loan Party shall fail to comply with the Order;

(x)     any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Loan Document Obligations, other than in accordance with the Order;

(y)     the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Cases;

(z)     the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(aa)    the Court denies confirmation of the Plan, provided, that if the Loan Parties subsequently obtain an order of the Court approving a plan of reorganization that either (i) proposes to repay in full in cash of all Loan Document Obligations under the Term Credit Facility, immediately upon the effectiveness thereof, (ii) is, taken as a whole, in form and substance substantially similar to the Plan of Reorganization or (iii) otherwise is approved by the Required Lenders, an Event of Default shall not occur;

(bb)    The Loan Parties attempts to consummate a sale of substantially all of its assets via a plan of reorganization or a 363 sale without consent of the Required Lenders; or

(cc)    the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers and (iii) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

## ARTICLE VIII

The Administrative Agent

Each of the Lenders hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and

is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents, provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any Subsidiary or any other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment).  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrowers or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof).  The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying,

upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all their duties and exercise their rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the terms of this paragraph, the Administrative Agent may resign at any time, upon thirty days prior notice, from its capacity as such.  In connection with such resignation, the Administrative Agent shall give notice of its intent to resign to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower so long as no Event of Default under clauses (a) or (b) of Article VII is continuing, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents.  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor.  Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents,

provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with the Loan Documents or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Loan Document Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.  In the event of a foreclosure by the Administrative Agent on any of the Collateral

pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Secured Parties at such sale or other disposition.

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is a Permitted Encumbrance or that is permitted by Section 6.02(d), (e), (g) and (h).  The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.10, 2.11, 2.13, 2.14, 2.15 and 9.03) allowed in such judicial proceeding;

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax.  Without

limiting or expanding the provisions of Section 2.15, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Loan Document Obligations.

Notwithstanding anything herein to the contrary, neither the Debtors' Investment Banker nor any Person (if any) named on the cover page of this Agreement for recognition purposes only shall have any duties or obligations under this Agreement or any other Loan Document (except in any such Person's capacity, and to the extent applicable, as a Lender), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Loan Document Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

ARTICLE IX

Miscellaneous

SECTION 9.01.    Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, or mailed by certified or registered mail, as follows:

(i)      if to the Borrowers:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention:  Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail: dan.lamadrid@ascenaretail.com

with a copy to:

933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Gary Holland, General Counsel and VP
E-mail: gary.holland@ascenaretail.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attention:  David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com


(ii)    if to the Administrative Agent:

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, IL 60606
Attention: Legal Department and Hendrik van der Zandt
Email: legal@alterdomus.com and hendrik.vanderzandt@alterdomus.com


with a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua Spencer
Email: joshua.spencer@hklaw.com

and

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Evan Fleck
Email: EFleck@milbank.com

(iii)    if to any other Lender, to it at its address or e-mail address set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received and (ii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

(d)    The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "Platform").  The Platform is provided "as is" and "as available."  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.

SECTION 9.02.    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the

Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Without limiting the generality of the foregoing, the execution and delivery of this Agreement or the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Except as provided in Sections 9.02(c) and 9.19 and except with respect to the Administrative Agent Fee Letter, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent and the Required Lenders and, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrowers and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon or reduce or forgive any interest or fees or premiums (including any prepayment premiums but excluding for the avoidance of doubt, any mandatory prepayment) payable hereunder without the written consent of each Lender directly affected thereby, (C) postpone the scheduled maturity date of any Loan, or the date of any scheduled payment of the principal amount of any Term Loan under Section 2.08, or any date for the payment of any interest or fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby, (D) change Section 2.16(b) or 2.16(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (E) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender; provided that, with the consent of the Required Lenders, the provisions of this Section and the definition of the term "Required Lenders" may be amended to include references to any new class of loans created under this Agreement (or to lenders extending such loans) on substantially the same basis as the corresponding references relating to the existing Loans or Lenders, (F) release substantially all of the value of the Guarantees provided by the Guarantors (including, in each case, by limiting liability in respect thereof) created under the Collateral Agreement without the written consent of each Lender (except as expressly provided in Section 9.16 or the Collateral Agreement including any such release by the Administrative Agent in connection with any sale or other disposition of

any Subsidiary upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations guaranteed under the Collateral Agreement shall not be deemed to be a release or limitation of any Guarantee, and (G) release all or substantially all the Collateral from the Liens of the Collateral Documents, without the written consent of each Lender (except as expressly provided in Section 9.16 or the applicable Collateral Document (including any such release by the Administrative Agent in connection with any sale or other disposition of the Collateral upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations secured by the Collateral Documents shall not be deemed to be a release of the Collateral from the Liens of the Collateral Documents); provided further that no such agreement shall amend, modify, extend or otherwise affect the rights or obligations of the Administrative Agent without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of, in the case of any amendment, waiver or other modification referred to in clause (ii) of the first proviso of this paragraph, any Lender that receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, waiver or other modification becomes effective and whose Commitments terminate by the terms and upon the effectiveness of such amendment, waiver or other modification.

(c)     Notwithstanding anything herein to the contrary, the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Loan Party from any covenant of such Loan Party set forth in this Agreement, the Collateral Agreement or in any other Collateral Document to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement".

(d)     The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.  Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(e)     Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.22 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Parent Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit G as in effect on the Effective Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.22 and such

95

other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Parent Borrower in connection therewith.

SECTION 9.03.    Expenses; Indemnity; Damage Waiver.

(a)    The Borrowers shall, jointly and severally, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee, the Lenders and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, one primary counsel for the Ad Hoc Committee, and if deemed necessary by the Administrative Agent or the Ad Hoc Committee, one local counsel for the Administrative Agent and Ad Hoc Committee, as applicable in each applicable jurisdiction, in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof, the Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral  and (iii) all out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any subagent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the structuring, arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, enforcement, delivery and administration of this Agreement, the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or the other Loan Documents of their obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under to or from any property currently or formerly owned or operated by the Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent Borrower or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing,

whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement, or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (i) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (ii) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from a material breach by such Indemnitee of the Loan Documents or (iii) involve a dispute solely among Indemnitees (other than an action involving (i) alleged conduct by any Borrower or any of its Affiliates or (ii) against the Administrative Agent in its capacity as such).  This Section shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

(c)    Each Lender severally agrees to indemnify and hold harmless the Administrative Agent (or any sub-agent thereof), to the extent that the Administrative Agent (or any sub-agent) shall not have been timely reimbursed by the Borrowers, based on and to the extent of such Lender's pro rata share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent (or any sub-agent thereof) in any way relating to or arising out of this Agreement or the other Loan Documents; provided, that no Lender shall be liable to the Administrative Agent (or any sub-agent) for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or any sub-agent's) gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Article VIII) shall constitute gross negligence or willful misconduct). If any indemnity furnished to the Administrative Agent (or any sub-agent thereof) for any purpose shall, in the opinion of the Administrative Agent (or any sub-agent thereof), be insufficient or become impaired, the Administrative Agent (or any sub-agent ) may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify the Administrative Agent (or any sub-agent thereof) against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

(d)    To the extent permitted by applicable law, (i) the Borrowers shall not assert, or permit any of their respective Affiliates or Related Parties to assert, and hereby waives, any claim against any Indemnitee for any damages arising from the use by others of information or

other materials obtained through telecommunications, electronic or other information transmission systems (including the internet)and (ii) none of the Borrowers or any Secured Party shall assert, or permit any of their respective Affiliates or Related Parties to assert any claims on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.   Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Debtors' Investment Banker (to the extent provided in Article VIII)and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(i)     the Borrowers; provided that no consent of Borrowers shall be required (1) for an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund, (2) if in connection with the Initial Allocation (as defined in the Commitment Letter) or to Persons who have delivered a joinder and an election agreement to the Ad Hoc Committee Advisors by August 13, 2020 and (3) if an Event of Default has occurred and is continuing, for any other assignment; provided further that, the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof.

(ii)     the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund.

98

(iii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and recorded in the Register) shall not be less than $1,000,000 unless each of the Borrowers and the Administrative Agent otherwise consent; provided that no such consent of the Borrowers shall be required (i) if an Event of Default has occurred and is continuing or (ii) in connection with the Initial Allocation (as defined in the Commitment Letter) or to Persons who have delivered a joinder and an election agreement to the Ad Hoc Committee Advisors by August 13, 2020;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that only one such processing and recordation fee shall be payable in the event of simultaneous assignments from any Lender or its Approved Funds to one or more other Approved Funds of such Lender;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form, and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain MNPI) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws;

(E)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, the Ad Hoc Committee Advisors and the Company a signed joinder to the Restructuring Support Agreement; and

(F)    each Lender acknowledges and agrees that the Loans, on the one hand, and the unfunded Commitments on the other hand, shall be held by such Lender in equal percentages and such Loans, on the one hand, and such unfunded Commitments, on the other hand, are "stapled" to each other, and shall be assigned in equal percentages.

(iv)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and

99

Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c).

(v)    The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and records of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(vi)    Upon receipt by the Administrative Agent of an Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), all other information required under (iii)(D) above and the processing and recordation fee referred to in this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that the Administrative Agent shall not be required to accept such Assignment and Assumption or so record the information contained therein if the Administrative Agent reasonably believes that such Assignment and Assumption lacks any written consent required by this Section or is otherwise not in proper form, it being acknowledged that the Administrative Agent shall have no duty or obligation (and shall incur no liability) with respect to obtaining (or confirming the receipt) of any such written consent or with respect to the form of (or any defect in) such Assignment and Assumption, any such duty and obligation being solely with the assigning Lender and the assignee. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph, and following such recording, unless otherwise determined by the Administrative Agent (such determination to be made in the sole discretion of the Administrative Agent, which determination may be conditioned on the consent of the assigning Lender and the assignee), shall be effective notwithstanding any defect in the Assignment and Assumption relating thereto. Each assigning Lender and the assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the Administrative Agent that all written consents required by this Section with respect thereto (other than the consent of the Administrative Agent)

100

have been obtained and that such Assignment and Assumption is otherwise duly completed and in proper form, and each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee.

(vii)    No such assignment shall be made to the Parent Borrower or any of its Subsidiaries, except as set forth in Section 9.04(e).

(c)    (i) Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement; provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders.  The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (x) agrees to be subject to the provisions of Sections 2.16 and 2.17 as if it were an assignee under paragraph (b) of this Section and (y) shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.17(b) with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(i)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such

Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    Notwithstanding anything to the contrary contained in this Section 9.04 or any other provision of this Agreement, no Lender shall have the right at any time to sell, assign or transfer all or a portion of the Loans owing to it to the Parent Borrower or any of its Subsidiaries.

SECTION 9.05.    Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.13, 2.14, 2.15, 2.16(e) and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.    Counterparts; Integration; Effectiveness; Electronic Execution.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature

page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement.   The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07.    Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.   Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the Loan Document Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)      Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and the Borrowers hereby irrevocably and unconditionally agree that all claims arising out of or relating to this Agreement or any other Loan Document brought by the Borrowers or any of their respective Affiliates shall be brought, and shall be heard and determined in the Court, in such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any

other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)     The Borrowers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.   WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.   Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.   Confidentiality. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document

or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Parent Borrower or any Subsidiary or its obligations, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein, (h) with the consent of the Borrowers or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender or any Affiliate of any of the foregoing on a non-confidential basis from a source other than the Borrowers; provided that, in the case of clause (c) above, the party disclosing such information shall provide to the Borrowers prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Borrowers in obtaining a protective order for, or other confidential treatment of, such disclosure.  For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Parent Borrower or any Subsidiary or their businesses or the Collateral.

SECTION 9.13.    Several Obligations; Nonreliance; Violation of Law.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14.    USA Patriot Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with such Act.

SECTION 9.15.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.16.    Release of Liens and Guarantees.  A Guarantor (for the avoidance of doubt, other than the Borrowers) shall be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Guarantor shall be released, upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary (including any voluntary liquidation or dissolution of such Guarantor in accordance with Section 6.03); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party or to any other Subsidiary of the Parent Borrower) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 9.02, the security interests in such Collateral created by the Collateral Documents shall be automatically released. In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

SECTION 9.17.    No Fiduciary Relationship.  Each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Parent Borrower, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent Borrower, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Lenders or their Affiliates has any obligation to disclose any of such interests to the Parent Borrower, the Subsidiaries or its other Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.    Non-Public Information.

(a)      Each Lender acknowledges that all information, including requests for waivers and amendments, furnished by a Borrower or the Administrative Agent pursuant to or in connection with, or in the course of administering, this Agreement will be syndicate-level information, which may contain MNPI.  Each Lender represents to the Borrowers and the Administrative Agent that (i) it has developed compliance procedures regarding the use of MNPI and that it will handle MNPI in accordance with such procedures and applicable law, including Federal, state and foreign securities laws, and (ii) it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain MNPI in

106

accordance with its compliance procedures and applicable law, including Federal, state and foreign securities laws.

(b)    The Borrowers and each Lender acknowledge that, if information furnished by the Loan Parties pursuant to or in connection with this Agreement is being distributed by the Administrative Agent through the Platform, (i) the Administrative Agent may post any information that the Borrowers have indicated as containing MNPI solely on that portion of the Platform designated for Private Side Lender Representatives and (ii) if the Borrowers have not indicated whether any information furnished by it pursuant to or in connection with this Agreement contains MNPI, the Administrative Agent reserves the right to post such information solely on that portion of the Platform designated for Private Side Lender Representatives.  The Borrowers agree to clearly designate all information provided to the Administrative Agent by or on behalf of the Borrowers that is suitable to be made available to Public Side Lender Representatives, and the Administrative Agent shall be entitled to rely on any such designation by the Borrowers without liability or responsibility for the independent verification thereof.

SECTION 9.19.    Intercreditor Agreement.    (a) Each of the Lenders and the other Secured Parties acknowledges that obligations of the Loan Parties under the ABL Credit Agreement are secured by Liens on assets of the Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Secured Parties and the secured parties under the ABL Credit Agreement will be set forth in the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Intercreditor Agreement and any documents relating thereto.

(a)    Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the ABL Priority Collateral securing the Loan Document Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the execution and delivery thereof, such Secured Party will be bound by the provisions of the Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(b)    Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment,

extension, renewal, refinancing or replacement of any Loan Document Obligations or the Indebtedness under the ABL Credit Agreement to the extent applicable, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(c)    Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(d)    The Administrative Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature pages follow]

108

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT BORROWER:**

ASCENA RETAIL GROUP, INC.

By:_____

Name: _____

Title: _____

**SUBSIDIARY BORROWER:**

ANNTAYLOR RETAIL, INC.

By:_____

Name: _____

Title: _____

ALTER DOMUS (US) LLC,
as Administrative Agent,


By:_____

Name: _____

Title: _____

## Schedule 2.01
## Commitments

| Lender | Commitment |
|--------|------------|
| [   ] | $           [  ],000,000 |
| **Total** | $           [  ],000,000 |

Schedule 5.11
Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Court and as such time periods may be extended by the Required Lenders, achieve the following milestones:

(i)    the Petition Date shall have occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(ii)    the Debtors shall have filed the Rent Deferral Motion (as defined in the RSA) with the Court within three (3) calendar days of the Petition Date;

(iii)    the Court shall have entered the Cash Collateral Order (as defined in the RSA) on an interim basis by the date that is five (5) Business Days after the Petition Date;

(iv)    the Court shall have entered the DIP Financing Order (as defined in the RSA) on a final basis by the date that is fifty (50) calendar days after the Petition Date;

(v)    the Court shall have entered the Disclosure Statement Order (as defined in the RSA) by the date that is sixty (60) calendar days after the Petition Date;

(vi)    solicitation of the Plan (as defined in the RSA) shall have commenced by the date that is seventy (70) calendar days after the Petition Date;

(vii)    the Court shall have entered the Confirmation Order (as defined in the RSA) by the date that is one hundred ten (110) calendar days after the Petition Date; and

(viii)    the Plan Effective Date (as defined in the RSA) shall have occurred by the date that is one hundred thirty (130) calendar days after the Petition Date.

**Annex 4: Form of DIP ABL Agreement**

# J.P.Morgan

$400,000,000

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

September [●], 2020,

among

ASCENA RETAIL GROUP, INC.,

The BORROWING SUBSIDIARIES party hereto,

The other LOAN PARTIES party hereto,

The LENDERS party hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

_____

JPMORGAN CHASE BANK, N.A. and
BANK OF AMERICA, N.A.,
as Joint Bookrunners and Joint Lead Arrangers

BANK OF AMERICA, N.A. and
WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Syndication Agents

FIFTH THIRD BANK, NATIONAL ASSOCIATION,
GOLDMAN SACHS BANK USA,
CAPITAL ONE, NATIONAL ASSOCIATION and
U.S. BANK NATIONAL ASSOCIATION,
as Documentation Agents

TABLE OF CONTENTS

Page

ARTICLE I

**Definitions**

SECTION 1.01. Defined Terms       2

SECTION 1.02. Classification of Loans and Borrowings      48

SECTION 1.03. Terms Generally       48

SECTION 1.04. Accounting Terms; GAAP   49

SECTION 1.05. Classification of Actions      49

SECTION 1.06. Divisions      50

ARTICLE II

**The Credits**

SECTION 2.01. Commitments; Full-Roll of Pre-Petition Obligations
            50

SECTION 2.02. Loans and Borrowings       50

SECTION 2.03. Requests for Revolving Borrowings       51

SECTION 2.04. Protective Advances  52

SECTION 2.05. Overadvances       53

SECTION 2.06. Letters of Credit       54

SECTION 2.07. Funding of Borrowings       61

SECTION 2.08. Interest Elections      62

SECTION 2.09. Termination and Reduction of Revolving Commitments
            63

SECTION 2.10. Repayment of Loans; Evidence of Debt      64

SECTION 2.11. Prepayment of Loans       65

SECTION 2.12. Fees  66

i

SECTION 2.13. Interest          67

SECTION 2.14. Alternate Rate of Interest     68

SECTION 2.15. Increased Costs         69

SECTION 2.16. Break Funding Payments     70

SECTION 2.17. Taxes          71

SECTION 2.18. Payments Generally; Allocation of Proceeds; Sharing of
          Set-offs          75

SECTION 2.19. Mitigation Obligations; Replacement of Lenders   78

SECTION 2.20. Defaulting Lenders  79

SECTION 2.21. Returned Payments  81

SECTION 2.22. Borrowing Subsidiaries       81

SECTION 2.23. Eligible Pledged Cash Account       82

SECTION 2.24. Super-Priority Nature of Obligations and Administrative
          Agent's Liens; Payment of Obligations.       82

SECTION 2.25. Conversion to Exit Facility Agreement      82

**ARTICLE III**

**Representations and Warranties**

SECTION 3.01. Organization; Powers         83

SECTION 3.02. Authorization; Enforceability; Benefit to Loan Parties
               84

SECTION 3.03. Governmental Approvals; No Conflicts     84

SECTION 3.04. Financial Condition; No Material Adverse Effect   84

SECTION 3.05. Properties     85

SECTION 3.06. Litigation and Environmental Matters       85

SECTION 3.07. Compliance with Laws and Agreements     85

SECTION 3.08. Investment Company Status86

SECTION 3.09. Taxes          86

SECTION 3.10. ERISA; Labor Matters        86

SECTION 3.11. Disclosure    87

SECTION 3.12. Subsidiaries and Joint Ventures      87

SECTION 3.13. Insurance      88

SECTION 3.14. Federal Reserve Regulations          88

SECTION 3.15. [Reserved].   88

SECTION 3.16. Collateral Matters    88

SECTION 3.17. Use of Proceeds      88

SECTION 3.18. Credit Card Agreements      88

SECTION 3.19. Approved Budget     89

SECTION 3.20. Chapter 11 Cases     89

**ARTICLE IV**

**Conditions**

SECTION 4.01. Conditions to Effectiveness of Credit Agreement   90

SECTION 4.02. Each Credit Event    92

**ARTICLE V**

**Affirmative Covenants**

SECTION 5.01. Financial Statements; Borrowing Base and Other
          Information     93

SECTION 5.02. Notices of Material Events  97

SECTION 5.03. [Reserved]   98

SECTION 5.04. Information Regarding Collateral   98

SECTION 5.05. Existence; Conduct of Business       99

SECTION 5.06. Payment of Obligations       99

SECTION 5.07. Maintenance of Properties   99

SECTION 5.08. Insurance      99

SECTION 5.09. Books and Records; Inspection Rights       100

SECTION 5.10. Compliance with Laws        100

SECTION 5.11. Use of Proceeds        100

SECTION 5.12. Appraisals    101

SECTION 5.13. Field Examinations  101

SECTION 5.14. Depository Banks    101

SECTION 5.15. Further Assurances  101

SECTION 5.16. Credit Card Agreements and Notifications 102

SECTION 5.17. Loan Parties' Advisors        102

SECTION 5.18. Lender Advisors      103

SECTION 5.19. Bankruptcy Matters 103

**ARTICLE VI**

**Negative Covenants**

SECTION 6.01. Indebtedness; Certain Equity Securities      104

SECTION 6.02. Liens 106

SECTION 6.03. Fundamental Changes; Business Activities 108

SECTION 6.04. Investments, Loans, Advances, Guarantees and
            Acquisitions   108

SECTION 6.05. Asset Sales   110

SECTION 6.06. Sale/Leaseback Transactions          111

SECTION 6.07. Swap Agreements     111

SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness
                111

SECTION 6.09. Transactions with Affiliates 113

SECTION 6.10. Restrictive Agreements        113

SECTION 6.11. Amendment of Organizational Documents 114

SECTION 6.12. Financial Covenants 114

SECTION 6.13. Accounting Changes        114

SECTION 6.14. Sanctions     114

SECTION 6.15. Anti-Corruption Laws        115

SECTION 6.16. Subrogation  115

## ARTICLE VII

### Events of Default

## ARTICLE VIII

### The Administrative Agent

## ARTICLE IX

### Miscellaneous

SECTION 9.01. Notices        128

SECTION 9.02. Waivers; Amendments        130

SECTION 9.03. Expenses; Indemnity; Damage Waiver      134

SECTION 9.04. Successors and Assigns      136

SECTION 9.05. Survival        140

SECTION 9.06. Counterparts; Integration; Effectiveness; Electronic
        Execution       140

SECTION 9.07. Severability  141

SECTION 9.08. Right of Setoff        141

SECTION 9.09. Governing Law; Jurisdiction; Consent to Service of
        Process           141

SECTION 9.10. WAIVER OF JURY TRIAL          142

SECTION 9.11. Headings      142

SECTION 9.12. Confidentiality        142

SECTION 9.13. Several Obligations; Nonreliance; Violation of Law
144

SECTION 9.14. USA Patriot Act        144

SECTION 9.15. Appointment for Perfection 144

SECTION 9.16. Interest Rate Limitation        144

SECTION 9.17. No Fiduciary Relationship   145

SECTION 9.18. [Reserved]    145

SECTION 9.19. Intercreditor Agreement        145

SECTION 9.20. Acknowledgement and Consent to Bail-In  146

## ARTICLE X

### Loan Guarantee

SECTION 10.01. Guarantee  147

SECTION 10.02. Guarantee of Payment        147

SECTION 10.03. No Discharge or Diminishment of Loan Guarantee
147

SECTION 10.04. Defenses Waived   148

SECTION 10.05. Rights of Subrogation        149

SECTION 10.06. Reinstatement; Stay of Acceleration        149

SECTION 10.07. Information149

SECTION 10.08. Taxes        149

SECTION 10.09. Maximum Liability        149

SECTION 10.10. Contribution        150

SECTION 10.11. Liability Cumulative        150

## ARTICLE XI

### The Borrower Representative

SECTION 11.01. Appointment; Nature of Relationship        151

SECTION 11.02. Powers        151

SECTION 11.03. Employment of Agents        151

SECTION 11.04.        Notices        151

SECTION 11.05. Successor Borrower Representative        151

SECTION 11.06. Execution of Loan Documents; Borrowing Base
            Certificate        151

SECTION 11.07. Reporting   152

SECTION 11.08. Acknowledgement Regarding Any Supported QFCs
            152

SCHEDULES:

Schedule 2.01        — Commitments
Schedule 2.06        — Existing Letters of Credit
Schedule 3.05        — Leases and Real Property
Schedule 3.06        — Disclosed Matters
Schedule 3.12        — Subsidiaries and Joint Ventures
Schedule 3.13        — Insurance
Schedule 3.18        — Credit Card Agreements
Schedule 5.19        — Required Milestones
Schedule 6.01        — Pre-Petition Indebtedness
Schedule 6.02        — Liens
Schedule 6.04        — Investments
Schedule 6.09        — Transactions with Affiliates
Schedule 6.10        — Restrictive Agreements

EXHIBITS:

Exhibit A        —        Form of Assignment and Assumption
Exhibit B        —        Form of Borrowing Base Certificate
Exhibit C        —        Form of Borrowing Request
Exhibit D        —        Form of Compliance Certificate
Exhibit E        —        Form of Issuing Bank Agreement
Exhibit F        —        Form of Interest Election Request
Exhibit G        —        Form of Exit Facility Term Sheet
Exhibit H        —        [Reserved]

Exhibit I-1    —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes

Exhibit I-2    —    Form of U.S. Tax Certificate for Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes

Exhibit I-3    —    Form of U.S. Tax Certificate for Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes

Exhibit I-4    —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes

Exhibit J    —    Form of Variance Report

Annex A    —    Approved Budget

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of September [●], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession, the BORROWING SUBSIDIARIES party hereto, the other LOAN PARTIES party hereto, the LENDERS party hereto, the ISSUING BANKS party hereto and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated on June 4, 2012, March 13, 2013, July 24, 2015 and February 27, 2018, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders, and JPMORGAN CHASE BANK, N.A., as the Pre-Petition Agent, and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $230,000,000 in Revolving Loans and $103,000,000 in maximum aggregate amounts available to be drawn under outstanding Letters of Credit (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a Lien in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such Lien is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other Liens.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a senior secured super priority revolving credit facility of up to $400,000,000 in the aggregate with a $200,000,000 Letter of Credit sublimit that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of $400,000,000 in aggregate principal amount of commitments to be made available to the Borrowers at any time and from time to time until the Maturity Date subject to the terms and conditions set forth herein (the "Revolving Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Lender Parties, a Lien in and upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement, as

1

supplemented and modified by the Intercreditor Acknowledgment, and the limitations and priorities contained in the Loan Documents and the Final Order.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Administrative Agent, the Required Lenders and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Administrative Agent and the Required Lenders.

"Account Debtor" means any Person obligated on an Account.

"Accounts" has the meaning set forth in the Security Agreement.

"Actual Net Cash Flow Amount" means the actual net cash flows of the Loan Parties during the relevant period of determination.

"Additional Eligible Pledged Cash" means, on any date of determination, (a) cash that is on deposit in a special purpose Deposit Account established by the Company with the Administrative Agent and (b) cash that is invested in a money market fund account established by the Company and managed by the Administrative Agent or one of its Affiliates and, in each case, that is subject to the Lien in favor of the Administrative Agent set forth in the Final Order, the Security Agreement and a Deposit Account Control Agreement or other control agreement reasonably satisfactory to the Administrative Agent and with respect to which the Administrative Agent shall have sole dominion and control, except that withdrawals thereof by the Company shall be permitted so long as, on a pro forma basis, the Company shall be in compliance with the second sentence of Section 2.09(a).  Neither Eligible Pledged Cash nor cash pledged pursuant to Section 2.06(j) shall constitute Additional Eligible Pledged Cash.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means JPMCB, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agent Fee Letter" means the Fee Letter dated August 14, 2020, between the Company and JPMCB, with respect to fees payable to the Administrative Agent and the other persons named therein for their respective accounts.

