**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' SUPPLEMENTAL MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF, AND (II) APPROVING THE SALE OF JUSTICE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Supplemental Motion")[3]:

## Introduction

1.     On October 13, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order
(I) Establishing Bidding Procedures and Granting Related Relief, and (II) Approving the Sale of
Justice Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. 901]
(the "Initial Motion"),[4] seeking the Court's approval of:  (a)  the bidding procedures for the sale
of the Justice Assets (as defined herein); (b) the proposed dates and deadlines in connection
therewith (including a bid deadline, objection deadlines, the date of the auction, and the hearing
dates); (c)  procedures for the assumption or assumption and assignment of certain executory
contracts and leases and the resolution of related cure amounts; (d)  the form and manner of notice
of each of the foregoing; and (e) certain stalking horse protections.

2.     The Debtors have undertaken an extensive sale and marketing process of the Justice
Assets that began shortly after the Petition Date.  As part of that process, the Debtors, through their
investment banker, engaged in frequent communications with potential purchasers, including
Bluestar Alliance LLC ("Bluestar"), a leading brand management company, Premier Brands
Justice LLC ("Premier Brands"), and certain other parties.  The Debtors initially selected Premier

---

[2]  On July 23, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11
of the United States Code (the "Bankruptcy Code").  A detailed description of the Debtors, their business, and
the facts and circumstances supporting these chapter 11 cases is set forth in the *Declaration of Carrie W. Teffner,
Interim Executive Chair of Ascena Retail Group, Inc., in Support of Chapter 11 Petitions and First Day Motions*
[Docket No. 14] (the "First Day Declaration").

[3]  This Supplemental Motion shall amend and supersede the Initial Motion (as defined herein), except as expressly
set forth herein.

[4]  Capitalized terms used herein but not otherwise defined shall have the meaning given to them in the Stalking
Horse Purchase Agreement (as defined herein).

Brands as its stalking horse bidder for the sale of the Justice Assets, and its bid as the initial stalking horse bid (the "Original Stalking Horse Bid"), and filed the Initial Motion to seek approval thereof. However, shortly thereafter, the Debtors received an alternative proposal for the Justice Assets from Bluestar, which was higher and better than the Original Stalking Horse Bid.  As a result, the Debtors requested an adjournment of the hearing on the Initial Motion to finalize the Stalking Horse Purchase Agreement (as defined herein).

3.        As set forth in greater detail below, Justice Brand Holdings LLC ("Justice Brand" or the "Stalking Horse Bidder"), an entity formed by Bluestar, has offered to purchase the Justice Assets (the "Stalking Horse Bid") pursuant to the terms of the Stalking Horse Purchase Agreement. The Stalking Horse Bid and the Stalking Horse Purchase Agreement present significant advantages to the Debtors' estates over the Original Stalking Horse Bid, including:  (i) an increased Cash Purchase Price of $44 million (which is $9 million more than the Base Amount (as defined in the Original Stalking Horse Bid)) for the Justice Assets; (ii) significantly reduced bid protections from those under the Original Stalking Horse Bid as a result of the elimination of a $1,050,000 break-up fee and a lower expense reimbursement of up to $200,000 (a reduction from $450,000 under the Original Stalking Horse Bid) (the "Stalking Horse Protections"); (iii) an elimination of any requirements for a transition services agreement following Closing of the Sale; (iv) the assumption of liability under certain postpetition purchase orders for goods to be delivered during the period beginning on December 1, 2020 and ending on April 30, 2020, up to an aggregate cap of $20 million; and (v) terms that are, in the Debtors' business judgment, better than the terms reflected in the Original Stalking Horse Bid.  The Stalking Horse Bid also contemplates a significantly

higher cash deposit of $10 million[5] (which is a $6.5 million increase from the deposit amount

under the Original Stalking Horse Bid).

4.    In light of the foregoing and other advantages contained in the Stalking Horse

Purchase Agreement, the Debtors have determined, in the exercise of their business judgment, that

the Stalking Horse Bid reflects the highest and best available stalking horse proposal for the Justice

Assets and selection of Justice Brand as the Stalking Horse Bidder is the best way to maximize the

value of the Justice Assets.

## Relief Requested

5.    For the reasons set forth herein, in addition to those otherwise set forth in the Initial

Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**

(the "Bidding Procedures Order"):

> a. authorizing and approving the bidding procedures attached to the Bidding
> Procedures Order as **Exhibit A-1** (the "Bidding Procedures") in connection
> with the sale free and clear of all liens, claims, interests, and encumbrances
> (the "Sale") of the right, title, and interest of the Debtors in and to certain Tween
> Brands, Inc. ("Justice") assets, including:  (i) certain executory contracts and
> leases, if assignable under applicable law; (ii) intellectual property and rights to
> collect royalties and proceeds in connection therewith; (iii) certain inventory;
> and (iv) customer data (collectively, the "Justice Assets");
>
> b. approving the terms of the purchase agreement dated October 20, 2020 entered
> into by and among certain of the Debtors and Justice Brand, attached to the
> Bidding Procedures Order as **Exhibit A-2** (as amended, supplemented, or
> otherwise modified by the parties thereto in accordance with the terms thereof,
> and including the disclosure schedules and exhibits attached hereto,
> the "Stalking Horse Purchase Agreement"), including approval of the Stalking
> Horse Protections; and

---

[5]    The Debtors acknowledge and agree that, notwithstanding anything to the contrary in the Stalking Horse Purchase
Agreement, the Bidding Procedures Order or the Bidding Procedures, in the event Purchaser (as defined in the
Stalking Horse Purchase Agreement) is not designated by the Court as the stalking horse bidder in accordance
with the Bidding Procedures Order on or prior to the close of business on October 20, 2020, the escrow agent
(which is the Debtors' claims agent) shall return this cash deposit of $10 million to Purchaser without offset or
deduction for any purpose not later than October 23, 2020.

    c.  approving procedures for the assumption or assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures") and approving the form and manner of notice thereof, attached as **Exhibit A-3** to the Bidding Procedures Order (the "Cure Notice").

6.      The Debtors also seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), approving the Debtors' entry into a definitive purchase agreement substantially in the form that shall be attached to the Sale Order as **Exhibit B-1** (as amended, supplemented, or otherwise modified from time to time, the "Definitive Purchase Agreement").[6]

### Summary of Key Terms of the Stalking Horse Purchase Agreement

7.      The Debtors and Justice Brand negotiated the terms of the Stalking Horse Purchase Agreement to serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.  The Stalking Horse Purchase Agreement provides a vehicle for the disposition of the Debtors' Justice Assets and, at the same time, enables the Debtors to canvas the marketplace for any higher and better offers for the Justice Assets on a standalone basis or as a package.

8.      Pursuant to the Stalking Horse Purchase Agreement, Justice Brand is purchasing the Justice Assets and assuming certain liabilities as specified therein.  The consideration for the transfer of the assets and the transactions contemplated by the Stalking Horse Purchase Agreement is:  (i) the assumption of Assumed Liabilities and (ii) the payment of an amount equal to the sum of (A) $44 million plus (B) an upward adjustment for additional inventory, up to $20 million.  If the Sale to Justice Brand is consummated, the Debtors intend to assume and/or assign the Assigned Contracts to Justice Brand, which will be responsible for paying any Cure Costs related to the

---

[6]    Attached hereto as **Exhibit C** are certain redlines to the previously filed versions of the proposed bidding procedures order and the bidding procedures related to the Initial Motion.

assumption and assignment of such contracts in accordance with the provisions of section 365 of the Bankruptcy Code and the Stalking Horse Purchase Agreement following any such assumption and assignment.

9.      In addition, the Stalking Horse Purchase Agreement provides for the payment of the Stalking Horse Protections in certain limited circumstances, which are comprised of reimbursement of reasonable out-of-pocket attorneys and financial advisors fees, costs, and expenses being paid at Closing, capped at $200,000, in the event that Justice Brand is not the winning bidder and the Debtors sell the Justice Assets to another party.

10.      The following is a summary[7] of the material terms of the Stalking Horse Purchase Agreement.

| Sellers | Ascena Retail Group, Inc., Tween Brands, Inc., Tween Brands Investment, LLC, Tween Brands Service Co., Tween Brands Direct Services, Inc., Tween Brands Marketing, Inc., Tween Brands Agency, Inc. |
|---|---|
| Purchaser | Bluestar Alliance LLC |
| Purchase Price | $44,000,000 **See Section 2.1 of the Stalking Horse Purchase Agreement** |
| Deposit Escrow | $10,000,000 **See Section 2.2 of the Stalking Horse Purchase Agreement** |
| Acquired Assets | Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, or Purchaser's designee, and Purchaser, or Purchaser's designee, shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means the following assets of Sellers (but excluding in all cases the Excluded Assets): (ii)      to the extent assignable under applicable Law, all (i) Contracts (other than purchase orders) listed on Schedule 1.1(a)(i) of the Stalking Horse Purchase Agreement and |

---

[7]    Capitalized terms used in this summary shall have the meaning given to such terms in the Stalking Horse Purchase Agreement. To the extent there are any conflicts between this summary and the terms of the Stalking Horse Purchase Agreement, the terms of the Stalking Horse Purchase Agreement shall control.

(ii) purchase orders for Inventory that is designated exclusively for sale via the Business or the business of operating brick-and-mortar retail stores under a Transferred Trademark (the "Retail Business") and that has not yet been delivered to Sellers' distribution centers and is delivered during the period beginning on December 1, 2020 and ending on April 30, 2021, subject to a maximum aggregate purchase amount under such purchase orders of $20,000,000, which purchase orders are either listed on Schedule 1.1(a)(ii) of the Stalking Horse Purchase Agreement or are entered into after the date hereof in accordance with Section 6.1(b) of the Stalking Horse Purchase Agreement (collectively, the "Assigned POs"; the Contracts and the Assigned POs to be assigned to Purchaser in accordance with the terms of this Agreement shall be referred to herein as the "Assigned Contracts");

(iii)    all interests of Sellers in and to all Intellectual Property exclusively used or held for use in the Business and the Retail Business, including the following: (i) copyright registrations set forth on Schedule 1.1(b)(i) of the Stalking Horse Purchase Agreement; (ii) internet domain name registrations and social media accounts set forth on Schedule 1.1(b)(ii) of the Stalking Horse Purchase Agreement; (iii) (A) patents and patent applications listed on Schedule 1.1(b)(iii) of the Stalking Horse Purchase Agreement (all such patents and patent applications, collectively, "Scheduled Patents"); and (B) reissues, reexaminations, continuations, continuations in part (only with respect to subject matter disclosed in the Scheduled Patents), divisionals, requests for continuing examinations or continuing prosecution applications, or design registrations of any Scheduled Patent; (iv) Trademark registrations and applications for registration set forth on Schedule 1.1(b)(iv) of the Stalking Horse Purchase Agreement (the "Transferred Trademarks"), including, to the extent in Sellers' possession, the historical trademark file for each; and (v) the name "Justice" or any derivation thereof, in each case to the extent assignable under applicable Law (the assets described in this Section 1.1(b) of the Stalking Horse Purchase Agreement, collectively, the "Transferred Intellectual Property");

(iv)    all rights to collect royalties and proceeds in connection with the Transferred Intellectual Property with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, the Transferred Intellectual Property and any and all corresponding rights that,

now or hereafter, may be secured throughout the world with respect to the Transferred Intellectual Property;

(v) to the extent transferable under applicable Law (including as an asset that is part of an acquisition, bankruptcy, or other transaction under the exemption from the definition of "sale" set forth in California Civ. Code Section 1798.140(t)(2)(D)) and Sellers' privacy policy attached hereto as Schedule 6.11 of the Stalking Horse Purchase Agreement, the Customer Data (for clarity, it is understood and agreed by Purchaser that Sellers and its Affiliates may have, now or in the future, certain data, pertaining to current, former or prospective customers of one or more of such Sellers or Affiliates that is similar or identical to certain Customer Data (e.g., an individual may be a customer or prospective customer of both the Business and Sellers' or one or more of their Affiliates' other businesses)) and nothing in the Stalking Horse Purchase Agreement shall be deemed to transfer, assign or convey any rights to Purchaser with respect to such data that relates to such other businesses (such data of Sellers and Affiliates of Sellers being referred to as "Other Data") or to in any way restrict the use of any Other Data by any Seller or Affiliates of Sellers (or by their successors or assigns); and

(vi) to the extent transferable under applicable Law (including as an asset that is part of an acquisition, bankruptcy, or other transaction under the exemption from the definition of "sale" set forth in California Civ. Code Section 1798.140(t)(2)(D)) and Seller's privacy policy attached hereto as Schedule 6.11 of the Stalking Horse Purchase Agreement, all Documents (except as expressly excluded in Section 1.2 of the Stalking Horse Purchase Agreement) to the extent used or held for use in the Business or the Retail Business.

**See Section 1.1 of the Stalking Horse Purchase Agreement**

| | |
|---|---|
| **Excluded Assets** | Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under all assets, properties, interests and rights of such Sellers that are not expressly included in the Acquired Assets (collectively, the "Excluded Assets"), including the following: |

(i)    all assets expressly excluded from the definition of Acquired Assets pursuant to <u>Section 1.1</u> of the Stalking Horse Purchase Agreement;

(ii)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(iii)    all Contracts of Sellers other than the Assigned Contracts (the "<u>Excluded Contracts</u>");

(iv)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records, corporate seal, checkbooks, and canceled checks; (iii) that any Seller is required by Law to retain, <u>provided</u> that, in the case of (i) through (iii), to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(v)    all Documents prepared or received by any Seller or any of its Affiliates in connection with the sale of the Acquired Assets, the Stalking Horse Purchase Agreement, or the transactions contemplated hereby, including (i) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received; (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets; or (iii) all privileged materials, documents and records of a Seller or any of its Affiliates; and (iv) copies of documents, materials and data to the extent related to the Acquired Assets prior to the Closing Date;

(vi)    all current and prior insurance policies of any of Sellers, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature

of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(vii)    all membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(viii)   the sponsorship of all benefits plans, and any right, title or interest in any of the assets thereof or relating thereto;

(ix)    (i) other than those against any go forward contract counterparties under the Assigned Contracts, all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any of Sellers may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(x)    Sellers' claims or other rights under the Stalking Horse Purchase Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(xi)    all Tax Refunds and Tax attributes or any rights with respect thereto;

(xii)   all real estate and all interests in real estate;

(xiii)  except as set forth in Section 1.1(c) of the Stalking Horse Purchase Agreement all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and

| | |
|---|---|
| | counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date;<br><br> (xiv) Other Data;<br><br> (xv) the properties and assets set forth on <u>Schedule 1.2(o)</u> of the Stalking Horse Purchase Agreement; and<br><br> (xvi) Inventory, other than Inventory acquired pursuant to Assigned POs.<br><br>**See Section 1.2 of the Stalking Horse Purchase Agreement** |
| **Assumed Liabilities** | On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):<br><br> (xvii) all Liabilities of Sellers under the Assigned Contracts (excluding the Assigned POs) that become due from and after the Closing, but only to the extent that such Liabilities (i) are required to be performed after the Closing and (ii) are not (A) trade accounts payable or (B) Liabilities that (1) arise from breaches of or violations with respect to (including, without limitation, in contravention of their obligations set forth in the Stalking Horse Purchase Agreement) such Assigned Contracts by Sellers or (2) were, pursuant to the terms of the applicable Assigned Contracts, to be performed on or prior to the Closing;<br><br> (xviii) all Liabilities of Sellers under the Assigned POs, other than Liabilities arising out of or related to any breach, act or omission by Sellers prior to the Closing;<br><br> (xix) all amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assigned Contracts, in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Order of the Bankruptcy Court (the "<u>Cure Costs</u>"); |

11

|  | (xx) all Liabilities arising out of the ownership or operation of the Acquired Assets by Purchaser from and after the Closing Date; |
|  | (xxi) all Liabilities, including, for the avoidance of doubt, all Taxes (other than income Taxes of Sellers), with respect to the Acquired Assets attributable to any Post-Closing Tax Period; |
|  | (xxii) all Liabilities for Transfer Taxes; |
|  | (xxiii) all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with the Stalking Horse Purchase Agreement; and |
|  | (xxiv) all Liabilities set forth on <u>Schedule 1.3(h)</u> of the Stalking Horse Purchase Agreement. **See Section 1.3 of the Stalking Horse Purchase Agreement** |
| **Retained Liabilities** | Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities. **See Section 1.4 of the Stalking Horse Purchase Agreement** |
| **Conditions to Each Party's Obligation to Close** | The respective obligations of each Party to the Stalking Horse Purchase Agreement to consummate the transactions contemplated by the Stalking Horse Purchase Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions: (xxv) no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by the Stalking Horse Purchase Agreement; and |

| | |
|---|---|
| | (xxvi)  the Bankruptcy Court shall have entered the Sale Order.<br><br>**See Section 7.1 of the Stalking Horse Purchase Agreement** |
| **Conditions Precedent to Obligation of Purchaser** | The obligations of Purchaser to consummate the transactions contemplated by the Stalking Horse Purchase Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:<br><br>(xxvii) the representations and warranties made by Sellers in <u>Article III</u> of the Stalking Horse Purchase Agreement shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that the representations set forth in <u>Sections 3.1</u>, <u>3.2</u>, and <u>3.11</u> of the Stalking Horse Purchase Agreement will be true and correct in all material respects;<br><br>(xxviii)Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by the Stalking Horse Purchase Agreement to be performed by Sellers by the Closing;<br><br>(xxix)  Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u> of the Stalking Horse Purchase Agreement; and<br><br>(xxx)  from the date of the Stalking Horse Purchase Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect.<br><br>**See Section 7.2 of the Stalking Horse Purchase Agreement** |
| **Conditions Precedent to Obligation of Seller** | The obligations of Sellers to consummate the transactions contemplated by the Stalking Horse Purchase Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions: |

|  | (xxxi) the representations and warranties made by Purchaser in <u>Article IV</u> of the Stalking Horse Purchase Agreement shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby;<br><br>(xxxii) Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by the Stalking Horse Purchase Agreement to be performed by Purchaser by the Closing; and<br><br>(xxxiii) Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.6</u> of the Stalking Horse Purchase Agreement.<br><br>**See Section** 7.3 **of the Stalking Horse Purchase Agreement** |
|---|---|
| **Representations and Warranties** | The Stalking Horse Purchase Agreement contains customary representations and warranties by the Seller, including but not limited to, representations of the Seller regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts; consents; (d) title to properties; (e) insurance; (f) contracts; (g) litigation; (h) permits and compliance with laws; (i) intellectual property; (j) data privacy; (k) brokers; and (l) suppliers.<br><br>**See Article III of the Stalking Horse Purchase Agreement**<br><br>The Stalking Horse Purchase Agreement contains customary representations and warranties by the Purchaser, including but not limited to, representations of the Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts; consents; (d) financing; (e) brokers (f) litigation; and (g) certain arrangements.<br><br>**See Article IV of the Stalking Horse Purchase Agreement** |

14

| | |
|---|---|
| **Termination Events** | The Stalking Horse Purchase Agreement may be terminated only in accordance with <u>Section 8.1</u> of the Stalking Horse Purchase Agreement. The Stalking Horse Purchase Agreement may be terminated at any time prior to the Closing:<br><br>    (xxxiv) by the mutual written consent of the Company and Purchaser;<br><br>    (xxxv) by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by the Stalking Horse Purchase Agreement or declaring unlawful the transactions contemplated by the Stalking Horse Purchase Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under <u>Section 8.1(d)</u> of the Stalking Horse Purchase Agreement if the issuance of such Order was caused by the breach or action or inaction of such Party;<br><br>    (xxxvi) by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before forty-five (45) days after (i) if no Auction is held pursuant to the Bidding Procedures Order, the Bid Deadline (as defined in the Bidding Procedures Order) or (ii) if an Auction is held pursuant to the Bidding Procedures Order, the consummation of the Auction (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate the Stalking Horse Purchase Agreement pursuant to <u>Section 8.1(c)</u> of the Stalking Horse Purchase Agreement if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;<br><br>    (xxxvii)    by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;<br><br>    (xxxviii)    by written notice from Purchaser to the Company, if Sellers announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than a wind-down plan of Sellers' estates post-Closing;<br><br>    (xxxix) by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part |

of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) of the Stalking Horse Purchase Agreement would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then the Company may not terminate the Stalking Horse Purchase Agreement under Section 8.1(f) of the Stalking Horse Purchase Agreement unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Company notifies Purchaser of such breach and (ii) the right to terminate the Stalking Horse Purchase Agreement pursuant to Section 8.1(f) of the Stalking Horse Purchase Agreement will not be available to the Company at any time that the Company is in material breach of, any covenant, representation or warranty hereunder;

(xl)    by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a), 7.2(b) or 7.2(d) of the Stalking Horse Purchase Agreement; provided that (i) if such breach is curable by such Seller then Purchaser may not terminate the Stalking Horse Purchase Agreement under Section 8.1(g) of the Stalking Horse Purchase Agreement unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate the Stalking Horse Purchase Agreement pursuant to Section 8.1(g) of the Stalking Horse Purchase Agreement will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(xli)    by written notice from the Company to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 of the Stalking Horse Purchase Agreement have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3 of the Stalking Horse Purchase Agreement;

(xlii)    by written notice from the Company to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the

transactions contemplated by the Stalking Horse Purchase Agreement or failing to terminate the Stalking Horse Purchase Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(xliii) by written notice from Purchaser to the Company, if the Bankruptcy Court fails to enter the Bidding Procedures Order including approval of the payment of the Break-Up Fee and Expense Reimbursement on or before fourteen (14) days after the date hereof or as soon thereafter as the Bankruptcy Court is available to hear a motion seeking entry of the Bidding Procedures Order and enter the Bidding Procedures Order;

(xliv) by written notice of either Purchaser or the Company, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(xlv) by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction or automatically upon consummation by Sellers of an Alternative Transaction with the Successful Bidder (other than Purchaser);

(xlvi) by Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on the date that is thirty (30) days after the date hereof or as soon thereafter as the Bankruptcy Court is available to hear a motion seeking entry of the Sale Order and enter the Sale Order, or (ii) at any time after entry of the Sale Order, such Sale Order is subject to a notice of appeal, reversed, stayed, vacated or otherwise modified;

(xlvii) automatically at 5:00 PM ET on the first (1st) Business Day after the date hereof if the Deposit has not then been received by Sellers.

Notwithstanding anything to the contrary contained herein, a Party shall not be permitted to terminate the Stalking Horse Purchase Agreement pursuant to this Article VIII of the Stalking Horse Purchase Agreement if the applicable event giving rise to termination hereunder was caused by the breach or action or inaction of such Party.

**See Section 8.1 of the Stalking Horse Purchase Agreement**

| Break-Up and Expense Reimbursement | Break Up Fee: $0.00<br>Expense Reimbursement: $200,000<br>**See Section 5.4 of the Stalking Horse Purchase Agreement** |
|---|---|
| **Indemnification by Sellers** | None. |

## Basis for Relief

11.     By this Supplemental Motion, the Debtors restate each of the bases of relief set forth in the Initial Motion, as supplemented by this Supplemental Motion and modified to apply to and be in support of the Stalking Horse Bid, the Stalking Bidder, the Stalking Horse Purchase Agreement, the Stalking Horse Protections and the other relief requested in this Supplemental Motion.

## Reservation of Rights

12.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding

Procedures Order granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

Dated:   October 20, 2020

|  | */s/ Cullen D. Speckhart* |
|---|---|
| **KIRKLAND & ELLIS LLP** | **COOLEY LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Cullen D. Speckhart (VSB 79096) |
| Edward O. Sassower, P.C. | *Admitted to practice in New York, Virginia, Missouri and* |
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*) | *Texas; Not admitted to practice in DC, supervised by* |
| 601 Lexington Avenue | *members of DC bar* |
| New York, New York 10022 | Olya Antle (VSB 83153) |
| Telephone:   (212) 446-4800 | *Admitted to practice in Virginia; Not admitted to practice* |
| Facsimile:   (212) 446-4900 | *in DC, supervised by members of DC bar* |
| Email:   edward.sassower@kirkland.com | 1299 Pennsylvania Avenue, NW, Suite 700 |
|   steven.serajeddini@kirkland.com | Washington, DC 20004-2400 |
|  | Telephone:   (202) 842-7800 |
| **-**and- | Facsimile:   (202) 842-7899 |
|  | Email:   cspeckhart@cooley.com |
| John R. Luze (admitted *pro hac vice*) |   oantle@cooley.com- |
| 300 North LaSalle Street |  |
| Chicago, Illinois 60654 |  |
| Telephone:   (312) 862-2000 |  |
| Facsimile:   (312) 862-2200 |  |
| Email:   john.luze@kirkland.com |  |

*Co-Counsel to the Debtors and Debtors in Possession*

## <u>Exhibit A</u>

**Bidding Procedures Order**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice*
*in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    (202) 842-7800
Facsimile:    (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) APPROVING THE STALKING HORSE PROTECTIONS,
## (II) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE JUSTICE
## ASSETS, AND (III) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES

Upon the Supplemental Motion (the "Bidding Procedures Motion")[2] of the above-

captioned debtors and debtors in possession (the "Debtors"), for entry of an order (this "Order"):

(a) authorizing and approving the Bidding Procedures, substantially in the form attached hereto

as **Exhibit A-1**; (b) authorizing and approving the Debtors to enter into and perform under the

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Motion or the Bidding Procedures (as defined below), as applicable.

Stalking Horse Purchase Agreement, attached hereto as **Exhibit A-2**; (c) approving procedures for assuming and assigning certain executory contracts, and approving the Cure Notice, substantially in the form attached hereto as **Exhibit A-3**; and the Court having reviewed any evidence in support of the Bidding Procedures Motion; and the Court having reviewed the Bidding Procedures Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Bidding Procedures Motion and at the Hearing establish just cause for the relief granted herein; and any objections to the Bidding Procedures Motion having been withdrawn with prejudice or overruled on the merits at the Hearing; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS AS FOLLOWS**:[3]

A.    Jurisdiction and Venue.    The Court has jurisdiction to consider the Bidding Procedures Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.    The statutory and legal predicates for the relief requested in the Motion, sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014 have been satisfied.

