## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re: **RETAIL GROUP, INC.,** *et al.,* | **Chapter 11** |
| | **Case No. 20-33113-KRH** |
| **Debtors.** | **Jointly Administered** |

### <u>MEMORANDUM OPINION</u>

On July 23, 2020 (the "Petition Date"), Retail Group, Inc. (f/k/a Ascena Retail Group,

Inc.) ("Ascena") and sixty-three of its affiliates[1] (collectively, the "Debtors") commenced the

above-captioned jointly administered bankruptcy cases (collectively, the "Bankruptcy Cases") by

---

[1]  A complete listing of the Debtors is as follows:  *In re DBCM Holdings, LLC*, Case No. 20-33112-KRH; *In re Ascena Retail Group, Inc.*, Case No. 20-33113; *In re Charming Shoppes Street, Inc.*, Case No. 20-33114-KRH; *In re Charming Shoppes, Inc.*, Case No. 20-33115-KRH; *In re Chestnut Acquisition Sub Inc.*, Case No. 20-33116-KRH; *In re 933 Inspiration LLC*, Case No. 20-33117-KRH; *In re Crosstown Traders, Inc.*, Case No. 20-33118-KRH; *In re CS Holdco II Inc.*, Case No. 20-33119-KRH; *In re ANN Card Services, Inc.*, Case No. 20-33120-KRH; *In re CSGC, Inc.*, Case No. 20-33121-KRH; *In re ANN, Inc.*, Case No. 20-33122-KRH; *In re CSI Industries, Inc.*, Case No. 20-33123-KRH; *In re CSPE, LLC*, Case No. 20-33124-KRH; *In re AnnCo, Inc.*, Case No. 20-33125-KRH; *In re AnnTaylor Distribution Services, Inc.*, Case No. 20-33126-KRH; *In re DBI Holdings, Inc.*, Case No. 20-33127-KRH; *In re DBX, Inc.*, Case No. 20-33128-KRH; *In re Duluth Real Estate LLC*, Case No. 20-33129-KRH; *In re AnnTaylor of Puerto Rico, Inc.*, Case No. 20-33130-KRH; *In re Etna Retail DC, LLC*, Case No. 20-33131-KRH; *In re AnnTaylor Retail, Inc.*, Case No. 20-33132-KRH; *In re Fashion Apparel Sourcing LLC*, Case No. 20-33133-KRH; *In re AnnTaylor, Inc.*, Case No. 20-33134-KRH; *In re Fashion Service Fulfillment Corp.*, Case No. 20-33135-KRH; *In re Ascena Retail Holdings, Inc.*, Case No. 20-33136-KRH; *In re Fashion Service LLC*, Case No. 20-33137-KRH; *In re GC Fulfillment, LLC*, Case No. 20-33139-KRH; *In re Ascena Trade Services, LLC*, Case No. 20-33140-KRH; *In re ASNA Plus Fashion, Inc.*, Case No. 20-33141-KRH; *In re ASNA Value Fashion LLC*, Case No. 20-33142-KRH; *In re BackingBrands Buying Agent, LLC*, Case No. 20-33143-KRH; *In re Lane Bryant #6243, Inc.*, Case No. 20-33144-KRH; *In re Lane Bryant of Pennsylvania, Inc.*, Case No. 20-33145-KRH; *In re BackingBrands Solutions, LLC*, Case No. 20-33146-KRH; *In re C.S.F. Corp.*, Case No. 20-33147-KRH; *In re Catalog Receivables LLC*, Case No. 20-33148-KRH; *In re Catalog Seller LLC*, Case No. 20-33149-KRH; *In re Lane Bryant Outlet 4106, Inc.*, Case No. 20-33150-KRH; *In re Catherines #5124, Inc.*, Case No. 20-33151-KRH; *In re Lane Bryant Purchasing Corp.*, Case No. 20-33152-KRH; *In re Catherines #5147, Inc.*, Case No. 20-33153-KRH; *In re Lane Bryant, Inc.*, Case No. 20-33154-KRH; *In re Catherines Stores Corp.*, Case No. 20-33155-KRH; *In re PSTM, Inc.*, Case No. 20-33156-KRH; *In re Sonsi, Inc.*, Case No. 20-33157-KRH; *In re Catherines, Inc.*, Case No. 20-33158-KRH; *In re Spirit of America, Inc.*, Case No. 20-33159-KRH; *In re CCTM, Inc.*, Case No. 20-33160-KRH; *In re Too GC, LLC*, Case No. 20-33161-KRH; *In re Charming Sales Co. Four, Inc.*, Case No. 20-33162-KRH; *In re Tween Brands Agency, Inc.*, Case No. 20-33163-KRH; *In re Charming Sales Co. One, Inc.*, Case No. 20-33164-KRH; *In re Tween Brands Direct Services Inc.*, Case No. 20-33165-KRH; *In re Charming Sales Co. Three, Inc.*, Case No. 20-33166-KRH; *In re Tween Brands Investment, LLC*, Case No. 20-33167-KRH; *In re Tween Brands Marketing, Inc.*, Case No. 20-33168-KRH; *In re Tween Brands Service Co.*, Case No. 20-33169-KRH; *In re Tween Brands, Inc.*, Case No. 20-33170-KRH; *In re Winks Lane, Inc.*, Case No. 20-33171-KRH; *In re Worldwide Retail Holdings, Inc.*, Case No. 20-33172-KRH; *In re Charming Sales Co. Two, Inc.*, Case No. 20-33173-KRH; *In re Charming Shoppes of Delaware, Inc.*, Case No. 20-33174-KRH; *In re Charming Shoppes Receivables Corp.*, Case No. 20-33175-KRH; and *In re Charming Shoppes Seller, Inc.*, Case No. 20-33176-KRH.

each filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code

(the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of

Virginia (this "Court").  Following the Court's approval of a disclosure statement in accordance

with section 1125 of the Bankruptcy Code, on February 25, 2021, the Court conducted an

evidentiary hearing (the "Confirmation Hearing") to consider confirmation of the Debtors' Plan[2]

and unresolved objections thereto filed by the United States Securities and Exchange

Commission (the "SEC"), the Securities Litigation Lead Plaintiffs (as such term is defined

herein); and the United States Trustee.[3]  Notably, while the objecting parties made argument in

support of their objections, only the Debtors offered evidence at the Confirmation Hearing.

By its *Order Confirming the Amended Joint Chapter 11 Plan (Technical Modifications)*

*of Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) and Its Debtor Affiliates*

entered February 25, 2021 [ECF No. 1811] (the "Confirmation Order"), the Court confirmed the

Plan.  In accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), this Memorandum Opinion supplements the Court's findings of facts and

conclusions of law set forth in the Confirmation Order.  This Court has subject-matter

jurisdiction over the Bankruptcy Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the General

Order of Reference from the United States District Court for the Eastern District of Virginia

---

[2]   The term "Plan" shall refer to the *Amended Joint Chapter 11 Plan of Reorganization of Mahwah Bergan Retail
Group, Inc. (f/k/a Ascena Retail Group, Inc.) and Its Debtor Affiliates* attached to the Confirmation Order (as
such term is defined herein) as Exhibit A.  Order Confirming Am. Joint Chapter 11 Plan (Technical
Modifications) of Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) & Its Debtor Affiliates
Ex. A, ECF No. 1811.  Any capitalized term not defined herein shall have the meaning ascribed to it in the Plan.

[3]   Obj. by U.S. SEC to Confirmation of Debtors' Am. Joint Chapter 11 Plan, ECF No. 849; Securities Lead Pls.'
Obj. to Confirmation of Am. Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor
Affiliates, ECF No. 889; Securities Lead Pls.' Suppl. Obj. to Confirmation of Am. Joint Chapter 11 Plan of
Reorganization of Ascena Retail Group, Inc. & Its Debtor Affiliates, ECF No. 1622; Obj. of U.S. Trustee to
Confirmation of Am. Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor
Affiliates, ECF No. 746; Obj. of U.S. Trustee to Confirmation of Am. Joint Chapter 11 Plan of Reorganization
of Ascena Retail Group, Inc. & Its Debtor Affiliates, ECF No. 1697.

dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). Venue is
appropriate pursuant to 28 U.S.C. § 1409.

Prior to the Petition Date, the Debtors had entered into a Restructuring Support
Agreement (the "RSA")[4] then supported by 68% of the Debtors' prepetition secured term lenders
(the "Term Lenders"). Teffner Decl. ¶ 4, ECF No. 1760 at 3. The RSA contemplated a balance
sheet restructuring but also provided the Debtors flexibility to consider alternative value-
maximizing transactions. Shortly after the Petition Date, on July 31, 2020, the Debtors filed
their *Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor
Affiliates* [ECF No. 154] (the "Original Plan") to implement the restructuring transaction
contemplated by the RSA. The Original Plan would have converted the debt held by the
Debtors' Term Lenders into equity in the Reorganized Debtors. Original Plan, art. III.B.4, ECF
No. 154 at 21. General unsecured creditors would receive their pro rata share of $500,000. *Id*.,
art. III.B.5, ECF No. 154 at 22. Then-existing holders of equity interests in Ascena would
receive nothing.[5] *Id*., art. III.B.8, ECF No. 154 at 22.

As the Bankruptcy Cases progressed, the Debtors pivoted from the debt-to-equity
conversion set forth in the Original Plan to three consummated sale transactions. First, the
Debtors obtained a stalking horse bid for their Catherines assets of $16 million. Order
(I) Approving Stalking Horse Protections, (II) Approving Bidding Procedures for Sale of
Catherines Assets, & (III) Approving Contract Assumption & Assignment Procedures, ECF No.
455. The Debtors ultimately sold the Catherines enterprise as a going concern for a purchase
price of $40.8 million. Am. Order (I) Approving Definitive Purchase Agreement,

---

[4]    The RSA was subsequently amended. Teffner Decl. ¶ 5, ECF No. 1760 at 3.

