# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:  **RETAIL GROUP, INC.,** *et al.*, | **Chapter 11** |
| | **Case No. 20-33113-KRH** |
| **Debtors.** | **Jointly Administered** |

## <u>MEMORANDUM OPINION</u>

Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) ("Ascena") and sixty-three of its affiliates[1] (collectively, the "Debtors") commenced the above-captioned jointly administered bankruptcy cases (collectively, the "Bankruptcy Cases") on July 23, 2020 (the "Petition Date") by

---

[1]  A complete listing of the Debtors is as follows: *In re DBCM Holdings, LLC*, Case No. 20-33112-KRH; *In re Ascena Retail Group, Inc.*, Case No. 20-33113; *In re Charming Shoppes Street, Inc.*, Case No. 20-33114-KRH; *In re Charming Shoppes, Inc.*, Case No. 20-33115-KRH; *In re Chestnut Acquisition Sub Inc.*, Case No. 20-33116-KRH; *In re 933 Inspiration LLC*, Case No. 20-33117-KRH; *In re Crosstown Traders, Inc.*, Case No. 20-33118-KRH; *In re CS Holdco II Inc.*, Case No. 20-33119-KRH; *In re ANN Card Services, Inc.*, Case No. 20-33120-KRH; *In re CSGC, Inc.*, Case No. 20-33121-KRH; *In re ANN, Inc.*, Case No. 20-33122-KRH; *In re CSI Industries, Inc.*, Case No. 20-33123-KRH; *In re CSPE, LLC*, Case No. 20-33124-KRH; *In re AnnCo, Inc.*, Case No. 20-33125-KRH; *In re AnnTaylor Distribution Services, Inc.*, Case No. 20-33126-KRH; *In re DBI Holdings, Inc.*, Case No. 20-33127-KRH; *In re DBX, Inc.*, Case No. 20-33128-KRH; *In re Duluth Real Estate LLC*, Case No. 20-33129-KRH; *In re AnnTaylor of Puerto Rico, Inc.*, Case No. 20-33130-KRH; *In re Etna Retail DC, LLC*, Case No. 20-33131-KRH; *In re AnnTaylor Retail, Inc.*, Case No. 20-33132-KRH; *In re Fashion Apparel Sourcing LLC*, Case No. 20-33133-KRH; *In re AnnTaylor, Inc.*, Case No. 20-33134-KRH; *In re Fashion Service Fulfillment Corp.*, Case No. 20-33135-KRH; *In re Ascena Retail Holdings, Inc.*, Case No. 20-33136-KRH; *In re Fashion Service LLC*, Case No. 20-33137-KRH; *In re GC Fulfillment, LLC*, Case No. 20-33139-KRH; *In re Ascena Trade Services, LLC*, Case No. 20-33140-KRH; *In re ASNA Plus Fashion, Inc.*, Case No. 20-33141-KRH; *In re ASNA Value Fashion LLC*, Case No. 20-33142-KRH; *In re BackingBrands Buying Agent, LLC*, Case No. 20-33143-KRH; *In re Lane Bryant #6243, Inc.*, Case No. 20-33144-KRH; *In re Lane Bryant of Pennsylvania, Inc.*, Case No. 20-33145-KRH; *In re BackingBrands Solutions, LLC*, Case No. 20-33146-KRH; *In re C.S.F. Corp.*, Case No. 20-33147-KRH; *In re Catalog Receivables LLC*, Case No. 20-33148-KRH; *In re Catalog Seller LLC*, Case No. 20-33149-KRH; *In re Lane Bryant Outlet 4106, Inc.*, Case No. 20-33150-KRH; *In re Catherines #5124, Inc.*, Case No. 20-33151-KRH; *In re Lane Bryant Purchasing Corp.*, Case No. 20-33152-KRH; *In re Catherines #5147, Inc.*, Case No. 20-33153-KRH; *In re Lane Bryant, Inc.*, Case No. 20-33154-KRH; *In re Catherines Stores Corp.*, Case No. 20-33155-KRH; *In re PSTM, Inc.*, Case No. 20-33156-KRH; *In re Sonsi, Inc.*, Case No. 20-33157-KRH; *In re Catherines, Inc.*, Case No. 20-33158-KRH; *In re Spirit of America, Inc.*, Case No. 20-33159-KRH; *In re CCTM, Inc.*, Case No. 20-33160-KRH; *In re Too GC, LLC*, Case No. 20-33161-KRH; *In re Charming Sales Co. Four, Inc.*, Case No. 20-33162-KRH; *In re Tween Brands Agency, Inc.*, Case No. 20-33163-KRH; *In re Charming Sales Co. One, Inc.*, Case No. 20-33164-KRH; *In re Tween Brands Direct Services Inc.*, Case No. 20-33165-KRH; *In re Charming Sales Co. Three, Inc.*, Case No. 20-33166-KRH; *In re Tween Brands Investment, LLC*, Case No. 20-33167-KRH; *In re Tween Brands Marketing, Inc.*, Case No. 20-33168-KRH; *In re Tween Brands Service Co.*, Case No. 20-33169-KRH; *In re Tween Brands, Inc.*, Case No. 20-33170-KRH; *In re Winks Lane, Inc.*, Case No. 20-33171-KRH; *In re Worldwide Retail Holdings, Inc.*, Case No. 20-33172-KRH; *In re Charming Sales Co. Two, Inc.*, Case No. 20-33173-KRH; *In re Charming Shoppes of Delaware, Inc.*, Case No. 20-33174-KRH; *In re Charming Shoppes Receivables Corp.*, Case No. 20-33175-KRH; and *In re Charming Shoppes Seller, Inc.*, Case No. 20-33176-KRH.

each filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (this "Court").  Ascena was a leading specialty retailer for women and girls.  The Debtors operated a portfolio of recognizable brands, which included Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey, and Cacique.  Teffner First Day Decl. ¶ 5, ECF No. 14 at 2-3.  The Debtors had approximately 2,800 stores in the United States, Canada, and Puerto Rico.  *Id.*  They served more than 12.5 million active customers and employed nearly 40,000 employees.  *Id.*

As of the Petition Date, Ascena had approximately $1.60 billion in funded debt obligations. *Id.*, ECF No. 14 at 3.  The indebtedness included approximately $330 million in outstanding obligations under a $500 million senior secured asset-based lending facility (the "ABL Facility," and the lenders thereunder, the "ABL Lenders").  *Id.*  The Debtors also had approximately $1.27 billion in senior secured term loan obligations (the "Term Loans, and the lenders thereunder, the "Term Lenders"), with an August 21, 2022, maturity date.  *See id*. ¶¶ 5-8, ECF No. 14 at 3, 4.