"Aggregate Credit Exposure" means the sum of the Credit Exposures of all the Lenders.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.00% per annum. For purposes of clause (c) above, the Adjusted LIBO Rate on any day shall be based on the Screen Rate on such day for a deposit in dollars with a maturity of one month (or, if the Screen Rate is not available for such one month maturity, the Interpolated Screen Rate) at approximately 11:00 a.m., London time, on such day; provided that if such rate shall be less than zero, such rate shall be deemed to be zero. Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.14, then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Company and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Percentage" means, with respect to any Lender, a percentage equal to a fraction the numerator of which is such Lender's Revolving Commitment and the denominator of which is the total Revolving Commitments of all the Lenders (if the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments at or prior to the time of determination); provided that for purposes of Section 2.20 when a Defaulting Lender

shall exist, any such Defaulting Lender's Revolving Commitment shall be disregarded in the calculation.

"Applicable Rate" means, for any day, with respect to any ABR Loan or Eurodollar Revolving Loan or the participation fee for any Standby Letter of Credit or Commercial Letter of Credit, as the case may be, the applicable rate per annum set forth in the table below under the caption "ABR Spread", "Eurodollar Spread", "Standby Letter of Credit Fee" or "Commercial Letter of Credit Fee", as the case may be:

| ABR Spread | Eurodollar Spread | Standby Letter of Credit Fee | Commercial Letter of Credit Fee |
|---|---|---|---|
| 1.50% | 2.50% | 2.00% | 0.75% |

"Applicable Share" has the meaning set forth in Section 10.10.

"Approved Budget" means the budget prepared by the Company in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01.  The initial Approved Budget shall depict, on a weekly and line item basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders).

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arrangers" means JPMCB and BofA, in their capacities as joint bookrunners and joint lead arrangers for the credit facility established hereby (or, with respect to BofA, any other registered broker-dealer wholly owned by Bank of America Corporation to which all or substantially all of Bank of America Corporation's or any of its subsidiaries' investment banking, commercial lending services or related businesses may be transferred following the date hereof).

"Article 55 BRRD" means Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms.

"Asset Sale" has the meaning set forth in Section 6.05.

4

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability" means, at any time, an amount equal to (a) the Credit Limit then in effect minus (b) the Aggregate Credit Exposure at such time.

"Availability Period" means the period from and including the Effective Date to but excluding the Maturity Date.

"Average Daily Availability" means, with respect to any fiscal quarter, (a)(i) the sum of Availability for each day during such fiscal quarter divided by (ii) the number of days in such fiscal quarter, divided by (b)(i) the sum of the total Revolving Commitments in effect for each day during such fiscal quarter divided by (ii) the number of days in such fiscal quarter.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers.

"Bail-In Legislation" means in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 BRRD, the relevant implementing law or regulation 13 as described in the EU Bail-In Legislation Schedule from time to time.

"Banking Services" means each and any of the following bank services provided to any Loan Party by any Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Banking Services Obligations" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"Banking Services Reserves" mean all Reserves that the Administrative Agent from time to time establishes in its Permitted Discretion for Banking Services then provided or Banking Services Obligations then outstanding.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"Beneficial Ownership Certification" means a certification regarding the beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"BofA" means Bank of America, N.A., a national banking association, in its individual capacity, and its successors.

"Borrower Representative" means the Company, in its capacity as contractual representative of the Borrowers pursuant to Article XI.

"Borrowers" means the Company and the Borrowing Subsidiaries, collectively.

"Borrowing" means (a) Revolving Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, (b) a Protective Advance or (c) an Overadvance.

"Borrowing Base" means, at any time (subject to modification as provided below), an amount equal to the sum of (a) 90% of the Loan Parties' Eligible Credit Card Accounts Receivable at such time, plus (b) the Inventory Percentage multiplied by the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the Administrative Agent multiplied by the Loan Parties' Eligible Inventory, valued at the lower of cost, determined on a first-in-first-out basis, or market value, plus (c) the lesser of (i) 100% of Eligible Pledged Cash and (ii) $100,000,000, minus (d) Reserves.  The Administrative Agent may, in its Permitted Discretion and with no fewer than four (4) Business Days' prior written notice to the Borrower Representative, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base; provided, that (A) the Borrowers may not obtain any new Revolving Loans or Letters of Credit to the extent that such Revolving Loan or Letter of Credit would cause an Overadvance after giving effect to the reduction of any advance rate, adjustment of such Reserve or other reduction of such element as set forth in such notice and (B) no such prior notice shall be required in respect of any adjustment of a Reserve during the continuance of any Event of Default.  Subject to the immediately preceding sentence and the other provisions hereof (including Section 2.23) expressly providing for adjustment of, or permitting the Administrative Agent to adjust, the Borrowing Base, the Borrowing Base at any time shall be determined by reference to the Borrowing Base Certificate delivered to the Administrative Agent on or most recently prior to such day pursuant to Section 4.02(a)(iii) or 5.01(h) (or, prior to the first such delivery following the Effective Date, the Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 4.01(e)); provided that the Administrative Agent may modify the Borrowing

Base in its Permitted Discretion on a weekly basis to account for Inventory sales in connection with Specified Dispositions; and provided, further, that if any Borrowing Base Certificate delivered under Section 4.01(e), 4.02(a)(iii) or 5.01(h) shall prove to have been materially inaccurate (regardless of whether any Revolving Commitments are in effect or any amounts are outstanding hereunder when such inaccuracy is discovered), and such inaccuracy shall have resulted in the payment of any interest or fees at rates lower than those that were in fact applicable for any period (based on the actual Borrowing Base), the applicable Borrowers shall pay to the Administrative Agent, for distribution to the Lenders (or former Lenders) as their interests may appear, the accrued interest or fees that should have been paid but were not paid as a result of such inaccuracy.  Notwithstanding the foregoing provisions of this definition, until the Administrative Agent shall have completed with respect to any Loan Party, whether before or after the Effective Date, an Inventory appraisal of the sort contemplated by Section 5.12, and a field examination of the sort contemplated by Section 5.13, in each case reasonably satisfactory to the Administrative Agent, no amounts attributable to Inventory or Credit Card Accounts Receivable of such Loan Party shall be included in the Borrowing Base.

"Borrowing Base Certificate" means a certificate, signed and certified as accurate and complete by a Financial Officer or chief restructuring officer of the Borrower Representative, in substantially the form of Exhibit B (with such changes thereto as may be required by the Administrative Agent from time to time to reflect the components of and Reserves against the Borrowing Base as provided for hereunder) or another form that is acceptable to the Administrative Agent in its Permitted Discretion.

"Borrowing Base Reporting Date" means the last day of each fiscal month; provided that during any Enhanced Borrowing Base Reporting Period, the last day of each week will also be a Borrowing Base Reporting Date.

"Borrowing Request" means a request by the Borrower Representative for a Revolving Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit C or any other form approved by the Administrative Agent.

"Borrowing Subsidiary" means, until such time as it ceases to be a Borrowing Subsidiary pursuant to Section 2.22, each of (a) DBI Holdings, Inc., a Connecticut corporation, (b) Tween Brands, Inc., a Delaware corporation, (c) Ann Inc., a Delaware corporation, (d) Charming Shoppes of Delaware, Inc., a Pennsylvania corporation, (e) CSI Industries, Inc., a Delaware corporation, (f) Catherines, Inc., a Delaware corporation, (g) Catherines Stores Corporation, a Tennessee corporation, (h) Lane Bryant, Inc., a Delaware corporation, (i) Lane Bryant Purchasing Corp., an Ohio corporation, and (j) any wholly-owned Subsidiary designated as Borrowing Subsidiary pursuant to Section 2.22, in each case as a debtor and debtor-in-possession under the Cases.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, (a) the additions to property, plant and equipment and other capital expenditures of the Company and the Subsidiaries that are (or would be) set forth in a consolidated statement of cash flows of the Company for such period prepared in accordance with GAAP and (b) such portion of principal payments on Capital Lease Obligations or Synthetic Lease Obligations made by the Company and its consolidated Subsidiaries during such period as is attributable to additions to property, plant and equipment that have not otherwise been reflected on the consolidated statement of cash flows as additions to property, plant and equipment for such period; provided that the term "Capital Expenditures" shall not include (i) expenditures made in connection with the replacement, substitution, restoration or repair of assets to the extent financed with (A) insurance proceeds paid on account of the loss of or damage to the assets being replaced, restored, or repaired or (B) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (ii) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (iii) the purchase of plant, property or equipment or software to the extent financed with the net proceeds of any sale, transfer, lease, or other disposition (including pursuant to a Sale/Leaseback Transaction or by way of merger or consolidation) of any asset of the Company or any Subsidiary, including any sale or issuance to a Person other than the Company or any Subsidiary of Equity Interests in any Subsidiary, but excluding sales of Inventory in the ordinary course of business, (iv) expenditures that constitute rental expenses under operating leases of real or personal property, (v) expenditures that are accounted for as capital expenditures by the Company or any Subsidiary and that actually are paid for by a Person other than the Company or any Subsidiary and for which neither the Company nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such Person or any other Person (whether before, during or after such period), or (vi) the book value of any asset owned by the Company or any Subsidiary prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (A) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period in which such expenditure actually is made and (B) such book value shall have been included in Capital Expenditures when such asset was originally acquired.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretive change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial

Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Final Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" or "second day" hearing on a final basis, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Administrative Agent and the Required Lenders in all material respects.

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code, and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than Equity Interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means (a) any transaction (including a merger or consolidation) the result of which is that any "person" or "group" (within the meaning of Sections 13(d) and 14(d)(2) of the Exchange Act), other than the Permitted Investor, becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of more than 35% of the total voting power of all classes of the voting stock of the Company and/or warrants or options to acquire such voting stock, calculated on a fully diluted basis, and the percentage of the aggregate voting power represented by such voting stock of the Company owned by such "person" or "group" then or at any time thereafter exceeds the percentage of the aggregate voting power represented by the voting stock of the Company owned by the Permitted Investor or (b) during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Company cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i)

9

the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.16.

"Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Protective Advances or Overadvances.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) any and all "Collateral" or words of similar intent as defined in any applicable Collateral Document and (b) the "DIP Collateral" referred to in the Final Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Access Agreement" has the meaning set forth in the Security Agreement.

"Collateral Documents" means the Final Order, the Security Agreement and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Secured Obligations.

"Commercial LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Commercial Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements relating to Commercial Letters of Credit that have not yet been reimbursed by or on behalf of the Borrowers at such time.  The Commercial LC Exposure of any Lender at any time shall be its Applicable Percentage of the total Commercial LC Exposure at such time, adjusted to give effect to any reallocation under Section 2.20 of the Commercial LC Exposures of Defaulting Lenders in effect at such time.

"Commercial Letter of Credit" means a Letter of Credit that is (a) designated as a Commercial Letter of Credit by the Borrower Representative at the time of, or prior to, the issuance thereof, (b) issued to provide for the payment of the purchase price for goods or services purchased by the Company or any Subsidiary and (c) intended to be drawn when such

purchase price is due and payable and not merely upon the occurrence of a default or other contingency.

"Commitment Letter" means the Commitment Letter dated August 14, 2020, among JPMCB, the Lenders and the Borrower Representative.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent, any Lender or any Issuing Bank by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Company" means Ascena Retail Group, Inc., a Delaware corporation.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Concentration Account" has the meaning set forth in the Security Agreement.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and (y) (i) if the Revolving Credit Facility converts to the credit facility under the Exit Facility Agreement, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Loan Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Revolving Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding commitments under the Revolving Credit Facility.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Credit Card Accounts Receivable" means any receivables due to any Loan Party from a credit card issuer or a credit card processor in connection with purchases of Inventory of such Loan Party on (a) credit cards issued by Visa, MasterCard, American Express, Discover and any other credit card issuers that are reasonably acceptable to the Administrative Agent, (b) private label credit cards of any Loan Party issued through the Company's credit card program with any credit card issuer or manager of a credit card program approved in writing by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed) or (c) debit cards and mall cards issued by issuers or providers that are reasonably acceptable to the Administrative Agent, in each case which have been earned by performance by such Loan Party but not yet paid to such Loan Party by such credit card issuer or credit card processor.

"Credit Card Agreement" means any agreement between a Loan Party, on the one hand, and a credit card issuer or a credit card processor (including any credit card processor that processes purchases of Inventory from a Loan Party through debit cards or mall cards), on the other hand.

"Credit Card Notifications" means each Credit Card Notification, in form and substance reasonably satisfactory to the Administrative Agent, executed by one or more Loan Parties and delivered by such Loan Parties to credit card issuers or credit card processors that are party to any Credit Card Agreement.

"Credit Exposure" means, as to any Lender at any time, the sum of the outstanding principal amount of such Lender's Revolving Loans and the sum of such Lender's LC Exposure, Protective Advance Exposure and Overadvance Exposure at such time.

"Credit Limit" means, at any time, the lesser of (a) the total Revolving Commitments then in effect and (b) the Borrowing Base then in effect.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that has (a) failed, within three (3) Business Days of the date required to be funded or paid, (i) to fund any portion of its Loans, (ii) to fund any portion of its participations in Letters of Credit, Protective Advances or Overadvances or (iii) to pay to any Loan Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified in such writing, including, if applicable, by reference to a specific Default) has not been satisfied, (b) notified any Borrower, the Administrative Agent, any Issuing Bank or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good-faith determination that a condition precedent (specifically identified in such writing, including, if applicable, by reference to a specific Default) to funding a Loan cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) failed, within three (3) Business Days after request by the Administrative Agent made in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with the terms of this Agreement relating to its obligations (and is financially able to meet such obligations) to fund prospective Loans and participations in then outstanding Letters of Credit, Protective Advances or Overadvances, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's receipt of such certification in form and substance satisfactory to the Administrative Agent, (d) (i) become or is insolvent or has a parent company that has become or is insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, provided that a Lender shall not be a Defaulting Lender under this clause (d) solely by virtue of the ownership or acquisition of any Equity Interest in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender, or (e) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.

"Deposit Account Control Agreement" has the meaning set forth in the Security Agreement.

"Deposit Accounts" has the meaning set forth in the Security Agreement.

"Designated Jurisdiction" means any country, region or territory to the extent that such country, region or territory itself is the subject of any Sanction.

"Designated Persons" means any Person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the Effective Date, the Effective Date), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the Effective Date, the Effective Date).  Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests provide that the issuer may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"Document" means a document as such term is defined in the UCC, including all bills of lading, warehouse receipts or other documents of title, now owned or hereafter acquired by any Loan Party.

"Documentation Agents" means Fifth Third Bank, National Association, Goldman Sachs Bank USA, Capital One, National Association and U.S. Bank National Association.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Company that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"Dominion Period" means any period during which (a) any Event of Default has occurred and is continuing or (b) Availability shall have been less than the greater of (i) 12.5% of the Credit Limit and (ii) $50,000,000 for five (5) consecutive Business Days; provided that if a Dominion Period shall have commenced and (A) no Event of Default described in clause (a) of this definition shall be continuing and (B) Availability shall have been at least equal to the greater of (1) 12.5% of the Credit Limit and (2) $50,000,000 for a period of thirty (30) consecutive days, but not more than two (2) times during each period of twelve (12) consecutive

months, the Borrowers may request that the Administrative Agent discontinue the applicable Dominion Period, and the Administrative Agent will promptly comply with such request so long as the applicable Dominion Period termination event in clause (A) or (B) shall have been satisfied and will provide notification of such discontinuance to the Loan Parties' credit card issuers, credit card processors and such other parties as necessary or appropriate.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is September [●], 2020.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, (i) a natural person, (ii) a Defaulting Lender or (iii) the Company or any Subsidiary or any other Affiliate of the Company.

"Eligible Credit Card Accounts Receivable" means, at any time, the Credit Card Accounts Receivable of a Loan Party that the Administrative Agent determines in its Permitted Discretion are eligible as the basis for (i) the extension of Revolving Loans and (ii) the issuance of Letters of Credit.  Without limiting the Administrative Agent's discretion provided herein, Eligible Credit Card Accounts Receivable shall not include any Credit Card Account Receivable:

(a)  which is not earned or does not represent the bona fide amount due to a Loan Party from a credit card processor or a credit card issuer that originated in the ordinary course of business of the applicable Loan Party;

(b)  which is not owned by a Loan Party or to which a Loan Party does not have good or marketable title;

(c)  in which the payee of such Credit Card Account Receivable is a Person other than a Loan Party;

(d)  which does not constitute an "Account" (as defined in the UCC);

(e)  which has been outstanding for more than five (5) Business Days (or, in the case of American Express, fifteen (15) Business Days) from the date of sale;

(f)  with respect to which the applicable credit card issuer, credit card processor or debit card or mall card issuer or provider has (i) applied for, suffered, or consented to the appointment of any receiver, interim receiver, custodian, trustee, monitor, administrator, sequestrator or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, interim receiver, custodian, trustee, monitor, administrator, sequestrator or liquidator, (iii) filed, or had filed against it (but only so long as any such involuntary filing has not been stayed or vacated), any request or

15

petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state, provincial, territorial or federal bankruptcy laws, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent or (vi) ceased operation of its business;

(g)  which is not a valid, legally enforceable obligation of the applicable credit card issuer or credit card processor with respect thereto;

(h)  which is not subject to a properly perfected first priority Lien in favor of the Administrative Agent (for the benefit of the Lender Parties);

(i)  which is subject to any Lien, other than (i) a Lien in favor of the Administrative Agent (for the benefit of the Lender Parties), (ii) any Permitted Encumbrances contemplated by the applicable processor agreements and for which appropriate Reserves (as determined by the Administrative Agent in its Permitted Discretion) have been established and (iii) a Lien permitted by Section 6.02(i) to the extent such Liens are subject to, and subordinate and junior to the Liens securing the Secured Obligations under, the Intercreditor Agreement;

(j)  with respect to which (i) any covenant has been breached or (ii) any representation or warranty is not true in all material respects, in each case to the extent contained in this Agreement, the Security Agreement or in the Credit Card Agreements relating to such Credit Card Account Receivable; provided that each such representation and warranty shall be true and correct in all respects to the extent already qualified by a materiality standard;

(k)  which is subject to risk of set-off, recoupment, non-collection or not being processed due to unpaid and/or accrued credit card processor fee balances, to the extent of the lesser of the balance of the applicable Credit Card Accounts Receivable or the unpaid credit card processor fees;

(l)  which the Administrative Agent in its Permitted Discretion determines may not be paid by reason of the applicable credit card processor's, credit card issuer's or debit card or mall card issuer's or provider's inability to pay;

(m)  which represents a deposit or partial payment in connection with the purchase of Inventory of such Loan Party;

(n)  which is not subject to a Credit Card Notification; or

(o)  which does not meet such other usual and customary eligibility criteria for Credit Card Accounts Receivable in the Loan Parties' industry generally as the Administrative Agent in its Permitted Discretion may determine from time to time;

provided, however, that the Administrative Agent shall not add any additional eligibility criteria (or amend any then-existing eligibility criteria to make the same more restrictive) without giving at least four (4) Business Days' prior notice to the Borrower Representative.

In the event that (a) a Financial Officer of any Loan Party has actual knowledge that any credit card issuer, credit card processor or debit card or mall card issuer or provider with respect to Eligible Credit Card Accounts Receivable ceases to comply with the requirements of clause (f) above or (b) a Credit Card Account Receivable in an amount in excess of $1,000,000 which was previously an Eligible Credit Card Account Receivable ceases to be an Eligible Credit Card Account Receivable hereunder (other than by reason of clause (l) or (o) above), the applicable Loan Party or the Borrower Representative shall notify the Administrative Agent thereof promptly, and in any event not later than the time of submission to the Administrative Agent of the next Borrowing Base Certificate; provided that, other than as required for the purpose of preparing Borrowing Base Certificates, such Financial Officers shall have no affirmative duty to monitor, audit or otherwise investigate the status of any such issuers, processors or providers or Credit Card Accounts Receivable other than as explicitly set forth in the Loan Documents.

In determining the amount of an Eligible Credit Card Account Receivable, the face amount of a Credit Card Account Receivable may, in the Administrative Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that any Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) applicable to such Credit Card Account Receivable, (ii) the aggregate amount of all cash received in respect of such Credit Card Account Receivable but not yet applied by any Loan Party to reduce the amount of such Credit Card Account Receivable and (iii) the amount of all customary fees and expenses in connection with any credit card arrangement. Standards of eligibility may be made more restrictive from time to time solely by the Administrative Agent in the exercise of its Permitted Discretion, with any such changes to be effective four (4) Business Days after delivery of notice thereof to the Borrower Representative and the Lenders.

"Eligible Inventory" means, at any time, the Inventory of a Loan Party which the Administrative Agent determines in its Permitted Discretion is eligible as the basis for (i) the extension of Revolving Loans and (ii) the issuance of Letters of Credit. Without limiting the Administrative Agent's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a) which is not subject to a first priority perfected Lien in favor of the Administrative Agent (for the benefit of the Lender Parties), regardless of location;

(b) which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent (for the benefit of the Lender Parties), (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent (for the benefit of the Lender Parties) or (iii) a Lien permitted by Section 6.02(i) to the extent such Lien is subject to, and subordinate and junior to the Liens securing the Secured Obligations under, the Intercreditor Agreement;

(c) which is unmerchantable, defective, damaged or unfit for sale (as such terms are customarily used in the Loan Parties' industry), or is not salable at prices

approximating at least the cost of such Inventory in the ordinary course of business or is unacceptable due to age, type, category and/or quantity, in each case, consistent with the usage of such terms in the most recent inventory appraisal received by the Administrative Agent as contemplated hereby;

(d)  with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true or which does not conform in all material respects to all standards imposed by any applicable Governmental Authority having regulatory authority over such goods;

(e)  in which any Person other than such Loan Party shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)  which is not finished goods or which constitutes packaging and shipping material, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return, repossessed goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business (for the avoidance of doubt, sales in the ordinary course of business includes clearance sales);

(g)  which is not located in the United States or Puerto Rico or is in transit with a common carrier from vendors and suppliers; provided that an amount of Inventory in transit not greater than 30% of the total Revolving Commitments then in effect shall not be excluded from being Eligible Inventory pursuant to this clause (g) so long as, except as otherwise agreed by the Administrative Agent in its Permitted Discretion, such Inventory (i) is either (A) in transit from outside the United States or in transit within the United States, and in each case subject to a negotiable Document showing a Loan Party or, if requested by the Administrative Agent, the Administrative Agent as consignee, which Document is in the possession of a Loan Party or such other Person as the Administrative Agent shall approve or, if requested by the Administrative Agent, the Administrative Agent, or (B) in transit within the United States or, if approved by the Administrative Agent in writing, in transit from outside the United States, and in each case subject to a non-negotiable Document, (ii) in the case of Inventory in transit from outside the United States and, if requested by the Administrative Agent, in the case of Inventory in transit within the United States, is subject to a duly executed Collateral Access Agreement or other bailee agreement reasonably satisfactory to the Administrative Agent from the customs broker, freight-forwarder or other handler in possession of such Inventory, (iii) has been identified to the applicable sales contract and title to such Inventory has passed to such Loan Party, (iv) is not sold by a vendor that has a right to reclaim, divert shipment of, repossess, stop delivery, claim any reservation of title or otherwise assert Lien rights against the Inventory, or with respect to which any Loan Party is in default of any obligations, (v) is subject to purchase orders and other sale documentation satisfactory to the Administrative Agent, (vi) has not been in transit for more than forty-five (45) days from the date such Inventory first became Eligible Inventory, (vii) is covered by insurance policies (including, without limitation, marine cargo insurance) reasonably acceptable to the Administrative Agent, (viii) is being

18

handled by a customs broker, freight-forwarder or other handler that has delivered a customs broker agreement or other lien waiver acceptable to the Administrative Agent, (ix) the common carrier with respect to which is not an Affiliate of the applicable vendor or supplier and (x) the customs broker with respect to which is not an Affiliate of any Loan Party; provided that, upon the request of the Administrative Agent, the Company shall promptly deliver to the Administrative Agent copies of all of the documents referred to in this clause (g);

(h)  which is located in any location leased by the applicable Loan Party (other than any retail store of such Loan Party located in a jurisdiction that does not provide for a common law or statutory landlord's lien on the personal property of tenants that would be prior or superior to that of the Administrative Agent) unless (i) the lessor has delivered to the Administrative Agent a Collateral Access Agreement or (ii) a Rent Reserve has been established by the Administrative Agent in its Permitted Discretion;

(i)  which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document (other than bills of lading to the extent permitted pursuant to clause (g) above), unless (i) such warehouseman or bailee has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may require or (ii) an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion; provided that up to $10,000,000 at any one time of such Inventory described in this clause (i) and not meeting the requirements of the preceding subclauses (i) and (ii) may be included as Eligible Inventory to the extent such Inventory is being held for not more than sixty (60) days in a warehouse pending delivery to a store upon the initial opening thereof (including the initial opening after the renovation or remodeling of a store);

(j)  which is being processed offsite at a third party location or outside processor, or is in-transit to or from said third party location or outside processor;

(k)  which is the subject of a consignment by a Loan Party as consignor;

(l)  which contains or bears any intellectual property rights licensed to a Loan Party unless the Administrative Agent is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(m)  which is not reflected in a current perpetual inventory report of the applicable Loan Party (unless such Inventory is reflected in a report to the Administrative Agent as "in transit" Inventory);

(n)  for which reclamation rights have been asserted by the seller;

(o)  which has been acquired from a Sanctioned Person; or

(p) which does not meet such other eligibility criteria for Inventory as the Administrative Agent in its Permitted Discretion may determine from time to time;

provided, however, that the Administrative Agent shall not add any additional eligibility criteria (or amend any then-existing eligibility criteria to make the same more restrictive) without giving at least four (4) Business Days' prior notice to the Borrower Representative; provided further that in determining the value of the Eligible Inventory, such value shall be reduced by, without duplication, any amounts representing (i) Vendor Rebates; (ii) costs included in Inventory relating to advertising; (iii) to the extent determined by the Administrative Agent in its Permitted Discretion to be appropriate, the shrink reserve; (iv) the unreconciled discrepancy between the general inventory ledger and the perpetual inventory ledger, to the extent the general inventory ledger reflects less Inventory than the perpetual inventory ledger; and (v) a reserve for Inventory which is designated or demanded to be returned to or retained by the applicable vendor or which is recognized as damaged or off quality by the applicable Loan Party.

In the event that a Financial Officer of any Loan Party has actual knowledge that Inventory at any location having a fair market value of $7,500,000 or more which was previously Eligible Inventory ceases to be Eligible Inventory hereunder (other than by reason of clause (p) above), such Loan Party or the Borrower Representative shall promptly notify the Administrative Agent thereof; provided that the Loan Parties shall not be required to deliver an updated Borrowing Base Certificate until such time as submission to the Administrative Agent of the next Borrowing Base Certificate is required hereunder; provided further that the Administrative Agent may, in its reasonable discretion, upon receipt of such notice as set forth above, adjust the Borrowing Base to reflect such change in Eligible Inventory.