B.    Notice of the Bidding Procedures Motion.    As reflected in the certificate of service filed on [●] [Docket No. [●]], the Bidding Procedures Motion and the notice of the Hearing were served on the Court's electronic filing system and the Notice Parties.    The notice of the Bidding Procedures Motion and the Hearing is reasonable and sufficient in light of the circumstances and nature of the relief requested in the Bidding Procedures Motion, and no other

---

[3]    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.    To the extent any findings of facts are conclusions of law, they are adopted as such.    To the extent any conclusions of law are findings of fact, they are adopted as such.

or further notice of the Bidding Procedures Motion or the Hearing is necessary.  A reasonable and fair opportunity to object to the Bidding Procedures Motion and the relief granted in this Order has been afforded under the circumstances.

      C.      <u>Stalking Horse Bid and the Stalking Horse Protections</u>.  The Debtors have demonstrated and proven to the satisfaction of this Court that their performance of the obligations related to the Stalking Horse Bid and the Stalking Horse Protections are in the best interests of the Debtors, their creditors, and their estates, and that the foregoing represents a prudent exercise of the Debtors' sound business judgment.  The Debtors have articulated good, sufficient, and sound business justifications and compelling circumstances for performance of obligations related to the Stalking Horse Bid and the Stalking Horse Protections in that, among other things, the Stalking Horse Bid constitutes the highest or otherwise best proposal that the Debtors have received to date and the approval of the relief requested is a necessary and constructive step toward the confirmation and consummation of a chapter 11 plan, and the Stalking Horse Bid and the Stalking Horse Protections allow the Debtors to solicit the highest or otherwise best bid for the Justice Assets through the Bidding Procedures.

      D.      The Stalking Horse Bid and the Stalking Horse Protections were negotiated by the parties at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder. Furthermore, the Stalking Horse Bid will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.  The Stalking Horse Bidder and the Stalking Horse Protections are providing a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Justice Assets will be received.  Accordingly, the Stalking Horse Bid and the Stalking Horse Protections are fair, reasonable, appropriate, and represent the best method for maximizing value for the

3

benefit of the Debtors' estates.

E.    Justice Brand Holdings LLC ("Justice Brand") shall act as the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement annexed to the Motion, and the offer embodied therein shall be subject to higher and better offers in connection with the Bidding Procedures.  The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.  The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Stalking Horse Protections and the Bidding Procedures and the Stalking Horse Bidder's negotiation and entry into the Stalking Horse Purchase Agreement.

F.    Bidding Procedures.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures attached hereto as **Exhibit A-1**, which are fair, reasonable, and appropriate under the circumstances and designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest.

G.    Assumption and Assignment Procedures.    The Cure Notice is reasonably calculated to provide counterparties to the Justice Executory Contracts and Unexpired Leases to be assumed or assumed and assigned with proper notice of the intended assumption or assumption and assignment of their Justice Executory Contracts and Unexpired Leases, any Cure Amounts, and the Assumption and Assignment Procedures, and no other or further notice of such intention, the Cure Amounts, or the Assumption and Assignment Procedures shall be required. The Assumption and Assignment Procedures are fair, reasonable, and appropriate, and comply

4

with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

H.      <u>Auction</u>.  The Auction, if held, is necessary to determine whether any entity other than the Stalking Horse Bidder is willing to enter into a definitive agreement on terms and conditions more favorable to the Debtors than the Stalking Horse Bid.  Good and sufficient cause has been shown to waive the stay of effectiveness of this Order under Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, or any applicable provisions of the Bankruptcy Rules or the Local Bankruptcy Rules.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      Any objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, hereby are overruled and denied on the merits with prejudice.

**A.      The Bidding Procedures.**

3.      The Bidding Procedures, attached hereto as **<u>Exhibit A-1</u>**, in connection with the Sale pursuant to the Stalking Horse Purchase Agreement, attached hereto as **<u>Exhibit A-2</u>**, and incorporated by reference as though fully set forth herein, are hereby approved and the Debtors are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in the Bidding Procedures.  The Bidding Procedures shall govern the submission, receipt, and analysis of all bids, and any party desiring to submit a higher or otherwise better offer must do so strictly in accordance with the terms of the Bidding Procedures and this Order.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The Debtors are authorized to take all actions necessary or appropriate to

implement the Bidding Procedures.

4.      Subject to the right of parties-in-interest to object and the Court's entry of an order approving the sale, the Debtors are authorized to enter into the Stalking Horse Purchase Agreement, and the Stalking Horse Bid shall be subject to higher or better Qualified Bids, in accordance with the terms and procedures of the Bidding Procedures.

5.      The Stalking Horse Bidder is hereby deemed a Qualified Bidder, and the offer, as reflected in the Stalking Horse Purchase Agreement, is a Qualified Bid for all purposes and requirements pursuant to the Bidding Procedures.  If no other Qualified Bid with respect to the Justice Assets is received on or before Bid Deadline, the Debtors shall not conduct an Auction for the Justice Assets, and the Stalking Horse Bidder will be named the Successful Bidder.

**B.      Stalking Horse Protections.**

6.      The Stalking Horse Protections are approved and the Debtors are authorized to incur and pay the Stalking Horse Protections.  The Debtors' performance of any other obligations related to the Stalking Horse Bid shall be subject to entry of a further Court order approving the Sale.  Notwithstanding anything to the contrary herein, including, without limitation, this Order's authorization of, and approval of the Debtors' performance of obligations related to the Stalking Horse Protections, the entry of this Order and the relief granted hereby is without prejudice to the rights of any party to object or respond to the Sale, the Plan, the Stalking Horse Purchase Agreement, or any other document or instrument contemplated by any of the foregoing, and all such rights are reserved and preserved in all respects.

7.      The Stalking Horse Protections, to the extent payable under the Stalking Horse Agreement, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of the Bankruptcy Code section 503(b), (ii) are of substantial benefit to the Debtors' estates, (iii) are reasonable and appropriate, including in light of the size and nature of

6

the transactions and the efforts that have been and will be expended by the Stalking Horse
Bidder, (iv) have been negotiated by the parties and their respective advisors at arm's-length and
in good faith and (v) are necessary to ensure that the Stalking Horse Bidder will continue to
pursue the proposed Sale.  The Stalking Horse Protections are material inducements for, and a
condition of, the Stalking Horse Bidder's entry into the Stalking Horse Purchase Agreement.
The Stalking Horse Bidder is unwilling to commit to the Sale under the terms of the Stalking
Horse Purchase Agreement unless the Stalking Horse Bidder receives the Stalking Horse
Protections.

8.      The Stalking Horse Protections shall be accorded treatment as an administrative
expense claim in the chapter 11 cases.

9.      Subject to the right of parties-in-interest to object to, and the Court's entry of an
order approving, the Sale, the Debtors are authorized to enter into the Stalking Horse Purchase
Agreement, and the Stalking Horse Bid shall be subject to higher or better Qualified Bids in
accordance with the terms and procedures of the Bidding Procedures.

10.     As soon as reasonably practicable after the conclusion of the Auction, if any, but
no later than two (2) business days thereafter, the Debtors will file on the docket, but not serve, a
notice (the "Post-Auction Notice") identifying the Successful Bidder.  Within five (5) business
days of the filing of the Post-Auction Notice and, if the Successful Bidder is not the Stalking
Horse Bidder, the Debtors will file on the docket, but not serve, a notice detailing the
Expense Reimbursement proposed to be paid to the Stalking Horse Bidder.  All parties will have
fourteen days from the date such notice is filed to file a written objection, compliant with the
Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and all orders of the Court, to the
Expense Reimbursement and serve such objection on the Debtors, counsel to the Debtors, and

the Notice Parties.  If any party objects within fourteen days in accordance with the foregoing,

the Court shall adjudicate any unresolved dispute as soon as the Court's schedule permits.

**C.     The Assumption and Assignment Procedures.**

11.     The Assumption and Assignment Procedures set forth in the Bidding Procedures

Motion regarding the assumption or assumption and assignment of the Justice Executory

Contracts and Unexpired Leases proposed to be assumed by the Debtors and assigned to a

Successful Bidder are approved:

> i.    Cure Notice.  No later than October 26, 2020, if applicable, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the Cure Notice on all applicable non-Debtor contract counterparties (at the notice address set forth in the applicable contract or lease) to the Justice Executory Contracts and Unexpired Leases (collectively, the "Contract Parties," and each, a "Contract Party") and by email on their counsel of record, if known;

> ii.    Content of Cure Notice.   The Cure Notice shall notify the applicable Contract Parties that the Justice Executory Contracts and Unexpired Leases may be subject to assumption or assumption and assignment in connection with the proposed Sale and contain the following information:  (a) identification of the applicable Justice Executory Contracts and Unexpired Leases; (b) the applicable Contract Parties; (c) the Debtors' good faith estimates of the corresponding Cure Amounts required to cure all monetary defaults under the Justice Executory Contracts and Unexpired Leases; (d) with respect to any Justice Unexpired Leases, to the extent applicable, adequate assurance information to the extent required under section 365 of the Bankruptcy Code (the "Adequate Assurance Information"); and (e) the deadline by which any Contract Party to a Justice Executory Contract or Justice Unexpired Lease may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); provided that service of a Cure Notice does not constitute an admission that such Justice Executory Contract or Justice Unexpired Lease is an executory contract or unexpired lease or that such Justice Executory Contract or Justice Unexpired Lease will be assumed at any point by the Debtors or assumed and assigned pursuant to the Stalking Horse Purchase Agreement or any other Successful Bid.  To the extent the Cure Notice includes a Justice Unexpired Lease, such Cure

8

Notice shall be accompanied by the following Adequate Assurance Information:

a. The legal name of the proposed assignee of the Justice Unexpired Lease (the "Proposed Assignee") and any guarantors, as applicable;

b. Financial statements for the calendar or fiscal years ended 2018 and 2019 for the Proposed Assignee and any guarantors, as applicable, or other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

c. Summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations.

iii. Cure Objections. Cure Objections, if any, to a Cure Notice must: (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (c) state with specificity the nature of the Cure Objection and, if the Cure Objection pertains to the proposed Cure Amount, state the cure amount alleged to be owed to the objecting Contract Party, together with any applicable and appropriate documentation in support thereof; and (d) be filed with the Court and served so as to be actually received by counsel to the Debtors, counsel to the Stalking Horse Bidder or any other Successful Bidder, and counsel to each of the Consultation Parties within fourteen days of the date of service of the Cure Notice at 5:00 p.m. (prevailing Eastern Time) (the "Cure Objection Deadline");

iv. Effects of Filing a Cure Objection. A properly filed and served Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption or assumption and assignment of the Justice Executory Contract or Justice Unexpired Lease at issue and/or objection to the accompanying Cure Amount, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this Motion;

v. Dispute Resolution. Any objection to the proposed assumption or assumption and assignment of a Justice Executory Contract, Justice Unexpired Lease, or Cure Amount that remains unresolved after the Sale Hearing, shall be heard at the next scheduled omnibus hearing (or at such later date as may be fixed by the Court). To the extent that any Cure Objection cannot be resolved by the parties, such Justice Executory Contract or Justice

9

Unexpired Lease shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Stalking Horse Bidder's (if applicable) or other Successful Bidder's reasonable discretion. If a Cure Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Justice Executory Contract or Justice Unexpired Lease should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Amounts in respect of such contract unless otherwise provided in the Stalking Horse Purchase Agreement;

vi.   <u>Supplemental Cure Notice</u>. If the Debtors discover Justice Executory Contracts and Unexpired Leases inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Justice Executory Contracts and Leases that it desires to assume or assume and assign in connection with the Sale, the Debtors may, in consultation with the Successful Bidder and in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the Debtors and the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Justice Executory Contracts and Leases, which shall include all Adequate Assurance Information, or modify a previously filed Cure Notice, including modify the previously stated Cure Amounts associated with any Justice Executory Contract or Justice Unexpired Lease (the "<u>Supplemental Cure Notice</u>");

vii.   <u>Objection to the Supplemental Cure Notice</u>. Any Contract Party listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the applicable Justice Executory Contract and/or Justice Unexpired Lease or the proposed Cure Amounts, if any. All Supplemental Cure Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Amounts are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 5:00 p.m. (prevailing Eastern Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice;

viii.   <u>Dispute Resolution of Supplemental Cure Objection</u>. If a Contract Party files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amounts, if any, and approve the assumption and/or assignment of

the relevant Justice Executory Contracts and Unexpired Leases.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Amount and approving the assumption and/or assignment of any Justice Executory Contracts and Unexpired Leases listed on a Supplemental Cure Notice; and

ix.    <u>No Cure Objections</u>.  If there are no objections to a Cure Notice or a Supplemental Cure Notice, or if a Contract Party does not file and serve a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amounts, (a) the Cure Amount, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Justice Executory Contracts and Unexpired Leases or any other document, and (b) to the extent the Contract Party's consent is required under applicable law, the Contract Party will be deemed to have consented to the assumption or assumption and assignment of the Justice Executory Contracts and Unexpired Leases and the Cure Amounts, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Justice Executory Contracts and Unexpired Leases and rights thereunder, including the Cure Amounts, if any, and from asserting any other claims related to such Justice Executory Contracts and Unexpired Leases against the Debtors or the Successful Bidder, or the property of any of them.

12.    Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the later of (a) the Cure Objection Deadline, and (b) 4:00 p.m. (prevailing Eastern Time) on the date that is 14 days following (i) the date of service of the Cure Notice, or (ii) the date of service of the Supplemental Cure Notice, as applicable.

13.    The inclusion of a Justice Executory Contract or Justice Unexpired Lease in the Cure Notice (or Supplemental Cure Notice) will not:  (a) obligate the Debtors to assume any Justice Executory Contract or Justice Unexpired Lease listed thereon or obligate the Successful Bidder to take assignment of such Justice Executory Contract or Justice Unexpired Lease; or (b) constitute any admission or agreement of the Debtors that such Justice Executory Contract or

Justice Unexpired Lease is an executory contract.  Only those Justice Executory Contracts and Unexpired Leases that are included on a schedule of assumed and assigned contracts attached to the Definitive Purchase Agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

14.    For the avoidance of doubt, nothing herein shall be deemed to extend the Debtors' deadline to assume or reject any of its leases pursuant to section 365(d)(4) of the Bankruptcy Code.

15.    Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party (including the sureties, the Debtors, the Debtors' lenders, the Stalking Horse Bidder, or any other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, surety bonds, or related agreements or any letters of credit relating thereto, or any rights, remedies or defenses of the Debtors with respect thereto, including seeking Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

16.    Notwithstanding anything to the contrary in this Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Order must be in compliance with, and shall be subject to:  (i) the final order approving the Debtors' use of cash collateral and postpetition financing facility [Docket No. 587] (the "Final DIP Order"); (ii) the documentation in respect of any such use of cash collateral and postpetition financing; and (iii) the budget governing any such use of cash collateral and postpetition financing.  To the

extent there is any inconsistency between the term of the Final DIP Order and this Order, the terms of the Final DIP Order shall control.

17.    To the extent there is any inconsistency between the terms of the Bidding Procedures Motion and this Order, the terms of this Order shall control.

18.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

19.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Bidding Procedures Motion.

20.    The requirements set forth in Local Bankruptcy Rule 9013-1 are satisfied by the contents of the Bidding Procedures Motion.

21.    This Order shall be immediately effective and enforceable upon entry hereof.

22.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  _____

Richmond, Virginia                    _____

                                              United States Bankruptcy Judge

13

WE ASK FOR THIS:

/s/ Cullen D. Speckhart

**KIRKLAND & ELLIS LLP**                            **COOLEY LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**      Cullen D. Speckhart (VSB 79096)
Edward O. Sassower, P.C.                            *Admitted to practice in New York, Virginia, Missouri and*
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)   *Texas; Not admitted to practice in DC, supervised by*
601 Lexington Avenue                               *members of DC bar*
New York, New York 10022                           Olya Antle (VSB 83153)
Telephone:      (212) 446-4800                      *Admitted to practice in Virginia; Not admitted to practice in*
Facsimile:      (212) 446-4900                      *DC, supervised by members of DC bar*
-and-                                              1299 Pennsylvania Avenue, NW, Suite 700
John R. Luze (admitted *pro hac vice*)              Washington, DC 20004-2400
300 North LaSalle                                  Telephone:      (202) 842-7800
Chicago, Illinois 60654                            Facsimile:      (202) 842-7899
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

<u>**CERTIFICATION OF ENDORSEMENT**</u>
<u>**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**</u>

     Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Cullen D. Speckhart

## **<u>Exhibit A-1</u>**

## **Bidding Procedures**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:        (202) 842-7800
Facsimile:        (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## BIDDING PROCEDURES
## FOR THE SALE OF THE JUSTICE ASSETS

On July 23, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

On [__], 2020, the Bankruptcy Court entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [__]] (the "Bidding

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

Procedures Order"),[2] by which the Bankruptcy Court approved the following procedures (the "Bidding Procedures").

These Bidding Procedures set forth the process for a potential auction (the "Auction") and sale (the "Sale") of the right, title, and interest of the Debtors in and to certain Tween Brands, Inc. assets (the "Justice Assets"), subject to the option of the Stalking Horse Bidder (as defined below) to require the Debtors to consummate the Sale in accordance with the Stalking Horse Purchase Agreement (as defined below).

The Debtors selected the bid (the "Stalking Horse Bid") for the Justice Assets submitted by Justice Brand Holdings LLC ("Justice Brand" and/or the "Stalking Horse Bidder"), after a comprehensive public bidding process.  The Stalking Horse Bidder has executed that certain purchase agreement dated October 20, 2020 entered into by and among certain of the Debtors and Justice Brand (as amended, supplemented or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Stalking Horse Purchase Agreement") pursuant to which the Stalking Horse Bidder has agreed to purchase the Acquired Assets (as defined in the Stalking Horse Purchase Agreement), subject to the terms and conditions set forth therein.  Having announced the Stalking Horse Bid, the Debtors will now conduct a round of open bidding during these chapter 11 cases intended to obtain the highest or otherwise best bid for the Justice Assets.  The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

> **Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Prime Clerk LLC by calling (877) 930-4319 (toll free) or (347) 899-4594 (international) or visiting the Debtors' restructuring website at (https://cases.primeclerk.com/ascena).**

## I.      Assets to be Auctioned.

These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction.  The Justice Assets will be offered for sale through the Auction. The Debtors may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the Justice Assets.  The Stalking Horse Bid referenced herein provides for the Stalking Horse Bidder's acquisition of the Justice Assets in the absence of a higher or otherwise better offer.

## II.     Public Announcement of Auction.

As soon as reasonably practicable after entry of the Bidding Procedures Order the Debtors shall (I) serve on the Notice Parties (as defined below) a notice of the Auction and Sale in the form attached hereto as **Schedule 1** (the "Sale Notice"), and (II) publish the Sale Notice, with any

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

modifications necessary for ease of publication, in *The New York Times (National Edition)* to provide notice to any other potential interested parties.

## III.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity (other than the Stalking Horse Bidder) interested in purchasing the Justice Assets (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors; and

b.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close the Sale (including current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be acceptable to the Debtors.

Only those Potential Bidders that have submitted acceptable Preliminary Bid Documentation (each, an "Acceptable Bidder") to the reasonable satisfaction of the Debtors and their advisors, in consultation with the Consultation Parties,[3] may submit bids to purchase the Justice Assets.

## IV.    Qualified Bid Requirements.

To participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of the Justice Assets (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline:

a.    **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state which of the Justice Assets the Acceptable Bidder seeks to acquire and which liabilities of the applicable Debtor the Acceptable Bidder agrees to assume;

b.    **Good Faith Deposit**:  The Bid must be accompanied by a cash deposit in the amount equal to the greater of (i) $10,000,000 and (ii) 10% of the aggregate

---

[3]    The term "Consultation Parties" shall mean (a) the DIP Agents, (b) the DIP Lenders, (c) counsel to the DIP Agents, (d) one or more Initial Consenting Stakeholders under the RSA; (e) counsel to the Ad Hoc Group; and (f) the Official Committee of Unsecured Creditors (the "Committee") and counsel to the Committee; *provided* that any party otherwise included as a Consultation Party shall not serve as a Consultation Party with respect to the sale of Justice Assets to which such party has submitted a Bid unless and until such party unequivocally revokes its Bid and waives its right to continue in the Auction process; *provided further* that any member of the Committee that submits a Bid shall not participate in any deliberations by the Committee as a Consultation Party.

purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit");

c.   **Purchase Price**:  Each Bid must clearly set forth the cash purchase price to be paid, assuming a purchase of the Justice Assets and any assumption of liabilities (the "Purchase Price").  The Purchase Price should be a single point value in U.S. Dollars for the applicable Justice Assets on a cash-free, debt-free basis;

d.   **Minimum Bid**:[4]  At a minimum, each Bid must have a Purchase Price equal to, or in excess of, of an amount equal to the sum of (i) the Cash Purchase Price, plus (ii) the assumption of Assumed Liabilities, plus (iii) payments made for Inventory subject to Assigned POs pursuant to Section 1.1(a) of the Stalking Horse Purchase Agreement, plus (iv) $2,000,000;

e.   **Markup of the Purchase Agreement**:  Each Acceptable Bidder must provide a draft purchase agreement as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Purchase Agreement, which amendments and modifications may not be inconsistent with these Bidding Procedures.  Significant alterations to the Stalking Horse Purchase Agreement are discouraged and may negatively impact a Bid;

f.   **Same or Better Terms; Bid Documents**:  Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, substantially on the same or better terms than the terms of the Stalking Horse Purchase Agreement.  Each Bid must include duly executed transaction documents, including a proposed purchase agreement and any other ancillary documentation necessary to effectuate the transactions contemplated in such Bid (such documents, the "Bid Documents"). The bid must be expressly made subject to the Debtors' obligations to pay the Expense Reimbursement pursuant to the terms of the Stalking Horse Purchase Agreement, as modified by the Bidding Procedures Order.

g.   **No Qualified Bidder Bid Protections**:  Except as provided with respect to the Stalking Horse Bidder, a Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Justice Assets;

h.   **Employee Obligations**:  Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the Justice Assets included in such Bid;

---

[4]   Capitalized terms used but not otherwise defined in this section IV.d. shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

i.    **Sources of Financing**:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

j.    **Contingencies; No Financing or Diligence Outs**:  Any Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Purchase Agreement and (ii) shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence;

k.    **Identity**:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Justice Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom Guggenheim and Kirkland & Ellis LLP should contact regarding such Bid;

l.    **As-Is, Where-Is**:   Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

m.    **Authorization**:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

n.    **Adequate Assurance of Future Performance**:  Each Bid (other than the Stalking Horse Bid) must (i) identify the Justice Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all Cure Amounts related to such Justice Executory

Contracts and Unexpired Leases and by the Acceptable Bidder, and (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Justice Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code;

o.  **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment**:  Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law;

p.  **Compliance with the Debtors' Privacy Policy**:  Each Bid must comply in all respects with the Debtors' Justice privacy policy, which restricts the transfer of the personally identifiable information of its customers, and contain a statement acknowledging such compliance;

q.  **No Collusion**:  The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice);

r.  **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale;

s.  **Irrevocable**:  Each Bid must state that in the event a Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale;

t.  **Back-Up Bid**:  Each Bid shall provide that the Acceptable Bidder will serve as a back-up bidder if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

u.  **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including the Justice Executory Contracts and Unexpired Leases (each as defined in the Bidding Procedures Motion) for which assumption and assignment is required; and

v.  **Expected Closing Date**:  Each Bid must state the Acceptable Bidder's expected date of closing of the Sale.

Only Bids fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable discretion, in consultation with the Consultation Parties, be

deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable discretion, be deemed to be "Qualified Bidders."

Within one (1) business day after the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, the Stalking Horse Bid shall be deemed a Qualified Bid, and the Stalking Horse Bidder shall be entitled to participate in the Auction with respect to the Justice Assets. The Debtors shall inform counsel to the Stalking Horse Bidder whether the Debtors consider any Bid to be a Qualified Bid as soon as practicable after the Bid Deadline and in no event later than one (1) business day after the Bid Deadline.

## V.    Obtaining Due Diligence Access.

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. ***No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***. Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request. The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room for the benefit of all Acceptable Bidders. Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale. For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

### A.  Communications with Acceptable Bidders (including Qualified Bidders).

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Guggenheim.

### B.  Due Diligence from Acceptable Bidders (including Qualified Bidders).

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction.  Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) or that a bid made by such bidder is not a Qualified Bid.

> **Guggenheim Securities LLC, 330 Madison Avenue, New York, New York 10017, Attn.: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com) and Stuart Erickson (Stuart.Erickson@guggenheimpartners.com), shall coordinate all requests for additional information and due diligence access on behalf of the Debtors.**

## VI.  Indications of Interest.

The Debtors reserve the right to require Acceptable Bidders to submit non-binding written indications of interest prior to the Bid Deadline specifying, among other things, the Justice Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.  If an Acceptable Bidder fails to comply with any such request by the Debtors, the Debtors may, in consultation with one or more Required Consenting Stakeholders under the RSA and the Consultation Parties, deny such Acceptable Bidder further diligence access or deny such Acceptable Bidder further participation in the Auction process; *provided* that such Acceptable Bidder shall be granted the opportunity to cure such noncompliance with any request by the Debtors before being denied further participation in the Auction process. The Debtors also reserve the right to exclude any Acceptable Bidder (prior to its submission of a Qualified Bid) from continuing in the Auction process if the Debtors determine, in consultation with one or more Required Consenting Stakeholders under the RSA and the Consultation Parties, that the consideration proposed to be paid by such Acceptable Bidder is insufficient.