[5]    Out of the sixty-four debtor entities, only Ascena was publicly traded.

(II) Authorizing Sale of Catherines Assets Free & Clear of Liens, Claims, Encumbrances, &

Interests, & (III) Granting Related Relief, ECF No. 690.  Second, the Debtors obtained an initial

stalking horse bid for their Justice assets of $44 million.  Order (I) Approving Stalking Horse

Protections, (II) Approving Bidding Procedures for Sale of Justice Assets, & (III) Approving

Contract Assumption & Assignment Procedures, ECF No. 986.  The Debtors ultimately sold the

Justice enterprise as a going concern for $71 million.  Order (I) Approving Sale of Justice Assets

Free & Clear of All Liens, Claims & Encumbrances, (II) Authorizing Assumption & Assignment

of Certain Executory Contracts & Unexpired Leases, & (III) Granting Related Relief, ECF No.

1118.  Third and finally, the Debtors sold their remaining brands[6] (the "Premium Sale") as a

going concern for a purchase price of $540 million, exclusive of the assumption of certain

liabilities.  Order (I) Approving Assumption & Assignment of Certain Non-Real Property

Contracts & Real Property Leases, (II) Approving Sale of Premium & Lane Bryant & Certain

Other Assets Free & Clear of All Liens, Claims, Encumbrances, & Interests, (III) Authorizing

Assumption & Assignment of Certain Executory Contracts & Unexpired Leases,

(IV) Establishing Rejection Procedures, & (V) Granting Related Relief, ECF No. 1295.  When

the Premium Sale closed on December 23, 2020, the Debtors had effectively completed the sale

of substantially all of their assets.  Teffner Decl. ¶ 5, ECF No. 1760 at 3.  The Ascena brands live

---

[6]    Including the Lane Bryant, Ann Taylor, LOFT, and Lou & Grey brands.  *See* Debtors' Mot. Entry of Order
(I) Approving Assumption & Assignment of Certain Non-Real Property Contracts & Real Property Leases,
(II) Approving Sale of Premium & Lane Bryant & Certain Other Assets Free & Clear of All Liens, Claims,
Encumbrances, & Interests, (III) Authorizing Assumption & Assignment of Certain Executory Contracts &
Unexpired Leases, (IV) Establishing Rejection Procedures, & (V) Granting Related Relief ¶ 3, ECF No. 1212 at
3.

on, however, with almost all of the Debtors' stores continuing business operations and most

employees retaining their jobs.[7]

The RSA was amended in light of the foregoing.  The RSA, as amended and revised, was

supported by 97% of the Term Lenders.  Teffner Decl. ¶¶ 4-5, ECF No. 1760 at 3-4.  Similarly,

the Plan was subsequently amended to provide for a distribution of remaining estate cash

following the effective date (the "Effective Date")[8] of the Plan and incorporated a global

resolution with the official committee of unsecured creditors.[9]  *Id*. ¶ 5, ECF No. 1760 at 3-4.

The Plan now provided for payment in full in Cash on the Effective Date of priority and

administrative claims and the Debtors' pre-Petition Date ABL loan in the amount of $333

million.  The fulcrum class was the Term Lenders, who will receive their pro rata share of the

remaining cash subject to a carveout for general unsecured creditors.  In turn, the general

unsecured creditors will receive a pro rata distribution from a trust (the "GUC Trust") established

for their benefit and, as more fully explained herein, a possible waiver of any avoidance action

that may be brought against a holder of a general unsecured claim.  Plan, art. III.B.5 & IV.C,

ECF No. 1811 at 104-105, 107.  The GUC Trust will be funded by $7.25 million in cash and a

portion of proceeds from certain non-bankruptcy litigation.  *Id*., art. I.A.84, ECF No. 1811 at 92.

---

[7]   As part of the Premium Sale alone, the Debtors assumed and assigned 1,246 real property leases and 1,470 non-lease executory contracts.  Debtors' Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶ 4, ECF No. 1762 at 15.

[8]   The "Effective Date" is defined as "the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective by the Debtors."  Plan, art. I.A.65, ECF No. 1811 at 91.

      Per the *Notice of (I) Entry of Order Confirming the Debtors' Amended Chapter 11 Plans and (II) Occurrence of Effective Date* [ECF No. 1845], the Effective Date occurred on March 5, 2021.

[9]   On August 3, 2020, the U.S. Trustee appointed a statutory committee of unsecured creditors in these Bankruptcy Cases in accordance with section 1102 of the Bankruptcy Code.  *See* Appointment Official Committee Unsecured Creditors, ECF No. 164.

Holders of equity interests in Ascena are not projected to receive any distribution and, as such, were deemed to reject the Plan. *Id*., art. III.B.8, ECF No. 1811 at 105.

To effectuate the sale transactions, the Debtors used certain of the sales proceeds to repay the Debtors' Court-approved debtor-in-possession financing facilities. Kosturos Decl. ¶ 6, ECF No. 1761 at 3. The Debtors reserved appropriately $255 million for payment of certain unresolved claims to be paid in full pursuant to the terms of the Plan: (a) approximately $61 million for projected administrative and priority claims related to the Justice and Catherines businesses; (b) approximately $27 million to fund administrative costs related to the post-Effective Date wind-down of the Debtors' estates; (c) $7.25 million to fund the GUC Trust in accordance with the terms of the Plan; (d) approximately $5.3 million to cash collateralize certain outstanding surety bonds; and (e) approximately $154 million for allowed administrative, priority, and other claims or amounts required to be paid under the Plan. *Id*. ¶ 8, ECF No. 1761 at 4. Based on the claims filed to date and the Debtor's books and records, the Debtors will have cash reserved on the Effective Date well in excess of what will be necessary to pay all allowed administrative, priority, and other claims or amounts required to be paid under the Plan. *Id*. ¶ 11, ECF No. 1761 at 5. After payment of the allowed amount of these claims, the Plan provides that any remaining excess cash will be disbursed to the Term Lenders. *Id*.

As part of the holistic structure of the Plan, the major constituents negotiated and included certain releases and exculpation provisions contained in Article VIII of the Plan. In particular, the Plan provides, inter alia:

> [E]ach Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates . . . from any and all Causes of Action,[10] including any derivative claims,

---

[10]    The term "Causes of Action" is broadly defined in the Plan. *See* Plan, art. I.A.28, ECF No. 1811 at 88.

> asserted or assertable on behalf of any of the Debtors . . . based on
> or relating to, or in any manner arising from, in whole or in part, the
> Debtors (including the management, ownership, or operation
> thereof), the purchase, sale, or rescission of any Security of the
> Debtors or the Reorganized Debtors, the subject matter of, or the
> transactions or events giving rise to, any Claim or Interest that is
> treated in the Plan, . . . or any other related agreement, or upon any
> other act, omission, transaction, agreement, event, or other
> occurrence (in each case, related to any of the foregoing) taking
> place on or before the Effective Date.

(the foregoing the "Debtor Releases").  Plan, art. VIII.E, ECF No. 1811 at 129-30.  The Plan

further provides:

> [E]ach Releasing Party . . . is deemed to have released and
> discharged each Debtor, Reorganized Debtor, and each other
> Released Party from any and all Causes of Action, whether known
> or unknown, including any derivative claims, asserted or assertable
> on behalf of any of the Debtors . . . based on or relating to, or in
> any manner arising from, in whole or in part, the Debtors
> (including the management, ownership or operation thereof), the
> purchase, sale, or rescission of any Security of the Debtors or the
> Reorganized Debtors, the subject matter of, or the transactions or
> events giving rise to, any Claim or Interest that is treated in the
> Plan, . . . or any other related agreement, or upon any other act,
> omission, transaction, agreement, event, or other occurrence (in
> each case, related to any of the foregoing) taking place on or
> before the Effective Date.

(the foregoing, the "Third-Party Releases").  *Id.*, art. VIII.F, ECF No. 1811 at 130.  "Releasing

Party" is defined to include, but is not limited to, all holders of claims and interests who do not

timely opt out of or object to the Third-Party Releases.  *Id.* art. I.A.129, ECF No. 1811 at 96.

"Released Party" includes, but is not limited to, the Debtors and certain of their current and

former managers, directors, and officers.  *See id.* art. I.A.127 & 128, ECF No. 1811 at 95-96.

Finally, the Plan provides, inter alia:

> [N]o Exculpated Party shall have or incur, and each Exculpated
> Party is hereby released and exculpated from any Cause of Action
> or any claim arising from the Petition Date through the Effective
> Date related to any act or omission in connection with, relating to,

> or arising out of, the Chapter 11 Cases . . . except for claims related
> to any act or omission that is determined in a Final Order to have
> constituted actual fraud, willful misconduct, or gross
> negligence . . . .

(the foregoing, the "Exculpation Provision").  *Id.*, art. VIII.G, ECF No. 1811 at 130-31.

"Exculpated Parties" is defined to include, but is not limited to, the Debtors and certain of their

non-estate fiduciaries who played a critical role in these Bankruptcy Cases.  *Id.*, art. I.A.71, ECF

No. 1811 at 91.

The Debtor Releases, the Third-Party Releases, and the Exculpation Provision were an

integral part of the parties' negotiations in reaching a successful restructuring.  Among other

things, the releases resolved indemnification claims against the estates and permitted an orderly

and efficient wind-down process to proceed.  They served to avoid entanglement of the estates in

expensive and protracted post-confirmation litigation that could only delay and dilute the

negotiated distributions.