Beginning in March 2020, Ascena was forced to temporarily close all its retail stores in response to the COVID-19 pandemic and mandatory regulations put in place to slow the spread of the virus.  *Id.* ¶ 6, ECF No. 14 at 3. The Debtors had to furlough nearly all their store-level workforce as well as a substantial portion of their corporate workforce.  *Id.*  Faced with these dire operating circumstances and with the approaching maturity date of the Term Loans, Ascena's board of directors (the "Board") formed a special committee of independent directors (the "Special Committee"), which began exploring financing and other alternatives for addressing the Debtors' capital structure.  *Id.* ¶¶ 8-9, ECF No. 14 at 4.  As a result of negotiations with an ad hoc group of Term Lenders, Ascena was able to obtain a *Restructuring Support Agreement* (the "RSA") supported by approximately 68% of the Term Lenders.  *Id.* ¶ 9, ECF No. 14 at 4.  The RSA would

provide for a comprehensive recapitalization of the company to be implemented through a chapter 11 plan of reorganization. *Id.*

Accordingly, the Debtors commenced the Bankruptcy Cases on the Petition Date contemplating a balance-sheet restructuring with the support of a majority of their Term Lenders. On the first day of the Bankruptcy Cases, the Debtors laid out their strategy for reorganization as envisioned by the RSA. The Term Lenders would substantially equitize their debt and fully backstop $150 million new money financing to fund the restructuring. *Id.* ¶ 10, ECF No. 14 at 5. The ABL Lenders would be paid in full using cash on hand or proceeds from a new asset-based lending exit credit facility. *Id.* Holders of general unsecured claims would receive their pro rata share from $500,000. *Id.* Finally, then-existing common equity in Ascena would be canceled. *Id.* Shortly after the Petition Date, on July 31, 2020, the Debtors filed their *Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor Affiliates* [ECF No. 154] (the "Original Plan"), which reflected the terms of the RSA.

The Court approved the Debtors' Disclosure Statement (as defined herein) in accordance with section 1125 of the Bankruptcy Code by order entered September 11, 2020.[2] After a series of negotiations and a period of plan solicitation, on February 25, 2021, the Court conducted an evidentiary hearing (the "Confirmation Hearing") to consider confirmation of the Debtors' Plan[3] and unresolved objections thereto filed by the United States Securities and Exchange Commission

---

[2] Order (I) Approving Adequacy of Disclosure Statement, (II) Approving Solicitation & Notice Procedures, (III) Approving Forms of Ballots & Notices, (IV) Scheduling Certain Dates, & (V) Granting Related Relief, ECF No. 592 (the "Disclosure Statement Order").

[3] The term "Plan" shall refer to the *Amended Joint Chapter 11 Plan of Reorganization of Mahwah Bergan Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) and Its Debtor Affiliates* attached to the Confirmation Order (as such term is defined herein) as Exhibit A. Order Confirming Am. Joint Chapter 11 Plan (Technical Modifications) of Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) & Its Debtor Affiliates Ex. A, ECF No. 1811. Any capitalized term not defined herein shall have the meaning ascribed to it in the Plan.

(the "SEC"), the Securities Litigation Lead Plaintiffs (as such term is defined herein); and the

United States Trustee.[4]  At the conclusion of the Confirmation Hearing, the Court overruled the

pending objections and, by its *Order Confirming the Amended Joint Chapter 11 Plan (Technical*

*Modifications) of Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) and Its*

*Debtor Affiliates* entered February 25, 2021 [ECF No. 1811] (the "Confirmation Order"), the Court

confirmed the Plan.  To supplement the Court's findings of facts and conclusions of law set forth

in the Confirmation Order, on March 9, 2021, the Court entered its *Memorandum Opinion* [ECF

No. 1855].

The United States Trustee file a notice of appeal [ECF No. 1937] on March 25, 2021 (the

"Appeal").  The Appeal is currently pending before the United States District Court for the Eastern

District of Virginia (the "District Court") and has been consolidated with other pending appeals,

with the lead case being Civil No. 3:20-cv-167.  The United States Trustee contends that the Court

erred in approving certain release and exculpation provisions contained in the Plan and approved

by the Confirmation Order in contravention of law and public policy.  Now before the Court is the

*Motion of the United States Trustee for a Stay of Enforcement of the Third-Party Releases and*

*Exculpation Clause Pending Appeal Pursuant to Bankruptcy Rule 8007 and Memorandum of*

*Points and Authorities* [ECF No. 1962] (the "Motion").  The United States Trustee seeks to have

both the Disclosure Statement Order and Confirmation Order stayed solely as to the application of

the Plan's exculpation and release provisions, pending the adjudication of the Appeal.  On May

---

[4]    Obj. by U.S. SEC to Confirmation of Debtors' Am. Joint Chapter 11 Plan, ECF No. 849; Securities Lead Pls.'
Obj. to Confirmation of Am. Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor
Affiliates, ECF No. 889; Securities Lead Pls.' Suppl. Obj. to Confirmation of Am. Joint Chapter 11 Plan of
Reorganization of Ascena Retail Group, Inc. & Its Debtor Affiliates, ECF No. 1622; Obj. of U.S. Trustee to
Confirmation of Am. Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. & Its Debtor
Affiliates, ECF No. 746; Obj. of U.S. Trustee to Confirmation of Am. Joint Chapter 11 Plan of Reorganization
of Ascena Retail Group, Inc. & Its Debtor Affiliates, ECF No. 1697.

13, 2021, the Court conducted a hearing (the "Hearing") on the Motion.[5]  This Memorandum

Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule

7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").[6]

### Jurisdiction and Venue

The Court has subject matter jurisdiction over these matters pursuant to 28 U.S.C. §§ 157

and 1334 and the General Order of Reference from the United States District Court for the Eastern

District of Virginia dated August 15, 1984.   This is a core proceeding under 28 U.S.C.

§§ 157(b)(2)(A), (L), (O).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

### Factual Background

To effectuate the process for confirmation of the Original Plan, as modified by the Plan,

the Court had to first approve a disclosure statement in accordance with the requirements of section

1125 of the Bankruptcy Code.  The disclosure statement supplies creditors and interest holders

with information about the proposed plan and is a critical part of the solicitation process. To that

end, the Court conducted a hearing on September 10, 2020, (the "Disclosure Statement Hearing")

to consider the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of*

*Ascena Retail Group, Inc. and Its Debtor Affiliates* [ECF No. 565] (the "Disclosure Statement").

---

[5]   On April 23, 2021, the Debtors objected to the Motion, which objection was joined by the Ascena GUC Trust. Debtors' Obj. to Mot., ECF No. 2081; Joinder of Ascena GUC to Debtors' Obj., ECF No. 2082.  The United States Trustee subsequently filed a reply (the "Reply") in support of his Motion.  Reply of U.S. Trustee in Supp. of Mot., ECF No. 2114.

Joel Patterson and Michaella Corporation (collectively, the "Securities Litigation Lead Plaintiffs") filed a joinder in support of the Motion.  Joinder of Securities Lead Pls. to Mot., ECF No. 1997.  For the reasons stated in this Court's March 5, 2021, *Memorandum Opinion* [ECF No. 1842], the Court denied the Securities Litigation Lead Plaintiffs' request for class certification.  As the Securities Litigation Lead Plaintiffs effectively opted out of the release and exculpation provisions, the Securities Litigation Lead Plaintiffs do not have a pecuniary interest in this Motion and, therefore, do not have standing to be heard.  *See* Mem. Op. 36-38, ECF No. 1855.