"Eligible Pledged Cash" means, on any date of determination, the aggregate amount of cash as of such date (including cash represented by shares in any money market fund) that (a) is on deposit in the Eligible Pledged Cash Account and subject to a duly perfected first priority Lien in favor of the Administrative Agent and (b) does not constitute (i) cash pledged pursuant to Section 2.06(j) or (ii) Term Loan Priority Collateral (as defined in the Intercreditor Agreement).

"Eligible Pledged Cash Account" means (a) a special purpose Deposit Account established by the Company with the Administrative Agent or (b) shares representing immediately withdrawable cash in a money market fund managed by the Administrative Agent or one of its Affiliates, in either case subject to the Lien of the Security Agreement and to a Deposit Account Control Agreement or other control agreement reasonably satisfactory to the Administrative Agent, designated by the Company and the Administrative Agent as the "Eligible Pledged Cash Account", and withdrawals from which are subject to the provisions of Section 2.23.

"Eligible Successor Agent" means a bank or financial institution that is organized under the laws of the United States or any State or district thereof with an office in New York, New York which has a combined capital surplus of at least $200,000,000.

"Enhanced Borrowing Base Reporting Period" means any period (a) commencing at any time when the total Revolving Loans outstanding exceeds $25,000,000 and (b) ending when the total Revolving Loans outstanding shall have been equal to or less than $25,000,000 for a period of thirty (30) consecutive days.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders) issued by, and binding agreements with, any Governmental Authority, in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to toxic or hazardous substances, materials or wastes), or the presence, Release of, or exposure to, toxic or hazardous substances, materials or wastes, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, toxic or hazardous substances, materials or wastes.

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any obligation, damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in

"at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 or Section 3(14) of ERISA) or could otherwise reasonably be expected to be liable.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" has the meaning set forth in Article VII.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Excluded Deposit Account" means (a) any Deposit Account that is an operating account maintained by any Loan Party solely for the use of one of its retail stores (or a group of 125 or fewer retail stores) in which payments received from customers are deposited and which is not an account to which amounts held in other deposit accounts of the Loan Parties are swept, provided that (i) such Loan Party shall cause all amounts on deposit in such Deposit Account (other than amounts reasonably determined by such Loan Party to be required for the operating needs of the retail store or stores to which such Deposit Account relates) to be swept on each Business Day into one or more Deposit Accounts that are not Excluded Deposit Accounts and (ii) no such Deposit Account shall contain payment of or in respect of any Credit Card Account Receivable of any Loan Party, (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses,

(d) any escrow account to the extent the creation of a Lien therein would violate any agreement with a Person other than the Company or a Subsidiary, and (e) any fiduciary or trust account.

"Excluded Subsidiary" means (a) any Subsidiary that is not a wholly-owned Subsidiary of the Company, (b) any Foreign Subsidiary of the Company, (c) any Subsidiary that is a CFC or a CFC Holdco, (d) any Subsidiary of any CFC or CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or by a contractual obligation in existence on the Effective Date (from providing a Guarantee of the Obligations (solely for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) any Subsidiary that is a not-for-profit organization, (g) [reserved], (h) any Subsidiary that is an Immaterial Subsidiary (unless the Company otherwise elects), and (i) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Company), the cost or other consequences of becoming a Loan Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  In no event shall (i) any Borrowing Subsidiary be an Excluded Subsidiary or (ii) any Subsidiary of the Company that is a "Loan Party" (under and as defined in the Term Credit Agreement), or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the Term Credit Agreement or any other Material Indebtedness of the Company or any Subsidiary that is not a CFC, a CFC Holdco or a Foreign Subsidiary, be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Revolving Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Revolving Commitment (other than pursuant to an assignment request by the Company under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Revolving Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(f) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"Existing Letters of Credit" means the letters of credit referred to on Schedule 2.06.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date that has been negotiated in good faith by the Loan Parties, the Administrative Agent and the Lenders, and that is consistent in all

material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; provided, that such credit agreement shall have been made available and is satisfactory to the Administrative Agent, the Issuing Banks and all Lenders.

"Exit Facility Term Sheet" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"Extraordinary Receipt" means any cash received by any Person (net of all losses and expenses incurred by such Person in connection with the event resulting in the Extraordinary Receipt) in an aggregate amount in excess of $5,000,000 in respect of tax refunds, pension plan reversions, indemnity payments and purchase price adjustments (but not, for the avoidance of doubt, with respect to any Prepayment Event described in clauses (a) through (c) thereof).

"FATCA" means Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depository institutions (as determined in such manner as the NYFRB shall be set forth on the Federal Reserve Bank of New York's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate; provided that such rate shall in no event be less than zero.

"Fee Letters" means, collectively, the Agent Fee Letter and the Lender Fee Letter.

"Final Order" means, collectively, the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Administrative Agent and the Required Lenders and approves a full roll-up of all Pre-Petition Lender Obligations, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent and the Required Lenders waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and each Lender, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Financial Officer" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"Flood Hazard Property" means any Mortgaged Property that includes a "Building" (as defined in 12 CFR Chapter III, Section 339.2) that on the relevant date of determination is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area.

"Flood Insurance Documents" means, with respect to any Mortgaged Property that is a Flood Hazard Property, (a) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent as to the fact that such Mortgaged Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (b) (i) copies of the applicable Loan Party's application for a flood insurance policy, together with proof of premium payment, (ii) a declaration page confirming that flood insurance has been issued or (iii) such other evidence of flood insurance as shall be reasonably satisfactory to the Administrative Agent.

"Flood Insurance Laws" means, collectively, (a) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973), as now or hereafter in effect or any successor statute thereto, (b) the Flood Insurance Reform Act of 2004, as now or hereafter in effect or any successor statute thereto, (c) the Biggert-Waters Flood Insurance Reform Act of 2012, as now or hereafter in effect or any successor statute thereto, and (d) Regulation H of the Board of Governors.

"Flood Laws" has the meaning set forth in Article VIII.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Subsidiary of the Company, other than a Domestic Subsidiary.

"Funding Account(s)" means the deposit account(s) of the Borrowers to which the Administrative Agent is authorized by the Borrowers (or by the Borrower Representative on their behalf) to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

"GAAP" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"Gift Card Reserve" means, at any time, the sum of (a) a percentage determined from time to time by the Administrative Agent in the exercise of its Permitted Discretion of the aggregate remaining amount at such time of outstanding gift certificates and gift cards sold by the Loan Parties entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price of Inventory and (b) a percentage determined from time to time by the Administrative Agent in the exercise of its Permitted Discretion of the aggregate

amount at such time of outstanding customer deposits and merchandise credits entitling the holder thereof to use all or a portion of such deposit or credit to pay all or a portion of the purchase price of Inventory.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Company)).

"Guaranteed Obligations" has the meaning set forth in Section 10.01.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

"Immaterial Subsidiary" means, at any date of determination, any Subsidiary (other than any Borrowing Subsidiary) that, at the last day of the most recently ended fiscal quarter of the Company for which financial statements have been delivered pursuant to Section 4.01(f), Section 5.01(a) or (b), accounted for less than (x) 5.0% of Total Assets at such date and (y) less than 5.0% of the consolidated revenues of the Company and its Subsidiaries for the four fiscal quarter period ended on such date; provided that, notwithstanding the above, "Immaterial

Subsidiary" shall exclude any of the Company's Subsidiaries designated in writing to the Administrative Agent, by a responsible officer of the Company (which the Company shall be required to designate (and hereby undertakes to designate)) to the extent necessary to ensure that Immaterial Subsidiaries, in the aggregate, accounted for, at the last day of any fiscal quarter of the Company for which financial statements have theretofore been most recently delivered pursuant to Section 4.01(f), Section 5.01(a) or (b), less than 10.0% of Total Assets at such date and less than 10.0% of consolidated revenues of the Company and its Subsidiaries for the four fiscal quarter period ending on such date.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Company or any  Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant to such purchase price adjustment or earnout is, or becomes, payable), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others.  The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  It is acknowledged and agreed that private label and corporate letters of credit issued by the Company or any Subsidiary for the making of payment for the purchase of Inventory in the ordinary course of business (and in respect of which no Issuing Bank or other financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Company or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

27

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Effective Date, by and among the Administrative Agent, the Pre-Petition Agent, the Term Agent and the Pre-Petition Term Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as ABL collateral agent, the Pre-Petition Term Agent, as term collateral agent, and acknowledged by the Loan Parties, as supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrower Representative to convert or continue a Revolving Borrowing in accordance with Section 2.08, which shall be, in the case of any such written request, in the form of Exhibit F or any other form reasonably approved by the Administrative Agent.

"Interest Payment Date" means (a) with respect to any ABR Loan (other than a Protective Advance or an Overadvance), the first Business Day of each calendar quarter and the Maturity Date, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period, and the Maturity Date, and (c) with respect to any Protective Advance or Overadvance, the day that such Loan is required to be repaid and the Maturity Date.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, twelve months) thereafter, as the Borrower Representative may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate per annum which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.

"Inventory" has the meaning set forth in the Security Agreement.

"<u>Inventory Percentage</u>" means 90%; <u>provided</u>, that on not more than one occasion during any calendar year, the Company may deliver to the Administrative Agent a notice electing to have the Inventory Percentage increased to 92.5% for a period of ninety (90) days identified in such notice, in which case, for purposes of any determination of the Borrowing Base as of a date within such specified period, the Inventory Percentage shall be 92.5%.

"<u>Investment</u>" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Issuing Bank</u>" means (a) each of JPMCB, BofA and Wells Fargo Bank, in its capacity as an issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.06(i), and (b) solely with respect to any Existing Letter of Credit, any Lender that shall have issued such Letter of Credit.  An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate (it being agreed that such Issuing Bank shall, or shall cause such Affiliate to, comply with the requirements of Section 2.06 with respect to such Letters of Credit).

"<u>Issuing Bank Agreement</u>" means an Issuing Bank Agreement between an Issuing Bank, the Administrative Agent and the Company substantially in the form of Exhibit E.

"<u>JPMCB</u>" means JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors.

"<u>LC Collateral Account</u>" has the meaning set forth in Section 2.06(j).

"<u>LC Commitment</u>" means, as to any Issuing Bank, the maximum permitted amount of the LC Exposure that may be attributable to Letters of Credit issued by such Issuing Bank.  The initial amount of each Issuing Bank's LC Commitment is set forth on <u>Schedule 2.01</u> or in such Issuing Bank's Issuing Bank Agreement.

"<u>LC Disbursement</u>" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of the Commercial LC Exposure and the Standby LC Exposure.  The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time, adjusted to give effect to any reallocation under Section 2.20 of the LC Exposures of Defaulting Lenders in effect at such time.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lease Rejection Date" means, as to any leased location, the last day of the 120-day lease rejection/assumption period, as such period may be extended or shortened by the Court, as such period may be further extended with the consent of the landlord for such location.

"Lease Reserve" means a reserve that shall be established by the Administrative Agent (unless otherwise determined by the Required Lenders) (a) solely with respect to Ann Taylor Inventory, after the date (i) that is one hundred and five (105) days after the Petition Date, unless the Court shall have entered the Confirmation Order on or prior to such date, and (ii) that Liquidity is less than $150,000,000, in respect of any such Ann Taylor Inventory held at any leased store locations (x) intended to be closed with respect to which the Lease therefor is, or is intended to be, terminated by the applicable Loan Party, or (y) with respect to which the Lease therefor has not been assumed, commencing on the Lease Reserve Commencement Date set forth in clause (a) of the definition thereof, and (b) with respect to all other Inventory (other than Ann Taylor Inventory) held at any leased store locations (x) intended to be closed with respect to which the Lease therefor is, or is intended to be, terminated by the applicable Loan Party, or (y) with respect to which the Lease therefor has not been assumed, commencing on the Lease Reserve Commencement Date set forth in clause (b) of the definition thereof.  The amount of the Lease Reserve in effect from time to time shall not exceed the anticipated reduction in the Net Orderly Liquidation Value, as communicated to the Administrative Agent by the applicable appraiser (which information the Administrative Agent is authorized to obtain), which is anticipated to result from (x) the Modified Sale Term being more than (y) the number of days remaining until the Lease Rejection Date.

"Lease Reserve Commencement Date" means, (a) solely with respect to any Ann Taylor Inventory and any leased location at which such Ann Taylor Inventory is located, the date that is the number of days prior to the Lease Rejection Date applicable thereto that is equal to the Modified Sale Term, and (b) with respect to all other Inventory (other than Ann Taylor Inventory) and any leased location where such Inventory (other than Ann Taylor Inventory) is located, the later of (x) the date that is the number of days prior to the Lease Rejection Date applicable thereto that is equal to the Modified Sale Term and (y) ten (10) weeks prior to the Lease Rejection Date.

"Lender Advisors" means the professionals and experts retained by Administrative Agent and the Required Lenders, consisting of Berkeley Research Group, LLC, Morgan Lewis & Bockius LLP and Hunton Andrews Kurth LLP.

"Lender Fee Letter" means the Fee Letter dated August 14, 2020, among the Company and JPMCB, with respect to fees payable to the Administrative Agent for the benefit of the Lenders.

"Lender Parties" means (a) the Administrative Agent, (b) the Arrangers, (c) the Syndication Agents, (d) the Documentation Agents, (e) the Lenders, (f) the Issuing Banks, (g) Lenders and their Affiliates to whom any Banking Services Obligations are owing, (h) Lenders and their Affiliates to whom Swap Obligations constituting Secured Obligations hereunder are owing, (i) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (j) the permitted successors and assigns of the foregoing.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means each Existing Letter of Credit and any letter of credit issued pursuant to this Agreement.  It is acknowledged that private label letters of credit issued by the Company or any Subsidiary do not constitute Letters of Credit (it being further acknowledged that no Issuing Bank is an issuer of any such private label letter of credit or has any disbursement obligations thereunder).

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on the Reuters screen page that displays such rate (currently page LIBOR01) (or, in the event such rate does not appear on a page of the Reuters screen, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) (the "Screen Rate") at 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.  If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than 0.75%, the LIBO Rate shall for all purposes of this Agreement be 0.75%.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, at any time, the sum of, without duplication, (a) Availability, (b) unrestricted cash and cash equivalents of the Company and its Subsidiaries that would be

reflected on a consolidated balance sheet of the Company in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Company and its Subsidiaries (excluding Eligible Pledged Cash to the extent duplicative of clause (a)) that are restricted in favor of the Administrative Agent or any Lender (which cash and cash equivalents may also secure other Indebtedness together with the Obligations).

"Loan Documents" means this Agreement, the Commitment Letter, the Fee Letters, the Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, any agreement referred to in Section 2.06(i) and, except for purposes of Section 9.02, any promissory notes issued pursuant to this Agreement, any Letter of Credit applications and all other agreements, instruments, documents and certificates identified in Section 4.01 executed and delivered to, or in favor of, the Administrative Agent or any other Lender Party and including all other pledges, powers of attorney, consents, assignments, contracts, notices and letter of credit agreements whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Administrative Agent or any other Lender Party in connection with the Agreement or the transactions contemplated thereby.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantee" means Article X of this Agreement.

"Loan Guarantor" means the Company and each Subsidiary (including each Borrowing Subsidiary) that is a party to this Agreement.

"Loan Parties" means the Company and the Subsidiary Loan Parties.

"Loans" means the loans and advances made by the Lenders or the Administrative Agent pursuant to this Agreement, including Overadvances and Protective Advances.

"Material Adverse Effect" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Company and the Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Final Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases, and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders on a final basis, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent, the Issuing Banks or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof solely during the period from the Effective Date through the Maturity Date, the impacts of COVID-19 on the results of operations, assets, business or

financial condition of the Company and the Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Company and its Subsidiaries operate).

"Material Indebtedness" means Indebtedness (other than the Loans, Letters of Credit and the Loan Guarantee), or obligations in respect of one or more Swap Agreements, of any one or more of the Company and the Subsidiaries in an aggregate principal amount exceeding $20,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Company or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Company or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means the date that is the earliest of (i) six (6) months after the Effective Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"Maximum Liability" has the meaning set forth in Section 10.09.

"Maximum Rate" has the meaning set forth in Section 9.16.

"Modified Sale Term" means, with respect to any Inventory, the sum of (a) the number of days specified as the anticipated sale term period for such Inventory in the most recent appraisal delivered to the Administrative Agent for such Inventory plus (b) twenty (20) days.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Mortgaged Property" means each parcel of real property located in the United States of America owned in fee by a Loan Party, and the improvements thereto, subject to the Lien of the Administrative Agent in accordance with the Final Order that (together with such improvements) has a fair market value of $5,000,000 or more on the Effective Date or at the time of acquisition thereof by any Loan Party.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the past six years has made or been obligated to make contributions.

"National Flood Insurance Program" means the program created pursuant to the Flood Insurance Laws.

"Net Orderly Liquidation Value" means, with respect to Inventory of any Person, the orderly liquidation value thereof, as determined on a basis consistent in all material respects with the inventory appraisals most recently delivered to the Administrative Agent prior to the Effective Date pursuant to the Pre-Petition Credit Agreement by an appraiser acceptable to the Administrative Agent (with such adjustments as shall be deemed appropriate to reflect events or changes in circumstances after the dates of such appraisals), net of all costs of liquidation thereof.

"Net Proceeds" means, with respect to any event, (a) the cash (which term, for purposes of this definition, shall include cash equivalents) proceeds (including, in the case of any casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds) received in respect of such event, including any cash received in respect of any noncash proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual fees and out-of-pocket expenses paid in connection with such event by the Company and the Subsidiaries to Persons that are not Affiliates of the Company or any Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an asset, the amount of all payments required to be made by the Company and the Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness under the Term Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on such assets securing the Obligations and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Company and the Subsidiaries, and the amount of any reserves established by the Company and the Subsidiaries in accordance with GAAP to fund purchase price adjustment, indemnification and similar contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to the occurrence of such event (as determined reasonably and in good faith by the chief financial officer of the Borrower Representative).  For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"Non-Paying Guarantor" has the meaning set forth in Section 10.10.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; provided that if both such rates are not published for any day that is a Business Day, the NYFRB Rate shall be the rate quoted for such day for a federal funds transaction at 11:00 a.m., New York City time, on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided that the NYFRB Rate shall in no event be less than zero.

"Obligated Party" has the meaning set forth in Section 10.02.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all LC Exposure, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, any Arranger, any Documentation Agent, any Syndication Agent, any Issuing Bank or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest (at the rate stated herein, including default interest), fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees costs, expenses and indemnities are allowed claims in such proceeding.

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a Lien under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document)."Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19).

"Overadvance" has the meaning set forth in Section 2.05(a).

"Overadvance Exposure" means, at any time, the sum of the aggregate principal amount of all outstanding Overadvances at such time.  The Overadvance Exposure of any Lender at any time shall be its Applicable Percentage of the total Overadvance Exposure at such time, adjusted to give effect to any reallocation under Section 2.20 of the Overadvance Exposures of Defaulting Lenders in effect at such time.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by US-managed banking offices of depository institutions (as such composite rate shall be determined by the New York Federal Reserve Bank as set forth on the Federal Reserve Bank of New York's Website from time to time) and published on the next succeeding Business Day as an Overnight Bank Funding Rate (from and after such date as the New York Federal Reserve Bank shall commence to publish such composite rate).

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"Paying Guarantor" has the meaning set forth in Section 10.10.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions under ERISA.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

(a)  Liens imposed by law for (i) Taxes that were not yet due on the Petition Date or which are being contested in compliance with Section 5.06 and (ii) Taxes arising Post-Petition that are not yet delinquent or are being contested in compliance with Section 5.06;

(b)  carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA), arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 5.06;

(c)  pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA) and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Company or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Company and its Subsidiaries;

(d)  pledges and deposits made (i) to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA), surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Company or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above;

(e)  judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)  easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal

easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Company or any Subsidiary or the ordinary operation of such real property;

(g)  customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)  Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments;

(i)  Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)  Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

(k)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)  Liens or rights of setoff against credit balances of the Company or any Subsidiary with credit card issuers or credit card processors to secure obligations of the Company or such Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)  Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

(n)  other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) or (d) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Investments" means:

(a)  marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

(b) marketable direct obligations issued by any state of the United States of America or any province of Canada, the UK or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c) commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d) certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e) repurchase agreements of the Administrative Agent, any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f) overnight investments with the Administrative Agent, any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g) other readily marketable instruments issued or sold by the Administrative Agent, any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h) shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i) funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j) in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments in the

country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Permitted Investor" means David Jaffe (or any member of his family that is actively involved in the management of the Company).

"Permitted Variance" means any variance that does not violate Section 6.12(c)).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan", as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), (a) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Post-Petition" means the time period commencing immediately upon the filing of the applicable Case.

"Pre-Petition" means the time period ending immediately prior to the filing of the Cases.

"Pre-Petition Agent" means JPMCB, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Aggregate Credit Exposure" means the sum of the Pre-Petition Credit Exposures of all the Pre-Petition Lenders under the Pre-Petition Credit Agreement; provided, that for purposes of this definition, the Pre-Petition Credit Exposure of the Pre-Petition Lender that is the "Swingline Lender" shall be deemed to exclude any amount of its "Swingline Exposure" in excess of its "Applicable Percentage" of all outstanding "Swingline Loans" (in each case under and as defined in the Pre-Petition Credit Agreement).

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Credit Exposure" means, as to any Pre-Petition Lender at any time, the sum of the outstanding principal amount of such Pre-Petition Lender's "Revolving Loans"

and the sum of such Pre-Petition Lender's "LC Exposure," "Swingline Exposure," "Protective Advance Exposure" and "Overadvance Exposure" (in each case under and as defined in the Pre-Petition Credit Agreement) at such time.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Effective Date and set forth on Schedule 6.01.

"Pre-Petition Lender Obligations" means all "Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Revolving Loans" means Pre-Petition Lender Obligations in respect of principal of "Revolving Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Pre-Petition Term Agent" means Goldman Sachs Bank USA, as administrative agent under the Pre-Petition Term Credit Agreement.

"Pre-Petition Term Credit Agreement" means the Term Credit Agreement, dated as of August 21, 2015, among the Company, AnnTaylor Retail, Inc., the Pre-Petition Term Lenders and the Pre-Petition Term Agent, as the same may be amended, modified, restated and/or supplemented from time to time through the Petition Date.

"Pre-Petition Term Lenders" means the lenders under the Pre-Petition Term Credit Agreement.

"Prepayment Event" means:

(a) any Asset Sale of the type described in clauses (h), (i) and (j) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Company or any Subsidiary resulting in aggregate Net Proceeds exceeding $500,000;

(c) the incurrence by the Company or any Subsidiary of any Indebtedness, other than Indebtedness permitted to be incurred by Section 6.01;

(d) the receipt by the Company or any Subsidiary of any Extraordinary Receipt; or

(e) the receipt by the Company or any Subsidiary of the Net Proceeds of Indebtedness permitted to be incurred by Section 6.01(a)(x)(ii).

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMCB as its prime rate in effect at its principal office in New York City. Each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Protective Advance" has the meaning set forth in Section 2.04(a).

"Protective Advance Exposure" means, at any time, the sum of the aggregate principal amount of all outstanding Protective Advances at such time. The Protective Advance Exposure of any Lender at any time shall be its Applicable Percentage of the total Protective Advance Exposure at such time, adjusted to give effect to any reallocation under Section 2.20 of the Protective Advance Exposures of Defaulting Lenders in effect at such time.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Recipient" means the Administrative Agent, any Lender, any Issuing Bank or any combination thereof (as the context requires).

"Register" has the meaning set forth in Section 9.04(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

"Remedies Notice Period" has the meaning specified in the Final Order.

"Rent Reserve" means, with respect to any leased store, warehouse distribution center, regional distribution center or depot where any Inventory subject to Liens arising by operation of law is located, a reserve equal to two months' rent at such store, warehouse distribution center, regional distribution center or depot.

"Report" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Loan Parties' assets from information furnished by or on behalf of the Loan Parties, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"Required Lenders" means, at any time, Lenders having aggregate Credit Exposure and unused Revolving Commitments representing more than 50% of the sum of the total Credit Exposure and unused Revolving Commitments at such time.

"Required Milestones" means the covenants set forth on Schedule 5.19.

"Reserves" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, to maintain (including, without limitation, reserves in respect of the Carve Out, the Lease Reserve, reserves in respect of estimated or actual amounts that may be included in the Carve Out or that are or may be payable from any proceeds of a transaction (as described in the Final Order), including amounts which are or may become payable to any investment bankers or financial advisors of the Debtors or any Committee, reserves for reclamation or similar claims (including any such claims that may reasonably be expected to be valid) and such other matters as may relate to or arise during the Cases, reserves based on appraisals and field exams of the Collateral, reserves for accrued and unpaid interest on the Secured Obligations, Rent Reserves, Gift Card Reserves, Banking Services Reserves and reserves for loyalty programs, reserves for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges and other foreign landing costs related to any Inventory in transit, reserves for Swap Obligations, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party.

"Resolution Authority" means any body which has authority to exercise any Write-down and Conversion Powers.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Company or any Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Company or any Subsidiary.

"Revolving Commitment" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans and to acquire participations in Letters of Credit, Protective Advances and Overadvances hereunder, expressed as an amount representing the maximum permitted aggregate amount of such Lender's Credit Exposure hereunder, as such commitment may be reduced from time to time pursuant to (a) Section 2.09 and (b) assignments by or to such Lender pursuant to Section 9.04.  The initial amount of each Lender's Revolving Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed or acquired its Revolving Commitment, as applicable. The aggregate amount of the Lenders' Revolving Commitments as of the Effective Date is $400,000,000.

"Revolving Credit Facility" has the meaning assigned to such term in the Recitals.

"<u>Revolving Loan</u>" means a Loan made pursuant to Section 2.01.

"<u>RSA</u>" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"<u>S&P</u>" means S&P Global Ratings, a division of S&P Global Inc., or any successor to its rating agency business.

"<u>Sale/Leaseback Transaction</u>" means an arrangement relating to property owned by the Company or any Subsidiary whereby the Company or such Subsidiary sells or transfers such property to any Person and the Company or any Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"<u>Sanctioned Country</u>" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"<u>Sanctioned Person</u>" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, Her Majesty's Treasury of the United Kingdom, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"<u>Sanctions</u>" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or any EU member state or Her Majesty's Treasury of the United Kingdom.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Secured Obligations</u>" means all Obligations, together with all (a) Banking Services Obligations and (b) Swap Obligations owing to one or more Lenders or their respective Affiliates; <u>provided</u> that at or prior to the time that any transaction relating to such Swap Obligation is executed, the Lender or an Affiliate thereof party thereto (if other than JPMCB or an Affiliate thereof) shall have delivered written notice to the Administrative Agent that such a transaction has been entered into and that it constitutes a Secured Obligation entitled to the benefits of the Collateral Documents.

"<u>Security Agreement</u>" means that certain Pledge and Security Agreement, dated as of the Effective Date, between the Loan Parties and the Administrative Agent, for the benefit of the Lender Parties, as amended and in effect from time to time.

"<u>Specified Dispositions</u>" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real

property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of a Loan Party or its Subsidiaries and (iii) the termination of Leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Borrower Representative to the Administrative Agent and agreed to by the Administrative Agent in its reasonable discretion on or prior to the Effective Date, and as may be updated, supplemented or modified from time to time, as agreed to in writing by the Administrative Agent in its reasonable discretion.