## VII.  Bid Deadline.

Binding Bids must be received by (a) the Debtors' counsel, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  John R. Luze (john.luze@kirkland.com) and Jeff Michalik (jeff.michalik@kirkland.com), (b) the Debtors' financial advisor, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com)                 and                 Stuart                 Erickson

(Stuart.Erickson@guggenheimpartners.com), (c) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn: Robert Feinstein (rfeinstein@pszjlaw.com), Bradford Sandler (bsandler@pszjlaw.com), and Shirley Cho (scho@pszjlaw.com), and (d) the proposed financial advisor to the Creditors' Committee, Province, Inc., 2360 Corporate Circle, Suite 330, Henderson, NV 89074, Attn: Paul Huygens (phuygens@provincefirm.com) and Ed Kim (ekim@provincefirm.com), in each case so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on November 2, 2020 (the "Bid Deadline").

## VIII.    Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Justice Assets (the "Starting Bid"). When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid. Two (2) business days prior to the date of the Auction, the Debtors shall notify the Stalking Horse Bidder and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to the applicable assets. At such time, the Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder and each Qualified Bidder.

## IX.    No Qualified Bids.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Auction shall be cancelled, the Stalking Horse Bid shall be designated as the Successful Bid (as defined below) and the Debtors shall pursue entry of an order approving a Sale of the Justice Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and designation of the Stalking Horse Bid as the Successful Bid with the Bankruptcy Court.

## X.    Auction.

If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the Justice Assets, then the Debtors shall conduct the Auction with respect to such assets. The Auction for the Justice Assets shall commence on **November 5, 2020, at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors, or such later time or other place as the Debtors determine, in which case the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders of such later time or other place, and file a notice of the change on the Bankruptcy Court's docket for these chapter 11 cases.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.      the Auction will be conducted openly;

b.      only Qualified Bidders shall be entitled to bid at the Auction;

c.      the Qualified Bidders shall appear at the Auction via videoconference or such other form of remote communication or through duly authorized representatives;

d.      bidding shall begin with the Starting Bid;

e.      subsequent bids (each, an "Overbid") shall be made in minimum increments of $250,000;

f.      each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors;

g.      during the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the Justice Assets;

h.      the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

i.      each Qualified Bidder will be required to confirm on the record that it has not engaged in any collusion with respect to the bidding or any Sale;

j.      each Qualified Bidder will be required to confirm that its bid is a good faith, *bona fide* offer and it intends to consummate the Sale if selected as the Successful Bid;

k.      the Bankruptcy Court and the Debtors will not consider bids made after the Auction has been closed; and

l.      notwithstanding anything herein to the contrary, the Debtors may at any time choose to adjourn the Auction by announcement at the Auction.  The Debtors shall promptly file notice of such adjournment with the Bankruptcy Court.

At the Auction, the Debtors, in consultation with the Consultation Parties, shall have the right to modify the Auction Procedures or adopt and announce additional Auction Procedures, including, for example and without limitation, other Auction Procedures necessary for the Debtors to consider any bids to purchase fewer than all of the Justice Assets; *provided*, however that the Debtors shall not modify the Auction Procedures such that the bidding is (i) inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Purchase Agreement and/or (ii) not transparent to the Qualified Bidders.  Any Auction rules adopted by the Debtors will not

modify any of the terms of the Stalking Horse Purchase Agreement or the rights of the Stalking Horse Bidder under the Bid Procedures without the consent of the Stalking Horse Bidder.

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Debtors' secured creditors, (iii) the Office of the United States Trustee, (iv) the Creditors' Committee, (v) the Stalking Horse Bidder, (vi) any other Qualified Bidders, (vii) any creditor of the Debtors that at least five (5) business days prior to the Auction delivers to Debtors' counsel (by mail or email at the address or email address identified hereinabove) a written request to attend the Auction, and (viii) the respective professionals of all of the foregoing shall be entitled to attend the Auction; *provided* that (x) the Debtors reserve the right to object to any request to attend the Auction made by the creditor pursuant to clause (vii) immediately above, and (y) if the Debtors and such creditor are unable to consensually resolve such objection promptly, the Debtors shall seek a teleconference with the Bankruptcy Court prior to the Auction to adjudicate such objection.

## XI.    Acceptance of the Successful Bid.

The Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase any or all of the Justice Assets (each, a "Successful Bid"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate:   (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid; and (e) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "Successful Bidder" with respect to the Justice Assets.  The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Bankruptcy Court.  Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at a hearing (the "Sale Hearing") and shall seek Bankruptcy Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Definitive Purchase Agreement Order").  For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and /or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or

refrain from taking any action that would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including both the Stalking Horse Bidder and Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XII.    Designation of Back-Up Bidder.

The Qualified Bidder with the second highest or otherwise best bid or combination of bids (the "Back-Up Bid") to purchase any or all of the Justice Assets (the "Back-Up Bidder") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection. If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale with the Debtors as soon as is reasonably practicable without further order of the Bankruptcy Court, *provided* that the Debtors shall file a notice with the Bankruptcy Court.

Except as otherwise provided in the Stalking Horse Purchase Agreement, the Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) forty-five (45) days after completion of the Auction, (ii) consummation of an Alternative Transaction with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "Back-Up Termination Date"). The Debtors shall return the Back-Up Bidder's deposit and pay any Expense Reimbursement owed within three (3) business days of the Back-Up Termination Date.

## XIII.    Stalking Horse Protections.

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder is entitled to the Stalking Horse Protections in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Purchase Agreement and the Bidding Procedures Order. For the avoidance of doubt, except for the Stalking Horse Bidder, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

## XIV.   Approval of the Sale.

A hearing to consider approval of the Sale (the "Sale Hearing"), is currently scheduled to take place on November 12, 2020, at 1:00 p.m. (prevailing Eastern Time), before the Honorable Kevin R Huennekens, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, 5th Floor, Richmond, Virginia, 23219 or conducted consistent with the procedures established pursuant to the Bankruptcy Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

At the Sale Hearing certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that:   (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (4) consummation of any Sale as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the Justice Assets and is in the best interests of the Debtors and their estates.  **The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

Objections to the Sale, any of the relief requested in the Motion, and entry of any order approving the sale (the "Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, counsel to the Debtors, and the Notice Parties by November 9, 2020 at 5:00 p.m. (prevailing Eastern Time).

## XV.   Return of Good Faith Deposit.

Subject to the Stalking Horse Purchase Agreement, the Good Faith Deposit of a Successful Bidder shall, upon consummation of any Sale, be credited to the Purchase Price paid for the applicable Justice Assets.  Subject to the Stalking Horse Purchase Agreement, if a Successful Bidder fails to consummate any Sale, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors, and all parties in interest, and the Debtors specifically, reserve the right to seek all available damages from the defaulting Successful Bidder.

Subject to the Stalking Horse Purchase Agreement, the Good Faith Deposit of any Qualified Bidders that are not Successful Bidders or Back-Up Bidders will be returned within five business days after the Auction or upon the permanent withdrawal of the proposed Sale, and the Good Faith Deposit of any Back-Up Bidders will be returned within five business days after the consummation of any Sale.

## XVI.   Reservation of Rights.

The Debtors reserve their rights to, subject to the terms of the Stalking Horse Purchase Agreement and these Bidding Procedures, and in consultation with the Consultation Parties, to modify these Bidding Procedures in their reasonable business judgment and in a manner consistent

with the exercise of their fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the sale of the Justice Assets, including, without limitation:  (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment.  The Debtors shall provide advance notice in writing of any such modification to any Qualified Bidder, including the Stalking Horse Bidder. For the avoidance of doubt, subject to the Stalking Horse Purchase Agreement, the Debtors reserve the right at any point prior to the selection of the Successful Bidder to terminate the Sale processes contemplated hereunder with respect to any or all of the Justice Assets.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

## XVII.  Consent to Jurisdiction.

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction and the construction and enforcement of these Bidding Procedures, and/or any written indications of interest, Preliminary Bid Documents, or the Bid Documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

## XVIII. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## XIX.  Alternative Proposals.

Further, notwithstanding anything to the contrary in these Bidding Procedures, and subject to the Stalking Horse Purchase Agreement, through the acceptance of the Successful Bid, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (a) consider,

respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Justice Assets (each an "Alternate Proposal"); (b) subject to the terms and conditions of these Bidding Procedures, provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor, any other party in interest in these chapter 11 cases (including the Creditors' Committee and the United States Trustee), or any other entity regarding Alternate Proposals. Nothing in these Bidding Procedures shall be construed as a waiver of any parties' rights with respect to an Alternative Transaction.

## XX. Notice Parties.

Information that must be provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties or their respective counsel, if known (collectively, the "Notice Parties"):  (a) the United States Trustee for the Eastern District of Virginia; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) the United States Attorney's Office for the Eastern District of Virginia; (f) the Internal Revenue Service; (g) the office of the attorneys general for the states in which the Debtors operate; (h) the Securities and Exchange Commission; (i) the Stalking Horse Bidder (and counsel to the Stalking Horse Bidder); (j) all parties who have expressed a written interest in some or all of the Justice Assets; (k) all known holders of liens, encumbrances, and other claims secured by the Justice Assets; (l) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (m) the Creditors' Committee; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## XXI. Consultation Rights of the Consultation Parties.

The Debtors will consult with the Consultation Parties (a) with respect to any action, evaluation, or determination by the Debtors that is expressly contemplated or authorized by these Bidding Procedures, or (b) to the extent not explicitly required by these Bidding Procedures, in any event before making any material decision with respect to the Sale or Auction.

## Schedule 1

**Notice of Auction and Sale Hearing**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:       (202) 842-7800
Facsimile:       (202) 842-7899

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on [__], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [__]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Justice Assets consistent with the bidding procedures (the "Bidding Procedures")

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

approved by the Court by Bidding Procedures Order.  **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.**  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

      **PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets **on November 5, 2020 at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before **November 12, 2020 at 1:00 p.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Kevin R Huennekens, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, 5th Floor, Richmond, Virginia, 23219 or conducted consistent with the procedures established pursuant to the Bankruptcy Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

      **PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before November 9, 2020 at 5:00 p.m. (prevailing Eastern Time)** by the following parties:  (i) the Debtors, Ascena Group Retail, Inc., 933 MacArthur Boulevard, Mahwah, New Jersey 07430, Attn: Michael Veitenheimer; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  John R. Luze and Jeff Michalik and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven N. Serajeddini, P.C.; (iii) co-counsel to the Debtors, Cooley LLP, 1299 Pennsylvania Avenue, NW, Suite 700, Washington, D.C. 20004-2400, Attn: Cullen D. Speckhart and Olya Antle; (iv) counsel to the ABL agent, (a) Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn:  Matthew F. Furlong, Julia Frost-Davies and Christopher L. Carter, and (b) Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn:  Tyler P. Brown; (v) the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn:  Kathryn Montgomery; (vi) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn:  Robert Feinstein, Bradford Sandler, and Shirley Cho; (vii) counsel to the term loan ad hoc group, Milbank LLP, 55 Hudson Yards, New York, NY 1001, Attn:  Evan R. Fleck, Esq; (viii) counsel to the Stalking Horse Bidder, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn:  Kristine Manoukian and Kelly Knight.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

      **ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM**

**ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

Dated:   October 20, 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

**-**and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com-

## <u>Exhibit A-2</u>

**Stalking Horse Purchase Agreement**

**Execution Copy**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 20, 2020**

**BY AND BETWEEN**

**JUSTICE BRAND HOLDINGS LLC, AS PURCHASER,**

**ASCENA RETAIL GROUP, INC., AS THE COMPANY,**

**AND**

**THE OTHER SELLERS NAMED HEREIN**

---

**TABLE OF CONTENTS**

**Page**

### Article I

### Purchase and Sale of the Acquired Assets; Assumption of Assumed Liabilities


1.1 Purchase and Sale of the Acquired Assets ....1
1.2 Excluded Assets ....3
1.3 Assumption of Certain Liabilities ....4
1.4 Excluded Liabilities ....5
1.5 Assumption/Rejection of Certain Contracts ....5


### Article II

### CONSIDERATION; CLOSING


2.1 Consideration; Payment ....7
2.2 Deposit. ....7
2.3 Closing ....8
2.4 Closing Deliveries by Sellers ....8
2.5 Closing Deliveries by Purchaser to the Company ....9
2.6 Withholding ....9


### Article III

### REPRESENTATIONS AND WARRANTIES OF SELLERS


3.1 Organization and Qualification ....10
3.2 Authorization of Agreement ....10
3.3 Conflicts; Consents ....10
3.4 Title to Properties ....11
3.5 Insurance ....11
3.6 Contracts ....11
3.7 Litigation ....12
3.8 Permits; Compliance with Laws ....12
3.9 Intellectual Property ....12
3.10 Data Privacy ....13
3.11 Brokers ....14
3.12 Suppliers ....14


### Article IV

### REPRESENTATIONS AND WARRANTIES OF PURCHASER


4.1 Organization and Qualification ....14
4.2 Authorization of Agreement ....15
4.3 Conflicts; Consents ....15
4.4 Financing ....15
4.5 Brokers ....15
4.6 No Litigation ....16
4.7 Certain Arrangements ....16

## TABLE OF CONTENTS

**Page**

4.8        No Additional Representations or Warranties ........................................16
4.9        No Outside Reliance ....................................................................16

## Article V

### BANKRUPTCY COURT MATTERS

5.1        Bankruptcy Actions ....................................................................17
5.2        Cure Costs ..............................................................................18
5.3        The Sale Order ..........................................................................19
5.4        Bid Protections ..........................................................................19
5.5        Approval ..................................................................................20
5.6        Contracts ..................................................................................20
5.7        No Shop ....................................................................................20

## Article VI

### COVENANTS AND AGREEMENTS

6.1        Conduct of Business of Sellers ......................................................20
6.2        Access to Information ..................................................................21
6.3        Employee Matters ........................................................................23
6.4        Regulatory Approvals ..................................................................24
6.5        Reasonable Efforts; Cooperation ..................................................24
6.6        Notification of Certain Matters ....................................................25
6.7        Further Assurances ......................................................................25
6.8        Insurance Matters ........................................................................25
6.9        Receipt of Misdirected Assets ......................................................26
6.10       Acknowledgment by Purchaser ....................................................26
6.11       Use of Customer Data after Closing ..............................................27
6.12       Wind Down License ....................................................................28
6.13       Guaranty ..................................................................................29

## Article VII

### CONDITIONS TO CLOSING

7.1        Conditions Precedent to the Obligations of Purchaser and Sellers........29
7.2        Conditions Precedent to the Obligations of Purchaser .........................29
7.3        Conditions Precedent to the Obligations of the Company....................30
7.4        Waiver of Conditions....................................................................30

## Article VIII

### Termination

8.1        Termination of Agreement............................................................31
8.2        Effect of Termination....................................................................32

# TABLE OF CONTENTS

**Page**

### Article IX

#### TAXES

| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 33 |
| 9.2 | Allocation of Purchase Price | 33 |
| 9.3 | Cooperation | 33 |
| 9.4 | Preparation of Tax Returns and Payment of Taxes | 33 |
| 9.5 | Wage Reporting | 34 |

### Article X

#### MISCELLANEOUS

| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 34 |
| 10.2 | Expenses | 35 |
| 10.3 | Notices | 35 |
| 10.4 | Binding Effect; Assignment | 37 |
| 10.5 | Amendment and Waiver | 37 |
| 10.6 | Third Party Beneficiaries | 37 |
| 10.7 | Non-Recourse | 37 |
| 10.8 | Severability | 37 |
| 10.9 | Construction | 38 |
| 10.10 | Schedules | 38 |
| 10.11 | Complete Agreement | 38 |
| 10.12 | Specific Performance | 38 |
| 10.13 | Jurisdiction and Exclusive Venue | 39 |
| 10.14 | Governing Law; Waiver of Jury Trial | 40 |
| 10.15 | No Right of Set-Off | 40 |
| 10.16 | Counterparts and PDF | 40 |
| 10.17 | Publicity | 41 |
| 10.18 | Bulk Sales Laws | 41 |
| 10.19 | Fiduciary Obligations | 41 |

### Article XI

#### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

| | | |
|---|---|---|
| 11.1 | Certain Definitions | 41 |
| 11.2 | Index of Defined Terms | 47 |
| 11.3 | Rules of Interpretation | 48 |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of October 20, 2020, by and among Justice Brand Holdings LLC, a New York limited liability company ("<u>Purchaser</u>"), solely for purposes of <u>Section 6.13</u>, Bluestar Alliance LLC, a New York limited liability company, ("<u>Guarantor</u>"), Ascena Retail Group, Inc., a Delaware corporation (the "<u>Company</u>"), and the Subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each a "<u>Seller</u>" and collectively "<u>Sellers</u>"). Purchaser and Sellers are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used in herein shall have the meanings set forth herein or in <u>Article XI</u>.

WHEREAS, the Company and the other Sellers filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) (the "<u>Bankruptcy Court</u>"), which chapter 11 cases will be jointly administered for procedural purposes (collectively, the "<u>Bankruptcy Case</u>");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the transactions contemplated herein are subject to the approval of the Bankruptcy Court, and will be consummated only pursuant to and upon entry of the Sale Order by the Bankruptcy Court on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

# ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, or Purchaser's designee, and Purchaser, or Purchaser's designee, shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means the following assets of Sellers (but excluding in all cases the Excluded Assets):

(a)      to the extent assignable under applicable Law, all (i) Contracts (other than purchase orders) listed on Schedule 1.1(a)(i) and (ii) purchase orders for Inventory that is designated exclusively for sale via the Business or the business of operating brick-and-mortar retail stores under a Transferred Trademark (the "Retail Business") and that has not yet been delivered to Sellers' distribution centers and is delivered during the period beginning on December 1, 2020 and ending on April 30, 2021, subject to a maximum aggregate purchase amount under such purchase orders of $20,000,000, which purchase orders are either listed on Schedule 1.1(a)(ii) or are entered into after the date hereof in accordance with Section 6.1(b) (collectively, the "Assigned POs"; the Contracts and the Assigned POs to be assigned to Purchaser in accordance with the terms of this Agreement shall be referred to herein as the "Assigned Contracts");

(b)      all interests of Sellers in and to all Intellectual Property exclusively used or held for use in the Business and the Retail Business, including the following: (i) copyright registrations set forth on Schedule 1.1(b)(i); (ii) internet domain name registrations and social media accounts set forth on Schedule 1.1(b)(ii); (iii) patents and patent applications listed on Schedule 1.1(b)(iii) (all such patents and patent applications, collectively, "Scheduled Patents"), including, for clarity, reissues, reexaminations, continuations, continuations in part (only with respect to subject matter disclosed in the Scheduled Patents), divisionals, requests for continuing examinations or continuing prosecution applications, or design registrations of any Scheduled Patent; (iv) Trademark registrations and applications for registration set forth on Schedule 1.1(b)(iv) (the "Transferred Trademarks"), including, to the extent in Sellers' possession, the historical trademark file for each; and (v) without limiting the foregoing, the name "Justice" and any derivation thereof (the assets described in this Section 1.1(b), collectively, the "Transferred Intellectual Property");

(c)      all rights to collect royalties and proceeds in connection with the Transferred Intellectual Property with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, the Transferred Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world with respect to the Transferred Intellectual Property;

(d)      to the extent transferable under applicable Law (including as an asset that is part of an acquisition, bankruptcy, or other transaction under the exemption from the definition of "sale" set forth in California Civ. Code Section 1798.140(t)(2)(D)) and Sellers' privacy policy attached hereto as Schedule 6.11, the Customer Data (for clarity, it is understood and agreed by Purchaser that Sellers and its Affiliates may have, now or in the future, certain data, pertaining to current, former or prospective customers of one or more of such Sellers or Affiliates that is similar or identical to certain Customer Data (e.g., an individual may be a customer or prospective customer of both the Business and Sellers' or one or more of their Affiliates' other businesses)) and nothing in this Agreement shall be deemed to transfer, assign or convey any rights to Purchaser with respect to such data that relates to such other businesses (such data of Sellers and Affiliates of Sellers being referred to as "Other Data") or to in any way restrict the use of any Other Data by any Seller or Affiliates of Sellers (or by their successors or assigns); and

(e)      to the extent transferable under applicable Law (including as an asset that is part of an acquisition, bankruptcy, or other transaction under the exemption from the definition of

2

"sale" set forth in California Civ. Code Section 1798.140(t)(2)(D)) and Seller's privacy policy attached hereto as <u>Schedule 6.11</u>, all Documents (except as expressly excluded in <u>Section 1.2</u>) to the extent used or held for use in the Business or the Retail Business.

1.2     <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under all assets, properties, interests and rights of such Sellers that are not expressly included in the Acquired Assets (collectively, the "<u>Excluded Assets</u>"), including the following:

(a)     all assets expressly excluded from the definition of Acquired Assets pursuant to <u>Section 1.1</u>;

(b)     all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(c)     all Contracts of Sellers other than the Assigned Contracts (the "<u>Excluded Contracts</u>");

(d)     all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records, corporate seal, checkbooks, and canceled checks; (iii) that any Seller is required by Law to retain; <u>provided</u> that, in the case of (i) through (iii), to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(e)     all Documents prepared or received by any Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (i) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received; (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets; or (iii) all privileged materials, documents and records of a Seller or any of its Affiliates; and (iv) copies of documents, materials and data to the extent related to the Acquired Assets prior to the Closing Date;

(f)     all current and prior insurance policies of any of Sellers, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

3

(g)      all membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(h)      the sponsorship of all benefits plans, and any right, title or interest in any of the assets thereof or relating thereto;

(i)      (i) other than those against any go forward contract counterparties under the Assigned Contracts, all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any of Sellers may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(j)      Sellers' claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(k)      all Tax Refunds and Tax attributes or any rights with respect thereto;

(l)      all real estate and all interests in real estate;

(m)      except as set forth in Section 1.1(c), all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date;

(n)      Other Data;

(o)      the properties and assets set forth on Schedule 1.2(o); and

(p)      Inventory, other than Inventory acquired pursuant to Assigned POs.

1.3      Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Liabilities of Sellers under the Assigned Contracts (excluding the Assigned POs) that become due from and after the Closing, but only to the extent that such

4

Liabilities (i) are required to be performed after the Closing and (ii) are not (A) trade accounts payable or (B) Liabilities that (1) arise from breaches of or violations with respect to (including, without limitation, in contravention of their obligations set forth in this Agreement) such Assigned Contracts by Sellers or (2) were, pursuant to the terms of the applicable Assigned Contracts, to be performed on or prior to the Closing;

(b)    all Liabilities of Sellers under the Assigned POs, other than Liabilities arising out of or related to any breach, act or omission by Sellers prior to the Closing;

(c)    all amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assigned Contracts, in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Order of the Bankruptcy Court (the "Cure Costs");

(d)    all Liabilities arising out of the ownership or operation of the Acquired Assets by Purchaser from and after the Closing Date;

(e)    all Liabilities, including, for the avoidance of doubt, all Taxes (other than income Taxes of Sellers) with respect to the Acquired Assets attributable to any Post-Closing Tax Period;

(f)    all Liabilities for Transfer Taxes;

(g)    all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(h)    all Liabilities set forth on Schedule 1.3(h).

1.4    Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the Sale Motion to all parties to any executory Contracts to which any Seller is a party and take all other actions reasonably necessary to cause such Contracts elected by Purchaser to be Assigned Contracts hereunder to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide, among other things, that as of and conditioned on the occurrence of the Closing, Sellers shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or

appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to a notice filed with the Bankruptcy Court in accordance with the Bidding Procedures Order. Such exhibit shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on Sellers' books and records, and the Bidding Procedures Order shall require any counterparty to any Assigned Contracts to respond or be bound to estimate designated in such notice as the Cure Cost for such Assigned Contract or such other Cure Cost as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing (or promptly thereafter upon the determination by Purchaser of an agreed Cure Cost amount), Purchaser shall (i) pay all Cure Costs and (ii) assume each Assigned Contract pursuant to section 365 of the Bankruptcy Code. Purchaser shall use reasonable efforts to provide sufficient adequate assurance of future performance in accordance with the Bidding Procedures Order necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assigned Contracts.

(b)      <u>Excluding or Adding Assigned Contracts Prior to Closing</u>. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than any Assigned POs) that it does not wish to assume or a Contract to which any Seller is a party that is exclusively used or held for use in the Business or the Retail Business that Purchaser wishes to add as an Assigned Contract, in each case up to one (1) Business Day prior to the Closing and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(c)      <u>Non-Assignment</u>. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, or in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder. In addition, no Acquired Asset shall be assigned to, or assumed by, Purchaser to the extent that such Acquired Asset requires a Consent or Governmental Authorization (other than, or in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the

applicable Seller's rights with respect to such Acquired Asset, and no such Consent or Governmental Authorization has been obtained prior to the Closing. In the event that any Acquired Asset is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(c) or the immediately preceding sentence, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of any such Acquired Asset that is a Contract or the closing of the Bankruptcy Case, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing (which reasonable best efforts shall not require any payment or other consideration from Sellers or Purchaser (other than the Cure Costs, which shall be the responsibility of Purchaser)) and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates) under such Acquired Asset with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation (including performance) with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; CLOSING

2.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) the payment of an amount equal to the sum of $44,000,000 (the "Cash Purchase Price").

(b)    At the Closing, Purchaser shall pay to Sellers an amount equal to (i) the Cash Purchase Price, minus (ii) the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

2.2    Deposit.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit in the amount of $10,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into the escrow account identified and established by Sellers with its claims agent subject

to the procedures set forth in the Bidding Procedures Order (as modified by the motion filed in connection therewith). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Purchaser and shall be applied against payment of the Cash Purchase Price on the Closing Date. Notwithstanding anything in this Agreement to the contrary, in the event Purchaser is not designated by the Bankruptcy Court as the stalking horse bidder in accordance with the Bidding Procedures Order on or prior to the close of business on October 20, 2020, the escrow agent shall return the Deposit to Purchaser without offset or deduction for any purpose not later than October 23, 2020.