The propriety of these provisions was investigated prior to the Petition Date and

throughout the pendency of the Bankruptcy Cases.  The Debtors appointed a special committee

of disinterested directors (the "Special Committee"), Begeman Decl. ¶ 1, ECF No. 1759 at 1-2,

who were charged with conducting an investigation of certain historical transactions and with

evaluating the merits and propriety of the proposed releases by the Debtors of any claims or

causes of action they held against any Related Party.  The Special Committee was tasked with

making determinations and recommendations to the Debtors' Board of Directors (the "Board") in

connection with the release by the Debtors of any claims or causes of action against any Related

Party.  *Id.* ¶ 7, ECF No. 1759 at 3.  As a result of this investigation, the Special Committee did

not identify any material claims in favor of the Debtors.  *Id* ¶ 9, ECF No. 1759 at 4.  Specifically,

in connection with the releases contemplated by the Plan, including the Third-Party Releases, the

Special Committee determined that the benefits from the transactions contemplated by the Plan and the confirmation of the Plan without undue delay, in light of the clear support of the Debtors' stakeholders, outweighed potential benefits of pursuing any potential Causes of Action that the Debtors and Releasing Parties could assert against the Released Parties. *Id*. ¶ 12, ECF No. 1759 at 5. In reaching such a decision, the Special Committee did not find any colorable Causes of Action against the Debtors' or their affiliates' managers, directors, or officers subject to the Third-Party Releases. *Id*. ¶ 13, ECF No. 1759 at 5. The Special Committee further determined that, even if such claims did exist, they would be unlikely to result in any net recovery because of mutual indemnification obligations with the Debtors. *Id*. ¶ 13, ECF No. 1759 at 5.

The Special Committee also focused on allegations advanced by Joel Patterson and Michaella Corporation, the court-appointed lead plaintiffs (together, the "Securities Litigation Lead Plaintiffs") in litigation commenced in the District of New Jersey against Ascena and certain former directors and officers, captioned *In re Ascena Retail Group, Inc. Securities Litigation*, Case No. 2:19-cv-13529-KM-JBC (the "Securities Litigation"),[11] and on a derivative claim pending in the District of Delaware against current and former members of the Board. *Id*. ¶ 14, ECF No. 1759 at 5. The Special Committee concluded as a result of its investigation that

---

[11] The Securities Litigation involved a class action lawsuit brought on behalf of the Securities Litigation Lead Plaintiffs and a proposed class of persons who purchased or otherwise acquired Ascena common stock between December 1, 2015 and May 17, 2017 (the "Putative Class Period"). As of the Petition Date, the district court had not certified the class in the Securities Litigation. As more fully detailed in this Court's *Memorandum Opinion* [ECF No. 1842] (the "Class Certification Opinion") issued in connection with the *Securities Lead Plaintiffs' Motion for Entry of an Order (I) Authorizing Lead Plaintiffs to Opt Out of Third-Party Releases on Behalf of the Class or, in the Alternative, (II) Certifying the Class for a Limited Purpose Pursuant to Fed. R. Bankr. P. 7023 and 9014 and Fed. R. Civ. P. 23* [ECF No. 740] (the "Class Certification Motion"), at no point did the Securities Litigation Lead Plaintiffs seek relief from the automatic stay under section 362(d) of the Bankruptcy Code to resume the Securities Litigation. Rather, the Securities Litigation Lead Plaintiffs waited until after the conclusion of the Confirmation Hearing to bring their Class Certification Motion. For the reasons stated in the Class Certification Opinion, the Court denied the Class Certification Motion. Order, ECF No. 1843. As such, the Securities Litigation Lead Plaintiffs appear in their individual capacities and not as representatives of any putative class.

the claims asserted in both lawsuits were meritless and did not have material value.  *Id*. ¶ 14,

ECF No. 1759 at 6.

Although the Debtors had previously determined that the releases incorporated in the

Plan had no value, the Third-Party Releases were not without value to other constituencies in the

Bankruptcy Cases.  As consideration for the Third-Party Release, the Debtors agreed to waive

any avoidance action held by the bankruptcy estates under chapter 5 of the Bankruptcy Code

against any holder of a general unsecured claim who did not choose to opt-out.  Plan, art. I.A.1,

2, & 129, art. VIII.F, ECF No. 1811 at 87, 129.  A holder of an equity interest in Ascena who

chose not to opt-out of or object to the releases was also included as a Released Party and, as

such, also received a mutual release.  *Id.*, art. I.A.127 & 128, ECF No. 1811 at 95-96.

Prior to the Debtors' solicitation of votes on the Plan, the Court entered an Order (the

"Disclosure Statement Order") on September 11, 2020, approving the *Disclosure Statement for*

*the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and Its*

*Debtor Affiliates* [ECF No. 565] (the "Disclosure Statement") in accordance with section 1125 of

the Bankruptcy Code.  Order (I) Approving Adequacy Disclosure Statement, (II) Approving

Solicitation & Notice Procedures, (III) Approving Forms of Ballots & Notices, (IV) Scheduling

Certain Dates with Respect Thereto, & (V) Granting Related Relief, ECF No. 592.  Holders of

equity interests in Ascena were deemed to reject the Plan and, as such, were not entitled to vote

on the Plan.  Nevertheless, the Court required that a *Notice of Non-Voting Status to Holders of*

*Interests Deemed to Reject the Plan and of Third-Party Release under the Plan* [ECF No. 592]

(the "Notice of Non-Voting Status") be sent to both current shareholders of Ascena and former

shareholders of Ascena during the Putative Class Period.  On the suggestion of the Securities and

Exchange Commission, the Court required the Notice of Non-Voting Status to include the

following language:

---

**PLEASE READ – YOUR RESPONSE IS REQUIRED BY <u>OCTOBER 13, 2020</u>**

- You are receiving this notice because you are a current or former shareholder of Ascena Retail Group, Inc., which filed for chapter 11 bankruptcy.

- You will not receive any distribution in the bankruptcy case and your shares will be canceled.

- In addition, **<u>you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed "Release Opt-Out Form" by October 13, 2020, at 5:00 P.M</u>**. prevailing Eastern Time.

- There will be no harm to you under the Plan if you return the Opt-Out Form; however, you will not receive a release.

- For more specific information and instructions, please read the Release Opt-Out Form enclosed at the end of this notice as <u>Exhibit A</u>.

---

Disclosure Statement Order, sched. 5, ECF No. 592 at 562 (emphasis in original).  The Court

determined that the foregoing Notice of Non-Voting Status provided adequate information

reasonably practicable to enable the Debtors' equity holders to make an informed decision about

the process for opting out of the Third-Party Releases in accordance with section 1125 of the

Bankruptcy Code.  *See id*. ¶¶ 2-3 & 7, ECF No. 592 at 3 & 5. No party appealed the Disclosure

Statement Order, which is now a final, unappealable order.

    The Notice of Non-Voting Status advised recipients that they could elect to opt out of the

Third-Party Releases by returning an enclosed form (the "Release Opt-Out Form") no later than

November 15, 2020[12] either (i) in hard copy by first class mail, overnight delivery, or hand

---

[12]    Per the Disclosure Statement Order, the original deadline to return the Release Opt-Out Form was October 13, 2020.  Disclosure Statement Order, sched. 5, ECF No. 592 at 562.  The Debtors later extended the deadline through November 15, 2020, giving recipients of the Notice of Non-Voting Status and the Release Opt-

delivery, or (ii) electronically through a dedicated online portal.  Johnson Decl. ¶¶ 5-6, ECF No.

947 at 3.  The Release Opt-Out Form did not require recipients to fill out or otherwise supply any

information other than their identity to indicate their desire to opt out.  Merely returning the form

prior to the deadline was sufficient to effectuate the opt-out.  Debtors' Obj. to Class Certification

Mot. ¶¶ 15, 48; ECF No. 944 at 6, 22.  The Notice of Non-Voting Status was accompanied by a

pre-addressed envelope, with pre-paid postage, which recipients could use to return the Release

Opt-Out Form.  Johnson Decl. ¶ 8, ECF No. 947 at 4.

Ascena's equity holders held their interests either (i) as a registered holder directly on the

books and records of Ascena's transfer agent, American Stock Transfer & Trust Company, LLC

("AST"), or (ii) as a beneficial holder through a bank, broker, or other financial institution (each

of the foregoing, a "Nominee") holding the equity "in street name" at The Depository Trust

Company.  Johnson Decl. ¶ 7, ECF No. 947 at 4.  In accordance with the notice procedures set

forth in the Court's Disclosure Statement Order, Prime Clerk LLC ("Prime Clerk"),[13] the

Debtors' Court-approved claims and noticing agent, took a comprehensive, two-pronged

approach to ensure that equity holders of each type received notice of the Third-Party Releases

and the opt-out procedures.  First, as to registered holders, Prime Clerk worked with AST to

identify current registered equity holders and registered equity holders who purchased or

otherwise acquired Ascena stock either as of the voting record date (as such term is defined in

the Plan) or during the Putative Class Period.  *Id*. ¶ 8, ECF No. 947 at 4.  Prime Clerk then

served by first-class mail the Notice of Non-Voting Status, the Release Opt-Out Form, and the

---

Form nearly sixty days to make their election. *See* Debtors' Obj. to Class Certification Mot. ¶¶ 15, 48; ECF No. 944 at 6, 22.