[6]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

The United States Trustee objected [ECF No. 411] to the Disclosure Statement (i) on the grounds that the content of the Disclosure Statement did not provide adequate information to parties entitled to vote on the proposed plan of reorganization and (ii) on the grounds that the proposed plan was facially unconfirmable because it included voluntary third-party releases (the "Third-Party Releases") and exculpation (the "Exculpation Provision") of the Debtors and various parties that participated in the Bankruptcy Cases,. Notably, the United States Trustee did not object to the form or manner of notice that the Disclosure Statement proposed to provide to the Debtors' creditors or holders of equity interests in Ascena. The SEC did object [ECF No. 471] to the form of notice that the Disclosure Statement proposed to give to equity holders but not to the manner of delivery of the form of notice. In response to the objection of the SEC, the Court required the Debtors to amend the Disclosure Statement to include language recommended by the SEC so that the notice would clearly convey information to non-voting equity holders about the provisions of the plan, including the inclusion of the Third-Party Releases, the right of each non-voting equity holder to opt out of the Third-Party Releases, and the process for doing so. *See* Notice of Non-Voting Status to Holders of Interests Deemed to Reject the Plan & of Third Party Release Under the Plan 1, ECF No. 592 at 562 (the "Notice of Non-Voting Status"). The Debtors' inclusion of the suggested language, as required by the Court, resolved the SEC's objection to the Disclosure Statement. Finally, the Securities Litigation Lead Plaintiffs objected to the Disclosure Statement on the grounds that the manner proposed for service of the Notice of Non-Voting Status on equity holders might not capture the entire universe of former equity holders who would, nevertheless, be bound by the Third-Party Releases. Specifically, the Securities Litigation Lead Plaintiffs stated that proper notice on former equity holders should "involve the Debtors, through their claims and noticing agent, taking certain steps to distribute notices through nominee brokers." Hr'g Tr. 29:18-

21, ECF No. 590 at 29. To resolve this objection, the Court required the Debtors, through their

claims and noticing agent, to serve the Notice of Non-Voting Status on all former equity holders

via first-class mail and in accordance with the Securities Litigation Lead Plaintiffs'

recommendation. *See* Disclosure Statement Order, ECF No. 592 at 7.

At the same time that the Debtors were pursuing the restructuring contemplated by the

Original Plan, they were also engaged in a thorough and comprehensive marketing process to

determine whether a going concern sale transaction of all or a portion of the Debtors' businesses

would result in a higher and better value for the benefit of all stakeholders. Teffner Confirmation

Decl. ¶ 4, ECF No. 1760 at 3. This flexibility afforded by the RSA allowed the Debtors to pivot

away from a debt-to-equity conversion and pursue, instead, the three transactions, which resulted

in the sale of substantially all of the Debtors' assets. *Id.* On September 24, 2020, the Court

approved the sale of the Debtors' Catherines assets as a going concern for a purchase price of

$40.8 million. Am. Order (I) Approving Definitive Purchase Agreement, (II) Authorizing Sale of

Catherines Assets Free & Clear of Liens, Claims, Encumbrances, & Interests, & (III) Granting

Related Relief, ECF No. 690. Second, on November 12, 2020, the Court approved the sale of the

Debtors' Justice business assets for a purchase price of $71 million. Order (I) Approving Sale of

Justice Assets Free & Clear of All Liens, Claims & Encumbrances, (II) Authorizing Assumption

& Assignment of Certain Executory Contracts & Unexpired Leases, & (III) Granting Related

Relief, ECF No. 1118. Third and finally, on December 8, 2020, the Court approved the Debtors'

sale of their remaining premium brands for a purchase price of $540 million, exclusive of the

assumption of certain liabilities. Order (I) Approving Assumption & Assignment of Certain Non-

Real Property Contracts & Real Property Leases, (II) Approving Sale of Premium & Lane Bryant

& Certain Other Assets Free & Clear of All Liens, Claims, Encumbrances, & Interests,

(III) Authorizing Assumption & Assignment of Certain Executory Contracts & Unexpired Leases,

(IV) Establishing Rejection Procedures, & (V) Granting Related Relief, ECF No. 1295. These

sale transactions brought significant proceeds into the Debtors' bankruptcy estates for the benefit

of creditors and allowed the Ascena brands to live on under new ownership, preserving tens of

thousands of jobs and hundreds of commercial leases amid the COVID-19 pandemic. Debtors'

Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶ 4, ECF No. 1762 at 15-16.

In connection with this strategic shift, the Debtors executed an amended and restated RSA

which garnered the support of over 97% of the Term Lenders. *Id.* ¶ 5, ECF No. 1762 at 16. The

Debtors proposed the *Amended Joint Chapter 11 Plan (Technical Modifications) of Mahwah*

*Bergen Retail Group, Inc. (F/K/A Ascena Retail Group, Inc.) and Its Debtor Affiliates* [ECF No.

1794] (the "Plan") designed to effect distribution of the sales proceeds. The Plan was supported

by the same overwhelming majority of the Term Lenders and further represented a global

settlement with the Creditors' Committee.[7] As a result, the Creditors' Committee also endorsed

confirmation of the Plan.[8] As amended, the Plan provided for payment in full in cash on the

Effective Date (as defined herein) of all priority and administrative claims and of the ABL Facility

in the amount of $333 million. The Term Lenders would receive their pro rata share of the

remaining cash, subject to a carveout for general unsecured creditors. General unsecured creditors

were to receive a pro rata distribution from a trust (the "GUC Trust") established for their benefit.

The GUC Trust would be funded with $7.25 million in cash plus a portion of proceeds from certain

non-bankruptcy litigation. The general unsecured creditors would also receive a waiver of any

---

[7]    On August 3, 2020, the Office of the United States Trustee appointed a statutory committee of unsecured creditors
(the "Creditors' Committee") in these Bankruptcy Cases in accordance with section 1102 of the Bankruptcy Code.
*See* Appointment Official Committee Unsecured Creditors, ECF No. 164.

[8]    Ultimately, the holders of claims entitled to vote on the Plan overwhelmingly voted to accept the Plan. Debtors'
Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶ 7, ECF No. 1762 at 16-17.

avoidance actions that could be brought against them.  Plan, art. I.A.84, III.B.5, IV.C, ECF No.

1811 at 92, 104-105, 107.  This treatment under the Plan represented an increase of more than

fourteen times over the distribution to general unsecured creditors proposed in the Original Plan.

As with the Original Plan, holders of equity interests in Ascena were not projected to receive any

distribution and, as such, were deemed to reject the Plan.  *Id*., art. III.B.8, ECF No. 1811 at 105.

*See* 11 U.S.C. § 1126(g).

      As part of the holistic structure of the Plan, the major constituents negotiated and included

certain releases, exculpation, and indemnification provisions contained in Articles V and VIII of

the Plan. In particular, the Plan includes, among other provisions, the voluntary Third-Party

Releases,[9] Plan, art. VIII.F, ECF No. 1811 at 130, and the Exculpation Provision, *id.* art. VIII.G,

ECF No. 1811 at 130-31.

      At the Confirmation Hearing, the Debtors offered evidence and testimony to support

confirmation of the Plan.  The Court heard testimony in support of confirmation of the Plan from

Carrie W. Teffner ("Teffner"), president of the Debtors and a member of the Board, and from Gary

D. Begeman ("Begeman"), a disinterested director of the Board and a member of the Special

Committee.  In pertinent part, Teffner testified that the Third-Party Releases and Exculpation

Provision were the product of extensive good-faith, arm's length negotiations and were material

inducements for the parties to enter into the comprehensive settlement embodied by the Plan.