"Specified Indebtedness" means any Subordinated Indebtedness, any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Secured Obligations; provided that Indebtedness under the Term Credit Agreement shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"Standby LC Commitment" means, as to any Issuing Bank, the maximum permitted amount of the Standby LC Exposure that may be attributable to Standby Letters of Credit issued by such Issuing Bank.  The initial amount of each Issuing Bank's Standby LC Commitment is set forth on Schedule 2.01 or in such Issuing Bank's Issuing Bank Agreement.

"Standby LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Standby Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements relating to Standby Letters of Credit that have not yet been reimbursed by or on behalf of the Borrowers at such time.  The Standby LC Exposure of any Lender at any time shall be its Applicable Percentage of the total Standby LC Exposure at such time, adjusted to give effect to any reallocation under Section 2.20 of the Standby LC Exposures of Defaulting Lenders in effect at such time.

"Standby Letter of Credit" means all Letters of Credit other than Commercial Letters of Credit.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Secured Obligations.

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Company.

"Subsidiary Loan Party" means each Subsidiary that is a party to this Agreement as a Borrower or a Loan Guarantor and is a party to the Security Agreement.

"Supermajority Lenders" means, at any time, Lenders having aggregate Credit Exposure and unused Revolving Commitments representing more than 66⅔% of the sum of the total Credit Exposure and unused Revolving Commitments at such time.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Company or any Subsidiary shall be a Swap Agreement.

"Swap Obligations" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"Syndication Agents" means BofA and Wells Fargo Bank, National Association.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. Federal income Tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term.  For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Agent</u>" means Alter Domus (US) LLC.

"<u>Term Credit Agreement</u>" means the Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement by and among the Company, the other subsidiaries party thereto as loan parties, the Term Agent, and the Term Loan Lenders, in effect on the Effective Date and as the same may be amended from time to time in accordance with the Final Order, in each case, with the prior written consent of the Administrative Agent (provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous notice thereof is given to the Administrative Agent).

"<u>Term Loan Facility</u>" means the term loan facility to be provided by the Term Loan Lenders under the Term Credit Agreement in an aggregate principal amount not in excess of $312,342,704.17 at any time prior to the Debtors' emergence from the Cases.

"<u>Term Loan Lenders</u>" means the lenders under the Term Credit Agreement.

"<u>Term Loan Obligations</u>" means the "Obligations" as defined in the Term Credit Agreement.

"<u>Term Priority Collateral</u>" has the meaning set forth in the Intercreditor Agreement.

"<u>Total Assets</u>" means, at any date of determination, the consolidated total assets of the Company as of the last day of the most recent fiscal quarter of the Company for which financial statements have been (or are required to have been) delivered pursuant to clause (f) of Section 4.01, Section 5.01(a) or (b).

"<u>Transactions</u>" means (a) the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents, the borrowings hereunder, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, (b) the execution, delivery and performance by the Loan Parties of the Term Credit Agreement, (c) the creation and perfection of the Liens provided for in the Collateral Documents and (d) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of Liens created by the Collateral Documents.

"<u>UK Bail-In Legislation</u>" means (to the extent that the United Kingdom is not an EEA Member Country which has implemented, or implements, Article 55 BRRD) Part I of the

United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings).

"Unliquidated Obligations" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is, (a) an obligation to reimburse an Issuing Bank for drawings not yet made under a Letter of Credit issued by it, (b) any other obligation (including any guarantee) that is contingent in nature at such time or (c) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.17(f)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"Vendor Rebates" means credits earned from vendors for volume purchases that reduce net inventory costs for the Loan Parties.

"Wells Fargo Bank" means Wells Fargo Bank, National Association, a national banking association, in its individual capacity, and its successors.

"wholly-owned", when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means:

(a)    in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and

(b)    in relation to any UK Bail-In Legislation:

(i)    any powers under that UK Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers; and

(ii)    any similar or analogous powers under that UK Bail-In Legislation.

SECTION 1.02.  Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar Revolving Borrowing").

SECTION 1.03.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.  Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any

reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04. <u>Accounting Terms; GAAP</u>.    Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; <u>provided</u> that (a) if the Borrower Representative notifies the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower Representative that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; <u>provided</u> that the Borrower Representative, on the one hand, and the Administrative Agent and Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Company or any Subsidiary at "fair value", as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05. <u>Classification of Actions</u>.    For purposes of determining compliance at any time with the covenants set forth in Article VI (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Article VI, the Company may, in its sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that the Company may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under

the Pre-Petition Term Credit Agreement and the Term Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(x) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(i).

SECTION 1.06.  Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE II

The Credits

SECTION 2.01.  Commitments; Full-Roll of Pre-Petition Obligations.  Subject to the terms and conditions set forth herein, each Lender, severally and not jointly, agrees to make Revolving Loans to the Borrowers in dollars from time to time during the Availability Period in an aggregate principal amount that will not result in (a) sum of the Credit Exposure and Pre-Petition Credit Exposure of any Lender exceeding such Lender's Revolving Commitment or (b) the sum of the Aggregate Credit Exposure and the Pre-Petition Aggregate Credit Exposure exceeding the Credit Limit, subject to the Administrative Agent's authority, in its sole discretion, to make Protective Advances and Overadvances pursuant to the terms of Section 2.04 or 2.05, as applicable.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans. Notwithstanding anything to the contrary contained herein or in any other Loan Document, (i) on the Effective Date, (x) each Existing Letter of Credit shall constitute a "Letter of Credit" for all purposes of this Agreement and shall be deemed issued under this Agreement on the Effective Date and all LC Exposure (as such term is defined in the Pre-Petition Credit Agreement) shall constitute "LC Exposure" for all purposes of this Agreement and (y) all Pre-Petition Lender Obligations constituting "Banking Services Obligations" and "Swap Obligations" (as each such term is defined in the Pre-Petition Credit Agreement) shall constitute Secured Obligations under the Loan Documents and (ii) upon the entry of the Final Order, the total outstanding amount of the Pre-Petition Lender Obligations shall constitute Secured Obligations hereunder, with (x) the outstanding amount of all Pre-Petition Revolving Loans, if any, as of the date of the entry of the Final Order being refinanced as Loans hereunder immediately upon the entry of the Final Order and (y) all unpaid interest and fees thereon accrued through the entry of the Final Order to be paid on the next scheduled date for payment of interest and fees under this Agreement.

SECTION 2.02.  Loans and Borrowings.  (a) Each Revolving Loan shall be made as part of a Borrowing consisting of Revolving Loans of the same Type made by the Lenders ratably in accordance with their respective Revolving Commitments. Any Protective Advance and any Overadvance shall be made in accordance with the procedures set forth in Section 2.04 or 2.05, as applicable.

(b) Subject to Section 2.14, each Revolving Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower Representative may request in accordance herewith. Each Protective Advance or Overadvance shall be an ABR Loan. Each Lender at its option may make any Eurodollar Revolving Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c) At the commencement of each Interest Period for any Eurodollar Revolving Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Revolving Borrowing that results from a continuation of an outstanding Eurodollar Revolving Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time each ABR Revolving Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000; provided that, without affecting the Borrowing Base limitation set forth in Section 2.01, an ABR Revolving Borrowing may be in an aggregate principal amount that is equal to the entire unused balance of the Revolving Commitments then in effect or that is required to finance the repayment of a Protective Advance as contemplated by Section 2.04(a) or the reimbursement of an LC Disbursement as contemplated by Section 2.06(e). Each Protective Advance or Overadvance may be in such principal amount as shall be determined by the Administrative Agent in accordance with Section 2.04 or 2.05, as applicable. Revolving Borrowings of more than one Type may be outstanding at the same time.

(d) Notwithstanding any other provision of this Agreement, the Borrower Representative shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Revolving Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03. Requests for Revolving Borrowings. To request a Revolving Borrowing, the Borrower Representative shall notify the Administrative Agent of such request either in writing (delivered by e-mail, hand or facsimile) or by telephone (a) in the case of a Eurodollar Revolving Borrowing, not later than 11:00 a.m., New York City time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Revolving Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by e-mail, hand delivery or facsimile to the Administrative Agent of an executed written Borrowing Request. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i) the name of the applicable Borrower;

(ii) the aggregate amount of the requested Borrowing and the manner in which the proceeds of such Borrowing are to be disbursed (which shall be consistent with Section 2.07);

(iii) the date of such Borrowing, which shall be a Business Day;

(iv) whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(v) in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(vi) in the case of any ABR Revolving Borrowing requested to finance the reimbursement of an LC Disbursement as contemplated by Section 2.06(e), the identity of the Issuing Bank that made such LC Disbursement.

If no election as to the Type of Revolving Borrowing is specified, then the requested Revolving Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Revolving Borrowing, then the applicable Borrower(s) shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Revolving Loan to be made as part of the requested Revolving Borrowing.

SECTION 2.04.  Protective Advances.  (a) Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrowers and the Lenders, from time to time during the Availability Period, in the Administrative Agent's sole discretion (but shall have absolutely no obligation) to make Loans in dollars to the Borrowers, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations or (iii) to pay any other amounts required to be paid by the Borrowers pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 9.03) and other sums payable under the Loan Documents which have not been paid by the Borrowers after written demand therefor (any of such Loans are herein referred to as "Protective Advances"); provided that the aggregate principal amount of Protective Advances outstanding at any time shall not exceed (i) $30,000,000 in the aggregate or (ii) together with the aggregate principal amount of Overadvances outstanding at such time pursuant to Section 2.05, $45,000,000 in the aggregate; provided further that no Protective Advance may be made if, after giving effect thereto, the sum of any Lender's Credit Exposure and Pre-Petition Credit Exposure shall exceed its Revolving Commitment.  Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied.  The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder.  All Protective Advances shall be ABR Borrowings.  The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.  At any time that there is sufficient Availability and the conditions precedent set forth in Section 4.02 have been satisfied, the Administrative Agent may request the Lenders to make Revolving Loans to repay a Protective Advance.  At any other time the Administrative Agent may require the Lenders to fund their risk participations as described in Section 2.04(b).

(b) The Administrative Agent may by notice given not later than 12:00 p.m., New York City time, on any Business Day require the Lenders to acquire participations on such Business Day in all or a portion of any Protective Advance outstanding. Such notice shall specify the aggregate principal amount of the Protective Advance in which the Lenders will be required to participate and each Lender's Applicable Percentage of such Protective Advance. Each Lender hereby absolutely and unconditionally agrees to pay, promptly upon receipt of notice as provided above (and in any event, if such notice is received by 12:00 p.m., New York City time, on a Business Day, no later than 5:00 p.m., New York City time, on such Business Day and if received after 12:00 p.m., New York City time, on a Business Day, no later than 10:00 a.m., New York City time, on the immediately succeeding Business Day), to the Administrative Agent such Lender's Applicable Percentage of such Protective Advance. Each Lender acknowledges and agrees that its obligation to acquire participations in Protective Advances pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including nonsatisfaction of any of the conditions precedent set forth in Section 4.02, the occurrence and continuance of a Default or any reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.07 with respect to Revolving Loans made by such Lender (and Section 2.07 shall apply, mutatis mutandis, to the payment obligations of the Lenders pursuant to this paragraph). From and after the date, if any, on which any Lender has paid in full for its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender its Applicable Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance; provided that any such payment or proceeds so distributed shall be repaid to the Administrative Agent if and to the extent such payment or proceeds is required to be refunded to the Borrowers for any reason. The purchase of participations in any Protective Advance pursuant to this paragraph shall not constitute a Loan and shall not relieve the Borrowers of their obligation to repay such Protective Advance.

SECTION 2.05. Overadvances.

(a) Any provision of this Agreement to the contrary notwithstanding, at the request of the Borrower Representative, the Administrative Agent may in its sole discretion (but shall have absolutely no obligation to) make Loans to the Borrowers, on behalf of the Lenders, in amounts that exceed Availability (any such Loans are herein referred to collectively as "Overadvances"); provided that the aggregate principal amount of Overadvances outstanding at any time shall not exceed (i) $30,000,000 in the aggregate or (ii) together with the aggregate principal amount of Protective Advances outstanding at such time pursuant to Section 2.04, $45,000,000 in the aggregate; provided, further, that no Overadvance may be made if, after giving effect thereto, the sum of any Lender's Credit Exposure and Pre-Petition Credit Exposure shall exceed its Revolving Commitment. The Overadvances shall be secured by the Liens in favor of the Administrative Agent in and on the Collateral and shall constitute Obligations hereunder. All Overadvances shall be ABR Borrowings. The Borrowers shall be required to repay

each Overadvance no later than the 60th day after the date of the making thereof.  The Administrative Agent's authorization to make Overadvances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.

(b) The Administrative Agent may by notice given not later than 12:00 p.m., New York City time, on any Business Day require the Lenders to acquire participations on such Business Day in all or a portion of any Overadvance outstanding.  Such notice shall specify the aggregate principal amount of the Overadvance in which the Lenders will be required to participate and each Lender's Applicable Percentage of such Overadvance.  Each Lender hereby absolutely and unconditionally agrees to pay, promptly upon receipt of notice as provided above (and in any event, if such notice is received by 12:00 p.m., New York City time, on a Business Day, no later than 5:00 p.m., New York City time, on such Business Day and if received after 12:00 p.m., New York City time, on a Business Day, no later than 10:00 a.m., New York City time, on the immediately succeeding Business Day), to the Administrative Agent, the account of the Administrative Agent, such Lender's Applicable Percentage of such Overadvance.  Each Lender acknowledges and agrees that its obligation to acquire participations in Overadvances pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including nonsatisfaction of any of the conditions precedent set forth in Section 4.02, the occurrence and continuance of a Default or any reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  Each Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.07 with respect to Revolving Loans made by such Lender (and Section 2.07 shall apply, mutatis mutandis, to the payment obligations of the Lenders pursuant to this paragraph).  From and after the date, if any, on which any Lender has paid in full for its participation in any Overadvance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender its Applicable Percentage of all payments of principal and interest and all proceeds of Collateral thereafter received by the Administrative Agent in respect of such Overadvance; provided that any such payment or proceeds so distributed shall be repaid to the Administrative Agent if and to the extent such payment or proceeds shall be required to be refunded to the Borrowers for any reason.  The purchase of participations in any Overadvance pursuant to this paragraph shall not constitute a Loan and shall not relieve the Borrowers of their obligation to repay such Overadvance.

SECTION 2.06. Letters of Credit.    (a) General.    Subject to the terms and conditions set forth herein, the Borrower Representative may request the issuance of Letters of Credit in dollars for its own account or for the account of another Loan Party, in a form reasonably acceptable to the Administrative Agent and the applicable Issuing Bank, at any time and from time to time during the Availability Period.  The Company unconditionally and irrevocably agrees that, in connection with any Letter of Credit issued for the account of a Loan Party that is not a Borrower as provided in the first sentence of this paragraph, the Company will be fully responsible for the reimbursement of LC Disbursements, the payment of interest thereon and the payment of fees due under Section 2.12(b) to the same extent as if it were the sole account party in respect of such Letter of Credit.  In the event of any inconsistency between the

terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrowers to, or entered into by the Borrowers with, an Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b) Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit or the amendment, renewal or extension of an outstanding Letter of Credit (other than an automatic renewal permitted pursuant to paragraph (c) of this Section), the Borrower Representative shall e-mail, hand deliver or send by facsimile (or transmit by electronic communication, if arrangements for doing so have been approved by the recipient) to the applicable Issuing Bank and the Administrative Agent (reasonably in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the applicable Issuing Bank, the applicable Borrower also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrowers shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the total LC Exposure shall not exceed $200,000,000, (ii) the total Standby LC Exposure shall not exceed $200,000,000, (iii) the portion of the LC Exposure attributable to Letters of Credit issued by any Issuing Bank will not exceed the LC Commitment of such Issuing Bank, (iv) the portion of the Standby LC Exposure attributable to Letters of Credit issued by any Issuing Bank will not exceed the Standby LC Commitment of such Issuing Bank, (v) the Credit Exposure of any Lender exceeding such Lender's Revolving Commitment and (vi) the Aggregate Credit Exposure shall not exceed the Credit Limit.  An Issuing Bank shall not be under any obligation to issue, amend, renew or extend any Letter of Credit if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing, amending, renewing or extending such Letter of Credit, or any law applicable to such Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit, or request that such Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which such Issuing Bank in good faith deems material to it, or if the issuance, amendment, renewal or extension of such Letter of Credit would violate one or more policies of such Issuing Bank applicable to letters of credit generally.

(c) _Expiration Date_.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date as in effect on the date of the issuance of such Letter of Credit (or such renewal or extension thereof); _provided_ that, if the applicable Issuing Bank shall so agree, a Letter of Credit may expire at a later date if the applicable Borrower shall have deposited cash collateral in an LC Collateral Account pursuant to Section 2.06(j) in an amount equal to 103% of the undrawn face amount of such Letter of Credit.  Any Letter of Credit may provide by its terms that it may be automatically extended for additional successive one year periods on terms reasonably acceptable to the applicable Issuing Bank.  Any Letter of Credit providing for automatic extension shall be extended upon the then current expiration date without any further action by any Person unless the applicable Issuing Bank shall have given notice to the applicable beneficiary (with a copy to the applicable Borrower) of the election by such Issuing Bank not to extend such Letter of Credit, such notice to be given not fewer than thirty (30) days prior to the then current expiration date of such Letter of Credit unless otherwise agreed to by the applicable Issuing Bank; _provided_ that no Letter of Credit may be extended automatically or otherwise beyond the date that is five (5) Business Days prior to the Maturity Date in effect at the time thereof (other than in accordance with this paragraph).

(d) _Participations_.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the Lenders, such Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of such Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrowers on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment required to be refunded to the Borrowers for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit, the expiration of any Letter of Credit on a date after the Maturity Date due to the operation of the proviso in the definition of the term "Maturity Date", the nonsatisfaction of any of the conditions precedent set forth in Section 4.02, the occurrence and continuance of a Default, any reduction or termination of the Revolving Commitments or any _force_ _majeure_ or other event that under any rule of law or uniform practices to which any Letter of Credit is subject (including Section 3.14 of ISP 98 or any successor publication of the International Chamber of Commerce) permits a drawing to be made under such Letter of Credit after the expiration thereof or of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e) <u>Reimbursement</u>.  If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrowers shall, following notice of such LC Disbursement to the Borrower Representative, reimburse such LC Disbursement by paying to the Administrative Agent or such Issuing Bank an amount equal to such LC Disbursement not later than 2:00 p.m., New York City time, on the date that such LC Disbursement is made, if the Borrower Representative shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower Representative prior to such time on such date, then not later than 2:00 p.m., New York City time, on (i) the Business Day that the Borrower Representative receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower Representative receives such notice, if such notice is not received prior to such time on the day of receipt; <u>provided</u> that the Borrowers may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 that such payment be financed with an ABR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting ABR Revolving Borrowing.  If the Borrowers fail to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrowers in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrowers, in the same manner as provided in Section 2.07 with respect to Loans made by such Lender (and Section 2.07 shall apply, <u>mutatis mutandis</u>, to the payment obligations of the Lenders pursuant to this paragraph), and the Administrative Agent shall promptly pay to such Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrowers pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this paragraph to reimburse an Issuing Bank for any LC Disbursement (other than the funding of ABR Revolving Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrowers of their obligation to reimburse such LC Disbursement.

(f) <u>Obligations Absolute</u>.   The Borrowers' joint and several obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section is absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by any Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not substantially comply with the terms of such Letter of Credit, (iv) any <u>force majeure</u> or other event that under any rule of law or uniform practices to which any Letter of Credit is subject (including Section 3.14 of ISP 98 or any successor publication of the

International Chamber of Commerce) permits a drawing to be made under such Letter of Credit after the stated expiration date thereof or of the Revolving Commitments or (v) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder.  None of the Administrative Agent, the Lenders or the Issuing Banks, or any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any other act, failure to act or other event or circumstance; provided that the foregoing shall not be construed to excuse any Issuing Bank from liability to the Borrowers to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by any Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of bad faith, gross negligence or willful misconduct on the part of an Issuing Bank (with such absence to be presumed unless otherwise determined by a court of competent jurisdiction in a final and nonappealable judgment), such Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, an Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)  Disbursement Procedures.  Each Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  Each Issuing Bank shall promptly notify the Administrative Agent and the Borrower Representative by telephone (confirmed by e-mail or facsimile) of such demand for payment and whether such Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse such Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)  Interim Interest.  If any Issuing Bank shall make any LC Disbursement, then, unless the Borrowers shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrowers reimburse such LC Disbursement in full, at the rate per annum then applicable to ABR Revolving Loans; provided that, if the Borrowers fail to reimburse such LC

Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.13(d) shall apply.    Interest accrued pursuant to this paragraph shall be paid to the Administrative Agent for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to paragraph (e) of this Section to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment, and shall be payable on demand or, if no demand has been made, on the date on which the Borrowers reimburse the applicable LC Disbursement in full.

(i)    Replacement of the Issuing Banks.  Any Issuing Bank may be replaced at any time by written agreement among the Borrower Representative, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Bank.  At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j)    Cash Collateralization.  If any Event of Default shall occur and be continuing, on the Business Day that the Borrower Representative receives notice from the Administrative Agent or the Required Lenders demanding the deposit of cash collateral pursuant to this paragraph, the Borrowers shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders (the "LC Collateral Account"), an amount in cash equal to 103% of the LC Exposure as of such date plus accrued and unpaid interest thereon.  The Borrowers shall also deposit cash collateral in accordance with this paragraph as and to the extent required by Section 2.11(b) or 2.20.    Each such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the Obligations.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and the Borrowers hereby grant the Administrative Agent a Lien in the LC Collateral Account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrowers' risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.    Moneys in such account shall, notwithstanding anything to the contrary herein or in the Collateral Documents, be applied by the Administrative Agent to reimburse the applicable Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other Obligations (but subject to, in the case of any such application at a

time when any Lender is a Defaulting Lender (but only if, after giving effect thereto, the remaining cash collateral shall be less than the aggregate LC Exposure of all the Defaulting Lenders that has not been reallocated to non-Defaulting Lenders pursuant to Section 2.20), the consent of each Issuing Bank).  If the Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrowers within three (3) Business Days after all Events of Default have been cured or waived.  If any Borrower is required to provide an amount of cash collateral hereunder pursuant to Section 2.11(b), such amount (to the extent not applied as aforesaid) shall be returned to such Borrower as and to the extent that, after giving effect to such return, the Borrowers would remain in compliance with Section 2.11(b) and no Event of Default shall have occurred and be continuing. If any Borrower is required to provide an amount of cash collateral hereunder pursuant to Section 2.20, such amount (to the extent not applied as aforesaid) shall be returned to such Borrower as promptly as practicable to the extent that, after giving effect to such return, no Issuing Bank shall have any exposure in respect of any outstanding Letter of Credit that is not fully covered by the Revolving Commitments of the non-Defaulting Lenders and/or the remaining cash collateral and no Event of Default shall have occurred and be continuing.

(k)  <u>Existing Letters of Credit</u>.  Each Existing Letter of Credit shall constitute a "Letter of Credit" for all purposes of this Agreement and shall be deemed issued under this Agreement on the Effective Date and all LC Exposure (as defined in the Pre-Petition Credit Agreement) shall constitute "LC Exposure" for all purposes of this Agreement, and no issuance or similar fees (as distinguished from ongoing participation or fronting fees) will be required in connection with the Existing Letters of Credit.  Without limiting the foregoing, (i) each such Existing Letter of Credit shall be included in the calculation of the LC Exposure, (ii) all liabilities of the Borrowers and the other Loan Parties with respect to such Existing Letters of Credit shall constitute Obligations and (iii) each Lender shall have reimbursement obligations with respect to such Existing Letters of Credit as provided in this Section 2.06.  Notwithstanding any other provision contained in this Section 2.06, no Existing Letter of Credit that has not been issued by an Issuing Bank referred to in clause (a) of the definition of such term may be renewed or extended.

(l)  <u>Issuing Bank Reports to the Administrative Agent</u>.  Unless otherwise agreed by the Administrative Agent, each Issuing Bank shall, in addition to its notification obligations set forth elsewhere in this Section, report in writing to the Administrative Agent (i) periodic activity (for such period or recurrent periods as shall be requested by the Administrative Agent) in respect of Letters of Credit issued by such Issuing Bank, including all issuances, extensions, amendments and renewals, all expirations and cancelations and all disbursements and reimbursements, (ii) reasonably prior to the time that such Issuing Bank issues, amends, renews or extends any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the stated amount of the Letters of Credit issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and whether the amounts thereof shall have changed), (iii) on each Business Day on which such Issuing Bank makes any LC Disbursement, the date and amount of such LC Disbursement, (iv) on any Business Day on which the Borrowers fail to reimburse an LC Disbursement required to be reimbursed

to such Issuing Bank on such day, the date of such failure and the amount of such LC Disbursement and (v) on any other Business Day, such other information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by such Issuing Bank.

(m)  LC Exposure Determination.  For all purposes of this Agreement, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such .maximum stated amount is in effect at the time of determination

SECTION 2.07.  Funding of Borrowings.  (a) Each Lender shall make each Revolving Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower Representative by promptly crediting the amounts so received, in like funds, to the Funding Account(s); provided that ABR Revolving Loans made to finance the reimbursement of (i) an LC Disbursement as provided in Section 2.06(e) shall be remitted by the Administrative Agent to the applicable Issuing Bank and (ii) a Protective Advance or an Overadvance shall be retained by the Administrative Agent.

(b)  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Revolving Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption, make available to the applicable Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Revolving Loans.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Revolving Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.08.  Interest Elections.  (a)  Each Revolving Borrowing initially shall be of the Type and, in the case of a Eurodollar Revolving Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03.  Thereafter, the Borrower Representative may elect to convert such Borrowing to a Revolving Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Revolving Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower Representative may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.  This Section shall not apply to Overadvances or Protective Advances, which may not be converted or continued.

(b)  To make an election pursuant to this Section, the Borrower Representative shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Revolving Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by e-mail, hand delivery or facsimile to the Administrative Agent of an executed written Interest Election Request.  Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i) the Borrower and the Revolving Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii) the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii) whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv) if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c)  Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(d)  If the Borrower Representative fails to deliver a timely Interest Election Request with respect to a Eurodollar Revolving Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the

end of such Interest Period such Borrowing shall be converted to an ABR Revolving Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower Representative, then, so long as an Event of Default is continuing (i) no outstanding Revolving Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Revolving Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.09.  <u>Termination and Reduction of Revolving Commitments</u>.  (a) Unless previously terminated, the Revolving Commitments shall automatically terminate on the Maturity Date.

(b)  The Borrowers may at any time terminate the Revolving Commitments upon (i) the payment in full in cash of all outstanding Loans and any LC Disbursements, together with accrued and unpaid interest thereon and on any LC Disbursements, (ii) the cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, (x) the furnishing to the applicable Issuing Bank of a cash deposit (or at the discretion of such Issuing Bank a back -up standby letter of credit reasonably satisfactory to such Issuing Bank equal to 103% of the portion of the LC Exposure attributable to such Letter of Credit as of such time) or (y) such other alternative arrangements with respect to any such Letters of Credit that is satisfactory to the Administrative Agent and the Issuing Bank), and such cash deposit shall not be subject to or subordinate to the Carve Out, (iii) the payment in full in cash of all accrued and unpaid fees and (iv) the payment in full in cash of all reimbursable expenses and all other Obligations outstanding at such time; <u>provided</u> that, upon the termination of the Revolving Commitments pursuant to this <u>clause (b)</u>, the "Exit Revolving Commitments" under and as defined in the Exit Facility Term Sheet and the rights and obligations of the parties hereto under <u>Section 2.25</u> shall, in each case, automatically terminate without any further consent or action required by any Person.