(b)    If this Agreement has been terminated by the Company pursuant to Section 8.1(f) or 8.1(h) (or by Purchaser pursuant to Section 8.1(b), 8.1(c), 8.1(d) or 8.1(e), in each case in circumstances where the Company would be entitled to terminate this Agreement pursuant to Section 8.1(f) or 8.1(h)), then the Company shall retain the Deposit together with all received investment income, if any.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)    The Parties agree that the Company's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to the Company.

2.3    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Closing Date Payment, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle, Chicago, Illinois 60654) at 8:00 a.m. Chicago time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Sellers;

(b)      an assignment agreement with respect to the Transferred Intellectual Property substantially in the form of <u>Exhibit B</u> ( the "<u>IP Assignment Agreement</u>"), duly executed by Seller(s) party thereto;

(c)      a copy of the Sale Order, as entered by the Bankruptcy Court;

(d)      a duly executed IRS Form W-9 with respect to each Seller (or, in the case of any disregarded entity, the regarded parent entity of such Seller); <u>provided</u> that the sole remedy of the Purchaser for the failure of any Seller to deliver such certificate and notice shall be the withholding of Tax as provided in <u>Section 2.6</u> and the delivery of such certificate and notice shall in no event be a condition to the Closing; and

(e)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in <u>Sections 7.2(a)</u>, <u>7.2(b)</u> and <u>7.2(d)</u> have been satisfied.

2.5      <u>Closing Deliveries by Purchaser to the Company</u>. At the Closing, Purchaser shall deliver to (or at the direction of) the Company:

(a)      the Closing Date Payment;

(b)      the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)      the IP Assignment Agreement, duly executed by Purchaser; and

(d)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied.

2.6      <u>Withholding</u>. Purchaser shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under <u>Section 2.4(d)</u>. In the event that any such withholding is made, Purchaser shall give Sellers at least five (5) Business Days' prior written notification of its intention to make any such deduction or withholding and shall cooperate with Sellers to mitigate, reduce or eliminate any such deduction or withholding. To the extent Purchaser deducts or withholds any amount from Sellers that was not required to be deducted or withheld, Purchaser shall promptly return such amount to Sellers, as applicable, within 10 days of a reasonable good faith determination by Purchaser that such amount was improperly deducted or withheld.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in any forms, statements or other documents filed with the Bankruptcy Court or as set forth in the Schedules delivered by the Company concurrently herewith (subject to Sections 6.6(a) and 10.10), Sellers represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1    <u>Organization and Qualification</u>. Each of Sellers (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, the execution, delivery, and performance of this Agreement by each Seller, and the consummation by such Seller of the transactions contemplated hereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by such Seller. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Except as set forth on <u>Schedule 3.3(a)</u> and assuming (x) compliance with all requirements of the Bankruptcy Code, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(b)</u> are made, given or obtained (as applicable), and (z) the Sale Order has been entered, still in effect and not subject to any stay pending appeal at the time of Closing, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Company or any of its Subsidiaries; (ii) violate any Law applicable to the Company or any of its Subsidiaries or by which any of the Acquired Assets is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Company or any of its Subsidiaries under, any Assigned Contracts; except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the Acquired Assets and Assumed Liabilities, taken as a whole.

(b)    Except as set forth on <u>Schedule 3.3(b)</u>, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of the Assigned Contracts Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii)  such

filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Acquired Assets and Assumed Liabilities taken as a whole, or (iv) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

3.4    Title to Properties. Subject to entry of the Sale Order and obtaining any other requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Company and its Subsidiaries own good title to, or hold a valid leasehold interest in, all of the Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such Acquired Assets that is not material to the Acquired Assets taken as a whole. At the Closing, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of Sellers' interests in the Acquired Assets, free and clear of all Encumbrances (except for Permitted Encumbrances), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

3.5    Insurance. Each material insurance policy maintained by the Company and its Subsidiaries on the Acquired Assets is legal, valid, binding, enforceable on the Company or its Subsidiaries, as applicable, and in full force and effect, and all premiums with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation, termination or denial of coverage for any material claim has been received with respect to any such insurance policy.

3.6    Contracts. Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, each of the Assigned Contracts is in full force and effect and is a valid, binding and enforceable obligation of the Company and its Subsidiaries and, to the knowledge of the Company, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except as a result of the commencement of the Bankruptcy Case or as would not reasonably be expected to be material to the Acquired Assets and Assumed Liabilities, taken as a whole, neither the Company nor any of its Subsidiaries, as applicable, is in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Assigned Contract, and, to the knowledge of the Company, the other party to each Assigned Contract is not in material default thereunder. The Company has made available to Purchaser complete and correct copies of all Assigned Contracts, each as amended to the date hereof. None of the Assigned Contracts has been canceled or otherwise terminated, and neither the Company nor its Subsidiaries has received any written notice from any Person regarding any such cancellation or termination. No Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any Assigned Contract. Sellers have not, and, to the Company's knowledge, no other party to any Assigned Contract has, commenced any Action against any of the parties to any Assigned Contract or given or received any written notice of any material default or violation under any Assigned Contract, in each case that has not been withdrawn

11

or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Costs, assuming entry of the Sale Order.

3.7     Litigation. Except as set forth on Schedule 3.7 and other than the Bankruptcy Case, there are, and during the prior two (2) years there have been, no Actions pending against or by the Company or any of its Subsidiaries with respect to the Acquired Assets or the Assumed Liabilities, at law or in equity, or before or by any Governmental Body, other than any Action pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to be material to the Acquired Assets and Assumed Liabilities, taken as a whole. Except as set forth on Schedule 3.7 and other than in connection with the Bankruptcy Case, neither the Company nor any of its Subsidiaries is, or during the prior two (2) years has been, subject to any outstanding Order with respect to the Acquired Assets or the Assumed Liabilities, other than any such Order where no injunctive or equitable relief was granted and where the monetary damages were covered by insurance or were not be material to the Acquired Assets and Assumed Liabilities, taken as a whole.

3.8     Permits; Compliance with Laws. Except as set forth on Schedule 3.8:

(a)     Each of the Company and its Subsidiaries holds and is in compliance, in all material respects, with all material permits, certificates, licenses, approvals, registrations and authorizations that are required in connection with the ownership, operation and use of the Acquired Assets and Assumed Liabilities under applicable Laws (the "Permits"). All of the Permits are valid and in full force and effect.

(b)     The Company and its Subsidiaries are, and have been during the prior two (2) years, in compliance, in all material respects, with all Laws applicable to the ownership, operation and use of the Acquired Assets and Assumed Liabilities, and during the prior two (2) years neither the Company nor any of its Subsidiaries has received any written notice of any action or proceeding against it alleging any failure to comply in any material respect with any such Laws, except in each case as would not reasonably be expected to be material to the Acquired Assets and Assumed Liabilities, taken as a whole. No investigation by any Governmental Body with respect to the Company's or any of its Subsidiaries' ownership, operation and use of the Acquired Assets and Assumed Liabilities is pending or, to the Company's knowledge, threatened, and during the prior two (2) years neither the Company nor any of its Subsidiaries has received any written notice of any such investigation, except, in each case, for any such investigation that would not reasonably be expected to be material to the Acquired Assets and Assumed Liabilities taken as a whole.

3.9     Intellectual Property. Except as set forth on Schedule 3.9:

(a)     Schedule 1.1(b) contains a correct and complete list of all copyright registrations, internet domain name registrations, Scheduled Patents, and Transferred Trademarks, in each case, included in the Transferred Intellectual Property. A Seller owns each item of Transferred Intellectual Property, free and clear of all Encumbrances, other than Permitted Encumbrances, and the material registered Transferred Trademarks are valid, subsisting and enforceable and any applications for material Transferred Trademarks are pending in the name of a Seller and filed in accordance with applicable Laws.

(b)    To the knowledge of the Company, neither the Company's nor any of its Subsidiaries' operation of the Business infringes, misappropriates or otherwise violates any Intellectual Property of any other Person, except where such infringement, misappropriation or violation is not material to the Acquired Assets and Assumed Liabilities, taken as a whole.

(c)    To the knowledge of the Company, no third party infringes, misappropriates or otherwise violates any Transferred Intellectual Property, except where such infringement, misappropriation or violation is not material to the Acquired Assets and the Assumed Liabilities taken as a whole. The Company and its Subsidiaries have used efforts that are reasonable under the circumstances to maintain the secrecy of their material trade secrets included in the Acquired Assets, except where such failure to maintain such material trade secrets would not be material to the Acquired Assets and Assumed Liabilities taken as a whole.

(d)    Except for office actions issued in the ordinary course of prosecution by the United States Patent and Trademark Office or analogous foreign Governmental Body, in the prior two (2) years, no claim by any third party contesting the validity or enforceability of any of the Transferred Intellectual Property has been made or threatened against the Company or any of its Subsidiaries, in each case in writing.

(e)    During the prior two (2) years, neither the Company nor any of its Subsidiaries has made any claim of a violation or infringement by others of its rights to or in connection with the Transferred Intellectual Property, except for any violation or infringement that is not material to the Acquired Assets and Assumed Liabilities taken as a whole.

(f)    There is no material Transferred Intellectual Property developed by any shareholder, director, officer, consultant or employee of the Company or one or more of its Subsidiaries that is used by the Business and (i) that has not been transferred to the applicable Seller or (ii) for which all rights have not vested in the applicable Seller by operation of applicable Law.

(g)    This Section 3.9 contains the sole and exclusive representations and warranties of the Company with respect to Intellectual Property.

3.10    Data Privacy. With respect to the Acquired Assets and Assumed Liabilities, the Company and its Subsidiaries maintain commercially reasonable policies and procedures regarding data privacy, protection and security designed to protect any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties collected by it. The Company and its Subsidiaries and the conduct of their businesses, in each case with respect to the Acquired Assets and Assumed Liabilities, are in material compliance with, and at all times during the prior two (2) years have been in material compliance with, all applicable Privacy Laws, the Payment Card Industry Data Security Standard and other applicable contractual requirements with respect to data protection, privacy or security, and their applicable published privacy policies. The transactions contemplated by this Agreement will not result in (i) a breach of the Company's or any of its Subsidiary's published privacy policies in effect as of the date hereof or any Customer Data Use Requirements and (ii) do not require the consent of or notice to any individual. In the past two (2) years (a) no personally identifiable information from any individuals in the possession or under the control of the Company and its

Subsidiaries has been subject to any data breach or other security incident that has resulted in or presents material risk of unauthorized access, disclosure, use, denial of use, alteration, corruption, destruction, or loss of such personally identifiable information (a "Security Incident"), and (b) Seller has not notified and, to Sellers' knowledge, there have been no facts or circumstances that would require Seller to notify, any Governmental Body or other Person of any Security Incident. In the past two (2) years, Seller has not received any notice, request, claim, complaint, correspondence, or other communication in writing from any Governmental Body or other Person, and there has not been any audit, investigation, enforcement action (including any fines or other sanctions) or other Action, in each case relating to any actual, alleged or suspected Security Incident or violation of any Privacy Law or any individual's privacy rights involving personally identifiable information in the possession or under the control of the Company and its Subsidiaries in the conduct of the Business and there are no facts or circumstances that would reasonably be expected to give rise to any of the foregoing. Sellers and their Affiliates have the right to use the Customer Data, including for marketing purposes, subject to the Customer Data Use Requirements.  Immediately following the consummation of the transactions contemplated hereby, Purchaser will have the right to use the Customer Data included in the Acquired Assets on the same terms as Sellers and their Affiliates had the right to use such Customer Data immediately prior to Closing, including for marketing purposes, subject to the Customer Data Use Requirements.  This Section 3.10 contains the sole and exclusive representations and warranties of the Company with respect to data privacy, protection, and security.

3.11    Brokers. Except as set forth on Schedule 3.11, there is no investment banker, broker, finder or other such intermediary that has been retained by, or has been authorized to act on behalf of, the Company or any of its Subsidiaries and is entitled to a fee or commission in connection with the transactions contemplated by this Agreement from the Company or any of its Subsidiaries.

3.12    Suppliers. Schedule 3.12 sets forth the ten (10) largest suppliers (measured by aggregate expenses) of the Business for the fiscal year ended July 31, 2020 and the amount of expenses attributable to each such supplier during such period.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date.

4.1    Organization and Qualification. Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.2     <u>Authorization of Agreement</u>. The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of Sellers, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Except as set forth on <u>Schedule 4.3(a)</u> and assuming that the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(b)</u> are made, given or obtained (as applicable) the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, do not: (i) violate the certificate of incorporation, stockholders agreement or equivalent organizational documents of Purchaser; (ii) violate any Law applicable to Purchaser or by which any property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any property or asset of Purchaser under, any Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on <u>Schedule 4.3(a)</u>, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4     <u>Financing</u>. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management or board of directors (or applicable governing body) of the Company or its Subsidiaries, any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the other transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transactions.

4.8     No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, each of Sellers acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to any Seller by Purchaser.

4.9     No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the representations and warranties made by Sellers to Purchaser in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information, including in the Projections, the confidential information presentation prepared by Guggenheim Securities, LLC (the "Information Presentation"), in that certain datasite administered by Intralinks (the "Dataroom"), any Projections or in any meetings, calls or correspondence with management of the Company and its Subsidiaries or any other Person on behalf of the Company, its Subsidiaries or any of their respective Affiliates or Advisors and (b) the historical, current or future business, financial condition, results of operations, assets, liabilities, properties, contracts, or prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, in each case, are specifically disclaimed by Sellers, and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, liabilities, properties, contracts and prospects of the Company and its Subsidiaries, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of the

16

Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Company, its Subsidiaries or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except to the extent express set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1    <u>Bankruptcy Actions</u>.

(a)    As promptly as practicable after the date hereof, but in any event no later than five (5) Business Days hereafter, Sellers shall file with the Bankruptcy Court a motion (the "<u>Sale Motion</u>"), reasonably acceptable to the Purchaser, seeking approval of (i) the Bidding Procedures Order, (ii) the form of this Agreement, (iii) Sellers' authority to enter into this Agreement and (iv) the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by the Company to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and the Plan, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(b)    Subject to the Bidding Procedures and any further order of the Bankruptcy Court, if an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "<u>Successful Bidder</u>") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "<u>Backup Bidder</u>") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the Back-Up Termination Date as set forth in the Bidding Procedures. If the Successful Bidder fails to consummate the applicable Alternative Transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Company shall consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement as such terms may have been improved upon in the Auction. For the avoidance of doubt, nothing herein shall bind Purchaser to serve as the Successful Bidder or the Backup Bidder beyond the Outside Date, unless otherwise agreed by Sellers and Purchaser.

(c)    The Company and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. The

Company and Purchaser acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Company to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those approved in the Bidding Procedures Order. Each of Purchaser and Sellers shall act in a manner that causes the transactions contemplated by this Agreement to be compliant with the terms of sections 363(m) and 363(n) of the Bankruptcy Code, as applicable.

(d)     Notwithstanding any other provision of this Agreement to the contrary, following the entry of the Bidding Procedures Order, Sellers and their Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction.

(e)     Subject to the terms of this Agreement, nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estates in accordance with each Seller's fiduciary obligations; provided, however, that this Section 5.1(e) shall not be construed as a waiver of Purchaser's right to terminate this Agreement in accordance with Section 8.1.

(f)     To the extent reasonably practicable, from and after the Execution Date and until the Closing Date, Sellers shall deliver to Purchaser, at least two (2) Business Days in advance of Sellers' filing or submission thereof, drafts of any and all pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with or related to this Agreement for Purchaser's prior review and comment. Such filings shall be reasonably acceptable to Purchaser to the extent they relate to the Business, the Acquired Assets, any Assumed Liabilities or the transactions contemplated hereby, including any of Purchaser's rights or obligations hereunder. Sellers shall use reasonable best efforts to consult and cooperate with Purchaser regarding any such pleadings, motions, notices, statements, schedules, applications, reports or other papers. In the event the entry of the Bidding Procedures Order or any other Order reasonably necessary in connection with the transactions contemplated by this Agreement shall be appealed, Sellers shall use commercially reasonably efforts to defend such appeal. The Company shall promptly serve true and correct copies of the motion seeking entry of the Sale Order and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable Order of the Bankruptcy Court and otherwise comply with all notice requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with any pleading, notice or motion to be filed in connection herewith.

5.2     Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other monetary defaults and breaches under the Contracts elected by Purchaser to be Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     The Sale Order. Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order of the Bankruptcy Court. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Company to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4     Bid Protections. Sellers shall use commercially reasonable best efforts to obtain entry of the Bidding Procedures Order by fourteen (14) days after the date hereof or as soon as reasonably practicable thereafter as the Bankruptcy Court may hear a motion seeking entry of the Bidding Procedures Order and enter the Bidding Procedures Order. Notwithstanding Section 8.2, in the event that (a) this Agreement is terminated pursuant to Section 8.1(k) or  Section 8.1(l) and (b) at the time of such termination, Purchaser is not then in material breach of any of its representations, warranties, covenants or agreements hereunder, Sellers shall pay to Purchaser a cash amount equal to $0 (the "Break-Up Fee") and the Expense Reimbursement as set forth below, due and payable within two (2) days of the Sellers' consummation of an Alternative Transaction. Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that (i) the Purchaser's right to receive the Break-Up Fee and the Expense Reimbursement as set forth herein is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Purchaser for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision as of the date hereof, and (ii) the Purchaser's receipt of the Break-Up Fee and the Expense Reimbursement as provided herein shall be the sole and exclusive remedy of Purchaser against Sellers and any of their respective Affiliates for, and upon payment of the Break-Up Fee and the Expense Reimbursement in accordance herewith the Parties and their respective representatives and Affiliates shall be fully released and discharged from, any Liability, damage or other loss suffered by Purchaser or any of its Affiliates under or resulting from this Agreement (including any breach hereof) or the transactions contemplated hereby, and Purchaser shall have no other remedy or cause of action under or relating to this Agreement.

5.5     Approval. Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6     Contracts. Sellers shall serve on all non-Seller counterparties to all of Assigned Contracts in compliance with the Bidding Procedures Order, a Cure Notice stating that Sellers are or may be seeking the assumption and assignment of such Assigned Contract and shall notify such non-Seller counterparties of the deadline for objecting to the amount of Cure Costs proposed by Sellers. In the event of any objection to the assumption and assignment of any Assigned Contract, the Sellers shall continue to use commercially reasonable efforts to seek authority to assume and assign or otherwise transfer, as applicable, to Purchaser all of the Assigned Contracts. From the Effective Date until the Closing, Sellers shall not seek Bankruptcy Court approval to reject any Assigned Contract unless agreed to in writing by Purchaser.

5.7     No Shop. From the date hereof until such time as the Bidding Procedures Order has been entered by the Bankruptcy Court, Sellers shall not, and shall not authorize any of their Affiliates or any of its or their Representatives to, directly or indirectly, encourage, solicit or initiate any inquiries regarding an Alternative Transaction from any third party who has not as of the date hereof entered into a non-disclosure agreement with the Company or any of its Subsidiaries with respect to the possibility of an Alternative Transaction; provided that the foregoing shall not restrict, prohibit or otherwise limit Sellers or any of their Affiliates or Representatives from (a) continuing ongoing communications with third parties bound as of the date hereof by non-disclosure agreements with the Company or any of its Subsidiaries with respect to an Alternative Transaction or (b) responding to any third parties who, absent any prior encouragement, solicitation or initiation of any inquiries regarding an Alternative Transaction by Sellers in violation of this Section 5.7, contact the Company or any of its Subsidiaries with respect to an Alternative Transaction.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers. Until the earlier of the termination of this Agreement and the Closing, except (v) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing, (w) as required by applicable Law, (x) as otherwise required by or reasonably necessary to carry out the terms of this Agreement or as set forth on Schedule 6.1, (y) actions taken in good faith business judgement in response to the "coronavirus" or "COVID-19" and any Laws or government action taken in connection therewith or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Sellers shall conduct their business with respect to the ownership, operation and use of the Acquired Assets and Assumed Liabilities only in the Ordinary Course and shall not:

(a)      terminate (other than by expiration), or amend, modify (other than by automatic extension or renewal) or waive any rights under, in any material respect, the terms of any Assigned Contract (other than any purchase orders);

(b)      without Purchaser's prior written consent, enter into any new purchase order, or terminate (other than by expiration), or amend, modify (other than by automatic extension or renewal) or waive any rights under, in any material respect, the terms of any purchase order in effect as of the date of this Agreement, in each case for Inventory designated exclusively for sale via the Business or the Retail Business, that is intended to become an Assigned PO;

(c)      settle or compromise any pending or threatened Action that would reasonably be expected to give rise to Liabilities that are not Excluded Liabilities;

(d)      sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any of the Acquired Assets, other than (i) sales of Inventory (other than any Inventory that is an Acquired Asset) in the Ordinary Course, or (ii) pursuant to existing Contracts (other than the Assigned POs);

(e)      subject any portion of the Acquired Assets to any Encumbrance, except for Permitted Encumbrances;

(f)      directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes an Acquired Asset;

(g)      take, or agree to or commit to assist any other Person in taking, any action that would reasonably be expected to result in a failure of any of the conditions to the Closing set forth in Article VII; or

(h)      authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions;

provided that the foregoing shall not limit Sellers from conducting the wind-down and liquidation of the Retail Business. Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

6.2      Access to Information.

(a)      From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), the Company will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of the Company and its Subsidiaries with respect to the ownership, operation and use of the Acquired Assets and Assumed Liabilities, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and Assumed Liabilities as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; including such information regarding the attributes and structure of data maintained by Sellers with respect to the Business as Purchaser shall

reasonably request in writing in order to establish its own platform from which to operate the Business in the manner in which it is operated by Sellers; provided that (i) such access does not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) such access will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Michael Gottlieb or such other Person(s) as the Company may designate in writing from time to time and (iv) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure would (A) cause significant competitive harm to the Company or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B) require the Company or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of the Company (other than the Subsidiaries of the Company) or otherwise disclose information regarding the Affiliates of the Company (other than the Subsidiaries of the Company) that the Company deems to be commercially sensitive, (C) would waive any legal privilege or (D) be in violation of applicable Laws or the provisions of any agreement to which the Company or any of its Subsidiaries is bound or would violate any fiduciary duty; provided that, in the event that the Company withholds access or information in reliance on the foregoing clause (C) or (D), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)    From the date hereof until the Closing, the Company will provide reasonable assistance to Purchaser with respect to contacting the Company's existing stock vendors to enable Purchaser to seek to build a direct relationship with such vendors in furtherance of potential future orders. Such assistance shall be requested upon reasonable advance notice and during regular business hours and (i) such assistance shall not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) such assistance will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for such assistance will be directed to Michael Gottlieb or such other Person(s) as the Company may designate in writing from time to time and (iv) nothing herein will require the Company to provide assistance to, or to disclose any information to, Purchaser if such assistance or disclosure would (A) cause significant competitive harm to the Company or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B)  require the Company or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of the Company (other than the Subsidiaries of the Company) or otherwise disclose information regarding the Affiliates of the Company (other than the Subsidiaries of the Company) that the Company deems to be commercially sensitive, (C) waive any legal privilege or (D) be in violation of applicable Laws or the provisions of any agreement to which the Company or any of its Subsidiaries is bound or would violate any fiduciary duty; provided that, in the event that the Company withholds assistance or information in reliance on the foregoing clause (C) or (D), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such assistance or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(c)     The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Neither the Company nor any of Sellers makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(d)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by the Company, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to the Company such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance claims).

(e)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior written consent of the Company for each such contact, which consent shall not be unreasonably withheld.

(f)     For a reasonable period following the Closing, Sellers will, and will cause their employees to, use commercially reasonable efforts to respond to Purchaser's inquiries with respect to historical information regarding the Business, to the extent not provided in the Acquired Assets and to the extent of available personnel and books and records, it being understood that Sellers are in the process of ceasing to operate the Business and do not expect to retain personnel related to the Business.

6.3     <u>Employee Matters</u>. Sellers shall provide, to the extent it does not violate any applicable Law, reasonable cooperation and information as reasonably requested by Purchaser with respect to its determination of terms and conditions of employment for individuals who are as of the date of this Agreement or were within the past twelve (12) months employed by Sellers

(or any of their predecessors) and whose duties during such time were primarily dedicated to the Business or the Retail Business.

    6.4    <u>Regulatory Approvals</u>.

    (a)    The Company will (i) make or cause to be made all filings and submissions required to be made by the Company or its Subsidiaries under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on <u>Schedule 6.4</u>, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use commercially reasonable efforts to take all actions necessary to obtain all required clearances in connection with such filings.

    (b)    Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, (ii) cooperate with the Company in exchanging such information and providing such assistance as the Company may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use commercially reasonable efforts to take all actions necessary to obtain all required clearances.

    6.5    <u>Reasonable Efforts; Cooperation</u>.

    (a)    Subject to the other terms of this Agreement provisions hereof, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of the Company will not require the Company or any of its Subsidiaries, Affiliates or Advisors to expend any money, to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

    (b)    The obligations of the Company pursuant to this Agreement, including this <u>Section 6.5</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Sellers' debtor-in-possession financing, and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Notification of Certain Matters.

(a)     The Company will promptly notify Purchaser of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) promptly upon discovery thereof, any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in Article III to be untrue or inaccurate such that the condition set forth in Section 7.2(a) not to be satisfied. If the subject matter of any such notification required by the previous sentence requires any change in the Schedules, the Company shall deliver to Purchaser prior to the Closing a supplement to such Schedule (the "Updated Schedules") with such change; provided that in no event will any Updated Schedule delivered to Purchaser within ten (10) Business Days after the date hereof, serve to amend, supplement or modify the Schedules for purposes of Section 7.2(a); provided further that if the Closing occurs, the Updated Schedules will be considered and deemed to be part of the Schedules for all purposes under this Agreement, and each reference in this Agreement to a particular Schedule will mean such Schedule in, or as updated by, the Updated Schedules.

(b)     Purchaser will promptly notify the Company of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; (iii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.6 or that relate to the transactions contemplated by this Agreement; and (iv) any breach or inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that would reasonably be expected to cause the conditions set forth in Article VII not to be satisfied; provided that the delivery of any notice pursuant to this Section 6.6(a) will not limit the remedies available to Sellers under or with respect to this Agreement.