[13]   The Court authorized the retention and appointment of Prime Clerk as claims and noticing agent in these Bankruptcy Cases pursuant to 28 U.S.C. § 156(c) and section 105 of the Bankruptcy Code.  Order Authorizing Retention & Appointment of Prime Clerk LLC as Claims & Noticing Agent, ECF No. 69.

postage pre-paid return envelope on all current and former registered holders identified by AST.

*Id*.  Second, as to beneficial holders, Prime Clerk served the Notice of Non-Voting Status and the

Release Opt-Out Form on Prime Clerk's comprehensive proprietary list of Nominees with

instructions for them to forward the materials to their beneficial holder clients as of the voting

record date and their beneficial holder clients who had purchased or otherwise acquired the

equity interest during the Putative Class Period.  *Id*. ¶ 9, ECF No. 947 at 4.  The instructions

provided Nominees with the option either to (i) request additional copies of the Notice of Non-

Voting Status and Release Opt-Out Forms from Prime Clerk for the purpose of forwarding such

materials to their underlying beneficial holder clients within seven days of receipt, or (ii) provide

a list of their clients directly to Prime Clerk within seven days of receipt of the materials, with

instructions for Prime Clerk to serve such beneficial holders directly.  *Id*. ¶ 9, ECF No. 947 at

4-5.

        Utilizing this comprehensive process, the Debtors provided notice of the Third-Party

Releases and the opt-out procedure to 300,000 notice parties.  As of October 15, 2020, at least

200 current and former shareholders of Ascena had opted out of the Third-Party Releases.  *Id*.

¶ 6, ECF No. 947 at 3.  A month later, by November 18, 2020, the Debtors had received

approximately 596 Release Opt-Out Forms.  Debtors' Mem. of Law in Supp. of Confirmation of

Fifth Am. Plan ¶ 103, ECF No. 1762 at 56.  The Court found that this process provided sufficient

notice to the Debtors' equity interest holders and a meaningful, informed, and convenient

opportunity for them to opt out of the Third-Party Releases in the Plan.

        In order to confirm the Plan, the Court must find that each of the requirements set forth in

section 1129(a) of the Bankruptcy Code has been met.  11 U.S.C. § 1129(a); *see also In re Smith*,

58 B.R. 652, 654 (Bankr. W.D. Va. 1985), *aff'd sub nom. Architectural Design, Inc. v. Internal*

*Revenue Serv.* (*In re Architectural Design, Inc.*), 59 B.R. 1019 (W.D. Va. 1986) ("Section 1129(a) of the Bankruptcy Code authorizes confirmation of a plan of reorganization if all of the requirements of the listed subsections are met.").

The Court finds that the Plan complies with all applicable provisions of the Bankruptcy Code and, as such, that the first element of section 1129(a) is satisfied.  11 U.S.C. § 1129(a)(1). In analyzing this factor, the Court must consider whether the Plan complies with the requirements for the classification of claims set forth in sections 1122 and 1123 of the Bankruptcy Code.  *See* S. Rep. No. 95-989 (1978), at 126, *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 549 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6541.

Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  "[S]ection 1122 requires substantial similarity between claims that are placed in the same class."  *Travelers Ins. Co. v. Bryson Props., XVIII* (*In re Bryson Props., XVIII*), 961 F.2d 496, 502 (4th Cir. 1992).  Nevertheless, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case."  *Id*. (quoting *Olympia & York Fla. Equity Corp. v. Bank of New York* (*In re Holywell Corp.*), 913 F.2d 873, 880 (11th Cir. 1990)).

The Plan provides for the following eight classes of claims and interests:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired /Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

Plan, art. III.A, ECF No. 1811 at 102-03.  The Court finds that the foregoing classes satisfy the requirements of section 1122 of the Bankruptcy Code.  The claims and interests assigned to each of the classes are substantially similar to other such claims and interests in each respective class.  The Court further finds that valid business, legal, and factual reasons justify the separate classification of the particular claims and interests into the foregoing classes.  The classification scheme tracks the Debtors' capital structure.  *See* Teffner Decl. ¶ 9, ECF No. 1760 at 4.  Finally, the Court finds that no unfair discrimination exists between or among holders of claims and interests in each of the respected classes.  The Plan separately classifies claims and interests because the claims and interests are dissimilar from the other classes of claims and interest.  For example, ABL Claims are separately classified in Class 3 from Term Loan Claims in Class 4 due to their differing contractual rights under the applicable credit agreements.  Plan, art. III.A, ECF No. 1811 at 102-03; *see* Teffner Decl. ¶ 12, ECF No. 1760 at 5.  Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

The Court further finds that the Plan satisfies the requirements of section 1123(a) of the Bankruptcy Code.  The seven requirements of section 1123(a) of the Bankruptcy Code applicable to these Bankruptcy Cases generally concern the classification of claims and interests, the treatment of such claims and interests within classes, and the mechanics for implementing the plan.  *See* 11 U.S.C. § 1123(a)(1)-(7).  The Court has found that the Plan designates classes of claims and classes of interests as required by section 1123(a)(1).  Article III of the Plan specifies which of those classes are unimpaired.  Plan, art. III.A, ECF No. 1811 at 102-03.  It specifies the treatment that each of the identified impaired classes will receive.  *Id.*, art. III.B, ECF No. 1811 at 103-05.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) and (a)(3).

Section 1123(a)(4) is met as the Plan provides for the same treatment of each claim or interests in a particular class unless otherwise agreed. *Id.*, art. III.B, ECF No. 1811 at 103-05.

Section 1123(a)(5) requires that the Plan provide adequate means for its implementation. 11 U.S.C. § 1123(a)(5). Article IV of the Plan meets this requirement as it provides for (a) the identification of sources of consideration for Plan distributions; (b) the cancellation of notes, instruments, certificates, securities, and other documents evidencing claims or interests; (c) the authorization for the corporate actions necessary to effectuate the Plan; and (d) the preservation of certain causes of action. Plan, art. IV, ECF No. 1811 at 106-18. The Plan explicitly prohibits the issuance of non-voting securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. *Id.*, art. IV.J, ECF No. 1811 at 112. The Plan provides that upon the Effective Date, a Plan Administrator will be appointed as the sole manager and officer of the reorganized Debtors, as detailed on Exhibits G and H thereto. *Id.*, art. IV.E.1, ECF No. 1811 at 109-10; Sixth Am. Plan Suppl., ECF No. 1790 at 18-29. The Court finds, therefore, that the provisions concerning the selection of officers, directors, and trustees under the Plan are consistent with the interests of creditors and equity security holders and public policy, as required by section 1123(a)(7) of the Bankruptcy Code. As the Plan complies with sections 1122 and 1123 of the Bankruptcy Code, the first element of section 1129(a) is satisfied.

The second element of section 1129(a) requires the proponent of the plan to comply with all applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). In evaluating this element, the Court must consider whether the plan proponent, here, the Debtors, complied with the disclosure and solicitation procedures of sections 1125 and 1126 of the Bankruptcy Code. *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009); *see also In re*

*Manchester Oaks Homeowners Ass'n, Inc.*, No. 11-10179-BFK, 2014 WL 961167, at *11, 2014 Bankr. LEXIS 951, at *33 (Bankr. E.D. Va. Mar. 12, 2014).

Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). By entry of the Disclosure Statement Order, the Court not only approved the Disclosure Statement as containing adequate information, it also approved the procedures for solicitation and voting, including all related notices, forms, and ballots. Disclosure Statement Order, ECF No. 592. Of particular importance, the Court specifically tailored the Notice of Non-Voting Status to ensure that Ascena equity holders were receiving sufficient information regarding the treatment of their interests, the impact of the Third-Party Releases, and the ability to opt out of the Third-Party Releases through the use of the Release Opt-Out Form. The uncontroverted evidence established that the Debtors, through Prime Clerk, satisfied the solicitation procedures approved by the Court and transmitted the Disclosure Statement as required by section 1125(c) of the Bankruptcy Code. *See* Orchowski Affs., ECF Nos. 720, 744, 768. As such, the Court finds that the Debtors complied with section 1125 of the Bankruptcy Code.

Section 1126 of the Bankruptcy Code concerns the mechanics for voting. 11 U.S.C. § 1126. The section first identifies who may vote and who may not vote on a plan:

> (a)   The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

*****

     (f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

     (g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

*Id*. § 1126(a), (f), (g).  The Court finds that the Debtors have complied with these provisions of section 1126 of the Bankruptcy Code.  The Plan created eight classes of claims and interests. Plan, art. III.A, ECF No. 1811 at 103.  Classes 1, 2, 3, 6, and 7 were unimpaired and deemed to accept the Plan pursuant to section 1126(a)(f).  *Id*.; 11 U.S.C. § 1126(f).  Class 8 was impaired and deemed to reject the Plan pursuant to section 1126(a)(g) of the Bankruptcy Code.  Plan, art. III.A, ECF No. 1811 at 103; 11 U.S.C. § 1126(g).  Only Classes 4 and 5 were impaired and entitled to vote on the Plan.  Plan, art. III.A, ECF No. 1811 at 103; 11 U.S.C. § 1126(a).

     For classes entitled to vote on a plan, section 1126 further explains the requirements for class acceptance:

     A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.

11 U.S.C. § 1126(c).  For a class of creditors[14] to accept the plan, more than one-half in number and two-thirds in amount of creditors who cast a ballot in such class must vote to accept the plan.

*See id*.

---

[14]    Subsection (d) contains certain requirements applicable to classes of interests entitled to vote on a plan.  *See* 11 U.S.C. § 1126(d).  No such class existed here.