Teffner Confirmation Decl. ¶ 41, ECF No. 1760 at 13.  She further testified that these provisions

were an integral part of the global settlement negotiated among the parties.  *Id.*

---

[9]    "Released Party" includes, but is not limited to, the Debtors, the Term Loan Lenders, the DIP Lenders, the Plan
Administrator, and the Creditors' Committee.  *See* Plan, art. I.A.127 & 128, ECF No. 1811 at 96.  "Releasing
Party" is defined to include, but is not limited to, all creditors and all holders of interests in Ascena who do not
timely opt out of or object to the Third-Party Releases. *Id.* art. I.A.129, ECF No. 1811 at 96.  However, any entity
that opted out of the Third-Party Releases would not be entitled to a mutual release from the Debtors, including
a release for avoidance actions. *See id.*

In pertinent part, Begeman testified that the Special Committee conducted a thorough investigation of potential claims that might be held by and against the Debtors and the third parties covered by the releases proposed in the Plan.  The Special Committee did not find any colorable causes of action against the Debtors' or their affiliates' managers, directors, or officers subject to the Third-Party Releases.  Begeman Decl. ¶ 13, ECF No. 1759 at 5.  The Special Committee further determined that, even if such claims did exist, they would be unlikely to result in any net recovery because of mutual indemnification obligations with the Debtors.[10]  *Id*.  The Special Committee concluded that the benefits from the transactions contemplated by the Plan and confirmation of the Plan without undue delay, in light of the clear support of the Debtors' stakeholders, outweighed potential benefits of pursuing any potential causes of action that the Debtors and releasing parties could assert against the released parties.  *Id*. ¶ 12, ECF No. 1759 at 5.  Begeman also testified that the Plan's release, exculpation, and indemnification provisions were integral parts of the parties' negotiations in reaching a holistic, successful restructuring.  *See id*. ¶ 15, ECF No. 1759 at 6.

The Debtors' evidence in support of confirmation further showed that the Debtors engaged in a comprehensive noticing process, as required by the Court in connection with approving the Disclosure Statement.  Specifically, the Debtors provided notice of the Third-Party Releases and the opt-out procedure, in the form and manner approved by the Court to 300,000 notice parties, including all equity holders.  The evidence established that Ascena's equity holders held such equity either (i) as a registered holder directly on the books and records of Ascena's transfer agent, American Stock Transfer & Trust Company, LLC ("AST"), or (ii) as a beneficial holder through

---

[10]    The Special Committee also investigated whether there were any colorable claims related to the claims asserted by the Securities Litigation Lead Plaintiffs (the "Securities Litigation") and a derivative claim pending in the District of Delaware against current and former members of the Board.  *Id*. ¶ 14, ECF No. 1759 at 5.  As a result of their investigation, the Special Committee determined that the claims were meritless and did not have material value.  *Id*., ECF No. 1759 at 6.

a bank, broker, or other financial institution (each of the foregoing, a "Nominee") holding the equity "in street name" at The Depository Trust Company.  Johnson Decl. ¶ 7, ECF No. 947 at 4. To ensure that equity holders of each type received proper notice of the Third-Party Releases and the opt-out procedures in accordance with the Disclosure Statement, the Debtors' claims and noticing agent, Prime Clerk LLC ("Prime Clerk"),[11] took a comprehensive, two-pronged approach. First, as to registered holders, Prime Clerk worked with AST to identify current registered equity holders and registered equity holders who purchased or otherwise acquired Ascena stock either as of the voting record date (as such term is defined in the Plan) or during the putative class period claimed in the Securities Litigation.  *Id.* ¶ 8, ECF No. 947 at 4.  Prime Clerk then served the Notice of Non-Voting Status, the Release Opt-Out Form,[12] and the postage paid, pre-addressed return envelope on all current and former registered holders identified by AST.  *Id.*  Second, as to beneficial holders, Prime Clerk served the Notice of Non-Voting Status and the Release Opt-Out Form on Prime Clerk's comprehensive proprietary list of Nominees with instructions to forward the materials to their beneficial holder clients as of the voting record date and their beneficial holder clients who purchased or otherwise acquired the equity during the putative class period claimed in the Securities Litigation.  *Id.* ¶ 9, ECF No. 947 at 4.  The instructions also provided Nominees with the option either to (i) request additional copies of the Notice of Non-Voting Status

---

[11]    The Court authorized the retention and appointment of Prime Clerk as claims and noticing agent in these Bankruptcy Cases pursuant to 28 U.S.C. § 156(c) and section 105 of the Bankruptcy Code.  Order Authorizing Retention & Appointment of Prime Clerk LLC as Claims & Noticing Agent, ECF No. 69.

[12]    As stated in the Notice of Non-Voting Status, recipients could elect to opt out of the Third-Party Releases by returning the enclosed form (the "Release Opt-Out Form") no later than November 15, 2020 either (i) in hard copy by first class mail, overnight delivery, or hand delivery, or (ii) electronically through a dedicated online portal.  Johnson Decl. ¶¶ 5-6, ECF No. 947 at 3.  The Release Opt-Out Form did not require recipients to fill out or otherwise supply any information to indicate their desire to opt out.  Merely returning the form prior to the deadline in the stamped, pre-addressed envelope that accompanied the form was sufficient to effectuate the opt-out.  Debtors' Obj. to Class Certification Mot. ¶¶ 15, 48; ECF No. 944 at 6, 22.

and Release Opt-Out Forms from Prime Clerk for the purpose of forwarding such materials to their underlying beneficial holder clients within seven days of receipt, or (ii) provide a list of their clients directly to Prime Clerk within seven days of receipt of the materials, with instructions to Prime Clerk to serve such beneficial holders directly. *Id*. ¶ 9, ECF No. 947 at 4-5. In total, as of October 15, 2020, at least 200 current and former shareholders of Ascena opted out of the Third-Party Releases. *Id*. ¶ 6, ECF No. 947 at 3. A month later, by November 18, 2020, the Debtors received approximately 596 Release Opt-Out Forms. Debtors' Mem. of Law in Supp. of Confirmation of Fifth Am. Plan ¶ 103, ECF No. 1762 at 56.

No party in interest other than the Debtors put on evidence in support of or in opposition to confirmation of the Plan. The United States Trustee objected [ECF No. 746] to confirmation of the Plan on the same grounds that he objected to the Disclosure Statement. Notably, the United States Trustee did not offer evidence in opposition to confirmation and did not ask to cross-examine the Debtors' witnesses at the Confirmation Hearing. The SEC and the Securities Litigation Lead Plaintiffs objected to the substance of the Third-Party Releases. No party objected to confirmation on the grounds that the Debtors' noticing efforts failed to comply with the requirements set forth in the Court-approved Disclosure Statement.

In light of the evidence presented and the arguments made at the Confirmation Hearing, the Court found that the Notice of Non-Voting Status and Release Opt-Out Form provided adequate information to enable hypothetical reasonable investors typical of the Debtors' creditors and Ascena's equity holders to make an informed and voluntary decision whether to opt-out of the Third-Party Releases. Accordingly, the Court concluded that the Third-Party Releases were entirely voluntary.