(c)  The Borrowers may from time to time reduce the Revolving Commitments; <u>provided</u> that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Borrowers shall not reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.11, the Aggregate Credit Exposure would exceed the Credit Limit.

(i) The Borrower Representative shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) or (c) of this Section at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower Representative pursuant to this Section shall be irrevocable; <u>provided</u> that a notice of termination of the Revolving Commitments delivered by the Borrower Representative may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such

notice may be revoked by the Borrower Representative (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Revolving Commitments shall be permanent. Each reduction of the Revolving Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments.

SECTION 2.10.  Repayment of Loans; Evidence of Debt.  (a) The Borrowers hereby unconditionally promise to pay (i) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan on the Maturity Date and (ii) to the Administrative Agent the then unpaid principal amount of each Protective Advance and Overadvance on the earliest of (A) the Maturity Date, (B) demand by the Administrative Agent therefor and (C) in the case of any Overadvance, the 60th day after the date of the making thereof.

(b) On each Business Day during any Dominion Period, the Administrative Agent shall apply all funds credited to a Concentration Account on such Business Day or the immediately preceding Business Day (at the discretion of the Administrative Agent, whether or not immediately available), first, to prepay the Pre-Petition Revolving Loans that may be outstanding in the order and manner provided in the Pre-Petition Credit Agreement, second to prepay any Protective Advances and Overadvances that may be outstanding and, third, to prepay the Revolving Loans and to cash collateralize outstanding LC Exposure.

(c) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e) The entries made in the accounts maintained pursuant to paragraph (c) or (d) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement.

(f) Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all

times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.11.  Prepayment of Loans.  (a)  The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (d) of this Section; *provided* that, any such prepayments shall be applied, first, to the Pre-Petition Revolving Loans then outstanding (in the order and manner provided in the Pre-Petition Credit Agreement) and then to the Revolving Loans.

(b)  In the event and on each occasion that the total Credit Exposure exceeds the lesser of (i) the sum of (A) the Borrowing Base then in effect, (B) the Protective Advance Exposure and (C) the Overadvance Exposure and (ii) the total Revolving Commitments then in effect, the Borrowers shall prepay first, the Pre-Petition Revolving Loans then outstanding (in the order and in the manner provided in the Pre-Petition Credit Agreement) and, second, the Revolving Loans (or, if no such Borrowings are outstanding, deposit cash collateral in the LC Collateral Account in accordance with Section 2.06(j)) in an aggregate amount equal to such excess.

(c)  Subject to the priority of Liens and application of funds set forth in the Final Order with respect to the Collateral that is sold pursuant to an Asset Sale, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Company or any Subsidiary in respect of any Prepayment Event, the Borrowers shall, on the day such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds (or, with respect to a Prepayment Event described in clause (e) of the definition of the term "Prepayment Event" up to $50,000,000 of such Net Proceeds); provided that in the case of a Prepayment Event described in clauses (a), (b) or (d) of the definition thereof, any Net Proceeds in respect of Term Loan Priority Collateral received by the Borrowers as a result of such Prepayment Event shall be applied (A) unless waived in accordance with the Term Credit Agreement, first, to the Term Loan Obligations, until paid in full, and (B) second, as set forth in Section 2.11(d) below.  Notwithstanding the foregoing, the Loan Parties or any Subsidiary shall be permitted to reinvest the Net Proceeds of any Prepayment Event described in clauses (a) or (b) of the definition of Prepayment Event with the prior written consent of the Administrative Agent and the Required Lenders (in their sole and absolute discretion).

(d)  The Borrower Representative shall notify the Administrative Agent by telephone (confirmed by e-mail, hand delivery or facsimile) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Revolving Borrowing, not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by Section 2.09, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.09.  Promptly following receipt of

any such notice relating to a Revolving Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.   Each partial prepayment of any Revolving Borrowing shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.   Each prepayment of a Revolving Borrowing shall be applied ratably to the Revolving Loans included in the prepaid Borrowing.   Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13.

(e) Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (c) of this Section 2.11, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Borrower Representative or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (c).

SECTION 2.12. <u>Fees</u>.  (a) The Borrowers agree to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue on the Effective Date and each day thereafter on the amount of the unused Revolving Commitment of such Lender on such day at a rate per annum equal to 0.50%.   Accrued commitment fees shall be payable in arrears on the first Business Day of each January, April, July and October, commencing on the first such date to occur after the Effective Date, and on the date on which the Revolving Commitments terminate.   All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).   For purposes of computing commitment fees, the Revolving Commitment of a Lender shall be deemed to be used to the extent of the outstanding Revolving Loans and LC Exposure of such Lender (and the Protective Advance Exposure and Overadvance Exposure of such Lender shall be disregarded for such purpose).

(b)  The Borrowers agree to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participation in each Standby Letter of Credit or Commercial Letter of Credit at the Applicable Rate for a Letter of Credit of such type, in each case on the average daily amount of the portion of such Lender's LC Exposure attributable to such Letter of Credit (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to each Issuing Bank a fronting fee, which shall accrue at the rate of 0.10% per annum, on the average daily amount of the LC Exposure attributable to Letters of Credit issued by such Issuing Bank (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date of termination of the Revolving Commitments and the date on which there ceases to be any LC Exposure, as well as such Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.   Participation fees and fronting fees

66

accrued through and including the last day of each calendar month shall be payable on the first Business Day of the next succeeding month, commencing on the first such date to occur after the Effective Date; <u>provided</u> that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand. Any other fees payable to the Issuing Banks pursuant to this paragraph shall be payable within ten (10) days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c) The Borrowers agree to pay the fees in the amounts and payable at the times separately agreed upon in the Fee Letters or as otherwise agreed between the Borrowers and the Administrative Agent.

(d) All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to the applicable Issuing Bank, in the case of fees payable to it) for distribution, in the case of commitment fees and participation fees, to the Lenders. Fees paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.13. <u>Interest</u>. (a) The Loans comprising each ABR Borrowing (excluding Protective Advances and Overadvances) shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b) The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c) Each Protective Advance and Overadvance shall bear interest at the Alternate Base Rate plus the Applicable Rate for ABR Revolving Loans plus 2% per annum.

(d) Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrowers hereunder is not paid when due (after giving effect to any applicable grace period), whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% per annum plus the rate applicable to ABR Revolving Loans as provided in paragraph (a) of this Section.

(e) Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Revolving Commitments; <u>provided</u> that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Availability Period), accrued interest on the

principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Revolving Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14.  Alternate Rate of Interest.  (a)  If prior to the commencement of any Interest Period for a Eurodollar Revolving Borrowing:

(i)  the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(ii)  the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice (which may be telephonic) thereof to the Borrower Representative and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower Representative and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (A) any Interest Election Request that requests the conversion of any Revolving Borrowing to, or continuation of any Revolving Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Revolving Borrowing shall be continued as an ABR Borrowing, and (B) any Borrowing Request for a Eurodollar Revolving Borrowing shall be treated as a request for an ABR Revolving Borrowing.

(b)  If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (a)(i) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (a)(i) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement

to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for all purposes of this Agreement.  Such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.  Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Revolving Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Revolving Borrowing, and (y) any Borrowing Request for a Eurodollar Revolving Borrowing shall be treated as a request for an ABR Revolving Borrowing.

SECTION 2.15.  Increased Costs.  (a)  If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or any Issuing Bank;

(ii) impose on any Lender or any Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein; or

(iii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of the term "Excluded Taxes" and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any Loan), or to increase the cost to such Lender or other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered.  Notwithstanding the foregoing, if the Company reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Company to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith, result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b) If any Lender or any Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or on the capital of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement, the Revolving Commitment of such Lender or the Loans made by, or participations in Letters of Credit or Loans held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender or such Issuing Bank, the Borrowers will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

(c) A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as well as a reasonably detailed description of the occurrence giving rise to such event, as specified in paragraph (a) or (b) of this Section delivered to the Borrower Representative shall be conclusive absent manifest error.  The Borrowers shall pay such Lender or such Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d) Failure or delay on the part of any Lender or any Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender or an Issuing Bank pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender or Issuing Bank, as the case may be, notifies the Borrower Representative of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefor; provided further that if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e) Notwithstanding the above, a Lender or an Issuing Bank will not demand compensation for any increased cost or reduction set forth in this Section 2.15 at any time if it is not the general practice and policy of such Lender or Issuing Bank to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.16.  Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow,

convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(d) and is revoked in accordance therewith), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower Representative pursuant to Section 2.19, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate  such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market.  A certificate of any Lender delivered to the Borrower Representative and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

SECTION 2.17.  Taxes.  (a)  Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)  Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)  Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d) <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower Representative by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e) <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within thirty (30) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f) <u>Status of Lenders</u>.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrower Representative or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing:

(A) any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding Tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed originals of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit I-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Company within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-2 or Exhibit I-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such

Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower Representative or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrower Representative and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Effective Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(g) Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental

74

Authority.  Notwithstanding anything to the contrary in this paragraph, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)  Defined Terms.  For purposes of this Section, the term "Lender" shall include any Issuing Bank, and the term "applicable law" includes FATCA.

(i)  Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or Issuing Banks, the termination of the Revolving Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(j)  FATCA Grandfathering.  For purposes of determining withholding Taxes imposed under FATCA, from and after the Effective Date, the Borrowers and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) the Loans as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

SECTION 2.18.  Payments Generally; Allocation of Proceeds; Sharing of Set-offs.  (a) The Borrowers shall make each payment required to be made by them hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment or, if no such time is expressly required, on or prior to 3:00 p.m., New York City time, on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at 10 South Dearborn Street, 22nd Floor, Chicago, Illinois, or by wire transfer using the Administrative Agent's wire instructions, except that payments required to be made directly to an Issuing Bank shall be so made and except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)  Any proceeds of Collateral received by the Administrative Agent (i) not constituting (A) a specific payment of principal, interest, fees or other sum payable under

the Loan Documents (which shall be applied as specified by the Borrowers), (B) amounts to be applied from a Concentration Account during any Dominion Period (which shall be applied in accordance with Section 2.10(b)) or (C) so long as no Event of Default shall have occurred and be continuing, amounts which are received into any Concentration Account (which shall be deposited to the Borrowers' Funding Account in accordance with the Security Agreement) or (ii) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, shall be applied ratably <u>first</u>, to permanently reduce the fees, interest and principal in respect of the Pre-Petition Lender Obligations then outstanding (if any) constituting fees, interest and principal in accordance with Section 2.18(b) of the Pre-Petition Credit Agreement, until paid in full, second to permanently reduce the other Pre-Petition Lender Obligations then outstanding (if any) in accordance with Section 2.18(b) of the Pre-Petition Credit Agreement until paid in full, third, to pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent and the Issuing Banks from the Borrowers (other than in connection with Banking Services or Swap Obligations), fourth, to pay any fees or expense reimbursements then due to the Lenders from the Borrowers (other than in connection with Banking Services or Swap Obligations), fifth, to pay interest due in respect of the Protective Advances and Overadvances, sixth, to pay the principal of the Protective Advances and Overadvances, seventh, to pay interest then due and payable on the Loans (other than the Protective Advances and Overadvances) ratably, eighth, to prepay principal on the Loans (other than the Protective Advances and Overadvances) and unreimbursed LC Disbursements ratably, ninth, to pay an amount to the Administrative Agent equal to 103% of the aggregate undrawn face amount of all outstanding Letters of Credit and the aggregate amount of any unpaid LC Disbursements, to be held as cash collateral for such Obligations, tenth, to payment of any amounts owing with respect to Banking Services and Swap Obligations, eleventh, to the payment of any other Secured Obligations due to the Administrative Agent or any Lender, and twelfth, any excess to be returned to Borrower Representative to be used in accordance with the Approved Budget; provided, that if and to the extent that it would be unlawful for any Subsidiary Loan Party to secure any Swap Obligation under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Subsidiary Loan Party's failure for any reason (and after giving effect to the guarantees by the other Loan Guarantors of the Secured Obligations of such Subsidiary Loan Party) to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Liens created by the Loan Documents in the assets of such Subsidiary Loan Party become effective with respect to such Swap Obligation, no proceeds of Collateral of such Subsidiary Loan Party will be applied pursuant to clause eighth of the preceding sentence to the payment of such Swap Obligation. Notwithstanding any other provision of this Agreement, unless so directed by the Borrower Representative, or unless a Default is in existence, neither the Administrative Agent nor any Lender shall apply any payment which it receives to any Eurodollar Loan, except (a) on the expiration date of the Interest Period applicable to such Eurodollar Loan or (b) in the event, and only to the extent, that there are no outstanding ABR Loans and, in any such event, the Borrowers shall pay the break funding payment required in accordance with Section 2.16.

(c) At the election of the Administrative Agent, all payments of principal, interest, LC Disbursements, fees, reimbursable expenses (including, without limitation, all reimbursements of fees and expenses pursuant to Section 9.03) and other sums payable under the Loan Documents or in respect of the Pre-Petition Lender Obligations may be paid from the proceeds of Borrowings made hereunder, whether made following a request by the Borrower Representative pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of any Borrower maintained with the Administrative Agent.  Each Borrower hereby irrevocably authorizes (i) the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest, fees or any other amount due under the Loan Documents or in respect of the Pre-Petition Lender Obligations and agrees that all such amounts charged shall constitute Loans (including Overadvances, but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses pursuant to Section 9.03) and that all such Borrowings shall be deemed to have been requested pursuant to Section 2.03, 2.04 or 2.05, as applicable, and (ii) the Administrative Agent to charge any deposit account of any Borrower (other than, so long as no Dominion Period is in effect or no Event of Default shall have occurred or be continuing, any Excluded Deposit Account) maintained with the Administrative Agent for each payment of principal, interest, fees or any other amount due under the Loan Documents or in respect of the Pre-Petition Lender Obligations.

(d) If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans or participations in LC Disbursements, Protective Advances or Overadvances resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans and participations in LC Disbursements, Protective Advances or Overadvances and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Revolving Loans and participations in LC Disbursements, Protective Advances and Overadvances of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their respective Revolving Loans and participations in LC Disbursements, Protective Advances and Overadvances; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Loans or participations in LC Disbursements, Protective Advances or Overadvances to any Person that is an Eligible Assignee (as such term is defined from time to time).  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of set-off and

counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(e) Unless the Administrative Agent shall have received notice from the Borrower Representative prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Banks hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Banks, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or Issuing Banks, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f) f any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.19.  Mitigation Obligations; Replacement of Lenders.  (a) If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b) If (i) any Lender requests compensation under Section 2.15, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender becomes a Defaulting Lender or (iv) any Lender has failed to consent to a proposed amendment or waiver that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders or Supermajority Lenders) and with respect

to which the Required Lenders shall have granted their consent, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrower Representative, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or 2.17) and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent and the Issuing Banks, which consent shall not unreasonably be withheld, conditioned or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, Protective Advances and Overadvances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments, (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment or waiver can be effected and (E) such assignment and delegation does not conflict with applicable law.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply.  Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower Representative, the Administrative Agent and the assignee (subject to any required consents referred to above) and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.20. Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)  commitment fees shall cease to accrue on the unused portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 2.12(a);

(b)  the Revolving Commitment and Credit Exposure of such Defaulting Lender shall not be included in determining whether all Lenders, all affected Lenders, the Required Lenders or the Supermajority Lenders have taken or may take any action hereunder or under any other Loan Documents (including any consent to any amendment, waiver or other modification pursuant to Section 9.02); provided that any waiver, amendment or other modification requiring the consent of all Lenders or all Lenders affected thereby shall, except as otherwise provided in Section 9.02, require the consent of such Defaulting Lender in accordance with the terms hereof;

(c) if any LC Exposure, Protective Advance Exposure and Overadvance Exposure exists at the time such Lender becomes a Defaulting Lender, then:

(i) such Defaulting Lender's LC Exposure (other than any portion thereof attributable to unreimbursed LC Disbursements with respect to which such Defaulting Lender shall have funded its participation as contemplated by Section 2.06(d)), Protective Advance Exposure (other than any portion thereof with respect to which such Defaulting Lender shall have funded its participation as contemplated by Section 2.04(b)) and Overadvance Exposure (other than any portion thereof with respect to which such Defaulting Lender shall have funded its participation as contemplated by Section 2.05(b)) shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages, but only to the extent the sum of all non-Defaulting Lenders' Revolving Credit Exposures plus such Defaulting Lender's LC Exposure, Protective Advance Exposure and Overadvance Exposure does not exceed the total of all non-Defaulting Lenders' Revolving Commitments;

(ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrowers shall within one Business Day following notice by the Administrative Agent, without prejudice to any rights or remedies of the Borrowers against such Defaulting Lender, (A) first, prepay the portion of such Defaulting Lender's Overadvance Exposure (other than any portion thereof referred to in the parenthetical in such clause (i)) that has not been so reallocated, (B) second, prepay the portion of such Defaulting Lender's Protective Advance Exposure that has not been so reallocated, and (C) third, cash collateralize such Defaulting Lender's LC Exposure (other than any portion thereof referred to in the parenthetical in such clause (i)) that has not been so reallocated in accordance with the procedures set forth in Section 2.06(j) for so long as such LC Exposure is outstanding;

(iii) if the Borrowers cash collateralize any portion of such Defaulting Lender's LC Exposure pursuant to clause (ii) above, the Borrowers shall not be required to pay any letter of credit participation fees to such Defaulting Lender pursuant to Section 2.12(b) with respect to such Defaulting Lender's cash collateralized LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(iv) if any portion of the LC Exposure of such Defaulting Lender is reallocated pursuant to clause (c)(i) above, then the fees payable to the Lenders pursuant to Section 2.12(b) shall be adjusted to give effect to such reallocation; and

(v) if any portion of such Defaulting Lender's LC Exposure (other than any portion thereof referred to in the parenthetical in clause (i) above) is neither cash collateralized nor reallocated pursuant to clause (c)(i) or (c)(ii) above, then, without prejudice to any rights or remedies of the applicable Issuing Bank or any Lender hereunder, all letter of credit participation fees payable under Section 2.12(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Banks (and allocated among them ratably based on the amount of such Defaulting Lender's LC Exposure attributable to Letters of Credit issued by each Issuing Bank) until such LC Exposure is cash collateralized and/or reallocated; and

(d)  no Issuing Bank shall be required to issue, amend, renew, extend or increase any Letter of Credit, in each case, unless it is satisfied that the related exposure will be 100% covered by the Revolving Commitments of the non-Defaulting Lenders and/or cash collateral provided by the Borrowers in accordance with clause (c) of this Section, and participating interests in any such newly issued, amended, renewed, extended or increased Letter of Credit shall be allocated among non-Defaulting Lenders in a manner consistent with clause (c)(i) of this Section (and Defaulting Lenders shall not participate therein).

In the event and on the date that each of the Administrative Agent, the Company, each Issuing Bank agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the LC Exposure, Protective Advance Exposure and Overadvance Exposure of the other Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on such date such Lender shall purchase at par such of the Revolving Loans of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold Revolving Loans in accordance with its Applicable Percentage.

SECTION 2.21.  Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations, the Administrative Agent, any Issuing Bank or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside or determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement and the other Loan Documents shall continue in full force as if such payment or proceeds had not been received by the Administrative Agent, such Issuing Bank or such Lender.  The provisions of this Section shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent, any Issuing Bank or any Lender in reliance upon such payment or application of proceeds.  The provisions of this Section shall survive the termination of this Agreement.

SECTION 2.22.  Borrowing Subsidiaries.  The Company may designate any Subsidiary that is a wholly owned Domestic Subsidiary of the Company as a Borrowing Subsidiary upon five (5) Business Days' notice to the Administrative Agent and the Lenders (such notice to include the name, primary business address and tax identification number of such proposed Borrowing Subsidiary). Upon (i) the Lenders' receipt of documentation (including, to the extent such proposed Borrowing Subsidiary qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Subsidiary) and other information required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, and (ii) proper notice and receipt by the Administrative Agent of such agreements, documents and legal opinions as the Administrative Agent may reasonably request and subject to the Administrative Agent's determining in consultation with the Lenders that designating such Subsidiary as a Borrowing Subsidiary would not cause any Lender to suffer any economic, legal or regulatory disadvantage, such Subsidiary shall be a Borrowing Subsidiary and a party to this Agreement and the other Loan Documents. A Subsidiary shall cease to be a Borrowing Subsidiary hereunder at such time as the Company gives notice to the Administrative Agent and the Lenders of its intention to

terminate such Subsidiary as a Borrowing Subsidiary; provided that any such termination shall not be effective (other than to terminate such Borrowing Subsidiary's right to make further Borrowings or, except to the extent such Subsidiary remains a Loan Party after such termination, to obtain Letters of Credit) and such Subsidiary shall remain a Borrowing Subsidiary until such time as all Loans to such Borrowing Subsidiary and accrued interest thereon and all other amounts then due from such Borrowing Subsidiary have been paid in full and, unless such Subsidiary shall remain a Loan Party after such termination, no Letter of Credit issued for the account of such Borrowing Subsidiary shall be outstanding.

SECTION 2.23.  Eligible Pledged Cash Account.  The Company may from time to time, on any Business Day, deposit or cause to be deposited cash in dollars into the Eligible Pledged Cash Account, and on the Business Day following the delivery by the Borrower Representative to the Administrative Agent of a notice setting forth the amount so deposited and certifying that the amount so deposited constitutes Eligible Pledged Cash, the Borrowing Base shall be adjusted to include the aggregate amount of Eligible Pledged Cash after giving effect to such deposit (subject to the limit in the definition of "Borrowing Base" on the amount of Eligible Pledged Cash includible therein). The Company may withdraw cash from the Eligible Pledged Cash Account solely with the prior written consent of the Administrative Agent; provided that the Administrative Agent agrees to promptly provide such written consent so long as the Borrower Representative shall have delivered an updated Borrowing Base Certificate demonstrating that, after giving effect to such withdrawal, the Loan Parties shall be in compliance with the terms of this Agreement and no payment would then be due under Section 2.11(b) of this Agreement.  At the time of any withdrawal of cash from the Eligible Pledged Cash Account, the Borrowing Base shall be adjusted with immediate effect to include only the aggregate amount of Eligible Pledged Cash after giving effect to such withdrawal (subject to the limit in the definition of "Borrowing Base" on the amount of Eligible Pledged Cash includible therein).  At the time of any termination of the Deposit Account Control Agreement or other control agreement entered into in respect of the Eligible Pledged Cash Account, unless such agreement shall have been replaced by another effective Deposit Account Control Agreement or other control agreement reasonably satisfactory to the Administrative Agent, the Borrowing Base shall be adjusted with immediate effect to exclude Eligible Pledged Cash.  Interest or profits, if any, on amounts deposited in the Eligible Pledged Cash Account shall accumulate in such account and constitute Eligible Pledged Cash.

SECTION 2.24.  Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)  The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Final Order.

(b)  Upon the maturity (whether by acceleration or otherwise) of any of the Secured Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Secured Obligations without further application to or order of the Court.

SECTION 2.25.  Conversion to Exit Facility Agreement.  Upon the satisfaction or waiver by the Administrative Agent and each Lender of each of the conditions precedent to the

Conversion Date set forth in the section entitled "Conditions to Conversion" in the Exit Facility Term Sheet on or prior to the Maturity Date, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Lender Party, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Loan Guarantor and each entity assuming the operations and assets of each Loan Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Revolving Commitments, Loans and Letters of Credit hereunder and all other monetary obligations in respect hereof, (ii) each Loan and Letter of Credit hereunder shall be continued as a Loan or Letter of Credit under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.25), and each of the Revolving Commitments hereunder shall automatically be Revolving Commitments under the Exit Facility Agreement. Notwithstanding the foregoing, all obligations of the Borrowers and the Loan Guarantors to the Administrative Agent, the Issuing Banks and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect. Each of the Loan Parties, the Administrative Agent, the Lenders and the Issuing Banks shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.25 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby. Each Lender and Issuing Bank party hereto hereby agrees that, on the Conversion Date, the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet.

ARTICLE III

Representations and Warranties

Each Loan Party represents and warrants to the Lenders on the Effective Date (and will be deemed to represent at such other times as are specified in this Agreement) as follows:

SECTION 3.01. Organization; Powers. The Company and each Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Subsidiary other than a Borrowing Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, subject to the entry of the Final Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.  Authorization; Enforceability; Benefit to Loan Parties.    (a) Subject to entry of the Final Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equity holder action.  Subject to entry of the Final Order, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.  Each Loan Party has determined that, subject to entry of the Final Order, the execution, delivery and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.  Governmental Approvals; No Conflicts.  Except for the entry of, and pursuant to the terms of, the Final Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or so will be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Company or any Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition Term Credit Agreement, the Term Credit Agreement or other instrument binding upon the Company or any Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Company or any Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Company or any Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with Pre-Petition Term Credit Agreement, the Term Credit Agreement or the Pre-Petition Agreement, in the case of clauses (a) (as to the Transactions other than the entry into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation, default or payment, as applicable, which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.  Financial Condition; No Material Adverse Effect.  (a)  The Loan Parties have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Company and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (ii) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Company and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portion of the fiscal year ended November 2, 2019 and February 1, 2020.  Such financial statements present fairly, in all material

respects, the financial position and results of operations and cash flows of the Company and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)  Since the Effective Date, other than those customarily resulting from the commencement of the Cases and changes contemplated in the Borrower Representative's business plan delivered to the Administrative Agent, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.  Properties.  (a) The Company and each Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)  (i) The Company and each Subsidiary owns, is licensed to use, or otherwise has the right to use, all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Company and the Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)  Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.  Litigation and Environmental Matters.  (a) Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Company or any Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)  Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Company nor any Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any reasonable basis for any Environmental Liability to be imposed on or asserted against the Company or any Subsidiary.

SECTION 3.07.  Compliance with Laws and Agreements.  (a) The Company and each Subsidiary is in compliance with all laws, including all orders of Governmental Authorities,

applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14). Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the  Pre-Petition Credit Agreement or the Pre-Petition Term Credit Agreement, no Event of Default has occurred and is continuing.

(b) The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Company, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (i) the Company, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (ii) to the knowledge of the Borrowers any agent of the Company or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.  Investment Company Status.  No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.  Taxes.  The Company and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the Company or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  There is no current or proposed tax assessment, deficiency or other claim against the Company or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.  ERISA; Labor Matters.  (a)  Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws.  On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Company's most recent Annual Report

on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)  Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Company or any Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Company and the Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable Federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Company or any Subsidiary, or for which any claim may be made against the Company or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Company or such Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Company or any Subsidiary is bound.

(c)  None of the Borrower or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA).

SECTION 3.11.  Disclosure.  No reports, financial statements, certificates or other written information (other than forward-looking information, management projections or information of a general economic or industry nature) furnished by or on behalf of the Company or any Subsidiary to the Administrative Agent, any Arranger or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), when delivered and taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to forecasts and projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time made and at the time so furnished and, if furnished prior to the Effective Date, as of the Effective Date (it being understood that such forecasts and projections may vary from actual results and that such variances may be material).

SECTION 3.12.  Subsidiaries and Joint Ventures.  Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Company or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Company or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.  All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non -assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of any rights contained in organizational documents).  Except as set forth in Schedule 3.12, as of the Effective

Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Company or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13. <u>Insurance</u>.    Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Company and the Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.  The Loan Parties believe that the insurance maintained by or on behalf of the Company and the Subsidiaries is adequate.