6.7     Further Assurances. From time to time from and after Closing, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions (including, for the avoidance of doubt, with respect to Sellers, taking actions reasonably requested by Purchaser to deliver the Acquired Assets to or as directed by Purchaser) as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.8     Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

25

6.9    <u>Receipt of Misdirected Assets</u>. From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such right, property or asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.10    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Company and its Subsidiaries and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except to the extent expressly set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any of the Seller Parties or any other Person on behalf of the Company, its Subsidiaries or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, or prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, in each case, are specifically disclaimed by the Company, on its behalf and on behalf of the Seller Parties, and each Seller. Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without

limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, Liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Company and its Subsidiaries, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Company, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.10, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.10 (i) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.10, Sellers would not enter into this Agreement.

6.11    Use of Customer Data after Closing. From and after the Closing Date, Purchaser shall at all times use the Customer Data transferred to Purchaser hereunder (a) in compliance with all applicable Laws, and (b) except to the extent that Purchaser obtains the necessary consents from

consumers permitting broader uses, or there is any Law or Order that permits broader uses, in compliance with Seller's privacy policy (including the privacy policy update notification) attached hereto as Schedule 6.11 (collectively, the "Customer Data Use Requirements"). Purchaser shall defend, indemnify and hold harmless Sellers and their Affiliates, from and against any and all losses, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of any breach of this Section 6.11.

6.12    Wind Down License.

(a)    From and after the Closing Date, Purchaser hereby grants to each Seller and its Affiliates a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable right and license (with the right to sublicense with prior written approval of Purchaser, such approval not to be unreasonably withheld), under the Transferred Intellectual Property, to use the Transferred Intellectual Property (including any social media accounts included in the Transferred Intellectual Property, but only until January 15, 2020) in connection with the administration of the Bankruptcy Case, until the later of (i) the entry of an Order closing the Bankruptcy Case, (ii) the closing of all brick-and-mortar retail stores operated under or with respect to a Transferred Trademark, and (iii) for the purpose of liquidating any Inventory retained by Sellers or their Affiliates; provided that (A) in no event shall such use be made for a period of time exceeding four (4) months after the Closing Date and (B) all use of the Transferred Trademarks, including the quality of the products bearing the Transferred Trademarks, shall be consistent with the use of the Transferred Trademarks prior to the Effective Date; provided, however, that Sellers are and shall continue to operate (for a period of time not to exceed four (4) months after the Closing Date) liquidation, "going out of business," and similar operations at the brick and mortar stores and liquidation operations on online platforms (but, in the case of social media, only until January 15, 2020), in either case, which may involve older merchandise and/or significant discounts to historical prices (and advertisements with respect thereto, such as "liquidation sale," "store(s) closing(s)," "everything must go"), so long as no "going out of business" or similar messages that indicate that the Business itself is ending are used on the online platforms (including social media included in the Transferred Intellectual Property, but only until January 15, 2020 and no more than two (2) messages in any seven (7)-day period with respect to liquidation, liquidation sale, store closings, everything must go, or the like, without the written consent of Purchaser) and social media content does not include messages that would otherwise reasonably be expected to be materially adverse to the reputation of the Business. Upon request of Purchaser from time to time, Seller will engage in discussions with Purchaser and consider in good faith Purchaser's concerns, if any, with respect to the impact of such social media on the reputation of the Business. Seller shall provide Purchaser with the current administrative name, password and any other applicable credentials for each social media accounts, and the Parties shall reasonably cooperate in jointly operating such accounts during the period described in this Section 6.12(a), and, for clarity, Seller acknowledges that from and after the Closing Date, Purchaser has the right to utilize the social media accounts, including to upload posts and communications on the social media accounts.

(b)    In addition to the foregoing, Sellers may continue to use the Transferred Trademarks and Customer Data following the Closing (i) for billing and collections purposes in connection with the wind down of Sellers' private label consumer credit and debit cards until such wind down is completed, (ii) as required by applicable Law and (iii) for the purpose of liquidating any Inventory retained by Sellers or their Affiliates; provided that (A) in no event shall such use

continue for a period of time exceeding six (6) months after the Closing Date, (B) all use of the Transferred Trademarks, including the quality of the products bearing the Transferred Trademarks, shall be consistent with the use of the Transferred Trademarks prior to the Effective Date; provided, however, that Sellers are and shall continue to operate liquidation, "going out of business" and similar operations solely at the brick and mortar stores which may involve older merchandise and/or significant discounts to historical prices (and advertisements with respect thereto, such as "liquidation sale," "store(s) closing(s)," "everything must go")), and (z) all use of the Customer Data shall be in compliance with applicable Laws and Sellers' privacy policies.

(c)     For the avoidance of doubt, nothing in this Agreement shall prohibit or otherwise restrict the Company and its Affiliates from winding down their respective operations, and affairs or dissolving their respective business entities following the Closing Date.

6.13     Guaranty.  Guarantor guarantees absolutely and unconditionally to Sellers (a) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement (including, for the avoidance of doubt, the punctual payment of all sums, if any, now and hereafter owed by Purchaser hereunder) and (b) the accuracy of Purchaser's representations and warranties set forth herein.  Guarantor hereby makes the representations and warranties set forth in Sections 4.1, 4.2, 4.3, 4.4, 4.6, and 4.7 as to itself, and such representations and warranties shall apply *mutatis mutandis* as if the Guarantor were substituted for Purchaser therein.  The obligations of Guarantor pursuant to this Section 6.13 shall terminate and be of no further force and effect upon consummation of the Closing.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     Conditions Precedent to the Obligations of Purchaser and Sellers. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(b)     the Bankruptcy Court shall have entered the Sale Order.

7.2     Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Sellers in Article III shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that

representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that the representations set forth in Sections 3.1, 3.2, and 3.11 will be true and correct in all material respects;

       (b)    Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Sellers by the Closing;

       (c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4; and

       (d)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect.

       7.3    Conditions Precedent to the Obligations of the Company. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

       (a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby;

       (b)    Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

       (c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

       7.4    Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

# ARTICLE VIII

# TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Company and Purchaser;

(b)    by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before forty-five (45) days after (i) if no Auction is held pursuant to the Bidding Procedures Order, the Bid Deadline (as defined in the Bidding Procedures Order) or (ii) if an Auction is held pursuant to the Bidding Procedures Order, the consummation of the Auction (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;

(e)    by written notice from Purchaser to the Company, if Sellers announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than a wind-down plan of Sellers' estates post-Closing;

(f)    by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then the Company may not terminate this Agreement under this <u>Section 8.1(f)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Company notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> will not be available to the Company at any time that the Company is in material breach of, any covenant, representation or warranty hereunder;

(g)    by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u>, <u>7.2(b)</u> or <u>7.2(d)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by such Seller then

Purchaser may not terminate this Agreement under this <u>Section 8.1(g)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(g)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(h)     by written notice from the Company to Purchaser, if all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.3</u>;

(i)     by written notice from the Company to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(j)     by written notice from Purchaser to the Company, if the Bankruptcy Court fails to enter the Bidding Procedures Order including approval of the payment of the Break-Up Fee and Expense Reimbursement on or before fourteen (14) days after the date hereof or as soon thereafter as the Bankruptcy Court is available to hear a motion seeking entry of the Bidding Procedures Order and enter the Bidding Procedures Order;

(k)     by written notice of either Purchaser or the Company, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(l)     by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction or automatically upon consummation by Sellers of an Alternative Transaction with the Successful Bidder (other than Purchaser);

(m)     by Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on the date that is thirty (30) days after the date hereof or as soon thereafter as the Bankruptcy Court is available to hear a motion seeking entry of the Sale Order and enter the Sale Order, or (ii) at any time after entry of the Sale Order, such Sale Order is subject to a notice of appeal, reversed, stayed, vacated or otherwise modified;

(n)     automatically at 5:00 PM ET on the first (1st) Business Day after the date hereof if the Deposit has not then been received by Sellers.

Notwithstanding anything to the contrary contained herein, a Party shall not be permitted to terminate this Agreement pursuant to this <u>Article VIII</u> if the applicable event giving rise to termination hereunder was caused by the breach or action or inaction of such Party.

8.2     <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; <u>provided</u> that <u>Section 2.2</u>, this <u>Section 8.2</u>, and <u>Article X</u> shall survive any such termination; <u>provided</u> <u>further</u> that no

termination will relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

## ARTICLE IX

## TAXES

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes. Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

9.2    <u>Allocation of Purchase Price</u>. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other items treated as part of the purchase price for applicable income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in <u>Schedule 9.2</u> (the "<u>Allocation Methodology</u>"). As soon as commercially practicable, but no later than sixty (60) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "<u>Allocation</u>"). If Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this <u>Section 9.2</u>) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3    <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Sellers shall prepare and timely file (i) all Tax Returns for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Sellers. Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this <u>Section 9.4</u> is otherwise reflected as an adjustment to Purchase Price or constitutes an Assumed Liability, Sellers shall be responsible for paying any Taxes reflected on any Tax Return that Sellers are obligated to prepare and file under this <u>Section 9.4(a)</u>.

(b)     Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.4(a). With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Sellers with a draft of such Tax Returns at least thirty days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Sellers with respect to the portion of any such Tax Returns that relates to the portion of a Straddle Period ending on or before the Closing Date. At least five days prior to the due date for filing any such Straddle Period Tax Return, Sellers shall pay to Purchaser any Taxes shown due on such Straddle Period Tax Return that are allocable to the portion of such Straddle Period ending on or before the Closing Date (as determined in accordance with Section 9.4(d)).  Purchaser shall be responsible for paying any Taxes (other than any Taxes payable by Sellers pursuant to this Section 9.4(b)) reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.4(b). The Parties agree that they shall cooperate in preparing Internal Revenue Service Form 8594, which shall be prepared in accordance with the Allocation Methodology.  Further, such Form 8594 shall be filed with the Internal Revenue Service within the time provided for by the Internal Revenue Service.

(c)     Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date.

(d)     In the case of any Tax with respect to the Acquired Assets that is assessed with respect to a Straddle Period, the amount of such Tax based on or measured by income, sales, use, receipts or similar items (other than property and ad volerem Taxes) for the portion of the Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the close of business on the Closing Date, and the amount of any other Taxes and any exemptions, allowances or deductions determined for the entire Straddle Period, that in each case relates to the portion of the Straddle Period ending on and including the Closing Date shall equal the amount of such Tax, exemption, allowance or deduction for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the total number of days in such Straddle Period.

9.5     Wage Reporting. Purchaser and Sellers agree to utilize, or cause their respective Affiliates to utilize, the "alternate procedure" set forth in Revenue Procedure 2004-53 with respect to wage reporting.

## ARTICLE X

## MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty,

covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Sellers Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a)  all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) all Cure Costs will be allocated pursuant to Section 5.2.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

Justice Brand Holdings LLC
c/o Bluestar Alliance LLC
240 Madison Avenue #1500
New York, NY 10016
Attention:      Joseph S. Sutton, General Counsel
Email:          jsutton@Bluestarall.com

with a copy to (which shall not constitute notice):

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention:      Daniel Eisner
                Kristine Manoukian
Email:          Daniel.Eisner@srz.com
                Kristine.Manoukian@srz.com

Notices to Sellers:

Gary Muto, CEO
Ascena Retail Group, Inc.
7 Times Square
New York, NY 10036
Email: gary.muto@ascenaretail.com

Dan Lamadrid, CFO
Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, NJ 07430
Email: dan.lamadrid@ascenaretail.com

with a copy to (which shall not constitute notice):

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, NJ 07430
Attention: Michael Veitenheimer
Gary Holland
Email: michael.veitenheimer@ascenaretail.com
gary.holland@ascenaretail.com

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:      Steve Toth
                Mariska S. Richards
                John R. Luze
Email:          steve.toth@kirkland.com
                mariska.richards@kirkland.com
                john.luze@kirkland.com

                and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Steven N. Serajeddini
Email: steven.serajeddini@kirkland.com

10.4 <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void, except that Purchaser may freely assign any of its rights and obligations hereunder to any designee for purposes of consummating the transactions contemplated by this Agreement (provided that no such assignment shall release Purchaser of its obligations and liabilities under this Agreement except to the extent of payment or performance by such designee).

10.5 <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6 <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7 <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of Sellers will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8 <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11    Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12    Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that

any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

10.13    <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any

40

agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither the Company nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities, provided that the Party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   Certain Definitions.

(a)   "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise

under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

(b)      "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)      "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)      "Alternative Transaction" means any transaction (or series of transactions) with a Person or Persons other than Purchaser in which any Seller sells, transfers or otherwise disposes of, whether directly or indirectly, through a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition, any of the Acquired Assets held thereby (in any form of transaction, whether by merger, sale of assets or equity or otherwise); provided, however, that the foregoing shall not include sales of Inventory in the Ordinary Course.

(e)      "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)      "Bidding Procedures Order" means an Order substantially in the form attached hereto as Exhibit C or that is otherwise reasonably acceptable to the Parties.

(g)      "Business" means Sellers' business of marketing and selling Inventory to consumers who place orders for such Inventory through the "www.shopjustice.com" (and similar permutations thereof) website and related internet or mobile application based sales, marketing, advertising and social media channels.

(h)      "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(i)      "Cash and Cash Equivalents" means all of the Company's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, credit card receivables and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(j)      "Code" means the United States Internal Revenue Code of 1986.

(k)      "Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of July 23, 2020, by and between the Company and Bluestar Alliance LLC.

(l)      "Consent" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(m)      "Contract" means any contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, purchase order, license or other agreement that is binding upon a Person or its property.

(n)      "Customer Data" means (i) personally identifiable information and other data (*e.g.*, aggregate data) pertaining to current or former customers, or prospective customers, used or held for use in the Business or the Retail Business, including email addresses and other contact information, and (ii) personally identifiable information and other data (e.g., aggregate data) pertaining to customer file information and associated transaction data (where applicable), including Facebook, Instagram and other social media contact information, in each case, used or held for use in the Business or the Retail Business.

(o)      "Documents" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(p)      "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements.

(q)      "Expense Reimbursement" means an amount, not to exceed $200,000 of Purchaser's actual, reasonable, documented out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement, including all fees of professionals retained by Purchaser.

(r)      "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(s)      "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(t)      "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature,

whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(u)     "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, slogans, trade dress and other similar designations of origin and registrations and applications for any of the foregoing, together with all goodwill associated with each of the foregoing (collectively, "Trademarks"); (iii) copyrights and copyrightable subject matter including registrations and applications associated with each of the foregoing; (iv) internet domain name registrations and social media accounts; (v) art, archive files, products samples and catalogs; (vi) marketing, advertising and promotional materials, and (vii) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models and methodologies.

(v)     "Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by or on behalf of, stored by or on behalf of, or in transit to, any of Sellers.

(w)     "knowledge of the Company," "Company's knowledge" and words of similar import mean the actual knowledge of Derek Durley and Jonathan Mugler after reasonable inquiry.

(x)     "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(y)     "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(z)     "Material Adverse Effect" means any event, change, occurrence, or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which

the Company and its Subsidiaries operate, (ii) Effects in, arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) Effects in, arising from or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (iv) Effects in, arising from or relating to changes in, GAAP, (v) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, (vi) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, (vii) Effects in, arising from or relating to any matter set forth in the Schedules, (viii) Effects that arise from any seasonal fluctuations in the business, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by Purchaser of the Agreement, (xi) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith, or (xi) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including the "Coronavirus" or "COVID-19") or any quarantine or trade restrictions related thereto or any other *force majeure*.

(aa)    "Order" means any order, injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(bb)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Company and its Subsidiaries taken as a whole consistent with past practice and taking into account the commencement and pendency of the Bankruptcy Case.

(cc)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive

covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the tangible Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis in the Ordinary Course (none of which entitle the licensee to manufacture or distribute products incorporating the Transferred Intellectual Property), (vi) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on Schedule 11.1(cc), and (viii) solely for the purposes of the representations and warranties in Article III, any Encumbrances that will be removed or released by operation of the Sale Order.

(dd)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(ee)    "Post-Closing Tax Period" means (i) any taxable period beginning after the Closing Date and (ii) the portion of any Straddle Period beginning after the Closing Date.

(ff)    "Pre-Closing Tax Period" means (i) any taxable period ending on or before the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date.

(gg)    "Privacy Laws" means all applicable Laws concerning data protection, privacy or security.

(hh)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(ii)    "Sale Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties approving this Agreement and authorizing Sellers to undertake the transactions contemplated hereunder, which has either become final and non-appealable or contains an express waiver of Bankruptcy Rule 6004(h).

(jj)    "Seller Parties" means Sellers and the Company's Subsidiaries and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(kk)    "Straddle Period" means any Tax period beginning before, and ending after, the Closing Date.

(ll)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of

the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(mm)   "Tax" or "Taxes" means any federal, state, local, provincial, foreign or other income, accumulated earnings, personal holding company, net worth, capital, intangibles, windfall profits, goods and services, excise, customs duties, conveyance, mortgage, registration, documentary, recording, premium, severance, environmental, natural resources, intangibles, rent, occupancy, license, employment, workers' compensation, payroll, health care, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated other similar tax, duty, levy, or other governmental charge or assessment or deficiency thereof (including all interest, penalties thereon and additions thereto, whether disputed or not).

(nn)   "Tax Refund" means any Tax refund, credit or similar benefit with respect to or related to Taxes (including any interest paid or credited with respect thereto).

(oo)   "Tax Return" means any return, declaration, claim for refund, report, statement or information return or other document (including any related or supporting estimates, elections, schedules, statements, information or amendments) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any laws, regulations or administrative requirements, including any schedule or attachment thereto, and including any amendments thereof.

11.2   Index of Defined Terms.

Acquired Assets .......................................... 1
Acquired Inventory ..................................... 4
Agreement.................................................. 1
Allocation................................................. 33
Allocation Methodology ........................... 33
Assigned Contracts .................................... 2
Assigned POs ............................................. 2
Assignment and Assumption Agreement.... 8
Assumed Liabilities ................................... 4
Backup Bidder .......................................... 17
Bankruptcy Case ........................................ 1
Bankruptcy Code ....................................... 1
Bankruptcy Court....................................... 1
Bankruptcy Rules....................................... 1
Break-Up Fee............................................ 19
Cash Purchase Price.................................... 7
Chosen Courts.......................................... 39
Closing ...................................................... 8

Closing Date................................................ 8
Closing Date Payment................................. 7
Company .................................................... 1
Cure Costs .................................................. 5
Customer Data Use Requirements ........... 28
Dataroom.................................................. 16
Deposit....................................................... 7
Enforceability Exceptions........................ 10
Excluded Assets ......................................... 3
Excluded Contracts .................................... 3
Excluded Liabilities ................................... 5
Express Representations ........................... 16
Guarantor ................................................... 1
Information Presentation........................... 16
IP Assignment Agreement .......................... 9
Other Data.................................................. 2
Outside Date............................................. 31
Parties........................................................ 1

| | | | |
|---|---|---|---|
| Party | 1 | Seller | 1 |
| Permits | 12 | Sellers | 1 |
| Projections | 27 | Successful Bidder | 17 |
| Purchase Price | 7 | Transfer Taxes | 33 |
| Purchaser | 1 | Transferred Intellectual Property | 2 |
| Retail Business | 2 | Transferred Trademarks | 2 |
| Scheduled Patents | 2 | Updated Schedules | 25 |
| Security Incident | 14 | | |

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item (a) is included in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (c) made available upon request, including at the Company's or any of its Subsidiaries' offices.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature page(s) follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**PURCHASER**</u>:

**JUSTICE BRAND HOLDINGS LLC**

By: _____
Name: Joseph Sutton
Title: Authorized Signatory

<u>**GUARANTOR**</u>:

**BLUESTAR ALLIANCE LLC**

By:_____
Name: Joseph Sutton
Title: Authorized Signatory

[Signature page to Asset Purchase Agreement]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**ASCENA RETAIL GROUP, INC.**

By: *Dan Lamadrid*
Name: Dan Lamadrid
Title: Executive Vice President, Chief Financial Officer and Assistant Treasurer

**TWEEN BRANDS, INC.**

By: *Dan Lamadrid*
Name: Dan Lamadrid
Title: Executive Vice President and Assistant Treasurer

**TWEEN BRANDS INVESTMENT, LLC**

By: *Dan Lamadrid*
Name: Dan Lamadrid
Title: Executive Vice President and Assistant Treasurer

**TWEEN BRANDS SERVICE CO.**

By: *Dan Lamadrid*
Name: Dan Lamadrid
Title: Executive Vice President and Assistant Treasurer

DocuSign Envelope ID: 477B4C5B-45CE-4485-970D-16BD9BE7E69C

**TWEEN BRANDS DIRECT SERVICES, INC.**

By: _Dan Lamadrid_
EC936D080DCB49E...

Name: Dan Lamadrid
Title:   Executive Vice President and Assistant
Treasurer

**TWEEN BRANDS MARKETING, INC.**

By: _Dan Lamadrid_
EC936D080DCB49E...

Name: Dan Lamadrid
Title:   Executive Vice President and Assistant
Treasurer

**TWEEN BRANDS AGENCY, INC.**

By: _Dan Lamadrid_
EC936D080DCB49E...

Name: Dan Lamadrid
Title:   Executive Vice President and Assistant
Treasurer

## FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed as of [●], 2020 (the "Closing Date"), by and among (i) Justice Brand Holdings LLC, a New York limited liability company ("Assignee") and (ii) Ascena Retail Group, Inc., a Delaware corporation (the "Company"), and the subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each an "Assignor" and collectively "Assignors"). Assignors and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, this Agreement is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 20, 2020, by and among the Assignors and Assignee (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from such Assignors, all of such Assignors' direct or indirect right, title and interest in, to and under certain assets and liabilities;

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each Party to the other Parties effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained and intending to be legally bound hereby, Assignee and Assignors do hereby agree as follows:

## I.
## BILL OF SALE; ASSIGNMENT AND ASSUMPTION

1.1.    <u>Definitions</u>. Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Purchase Agreement.

1.2.    <u>Assignment</u>. On the terms and subject to the conditions set forth in the Purchase Agreement, effective as of the Closing, Assignors hereby irrevocably, absolutely and unconditionally sell, transfer, assign and convey to Assignee, and Assignee hereby accepts, all of the Assignors' rights, titles and interests in, to and under the Acquired Assets.  For the avoidance of doubt, the assignment of any rights, title or interests in Transferred Intellectual Property pursuant to this Section 1.2 shall include the rights, as applicable: (i) to sue and recover damages and obtain other equitable relief for past, present and future infringement, dilution, misappropriation or other violation or conflict associated with such Transferred Intellectual Property, (ii) to collect future royalties and other payments under such Transferred Intellectual Property, (iii) to claim priority based on such Transferred Intellectual Property under the laws of any jurisdiction and/or under international conventions or treaties, (iv) to prosecute, register, maintain and defend such Transferred Intellectual Property before any public or private agency, office or registrar and (v) to fully and entirely stand in the place of the Assignors and their Affiliates, as applicable, in all matters related to such Transferred Intellectual Property.

1.3.    Excluded Assets. Assignors except, reserve, and exclude all of Assignors' rights, titles and interests in, to and under the Excluded Assets, as provided in the Purchase Agreement. Without limiting the foregoing, Assignors do not hereby sell, transfer, assign and convey to Assignee any right, title or interest in any assets, properties and rights of Assignors that are not Acquired Assets.

1.4.    Assumed Liabilities. On the terms and subject to the conditions set forth in Section 1.3 of the Purchase Agreement, effective as of the Closing, Assignee will assume and become responsible for the Assumed Liabilities. Assignee agrees to pay, perform, honor and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

1.5.    Excluded Liabilities. Assignee shall not assume, be deemed to have assumed  or be liable or obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for the Excluded Liabilities, as provided in the Purchase Agreement.

## II.
## MISCELLANEOUS

2.1.    Purchase Agreement. This Agreement is expressly made subject to the terms of the Purchase Agreement. The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, indemnities, terms or provisions of the Purchase Agreement or any of the rights, remedies or obligations of any Assignor or Assignee provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms. The representations, warranties, covenants, indemnities, terms and provisions contained in the Purchase Agreement shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement (including the schedules hereto), the terms of the Purchase Agreement shall control.

2.2.    Successors and Assigns. The provisions of this Agreement shall bind and inure to the benefit of Assignors and Assignee and their respective successors and permitted assigns.

2.3.    Amendment and Waiver. Any provision of this Agreement may be (a) amended only in a writing signed by Assignors and Assignee or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

2.4.    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction. Upon such a

determination, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

2.5.    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court or any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the State of Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state of federal court within the State of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Action in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3 of the Purchase Agreement. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY

WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.5(c).

2.6.     _Captions_. The captions and article and section numbers in this Agreement are for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. References in this Agreement to articles and sections are to articles and sections of this Agreement unless otherwise specified.

2.7.     _Counterparts and PDF_. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. At the request of any Party, each other Party hereto will re-execute original forms of this Agreement and deliver them to all other parties. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written, to be effective as of the Closing Date.

**ASSIGNORS:**

**ASCENA RETAIL GROUP, INC.**

By: _____
Name:
Title:

**TWEEN BRANDS, INC.**

By: _____
Name:
Title:

**TWEEN BRANDS INVESTMENTS, LLC**

By: _____
Name:
Title:

**TWEEN BRANDS SERVICE CO.**

By: _____
Name:
Title:

**TWEEN BRANDS DIRECT SERVICES, INC.**

By: _____
Name:
Title:

**TWEEN BRANDS MARKETING, INC.**

By: _____
Name:
Title:


**TWEEN BRANDS AGENCY, INC.**

By: _____
Name:
Title:



**ASSIGNEE:**

**JUSTICE BRAND HOLDINGS LLC**

By: _____
Name:
Title:

*Signature page to Bill of Sale, Assignment and Assumption Agreement*

**EXHIBIT B**

## FORM OF COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [•], 2020 (the "Effective Date"), is by and between Justice Brand Holdings LLC, a New York limited liability company ("Assignee") and Tween Brands Investment, LLC, an Ohio limited liability company (the "Assignor").