In the case at bar, both classes that were entitled to vote elected to accept the Plan. For Class 4, 250 claim holders (or 97.28%) representing over $1.1 billion (or 98.93%) voted to accept the Plan, whereas only 7 claim holders (or 2.72%) with approximately $12 million in claims (or 1.07%) voted to reject the Plan. Orchowski Decl. Ex. A-1, ECF No. 1135 at 7. For Class 5, 281 claim holders (or 87.54%) representing over $82 million (or 90.19%) voted to accept the Plan, whereas only 40 claim holders (or 12.46%) with approximately $8 million (or 9.81%) voted to reject the Plan. *Id*. Section 1126(c) of the Bankruptcy Code was satisfied.

Accordingly, the Court finds that the Debtors have complied with the provisions of sections 1125 and 1126 of the Bankruptcy Code. The second element of section 1129(a) has been met.

The third element of section 1129(a) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "The overriding standard for good faith within the meaning of [section] 1129(a)(3) is whether 'there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" *Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1001 (E.D. Va. 1994) (quoting *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)). In assessing this factor, the Court is to consider the "totality of the circumstances which necessitated the plan," *id*., and whether the proponent "filed its case and proposed its Plan with the legitimate and honest purpose of reorganizing and maximizing both the value of the [debtor's] [e]state and the recovery to [c]laimants," *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 709-10 (4th Cir. 2011).

The Court finds that this element is met.[15]   The evidence adduced at the Confirmation

Hearing established that the Debtors proposed their Plan to maximize the recovery to the

Debtors' creditors.  From the Petition Date through the Confirmation Hearing, the Debtors took

all reasonable and necessary actions to maximize value.  The Debtors' undertakings in this

regard resulted in the full repayment of their debtor-in-possession financing.  It resulted in the

full satisfaction of the Debtors' ABL loans and the payment of all administrative and priority

claims.   The Debtors' Term Lenders realized a significant return. The Debtors' general

unsecured creditors saw a nearly fifteen-fold increase in the dividend they received, going from a

pool of $500,000 to one of $7.25 million.  *Compare* Original Plan, art. III.B, ECF No. 154 at 21-

22, *with* Plan, art. III.B, ECF No. 1811 at 102-05.  Not only does the Plan provide for an orderly

liquidation of the Debtors' remaining assets with a greater return to creditor constituents than

originally forecasted, the Plan is predicated upon the continued vitality of the Debtors'

businesses by the respective purchasers, ensuring that the Debtors' employees retain their jobs,

that suppliers and vendors retain buyers for their goods and services, and that consumers retain

the ability to shop their favorite brands.  No credible argument could suggest that the Debtors

have not proposed the Plan in good faith, and none has been advanced.  The Debtors have

achieved a remarkable result in the midst of unprecedented economic turmoil occasioned by the

ongoing global COVID-19 pandemic that has hit the retail sector particularly hard.  The Court

finds that section 1129(a)(3) has been met.

The fourth factor under section 1129 of the Bankruptcy Code requires that certain fees

and expenses be approved by the Court.  *See* 11 U.S.C. § 1129(a)(4) ("Any payment made or to

be made by the proponent . . . for services or for costs and expenses in or in connection with the

---

[15]    The Court will address the issue of the Third-Party Releases later in this Memorandum Opinion.

case, or in connection with the plan . . . , has been approved by, or is subject to the approval of, the court as reasonable."). Article II.D of the Plan provides the mechanism for the approval and payment of "Professional Fee Claims," as such term is defined in section 118 of Article I.A of the Plan. Plan, art. I.A.118, II.D, ECF No. 1811 at 95, 101-102. If not previously approved by the Court, all pre-confirmation Professional Fee Claims must be approved by the Court no later than forty-five days after the Effective Date of the Plan and remain subject to the reasonableness requirements of sections 328 or 330 of the Bankruptcy Code, as applicable. *Id*., art. II.D, ECF No. 1811 at 101-102. The Court finds that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

The Plan must disclose the directors and officers or successors of the debtor after confirmation. *See* 11 U.S.C. § 1129(a)(5). The Plan provides that upon the Effective Date, a Plan Administrator will be appointed as the sole manager and officer of the reorganized Debtors, as more fully detailed on Exhibits G and H thereto. Plan, art. IV.E.1, ECF No. 1811 at 109-10; Sixth Am. Plan Suppl., ECF No. 1790 at 18-29. The Plan also defines the duties and responsibilities of the Plan Administrator, Plan, art. IV.E.1, ECF No. 1811 at 109-10; Sixth Am. Plan Suppl., ECF No. 1790 at 18-29, which the Court finds to be consistent with the interests of creditors and equity security holders and with public policy. The Plan satisfies the fifth element of section 1129(a).

The Plan does not require any rate changes subject to governmental regulatory review and as such, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the case at bar.

The seventh factor of section 1129(a)(7), commonly known as the "best interests test," provides, in pertinent part:

> With respect to each impaired class of claims or interests—

(A)    each holder of a claim or interest of such class—

(i)    has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date

11 U.S.C. § 1129(a)(7).  If an impaired creditor has not voted to accept the plan, such creditor must receive as much as the creditor would in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.[16]  While Classes 4 and 5 voted overwhelmingly to accept the Plan, a few holders of the claims in those classes did vote to reject.  Orchowski Decl. Ex. A-1, ECF No. 1135 at 7.  Moreover, Ascena equity security holders in Class 8 were deemed to reject the Plan by operation of section 1126(a)(g).  Plan, art. III.A, ECF No. 1811 at 103; 11 U.S.C. § 1126(g). In order to satisfy the best interests test, creditors in Classes 4 and 5 and equity security holders in Class 8 must receive not less under the Plan than they would in a hypothetical chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7).

To that end, the Debtors prepared a liquidation analysis which was attached to their Disclosure Statement as Exhibit G.  According to that analysis, a conversion to chapter 7 and a liquidation thereunder would most likely result in the administrative insolvency of these Bankruptcy Cases.  Disclosure Statement Ex. G, ECF No. 565 at 379.  In a best-case scenario, the Term Lenders would receive only a 12% distribution on their claims with no money remaining to pay administrative or priority claims.  No money would flow to general unsecured

---

[16]    This test applies to individual holders of claims that vote to reject the plan, as opposed to classes.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

creditors. *Id*. In a worst-case scenario, the debtor-in-possession financing would not be fully repaid. *Id*.

In the interim between the filing of the Disclosure Statement and the Confirmation Hearing, the Debtors successfully liquidated the vast majority of their assets through the consummation of the three going-concern sale transactions. Those sale transactions generated significant revenue that greatly exceeded initial projections. In light of those sale transactions and the minimal amount of assets remaining, the Debtors have successfully liquidated. Conversion to a chapter 7 liquidation would serve to decrease any distribution to creditors by increasing administrative claims. As such, the Court finds that the best interests test is met.

The eighth element of section 1129(a)(8) is not met in this case. Section 1129(a)(8) requires that each class of claims either accept the plan or be unimpaired. 11 U.S.C. § 1128(a)(8). While all voting classes voted overwhelmingly to accept the plan, *see* Orchowski Decl. Ex. A-1, ECF No. 1135 at 7, Class 8 is impaired and deemed to reject the Plan pursuant to section 1126(g), Plan, art. III.A, ECF No. 1811 at 103; 11 U.S.C. § 1126(g). As such, this element cannot be met.

However, failure to satisfy section 1129(a)(8) is not fatal. The Court may still confirm the Plan pursuant to section 1129(b), provided the remaining elements of section 1129(a) are met.[17] Section 1129(b) of the Bankruptcy Code allows a court to "cramdown" a plan on a

---

[17]    The Plan may be confirmed pursuant to section 1129(b):

> if all of the applicable requirements of subsection (a) of this section other than
> paragraph (8) are met with respect to a plan, the court, on request of the
> proponent of the plan, shall confirm the plan notwithstanding the requirements
> of such paragraph if the plan does not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

dissenting class so long as "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Id*. § 1129(b)(1).

Only Class 8 – Ascena equity security holders – is impaired and has not accepted the Plan. Plan, art. III.A, ECF No. 1811 at 103; 11 U.S.C. § 1126(g). As such, the Court need only consider whether the Plan is fair and equitable with respect to Class 8. *See* 11 U.S.C. § 1129(b)(1).

A plan is "fair" and equitable" as required by section 1129(b) if it satisfies the "absolute priority rule." "The absolute priority rule provides that 'a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'" *Travelers Ins. Co. v. Bryson Props., XVII* (*In re Bryson Props., XVIII*), 961 F.2d 496, 503 (4th Cir. 1992) (alteration in original) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988)).

Section 1129(b)(2)(C)(ii) effectively codifies the absolute priority rule as to classes of interest.[18] Class 8 is comprised of the equity interest holders in Ascena. *See* Plan, art. III.A, ECF No. 1811 at 103. If a class of interests does not receive the value of their interest, no junior classes of claims may receive anything under the plan. 11 U.S.C. § 1129(b)(2)(C)(ii). There is

---

[18]    With respect to a class of interests, a plan is fair and equitable if

> (i)    the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

> (ii)    the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

*Id*. § 1129(b)(2)(C).

no class junior to Class 8.  As no class junior to Class 8 is receiving or retaining anything under the Plan, the Plan satisfies the absolute priority rule and is fair and equitable within the meaning of section 1129(b).