The Court overruled the objections and confirmed the Plan. The Court entered the Confirmation Order on February 25, 2021. The effective date of the Plan occurred on March 5, 2021 (the "Effective Date"). Notice of (I) Entry of Order Confirming Debtors' Am. Chapter 11 Plans & (II) Occurrence of Effective Date, ECF No. 1845. The Plan has now been fully consummated. The Debtors have distributed over $56 million to their pre-Petition Date lenders. They have assumed and assigned or rejected executory contracts and unexpired leases, cancelled existing shares of common equity, and funded the GUC Trust in accordance with the Plan. Now, months after the Plan's Effective Date, the United States Trustee seeks to stay the effectiveness of the underlying Disclosure Statement Order, entered in September 2020, and the Confirmation Order, entered in March 2021.

### Analysis

Rule 8007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requires parties moving for "a stay of a judgment, order, or decree of the bankruptcy court pending appeal" to move first for such relief in the bankruptcy court. Fed. R. Bankr. P. 8007(a)(1)(A). "'A stay is not a matter of right, even if irreparable injury might otherwise result.' It is instead 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672-73 (1926)). To prevail on such a motion for stay pending appeal, the United States Court of Appeals for the Fourth Circuit has established the following four-part test.

> [A] party seeking a stay must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay.

13

*Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).  "All four requirements must be satisfied."

*BDC Cap., Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 637 (E.D. Va. 2014).  "The party requesting

a stay bears the burden of showing that the circumstances justify an exercise of that discretion."

*Nken*, 556 U.S. at 433-34.

In reviewing these four factors, "[t]he first two factors . . . are the most critical."  *Id.* at 434.

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the

harm to the opposing party and weighing the public interest."  *Id.* at 435.  Accordingly, the Court

turns to the first two factors.

## I.    The United States Trustee Failed to Make a "Strong" Showing that He Is Likely to Succeed on Appeal.

"In order to receive a stay pending appeal, [the movant] must make a strong showing that

it would succeed on the merits on appeal."  *BDC Cap.*, 508 B.R. at 637.  To that end, the United

States Trustee "has the burden to show that it is *likely to succeed* as compared to being just as

likely to succeed as the other parties."  *Id.* at 637-38 (emphasis in original).[13]  On appeal, the

District Court will review this Court's "findings of fact for clear error and legal questions *de novo*."

*Id.* at 637.  This Court's "approval of a settlement, [such as the Plan] is reviewed for abuse of

discretion."  *Id.*

With these guiding principles in mind, the Court finds that the United States Trustee has

failed to meet his burden as to both the Third-Party Releases and the Exculpation Provision.  The

United States Trustee belatedly challenges the notice that was provided to equity security holders.

---

[13]    The United States Trustee relies upon *Realvirt, LLC v. Lee*, 220 F. Supp. 3d 704 (E.D. Va. 2016) in his Motion.
Unlike *BDC Capital*, *Realvirt* did not concern a bankruptcy appeal of a confirmation order.  *Compare BDC Cap.*,
508 B.R. 633, *with Realvirt*, 220 F. Supp. 3d 704.  Moreover, *Realvirt* was decided based upon an absence of
both non-binding and binding precedent.  220 F. Supp. 3d at 706.  In the present case, there is precedent for
approval of the exculpation and release provisions.  *In re Retail Grp., Inc.*, Case No. 20-33113-KRH, 2021 WL
962553, at *15 n.22, 2021 Bankr. LEXIS 547, at *81 n.22 (Bankr. E.D. Va. Mar. 9, 2021) (collecting cases).

As this challenge has no support in the record, the Court finds that the United States Trustee has not made a strong showing that he is likely to succeed on appeal for this new reason.

At the Disclosure Statement Hearing, the SEC challenged the contents of the Notice of Non-Voting Status to be provided to equity security holders. The Court resolved the objections by amending the Notice of Non-Voting Status. The Securities Litigation Lead Plaintiffs challenged the manner in which notice was to be provided to the equity security holders. The Court resolved their objection by ordering that Notice of Non-Voting Status be provided in the same manner as notice would be provided in a class action lawsuit, i.e., direct notice to all equity security holders on the debtors' books and records and notice provided to beneficial holders through their nominees. Additionally, notice of the Confirmation Hearing, including language on the Third-Party Releases, was published in the national edition of *USA Today* and *The New York Times*. Certificate of Publication, ECF No. 1563.

The SEC and the Securities Litigation Lead Plaintiffs were the only parties that challenged the sufficiency of notice at the Disclosure Statement Hearing. While the United States Trustee appeared at the Disclosure Statement Hearing and was heard on other issues in connection with the Disclosure Statement, the United States Trustee did not raise any concern regarding the form or manner of notice.

Even assuming arguendo that the United States Trustee had raised a timely challenge to the sufficiency of the notice, the Court finds that the United States Trustee is not likely to succeed on appeal. Bankruptcy Rule 2002(m) provides that "[t]he court may from time to time enter orders designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent." Fed. R. Bankr. P. 2002(m). That is exactly what occurred here. The Court ordered that a specific type of notice be provided to equity security holders either directly where

15

the Debtors had such contact information available or to Nominees of beneficial holder clients with instructions to forward the materials to the beneficial holders. The Court, finding it "desirable to supplement the notice" further ordered "notice by publication." Fed. R. Bankr. P. 2002(*l*).

As notice was provided in accordance with the Bankruptcy Rules and in the form and manner suggested by the SEC and the Securities Litigation Lead Plaintiffs in resolution of their pending objections, the Court finds that the United States Trustee is unlikely to succeed on his allegations that the notice was insufficient. The United States Trustee's objection to the form or manner of notice is disingenuous. The crux of the argument is that parties must affirmatively agree to be bound – that they can never be bound by their failure to act. This position is fundamentally at odds with the Bankruptcy Code and the procedures it provides for resolving cases.

The Bankruptcy Code requires, generally, that upon receipt of notice of a pending event an affected party must take some affirmative action to preserve the party's rights; in the absence of such affirmative action, such rights are lost. For example, at the onset of an asset case, notice is provided to all creditors of the deadline to file a proof of claim in order to maintain any right to distribution from the bankruptcy estate. *See* Fed. R. Bankr. P. 3002(a) ("Necessity for Filing"); Fed. R. Bankr. P. 3002(c) ("Time for Filing"). By way of further example, many motions in bankruptcy cases are resolved routinely on negative notice. *See* 11 U.S.C. § 102(1); *see also* Local Bankr. R. 9013-1(M). Objections to filed proofs of claim work in similar fashion. *See* Fed. R. Bankr. P. 3007(a)(1). Upon the successful conclusion of a bankruptcy case, an individual debtor may be granted a discharge of certain pre-petition debts and liabilities. Much like the Third-Party Releases here, that discharge would operate as an injunction applicable to all dischargeable claims. Only creditors who affirmatively file a timely complaint and receive a judgment declaring the debt

16

they hold to be non-dischargeable are not bound by the discharge injunction.  *See* 11 U.S.C. § 523(c)(1); *see also* Fed. R. Bankr. P. 4007(c).