SECTION 3.14. <u>Federal Reserve Regulations</u>.    Neither the Company nor any Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.  [Reserved].

SECTION 3.16. <u>Collateral Matters</u>.  (a)   Subject to the entry of the Final Order, the Security Agreement and the Final Order are effective to create in favor of the Administrative Agent (for the benefit of the Lender Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)  Except for the entry of the Final Order, no filing or other action will be necessary to perfect such Liens.

(c)  The Final Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Lender Parties, a legal, valid, binding and enforceable perfected Lien in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such Final Order.

SECTION 3.17. <u>Use of Proceeds</u>.  The Borrowers will use the proceeds of the Loans and will request the issuance of Letters of Credit only for purposes set forth in Section 5.11.

SECTION 3.18. <u>Credit Card Agreements</u>.  <u>Schedule</u> 3.18 (as updated from time to time as permitted by Section 5.16) sets forth a list of all Credit Card Agreements to which any Loan Party is a party. A true and complete copy of each Credit Card Agreement listed in <u>Schedule</u> 3.18 has been delivered to the Administrative Agent, together with all material amendments, waivers and other modifications thereto. All such Credit Card Agreements are in full force and effect, currently binding upon each Loan Party that is a party thereto and, to the knowledge of the Loan Parties, binding upon other parties thereto in accordance with their terms.

The Loan Parties are in compliance in all material respects with each such Credit Card Agreement.

SECTION 3.19. Approved Budget. As of the Effective Date, the Borrowers have furnished to the Administrative Agent the initial Approved Budget. Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.20. Chapter 11 Cases.

(a) The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Final Order, and (ii) the hearing for the entry of the Final Order. The Debtors shall give, on a timely basis as specified in the Final Order, all notices required to be given to all parties specified in the Final Order.

(b) After the entry of the Final Order, and pursuant to and to the extent permitted in the Final Order, the Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Final Order.

(c) After the entry of the Final Order and pursuant to and to the extent provided in the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Final Order.

(d) The Final Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended. The Loan Parties are in compliance in all material respects with the Final Order.

(e) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, to the extent the Conversion Date has not occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

ARTICLE IV

Conditions

SECTION 4.01. <u>Conditions to Effectiveness of Credit Agreement</u>.    The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent:

(a) The Administrative Agent shall have received from each Borrower, each Loan Guarantor, each Lender and each Issuing Bank a duly executed counterpart of this Agreement.

(b) The Administrative Agent and the Lenders shall have received a written opinion (addressed to the Administrative Agent, the Lenders and the Issuing Banks and dated the Effective Date) of Kirkland & Ellis LLP, counsel to the Borrowers and the other Loan Parties, addressing corporate authority matters and other matters as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent.

(c) (i)The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (A) in the case of the representations and warranties qualified as to materiality, in all respects and (B) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (ii) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have occurred and be continuing.

(d) The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(e) The Administrative Agent shall have received a completed Borrowing Base Certificate, which shall be dated the Effective Date and signed by a Financial Officer of the Company and shall set forth information required therein as of the last day of the most recent month ended at least fifteen (15) days prior to the Effective Date.

(f) The Lenders shall have received (i) unaudited interim consolidated financial statements of the Company for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of June 30, 2020, (ii) satisfactory projections (including the Borrowing Base and Availability forecasts) and the Approved Budget, (iii) a copy of the fully executed and effective RSA, in form and substance reasonably satisfactory to the Administrative Agent, and (iv) an Acceptable Plan.

(g) The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Company, certifying satisfaction of the conditions set forth in paragraphs (c) and (l) of this Section 4.01.

(h) All fees due to the Administrative Agent, the Arrangers and the Lenders in connection with the effectiveness of this Agreement and the Fee Letters, and all expenses to be paid or reimbursed to the Administrative Agent and the Arrangers on or prior to the Effective Date that have been invoiced at least three (3) Business Days prior to such date, shall have been paid, in each case, from the proceeds of the initial funding hereunder.

(i) The Administrative Agent shall have received from each Loan Party the documentation and other information (including, to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Loan Party) required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date to the extent such information has been requested at least ten (10) Business Days prior to the Effective Date.

(j) The Administrative Agent, for its benefit and the benefit of each other Lender Party, shall have been granted a perfected Lien on the Collateral by the Final Order on the terms and conditions set forth herein and in the other Loan Documents.

(k) The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(l) Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m) (i) The Court shall have entered the Final Order by no later than fifty (50) days after the Petition Date and (ii) all motions, orders (including any "first day" or "second day" orders on a final basis and the Cash Management Order) and other documents shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, and the Court shall have approved and entered all "first day" or "second day" orders on a final basis, including, without limitation, the Cash Management Order.

(n) The Intercreditor Acknowledgment and the Security Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(o) The Term Credit Agreement shall have been duly executed and delivered by each of the parties thereto and shall be in full force and effect, and the Term Loan Lenders shall have funded not less than $150,000,000 of aggregate debtor-in-possession term loans thereunder.

(p)  After giving effect to (i) the initial extensions of credit under the Agreement, (ii) the payment of all fees and expenses required to be paid by the Loan Parties on the Effective Date in connection with the Transactions and (iii) the Transactions to occur on the Effective Date, including the repayment of Pre-Petition Indebtedness, Availability shall not be less than $100,000,000.

(q)  The Borrowers shall have (i) reimbursed all outstanding "LC Disbursements" under drawn "Letters of Credit" (as such terms are defined in the Pre-Petition Credit Agreement), and (ii) paid all outstanding "Swap Obligations" arising from the termination of "Swap Agreements" (as such terms are defined in the Pre-Petition Credit Agreement) prior to the Effective Date, in each case, from the proceeds of the initial funding contemplated pursuant to the Transactions and cash on hand.

The Administrative Agent shall notify the Company and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.  Each Credit Event.  (a)  Except as provided in paragraph (b) of this Section 4.02, the obligation of each Lender to make a Loan on the occasion of any Borrowing, and of each Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the following conditions:

(i) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (A) in the case of the representations and warranties qualified as to materiality, in all respects and (B) otherwise, in all material respects, in each case on and as of the date of the making of such Loan or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date.

(ii) At the time of and immediately after giving effect to the making of such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default shall have occurred and be continuing.

(iii) After giving effect to the making of such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, the sum of the Aggregate Credit Exposure and Pre-Petition Aggregate Credit Exposure shall not exceed the lesser of (i) the total Revolving Commitments then in effect or (ii) other than in the case of a Protective Advance or an Overadvance, the Borrowing Base then in effect, and, other than in the case of a Protective Advance or an Overadvance, the Administrative Agent shall have received a Borrowing Base Certificate as of a date not earlier than the last day of the most recent fiscal month ended at least twenty (20) days prior to the date of the making of such Loan or such issuance, amendment, renewal or extension.

(iv) The Borrowers shall have paid the balance of all fees and expenses then due and payable under this Agreement.

Each making of a Loan and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrowers on the date thereof as to the matters specified in paragraphs (i) through (iv) of this Section 4.02(a).

(b) Notwithstanding the failure to satisfy the conditions precedent set forth in paragraph (a)(i) or (a)(ii) of this Section 4.02, unless otherwise directed by the Required Lenders, the Administrative Agent may, but shall have no obligation to, continue to make Loans and an Issuing Bank may but shall have no obligation to, issue, amend, renew or extend or cause to be issued, amended, renewed or extended any Letter of Credit for the ratable account and risk of Lenders from time to time if the Administrative Agent believes that making such Loans or taking such action with respect to such Letter of Credit is in the best interests of the Lenders.

ARTICLE V

Affirmative Covenants

Until the earlier to occur of the date on which (a) the Revolving Commitments have expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document (other than Banking Services Obligations, Swap Obligations and contingent or indemnity obligations for which no claim has been made) have been paid in full in cash and all Letters of Credit have expired or terminated and all LC Disbursements shall have been reimbursed, or (b) the Conversion Date set forth in the section entitled "Conditions to Conversion" in the Exit Facility Term Sheet shall have occurred, the Loan Parties covenant and agree, jointly and severally, with the Lenders that:

SECTION 5.01.  Financial Statements; Borrowing Base and Other Information. The Borrowers will furnish to the Administrative Agent, for distribution to each Lender and, in the case of clauses (e), (f) and (g), to the Lender Advisors:

(a) within ninety (90) days after the end of each fiscal year of the Company, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by a Financial Officer of the Company, to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

(b) within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Company, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting

fairly, in all material respects, the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)  within thirty (30) days after the end of each of the first two (2) fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b));

(d)  concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Company (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c), that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Sections 5.03 and 5.04 have been provided;

(e)  by no later than 5:00 p.m. New York City time on the four-week anniversary of the Effective Date and each fourth (4th) calendar week thereafter (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), an updated budget consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to the Lender Advisors and the Required Lenders in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Lender Advisors and the Required Lenders in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until

the Lender Advisors and the Required Lenders approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect and, upon the expiration of the then-current Approved Budget, the Approved Budget shall be based upon the Borrower Representative's business plan delivered to the Administrative Agent prior to the Effective Date, adjusted to a weekly basis in a manner acceptable to the Company, the Lender Advisors and the Required Lenders in their reasonable discretion;

(f) by no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, (i) a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date, a report setting forth the Liquidity as of the Friday of the most recently ended calendar week;

(g) by no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item variance report (each, a "Variance Report"), substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Administrative Agent and the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time) and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in actual operating disbursements during the Variance Testing Period (unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h) as soon as available but in any event within twenty (20) days (or, during any Enhanced Borrowing Base Reporting Period, three (3) days) after each Borrowing Base Reporting Date, a Borrowing Base Certificate setting forth a computation of the Borrowing Base as of such Borrowing Base Reporting Date, together with supporting information and any additional reports with respect to the Borrowing Base that the Administrative Agent may reasonably request;

(i)    as soon as available but in any event within twenty (20) days (or, during any Enhanced Borrowing Base Reporting Period, three (3) days) after each Borrowing Base Reporting Date, the following information as of such Borrowing Base Reporting Date, all delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent:

(i) a detailed aging of the Loan Parties' Credit Card Accounts Receivable (A) including aging by each credit card issuer and credit card processor and (B) reconciled to the Borrowing Base Certificate delivered as of such date, prepared in a manner reasonably acceptable to the Administrative Agent, together with a summary specifying the balance due from each credit card issuer or credit card processor;

(ii) a schedule detailing the Loan Parties' Inventory, in form reasonably satisfactory to the Administrative Agent, (A) by location (showing Inventory in transit, any Inventory located with a third party under any consignment, bailee arrangement or warehouse agreement), by product type and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Administrative Agent has previously indicated to the Borrower Representative are deemed by the Administrative Agent to be appropriate, (B) including a report of any variances or other results of Inventory counts performed by the Loan Parties since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, and credits issued by the Loan Parties), and (C) reconciled to the Borrowing Base Certificate delivered as of such date;

(iii) a worksheet of calculations prepared by the Loan Parties to determine Eligible Credit Card Accounts Receivable and Eligible Inventory, such worksheets detailing the Credit Card Accounts Receivable and Inventory excluded from Eligible Credit Card Accounts Receivable and Eligible Inventory and the reasons for such exclusion; and

(iv) a reconciliation of the Loan Parties' Credit Card Accounts Receivable and Inventory between the amounts shown in the Loan Parties' general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above;

(j)    at any time that any Revolving Loan is outstanding or the LC Exposure is equal to or greater than $100,000,000, as soon as available but in any event within twenty (20) days after the end of each calendar month, (i) a schedule and aging of the Loan Parties' accounts payable as of the month then ended and (ii) a reconciliation of the loan balance per the Loan Parties' general ledger to the loan balance under this Agreement, in each case delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent;

(k)    at such other times as may be reasonably requested by the Administrative Agent, copies of all Tax returns filed by any Loan Party with the IRS;

(l)    [reserved];

(m)  promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Company or any Subsidiary with the SEC, or with any national securities exchange, or distributed by the Company to its shareholders generally, as the case may be;

(n)  promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 in form and substance reasonably acceptable to the Administrative Agent; and

(o)  promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Company or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (m) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an Intralinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov.   Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02. Notices of Material Events.  The Company will furnish to the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of any Borrower becoming aware of any of the following:

(a)  the occurrence of any Default;

(b)  the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (other than in connection with the Cases) against or affecting the Company or any Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Company to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)  any Lien (other than a Permitted Encumbrance) or claim made or asserted against any material portion of the Collateral;

(d)  any and all default notices received under or with respect to any leased location or public warehouse where Collateral having an aggregate value in excess of $5,000,000 is located (which shall be delivered within ten (10) Business Days after receipt thereof);

(e)  the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(f)  (i) as soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, all material proposed orders and pleadings related to (x) the Cases (all of which must be in form and substance reasonably satisfactory to the Administrative Agent) or (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(g)  any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Company setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  [Reserved].

SECTION 5.04.  Information Regarding Collateral.  (a) Each Loan Party will furnish to the Administrative Agent prompt (and in any event within thirty (30) days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) its legal name, as set forth in its organizational documents, (ii) its jurisdiction of organization or the form of its organization (including as a result of any merger or consolidation), (iii) the location of its chief executive office or (iv) its organizational identification number, if any, and its Federal Taxpayer Identification Number, in each case under this clause (iv), only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement of such Loan Party.  Each Loan Party also agrees promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)  If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Loan Parties will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Secured Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Lien, all at the expense of the Loan Parties and, all to the extent required by this Agreement or the Collateral Documents.  It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels or Collateral Access Agreements, (C) perfect

Liens in any assets represented by a certificate of title or (D) enter into any Collateral Documents governed by the laws of a jurisdiction other than the United States.

(c) If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the Term Credit Agreement or the Pre-Petition Term Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the Term Credit Agreement and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05. Existence; Conduct of Business.  Subject to any required approval by the Court, each Loan Party will, and will cause each Subsidiary to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06. Payment of Obligations.  Subject to the Final Order and the terms thereof, each Loan Party will, and will cause each Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances) except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07. Maintenance of Properties. Each Loan Party will, and will cause each Subsidiary (other than an Immaterial Subsidiary) to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08. Insurance.  The Loan Parties will, and will cause each Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy

(other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Lender Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lender Parties, as a loss payee thereunder, and the Loan Parties will use commercially reasonable efforts to have each such policy provide for at least thirty (30) days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.  With respect to each Flood Hazard Property owned by any Loan Party with respect to which flood insurance has been made available under Flood Insurance Laws, the applicable Loan Party (i) has obtained and will maintain, with financially sound and reputable insurance companies, flood insurance in such amount and otherwise on such terms as shall be required to comply with all applicable rules and regulations promulgated pursuant to Flood Insurance Laws and (ii) promptly upon request of the Administrative Agent or any Lender, will deliver to the Administrative Agent or such Lender the applicable Flood Insurance Documents and such other evidence of compliance, including evidence of annual renewals of such insurance, as may be reasonably requested by the Administrative Agent or such Lender and as shall be in form and substance reasonably acceptable to the Administrative Agent or such Lender.

SECTION 5.09.  <u>Books and Records; Inspection Rights</u>.  Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof) (including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Company unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Company, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.  The Loan Parties shall have the right to have a representative present at any and all inspections.  Notwithstanding anything herein to the contrary, the right of the Administrative Agent or any Lender to conduct appraisals or field examinations shall be governed exclusively by Sections 5.12 and 5.13, respectively, and shall not be limited by this Section.

SECTION 5.10.  <u>Compliance with Laws</u>.  Each Loan Party will, and will cause each Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.  <u>Use of Proceeds</u>.  The proceeds of Loans made, and Letters of Credit issued, on or after the Effective Date will be used in accordance with the Approved Budget (subject to Permitted Variances) and the Final Order for the following: (i) fund the Cases

and repay Pre-Petition Indebtedness, (ii) for working capital, Capital Expenditures, letters of credit and other lawful corporate purposes of the Borrowers and their Subsidiaries (including payment of certain fees and expenses of professionals retained by the Loan Parties subject to the Carve Out and for certain other Pre-Petition and pre-filing expenses that are approved by the Court and permitted by the Approved Budget).  No part of the proceeds of any Loan and no Letter of Credit will be used in contravention of the provisions of the Final Order, including any restrictions or limitations on the use of proceeds contained therein.  Nothing in this Agreement shall prohibit the Post-Petition payment of Pre-Petition Lender Obligations, including principal, interest, fees, penalties or recoverable costs, due and payable in connection with the Pre-Petition Credit Agreement with the proceeds of the Collateral (as defined herein) or Collateral (as defined in the Pre-Petition Credit Agreement).

SECTION 5.12.  <u>Appraisals</u>.  The Loan Parties will provide to the Administrative Agent upon the Administrative Agent's request, one appraisal (or updates thereof) of the Inventory of the Loan Parties from appraisers selected and engaged by the Administrative Agent, prepared on a basis consistent in all material respects with the inventory appraisals delivered pursuant to the Pre-Petition Credit Agreement (with such adjustments as shall be deemed appropriate to reflect events or changes in circumstances after the dates of such appraisals).  For purposes of the foregoing, it is understood that a single appraisal may consist of appraisals of the assets of each Loan Party and may be conducted at multiple sites.  Such appraisal shall be at the expense of the Loan Parties.

SECTION 5.13.  <u>Field Examinations</u>.  At any time that the Administrative Agent requests, the Company and the Subsidiaries will allow the Administrative Agent to conduct, or engage a third party to conduct, one field examination (or updates thereof) upon reasonable prior notice during normal business hours to ensure the adequacy of Collateral included in the Borrowing Base and related reporting and control systems; <u>provided</u> that the Administrative Agent shall be entitled to conduct only one such field examination after the Petition Date.  For purposes of the foregoing, it is understood that such single field examination may consist of examinations of the assets of each Loan Party and may be conducted at multiple sites.  Such single field examination requested after the Petition Date shall be at the expense of the Loan Parties.

SECTION 5.14.  <u>Depository Banks</u>.  The Loan Parties will, and will cause the Subsidiaries to, maintain the Administrative Agent or one or more Lenders acceptable to the Administrative Agent as their principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other Deposit Accounts for the conduct of their business; <u>provided</u> that the Loan Parties shall not be required to satisfy the foregoing requirement with respect to any Deposit Account that is an Excluded Deposit Account.

SECTION 5.15.  <u>Further Assurances</u>.  The Loan Parties will execute and/or deliver any and all further documents, financing statements, agreements and instruments, and take all such further actions that may be required under any applicable law, or that the Administrative Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties.  The Loan Parties also agree to provide to the Administrative Agent, from

101

time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents.

SECTION 5.16.  Credit Card Agreements and Notifications.  Each Loan Party will (a) comply in all material respects with all its obligations under each Credit Card Agreement to which it is party and (b) maintain credit card arrangements solely with the credit card issuers and credit card processors identified in Schedule 3.18; provided, however, that the Company may amend Schedule 3.18 to remove any credit card issuer or credit card processor identified in such Schedule 3.18 or to add additional credit card issuers and credit card processors that are satisfactory to the Administrative Agent in its reasonable discretion, and concurrently with the making of any such amendment the Company shall provide to the Administrative Agent evidence that a Credit Card Notification shall have been delivered to any credit card issuer or credit card processor added to such Schedule 3.18.

SECTION 5.17.  Loan Parties' Advisors.

(a)  The Loan Parties shall continue to retain the Debtors' Investment Banker. The Loan Parties and their representatives will fully cooperate with the Debtors' Investment Banker and grant them full and complete access to the books and records of the Loan Parties.  The Loan Parties hereby (i) authorize the Administrative Agent (or their respective agents or advisors) to communicate directly with the Debtors' Investment Banker regarding any and all matters related to the Loan Parties and their Affiliates, and (ii) authorize the Debtors' Investment Banker to provide the Administrative Agent (or their respective agents or advisors) with reports and other information or materials prepared or reviewed by the Debtors' Investment Banker as the Administrative Agent may reasonably request (in the case of each of clauses (i) and (ii), subject to protection as necessary in respect of information that is subject to attorney-client or similar privilege or constitutes attorney work-product, and entry by the Administrative Agent (or its respective agents or advisors) into customary non-reliance/confidentiality arrangements in form reasonably satisfactory to the Debtors' Investment Banker).

(b)  the Loan Parties shall host a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01.  The Loan Parties will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than five Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(c)  the Loan Parties shall host bi-weekly conference calls for the Lender Advisors to discuss financial information delivered pursuant to Section 5.01(f).

(d)  Such monthly and bi-weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrower Representative and the Lenders or the Lender Advisors, as applicable.

(e)  Notwithstanding anything to the contrary contained in this Section 5.17, none of the Loan Parties or their respective professionals (including the Debtor's Investment

Banker) will be required to disclose or permit access to any document, information or other matter (i) in respect of which disclosure to the Administrative Agent, any Lender or any Lender Advisor (or their respective representatives or contractors) by the Loan Parties or their respective professionals (including the Debtor's Investment Banker) is prohibited by applicable law or any binding agreement or (ii) that is subject to attorney client or similar privilege or constitutes attorney-work product.

SECTION 5.18.  Lender Advisors.  The Administrative Agent, on behalf of itself and the Lenders, shall be entitled to retain or to continue to retain (either directly or through counsel) any Lender Advisors to provide advice, analysis and reporting for the benefit of the Administrative Agent and the Lenders.  The Loan Parties shall pay all fees and expenses of each Lender Advisor and all such fees and expenses shall constitute Obligations and be secured by the Collateral.

SECTION 5.19.  Bankruptcy Matters.  The Loan Parties shall:

(a)  cause all proposed (i) "first day" orders on a final basis, (ii) orders (other than the Final Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and acceptable to the Administrative Agent in its reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Administrative Agent (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)  comply in a timely manner with their obligations and responsibilities as debtors -in -possession under the Final Order;

(c)  except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property Leases pursuant to Section 365 of the Bankruptcy Code;

(d)  deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or any case stipulation; provided that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; provided, further, that such documents that are filed under seal, to the extent

permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e) comply with each of the Required Milestones contained on Schedule 5.19 upon the terms and at the times provided for therein.

ARTICLE VI

Negative Covenants

Until the earlier to occur of the date on which (a) the Revolving Commitments have expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document (other than Banking Services Obligations, Swap Obligations and contingent or indemnity obligations for which no claim has been made) have been paid in full in cash and all Letters of Credit have expired or terminated and all LC Disbursements shall have been reimbursed, or (b) the Conversion Date set forth in the section entitled "Conditions to Conversion" in the Exit Facility Term Sheet shall have occurred, the Loan Parties covenant and agree, jointly and severally, with the Lenders that:

SECTION 6.01.  Indebtedness; Certain Equity Securities.  (a)  The Company will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i) Indebtedness created under the Loan Documents and the Pre-Petition Loan Documents;

(ii) Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(iii) unsecured Indebtedness of the Company to any Subsidiary and of any Subsidiary to the Company or any other Subsidiary; provided that (A) such Indebtedness shall not have been transferred to any Person other than the Company or any Subsidiary, (B) any such Indebtedness owing by any Loan Party to a Subsidiary that is not a Loan Party shall be unsecured, subordinated in right of payment to the Obligations and the Pre-Petition Lender Obligations and (C) any such Indebtedness shall be incurred in compliance with Section 6.04;

(iv) Guarantees incurred in compliance with Section 6.04;

(v) Indebtedness of the Company or any Subsidiary permitted by the Approved Budget (including with respect to any Permitted Variances) (A) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (B) assumed in connection with the acquisition of any fixed or capital assets, and Refinancing Indebtedness in respect of any of the foregoing; provided that the

aggregate principal amount of Indebtedness permitted by this clause (v) at the time of incurrence thereof shall not exceed $1,000,000;

(vi) Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(vii) Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Company or any Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(viii) Indebtedness permitted by the Approved Budget (including with respect to any Permitted Variances);

(ix) [reserved];

(x) Indebtedness under (i) the Pre-Petition Term Credit Agreement in an aggregate principal amount not to exceed $1,271,597,089.65 and (ii) the Term Credit Agreement in an aggregate principal amount not to exceed $312,342,704.17 at any time outstanding, provided that the Term Loan Facility shall at all times be subject to the Intercreditor Agreement as supplemented by the Intercreditor Acknowledgment;

(xi) Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(xii) the Carve Out;

(xiii) Indebtedness incurred under leases of real property in respect of tenant improvements;

(xiv) [reserved];

(xv) other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000 permitted by the Approved Budget (including with respect to any Permitted Variances);

(xvi) Indebtedness consisting of (A) the financing of insurance premiums and (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvii) obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(xviii) Indebtedness in the form of Swap Agreements permitted under Section 6.07.

(b)  The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of Section 6.01(a).

(c)  Notwithstanding any of the foregoing, no Indebtedness permitted under this Section 6.01 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the superpriority administrative expense claims of (i) the Administrative Agent and the Lenders and (ii) the Pre-Petition Agent and the Pre-Petition Lenders, in each case, as set forth herein and in the Final Order, other than, solely with respect to Collateral that is not ABL Priority Collateral (as defined in the Intercreditor Agreement), Indebtedness under the Term Credit Agreement permitted under Section 6.01(a)(x).

SECTION 6.02.  Liens.   The Company will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, or assign or sell any accounts receivable or rights in respect thereof of the Company or any Domestic Subsidiary that is a Subsidiary, except:

(a)  Liens granted by the Final Order or created under the Loan Documents or Pre-Petition Loan Documents;

(b)  Permitted Encumbrances;

(c)  any Lien on any asset of the Company or any Subsidiary existing on the Effective Date and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Company or any Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the Effective Date and any extensions, renewals and refinancings thereof that do not increase the outstanding principal amount thereof;

(d)  the Carve Out;

(e)  Liens on fixed or capital assets acquired, constructed or improved by the Company or any Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(a)(v) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Company or any Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)  in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of creation of such Lien;

(g)  in the case of (i) any Subsidiary that is not a wholly-owned Subsidiary or (ii) the Equity Interests in any Person that is not a Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Subsidiary or such other Person set forth in the organizational documents of such Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)  Liens solely on any cash earnest money deposits, escrow arrangements or similar arrangements made by the Company or any Subsidiary in connection with the purchase or other acquisition of equipment or inventory in the ordinary course of business;

(i)  Liens on the Collateral securing Indebtedness and Guarantees of the Loan Parties permitted by Section 6.01(a)(x) and obligations relating thereto not constituting Indebtedness; provided that any such Liens on the Collateral shall be subject to the Intercreditor Agreement and the Final Order;

(j)  any Lien on assets of any Foreign Subsidiary; provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01(a) and obligations relating thereto not constituting Indebtedness;

(k)  other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Liens not to exceed $1,000,000 (it being understood that in the event any such Liens extend to Credit Card Accounts Receivable or Inventory, such Credit Card Accounts Receivable or Inventory shall, to the extent otherwise included therein, cease to be Eligible Credit Card Accounts Receivable or Eligible Inventory, as applicable);

(l)  non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)  Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Final Order.

Notwithstanding the foregoing, (i) none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's Collateral included in the Borrowing Base, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and clauses (a), (i) and (l) above, and (ii) Liens permitted under this Section 6.02, other than the Liens securing the credit facility under the Pre-Petition Term Credit Agreement or the Term Credit Agreement on Term Priority Collateral (solely to the extent set forth in the Final Order) shall at all times be junior and subordinate to the Liens under the Loan Documents and

the Final Order securing the Secured Obligations.  The prohibition provided for in this Section 6.02 specifically includes any material step by any Debtor, the Committee or any other party in interest in the Cases, as applicable, to prime any claims, Liens or interests of (x) the Administrative Agent and the Lenders or (y) for so long as the Pre-Petition Lender Obligations have not been indefeasibly paid in full in cash, the Pre-Petition Agent and the Pre-Petition Lenders, any Lien, in each case, other than as set forth in the Final Order and irrespective of whether such claims, Liens or interests may be "adequately protected."  The designation of a Lien as a Permitted Encumbrance shall not limit or restrict the ability of the Administrative Agent to establish any Reserve relating thereto in accordance with the terms hereof.