**WHEREAS,** pursuant to the Agreement, Assignor wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, the entire right, title and interest in and to the registered copyrights described on Schedule 1 attached hereto (the "Copyrights"), including, without limitation, the right to create derivative works based upon the Copyrights.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Assignor hereby sells, assigns, transfers, and relinquishes to Assignee, its successors, assigns, and legal representatives the entire right, title, and interest in and to the Copyrights for the United States and all foreign countries, whether or not copyright registration is secured, including, without limitation, any copyright registration applications, any renewals and extensions thereof, and in and to all works based upon, derived from, or incorporating the Copyrights, and in and to all income, royalties, damages, claims, and payments now or hereafter due or payable with respect thereto, and in and to all causes of action, either in law or in equity for past, present or future infringement based on the Copyrights, and in and to all rights corresponding to the foregoing throughout the world, and all the rights embraced therein, including but not limited to, the right to duplicate, reproduce, copy, distribute, display, license, adapt, and prepare derivative works from the Copyrights, together with all physical or tangible embodiments of the Copyrights, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, together with all physical or tangible embodiments of the Copyrights.

2.      Assignor hereby authorizes and requests the Register of Copyrights of the United States, and the corresponding entity or agency in any applicable foreign country, to record Assignee as assignee and owner of the Copyrights. Assignee shall be responsible for any and all costs and expenses associated with recording this Agreement with the applicable copyright office(s).  Assignor agrees to take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Agreement and to perfect Assignee's title in, to and under the Copyrights.

3.      The terms of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto.

4.      This Agreement, the Asset Purchase Agreement by and between Ascena Retail Group, Inc. (the "Company"), Assignor, Assignee and certain other subsidiaries of the Company dated October 20, 2020 and the schedules and exhibits thereto contain the entire agreement between the parties and supersede any previous communications, representations, or agreements, verbal or written, relating to the subject matter of this Agreement.  This Agreement may only be amended by a writing signed by both parties.

5.      This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

[Signatures follow on next page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**ASSIGNEE**
**JUSTICE BRAND HOLDINGS LLC**

By:

_____

Name:

_____

Title:

_____

Dated:

_____

**ASSIGNOR**
**TWEEN BRANDS INVESTMENT, LLC**

By:

_____

Name:

_____

Title:

_____

Dated:

_____

**EXHIBIT B**

## FORM OF FOREIGN TRADEMARK ASSIGNMENT AGREEMENT

This FOREIGN TRADEMARK ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [•], 2020 (the "Effective Date"), is by and between Justice Brand Holdings LLC, a New York limited liability company ("Assignee") and Tween Brands Investment, LLC, an Ohio limited liability company (the "Assignor").

WHEREAS, Assignor is the owner of trademarks and service marks, including those trademark registrations and applications listed on Attachment 1 hereto (such trademarks and service marks, common law or otherwise, registered or not registered, registrations and, to the extent assignable, applications therefor (including intent to use applications), as well as all goodwill appurtenant thereto, being referred to herein as the "Trademarks");

WHEREAS, Assignee is the successor of the ongoing and existing business or portion thereof of Assignor's business to which the Trademarks pertain; and

WHEREAS, Assignor wishes to assign such Trademarks to Assignee;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. As of the Effective Date, Assignor hereby assigns and transfers to Assignee, all of its right, title and interest in all Trademarks owned by Assignor, together with all registrations that have been or may be granted thereon, all applications for registrations thereof, all common law rights thereto and the goodwill of the business symbolized by and appurtenant to the Trademarks, including those listed in Attachment 1 hereto, free and clear of any charge, lien, claim, security interest or other similar restriction, and including Assignor's right to all income, royalties and payments due or payable with respect thereto, the right to sue for and collect damages and other recoveries for past, present and future infringement thereof and the right to prosecute and maintain trademark applications and the registrations for the Trademarks. The assignment contemplated herein is meant to be an absolute assignment and not by way of security.

2. Assignor hereby authorizes and requests the patent and trademark offices in the applicable foreign countries to record Assignee as the assignee and owner of the Trademarks, and to issue all corresponding registrations to the Assignee, its successors, legal representatives and assigns, in accordance with the terms of this Agreement. Assignee shall be responsible for any and all costs and expenses associated with recording this Agreement with the applicable trademark office(s). Assignor agrees to take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Agreement and to perfect Assignee's title in, to and under the Trademarks.

3. The terms of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto.

4. This Agreement, the Asset Purchase Agreement by and between Ascena Retail Group, Inc. (the "Company"), Assignor, Assignee and certain other subsidiaries of the Company dated October 20, 2020 and the schedules and exhibits thereto contain the entire agreement between the parties and supersede any previous communications, representations, or agreements,

verbal or written, relating to the subject matter of this Agreement.  This Agreement may only be amended by a writing signed by both parties.

5.      This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

[Signatures follow on next page]

2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**ASSIGNEE**

**JUSTICE BRAND HOLDINGS LLC**

By:

_____

Name:

_____

Title:

_____

Dated:

_____

**ASSIGNOR**

**TWEEN BRANDS INVESTMENT, LLC**


By:

_____

Name:

_____

Title:

_____

Dated:

_____

**ATTACHMENT 1**[1]

---

[1] <u>Note to Draft</u>: To match foreign trademark registrations and applications in disclosure schedules.

**EXHIBIT B**

## FORM OF U.S. TRADEMARK ASSIGNMENT AGREEMENT

This U.S. TRADEMARK ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [•], 2020 (the "Effective Date"), is by and between Justice Brand Holdings LLC, a New York limited liability company ("Assignee") and Tween Brands Investment, LLC, an Ohio limited liability company (the "Assignor").

WHEREAS, Assignor is the owner of trademarks and service marks, including those trademark registrations and applications listed on Attachment 1 hereto (such trademarks and service marks, common law or otherwise, registered or not registered, registrations and, to the extent assignable, applications therefor (including intent to use applications), as well as all goodwill appurtenant thereto, being referred to herein as the "Trademarks");

WHEREAS, Assignee is the successor of the ongoing and existing business or portion thereof of Assignor's business to which the Trademarks pertain; and

WHEREAS, Assignor wishes to assign such Trademarks to Assignee;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      As of the Effective Date, Assignor hereby assigns and transfers to Assignee, all of its right, title and interest in all Trademarks owned by Assignor, together with all registrations that have been or may be granted thereon, all applications for registrations thereof, all common law rights thereto and the goodwill of the business symbolized by and appurtenant to the Trademarks, including those listed in Attachment 1 hereto, free and clear of any charge, lien, claim, security interest or other similar restriction, and including Assignor's right to all income, royalties and payments due or payable with respect thereto, the right to sue for and collect damages and other recoveries for past, present and future infringement thereof and the right to prosecute and maintain trademark applications and the registrations for the Trademarks. The assignment contemplated herein is meant to be an absolute assignment and not by way of security.

2.      Assignor hereby authorizes and requests the U.S. Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the Trademarks, and to issue all corresponding registrations to the Assignee, its successors, legal representatives and assigns, in accordance with the terms of this Agreement. Assignee shall be responsible for any and all costs and expenses associated with recording this Agreement with the applicable trademark office(s). Assignor agrees to take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Agreement and to perfect Assignee's title in, to and under the Trademarks.

3.      The terms of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto.

4.      This Agreement, the Asset Purchase Agreement by and between Ascena Retail Group, Inc. (the "Company"), Assignor, Assignee and certain other subsidiaries of the Company dated October 20, 2020 and the schedules and exhibits thereto contain the entire agreement between the parties and supersede any previous communications, representations, or agreements,

verbal or written, relating to the subject matter of this Agreement.  This Agreement may only be amended by a writing signed by both parties.

5.      This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

[Signatures follow on next page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**ASSIGNEE**

**JUSTICE BRAND HOLDINGS LLC**

By:

_____

Name:

_____

Title:

_____

Dated:

_____

**ASSIGNOR**

**TWEEN BRANDS INVESTMENT, LLC**


By:

_____

Name:

_____

Title:

_____

Dated:

_____

# ATTACHMENT 1[1]

---

[1] <u>Note to Draft</u>: To match US trademark registrations and applications in disclosure schedules.

**EXHIBIT B**

## FORM OF COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [•], 2020 (the "Effective Date"), is by and between Justice Brand Holdings LLC, a New York limited liability company ("Assignee") and Tween Brands Service Co., an Ohio corporation (the "Assignor").

**WHEREAS,** pursuant to the Agreement, Assignor wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, the entire right, title and interest in and to the registered copyrights described on Schedule 1 attached hereto (the "Copyrights"), including, without limitation, the right to create derivative works based upon the Copyrights.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Assignor hereby sells, assigns, transfers, and relinquishes to Assignee, its successors, assigns, and legal representatives the entire right, title, and interest in and to the Copyrights for the United States and all foreign countries, whether or not copyright registration is secured, including, without limitation, any copyright registration applications, any renewals and extensions thereof, and in and to all works based upon, derived from, or incorporating the Copyrights, and in and to all income, royalties, damages, claims, and payments now or hereafter due or payable with respect thereto, and in and to all causes of action, either in law or in equity for past, present or future infringement based on the Copyrights, and in and to all rights corresponding to the foregoing throughout the world, and all the rights embraced therein, including but not limited to, the right to duplicate, reproduce, copy, distribute, display, license, adapt, and prepare derivative works from the Copyrights, together with all physical or tangible embodiments of the Copyrights, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, together with all physical or tangible embodiments of the Copyrights.

2.      Assignor hereby authorizes and requests the Register of Copyrights of the United States, and the corresponding entity or agency in any applicable foreign country, to record Assignee as assignee and owner of the Copyrights. Assignee shall be responsible for any and all costs and expenses associated with recording this Agreement with the applicable copyright office(s).  Assignor agrees to take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Agreement and to perfect Assignee's title in, to and under the Copyrights.

3.      The terms of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto.

4.      This Agreement, the Asset Purchase Agreement by and between Ascena Retail Group, Inc. (the "Company"), Assignor, Assignee and certain other subsidiaries of the Company dated October 20, 2020 and the schedules and exhibits thereto contain the entire agreement between the parties and supersede any previous communications, representations, or agreements, verbal or written, relating to the subject matter of this Agreement.  This Agreement may only be amended by a writing signed by both parties.

5.      This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

[Signatures follow on next page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**ASSIGNEE**
**JUSTICE BRAND HOLDINGS LLC**

By:

_____

Name:

_____

Title:

_____

Dated:

_____

**ASSIGNOR**
**TWEEN BRANDS SERVICE CO.**

By:

_____

Name:

_____

Title:

_____

Dated:

_____

**ATTACHMENT 1**[1]

---

[1] Note to Draft: To match copyrights in disclosure schedules.

EXHIBIT C

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    (202) 842-7800
Facsimile:    (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## BIDDING PROCEDURES
## FOR THE SALE OF THE JUSTICE ASSETS

On July 23, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

On [__], 2020, the Bankruptcy Court entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [__]] (the "Bidding

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

Procedures Order"),[2] by which the Bankruptcy Court approved the following procedures (the "Bidding Procedures").

These Bidding Procedures set forth the process for a potential auction (the "Auction") and sale (the "Sale") of the right, title, and interest of the Debtors in and to certain Tween Brands, Inc. assets (the "Justice Assets"), subject to the option of the Stalking Horse Bidder (as defined below) to require the Debtors to consummate the Sale in accordance with the Stalking Horse Purchase Agreement (as defined below).

The Debtors selected the bid (the "Stalking Horse Bid") for the Justice Assets submitted by Justice Brand Holdings LLC ("Justice Brand" and/or the "Stalking Horse Bidder"), after a comprehensive public bidding process.  The Stalking Horse Bidder has executed that certain purchase agreement dated October 20, 2020 entered into by and among certain of the Debtors and Justice Brand (as amended, supplemented or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Stalking Horse Purchase Agreement") pursuant to which the Stalking Horse Bidder has agreed to purchase the Acquired Assets (as defined in the Stalking Horse Purchase Agreement), subject to the terms and conditions set forth therein.  Having announced the Stalking Horse Bid, the Debtors will now conduct a round of open bidding during these chapter 11 cases intended to obtain the highest or otherwise best bid for the Justice Assets.  The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

---

**Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Prime Clerk LLC by calling (877) 930-4319 (toll free) or (347) 899-4594 (international) or visiting the Debtors' restructuring website at (https://cases.primeclerk.com/ascena).**

---

## I.      Assets to be Auctioned.

These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction.  The Justice Assets will be offered for sale through the Auction. The Debtors may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the Justice Assets.  The Stalking Horse Bid referenced herein provides for the Stalking Horse Bidder's acquisition of the Justice Assets in the absence of a higher or otherwise better offer.

## II.     Public Announcement of Auction.

As soon as reasonably practicable after entry of the Bidding Procedures Order the Debtors shall (I) serve on the Notice Parties (as defined below) a notice of the Auction and Sale in the form attached hereto as **Schedule 1** (the "Sale Notice"), and (II) publish the Sale Notice, with any

---

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

modifications necessary for ease of publication, in *The New York Times (National Edition)* to provide notice to any other potential interested parties.

## III.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity (other than the Stalking Horse Bidder) interested in purchasing the Justice Assets (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors; and

b.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close the Sale (including current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be acceptable to the Debtors.

Only those Potential Bidders that have submitted acceptable Preliminary Bid Documentation (each, an "Acceptable Bidder") to the reasonable satisfaction of the Debtors and their advisors, in consultation with the Consultation Parties,[3] may submit bids to purchase the Justice Assets.

## IV.    Qualified Bid Requirements.

To participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of the Justice Assets (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline:

a.    **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state which of the Justice Assets the Acceptable Bidder seeks to acquire and which liabilities of the applicable Debtor the Acceptable Bidder agrees to assume;

b.    **Good Faith Deposit**:  The Bid must be accompanied by a cash deposit in the amount equal to the greater of (i) $10,000,000 and (ii) 10% of the aggregate

---

[3]    The term "Consultation Parties" shall mean (a) the DIP Agents, (b) the DIP Lenders, (c) counsel to the DIP Agents, (d) one or more Initial Consenting Stakeholders under the RSA; (e) counsel to the Ad Hoc Group; and (f) the Official Committee of Unsecured Creditors (the "Committee") and counsel to the Committee; *provided* that any party otherwise included as a Consultation Party shall not serve as a Consultation Party with respect to the sale of Justice Assets to which such party has submitted a Bid unless and until such party unequivocally revokes its Bid and waives its right to continue in the Auction process; *provided further* that any member of the Committee that submits a Bid shall not participate in any deliberations by the Committee as a Consultation Party.

purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit");

c.  **Purchase Price**:  Each Bid must clearly set forth the cash purchase price to be paid, assuming a purchase of the Justice Assets and any assumption of liabilities (the "Purchase Price").   The Purchase Price should be a single point value in U.S. Dollars for the applicable Justice Assets on a cash-free, debt-free basis;

d.  **Minimum Bid**:[4]  At a minimum, each Bid must have a Purchase Price equal to, or in excess of, of an amount equal to the sum of (i) the Cash Purchase Price, plus (ii) the assumption of Assumed Liabilities, plus (iii) payments made for Inventory subject to Assigned POs pursuant to Section 1.1(a) of the Stalking Horse Purchase Agreement, plus (iv) $2,000,000;

e.  **Markup of the Purchase Agreement**:  Each Acceptable Bidder must provide a draft purchase agreement as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Purchase Agreement, which amendments and modifications may not be inconsistent with these Bidding Procedures.  Significant alterations to the Stalking Horse Purchase Agreement are discouraged and may negatively impact a Bid;

f.  **Same or Better Terms; Bid Documents**:  Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, substantially on the same or better terms than the terms of the Stalking Horse Purchase Agreement.  Each Bid must include duly executed transaction documents, including a proposed purchase agreement and any other ancillary documentation necessary to effectuate the transactions contemplated in such Bid (such documents, the "Bid Documents"). The bid must be expressly made subject to the Debtors' obligations to pay the Expense Reimbursement pursuant to the terms of the Stalking Horse Purchase Agreement, as modified by the Bidding Procedures Order.

g.  **No Qualified Bidder Bid Protections**:  Except as provided with respect to the Stalking Horse Bidder, a Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Justice Assets;

h.  **Employee Obligations**:  Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the Justice Assets included in such Bid;

---

[4]  Capitalized terms used but not otherwise defined in this section IV.d. shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

i.    **Sources of Financing**:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

j.    **Contingencies; No Financing or Diligence Outs**:  Any Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Purchase Agreement and (ii) shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence;

k.    **Identity**:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Justice Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom Guggenheim and Kirkland & Ellis LLP should contact regarding such Bid;

l.    **As-Is, Where-Is**:   Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

m.    **Authorization**:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

n.    **Adequate Assurance of Future Performance**:  Each Bid (other than the Stalking Horse Bid) must (i) identify the Justice Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all Cure Amounts related to such Justice Executory

Contracts and Unexpired Leases and by the Acceptable Bidder, and (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Justice Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code;

o.  **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment**:  Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law;

p.  **Compliance with the Debtors' Privacy Policy**:  Each Bid must comply in all respects with the Debtors' Justice privacy policy, which restricts the transfer of the personally identifiable information of its customers, and contain a statement acknowledging such compliance;

q.  **No Collusion**:  The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice);

r.  **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale;

s.  **Irrevocable**:  Each Bid must state that in the event a Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale;

t.  **Back-Up Bid**:  Each Bid shall provide that the Acceptable Bidder will serve as a back-up bidder if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

u.  **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including the Justice Executory Contracts and Unexpired Leases (each as defined in the Bidding Procedures Motion) for which assumption and assignment is required; and

v.  **Expected Closing Date**:  Each Bid must state the Acceptable Bidder's expected date of closing of the Sale.

Only Bids fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable discretion, in consultation with the Consultation Parties, be

deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable discretion, be deemed to be "Qualified Bidders."

Within one (1) business day after the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, the Stalking Horse Bid shall be deemed a Qualified Bid, and the Stalking Horse Bidder shall be entitled to participate in the Auction with respect to the Justice Assets. The Debtors shall inform counsel to the Stalking Horse Bidder whether the Debtors consider any Bid to be a Qualified Bid as soon as practicable after the Bid Deadline and in no event later than one (1) business day after the Bid Deadline.

## V.    Obtaining Due Diligence Access.

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. ***No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement.*** Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request. The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room for the benefit of all Acceptable Bidders. Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale. For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

A.    **Communications with Acceptable Bidders (including Qualified Bidders).**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Guggenheim.

B.    **Due Diligence from Acceptable Bidders (including Qualified Bidders).**

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) or that a bid made by such bidder is not a Qualified Bid.

> **Guggenheim Securities LLC, 330 Madison Avenue, New York, New York 10017, Attn.: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com) and Stuart Erickson (Stuart.Erickson@guggenheimpartners.com), shall coordinate all requests for additional information and due diligence access on behalf of the Debtors.**

## VI.    Indications of Interest.

The Debtors reserve the right to require Acceptable Bidders to submit non-binding written indications of interest prior to the Bid Deadline specifying, among other things, the Justice Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party. If an Acceptable Bidder fails to comply with any such request by the Debtors, the Debtors may, in consultation with one or more Required Consenting Stakeholders under the RSA and the Consultation Parties, deny such Acceptable Bidder further diligence access or deny such Acceptable Bidder further participation in the Auction process; *provided* that such Acceptable Bidder shall be granted the opportunity to cure such noncompliance with any request by the Debtors before being denied further participation in the Auction process. The Debtors also reserve the right to exclude any Acceptable Bidder (prior to its submission of a Qualified Bid) from continuing in the Auction process if the Debtors determine, in consultation with one or more Required Consenting Stakeholders under the RSA and the Consultation Parties, that the consideration proposed to be paid by such Acceptable Bidder is insufficient.

## VII.    Bid Deadline.

Binding Bids must be received by (a) the Debtors' counsel, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: John R. Luze (john.luze@kirkland.com) and Jeff Michalik (jeff.michalik@kirkland.com), (b) the Debtors' financial advisor, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com)                and                Stuart                Erickson

(Stuart.Erickson@guggenheimpartners.com), (c) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn: Robert Feinstein (rfeinstein@pszjlaw.com), Bradford Sandler (bsandler@pszjlaw.com), and Shirley Cho (scho@pszjlaw.com), and (d) the proposed financial advisor to the Creditors' Committee, Province, Inc., 2360 Corporate Circle, Suite 330, Henderson, NV 89074, Attn:  Paul Huygens (phuygens@provincefirm.com) and Ed Kim (ekim@provincefirm.com), in each case so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on November 2, 2020 (the "Bid Deadline").

## VIII.    Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Justice Assets (the "Starting Bid").  When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid.  Two (2) business days prior to the date of the Auction, the Debtors shall notify the Stalking Horse Bidder and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to the applicable assets.  At such time, the Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder and each Qualified Bidder.

## IX.    No Qualified Bids.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Auction shall be cancelled, the Stalking Horse Bid shall be designated as the Successful Bid (as defined below) and the Debtors shall pursue entry of an order approving a Sale of the Justice Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and designation of the Stalking Horse Bid as the Successful Bid with the Bankruptcy Court.

## X.    Auction.

If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the Justice Assets, then the Debtors shall conduct the Auction with respect to such assets.  The Auction for the Justice Assets shall commence on **November 5, 2020, at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors, or such later time or other place as the Debtors determine, in which case the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders of such later time or other place, and file a notice of the change on the Bankruptcy Court's docket for these chapter 11 cases.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.  the Auction will be conducted openly;

b.  only Qualified Bidders shall be entitled to bid at the Auction;

c.  the Qualified Bidders shall appear at the Auction via videoconference or such other form of remote communication or through duly authorized representatives;

d.  bidding shall begin with the Starting Bid;

e.  subsequent bids (each, an "Overbid") shall be made in minimum increments of $250,000;

f.  each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors;

g.  during the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the Justice Assets;

h.  the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

i.  each Qualified Bidder will be required to confirm on the record that it has not engaged in any collusion with respect to the bidding or any Sale;

j.  each Qualified Bidder will be required to confirm that its bid is a good faith, *bona fide* offer and it intends to consummate the Sale if selected as the Successful Bid;

k.  the Bankruptcy Court and the Debtors will not consider bids made after the Auction has been closed; and

l.  notwithstanding anything herein to the contrary, the Debtors may at any time choose to adjourn the Auction by announcement at the Auction.  The Debtors shall promptly file notice of such adjournment with the Bankruptcy Court.

At the Auction, the Debtors, in consultation with the Consultation Parties, shall have the right to modify the Auction Procedures or adopt and announce additional Auction Procedures, including, for example and without limitation, other Auction Procedures necessary for the Debtors to consider any bids to purchase fewer than all of the Justice Assets; *provided*, however that the Debtors shall not modify the Auction Procedures such that the bidding is (i) inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Purchase Agreement and/or (ii) not transparent to the Qualified Bidders.  Any Auction rules adopted by the Debtors will not

modify any of the terms of the Stalking Horse Purchase Agreement or the rights of the Stalking Horse Bidder under the Bid Procedures without the consent of the Stalking Horse Bidder.

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Debtors' secured creditors, (iii) the Office of the United States Trustee, (iv) the Creditors' Committee, (v) the Stalking Horse Bidder, (vi) any other Qualified Bidders, (vii) any creditor of the Debtors that at least five (5) business days prior to the Auction delivers to Debtors' counsel (by mail or email at the address or email address identified hereinabove) a written request to attend the Auction, and (viii) the respective professionals of all of the foregoing shall be entitled to attend the Auction; *provided* that (x) the Debtors reserve the right to object to any request to attend the Auction made by the creditor pursuant to clause (vii) immediately above, and (y) if the Debtors and such creditor are unable to consensually resolve such objection promptly, the Debtors shall seek a teleconference with the Bankruptcy Court prior to the Auction to adjudicate such objection.

## XI.    Acceptance of the Successful Bid.

The Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase any or all of the Justice Assets (each, a "Successful Bid"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid; and (e) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "Successful Bidder" with respect to the Justice Assets.  The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Bankruptcy Court.  Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at a hearing (the "Sale Hearing") and shall seek Bankruptcy Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Definitive Purchase Agreement Order").  For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and /or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or

refrain from taking any action that would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including both the Stalking Horse Bidder and Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XII.    Designation of Back-Up Bidder.

The Qualified Bidder with the second highest or otherwise best bid or combination of bids (the "Back-Up Bid") to purchase any or all of the Justice Assets (the "Back-Up Bidder") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection. If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale with the Debtors as soon as is reasonably practicable without further order of the Bankruptcy Court, *provided* that the Debtors shall file a notice with the Bankruptcy Court.

Except as otherwise provided in the Stalking Horse Purchase Agreement, the Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) forty-five (45) days after completion of the Auction, (ii) consummation of an Alternative Transaction with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "Back-Up Termination Date"). The Debtors shall return the Back-Up Bidder's deposit and pay any Expense Reimbursement owed within three (3) business days of the Back-Up Termination Date.

## XIII.   Stalking Horse Protections.

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder is entitled to the Stalking Horse Protections in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Purchase Agreement and the Bidding Procedures Order. For the avoidance of doubt, except for the Stalking Horse Bidder, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

## XIV.    Approval of the Sale.

A hearing to consider approval of the Sale (the "Sale Hearing"), is currently scheduled to take place on November 12, 2020, at 1:00 p.m. (prevailing Eastern Time), before the Honorable

Kevin R Huennekens, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, 5th Floor, Richmond, Virginia, 23219 or conducted consistent with the procedures established pursuant to the Bankruptcy Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

At the Sale Hearing certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that:   (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (4) consummation of any Sale as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the Justice Assets and is in the best interests of the Debtors and their estates.  **The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

Objections to the Sale, any of the relief requested in the Motion, and entry of any order approving the sale (the "Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, counsel to the Debtors, and the Notice Parties by November 9, 2020 at 5:00 p.m. (prevailing Eastern Time).