The Bankruptcy Code imposes the additional requirement that a plan not unfairly discriminate against impaired and non-accepting classes, i.e., Class 8.  *See id*. § 1129(b)(1).  "A plan unfairly discriminates in violation of [section] 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a reasonable basis for the disparate treatment, or a class of claims receives consideration of a value that is greater than the amount of its allowed claims."  *In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 230 (Bankr. E.D. Va. 2016).  The Plan does not discriminate unfairly because all holders of interests in Class 8 are treated the same under the Plan.  Therefore, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed regardless of its failure to satisfy section 1129(a)(8).

The ninth element of section 1129 provides for certain treatment of administrative and priority claims unless the holders of such claims agree otherwise.  Specifically, claims specified in section 507(a)(2) – administrative claims allowed under section 503(b) of the Bankruptcy Code – must be paid in full on the plan's effective date.  11 U.S.C. § 1129(a)(9)(A).  Article II.A of the Plan provides that all such administrative claims will be paid in full on the Effective Date unless otherwise agreed, thereby meeting the requirements of section 1129(a)(9)(A).  Plan, art. II.A, ECF No. 1811 at 99-100.

Claims specified in section 507(a)(1), (4)-(7) – priority claims concerning domestic support obligations, wages, employee benefits, and certain deposits – must be paid in cash either, if the class has accepted the plan, deferred cash payments with a value, as of the plan's effective date, equal to the allowed amount of such priority claim, or, if the class has not accepted the

plan, in full in cash on the effective date.  11 U.S.C. § 1129(a)(9)(B).  Such priority claims are

classified in Class 2, which will receive payment in full on the Effective Date, thereby meeting

the requirements of section 1129(a)(9)(B).  Plan, art. III.B.2, ECF No. 1811 at 103-04.  The

evidence adduced at the Confirmation Hearing established that the Debtors have set aside

sufficient cash to pay all such administrative and priority claims in full.  Kosturos Decl. ¶¶ 6,

8-11, ECF No. 1761 at 3, 4-5.

Lastly, claims specified in section 507(a)(8) – priority tax claims – must be paid the

present value of such claims, although the payments may be made in installments over a period

not to exceed five years.  11 U.S.C. § 1129(a)(9)(C).  Article II.E of the Plan provides such

treatment to allowed priority tax claims.  Plan, art. II.E, ECF No. 1811 at 102.  All three

sub-elements of 1129(a)(9) are met and this ninth element has been satisfied.

The tenth element of section 1129(a) requires that "[i]f a class of claims is impaired

under the plan, at least one class of claims that is impaired under the plan has accepted the plan,

determined without including any acceptance of the plan by any insider."   11 U.S.C.

§ 1129(a)(10).  As both Class 4 and Class 5 were impaired under the Plan, Plan, art. III.A, ECF

No. 1811 at 103; 11 U.S.C. § 1126(a), and as both classes voted to accept the Plan independent

of any insider votes, Orchowski Decl. Ex. A-1, ECF No. 1135 at 7, section 1129(a)(10) is met.

The eleventh factor of section 1129(a) requires that "[c]onfirmation of the plan is not

likely to be followed by the liquidation, or the need for further financial reorganization . . . unless

such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  Under this

element, the "plan must provide a realistic and workable framework for reorganization. . . . Of

course, '[i]t is not necessary that success be guaranteed, but only that the plan present a workable

scheme of organization and operation from which there may be a reasonable expectation of

success.'"  *Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1004 (E.D. Va. 1994) (alteration in original) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992)).

The Court finds that this element is met.  The bulk of the Debtors' assets have been reduced to cash through the consummation of the three sale transactions.  All that is remaining in the administration of these Bankruptcy Cases is the liquidation of the few enumerated retained assets, the completion of the claims reconciliation process, and the distribution of the estates' cash in accordance with the waterfall provided in the Plan.  The Plan provides that a Plan Administrator will be appointed to oversee and accomplish the foregoing tasks.  Plan, art. IV.E.1, ECF No. 1811 at 109-10; Sixth Am. Plan Suppl., ECF No. 1790 at 18-29.  The uncontroverted evidence is that the Debtors have reserved sufficient cash to make the distributions required under the Plan.  Kosturos Decl. ¶¶ 6, 8-11, ECF No. 1761 at 3, 4-5.  As such, the Court finds that section 1129(a)(11) of the Bankruptcy Code is met.

The twelfth element for confirmation requires payment in full of all outstanding fees payable under 28 U.S.C. § 1930.  11 U.S.C. § 1129(a)(12).  Article XII.C of the Plan provides that any such fees, to the extent not previously paid, will be paid in full on the Effective Date.  Plan, art. XII.C, ECF No. 1811 at 136.  As such, the Court finds that section 1129(a)(12) is satisfied.

Section 1129(a)(13) of the Bankruptcy Code requires the continuation of retiree benefits, as such term is defined in section 1114 of the Bankruptcy Code.  In satisfaction thereof, article IV.R of the Plan provides "pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits . . . shall continue to be paid in accordance with

applicable law." Plan, art. IV.R, ECF No. 1811 at 117. As such, the Court finds that the Plan

meets the requirements of section 1129(a)(14).

Subsections (14), (15), and (16) of section 1129(a) of the Bankruptcy Code are not

applicable to these Bankruptcy Cases. Section 1129(a)(14) contains certain requirements

applicable to a debtor who is required to pay domestic support obligations. The Debtors are not

so required and, as such, section 1129(a)(14) is inapplicable to these Bankruptcy Cases. Section

1129(a)(15) pertains to individual debtors and, as such, is inapplicable to these Bankruptcy

Cases. Finally, each of the Debtors are a moneyed, business, or commercial corporation, and, as

such, section 1129(a)(16) is inapplicable.

The Plan further complies with the remaining provisions of section 1129 of the

Bankruptcy Code. The Court has and will confirm only one plan – this Plan – for the Debtors,

thereby satisfying section 1129(c). The Plan meets the requirements of section 1129(d) as the

Plan is not designed to avoid taxes or the application of section 5 of the Securities Act of 1933

and no governmental unit has so alleged. Finally, none of the Bankruptcy Cases are a "small

business case" as such term is defined by section 101(51C) of the Bankruptcy Code, and

therefore section 1129(e) is inapplicable hereto. Therefore, the Court finds that, with the

exception of section 1129(a)(8), the Plan meets all elements of section 1129 and that, despite its

failure to satisfy section 1129(a)(8), the Plan is nonetheless confirmable as a cramdown plan

pursuant to section 1129(b) of the Bankruptcy Code.

The objections advanced at the Confirmation Hearing concerned the inclusion of the

Debtor Releases, the Third-Party Releases, and the Exculpation Provision in the Plan. The Court

overruled these objections, finding that these provisions are appropriate under the uncontroverted

facts presented at the Confirmation Hearing and the circumstances of these Bankruptcy Cases.

While a plan must meet the requirements of section 1129 in order to be confirmable, section 1123(b) the Bankruptcy Code provides a non-exhaustive list of various discretionary provisions that a plan may include.[19]  Among these discretionary provisions, a Plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  In accordance with this provision, the Plan also included Debtor Releases, by which the Debtors will release any and all Causes of Action against the Released Parties.  Plan, art. VIII.E, ECF No. 1811 at 129-130.

Releases, such as the Debtor Releases, are permissible under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.  *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 143 (Bankr. D. Del. 2010).  Based on the facts and circumstances of these Bankruptcy Cases, the Court finds that the uncontested evidence supports the Debtor Releases.  The Court finds that the Debtor Releases enjoyed the support of the overwhelming majority of the Debtors' creditors as indicated by the classes that voted on the Plan, Orchowski Decl. Ex. A-1, ECF No. 1135 at 7, or were otherwise deemed to accept the Plan, *see* Plan, art. III.A, ECF No. 1811 at 103; 11 U.S.C. § 1126(f).  The Court further finds that the Debtor Releases are a valid exercise of the Debtors' business judgment as the uncontroverted evidence presented is that, after an extensive investigation by the Debtors and by the Special Committee, the Debtors were unable to find any material Causes of Action covered by the Debtor Releases and that, in the event any such claims existed, the value of any such Causes of Action would have been significantly outweighed by the cost of litigation.  Teffner Decl. ¶ 42,

---

[19]    The Plan included many of these discretionary provisions.  Other than the releases and exculpation provisions discussed herein *infra*, no other discretionary provision was contested at the Confirmation Hearing.  For purposes of completeness, the Court finds all such other discretionary provisions supported by the uncontroverted evidentiary record and in accordance with section 1123(b)(3) of the Bankruptcy Code.

ECF No. 1760 at 14; Begeman Decl. ¶¶ 11-16, ECF No. 1759 at 4-6.  Finally, the Court finds

that the Debtor Releases are an integral part of the Plan and a key term negotiated by

sophisticated parties.  Without the Debtor Releases, "many of the Released Parties would have

been unwilling to financially contribute to or otherwise participate in the Plan process, which

would have been value destructive or compromised the Debtors' ability to restructure."  Teffner

Decl. ¶ 42, ECF No. 1760 at 14.  Accordingly, the Court will approve the Debtor Releases.[20]

In addition to the Debtor Releases, the Plan includes the Third-Party Releases.  "Most

courts allow consensual nondebtor releases to be included in a plan."  *In re Wool Growers Cent.*

*Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).  "The rationale for allowing

consensual third-party releases is that the affected parties are bound by their consensual

agreement."  *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 361 (Bankr. D. Md. 2014).  "It is well

settled that a chapter 11 plan is a contract between the debtor and its creditors in which general

rules of contract interpretation apply."  *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 261 (Bankr.

E.D. Va. 2016) (internal quotation omitted).  Where the parties have consented to the terms of

the plan, the Court will enforce such terms using general principles of contract law.[21]  It is only

where the releases included in a plan are non-consensual must the Court turn to the heightened

standard of scrutiny imposed by the Fourth Circuit in *Behrmann v. National Heritage*

*Foundation*, 663 F.3d 704, 713 (4th Cir. 2011).