A chapter 11 bankruptcy case is predicated upon a debtor's ability to corral many affected parties with disparate claims and interests into a single forum to complete a universal settlement of claims and interests.  Much like the foregoing examples demonstrate, once a proper notice has been approved by the bankruptcy court in the form of a disclosure statement, creditors and parties in interest are afforded the opportunity to vote to accept or reject a proposed plan.  Only the claims of parties that actually vote are included in the tally.  11 U.S.C. § 1126; *see In re Tribune Co.*, 464 B.R. 126, 207 (Bankr. D. Del. 2011).  The procedures the Debtors employed in the case at bar for providing notice of the Third-Party Releases are entirely consistent with these examples.

While the United States Trustee argues that the opt-out procedures at issue in the case at bar should be given a heightened standard, the United States Trustee has failed to identify any reason negative notice is inappropriate.  Not one affected equity security holder has come forward to date with allegations of an inability to have taken advantage of the opt-out procedure.  Contrary to the United States Trustee's assertions, all evidence before the Court is that the process worked as it should.

Turning to the substance of the various release provisions, the United States Trustee reiterates his prior arguments, which this Court rejected at the Confirmation Hearing.  Consistent with the foregoing analysis of the release and exculpation provisions in the Plan, the Court made specific factual findings in support of the relief it granted based on the uncontroverted evidence presented at the Disclosure Statement Hearing and the Confirmation Hearing.  The Court found that the evidence presented at the Disclosure Statement Hearing and the Confirmation Hearing was, in each case, reasonable, persuasive, and credible.  The only evidence before the Court was

17

that the Plan's exculpation and release provisions were necessary and fair because: (1) the Third-Party Releases and the Exculpation Provision were always contemplated as an integral part of the Debtors' restructuring since the Petition Date; (2) the non-Debtor released parties were, collectively, critical contributors to the settlements that made confirmation of the Plan possible; (3) the Third-Party Releases and the Exculpation Provision were (i) essential to the Debtors' restructuring, (ii) in the best interests of the Debtors and parties in interest, (iii) essential consideration for the substantial concessions and contributions made by the released parties throughout the Bankruptcy Case, and (iv) a critical element of the integrated and related settlements that were the foundation of the Plan; (4) all impaired Classes entitled to vote on the Plan had voted overwhelmingly to accept the Plan; (5) in the absence of the Third-Party Releases and the Exculpation Provision and the settlement reflected thereby, creditor constituencies would receive smaller recoveries, or no recoveries at all, if the Debtors were liquidated; and (6) the Third-Party Releases and the Exculpation Provision did not relieve any party of any liability arising out of an act or omission constituting gross negligence or willful misconduct.

The Court found that the Third-Party Releases and the Exculpation Provision were appropriately tailored to promote finality and prevent parties from attempting to circumvent the Plan's terms.  The Court found that the Third-Party Releases and the Exculpation Provision had all been negotiated in good faith, were contemplated as a necessary part of the restructuring from the Petition Date onward, and were consistent with sections 105, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code and applicable law in this Circuit.  The Third-Party Releases and the Exculpation Provision were plainly disclosed in the Disclosure Statement, the Notice of Non-Voting Status, and the Release Opt-Out Forms.  The Court found that Third-Party releases were voluntary and part of a holistic settlement among all interested parties that allowed the Debtors to

negotiate a consensual Plan and emerge successfully from bankruptcy.  Among other things, the releases resolved indemnification claims[14] against the estates and permitted an orderly and efficient wind-down process to proceed.  They served to avoid entanglement of the estates in expensive and protracted post confirmation litigation that could only delay and dilute the negotiated distributions.  The Court found that the Debtors' creditors and Ascena's equity interest holders[15] knew what they were getting,[16] knew how to preserve their rights, and got an incredible result given the economic climate facing the Debtors.

Nothing in the United States Trustee's Motion undermines this Court's extensive factual findings supporting the Third-Party Releases and the Exculpation Provision.  Nor has the Office of the United States Trustee offered any new evidence in support of its position.  The United States Trustee has failed to offer any new case law or other authority to support its position.  Rather, the United States Trustee argues that in the absence of a binding decision from the Fourth Circuit, "it is just as likely as the other parties to succeed on appeal" – the very standard rejected by *BDC Capital*.  508 B.R. at 638.  In the absence of any evidence or argument that the United States

---

[14]    In Article V, the Plan provides that "all indemnification provisions in place as of the Effective Date . . . for current and former directors, officers, managers, employees, attorneys, . . . and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness" of the Plan. Plan, art V.E, ECF No. 1811 at 121.

[15]    While the Appeal and this Motion seem to focus on holders of Interests, it is imperative to note that those parties are only one small component of the thousands of parties that gave and received releases in these Bankruptcy Cases. Out of the sixty-four debtor entities that filed, only Ascena was publicly traded. The Third-Party Releases and Exculpation Provisions applied to all constituents – the Debtors, the pre-Petition Date lenders, the post-Petition Date lenders, vendors, landlords, etc. These provisions had real value to all of these entities. While the Debtors, the pre-Petition Date lenders, and the post-Petition Date lenders were "Released Parties," other creditors received a substantially increased dividend and avoidance action waivers. In the absence of such waivers, creditors not only would be left without payment in full but also would be left with significant exposure for certain pre-Petition Date payments received.

[16]    As a fundamental principle, the absolute priority rule applicable in chapter 11 cases prohibits junior creditors from receiving anything if senior creditors are not paid in full. 11 U.S.C. § 1129(b)(2). By the plain application of this rule, as all holders of claim would need to be paid in full first, equity is routinely extinguished without return in chapter 11 bankruptcy cases. Coupled with the speculative nature of securities outside of bankruptcy cases, the result in these Bankruptcy Cases is neither novel nor unexpected.

Trustee is "*likely to succeed* as compared to being just as likely to succeed as the other parties,"
the United States Trustee has failed to satisfy the first factor. *Id.* (emphasis in original).

## II.     The United States Trustee Has Not Identified Any Irreparable Harm if the Motion Is Denied.

"To demonstrate entitlement to a stay, [the movant] must show that it will suffer irreparable
harm absent a stay." *Brea Union Plaza I, LLC v. Toys "R" Us, Inc.*, Case No. 3:18CV419, 2018
WL 3543056, at *5, 2018 U.S. Dist. LEXIS 123049, at *13 (E.D. Va. July 23, 2018). The
purported irreparable harm cannot be entirely speculative. *See id.*; *see also Nken v. Holder*, 556
U.S. 418, 434-35 (2009) ("[S]imply showing some possibility of irreparable injury fails to satisfy
the second factor." (internal quotations omitted)). In the Motion, the United States Trustee devotes
one sentence to whether irreparable harm will occur if the stay is denied: "Should this stay be
denied and this Court's decision later be overturned, parties who unknowingly and unintentionally
released their causes of action by failing to opt-out will be irreparably harmed should the statute
of limitations applicable to their cause of action expire during the pendency of the appeal." Mot.
§ II, ECF No. 1962 at 13. The Court finds that this conclusory sentence is entirely speculative
and, as such, the United States Trustee has not met his burden to prove irreparable harm.

The United States Trustee readily conceded at the Hearing that he is unaware whether any
such unknown third parties exist and whether any such claims exist, and further admitted that it is
entirely possible that no such claims exist. The United States Trustee argued instead that
irreparable harm may be speculative in this instance for "the common-sense reason that unknown
third parties are unaware that their right to bring state and federal law claims against other
non-debtor parties are extinguished under the Debtors' chapter 11 plan." Reply 14, ECF No. 2114
at 14.