SECTION 6.03.  Fundamental Changes; Business Activities.  (a) The Company will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary may (A) merge into the Company in a transaction in which the Company is the surviving entity and (B) merge into a Borrowing Subsidiary in a transaction in which the Borrowing Subsidiary is the surviving entity, (ii) any Person (other than the Company) may merge into or consolidate with any Subsidiary in a transaction in which the surviving entity is a Subsidiary and (A) if any party to such merger or consolidation is a Borrowing Subsidiary, a Borrowing Subsidiary and (B) if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Subsidiary (other than a Borrowing Subsidiary) may liquidate or dissolve if the Company determines in good faith that such liquidation or dissolution is in the best interests of the Company and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)  The Company will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Company and the Subsidiaries on the Effective Date and businesses reasonably related or complementary thereto.

SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions. The Company will not, and will not permit any Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)  Investments in cash and Permitted Investments;

(b)  Investments existing on, or contractually committed to as of, the Effective Date and set forth in Schedule 6.04 and any extensions, renewals or reinvestments thereof (but not any additions thereto (including any capital contributions) made after the Effective Date);

(c)  Investments by the Company and the Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, (ii) the aggregate amount of such Investments by the Loan Parties in, and

loans and advances by the Loan Parties to, and Guarantees by the Loan Parties of Indebtedness and other obligations of, Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the Effective Date and permitted by clause (b) above) permitted pursuant this clause (c) and pursuant to clauses (d) and (e) below shall not exceed $10,000,000, and (iii) such Investments are made in the ordinary course of business in connection with the operational and compliance needs of the Company and the Subsidiaries and are permitted by the Approved Budget (subject to Permitted Variances);

(d)  loans or advances made by the Company to any Subsidiary or made by any Subsidiary to the Company or any other Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(a)(iii) and (ii) the amount of such loans and advances made by the Loan Parties to Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(e)  Guarantees by the Company or any Subsidiary of Indebtedness or other obligations of the Company or any Subsidiary (including any such Guarantees (i) arising as a result of any such Person being a joint and several co-applicant with respect to any letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder); provided that the aggregate amount of Indebtedness and other obligations of Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)  [reserved];

(g)  Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)  [reserved];

(i)  deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)  advances by the Company or any Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes to the extent permitted by the Approved Budget (subject to Permitted Variances);

(k)  [reserved];

(l)  Investments in the form of Swap Agreements permitted under Section 6.07;

(m)  investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)  [reserved];

(o)  other Investments to the extent permitted in the Final Order;

(p)  other Investments in an aggregate amount not to exceed $1,000,000 to the extent permitted by the Approved Budget (subject to Permitted Variances); and

(q)  to the extent constituting Investments, actions permitted by Section 6.05.

SECTION 6.05.  Asset Sales.  The Company will not, and will not permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Company permit any Subsidiary to issue any additional Equity Interests in such Subsidiary (other than to the Company or any other Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

(a)  (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment, (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, and (iv) dispositions of cash and Permitted Investments in accordance with the Approved Budget, in each case (other than in the case of clause (iii) and (iv)) in the ordinary course of business;

(b)  sales, transfers, leases and other dispositions to the Company or any Subsidiary in the ordinary course of business; provided that any such sales, transfers, leases or other dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)  the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)  dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)  leases or subleases of real property granted by the Company or any Subsidiary to third Persons not interfering in any material respect with the business of the Company or any Subsidiary, including retail store lease assignments and surrenders;

(f)  [reserved];

(g)  direct or indirect transfers or other dispositions by any Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Subsidiary to any other Subsidiary in connection with the consolidation of foreign operations of the Company and its Subsidiaries;

(h)  sales, transfers and other dispositions of assets provided for in the Approved Budget that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a Responsible Officer of the Borrower Representative reasonably and acting in good faith, of not more than $1,000,000;

(i)  other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget;

(j)  Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)  the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Company and its Subsidiaries;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (a)(iv), (b), (c), (d), (e), (g), (i), (j) or (k) above) shall be made for fair value. Notwithstanding the foregoing, other than in connection with a Specified Disposition or dispositions to the Company or any Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable requirements of law, no such sale, transfer or other disposition of any Equity Interests in any Borrowing Subsidiary shall be permitted.

SECTION 6.06.  Sale/Leaseback Transactions.  The Company will not, and will not permit any Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.  Swap Agreements.  The Company will not, and will not permit any Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Company or a Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness.  (a) The Company will not, and will not permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)  the Company may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Company;

(ii)  any Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Company and the Subsidiaries);

(iii) [reserved];

(iv) [reserved];

(v) the Company may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Company in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Company;

(vi) the Company's Subsidiaries may make Restricted Payments to the Borrower Representative on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith to the extent permitted in the Final Order;

(vii) [reserved];

(viii) the Company and its Subsidiaries may make Restricted Payments to the extent provided for in the Approved Budget (subject to Permitted Variances thereto) and permitted by the Final Order; and

(ix) to the extent constituting a Restricted Payment, the Company and its Subsidiaries may consummate the transactions permitted by Section 6.05; and

(x) Restricted Payments to permit payment of franchise and similar taxes, administrative and maintenance expenses, and foreign independent director (or foreign independent member or manager) fees and expenses and related expenses, in each case, of certain non-Debtor affiliate entities to the extent provided in the "first day" or "second day" orders on a final basis entered by the Court in respect of ongoing cash management in the ordinary course of business consistent with past practice and to the extent provided for in the Approved Budget (including Permitted Variances thereto).

(b)  The Company will not, and will not permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i) payments of regularly scheduled interest and principal payments as and when due in respect of any Specified Indebtedness to the extent provided for in in the Approved Budget (including Permitted Variances thereto) and permitted by the Final Order;

(ii) [reserved];

(iii) to the extent not subject to any mandatory prepayment of the Loans or reinvestment required pursuant to the mandatory prepayment provisions and/or reinvestment provisions of Section 2.11(c), payment of secured Indebtedness that becomes due as a result of (A) any voluntary sale or transfer of any assets securing such

Indebtedness or (B) any casualty or condemnation proceeding (including a disposition in lieu thereof) of any assets securing such Indebtedness;

(iv) payments of or in respect of Indebtedness solely by issuance of the Equity Interests (other than Disqualified Stock) of the Company;

(v) payments of or in respect of Indebtedness incurred by any Subsidiary that is not a Debtor; and

(vi) payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Final Order

(c) The Company will not, and will not permit any Subsidiary to, amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.  Transactions with Affiliates.  The Company will not, and will not permit any Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Company or such Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Company and the Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Company or any Subsidiary, as determined by the board of directors of the Company in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate protection payments on account of secured Pre-Petition Indebtedness pursuant to the Final Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10.  Restrictive Agreements.  The Company will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (a) the ability of the Company or any Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure any Secured Obligations or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Company or any other Loan Party or to Guarantee the Secured Obligations; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Subsidiary that is not a wholly-owned Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such

113

restrictions and conditions apply only to such Subsidiary and to any Equity Interests in such Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Term Credit Agreement, the Term Credit Agreement, (F) restrictions and conditions imposed by agreements relating to Indebtedness of Subsidiaries that are not Loan Parties permitted under Section 6.01(a) and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), provided that such restrictions and conditions apply only to such Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(a)(v) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Subsidiary in existence at the time such Subsidiary became a Subsidiary and otherwise permitted under Section 6.01(a) (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), provided that such restrictions and conditions apply only to such Subsidiary.

SECTION 6.11.  Amendment of Organizational Documents.  The Company will not, and will not permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12.  Financial Covenants.

(a)  Minimum Availability.  The Company will not permit Availability at any time to be less than the greater of (i) 10% of the Credit Limit and (ii) $40,000,000.

(b)  Minimum Liquidity.  The Company will not permit Liquidity at any time to be less than $100,000,000.

(c)  Net Cash Flow.  Solely to the extent that Liquidity is less than $150,000,000, the Company will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

SECTION 6.13.  Accounting Changes.  The Company will not make any change in the Company's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14.  Sanctions.  The Company and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing or any Letter of Credit, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or

114

entity participating in the transaction, whether as Lender, Arranger, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15.  <u>Anti-Corruption Laws</u>.  The Company and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing or any Letter of Credit for any purpose which would breach any Anti-Corruption Laws.

SECTION 6.16.  <u>Subrogation</u>.    No Loan Party shall assert any right of subrogation or contribution against any other Loan Party.

## ARTICLE VII

## Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

(a) the Borrowers shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c) any representation, warranty or certification made or deemed made by the Company or any Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation, warranty or certification qualified by materiality, incorrect);

(d) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in the second sentence of Section 2.09(a), 5.01, 5.02(a), 5.05 (with respect to the Company's or a Borrowing Subsidiary's existence), 5.11, 5.12, 5.13, 5.17, 5.18 or 5.19 or in Article VI;

(e) the Loan Parties shall fail to comply with Section 5.08 or Article VII of the Security Agreement and any such failure shall continue unremedied for a period of three (3) Business Days or more, or any Loan Party shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article or in the preceding provisions of this clause (e)), and such failure shall continue unremedied for a period of twenty (20) days after receipt of written notice thereof from the Administrative Agent;

115

(f)  except as a result of commencement of the Cases or entry into this Agreement and the Term Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, any Loan Party or any Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of the Term Credit Agreement or any other Material Indebtedness (other than the Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)  except as a result of commencement of the Cases or entry into this Agreement and the Term Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in Indebtedness under the Term Credit Agreement or any other Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Indebtedness under the Term Credit Agreement or any other Material Indebtedness to become due, or to terminate or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness

(h)  [reserved];

(i)  [reserved];

(j)  [reserved];

(k)  except for any order of the Court fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Company or any Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Company or any Subsidiary to enforce any such judgment;

(l)  one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

116

(m)  a Change in Control shall occur;

(n)  the Loan Guarantee or the Loan Guarantee (as defined in the Pre-Petition Credit Agreement) shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guarantee or the Loan Guarantee (as defined in the Pre-Petition Credit Agreement), or any Loan Guarantor shall fail to comply in any material respect with any of the terms or provisions of the Loan Guarantee or the Loan Guarantee (as defined in the Pre-Petition Credit Agreement) to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guarantee or the Loan Guarantee (as defined in the Pre-Petition Credit Agreement)to which it is a party, or shall give notice to such effect (except as a result of the release thereof as provided herein); or

(o)  any Lien purported to be created under any Collateral Document or any Collateral Document (as defined in the Pre-Petition Credit Agreement) and the Final Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document or applicable Collateral Document (as defined in the Pre-Petition Credit Agreement), except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or applicable Collateral Document (as defined in the Pre-Petition Credit Agreement) or Section 9.02(c), or (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement;

(p)  the provisions of the Intercreditor Agreement, as supplemented and modified by the Intercreditor Acknowledgment, shall for any reason be revoked or invalidated, in whole or in part, or otherwise cease to be in full force and effect, or any Loan Party, the Term Agent, any Term Loan Lender, the Pre-Petition Term Agent, any Pre-Petition Term Lender or any Affiliate of any of the foregoing shall have commenced a suit or an action, including any motion or adversary proceeding in the Cases, contesting in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not have the priority contemplated by this Agreement, the Pre-Petition Credit Agreement or the Intercreditor Agreement, as supplemented and modified by the Intercreditor Acknowledgment;

(q)  any Loan Party or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for more than thirty (30) consecutive days (other than in connection with Specified Dispositions);

(r)  the Loan Parties attempt to consummate a sale of substantially all of its assets via a Plan of Reorganization (other than an Acceptable Plan) or a 363 sale without the prior written consent of the Required Lenders;

(s)  the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Lender Parties without the prior written consent of the Administrative Agent and the Required Lenders;

(t)  any Loan Party or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, shall file a motion in the Cases or take any action or file any Plan of Reorganization or disclosure statement attendant thereto without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Final Order, to use cash collateral of the Administrative Agent, the Lenders and the other Lender Parties or the Pre-Petition Agent, the Pre-Petition Lenders or the Lender Parties (as defined under the Pre-Petition Credit Agreement) under Section 363(c) of the Bankruptcy Code, that, in each case, does not either have the prior written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) or provide for the payment of the Obligations and the Pre-Petition Lender Obligations in full and in cash upon the incurrence of such additional financing;

(u)  an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

(v)  an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Revolving Commitments, and payment in full in cash of all Obligations and Pre-Petition Lender Obligations upon entry thereof;

(w)  an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent) (i) to revoke, reverse, stay, modify, supplement or amend the Final Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Final Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Obligations (other than the Carve Out);

(x)  (i) an application for any of the orders described in clause (u) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent, any Lender or any of the Collateral or against the Pre-Petition Agent, any Pre-Petition Lender or any Collateral (as defined in the Pre-Petition Credit Agreement);

(y)  (i) the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders or (ii) any Loan Party's exclusive right to file a Plan of Reorganization expires;

(z)  any Loan Party shall fail to comply with the Final Order;

(aa)  any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Lender Parties or any Lien that is senior to or *pari passu* with the Liens securing the Obligations, other than in accordance with the Final Order;

(bb)  the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or the Pre-Petition Agent and the Pre-Petition Lenders or their respective rights and remedies in their capacities as such under this Agreement or the Pre-Petition Credit Agreement or in any of the Cases;

(cc)  the Loan Parties or any of their Subsidiaries, or any Person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Final Order;

(dd)  the Court enters an order in the Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Pre-Petition Lender Obligations owing under the Pre-Petition Loan Documents;

(ee)  the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan or any order in any of the Cases is entered by the Court confirming a Plan of Reorganization other than an Acceptable Plan;

(ff)  any Loan Party shall challenge, support (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part, any payments made to the Administrative Agent or any other Lender Party with respect to the Obligations or the Pre-Petition Agent or the Pre-Petition Lenders with respect to the Pre-Petition Lender Obligations, or without the consent of the Administrative Agent, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by any Court approving) adequate protection or similar protections to any Pre-Petition agent or creditor that is inconsistent with the Final Order; or

(gg)  any Loan Party shall file a motion seeking, or the Court shall enter an order granting, relief from or modifying the Automatic Stay (other than in connection with the

Specified Disposition or in accordance with Approved Budget) to permit actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole).

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Final Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower Representative, take any or all of the following actions, at the same or different times: (i) terminate the Revolving Commitments, and thereupon the Revolving Commitments shall terminate immediately, (ii) terminate the "Exit Revolving Commitments" under and as defined in the Exit Facility Term Sheet, and (iii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, and, subject to the Remedies Notice Period, the Automatic Stay shall be deemed automatically vacated without further action or order of the Court and the Administrative Agent shall be entitled to (A) exercise on behalf of itself and the Lender Parties all rights and remedies available to it and the Lender Parties under the Loan Documents or applicable law (including, without limitation, the right to direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral (subject to the Intercreditor Agreement)) or (B) take any and all actions described in the Final Order, including, without limitation, those actions specified in the Final Order after the occurrence of any Event of Default.

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Lender Parties, as set forth in this Agreement, the Final Order or other Loan Documents.  It is agreed and understood that the Administrative Agent may not charge default interest pursuant to this Agreement during such time as the occurrence of such Event of Default is being contested during the Remedies Notice Period but once determined that such Event of Default exists, the Administrative Agent may charge default interest pursuant to this Agreement retroactively to cover the period from which the Event of Default exists through the date of determination

## ARTICLE VIII

## The Administrative Agent

Each of the Lenders and the Issuing Banks hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.   Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Final Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties

and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender or an Issuing Bank as any other Lender or Issuing Bank and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or the Issuing Banks.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any Subsidiary or other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own bad faith, gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment). The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrower Representative or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate (including any Borrowing Base Certificate), report or other document delivered hereunder or in connection with any Loan Document, (iii) qualification of (or lapse of any qualification of) any Account or Inventory under the eligibility criteria set forth herein, or other

121

than eligibility criteria expressly referring to the matters described therein being acceptable or satisfactory to, or being determined by, the Administrative Agent, (iv) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (v) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (vi) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral, or (vii) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein as being acceptable or satisfactory to the Administrative Agent. Notwithstanding anything herein to the contrary, the Administrative Agent shall not be liable for, or be responsible for any loss, cost or expense suffered by any Borrower or any Lender as a result of any determination of the Aggregate Credit Exposure, the Borrowing Base or the component amounts of any of the foregoing.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate (including any Borrowing Base Certificate), consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof). The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or amendment of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or Issuing Bank sufficiently in advance of the making of such Loan or the issuance, extension, renewal or amendment of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any of and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any of and all of their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the bad faith, negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and

nonappealable judgment that the Administrative Agent acted with bad faith, gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Banks and the Borrower Representative. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor that is an Eligible Successor Agent. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, in consultation with the Borrower Representative, on behalf of the Lenders and the Issuing Banks, appoint a successor Administrative Agent which is an Eligible Successor Agent, until such time, if any, as the Required Lenders appoint a successor Administrative Agent. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders, the Issuing Banks and the Borrower Representative, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, underlined provided that, solely for purposes of maintaining any Lien granted to the Administrative Agent under any Collateral Document for the benefit of the Lender Parties, the retiring Administrative Agent shall continue to be vested with such Lien as collateral agent for the benefit of the Lender Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such Lien), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, underlined provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender and each Issuing Bank. After the Administrative Agent's resignation hereunder, the provisions of this Article, Section 2.17(d) and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender and Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent, any Arranger, any Lender or any Issuing Bank or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger, any Lender or any Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender and Issuing Bank, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender or Issuing Bank hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

The Loan Parties acknowledge and agree that the Administrative Agent may prepare and distribute to the Lenders any Reports containing information obtained by the Administrative Agent through the conduct of appraisals and field examinations pursuant to Sections 5.12 and 5.13 and the exercise of its inspection rights under Section 5.09.  Each Lender hereby agrees that: (a) it has requested a copy of each Report prepared by or on behalf of the Administrative Agent; (b) the Administrative Agent (i) makes no representation or warranty, express or implied, as to the completeness or accuracy of any Report or any of the information contained therein or any inaccuracy or omission contained in or relating to a Report and (ii) shall not be liable for any information contained in any Report; (c) the Reports are not comprehensive audits or examinations, and that any Person performing any field examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel and that the Administrative Agent undertakes no obligation to update, correct or supplement the Reports; (d) it will keep all Reports confidential and strictly for its internal use, not share the Report with any Loan Party or any other Person except as otherwise permitted pursuant to this Agreement; and (e) without limiting the generality of any other indemnification provision contained in this Agreement, it will pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney fees) incurred by as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Except with respect to the exercise of setoff rights of any Lender in accordance with Section 9.08 or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Lender Party (other than the Administrative Agent) shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Lender Parties

124

in accordance with the terms thereof.  In the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Lender Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Lender Parties at such sale or other disposition.  In furtherance of the foregoing and not in limitation thereof, no agreement giving rise to Banking Services Obligations or Swap Obligations that constitute Secured Obligations will create (or be deemed to create) in favor of any Lender Party that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under any Loan Document.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral, except to the extent such failure is the result of the Administrative Agent's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and nonappealable judgment.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan or any LC Disbursement shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Exposure and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim under Sections 2.12, 2.13, 2.15, 2.16, 2.17 and 9.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender, each Issuing Bank and each other Lender Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, the

Issuing Banks or the other Lender Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Banks, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions.  Each Lender Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Loan Guarantee provided under the Loan Documents, to have agreed to the provisions of this Article and Section 9.19.

Notwithstanding anything herein to the contrary, none of the Arrangers, the Debtors' Investment Banker and any Person named on the cover page of this Agreement as a Syndication Agent or a Documentation Agent shall have any duties or obligations under this Agreement or any other Loan Document (except, with respect to an Arranger, in its capacity, as applicable, as a Lender or an Issuing Bank), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.  The Administrative Agent shall have the exclusive right on behalf of the Lenders to enforce the payment of the principal of and interest on any Loan after the date such principal or interest has become due and payable pursuant to the terms of this Agreement.

In its capacity, the Administrative Agent is a "representative" of the Lender Parties within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code.  Each Lender authorizes the Administrative Agent to enter into each of the Collateral Documents to which it is a party and to take all action contemplated by such documents.  In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the Administrative Agent is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Lender Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Lender Parties.

The bank serving as the Administrative Agent hereunder has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and related legislation (the "Flood Laws"). The Administrative Agent will post on the Platform (or otherwise distribute to each Lender) documents that it receives in connection with the Flood Laws.  However, the Administrative Agent reminds each Lender and Participant that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or Participant) is responsible for assuring its own compliance with the flood insurance requirements.

Each Lender (a) represents and warrants, as of the date such Person became a Lender party hereto, to and (b) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, that at least one of the following is and will be true: (i) such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Revolving Commitments, (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement or (iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless clause (i) of the immediately preceding paragraph is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in clause (iv) of the immediately preceding paragraph, such Lender further (a) represents and warrants, as of the date such Person became a Lender party hereto, to and (b) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent and the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that: (i) neither the Administrative Agent nor any Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto), (ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50,000,000, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E), (iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the

127

Revolving Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations), (iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Revolving Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder and (v) no fee or other compensation is being paid directly to the Administrative Agent or the Arrangers or any their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Revolving Commitments or this Agreement.

The Administrative Agent and the Arrangers hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the Transactions in that such Person or an Affiliate thereof (a) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (b) may recognize a gain if it extended the Loans, the Letters of Credit or the Revolving Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Revolving Commitments by such Lender or (c) may receive fees or other payments in connection with the Transactions, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

ARTICLE IX

Miscellaneous

SECTION 9.01. Notices.    (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, mailed by certified or registered mail or, except in the case of notices or communications to the Borrower Representative or any other Loan Party, sent by facsimile, as follows:

(i) if to any Loan Party, to the Borrower Representative at:

933 MacArthur Boulevard
Mahwah, NJ  07430
Attention:  Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail:  dan.lamadrid@ascenaretail.com
With a copy to the Borrower Representative at:

933 MacArthur Boulevard
Mahwah, NJ  07430
Attention:  Gary Holland, General Counsel and VP
E-mail:  gary.holland@ascenaretail.com

With a copy to:

Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA  90067
Attention:  David M. Nemecek, P.C.
E-mail:  david.nemecek@kirkland.com

(ii) if to the Administrative Agent, JPMCB in its capacity as an Issuing Bank, to JPMorgan Chase Bank, N.A. at:

4 New York Plaza, 17th Floor
Mail Code: NY1-E061
New York, New York  10004
Attention:  Ascena Retail Group, Inc. Credit Risk Manager
Facsimile No:  (212) 623-7309
E-mail:  donna.diforio@jpmorgan.com

With a copy to:

Morgan Lewis & Bockius LLP
One Federal Street
Boston, Massachusetts  02110
Attention:  Matthew F. Furlong, Esq.
Facsimile No. (617) 341-7701
E-mail:  matthew.furlong@morganlewis.com

(iii) if to any other Issuing Bank, to it at its address, e-mail or facsimile number most recently specified by it in a notice delivered to the Administrative Agent and the Borrower Representative; and

(iv) if to any other Lender, to it at its address, e-mail or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent (or, if not given during normal business hours for the recipient, at the opening of business on the next Business Day for the recipient), it being understood that notices and other communications shall not be sent by facsimile to the Borrower Representative or any Loan Party, and (iii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

(b) Notices and other communications to the Lenders and Issuing Banks hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender or Issuing Bank if such Lender or Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower Representative (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c) Any party hereto may change its address, email or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d) The  Loan Parties agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "Platform").  The Platform is provided "as is" and "as available".  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties have any liability to the Loan Parties, any Lender, any Issuing Bank or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of Communications through the Platform.

SECTION 9.02. Waivers; Amendments.   (a) No failure or delay by the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Issuing Banks and the Lenders hereunder and under any other Loan Document are cumulative

and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document (other than the Agent Fee Letter) or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default at the time.

(b) Except as provided in Sections 2.14(b), 5.16 or 9.02(d), none of this Agreement, any other Loan Document or any provision hereof or thereof (other than the Agent Fee Letter) may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, with the consent of the Required Lenders; provided that (A) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Company and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, (1) such amendment does not adversely affect the rights of any Lender or (2) the Lenders shall have received at least five (5) Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (B) no such agreement shall (1) increase the Revolving Commitment of any Lender without the written consent of such Lender (provided that the Administrative Agent may make Protective Advances and Overadvances as set forth in Section 2.04 or 2.05, as applicable), (2) reduce or forgive the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of each Lender directly affected thereby, (3) postpone any scheduled date of payment of the principal amount of any Loan or LC Disbursement, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Revolving Commitment, without the written consent of each Lender directly affected thereby, (4) change Section 2.18(b) or 2.18(d) in a manner that would alter the manner in which payments are shared, without the written consent of each Lender, (5) increase the advance rates set forth in the definition of Borrowing Base or add new categories of eligible assets, without the written consent of the Supermajority Lenders, (6) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or "Supermajority Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (7) change Section 2.20 without the consent of each Lender (other than any Defaulting Lender), (8) release Loan Guarantors representing all or substantially all the value of the Loan Guarantees from their obligation under such Loan Guarantees without the written consent of each Lender, (9) except as provided in

paragraph (c) of this Section or in any Collateral Document, release all or substantially all Liens on the Collateral without the written consent of each Lender, or (10) amend, modify or waive the condition precedent in Section 4.01(o) without the written consent of each Lender; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or any Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or such Issuing Bank, as the case may be (it being understood that any change to Section 2.20 shall require the consent of the Administrative Agent and the Issuing Banks).  The Administrative Agent may also amend Schedule 2.01 to reflect increases in the Revolving Commitments in the manner contemplated by Section 2.09 or assignments entered into pursuant to Section 9.04.