## XV.   Return of Good Faith Deposit.

Subject to the Stalking Horse Purchase Agreement, the Good Faith Deposit of a Successful Bidder shall, upon consummation of any Sale, be credited to the Purchase Price paid for the applicable Justice Assets.  Subject to the Stalking Horse Purchase Agreement, if a Successful Bidder fails to consummate any Sale, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors, and all parties in interest, and the Debtors specifically, reserve the right to seek all available damages from the defaulting Successful Bidder.

Subject to the Stalking Horse Purchase Agreement, the Good Faith Deposit of any Qualified Bidders that are not Successful Bidders or Back-Up Bidders will be returned within five business days after the Auction or upon the permanent withdrawal of the proposed Sale, and the Good Faith Deposit of any Back-Up Bidders will be returned within five business days after the consummation of any Sale.

## XVI.   Reservation of Rights.

The Debtors reserve their rights to, subject to the terms of the Stalking Horse Purchase Agreement and these Bidding Procedures, and in consultation with the Consultation Parties, to modify these Bidding Procedures in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the sale of the Justice Assets, including, without limitation:  (1) extending the deadlines set

forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment. The Debtors shall provide advance notice in writing of any such modification to any Qualified Bidder, including the Stalking Horse Bidder. For the avoidance of doubt, subject to the Stalking Horse Purchase Agreement, the Debtors reserve the right at any point prior to the selection of the Successful Bidder to terminate the Sale processes contemplated hereunder with respect to any or all of the Justice Assets.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

## XVII.  Consent to Jurisdiction.

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction and the construction and enforcement of these Bidding Procedures, and/or any written indications of interest, Preliminary Bid Documents, or the Bid Documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

## XVIII. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## XIX.  Alternative Proposals.

Further, notwithstanding anything to the contrary in these Bidding Procedures, and subject to the Stalking Horse Purchase Agreement, through the acceptance of the Successful Bid, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Justice Assets (each an "Alternate Proposal"); (b) subject to the terms and conditions of these Bidding Procedures, provide access to non-public information concerning

the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor, any other party in interest in these chapter 11 cases (including the Creditors' Committee and the United States Trustee), or any other entity regarding Alternate Proposals.  Nothing in these Bidding Procedures shall be construed as a waiver of any parties' rights with respect to an Alternative Transaction.

## XX.    Notice Parties.

Information that must be provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties or their respective counsel, if known (collectively, the "Notice Parties"):  (a) the United States Trustee for the Eastern District of Virginia; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) the United States Attorney's Office for the Eastern District of Virginia; (f) the Internal Revenue Service; (g) the office of the attorneys general for the states in which the Debtors operate; (h) the Securities and Exchange Commission; (i) the Stalking Horse Bidder (and counsel to the Stalking Horse Bidder); (j) all parties who have expressed a written interest in some or all of the Justice Assets; (k) all known holders of liens, encumbrances, and other claims secured by the Justice Assets; (l) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (m) the Creditors' Committee; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## XXI.    Consultation Rights of the Consultation Parties.

The Debtors will consult with the Consultation Parties (a) with respect to any action, evaluation, or determination by the Debtors that is expressly contemplated or authorized by these Bidding Procedures, or (b) to the extent not explicitly required by these Bidding Procedures, in any event before making any material decision with respect to the Sale or Auction.

## <u>Schedule 1</u>

**Notice of Auction and Sale Hearing**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on [__], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [__]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Justice Assets consistent with the bidding procedures (the "Bidding Procedures")

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]   Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

approved by the Court by Bidding Procedures Order.  **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.**  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

      **PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets **on November 5, 2020 at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before **November 12, 2020 at 1:00 p.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Kevin R Huennekens, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, 5th Floor, Richmond, Virginia, 23219 or conducted consistent with the procedures established pursuant to the Bankruptcy Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

      **PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before November 9, 2020 at 5:00 p.m. (prevailing Eastern Time)** by the following parties:  (i) the Debtors, Ascena Group Retail, Inc., 933 MacArthur Boulevard, Mahwah, New Jersey 07430, Attn: Michael Veitenheimer; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  John R. Luze and Jeff Michalik and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven N. Serajeddini, P.C.; (iii) co-counsel to the Debtors, Cooley LLP, 1299 Pennsylvania Avenue, NW, Suite 700, Washington, D.C. 20004-2400, Attn: Cullen D. Speckhart and Olya Antle; (iv) counsel to the ABL agent, (a) Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn:  Matthew F. Furlong, Julia Frost-Davies and Christopher L. Carter, and (b) Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn:  Tyler P. Brown; (v) the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn:  Kathryn Montgomery; (vi) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn:  Robert Feinstein, Bradford Sandler, and Shirley Cho; (vii) counsel to the term loan ad hoc group, Milbank LLP, 55 Hudson Yards, New York, NY 1001, Attn:  Evan R. Fleck, Esq; (viii) counsel to the Stalking Horse Bidder, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn:  Kristine Manoukian and Kelly Knight.

### CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

      **ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM**

**ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

Richmond, Virginia
Dated:   October 20, 2020

<table>
<tr>
<td>

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

</td>
<td>

*/s/ Cullen D. Speckhart*
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com-

</td>
</tr>
</table>

3

## Exhibit A-3

**Cure Notice**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    (202) 842-7800
Facsimile:    (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[8] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE TO CONTRACT PARTIES
## TO POTENTIALLY ASSUMED OR ASSUMED AND
## ASSIGNED JUSTICE EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO A JUSTICE
EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE WITH ONE OR
MORE OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

     **PLEASE TAKE NOTICE** that on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [●]] (the "Bidding

---

[8]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

Procedures Order")[9] authorizing the Debtors to conduct an auction (the "<u>Auction</u>") to select the party to purchase the Justice Assets. The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as **Exhibit A-1**, the "<u>Bidding Procedures</u>").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume or assume and assign to the Successful Bidder certain Justice Executory Contracts and Unexpired Leases, listed on the Assigned Contracts Schedule, attached hereto as **Exhibit A**, to which you are a counterparty, upon approval of the Sale. The Justice Executory Contracts and Unexpired Leases Schedule can also be viewed on the Debtors' case website (https://cases.primeclerk.com/ascena). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Justice Executory Contracts and Unexpired Leases is as set forth on **Exhibit A** attached hereto (the "<u>Cure Amounts</u>").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Amounts, object to a proposed assignment to the Successful Bidder of any Justice Executory Contract or Justice Unexpired Lease, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Justice Executory Contract or Justice Unexpired Lease, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amounts, state the correct cure amount alleged to be owed to the objecting Contract Party, together with any applicable and appropriate documentation in support thereof; and (iv) if you object to proposed Cure Amounts or a proposed assignment to the Successful Bidder of any Justice Executory Contract or Justice Unexpired Lease, be filed with the Court and served and **actually received within 14 days of the date of service of the Cure Notice** (the "<u>Cure Objection Deadline</u>") and if you object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Justice Executory Contract or Justice Unexpired Lease, be filed with the Court and **actually received no later than the later of (a) the Cure Objection Deadline, and (b) 4:00 p.m. (prevailing Eastern Time) on the date that is 14 days following (x) the date of service of the Cure Notice, or (y) the date of service of the Supplemental Cure Notice, as applicable**, in each case, by the following parties: (a) counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: John R. Luze and Jeff Michalik; (b) counsel to the ABL Agent, (i) Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn.: Matthew F. Furlong, Julia Frost-Davies and Christopher L. Carter, and (ii) Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn.: Tyler P Brown; (c) counsel to the Ad Hoc Group, Milbank LLP, 55 Hudson Yards, New York, NY 10001, Attn: Evan R. Fleck; (d) the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn: Kathryn Montgomery; (e) counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34 Fl Attn: Robert Feinstein, Bradford Sandler, and Shirley Cho; and (f) counsel to the Stalking Horse Bidder, Schulte Roth & Zabel

---

[9]    All capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Bidding Procedures Order.

LLP, 919 Third Avenue, New York, New York, 10022, Attn. Kristine Manoukian and Kelly Knight.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Amounts, (b) the proposed assignment or assumption and assumption of any Justice Executory Contract or Justice Unexpired Lease, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Amounts as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed assumed or assumed and assigned Justice Executory Contracts and Unexpired Leases, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption or assumption and assignment of a Justice Executory Contract, Justice Unexpired Lease, or related Cure Amounts in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Confirmation Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Justice Executory Contract or Justice Unexpired Lease on the Cure Notice does not require or guarantee that such Justice Executory Contract or Justice Unexpired Lease will be assumed by the Debtors at any time or assumed or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Justice Executory Contract or Justice Unexpired Lease are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Justice Executory Contract or Justice Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Justice Executory Contract or Justice Unexpired Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Justice Executory Contracts and Unexpired Leases or the validity, priority, or amount of any claims of a counterparty to any Justice Executory Contract or Justice Unexpired Lease against the Debtors that may arise under such Justice Executory Contract or Justice Unexpired Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority of any claims of a counterparty to any Justice Executory Contract or Justice Unexpired Lease against the Debtors that may arise under such Justice Executory Contract or Justice Unexpired Lease.

**ANY COUNTERPARTY TO ANY JUSTICE EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE WHO FAILS TO TIMELY OBJECT TO THE PROPOSED ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF SUCH JUSTICE EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE OR THE RELATED CURE AMOUNTS IN CONNECTION WITH THE SUCCESSFUL BID**

**SHALL BE DEEMED TO HAVE CONSENTED TO SUCH ASSUMPTION OR ASSUMPTION AND ASSIGNMENT AND THE CURE AMOUNTS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO AND FOREVER BARRED FROM ASSERTING ANY OBJECTION OR CLAIMS AGAINST THE DEBTORS, THE SUCCESSFUL BIDDER(S), OR THE PROPERTY OF ANY SUCH PARTIES, RELATING TO THE ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF SUCH JUSTICE EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO SUCH JUSTICE EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN SUCH JUSTICE EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE, OR ANY OTHER DOCUMENT, THE CURE AMOUNTS SET FORTH IN <u>EXHIBIT A</u> ATTACHED HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE ASSUMED JUSTICE EXECUTORY CONTRACT OR JUSTICE UNEXPIRED LEASE UNDER SECTION 365(B) OF THE BANKRUPTCY CODE ARISING OUT OF OR RELATED TO ANY EVENTS OCCURRING PRIOR TO THE CLOSING OF THE SALE, WHETHER KNOWN OR UNKNOWN, WHETHER DUE OR TO BECOME DUE, WHETHER ACCRUED, ABSOLUTE, CONTINGENT, OR OTHERWISE.**

Dated:  October 20, 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

  **-**and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com-

**<u>Exhibit B</u>**

**Sale Order**


[TO COME]

## **Exhibit B-1**

### **Definitive Purchase Agreement**

[TO COME]

## **Exhibit C**

**Redline of Bidding Procedures Order filed on October 13, 2020**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice*
*in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) APPROVING THE STALKING HORSE PROTECTIONS,
## (II) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE JUSTICE
## ASSETS, AND (III) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES

Upon the Supplemental ~~m~~Motion (the "Bidding Procedures Motion")[2] of the above-

captioned debtors and debtors in possession (the "Debtors"), for entry of an order (this "Order"):

(a) authorizing and approving the Bidding Procedures, substantially in the form attached hereto

as **Exhibit A-1**; (b) authorizing and approving the Debtors to enter into and perform under the

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
       claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group,
       Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur
       Boulevard, Mahwah, New Jersey 07430.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding
       Procedures Motion or the Bidding Procedures (as defined below), as applicable.

Stalking Horse Purchase Agreement, attached hereto as **Exhibit A-2**; (c) approving procedures for assuming and assigning certain executory contracts, and approving the Cure Notice, substantially in the form attached hereto as **Exhibit A-3**; and the Court having reviewed any evidence in support of the Bidding Procedures Motion; and the Court having reviewed the Bidding Procedures Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Bidding Procedures Motion and at the Hearing establish just cause for the relief granted herein; and any objections to the Bidding Procedures Motion having been withdrawn with prejudice or overruled on the merits at the Hearing; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS AS FOLLOWS**:[3]

A.      Jurisdiction and Venue.  The Court has jurisdiction to consider the Bidding Procedures Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested in the Motion, sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014 have been satisfied.

B.      Notice of the Bidding Procedures Motion.  As reflected in the certificate of service filed on [  ] [Docket No. [  ]], the Bidding Procedures Motion and the notice of the Hearing were served on the Court's electronic filing system and the Notice Parties.  The notice of the Bidding Procedures Motion and the Hearing is reasonable and sufficient in light of the

---

[3]   The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

circumstances and nature of the relief requested in the Bidding Procedures Motion, and no other

or further notice of the Bidding Procedures Motion or the Hearing is necessary. A reasonable

and fair opportunity to object to the Bidding Procedures Motion and the relief granted in this

Order has been afforded under the circumstances.

C.    <u>Stalking Horse Bid and the Stalking Horse Protections</u>.   The Debtors have

demonstrated and proven to the satisfaction of this Court that their performance of the

obligations related to the Stalking Horse Bid and the Stalking Horse Protections are in the best

interests of the Debtors, their creditors, and their estates, and that the foregoing represents a

prudent exercise of the Debtors' sound business judgment. The Debtors have articulated good,

sufficient, and sound business justifications and compelling circumstances for performance of

obligations related to the Stalking Horse Bid and the Stalking Horse Protections in that, among

other things, the Stalking Horse Bid constitutes the highest or otherwise best proposal that the

Debtors have received to date and the approval of the relief requested is a necessary and

constructive step toward the confirmation and consummation of a chapter 11 plan, and the

Stalking Horse Bid and the Stalking Horse Protections allow the Debtors to solicit the highest or

otherwise best bid for the Justice Assets through the Bidding Procedures.

D.    The Stalking Horse Bid and the Stalking Horse Protections were negotiated by the

parties at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder.

Furthermore, the Stalking Horse Bid will serve as a minimum or floor bid on which the Debtors,

their creditors, suppliers, vendors, and other bidders may rely. The Stalking Horse Bidder and

the Stalking Horse Protections are providing a material benefit to the Debtors and their creditors

by increasing the likelihood that, given the circumstances, the best possible price for the Justice

Assets will be received. Accordingly, the Stalking Horse Bid and the Stalking Horse Protections

are fair, reasonable, appropriate, and represent the best method for maximizing value for the benefit of the Debtors' estates.

E.      ~~Premier Brands~~ Justice Brand Holdings LLC ("~~Premier~~Justice Brands") shall act as the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement annexed to the Motion, and the offer embodied therein shall be subject to higher and better offers in connection with the Bidding Procedures.  The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.  The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Stalking Horse Protections and the Bidding Procedures and the Stalking Horse Bidder's negotiation and entry into the Stalking Horse Purchase Agreement.

F.      Bidding Procedures.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures attached hereto as **Exhibit A-1**, which are fair, reasonable, and appropriate under the circumstances and designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest.

G.      Assumption and Assignment Procedures.   The Cure Notice is reasonably calculated to provide counterparties to the Justice Executory Contracts and Unexpired Leases to be assumed or assumed and assigned with proper notice of the intended assumption or assumption and assignment of their Justice Executory Contracts and Unexpired Leases, any Cure Amounts, and the Assumption and Assignment Procedures, and no other or further notice of such intention, the Cure Amounts, or the Assumption and Assignment Procedures shall be

4

required.  The Assumption and Assignment Procedures are fair, reasonable, and appropriate, and

comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

H.    <u>Auction</u>.  The Auction, if held, is necessary to determine whether any entity other

than the Stalking Horse Bidder is willing to enter into a definitive agreement on terms and

conditions more favorable to the Debtors than the Stalking Horse Bid.  Good and sufficient cause

has been shown to waive the stay of effectiveness of this Order under Bankruptcy Rules 6004(h),

6006(d), 7062, or 9014, or any applicable provisions of the Bankruptcy Rules or the Local

Bankruptcy Rules.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      Any objections to the relief granted herein that have not been withdrawn with

prejudice, waived, or settled, and all reservations of rights included in such objections, hereby

are overruled and denied on the merits with prejudice.

**A.      The Bidding Procedures.**

3.      The Bidding Procedures, attached hereto as **<u>Exhibit A-1</u>**, in connection with the

Sale pursuant to the Stalking Horse Purchase Agreement, attached hereto as **<u>Exhibit A-2</u>**, and

incorporated by reference as though fully set forth herein, are hereby approved and the Debtors

are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in

the Bidding Procedures.  The Bidding Procedures shall govern the submission, receipt, and

analysis of all bids, and any party desiring to submit a higher or otherwise better offer must do so

strictly in accordance with the terms of the Bidding Procedures and this Order.  The failure to

specifically include or reference any particular provision of the Bidding Procedures in the

Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures,

it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

4.     Subject to the right of parties-in-interest to object and the Court's entry of an order approving the sale, the Debtors are authorized to enter into the Stalking Horse Purchase Agreement, and the Stalking Horse Bid shall be subject to higher or better Qualified Bids, in accordance with the terms and procedures of the Bidding Procedures.

5.     The Stalking Horse Bidder is hereby deemed a Qualified Bidder, and the offer, as reflected in the Stalking Horse Purchase Agreement, is a Qualified Bid for all purposes and requirements pursuant to the Bidding Procedures.  If no other Qualified Bid with respect to the Justice Assets is received on or before Bid Deadline, the Debtors shall not conduct an Auction for the Justice Assets, and the Stalking Horse Bidder will be named the Successful Bidder.

**B.     Stalking Horse Protections.**

6.     The Stalking Horse Protections are approved and the Debtors are authorized to incur and pay the Stalking Horse Protections.  The Debtors' performance of any other obligations related to the Stalking Horse Bid shall be subject to entry of a further Court order approving the Sale.  Notwithstanding anything to the contrary herein, including, without limitation, this Order's authorization of, and approval of the Debtors' performance of obligations related to the Stalking Horse Protections, the entry of this Order and the relief granted hereby is without prejudice to the rights of any party to object or respond to the Sale, the Plan, the Stalking Horse Purchase Agreement, or any other document or instrument contemplated by any of the foregoing, and all such rights are reserved and preserved in all respects.

7.     The Stalking Horse Protections, to the extent payable under the Stalking Horse

Agreement, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of the Bankruptcy Code section 503(b), (ii) are of substantial benefit to the Debtors' estates, (iii) are reasonable and appropriate, including in light of the size and nature of the transactions and the efforts that have been and will be expended by the Stalking Horse Bidder, (iv) have been negotiated by the parties and their respective advisors at arm's-length and in good faith and (v) are necessary to ensure that the Stalking Horse Bidder will continue to pursue the proposed Sale.  The Stalking Horse Protections are material inducements for, and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse Purchase Agreement. The Stalking Horse Bidder is unwilling to commit to the Sale under the terms of the Stalking Horse Purchase Agreement unless the Stalking Horse Bidder receives the Stalking Horse Protections.

8.    7.  The Stalking Horse Protections shall be accorded treatment as an administrative expense claim in the chapter 11 cases.

9.    8. Subject to the right of parties-in-interest to object to, and the Court's entry of an order approving, the Sale, the Debtors are authorized to enter into the Stalking Horse Purchase Agreement, and the Stalking Horse Bid shall be subject to higher or better Qualified Bids in accordance with the terms and procedures of the Bidding Procedures.

10.    9. As soon as reasonably practicable after the conclusion of the Auction, if any, but no later than two (2) business days thereafter, the Debtors will file on the docket, but not serve, a notice (the "Post-Auction Notice") identifying the Successful Bidder.  Within five (5) business days of the filing of the Post-Auction Notice and, if the Successful Bidder is not the Stalking Horse PurchaserBidder, the Debtors will file on the docket, but not serve, a notice detailing the Expense Reimbursement proposed to be paid to the Stalking Horse

~~Purchaser~~Bidder.  All parties will have fourteen days from the date such notice is filed to file a written objection, compliant with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and all orders of the Court, to the Expense Reimbursement and serve such objection on the Debtors, counsel to the Debtors, and the Notice Parties.  If any party objects within fourteen days in accordance with the foregoing, the Court shall adjudicate any unresolved dispute as soon as the Court's schedule permits.

### C.    The Assumption and Assignment Procedures.

11.    ~~10.~~The Assumption and Assignment Procedures set forth in the Bidding Procedures Motion regarding the assumption or assumption and assignment of the Justice Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors and assigned to a Successful Bidder are approved:

  i.    Cure Notice.  No later than October 26, 2020, if applicable, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the Cure Notice on all applicable non-Debtor contract counterparties (at the notice address set forth in the applicable contract or lease) to the Justice Executory Contracts and Unexpired Leases (collectively, the "Contract Parties," and each, a "Contract Party") and by email on their counsel of record, if known;

  ii.    Content of Cure Notice.  The Cure Notice shall notify the applicable Contract Parties that the Justice Executory Contracts and Unexpired Leases may be subject to assumption or assumption and assignment in connection with the proposed Sale and contain the following information:  (a) identification of the applicable Justice Executory Contracts and Unexpired Leases; (b) the applicable Contract Parties; (c) the Debtors' good faith estimates of the corresponding Cure Amounts required to cure all monetary defaults under the Justice Executory Contracts and Unexpired Leases; (d) with respect to any Justice Unexpired Leases, to the extent applicable, adequate assurance information to the extent required under section 365 of the Bankruptcy Code (the "Adequate Assurance Information"); and (e) the deadline by which any Contract Party to a Justice Executory Contract or Justice Unexpired Lease may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures

relating thereto (the "Cure Objection"); provided that service of a Cure Notice does not constitute an admission that such Justice Executory Contract or Justice Unexpired Lease is an executory contract or unexpired lease or that such Justice Executory Contract or Justice Unexpired Lease will be assumed at any point by the Debtors or assumed and assigned pursuant to the Stalking Horse Purchase Agreement, if any, or any other Successful Bid.  To the extent the Cure Notice includes a Justice Unexpired Lease, such Cure Notice shall be accompanied by the following Adequate Assurance Information:

    a.  The legal name of the proposed assignee of the Justice Unexpired Lease (the "Proposed Assignee") and any guarantors, as applicable;

    b.  Financial statements for the calendar or fiscal years ended 2018 and 2019 for the Proposed Assignee and any guarantors, as applicable, or other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

    c.  Summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations.

iii.  Cure Objections.  Cure Objections, if any, to a Cure Notice must: (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (c) state with specificity the nature of the Cure Objection and, if the Cure Objection pertains to the proposed Cure Amount, state the cure amount alleged to be owed to the objecting Contract Party, together with any applicable and appropriate documentation in support thereof; and (d) be filed with the Court and served so as to be actually received by counsel to the Debtors, counsel to the Stalking Horse Bidder, if any, or any other Successful Bidder, and counsel to each of the Consultation Parties within fourteen days of the date of service of the Cure Notice at 5:00 p.m. (prevailing Eastern Time) (the "Cure Objection Deadline");

iv.  Effects of Filing a Cure Objection.  A properly filed and served Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption or assumption and assignment of the Justice Executory Contract or Justice Unexpired Lease at issue and/or objection to the accompanying Cure Amount,

as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this Motion;

v.   <u>Dispute Resolution</u>.  Any objection to the proposed assumption or assumption and assignment of a Justice Executory Contract, Justice Unexpired Lease, or Cure Amount that remains unresolved after the Sale Hearing, shall be heard at the next scheduled omnibus hearing (or at such later date as may be fixed by the Court).  To the extent that any Cure Objection cannot be resolved by the parties, such Justice Executory Contract or Justice Unexpired Lease shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Stalking Horse Bidder's (if applicable) or other Successful Bidder's reasonable discretion.  ~~To the extent a Cure Objection remains unresolved, the Justice Executory Contract or Justice Unexpired Lease may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder, if any, or other Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.~~  If a Cure Objection is not satisfactorily resolved, the Stalking Horse Bidder~~, if any,~~ or other Successful Bidder may determine that such Justice Executory Contract or Justice Unexpired Lease should be rejected and not assigned, in which case the Stalking Horse Bidder~~, if any,~~ or other Successful Bidder will not be responsible for any Cure Amounts in respect of such contract unless otherwise provided in the Stalking Horse Purchase Agreement~~, if any~~;

vi.  <u>Supplemental Cure Notice</u>.   If the Debtors discover Justice Executory Contracts and Unexpired Leases inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Justice Executory Contracts and Leases that it desires to assume or assume and assign in connection with the Sale, the Debtors may, in consultation with the Successful Bidder and in accordance with the Stalking Horse Purchase Agreement~~, if any,~~ or as otherwise agreed by the Debtors and the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Justice Executory Contracts and Leases, which shall include all Adequate Assurance Information, or modify a previously filed Cure Notice, including modify the previously stated Cure Amounts associated with any Justice Executory Contract or Justice Unexpired Lease (the "<u>Supplemental Cure Notice</u>");

vii. <u>Objection to the Supplemental Cure Notice</u>.  Any Contract Party listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the

applicable Justice Executory Contract and/or Justice Unexpired Lease or the proposed Cure Amounts, if any.  All Supplemental Cure Objections must:  (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Amounts are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 5:00 p.m. (prevailing Eastern Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice;

viii.  <u>Dispute Resolution of Supplemental Cure Objection</u>.  If a Contract Party files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amounts, if any, and approve the assumption and/or assignment of the relevant Justice Executory Contracts and Unexpired Leases.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Amount and approving the assumption and/or assignment of any Justice Executory Contracts and Unexpired Leases listed on a Supplemental Cure Notice; and

ix.  <u>No Cure Objections</u>.  If there are no objections to a Cure Notice or a Supplemental Cure Notice, or if a Contract Party does not file and serve a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amounts, (a) the Cure Amount, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Justice Executory Contracts and Unexpired Leases or any other document, and (b) to the extent the Contract Party's consent is required under applicable law, the Contract Party will be deemed to have consented to the assumption or assumption and assignment of the Justice Executory Contracts and Unexpired Leases and the Cure Amounts, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Justice Executory Contracts and Unexpired Leases and rights thereunder, including the Cure Amounts, if any, and from asserting any other claims related to such Justice Executory Contracts and Unexpired Leases against the Debtors or the Successful Bidder, or the property of any of them.