Affirmative consent is not the exclusive mechanism under which a release may be

deemed consensual.  Bankruptcy courts have "taken a more flexible approach in evaluating

---

[20]  Notably, the Debtor Releases would eliminate liability for the derivative claims pending in the District of
Delaware and the District of New Jersey.

[21]  Unique under bankruptcy law, the court can bind all parties included in a class to provisions of a confirmed plan
even though the party may not have voted to accept the plan.  *See, e.g.*, 11 U.S.C. § 1126(c) ("A class of claims
has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and
more than one-half in number of the allowed claims of such class.").

whether a third-party release was consensual, finding that even impaired creditors who abstained from voting on a plan and did not otherwise opt out were nevertheless bound." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013).  As a general matter, a release is also consensual where the releasing parties have received sufficient notice of the releases and have had an opportunity to object to or opt out and have failed to do so.  *See, e.g.*, *id*. at 306 (finding consensual releases where releasing "parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 219 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003).  This is consistent with the jurisprudence of this jurisdiction.  This Court has found non-debtor releases, like the Third-Party Releases, to be consensual where the releasing parties had notice and an opportunity to object or opt out.[22]

Finding that the Third-Party Releases in the case at bar met this standard, the Court approves them as consensual in nature.  By the plain language of the Plan, the Third-Party Releases only applies to parties who did not opt out or object to the Plan, regardless of whether they were entitled to vote on the Plan.  *See* Plan, art. I.A.129, ECF No. 1811 at 96.  The Debtors provided sufficient notice to all parties of the opportunity to opt-out.  No party has challenged

---

[22]   *See, e.g.*, Order Confirming Am. Joint Chapter 11 Plan § O.c, *In re Pier 1 Imports, Inc.*, Case No. 20-30805-KRH (Bankr. E.D. Va. July 30, 2020), ECF No. 967 at 41-43; Order (I) Confirming Third Am. Joint Chapter 11 Plan of Taj Debtors & Tru Inc. Debtors & (II) Approving Credit Bid Transaction § N.b.v, *In re Toys "R" Us, Inc.*, Case No. 17-34665-KLP (Bankr. E.D. Va. Dec. 17, 2018), ECF No. 5979 at 21-23; Order Confirming Joint Chapter 11 Plan of Reorganization § N.b.v, *In re The Gymboree Corp.*, Case No. 17-32986-KLP (Bankr. E.D. Va. Sept. 7, 2017), ECF No. 646 at 18-20; Findings of Fact, Conclusions of Law & Order Confirming Second Am. Joint Chapter Plan § N.b, *In re Penn Va. Corp.*, Case No. 16-32395-KLP (Bankr. E.D. Va. Aug. 11, 2016), ECF No. 581 at 17-18; Findings of Fact, Conclusions of Law & Order (I) Confirming Debtors' Fourth Am. Joint Chapter Plan of Reorganization & Approving Fourth Am. Disclosure Statement § P.b.iii, *In re Patriot Coal Corp.*, Case No. 15-32450-KLP (Bankr. E.D. Va. Oct. 9, 2015), ECF No. 1615 at 15-16; Findings of Fact, Conclusions of Law & Order Confirming Second Am. Joint Plan § M.1.viii.b, *In re Movie Gallery, Inc.*, Case No. 07-33849-DOT (Bankr. E.D. Va. Apr. 10, 2008), ECF No. 2191 at 20-21.

the sufficiency of notice afforded to any class of claims. The objections focused on the notice afforded to the Debtors' equity security holders.

The Court finds that the notice provided to affected equity holders was reasonable under the facts and circumstances of these Bankruptcy cases. The form of notice and the adequacy of such notice was approved by this Court in its Disclosure Statement Order. The Court finds from the uncontroverted evidence that the Debtors, through Prime Clerk, were able to identify and serve in accordance with Bankruptcy Rules 2002(b), (c), (d), (g), and (m), 7004(b), and 7005, the Notice of Non-Voting Status and the Opt-Out Form, along with a postage pre-paid, pre-addressed envelope on all Ascena registered shareholders reflected on the books and records of AST as of the Petition Date and during the Putative Class Period. Johnson Decl. ¶ 8, ECF No. 947 at 4. The Court finds that this process was sufficient to provide actual notice of the opt-out procedures to these registered shareholders.

The evidence reflected that not all shares of Ascena stock were held by registered holders. It is not uncommon for shareholders to hold stock as beneficial holders through a Nominee. *Id*. ¶ 7, ECF No. 947 at 4. The Court finds that the process implemented by the Debtors to notify the beneficial holders was reasonable under the circumstances. For the beneficial holders, Prime Clerk served the Notice of Non-Voting Status and Release Opt-Out Form via overnight courier on Prime Clerk's comprehensive proprietary list of Nominees and those Nominees' mailing agents, with instructions for them to forward the materials to their beneficial holder clients as of the voting record date and to their beneficial holder clients who had purchased or otherwise acquired an equity interest in Ascena during the Putative Class Period. *Id*. ¶ 9, ECF No. 947 at 4. Instead of just foisting the responsibility of service on the Nominees, Prime Clerk struck a careful balance – at the Nominees' option, the Nominees could

either (i) request additional copies of the Notice of Non-Voting Status and Release Opt-Out Forms from Prime Clerk for the purpose of forwarding such materials to their beneficial holder clients within seven days of receipt, or (ii) provide a list of their clients directly to Prime Clerk within seven days of receipt of the materials, with instructions to Prime Clerk to serve such beneficial holders directly.  *Id*. ¶ 9, ECF No. 947 at 4-5.[23]  In light of the foregoing, the Court finds that the Debtors employed all reasonable efforts to provide notice to Ascena equity security holders and that service was sufficient under Bankruptcy Rules 2002(m), 7004, and 7005.[24]

Having found that the foregoing procedure provided sufficient notice, the Court finds that the substantive notice provided was sufficient as well.  The Court previously determined that the content of the Notice of Non-Voting Status provided adequate information reasonably practicable to enable Ascena's equity holders to make an informed decision about the process to opt out of the Third-Party Releases, in satisfaction of section 1125 of the Bankruptcy Code.  *See*

---

[23]  In this manner Prime Clerk, and ultimately the bankruptcy estates, could bear the cost and burden of forwarding the materials appropriately.  Debtors' Obj. to Class Certification Mot. ¶ 16, ECF No. 944 at 6–7; Johnson Decl. ¶¶ 8–9, ECF No. 947 at 4-5.

[24]  Although the Securities Litigation Lead Plaintiffs challenge whether the Debtors can assure actual notice was received by each equity security holder as of the Petition Date and during the Putative Class Period, that argument is without merit.  At the hearing to consider the Disclosure Statement, the Court inquired if the Securities Litigation Lead Plaintiffs were positioned to better serve the putative class – they declined:

> THE COURT:  All right. So Mr. Behlmann. I'm going to require that notice be sent out.  I would request that you coordinate with debtors' counsel with regard to any mailing lists or whatever you have, just to make sure that we give adequate notice to as many people as possible. . . .

> MR. BEHLMANN: I do, Your Honor.  I actually wanted to respond just very briefly to one of the comments that Mr. Serajeddini made and I believe that Your Honor referenced.  Unfortunately, this isn't a case where it's as simple as just giving the debtor a mailing list of who the class members are. . . . It would involve the debtors, through their claims and noticing agent, taking certain steps to distribute notices through nominee brokers and things like that . . . .

Hr'g Tr. 28:4-30:8, Sept. 11, 2020, ECF No. 590 at 28-30.  Even though the Securities Litigation Lead Plaintiffs declined to participate in determining to whom notice should be given, the Debtors' procedure complied exactly with those suggested by the Securities Litigation Lead Plaintiffs.

Disclosure Statement Order ¶¶ 2-3 & 7, ECF No. 592 at 3 & 5.  The Disclosure Statement Order

is now final.  As such, the parties are collaterally estopped from attacking the sufficiency of such

a factual finding at this point in the case.

Assuming *arguendo* that objection to the adequacy or form of notice had been

sufficiently preserved, the Court again finds that the Notice of Non-Voting Status was sufficient.

Nationally, bankruptcy courts have found opt-out third-party releases to be consensual where the

parties were given plain notice of the releases and the effect thereof.  *E.g.*, *In re Ditech Holding*

*Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019) (upholding consensual releases which were

"conspicuously disclosed in boldface type" and "plainly notified" creditors of the requirement to

opt-out); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (holding

releases to be consensual and permissible where "parties were provided detailed instructions on

how to opt out").

The Notice of Non-Voting Status was carefully drafted to state in plain English, using

capitalized, bold-face, underlined text that any holder of a claim or interest that does not

specifically object or opt-out would be bound by the Third-Party Releases:  "**you will be deemed**

**to have released whatever claims you may have against many other people and entities**

**(including company officers and directors) unless you return the enclosed 'Release Opt-**

**Out Form.'**"  Disclosure Statement Order, sched. 5, ECF No. 592, at 562 (emphasis in original).

It also specifically informed equity holders that not only that "[y]ou will not receive any

distribution in the bankruptcy case and your shares will be canceled," but also that "[t]here will

be no harm to you under the Plan if you return the Opt-Out Form; however, you will not receive

a release."  *Id*.  The Court finds that this language clearly, unambiguously, and conspicuously

provided current and former Ascena equity security holders adequate information to allow them to make an informed decision concerning the Third-Party Releases.