The Court rejects this unsupported assertion.  The second factor clearly requires the United States Trustee show irreparable harm if a stay is not granted.  No single party has come forward or been otherwise identified as being harmed.  Furthermore, even if such a party could be identified, the United States Trustee has failed to show "irreparable" harm, as required by this factor.  This Court retained jurisdiction to interpret and enforce the terms of its Confirmation Order.  Confirmation Order ¶ 180, ECF No. 1811 at 79 ("This Court retains jurisdiction over the Chapter 11 Cases, all matters arising out of or related to the Chapter 11 Cases and the Plan, the matters set forth in Article XI and other applicable provisions of the Plan.").  An adversely affected party could seek relief from the Confirmation Order in this Court on grounds such as excusable neglect if the notice the party was given proves to have been actually deficient.  Thus, it is unclear how any alleged "harm" would be "irreparable."

This case is much like *In re Alpha Natural Resources, Inc.*, 556 B.R. 249, 264 (Bankr. E.D. Va. 2016).  In *Alpha*, a party appealed a confirmation order and moved to stay the effectiveness of exculpation and releases provisions as to a particular released party.  *Id.*  In denying the motion to stay, the Court observed that as the plan's effective date had already occurred, the releases had already been granted.  There was nothing left for the Court to stay.  *Id.* (citing *BDC Cap.*, 508 B.R. at 640).

As was the case in *Alpha*, the Court is unsure in the case at bar what exactly it is that it is supposed to stay. The Plan and the Confirmation Order each provided that the exculpation and release provisions would become effective as of the Plan's Effective Date.  That date occurred on March 5, 2021.  *See* Notice of (I) Entry of Order Confirming Debtors' Am. Chapter 11 Plans & (II) Occurrence of Effective Date, ECF No. 1845.  The exculpation and release provisions for which the United States Trustee seeks a stay became effective more than two months ago.  The

distributions and the assignments of contracts and leases were made in reliance thereon. There is

no aspect of the implementation of the exculpation and release provisions left for the Court to stay.

*See In re Alpha Nat. Res., Inc.*, 556 B.R. at 264 n.30. The United States Trustee is not really

pursuing a stay as much as he is asking the Court to rule that provisions integral to the Plan should

be overturned. That is a decision for the appellate court to make.

Because the United States Trustee has failed to meet its burden of proof as to both the first

and second factor, the Court need not turn to the remaining third and fourth factors. *See Nken*, 556

U.S. at 435. Nevertheless, the Court will address each of those factors in turn.

### III.    The United States Trustee Failed to Establish that Other Parties Will Not Be Harmed by the Stay if the Motion Is Granted.

The United States Trustee mistakenly argues that the Debtors have failed to establish any

evidence that other parties would be harmed by the stay. This argument fails for two distinct

reasons. First, the Debtors, as the non-moving parties "do[ ] not bear the burden of proving the

potential harm. Rather, [the movant] has the burden of showing the *absence* of substantial harm."

*Brea Union Plaza I, LLC*, 2018 WL 3543056, at *5, 2018 U.S. Dist. LEXIS 123049, at *15 (citing

*Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970)) (emphasis in original). As such, the United

States Trustee must establish that other parties involved in the litigation will not be substantially

harmed by the stay. Not only has the United States Trustee failed to meet this burden, but the

overwhelming evidence before the Court shows that other parties will be substantially harmed by

the imposition of the stay.

The United States Trustee offered no evidence in support of this factor. Instead, the United

States Trustee relied wholly on the incorrect legal argument that the Court could sever the

offensive provisions without consequence to the remaining terms of the Plan. This argument fails

for two independent reasons. First, contrary to the assertions advanced by the United States

Trustee's, there is no severability provision in the Plan upon which the Court can rely.  While the

Plan did include a severability clause, that clause could only be invoked prior to confirmation:

> If, *before Confirmation*, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

Plan art. XII.J, ECF No. 1811 at 138 (emphasis added).  The Plan goes on to provide,

> The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (3) *nonseverable and mutually dependent*.

*Id.* (emphasis added).  No party, including the United States Trustee, objected to this provision of

the Plan.  The Plan is entirely consistent with the terms of the Confirmation Order, which expressly

provides:

> [T]he terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.  Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, and (c) *nonseverable and mutually dependent.*

Confirmation Order ¶ 156, ECF No. 1811 at 66 (emphasis added).

    As such, there is no severability clause in the Plan as confirmed.  The Plan was artfully

drafted to allow the Debtors the flexibility, at the Debtors' option, to continue to seek confirmation

of a revised plan should any provision of the proposed plan had been held by the Court to be invalid. In the alternative, the Debtors fully retained the ability to withdraw or revoke the Plan up to confirmation. *See* Plan art. X.C, ECF No. 1811 at 134. As such, the Debtors retained the ability to determine whether any adverse ruling by the Court would materially affect the terms of the Plan and whether, in consultation with the Term Lenders and other major creditor constituencies, to proceed with confirmation of the Plan as modified. Once the Plan had been confirmed, the severability provision terminated, and all Plan provisions are deemed interdependent. The Court cannot now, as the United States Trustee suggests, rewrite the terms of the Plan to excise the Third--Party Releases and Exculpation Provision in contravention of the terms of the Plan and the Confirmation Order. *Cf. In re Alpha Nat. Res., Inc.*, 556 B.R. at 264 (denying motion to stay pending appeal of release and exculpation issues on the grounds that narrower provisions would be "highly inequitable to all other creditors who will be harmed when the appeal disturbs the global peace reached in the Plan").

The United States Trustee's request that third parties be allowed to immediately proceed to litigate claims that are now enjoined by the release and exculpation provisions pending a determination on the merits fails to address the attendant cost associated with such litigation. The Plan specifically provided for the reinstatement of "all indemnification provisions in place as of the Effective Date . . . for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors," i.e., the same persons covered by the release and exculpation provisions. Plan art. V.E, ECF No. 1811 at 121. If the Court were to grant the relief sought by the United States Trustee, the Debtors would very likely have corresponding indemnification obligations.

The United States Trustee was unable to explain how these indemnification obligations
would be paid and what effect such payment may have upon the Debtors' ability to perform the
Plan.    While it is unclear how such indemnification obligations would be paid,[17] it is
unquestionable that such payments would deplete the estate and require the Debtors to claw back
distributions made to creditors.[18]  If the United States Trustee is unsuccessful on appeal, this will
effectively dissipate assets which would have otherwise benefited holders of allowed claims on
account of enjoined claims.  The Court finds that this separately constitutes harm and, therefore,
the United States Trustee has failed to satisfy this factor.

## IV.  The United States Trustee Failed to Establish that Denial of the Stay Is in the Public Interest.

The fourth and final factor requires the Court to examine whether the imposition of a stay
would serve the public interest.  In support of this factor, the United States Trustee argues that
public interest is best served by ensuring that these unknown hypothetical claimants retain the right
to bring their unknown hypothetical claims unfettered by the release and exculpation provisions.
The Court disagrees.