(c) The Lenders and the Issuing Banks hereby irrevocably authorize the Administrative Agent, at its option and in its sole discretion, (i) to release or to subordinate any Liens granted to the Administrative Agent by the Loan Parties on any Collateral (A) upon the termination of all the Revolving Commitments, payment and satisfaction in full in cash of all Secured Obligations (other than Unliquidated Obligations) and the cash collateralization of all Unliquidated Obligations in a manner satisfactory to each affected Lender, (B) constituting property being sold, disposed of or transferred, if the Loan Party selling, disposing of or transferring such property certifies to the Administrative Agent that the sale, disposition or transfer is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold, disposed of or transferred constitutes 100% of the Equity Interest of a Subsidiary, the Administrative Agent is authorized to release any Loan Guarantee provided by such Subsidiary, (C) constituting property leased to a Loan Party under a lease which has expired or been terminated in a transaction not prohibited under this Agreement and (D) as required to effect any sale, disposition or other transfer of such Collateral in connection with any exercise of remedies of the Administrative Agent and the Lenders pursuant to Article VII, (ii) to release any Loan Guarantee provided by any Subsidiary that may be dissolved pursuant to Section 6.03(a)(iv) in connection with a voluntary liquidation or dissolution thereof permitted by such Section and, in connection therewith, to release any Liens granted to the Administrative Agent by such Subsidiary on any Collateral, if the Company certifies to the Administrative Agent that such liquidation or dissolution is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), (iii) to release any Loan Guarantee provided by any Excluded Subsidiary and, in connection therewith, to release any Liens granted to the Administrative Agent by such Subsidiary on any Collateral and to release any pledge of voting Equity Interests of such Subsidiary in excess of 65% of the aggregate voting Equity Interests of such Subsidiary, (iv) to release any Loan Guarantee provided by any Subsidiary that becomes an Immaterial Subsidiary and, in connection therewith, to release any Liens granted to the Administrative Agent by such Subsidiary on any Collateral and to release any pledge of Equity Interests of such Subsidiary and (v) to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(d) or 6.02(e); provided that, in the case of any prospective release of any Loan Guarantee pursuant to

132

clauses (i)(B), (ii), (iii) and (iv) above with respect to any Guarantor having assets included in the Borrowing Base, (1) no Overadvance shall result after giving effect to any such release and (2) the Borrowers shall have delivered to the Administrative Agent an updated Borrowing Base Certificate giving pro forma effect to such release (as if such release occurred on such date of such Borrowing Base Certificate).  The Lenders and the Issuing Banks hereby further irrevocably authorize the release or subordination of Liens on the Term Priority Collateral as provided in the Intercreditor Agreement.   Any such release or subordination shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released or subordinated) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the Lien created under any Collateral Document in any Collateral pursuant to this Section, the Liens in such Collateral created by the Collateral Documents shall be automatically released.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 9.02(c) shall be without recourse to or warranty by the Administrative Agent.

(d)  No real property shall be taken as Collateral unless each Lender confirms to the Administrative Agent that it has completed all flood due diligence, received copies of all flood insurance documentation and confirmed flood insurance compliance as required by the Flood Laws or as otherwise satisfactory to such Lender.  At any time that any real property constitutes Collateral, no modification of a Loan Document shall add, increase, renew or extend any loan, commitment or credit line hereunder until the completion of flood due diligence, documentation and coverage as required by the Flood Laws or as otherwise satisfactory to all Lenders.

(e)  The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.   Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(f)  Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.25 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Lenders, the Administrative Agent and the Borrower Representative; provided that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transactions contemplated by Section 2.25 and such other technical or

immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower Representative in connection therewith.

SECTION 9.03.  Expenses; Indemnity; Damage Waiver.  (a)  The Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arrangers and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, the Arrangers and their Affiliates, and if deemed necessary by the Administrative Agent, one local counsel in each applicable jurisdiction, in connection with the preparation of this Agreement and the other Loan Documents, the syndication and distribution (including, without limitation, via the internet or through a service such as Intralinks) of the Revolving Credit Facility, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by each Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arrangers, any Issuing Bank or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Arrangers, any Issuing Bank or any Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.  Subject to the provisions of Sections 5.09, 5.12 and 5.13, expenses subject to reimbursement by the Borrowers under this Section include, without limiting the generality of the foregoing, reasonable costs and expenses incurred in connection with, but without duplication:

(i) appraisals and insurance reviews;

(ii) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination;

(iii) taxes, fees and other charges for (A) lien searches and (B) filing financing statements and continuations, and other actions to perfect, protect, and continue the Administrative Agent's Liens;

(iv) sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(v) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing costs and expenses may be charged to the Borrowers as Revolving Loans or to another deposit account, all as described in Section 2.18(c).

(b) The Borrowers agree, jointly and severally, to indemnify the Administrative Agent (or any sub-agent thereof), the Arrangers, each Syndication Agent, each Documentation Agent, each Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the syndication of the Revolving Credit Facility and the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto and thereto of their respective obligations hereunder and thereunder or the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds thereof (including any refusal by an Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on, at, to or from any property owned or operated by the Company or any of its Subsidiaries, or any other Environmental Liability related in any way to the Company or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement (including the Company), or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (A) are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee or from a material breach by such Indemnitee of its agreements hereunder (other than any unintentional breach that is corrected promptly after such Indemnitee becomes aware thereof), or (B) have arisen from a proceeding by an Indemnitee against another Indemnitee not involving any act or omission of the Company or any Subsidiary (other than a proceeding against the Administrative Agent, an Arranger or an Issuing Bank in its capacity or in fulfilling its role as such). This Section 9.03(b) shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

(c) To the extent the Borrowers fail to pay any amount required to be paid by them to the Administrative Agent (or any sub-agent thereof) or any Issuing Bank, or any Related Party of any of the foregoing, under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent, such Issuing Bank or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or such sub-agent) or such Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or any Issuing Bank in connection with such capacity.

(d) To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e) All amounts due under this Section shall be payable not later than ten (10) days after written demand therefor.

SECTION 9.04.  Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by a Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this Section) the Debtors' Investment Banker (to the extent provided in Article VIII), the Arrangers, each Syndication Agent, each Documentation Agent, and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent, the Arrangers, the Syndication Agents, the Documentation Agents, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i)Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A) the Borrower Representative; provided that no consent of the Borrower Representative shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default referred to in clause (a) or (b) of Article VII has occurred and is continuing, any other assignee; provided that if the Borrower Representative has not provided written notice of its objection to any proposed assignment within ten (10) Business Days of its receipt thereof from the Administrative Agent, the Borrower Representative shall be deemed to have consented to such proposed assignment;

(B) the Administrative Agent;

(C) [reserved]; and

(D) each Issuing Bank; <u>provided</u> that if any Issuing Bank has not provided written notice of its objection to any proposed assignment within ten (10) Business Days of its receipt thereof from the Administrative Agent, such Issuing Bank shall be deemed to have consented to such proposed assignment.

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment or Loans, the amount of the Revolving Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower Representative and the Administrative Agent otherwise consent; <u>provided</u> that no such consent of the Borrower Representative shall be required if an Event of Default referred to in clause (a) or (b) of Article VII has occurred and is continuing; <u>provided</u> that if the Borrower Representative has not provided written notice of its objection to any proposed assignment within ten (10) Business Days of its receipt thereof from the Administrative Agent, the Borrower Representative shall be deemed to have consented to such proposed assignment;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption (or an agreement incorporating by reference a form of Assignment and Assumption posted on the Platform), together with a processing and recordation fee of $3,500; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any Tax forms required by Section 2.17(f) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Company, the Subsidiaries and other Affiliates thereof or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released

137

from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv) The Administrative Agent, acting solely for this purpose as non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and records of the names and addresses of the Lenders, and the Revolving Commitment of, and principal amount (and stated interest) of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent, the Issuing Banks and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers, any Issuing Bank and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Assumption (or an agreement incorporating by reference a form of Assignment and Assumption posted on the Platform) executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.05, 2.06(d), 2.06(e), 2.07(b), 2.17(d) or 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i) Any Lender may, without the consent of the Borrowers, the Administrative Agent or the Issuing Banks, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan

138

Documents.   Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (B) of the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders or all the affected Lenders.   Subject to paragraph (c)(ii) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the requirements and limitations therein, including the requirements under 2.17(f) (it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.   To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(d) as though it were a Lender.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.   Each Lender that sells a participation agrees, at the Borrower Representative's request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.19(b) with respect to any Participant.   Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Revolving Commitments or Revolving Loans or other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Revolving Commitment or Revolving Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a

Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05. <u>Survival</u>.    All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Arranger, the Syndication Agents, the Documentation Agents, any Issuing Bank, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document was executed and delivered or became effective or any credit was extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any LC Exposure is outstanding and so long as the Revolving Commitments have not expired or terminated. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement or any other Loan Document, in the event that an Issuing Bank shall have provided to the Administrative Agent a written consent to the release of the Lenders from their obligations hereunder with respect to any Letter of Credit issued by such Issuing Bank (whether as a result of the obligations of any Borrower in respect of such Letter of Credit having been collateralized in full by a deposit of cash with such Issuing Bank, or being supported by a letter of credit that names such Issuing Bank as the beneficiary thereunder, or otherwise), then from and after such time such Letter of Credit shall cease to be a "Letter of Credit" outstanding hereunder for all purposes of this Agreement and the other Loan Documents (including for purposes of determining whether the Borrower is required to comply with Article V or Article VI, but excluding Sections 2.15, 2.16, 2.17, 2.21 and 9.03 and any expense reimbursement or indemnity provisions set forth in any other Loan Document), and the Lenders shall be deemed to have no participations in such Letter of Credit, and no obligations with respect thereto, under Sections 2.06(d) or 2.06(e).  The provisions of Sections 2.15, 2.16, 2.17, 2.21 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Revolving  Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. <u>Counterparts; Integration; Effectiveness; Electronic Execution</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable or indemnities and expense reimbursements owed to the Administrative Agent, the Arrangers, the Issuing Banks or their Related Parties, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective as provided in Section 4.01 and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement or any other Loan Document by facsimile or other electronic

imaging shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and any other Loan Document and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent.

SECTION 9.07. Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08. Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of any Borrower or any Loan Guarantor against any of and all the Secured Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured. The applicable Lender shall notify the Borrower Representative and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09. Governing Law; Jurisdiction; Consent to Service of Process. (a) EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, the Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the laws of the State of New York, but giving effect to federal laws applicable to banks.

(b) Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each Loan Party hereby irrevocably and unconditionally agrees that all claims arising out of or relating to

this Agreement or any other Loan Document brought by it or any of its Affiliates shall be brought, and shall be heard and determined in the Court, such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)  Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.  WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.  Headings.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.  Confidentiality.  Each of the Administrative Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed

of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Company or any Subsidiary or its obligations, (g) on a confidential basis to any rating agency in connection with rating the Company or the Subsidiaries or the credit facilities provided for herein, (h) with the consent of the Company, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Issuing Bank or any Lender, or any Affiliate of any of the foregoing, on a non-confidential basis from a source other than the Borrowers; provided that, in the case of clause (c) above, the party disclosing such information shall provide to the Company prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Company, at the Company's sole expense, in obtaining a protective order for, or other confidential treatment of, such disclosure, in each case at the Company's sole expense. For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Company or any Subsidiary or their businesses or the Collateral, other than (i) any such information that is available to the Administrative Agent, any Issuing Bank or any Lender, or any Affiliate of any of the foregoing, on a non-confidential basis prior to disclosure by the Borrowers and (ii) information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry; provided that, in the case of information received from the Borrowers after the Effective Date, such information is clearly identified at the time of delivery as confidential.

**EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE COMPANY, THE SUBSIDIARIES AND ITS OTHER AFFILIATES AND THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

**ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWERS OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE**

143

**COMPANY, THE SUBSIDIARIES AND ITS OTHER AFFILIATES AND THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWERS AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

SECTION 9.13. <u>Several Obligations; Nonreliance; Violation of Law</u>. The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder. Anything contained in this Agreement to the contrary notwithstanding, neither any Issuing Bank nor any Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14. <u>USA Patriot Act</u>. Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Borrowers and the Loan Guarantors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers and the Loan Guarantors, which information includes the names and addresses of the Borrowers and the Loan Guarantors and other information that will allow such Lender to identify the Borrowers and the Loan Guarantors in accordance with the Patriot Act.

SECTION 9.15. <u>Appointment for Perfection</u>. Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected by possession. Should any Lender (other than the Administrative Agent) obtain possession of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

SECTION 9.16. <u>Interest Rate Limitation</u>. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.17.  <u>No Fiduciary Relationship</u>.  Each Loan Party, on behalf of itself and its subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Company, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Arrangers, the Syndication Agents, the Documentation Agents, the Lenders, the Issuing Banks and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Arrangers, the Syndication Agents, the Documentation Agents, the Lenders, the Issuing Banks or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Arrangers, the Syndication Agents, the Documentation Agents, the Lenders, the Issuing Banks and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Company, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Arrangers, the Syndication Agents, the Documentation Agents, the Lenders, the Issuing Banks or their Affiliates has any obligation to disclose any of such interests to the Company, the Subsidiaries or its other Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Arrangers, the Syndication Agents, the Documentation Agents, the Lenders, the Issuing Banks and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.  [Reserved].

SECTION 9.19.  <u>Intercreditor Agreement</u>.  (a) Each of the Lenders (which term shall for the purposes of this Section 9.19 include each Issuing Bank) and the other Lender Parties acknowledges that obligations of the Company and the Subsidiary Loan Parties under the Term Credit Agreement are secured by Liens on assets of the Company and the Subsidiary Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Lender Parties and the secured parties under the Term Credit Agreement will be set forth in the Intercreditor Agreement.  Each of the Lenders and the other Lender Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement and the Intercreditor Acknowledgment.  Each of the Lenders and the other Lender Parties  hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Lender Party and without any further consent, authorization or other action by such Lender Party, the Intercreditor Agreement, the Intercreditor Acknowledgment and any documents relating thereto.

(b) Each of the Lenders and the other Lender Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the Term Priority Collateral securing the Secured Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the execution and delivery thereof, such Lender Party will be bound by the provisions of the Intercreditor Agreement, as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Lender Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19

145

or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(c)  Each of the Lenders and the other Lender Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Lender Party and without any further consent, authorization or other action by such Lender Party, any amendments, supplements or other modifications of the Intercreditor Agreement and the Intercreditor Acknowledgment that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Secured Obligations or the Indebtedness under the Term Credit Agreement, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Lender Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(d)  Each of the Lenders and the other Lender Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Lender Party and without any further consent, authorization or other action by such Lender Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(e)  The Administrative Agent shall have the benefit of the provisions of Article VIII and Section 9.03 with respect to all actions taken by it pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.  Acknowledgement and Consent to Bail-In.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any party to any other party under or in connection with the Loan Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(a) any Bail-In Action in relation to any such liability, including (without limitation):

(i) a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(ii) a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and;

(iii)  a cancellation of any such liability; and

146

(b)  a variation of any term of any Loan Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

ARTICLE X

Loan Guarantee

SECTION 10.01. <u>Guarantee</u>.  Each Loan Guarantor hereby agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to the Administrative Agent, the Lenders, the Issuing Banks and the other Lender Parties, the prompt payment and performance when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all reasonable costs and expenses, including, without limitation, all court costs and attorneys' and paralegals' fees and expenses paid or incurred by the Administrative Agent, the Issuing Banks and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, any Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, being collectively called the "<u>Guaranteed Obligations</u>"); <u>provided</u>, that the guarantee of any Subsidiary Loan Party will not apply to any Swap Obligation if and to the extent that it would be unlawful for such Subsidiary Loan Party to guarantee such Swap Obligation under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Subsidiary Loan Party's failure for any reason (and after giving effect to the guarantees by the other Loan Guarantors of the Secured Obligations of such Subsidiary Loan Party) to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Subsidiary Loan Party becomes effective with respect to such Swap Obligation.  Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guarantee apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

SECTION 10.02. <u>Guarantee of Payment</u>.  This Loan Guarantee is a Guarantee of payment and not of collection. Each Loan Guarantor waives any right to require the Administrative Agent, any Issuing Bank, any Lender or any other Lender Party to sue any Borrower, any other Loan Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "<u>Obligated Party</u>"), or to enforce its rights against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 10.03. <u>No Discharge or Diminishment of Loan Guarantee</u>. (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iii) any

147

insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or its assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other right which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Issuing Bank, any Lender, or any other Person, whether in connection herewith or in any unrelated transaction.

(b)  The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)  Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent, any Issuing Bank, any Lender or any other Lender Party to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent, any Issuing Bank, any Lender or any other Lender Party with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 10.04.  <u>Defenses Waived</u>.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower or any Loan Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person.  Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guarantee except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the

fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 10.05.  Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any Collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Administrative Agent, the Issuing Banks, the Lenders and the other Lender Parties.

SECTION 10.06.  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, each Loan Guarantor's obligations under this Loan Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent, the Issuing Banks, the Lenders or the other Lender Parties are in possession of this Loan Guarantee. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Administrative Agent.

SECTION 10.07.  Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrowers' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guarantee, and agrees that none of the Administrative Agent, any Issuing Bank or any Lender shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 10.08.  Taxes.  The provisions of Section 2.17 shall apply mutatis mutandis to all payments by the Loan Guarantors of the Guaranteed Obligations.

SECTION 10.09.  Maximum Liability.  The provisions of this Loan Guarantee are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Loan Guarantor under this Loan Guarantee would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Guarantor's liability under this Loan Guarantee, then, notwithstanding any other provision of this Loan Guarantee to the contrary, the amount of such liability shall, without any further action by the Loan Guarantors or the Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Loan Guarantor's "Maximum Liability").  This Section with respect to the Maximum Liability of each Loan Guarantor is intended solely to preserve the rights of the Lenders to the maximum extent not subject to avoidance under applicable law, and no Loan Guarantor nor any other Person or entity shall have

149

any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Loan Guarantor hereunder shall not be rendered voidable under applicable law. Each Loan Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Loan Guarantor without impairing this Loan Guarantee or affecting the rights and remedies of the Lenders hereunder; provided that nothing in this sentence shall be construed to increase any Loan Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 10.10.  Contribution.  In the event any Loan Guarantor (a "Paying Guarantor") shall make any payment or payments under this Loan Guarantee or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guarantee, each other Loan Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's Applicable Share of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Section, each Non-Paying Guarantor's "Applicable Share" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (a) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrowers after the Effective Date (whether by loan, capital infusion or by other means) to (b) the aggregate Maximum Liability of all Loan Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Loan Guarantor, the aggregate amount of all monies received by such Loan Guarantors from the Borrowers after the Effective Date (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Loan Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Loan Guarantor's Maximum Liability).  Each of the Loan Guarantors covenants and agrees that its right to receive any contribution under this Loan Guarantee from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of the Administrative Agent, the Issuing Banks, the Lenders and the Loan Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

SECTION 10.11.  Liability Cumulative.  The liability of each Loan Party as a Loan Guarantor under this Article X is in addition to and shall be cumulative with all other liabilities of each Loan Party to the Administrative Agent, the Issuing Banks and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

# ARTICLE XI

## The Borrower Representative

SECTION 11.01.  <u>Appointment; Nature of Relationship</u>.  The Company is hereby appointed by each of the Borrowers as its contractual representative (herein referred to as the "<u>Borrower Representative</u>") hereunder and under each other Loan Document, and each of the Borrowers irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents.  The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this Article XI.  Additionally, the Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the Funding Account(s), at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower.  The Administrative Agent, the Issuing Banks and the Lenders, and their respective Related Parties, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or the Borrowers pursuant to this Section.

SECTION 11.02.  <u>Powers</u>.  The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto.  The Borrower Representative shall have no implied duties to the Borrowers, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

SECTION 11.03.  <u>Employment of Agents</u>.  The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

SECTION 11.04.  <u>Notices</u>.  Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default hereunder referring to this Agreement describing such Default and stating that such notice is a "notice of default."  In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to the Administrative Agent and the Lenders.  Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

SECTION 11.05.  <u>Successor Borrower Representative</u>.  Upon the prior written consent of the Administrative Agent, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative.  The Administrative Agent shall give prompt written notice of such resignation to the Lenders.

SECTION 11.06.  <u>Execution of Loan Documents; Borrowing Base Certificate</u>. The Borrowers hereby empower and authorize the Borrower Representative, on behalf of the Borrowers, to execute and deliver to the Administrative Agent and the Lenders the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including, without

limitation, the Borrowing Base Certificates and the Compliance Certificates. Each Borrower agrees that any action taken by the Borrower Representative or the Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Borrower Representative of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

SECTION 11.07. <u>Reporting</u>. Each Borrower hereby agrees that such Borrower shall furnish promptly after each fiscal month to the Borrower Representative any certificate or report requested by the Borrower Representative, on which the Borrower Representative shall rely to prepare the Borrowing Base Certificates and Compliance Certificates required pursuant to the provisions of this Agreement.

SECTION 11.08. <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Agreement or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b) As used in this Section 11.08, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**[Remainder of page intentionally left blank]**

Schedule 5.19
Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA, and shall achieve the following milestones:

(a) on or before the earlier to occur of (i) the date the Court approves the Term Loan Facility and (ii) September 11, 2020, the Court shall have entered the Final Order;

(b) on or prior to seven (7) days after the date that the Court shall have entered the Final Order, the Term Credit Agreement shall have become effective and the Borrowers shall have prepaid all Borrowings hereunder with a portion of the proceeds of the Term Loan Facility in accordance with Section 2.11(c) hereof and cash on hand and shall have reduced the outstanding Loan balance to zero;

(c) on or before fifty (50) days after the Petition Date, the Court shall have entered an order extending the lease assumption/rejection period such that the lease assumption/rejection period shall be two hundred and ten (210) days from the Petition Date;

(d) on or before sixty (60) days after the Petition Date, the Court shall have entered an order approving a disclosure statement filed by the Loan Parties with respect to an Acceptable Plan;

(e) on or before seventy (70) days after the Petition Date, the Loan Parties shall have commenced solicitation of an Acceptable Plan;

(f) on or before one hundred and ten (110) days after the Petition Date, the Court shall have entered the Confirmation Order; and

(g) on or before the date that is one hundred and thirty (130) days after the Petition Date (or such later date as may be agreed to the Administrative Agent in its sole discretion), the Loan Parties shall have caused the Acceptable Plan to become effective and emerged from the Cases;

provided that the deadlines set forth in clauses (d) through (g) above shall be automatically extended in the event that (and for so long as) (i) no Revolving Loans, Protective Advances or Overadvances are outstanding and (ii) the Loan Parties cash collateralized (x) all outstanding Letters of Credit and unpaid LC Disbursements in an amount equal to 103% of the aggregate undrawn face amount of all outstanding Letters of Credit and (y) all other outstanding Secured Obligations in a manner and in amounts satisfactory to the holders of such Secured Obligations.

## Annex 5: Required Milestones

The Debtors shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA, and shall achieve the following milestones:

(h)  on or before the earlier of (i) the date the Court approves the DIP Term Loan Facility and (ii) September 11, 2020, the Court shall have entered the Final Order;

(i)  on or prior to seven (7) days after the date that the Court shall have entered the Final Order, the DIP Term Credit Agreement shall have become effective and the Debtors shall have prepaid all Borrowings (as defined in the DIP ABL Agreement) hereunder with a portion of the proceeds of the DIP Term Loan Facility in accordance with Section 2.11(c) of the DIP ABL Agreement and cash on hand and shall have reduced the outstanding Loan (as defined in the DIP ABL Agreement) balance to zero;

(j)  on or before fifty (50) days after the Petition Date, the Court shall have entered an order extending the lease assumption/rejection period such that the lease assumption/rejection period shall be two hundred and ten (210) days from the Petition Date;

(k)  on or before sixty (60) days after the Petition Date, the Court shall have entered an order approving a disclosure statement filed by the Debtors with respect to an Acceptable Plan (as defined in the DIP ABL Agreement);

(l)  on or before seventy (70) days after the Petition Date, the Debtors shall have commenced solicitation of an Acceptable Plan;

(m)  on or before one hundred and ten (110) days after the Petition Date, the Court shall have entered the Confirmation Order (as defined in the DIP ABL Agreement); and

(n)  on or before the date that is one hundred and thirty (130) days after the Petition Date (or such later date as may be agreed to the DIP ABL Agent in its sole discretion), the Debtors shall have caused the Acceptable Plan to become effective and emerged from the Cases;

provided that the deadlines set forth in clauses (d) through (g) above shall be automatically extended in the event that (and for so long as) (i) no Revolving Loans, Protective Advances or Overadvances (each as defined in the DIP ABL Agreement) are outstanding and (ii) the Debtors cash collateralized (x) all outstanding Letters of Credit and unpaid LC Disbursements (each as defined in the DIP ABL Agreement) in an amount equal to 103% of the aggregate undrawn face amount of all outstanding Letters of Credit and (y) all other outstanding DIP ABL Obligations in a manner and in amounts satisfactory to the holders of such DIP ABL Obligations.

**Annex 6: Global Settlement**

|   | Subject | Agreement |
|---|---------|-----------|
| 1 | *Rent Deferral Motion* | Upon entry of the Final Order, the *Motion of Debtors for Entry of Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Nonresidential Real Property Leases, and (II) Granting Related Relief* [Docket No. 158] shall be deemed withdrawn and the Debtors shall pay all rent for August 2020 and September 2020 owing to landlords promptly following entry of the Final Order but not later than September 18, 2020; *provided* that for any rejected real property lease, the Debtors shall only be required to pay rent owing to landlords for the period prior to the effective date of such rejection. |
| 2 | *Stub Rent* | Upon entry of the Final Order, all unpaid rent owing to landlords associated with the time period of July 23, 2020 through July 31, 2020 shall be paid concurrently with the payment of deferred rent for August 2020 and September 2020; *provided* that for any rejected real property lease, the Debtors shall only be required to pay rent owing to landlords for the period through the effective date of such rejection. |
| 3 | *Critical Vendor Payments* | Pursuant to the *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants, (C) Foreign Vendors, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 449] (the "Critical Vendor Order"), the Debtors are authorized to pay up to $40 million on account of Foreign Vendor Claims and $10 million on account of Critical Vendor Claims as set forth in the Critical Vendor Order.  The Debtors will use commercially reasonable efforts to spend at least 70% of the amounts set forth for payment under the Critical Vendor Order (generally, "Trade Payments") with respect to Critical Vendor Claims and Foreign Vendor Claims; *provided* that the size and terms of the relief granted shall not change from what was set forth in the Critical Vendor Order. The Debtors will use commercially reasonable efforts to condition any Trade Payments upon the applicable vendor's agreement to (a) provide trade terms at least as favorable as the most favorable trade terms provided by such vendor to the Debtors during the six-month period ending February 29, 2020 ("Customary Terms"), which Customary Terms shall be utilized for at least 6 months after the Effective Date of the Plan; and (b) vote in favor of the Settlement Plan, provided that the Settlement Plan is consistent with the terms of this Global Settlement. |

| 4 | *Creation of GUC Trust* | The Plan shall be revised to provide that on the Effective Date thereof, a trust shall be funded solely for the benefit of general unsecured claims (the "GUC Trust"), which GUC Trust shall be funded with (i) $6.5 million; and (ii) 100% of the first $1 million and 50% of the next $4 million of any proceeds from the Visa/MasterCard litigation transferred GUC Trust upon receipt, with proceeds in excess of $5 million (and 50% of proceeds between $1 million and $5 million) retained by the Reorganized Debtors; provided that the proceeds of the Visa/MasterCard litigation that are transferred to the GUC Trust will be transferred net of any costs to achieve such proceeds. The Plan shall further be revised to provide that any deficiency claims held by the Prepetition Secured Parties will be waived as to the GUC Trust assets and will not receive a distribution from the GUC Trust. |
|---|---|---|
| 5 | *Waiver of Chapter 5 Claims* | The Plan shall be revised to provide that all chapter 5 causes of action, including preference claims, held by the Debtors against vendors, service providers, landlords, and non-insider employees shall be released upon the Effective Date of the Plan. |
| 6 | *Final Order Modifications* | The revisions made to the Final Order include an agreement by the DIP Lenders and the Prepetition Secured Parties to marshal away from unencumbered assets (including Avoidance Action Proceeds) among other modifications agreed upon by the Creditors' Committee and the Prepetition Secured Parties and DIP Lenders as set forth in the Final Order. |
| 7 | *Plan Modification* | The Plan shall be modified to incorporate the terms of the Global Settlement in a manner acceptable to the Debtors and the Creditors' Committee and the Plan shall not be withdrawn or modified in a manner adverse to the Creditors' Committee or the terms of the Global Settlement without the Creditors' Committee consent. |
| 8 | *Plan Support* | The Creditors' Committee agrees to support the Settlement Plan to the extent consistent with the terms of the Global Settlement. |