12.  ~~11.~~ Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the ~~earlier~~later of (a) the Cure

Objection Deadline, and (b) 4:00 p.m. (prevailing Eastern Time) on the date that is 14 days following (i) the date of service of the Cure Notice, or (ii) the date of service of the Supplemental Cure Notice, as applicable. ~~Such objections will be resolved at the Confirmation Hearing. The Debtors may, in consultation with the Successful Bidder, adjourn the resolution of any such objection to a later hearing.~~

13.    ~~12.~~ The inclusion of a Justice Executory Contract or Justice Unexpired Lease in the Cure Notice (or Supplemental Cure Notice) will not:  (a) obligate the Debtors to assume any Justice Executory Contract or Justice Unexpired Lease listed thereon or obligate the Successful Bidder to take assignment of such Justice Executory Contract or Justice Unexpired Lease; or (b) constitute any admission or agreement of the Debtors that such Justice Executory Contract or Justice Unexpired Lease is an executory contract.  Only those Justice Executory Contracts and Unexpired Leases that are included on a schedule of assumed and assigned contracts attached to the Definitive Purchase Agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

14.    ~~13.~~ For the avoidance of doubt, nothing herein shall be deemed to extend the Debtors' deadline to assume or reject any of its leases pursuant to section 365(d)(4) of the Bankruptcy Code.

15.    ~~14.~~ Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party (including the sureties, the Debtors, the Debtors' lenders, the Stalking Horse Bidder, or any other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, surety bonds, or related agreements or any letters of credit relating thereto, or any rights, remedies or defenses

12

of the Debtors with respect thereto, including seeking Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

16.    15. Notwithstanding anything to the contrary in this Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and shall be subject to:  (i) the final order approving the Debtors' use of cash collateral and postpetition financing facility [Docket No. 587] (the "Final DIP Order"); (ii) the documentation in respect of any such use of cash collateral and postpetition financing; and (iii) the budget governing any such use of cash collateral and postpetition financing.  To the extent there is any inconsistency between the term of the Final DIP Order and this Order, the terms of the Final DIP Order shall control.

17.    To the extent there is any inconsistency between the terms of the Bidding Procedures Motion and this Order, the terms of this Order shall control.

18.    16. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

19.    17. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Bidding Procedures Motion.

20.    18. The requirements set forth in Local Bankruptcy Rule 9013-1 are satisfied by the contents of the Bidding Procedures Motion.

21.    19. This Order shall be immediately effective and enforceable upon entry hereof.

22.    20. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  _____
Richmond, Virginia                          _____
                                            United States Bankruptcy Judge

13

WE ASK FOR THIS:

| | /s/ Cullen D. Speckhart_____ |
|---|---|
| **KIRKLAND & ELLIS LLP** | **COOLEY LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Cullen D. Speckhart (VSB 79096) |
| Edward O. Sassower, P.C. | *Admitted to practice in New York, Virginia, Missouri and* |
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*) | *Texas; Not admitted to practice in DC, supervised by* |
| 601 Lexington Avenue | *members of DC bar* |
| New York, New York 10022 | Olya Antle (VSB 83153) |
| Telephone:        (212) 446-4800 | *Admitted to practice in Virginia; Not admitted to practice in* |
| Facsimile:        (212) 446-4900 | *DC, supervised by members of DC bar* |
| -and- | 1299 Pennsylvania Avenue, NW, Suite 700 |
| John R. Luze (admitted *pro hac vice*) | Washington, DC 20004-2400 |
| 300 North LaSalle | Telephone:        (202) 842-7800 |
| Chicago, Illinois 60654 | Facsimile:        (202) 842-7899 |
| Telephone:        (312) 862-2000 | |
| Facsimile:        (312) 862-2200 | |

*Co-Counsel to the Debtors and Debtors in Possession*

<u>**CERTIFICATION OF ENDORSEMENT**</u>
<u>**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**</u>

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

_____/s/ Cullen D. Speckhart_____

## **Exhibit C-1**

**Redline of Bidding Procedures filed on October 13, 2020**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice*
*in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:       (202) 842-7800
Facsimile:       (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## BIDDING PROCEDURES
## FOR THE SALE OF THE JUSTICE ASSETS

On July 23, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

On [__], 2020, the Bankruptcy Court entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [__]] (the "Bidding

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

Procedures Order"),[2] by which the Bankruptcy Court approved the following procedures (the "Bidding Procedures").

These Bidding Procedures set forth the process for a potential auction (the "Auction") and sale (the "Sale") of the right, title, and interest of the Debtors in and to certain Tween Brands, Inc. assets (the "Justice Assets"), subject to the option of the Stalking Horse Bidder (as defined below) to require the Debtors to consummate the Sale in accordance with the Stalking Horse Purchase Agreement (as defined below).

The Debtors selected the bid (the "Stalking Horse Bid") for the Justice Assets submitted by ~~Premier Brands~~ Justice Brand Holdings LLC ("~~Premier~~Justice Brands" and/or the "Stalking Horse Bidder"), after a comprehensive public bidding process.  The Stalking Horse Bidder has executed that certain purchase agreement dated October ~~1~~20, 2020 entered into by and among certain of the Debtors and ~~Premier~~Justice Brand~~s~~ (as amended, supplemented or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Stalking Horse Purchase Agreement") pursuant to which the Stalking Horse Bidder has agreed to purchase the Acquired Assets (as defined in the Stalking Horse Purchase Agreement), subject to the terms and conditions set forth therein.  Having announced the Stalking Horse Bid, the Debtors will now conduct a round of open bidding during these chapter 11 cases intended to obtain the highest or otherwise best bid for the Justice Assets.  The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

> **Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Prime Clerk LLC by calling (877) 930-4319 (toll free) or (347) 899-4594 (international) or visiting the Debtors' restructuring website at (https://cases.primeclerk.com/ascena).**

## I.      Assets to be Auctioned.

These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction.  The Justice Assets will be offered for sale through the Auction.  The Debtors may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the Justice Assets.  The Stalking Horse Bid referenced herein provides for the Stalking Horse Bidder's acquisition of the Justice Assets in the absence of a higher or otherwise better offer.

## II.     Public Announcement of Auction.

As soon as reasonably practicable after entry of the Bidding Procedures Order the Debtors shall (I) serve on the Notice Parties (as defined below) a notice of the Auction and Sale in the form attached hereto as **Schedule 1** (the "Sale Notice"), and (II) publish the Sale Notice,

---

[2]      All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the ~~Motion or the~~ Bidding Procedures Order.

with any modifications necessary for ease of publication, in *The New York Times (National Edition)* to provide notice to any other potential interested parties.

### III.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity (other than the Stalking Horse Bidder) interested in purchasing the Justice Assets (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors; and

b.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close the Sale (including current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be acceptable to the Debtors.

Only those Potential Bidders that have submitted acceptable Preliminary Bid Documentation (each, an "Acceptable Bidder") to the reasonable satisfaction of the Debtors and their advisors, in consultation with the Consultation Parties,[3] may submit bids to purchase the Justice Assets.

### IV.    Qualified Bid Requirements.

To participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of the Justice Assets (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline:

a.    **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state which of the Justice Assets the Acceptable Bidder seeks to acquire and which liabilities of the applicable Debtor the Acceptable Bidder agrees to assume;

b.      **Good Faith Deposit**:  The Bid must be accompanied by a cash deposit in the amount equal to the greater of (i) $10,000,000 and (ii) 10% of the aggregate

---

[3]    The term "Consultation Parties" shall mean (a) the DIP Agents, (b) the DIP Lenders, (c) counsel to the DIP Agents, (d) one or more Initial Consenting Stakeholders under the RSA; (e) counsel to the Ad Hoc Group; and (f) the Official Committee of Unsecured Creditors (the "Committee") and counsel to the Committee; *provided* that any party otherwise included as a Consultation Party shall not serve as a Consultation Party with respect to the sale of Justice Assets to which such party has submitted a Bid unless and until such party unequivocally revokes its Bid and waives its right to continue in the Auction process; *provided further* that any member of the Committee that submits a Bid shall not participate in any deliberations by the Committee as a Consultation Party.

purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit");

c.        **Purchase Price**:  Each Bid must clearly set forth the cash purchase price to be paid, assuming a purchase of the Justice Assets and any assumption of liabilities (the "Purchase Price").  The Purchase Price should be a single point value in U.S. Dollars for the applicable Justice Assets on a cash-free, debt-free basis;

d.        **Minimum Bid**:[4]  At a minimum, each Bid must have a Purchase Price equal to, or in excess of, of an amount equal to the sum of (i) the Cash Purchase Price under, plus (ii) the assumption of Assumed Liabilities, plus (iii) payments made for Inventory subject to Assigned POs pursuant to Section 1.1(a) of the Stalking Horse Purchase Agreement, plus the Initial Minimum Overbid Amount;[4] (iv) $2,000,000;

e.        **Markup of the Purchase Agreement**:  Each Acceptable Bidder must provide a draft purchase agreement as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Purchase Agreement, which amendments and modifications may not be inconsistent with these Bidding Procedures.  Significant alterations to the Stalking Horse Purchase Agreement are discouraged and may negatively impact a Bid;

f.        **Same or Better Terms; Bid Documents**:  Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, substantially on the same or better terms than the terms of the Stalking Horse Purchase Agreement.  Each Bid must include duly executed transaction documents, including a proposed purchase agreement and any other ancillary documentation necessary to effectuate the transactions contemplated in such Bid (such documents, the "Bid Documents").  The bid must be expressly made subject to the Debtors' obligations to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms of the SaleStalking Horse Purchase Agreement, as modified by the BidBidding Procedures Order.

g.        **No Qualified Bidder Bid Protections**:  Except as provided with respect to the Stalking Horse Bidder, a Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any

---

[4]  Capitalized terms used but not otherwise defined in this section IV.d. shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

[4]  "Initial Minimum Overbid Amount" means an amount equal to the sum of (a) $500,000 plus (b) the Break-Up Fee (as defined in the Stalking Horse Purchase Agreement) plus (c) the Expense Reimbursement (as defined in the Stalking Horse Purchase Agreement).

substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Justice Assets;

h.     **Employee Obligations**:  Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the Justice Assets included in such Bid;

i.     **Sources of Financing**:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale and other obligations under its Bid.  Such funding commitments or other financing commitments must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

j.     **Contingencies; No Financing or Diligence Outs**:  Any Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Purchase Agreement and (ii) shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence;

k.     **Identity**:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Justice Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom Guggenheim and Kirkland & Ellis LLP should contact regarding such Bid;

l.     **As-Is, Where-Is**:  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

m.     **Authorization**:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and

other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

n.  **Adequate Assurance of Future Performance**:  Each Bid (other than the Stalking Horse Bid) must (i) identify the Justice Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all Cure Amounts related to such Justice Executory Contracts and Unexpired Leases and by the Acceptable Bidder, and (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Justice Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code;

o.  **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment**:  Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law;

p.  **Compliance with the Debtors' Privacy Policy**:  Each Bid must comply in all respects with the Debtors' Justice privacy policy, which restricts the transfer of the personally identifiable information of its customers, and contain a statement acknowledging such compliance;

q.  **No Collusion**:  The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice);

r.  **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale;

s.  **Irrevocable**:  Each Bid must state that in the event a Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale;

t.  **Back-Up Bid**:  Each Bid shall provide that the Acceptable Bidder will serve as a back-up bidder if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

u.  **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including the Justice Executory Contracts and Unexpired Leases (each as defined in the Bidding Procedures Motion) for which assumption and assignment is required; and

6

v.        **Expected Closing Date**:  Each Bid must state the Acceptable Bidder's expected date of closing of the Sale.

Only Bids fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable discretion, in consultation with the Consultation Parties, be deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable discretion, be deemed to be "Qualified Bidders."

Within one (1) business day after the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction.  The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, the Stalking Horse Bid shall be deemed a Qualified Bid, and the Stalking Horse Bidder ~~may~~shall be entitled to participate in the Auction with respect to the Justice Assets.  The Debtors shall inform counsel to the Stalking Horse Bidder whether the Debtors consider any Bid to be a Qualified Bid as soon as practicable after the Bid Deadline and in no event later than one (1) business day after the Bid Deadline.

## V.    Obtaining Due Diligence Access.

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. ***No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.  Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request.  The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room for the benefit of all Acceptable Bidders. Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable

business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale. For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

> ### A.    Communications with Acceptable Bidders (including Qualified Bidders).

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Guggenheim.

> ### B.    Due Diligence from Acceptable Bidders (including Qualified Bidders).

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder) or that a bid made by such bidder is not a Qualified Bid.

**Guggenheim Securities LLC, 330 Madison Avenue, New York, New York 10017, Attn.: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com) and Stuart Erickson (Stuart.Erickson@guggenheimpartners.com), shall coordinate all requests for additional information and due diligence access on behalf of the Debtors.**

## VI.    Indications of Interest.

The Debtors reserve the right to require Acceptable Bidders to submit non-binding written indications of interest prior to the Bid Deadline specifying, among other things, the Justice Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party. If an Acceptable Bidder fails to comply with any such request by the Debtors, the Debtors may, in consultation with one or more Required Consenting Stakeholders under the RSA and the Consultation Parties, deny such Acceptable Bidder further diligence access or deny such Acceptable Bidder further participation in the Auction process; *provided* that such Acceptable Bidder shall be granted the opportunity to cure such noncompliance with any request by the Debtors before being denied further participation in the Auction Pprocess. The Debtors also reserve the right to exclude any Acceptable Bidder (prior to its submission of a Qualified Bid) from continuing in the Auction process if the Debtors determine, in consultation with one or more Required Consenting

Stakeholders under the RSA and the Consultation Parties, that the consideration proposed to be paid by such Acceptable Bidder is insufficient.

## VII.    Bid Deadline.

Binding Bids must be received by (a) the Debtors' counsel, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: John R. Luze (john.luze@kirkland.com) and Jeff Michalik (jeff.michalik@kirkland.com), (b) the Debtors' financial advisor, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com) and Stuart Erickson (Stuart.Erickson@guggenheimpartners.com), (c) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn: Robert Feinstein (rfeinstein@pszjlaw.com), Bradford Sandler (bsandler@pszjlaw.com), and Shirley Cho (scho@pszjlaw.com), and (d) the proposed financial advisor to the Creditors' Committee, Province, Inc., 2360 Corporate Circle, Suite 330, Henderson, NV 89074, Attn: Paul Huygens (~~phuygens@provincefirm.com~~phuygens@provincefirm.com) and Ed Kim (ekim@provincefirm.com), in each case so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on November 2, 2020 (the "Bid Deadline").

## VIII.    Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Justice Assets (the "Starting Bid").    When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid.  Two (2) business days prior to the date of the Auction, the Debtors shall notify the Stalking Horse Bidder and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to the applicable assets.  At such time, the Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder and each Qualified Bidder.

## IX.    No Qualified Bids.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the ~~Debtors may cancel the~~ Auction~~, and may decide, in the Debtors' reasonable business judgment, to designate~~ shall be cancelled, the Stalking Horse Bid shall be designated as the Successful Bid ~~and~~(as defined below) and the Debtors shall pursue entry of an order approving a Sale of the Justice Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement.  The Debtors shall promptly file notice of any cancellation of the Auction and designation of the Stalking Horse Bid as the Successful Bid with the Bankruptcy Court.

## X.      Auction.

If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to ~~any applicable~~the Justice ~~a~~Assets, then the Debtors shall conduct the Auction with respect to such assets.  The Auction for the Justice Assets shall commence on **November 5, 2020, at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors, or such later time or other place as the Debtors determine, in which case the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders of such later time or other place, and file a notice of the change on the Bankruptcy Court's docket for these chapter 11 cases.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.      the Auction will be conducted openly;

b.          only Qualified Bidders shall be entitled to bid at the Auction;

c.          the Qualified Bidders shall appear at the Auction via videoconference or such other form of remote communication or through duly authorized representatives;

d.          bidding shall begin with the Starting Bid;

e.          subsequent bids (each, an "Overbid") shall be made in minimum increments of $250,000;

f.          each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors;

g.          during the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the Justice Assets;

h.          the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

i.          each Qualified Bidder will be required to confirm on the record that it has not engaged in any collusion with respect to the bidding or any Sale;

j.          each Qualified Bidder will be required to confirm that its bid is a good faith, *bona fide* offer and it intends to consummate the Sale if selected as the Successful Bid;

10

k.          the Bankruptcy Court and the Debtors will not consider bids made after the Auction has been closed; and

l.         notwithstanding anything herein to the contrary, the Debtors may at any time choose to adjourn the Auction by announcement at the Auction.  The Debtors shall promptly file notice of such adjournment with the Bankruptcy Court.

At the Auction, the Debtors, in consultation with the Consultation Parties, shall have the right to modify the Auction Procedures or adopt and announce additional Auction Procedures, including, for example and without limitation, other Auction Procedures necessary for the Debtors to consider any bids to purchase fewer than all of the Justice Assets; *provided*, however that the Debtors shall not modify the Auction Procedures such that the bidding is (i) inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Purchase Agreement and/or (ii) not transparent to the Qualified Bidders.  Any Auction rules adopted by the Debtors will not modify any of the terms of the Stalking Horse Purchase Agreement or the rights of the Stalking Horse Bidder under the Bid Procedures without the consent of the Stalking Horse Bidder.

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Debtors' secured creditors, (iii) the Office of the United States Trustee, (iv) the Creditors' Committee, (v) the Stalking Horse Bidder, (vi) any other Qualified Bidders, (vii) any creditor of the Debtors that at least five (5) business days prior to the Auction delivers to Debtors' counsel (by mail or email at the address or email address identified hereinabove) a written request to attend the Auction, and (viii) the respective professionals of all of the foregoing shall be entitled to attend the Auction; *provided* that (x) the Debtors reserve the right to object to any request to attend the Auction made by the creditor pursuant to clause (vii) immediately above, and (y) if the Debtors and such creditor are unable to consensually resolve such objection promptly, the Debtors shall seek a teleconference with the Bankruptcy Court prior to the Auction to adjudicate such objection.

## XI.    Acceptance of the Successful Bid.

The Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase any or all of the Justice Assets (each, a "Successful Bid"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates

from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid; and (e) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "Successful Bidder" with respect to the Justice Assets. The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Bankruptcy Court. Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at a hearing (the "Sale Hearing") and shall seek Bankruptcy Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Definitive Purchase Agreement Order"). For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid (defined below), the Debtors shall not solicit and /or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including both the Stalking Horse Bidder and Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XII. Designation of Back-Up Bidder.

The Qualified Bidder with the second highest or otherwise best bid or combination of bids (the "Back-Up Bid") to purchase any or all of the Justice Assets (the "Back-Up Bidder") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection. If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale with the Debtors as soon as is reasonably practicable without further order of the Bankruptcy Court, *provided* that the Debtors shall file a notice with the Bankruptcy Court.

Except as otherwise provided in the Stalking Horse Purchase Agreement, the Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) forty-five (45) days after completion of the Auction, (ii) consummation of an Alternative Transaction with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in

writing (the "Back-Up Termination Date").  The Debtors shall return the Back-Up Bidder's deposit and pay any ~~Break-Up Fee and/or~~ Expense Reimbursement owed within three (3) business days of the Back-Up Termination Date.

**XIII.    Stalking Horse Protections.**

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder is entitled to the Stalking Horse Protections in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Purchase Agreement and the Bidding Procedures Order.  For the avoidance of doubt, except for the Stalking Horse Bidder, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

**XIV.    ~~XIII.~~ Approval of the Sale.**

A hearing to consider approval of the Sale (the "Sale Hearing"), is currently scheduled to take place on November 12, 2020, at 1:00 p.m. (prevailing Eastern Time), before the Honorable Kevin R Huennekens, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, 5th Floor, Richmond, Virginia, 23219 or conducted consistent with the procedures established pursuant to the Bankruptcy Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

At the Sale Hearing certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that:    (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (4) consummation of any Sale as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the Justice Assets and is in the best interests of the Debtors and their estates. **The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

Objections to the Sale, any of the relief requested in the Motion, and entry of any order approving the sale (the "Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, counsel to the Debtors, and the Notice Parties by November 4_9_, 2020 at ~~12~~5:00 p.m. (prevailing Eastern Time).

**XV.    ~~XIV.~~ Return of Good Faith Deposit.**

Subject to the Stalking Horse Purchase Agreement, the Good Faith Deposit of a Successful Bidder shall, upon consummation of any Sale, be credited to the Purchase Price paid for the applicable Justice Assets.  ~~If~~Subject to the Stalking Horse Purchase Agreement, if a Successful Bidder fails to consummate any Sale, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors, and all parties in interest, and the Debtors

specifically, reserve the right to seek all available damages from the defaulting Successful Bidder.

The~~The~~Subject to the Stalking Horse Purchase Agreement, the Good Faith Deposit of any Qualified Bidders that are not Successful Bidders or Back-Up Bidders will be returned within five business days after the Auction or upon the permanent withdrawal of the proposed Sale, and the Good Faith Deposit of any Back-Up Bidders will be returned within five business days after the consummation of any Sale.

## XVI.    ~~XV.~~ Reservation of Rights.

The Debtors reserve their rights to, subject to the terms of the Stalking Horse Purchase Agreement and these Bidding Procedures, and in consultation with the Consultation Parties, to modify these Bidding Procedures in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the sale of the Justice Assets, including, without limitation:  (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment.  The Debtors shall provide advance notice in writing of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.  For the avoidance of doubt, subject to the Stalking Horse Purchase Agreement, the Debtors reserve the right at any point prior to the selection of the Successful Bidder to terminate the Sale processes contemplated hereunder with respect to any or all of the Justice Assets.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

## XVII.    ~~XVI.~~ Consent to Jurisdiction.

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction and the construction and enforcement of these Bidding Procedures, and/or any written indications of interest, Preliminary Bid Documents, or the Bid Documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

**XVIII.** ~~XVII.~~ **Fiduciary Out.**

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**XIX.** ~~XVIII.~~ **Alternative Proposals.**

Further, notwithstanding anything to the contrary in these Bidding Procedures, and subject to the Stalking Horse Purchase Agreement, through the acceptance of the Successful Bid, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Justice Assets (each an "Alternate Proposal"); (b) subject to the terms and conditions of these Bidding Procedures, provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor, any other party in interest in these chapter 11 cases (including the Creditors' Committee and the United States Trustee), or any other entity regarding Alternate Proposals.  Nothing in these Bidding Procedures shall be construed as a waiver of any parties' rights with respect to an Alternative Transaction.

**XX.** ~~XIX.~~ **Notice Parties.**

Information that must be provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties or their respective counsel, if known (collectively, the "Notice Parties"):  (a) the United States Trustee for the Eastern District of Virginia; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) the United States Attorney's Office for the Eastern District of Virginia; (f) the Internal Revenue Service; (g) the office of the attorneys general for the states in which the Debtors operate; (h) the Securities and Exchange Commission; (i) the Stalking Horse Bidder (and counsel to the Stalking Horse Bidder); (j) all parties who have expressed a written interest in some or all of the Justice Assets; (k) all known holders of liens, encumbrances, and other claims secured by the Justice Assets; (l) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (m) the Creditors' Committee; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.

15

## XXI. ~~XX.~~ Consultation Rights of the Consultation Parties.

The Debtors will consult with the Consultation Parties (a) with respect to any action, evaluation, or determination by the Debtors that is expressly contemplated or authorized by these Bidding Procedures, or (b) to the extent not explicitly required by these Bidding Procedures, in any event before making any material decision with respect to the Sale or Auction.

*[Different first page link-to-previous setting changed from off in original to on in modified.]*
*[Link-to-previous setting changed from off in original to on in modified.]*

<u>**Schedule 1**</u>

**Notice of Auction and Sale Hearing**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    (202) 842-7800
Facsimile:    (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[51] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on [__], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Justice Assets, and (III) Approving Assumption and Assignment Procedures* [Docket No. [__]] (the "Bidding Procedures Order")[62] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

---

[51]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[62]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Justice Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.** To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets **on November 5, 2020 at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before **November 12, 2020 at 1:00 p.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Kevin R Huennekens, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, 5th Floor, Richmond, Virginia, 23219 or conducted consistent with the procedures established pursuant to the Bankruptcy Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** **on or before November 9, 2020 at 5:00 p.m. (prevailing Eastern Time)** by the following parties: (i) the Debtors, Ascena Group Retail, Inc., 933 MacArthur Boulevard, Mahwah, New Jersey 07430, Attn: Michael Veitenheimer; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: John R. Luze and Jeff Michalik and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven N. Serajeddini, P.C.; (iii) co-counsel to the Debtors, Cooley LLP, 1299 Pennsylvania Avenue, NW, Suite 700, Washington, D.C. 20004-2400, Attn: Cullen D. Speckhart and Olya Antle; (iv) counsel to the ABL agent, (a) Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Matthew F. Furlong, Julia Frost-Davies and Christopher L. Carter, and (b) Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown; (v) the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn: Kathryn Montgomery; (vi) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn: Robert Feinstein, Bradford Sandler, and Shirley Cho; (vii) counsel to the term loan ad hoc group, Milbank LLP, 55 Hudson Yards, New York, NY 1001, Attn: Evan R. Fleck, Esq; (viii) counsel to the Stalking Horse Bidder, ~~Mintz & Gold~~Schulte Roth & Zabel LLP, ~~600~~919 Third Avenue, ~~25th Floor,~~ New York, New York 100~~16~~22, Attn: ~~Andrew Gottesman~~Kristine Manoukian and Kelly Knight.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

~~Richmond, Virginia~~
Dated:   October ~~13~~20, 2020

/s/ Cullen D. Speckhart
_____

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       edward.sassower@kirkland.com
             steven.serajeddini@kirkland.com

**-**and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:   (202) 842-7800
Facsimile:   (202) 842-7899
Email:       cspeckhart@cooley.com
             oantle@cooley.com-

3