This finding is supported by the uncontroverted evidence that current and former Ascena shareholders did in fact utilize the opt-out procedures.    By the time of the extended deadline almost sixty days after service of the solicitation packages, the Debtors had received approximately 596 Release Opt-Out Forms.  Debtors' Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶ 103, ECF No. 1762 at 56.  The uncontested evidence before the Court is that any and all persons who did not want to be bound by the Third-Party Releases were able to effectively opt-out.

"Obviously, those creditors or equity holders agreeing to provide voluntary releases do so believing that they will be better served by voting to release claims against non-debtors and obtaining the benefits offered to them by the proposed plan than by retaining those claims." *In re Orlando Inv'rs, L.P.*, 103 B.R. 593, 595–96 (Bankr. E.D. Pa. 1989).  General unsecured creditors who did not opt out of the Third-Party Releases received a waiver of any avoidance action that might be otherwise brought against them.  Plan, art. I.A.1-2, & 129, art. VIII.F, ECF No. 1811 at 87, 129.  Equity security holders who did not opt out received a mutual release. Plan, art. I.A.127 & 128, ECF No. 1811 at 95-96.  The Court is not going to second guess the decision that these constituents have made[25] nor will the Court rewrite the terms of the contract that the Plan embodies.

The United States Trustee and the SEC raise two additional arguments against the Third-Party Releases – both without merit.  First, these parties allege that the Third-Party Releases are

---

[25]    This is particularly true where, as here, the only evidence before the Court is that no colorable Causes of Action exists that would be subject to the Third-Party Releases and any such Causes of Action are not only immaterial but unlikely to result in a benefit to the Debtors' estates.  *See* Begeman Decl. ¶¶ 9, 12-14, ECF No. 1759 at 4-5.

overly broad as they do not include a carveout for actual fraud, willful misconduct, or gross negligence (as the Exculpation Provision does).  However, there is no requirement in the Bankruptcy Code or any applicable case law that would suggest that such would be necessary in the context of Third-Party Releases.  Rather, such a duty of care fundamentally misunderstands the nature of releases.  Unlike an exculpation provision, which is designed to set the standard of care, releases are intended to do just that – release parties from specified claims and causes of action.  The scope of such releases is well within the rights of the stakeholders to negotiate and consider.  Where, as here, the releases were overwhelmingly approved, the Court will not arbitrarily rewrite the terms of the constituencies' deal.

Second, the United States Trustee and the SEC object to the Third-Party Releases on the grounds that they are an impermissible end-run around section 523 of the Bankruptcy Code, which would exclude certain debts from discharge.  According to this argument, the Third-Party Releases provide a discharge beyond the scope otherwise available under section 523 of the Bankruptcy Code.  However, the Released Parties are not being discharged pursuant to section 523 of the Bankruptcy Code.  Rather, the Releasing Parties have agreed to release their claims against the Released Parties as part of the Plan.  By approving the Third-Party Releases, the Court is merely ratifying the agreements that are the product of arms' length, good faith negotiations.  As such, section 523 is not implicated.

Finally, the Court specifically holds that the Securities Litigation Lead Plaintiffs lack the requisite standing to challenge the Third-Party Releases.   The Securities Litigation Lead Plaintiffs objected to the inclusion of the Third-Party Releases, which objection remained outstanding as of the Confirmation Hearing.  Securities Lead Pls.' Obj. to Confirmation of Am. Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor Affiliates,

ECF No. 889; Securities Lead Pls.' Suppl. Obj. to Confirmation of Am. Joint Chapter 11 Plan of

Reorganization of Ascena Retail Group, Inc. & Its Debtor Affiliates, ECF No. 1622.    A

"Releasing Party" subject to the Third-Party Releases specifically excludes an entity that "timely

objects to the releases contained in the Plan and such objection is not resolved before

Confirmation."  Plan, art. I.A.129, ECF No. 1811 at 96.  The Securities Litigation Lead Plaintiffs

are not a "Releasing Party" and, thus, are not bound by the Third-Party Releases.

"In the context of a confirmation hearing, creditors 'have standing only to challenge those

parts of a reorganization plan that affect their direct interests.'"  *In re Indianapolis Downs, LLC*,

486 B.R. 286, 304 (Bankr. D. Del. 2013) (quoting *In re Orlando Inv'rs*, 103 B.R. at 596).  Where

a party opts out of the non-debtor releases, the non-debtor releases do not affect their direct

interests and, therefore, such party lacks the standing to object to the non-debtor releases.[26]  *Id.*;

*In re Orlando Inv'rs*, 103 B.R. at 567-97.  As the Securities Litigation Lead Plaintiffs[27] have

opted out of the Third-Party Releases, the Third-Party Releases do not affect their individual

direct interests and have no bearing on the Securities Litigation Lead Plaintiffs' rights and

remedies for any perceived cause of action they may have against non-debtor entities.  "While

this result may reduce the potential recovery of the pending district court litigation, and thereby

reduce the negotiating leverage of the objecting [equity holders], those objecting [equity holders]

cannot veto the releases."  *In re Orlando Inv'rs*, 103 B.R. at 598.  Therefore, the Court finds that

---

[26]  Although the Securities Litigation Lead Plaintiffs may have statutory standing within the meaning of section 1109(b) of the Bankruptcy Code, "[i]t does not follow, though, that the statutory right to be heard on an issue includes the right to assert interests possessed solely by others."  *In re Orlando Inv'rs*, 103 B.R. at 597.  Only parties adversely affected by the Third-Party Releases, i.e., parties bound by the Third-Party Releases, would have the right to be heard on the Third-Party Releases.

[27]  As the Securities Litigation Lead Plaintiffs lack the requisite authority to represent any members of the putative class in these Bankruptcy Cases, the Court's analysis concerns the Securities Litigation Lead Plaintiffs only in their individual capacities. *See* note 11 *supra.*

the consensual Third-Party Releases are justified under the facts and circumstances of this case and will overrule the pending objections.[28]

Lastly, the United States Trustee has objected to the inclusion of the Exculpation Provision in the Plan. "[E]xculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in chapter 11 cases." *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 260–61 (Bankr. E.D. Va. 2016). "Exculpation provisions in chapter 11 plans are not uncommon and generally are permissible, so long as they are properly limited and not overly broad." *In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) (internal quotation and citation omitted). In fact, this Court has approved them in a number of chapter 11 cases. *See id.* at 233 n.36 (collecting cases).

As a practical matter, an exculpation provision does not "provide a release for any party," but instead "raise[s] the standard of liability of fiduciaries for their conduct during the bankruptcy case." *See id.* at 232. Notably, unlike the Debtors Releases and the Third-Party Releases, the Exculpation Provision does not release the Exculpated Parties. Much like the exculpation provision this Court previously approved in the *Alpha Natural Resources* bankruptcy case, if a party wishes to assert a Cause of Action against an Exculpated Party for its conduct in connection with these Bankruptcy Cases, the Cause of Action must rise at least to the level of gross negligence. *See In re Alpha Nat. Res., Inc.*, 556 B.R. at 261. "This gives a certain measure of finality to the interested parties and their professionals, and assures them they will not be

---

[28] As the Court finds that the Third-Party Releases were consensual, the Court need not address the factors necessary for the approval of non-consensual third-party releases set forth in *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 711-13 (4th Cir. 2011). However, were the *Behrmann* factors applicable to the Third-Party Releases, the Court would find the *Behrmann* factors were satisfied for the reasons stated in the *Debtors' Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan (Technical Modifications) of Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) and Its Debtor Affiliates.* Debtors' Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶¶ 104-11, ECF No. 1762 at 56-60.

second-guessed and hounded by meritless claims following the conclusion of the bankruptcy case." *Id.*

The Court again rejects the United States Trustee's argument that the Exculpation Provision is too broad and that the definition of "Exculpated Parties" should be narrowly tailored to estate fiduciaries. This Court has approved numerous exculpation provisions that encompass non-estate fiduciaries. *See* Debtors' Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶ 117 n.104, ECF No. 1762 at 63 (collecting cases). The Court is disinclined to upset its *stare decisis* upon the bare legal argument of the United States Trustee.

The Court finds that the uncontroverted evidence established that the Exculpation Provision is narrowly tailored and appropriate under the circumstances of these Bankruptcy Cases. The Exculpation Provision were an integral part of the Plan. The Exculpation Provision provides the necessary and customary protection to the Exculpated Parties, whose efforts were and continue to be vital in both formulating and implementing the Plan. Without the Exculpation Provision, there is no evidence that the stakeholders would have been willing and able to reach such a successful negotiated result in these Bankruptcy Cases and as encapsulated by the Plan. The evidence adduced does establish that the Exculpated Parties created substantial value to the Debtors for the benefit of all stakeholders in these Bankruptcy Cases and should not be subject to frivolous future litigation. The Court finds that the Debtors' estates remain appropriately protected by the standards of care set forth in the Exculpation Provision for Causes of Action involving gross negligence, willful misconduct, and actual fraud. Accordingly, the Court will approve the Exculpation Provision.

For all of the foregoing reasons, the Court finds that the Plan has satisfied all the elements of section 1129 of the Bankruptcy Code. The Court further finds that the uncontested

Debtor Releases, the contested consensual Third-Party Releases, and the Exculpation Provision are appropriate under the facts and circumstances of these Bankruptcy Cases. The Plan is CONFIRMED. A separate Confirmation Order was entered on February 25, 2021. *See* ECF No. 1811.

Dated:   March 9, 2021                        /s/ Kevin R. Huennekens
                                              UNITED STATES BANKRUPTCY JUDGE


                                              Entered on Docket:  Mar 9 2021