These Bankruptcy Cases involved a complex and multi-faceted restructuring that resulted
from months of negotiations between numerous constituencies.  Based upon the carefully crafted

---

[17]    The United States Trustee concedes that he is not seeking to undo the distributions that have been made under the Plan.  As discussed *supra*, in accordance with the Plan, on the Effective Date, the Debtors have disbursed payment in full to their secured lenders in the amount of $56 million.  $7.25 million in funds earmarked for a recovery to general unsecured creditors has been paid to the GUC Trust for distribution to holders of allowed general unsecured claims.  It appears that the only possible source of funds to pay such indemnification obligations may be funds set aside for administrative claimants.  In a best-case scenario, such payment may merely run afoul of the priority scheme mandated by *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).  In a worst-case scenario, payment of these indemnification obligations from the administrative claimants' pool may cause these Bankruptcy Cases to become administratively insolvent and force a post-confirmation conversion to chapter 7. This nightmare scenario could result in disrupting all parties' expectations, including but not limited to a resurrection of avoidance actions – a critical component of the negotiations in these Bankruptcy Cases.

[18]    This would likely trigger a default under the confirmed Plan, the remedy for which is conversion of the case to chapter 7.  *See* 11 U.S.C. § 1112(b)(2)(N).

settlements embodied in and the transactions contemplated by the Plan, the Ascena brand continues to live on in the face of a continuing global pandemic.  The business remains a going concern.[19]  These deals have resulted in tens of thousands of employees retaining their jobs, which would have otherwise disappeared.  Despite what some have termed a "retail apocalypse," Ascena brand stores in shopping centers nationwide have reopened, providing not only continued rent to landlords, but cure payments on pre- and post-Petition Date lease obligations.  Vendors are continuing to transact business without the threat of being sued for an avoidance action.  The uncontroverted evidence is that the implementation of this Plan has effectively created a viable entity that is contributing positively to the economy.[20]  The Court finds that these tangible benefits vastly outweigh some purely speculative harm to some persons who may or may not even exist.

---

[19]  This case was highly successful.  Most retail bankruptcies have resulted in liquidations.  Chuck Carroll & John Yozzo, *Why Are U.S. Retail Reorganizations So Hard?*, Am. Bankr. Inst. J., Oct. 2016, at 12, 12; *see, e.g.,* Order (I) Confirming Third Am. Joint Chapter 11 Plan of Taj Debtors & TRU Inc. Debtors & (II) Approving Credit Bid Transaction, *In re Toys "R" Us, Inc.*, Case No. 17-34665-KLP (Bankr. E.D. Va. Dec. 17, 2018), ECF No. 5979; Findings of Fact, Conclusions of Law & Order Confirming Modified Second Am. Joint Plan of Liquidation, *In re Circuit City Stores, Inc.*, Case No. 08-35653-KRH (Bankr. E.D. Va. Sept. 14, 2010), ECF No. 8555; Findings of Fact, Conclusions of Law & Order Confirming Second Am. Joint Plan of Reorganization, *In re Movie Gallery, Inc.*, Case No. 07-33849-DOT (Bankr. E.D. Va. Apr. 10, 2008), ECF No. 2191; Findings of Fact, Conclusions of Law, & Order Confirming Third Am. & Restated Joint Liquidating Plan of Reorganization, *In re Heilig-Meyers Co.*, Case No. 00-34533-DOT (Bankr. E.D. Va. Dec. 23, 2005), ECF No. 6378; Order Confirming Plan, *In re Best Prods., Co.*, Case No. 96-35267-DOT (Bankr. E.D. Va. May 29, 1997), ECF No. 2510.  The COVID-19 pandemic appears to have made retail reorganizations that much more difficult.  *See, e.g.*, Findings of Fact, Conclusions of Law & Order Confirming Debtors' First Am. Joint Plan of Liquidation, *In re Century 21 Dep't Stores LLC*, Case No. 20-12097 (SCC) (Bankr. S.D.N.Y. Apr. 26, 2021), ECF No. 883; Order (I) Confirming Combined Plan of Liquidation & (II) Approving Disclosure Statement, *In re Stein Mart, Inc.*, Case No. 3:20-bk-2387 (Bankr. M.D. Fla. Apr. 13, 2021), ECF No. 1010; Findings of Fact, Conclusions of Law & Order (I) Approving Disclosure Statement on Final Basis & (II) Confirming First Am. Joint Plan of Liquidation, *In re Modell's Sporting Goods, Inc.*, Case No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 13, 2020), ECF No. 827; Order Confirming Joint Second Am. Chapter 11 Plan, *In re Stage Stores, Inc.*, Case No. 20-32564 (DRJ) (Bankr. S.D. Tex. Aug. 14, 2020), ECF No. 705; Findings of Fact, Conclusions of Law, & Order (I) Approving Disclosure Statement on Final Basis & (II) Confirming Joint Plan of Liquidation, *In re SFP Franchise Corp.*, Case No. 20-10134-JTD (Bankr. D. Del. Aug. 13, 2020), ECF No. 601; Order Confirming Am. Joint Chapter 11 Plan, *In re Pier 1 Imports, Inc.*, Case No. 20-30805-KRH (Bankr. E.D. Va. July 30, 2020), ECF No. 967.  The success in the case at bar, particularly in a global pandemic, is attributable to the many complex compromises the parties were able to negotiate, resulting in the global settlement.

[20]  Notably, no party with a pecuniary interest objected to the Third-Party Releases or the Exculpation Provision.  No party with a pecuniary interest has appealed the Disclosure Statement Order or the Confirmation Order.  And no party with a pecuniary interest has sought to stay the Disclosure Statement Order or the Confirmation Order.

While the Court acknowledges that there is no time limit to file a motion for stay pending appeal embodied in Bankruptcy Rule 8007, the Court further finds that parties have justifiably relied upon the terms of the Plan. The Plan has been substantially consummated. More than $56 million has been paid to the Debtors' lenders, millions of dollars have been transferred to the GUC Trust for eventual disbursement to holders of allowed general unsecured claims, hundreds – if not thousands – of leases and contracts have been assumed and assigned with new counterparties performing thereunder, equity in Ascena has been canceled, and new equity issued. To stay the Disclosure Statement Order and the Confirmation Order now – more than two months after the Plan has gone effective and after all of these actions occurred – would unnecessarily upset the parties' expectations. Accordingly, the Court finds that the public interest would be served by denying the stay.

### Conclusion

The Motion seeks a stay of the exculpation and release provisions set forth in the Confirmation Order and Plan. Those releases were granted on March 5, 2021, when the Plan became effective, more than two months prior to the Hearing. There is nothing for the Court to stay pending appeal. But even assuming arguendo there were, the United States Trustee has failed to meet his burden of establishing any of the four elements necessary for a stay pending appeal. The United States Trustee has not demonstrated a likelihood of success on the merits. The balance of the equities weighs heavily in favor of the Debtors and all other economic stakeholders in these bankruptcy cases. The United States Trustee has failed to show irreparable harm in the absence of a stay. All evidence indicate that a stay would substantially harm all the Debtors' creditors and other constituencies in these cases. Finally, public interest weighs against a stay. Accordingly, the Motion will be denied.

A separate order shall issue.

Dated: ___May 28, 2021___          ___/s/ Kevin R. Huennekens_____
                                   UNITED STATES BANKRUPTCY JUDGE


                                   Entered on Docket: ___May 28, 2021_____


                                   Entered on Docket: May 28, 2021