IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JOEL PATTERSON, *et al.*,
    Appellants,

v.                                                    Civil No. 3:21cv167 (DJN)

MAHWAH BERGEN RETAIL GROUP, INC.
    Appellee.

## **MEMORANDUM OPINION**

This case arises out of the bankruptcy cases commenced by Mahwah Bergen Retail

Group, Inc. (f/k/a Ascena Retail Group, Inc.) ("Mahwah" or "Ascena") and sixty-three of its

affiliates (collectively, the "Debtors"). The United States Bankruptcy Court for the Eastern

District of Virginia ("Bankruptcy Court") confirmed the reorganization plan ("the Plan") set

forth by the parties in interest, and Joel Patterson and Michaella Corporation ("Securities

Litigation Lead Plaintiffs") filed notices of appeal to this Court. Likewise, the United States

Trustee ("Trustee") filed a notice of appeal of the confirmation to this Court.[1] The appeals were

consolidated into this action.[2] In these appeals, Appellants challenge third-party (non-debtor)

releases, as well as an exculpation provision, contained in the Plan.

This appeal implicates the most fundamental right guaranteed by the due process clause

in our judicial system: the right to be heard before the loss of one's rights. "For more than a

century the central meaning of procedural due process has been clear: 'Parties whose rights are

---

[1]    The United States Securities and Exchange Commission (SEC) supported the Trustee's
appeal as an amicus.

[2]    The other appeals consolidated into this action are Case No. 3:21cv166 and Case No.
3:21cv205.

to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. 223, 233 (1863)). "And, the Supreme Court has explained that the particular constitutional protection afforded by access to the courts is 'the right conservative of all other rights, and lies at the foundation of orderly government.'" *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004) (quoting *Chambers v. Baltimore & O. R. Co.*, 207 U.S. 142, 148 (1907)). Furthermore, "[t]his right . . . has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Schroeder v. City of New York*, 371 U.S. 208, 212 (1962) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). Relatedly, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). This is so, because the general rule provides "that a person cannot be deprived of his legal rights in a proceeding to which he is not a party." *Martin v. Wilks*, 490 U.S. 755, 759 (1989); *see also id.* at 762 ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

These fundamental principles resonate with force in this appeal from the Bankruptcy Court, as third-party releases strike at the heart of these foundational rights. The United States Trustee — a statutory watchdog over bankruptcy proceedings — and the Securities Litigation Lead Plaintiffs, as designated by a United States District Judge in a putative class action alleging

securities fraud, challenge the approval by the Bankruptcy Court[3] of exceedingly broad third-party (non-debtor) releases, as well as an exculpation provision, contained in the Plan submitted by Debtors.

Third-party releases, such as those at issue here, carry much controversy, for they are a "device that lends itself to abuse." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Indeed, several Courts of Appeals (the Fifth, Ninth and Tenth Circuits) prohibit the use of third-party releases. *See, e.g., In re Pac. Lumber Co.*, 584 F.3d 229, 251-53 (5th Cir. 2009); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600-02 (10th Cir. 1990). And a District Judge in the Southern District of New York recently concluded in a thoughtful opinion that no statutory basis exists for their use. *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021).

The Fourth Circuit has made clear that the use of third-party releases is disfavored, saying that such releases should be "granted cautiously and infrequently." *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011). Other circuits that permit their use likewise reserve their utilization for the rare or exceptional case. *See, e.g., In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (directing that "courts considering such releases do so with caution . . . . [and] with the utmost care and to thoroughly explain the justification for any such inclusion"); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2015) (permitting releases and bar orders but cautioning that they "ought not to be issued lightly, and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all

---

[3]     The Honorable Kevin R. Huennekens, United States Bankruptcy Judge for the Eastern District of Virginia (Richmond Division).

the facts and circumstances"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141-43

(holding that involuntary releases should only be approved if they form an important part in a

reorganization plan, and that they are proper "only in rare cases"); *In re Dow Corning Corp.*, 280

F.3d 648, 657-58 (6th Cir. 2002) ("Because such an injunction is a dramatic measure to be used

cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's

claim is only appropriate in 'unusual circumstances.'").

Despite these admonitions, the Bankruptcy Court for the Richmond Division of this

district regularly approves third-party releases, as acknowledged by Debtors' counsel during oral

argument. (Tr. of Dec. 20, 2021 Argument ("Arg. Tr.") at 6:8-14 (ECF No. 75).) This recurrent

practice contributes to major companies like Mahwah (a New Jersey company) using the

permissive venue provisions of the Bankruptcy Code to file for bankruptcy here.[4]  Indeed,

according to the Trustee, the Richmond Division (just the division, not the entire Eastern District

of Virginia) joins the District of Delaware, the Southern District of New York, and the Houston

Division of the Southern District of Texas as the venue choice for 91% of the "mega" bankruptcy

cases. (Reply Br. of Appellant John P. Fitzgerald, III, Acting United States Trustee for Region 4

("Trustee Reply Br.") at 22-23 (ECF No. 45).)  The ubiquity of third-party releases in the

Richmond Division demands even greater scrutiny of the propriety of such releases.  And, their

prevalence also undermines assertions that they are integral to the success of this particular

---

[4]      To be clear, venue properly exists in the Richmond Division, as Debtors latched onto the
existing bankruptcy of one of their affiliates, Dress Barn, which is incorporated in Virginia, as
the basis for venue. 28 U.S.C. § 1408. Consequently, the question is not whether venue was
proper here, but instead why Debtors chose this venue over the many other venue options that it
had available to it. During oral argument, counsel for Debtors had no explanation for his client's
choice of Richmond to file for bankruptcy. (Arg. Tr. at 78:20-22.)

reorganization plan. As District Judge Colleen McMahon astutely observed: "When every case is unique, none is unique." *In re Purdue Pharma, L.P.*, 2021 WL 5979108, at *3.

The Third-Party Releases at issue in this case represent the worst of this all-too-common practice, as they have no bounds. The sheer breadth of the releases can only be described as shocking. They release the claims of *at least* hundreds of thousands of potential plaintiffs not involved in the bankruptcy, shielding an incalculable number of individuals associated with Debtors in some form, from every conceivable claim — both federal and state claims — for an unspecified time period stretching back to time immemorial. In doing so, the releases close the courthouse doors to an immeasurable number of potential plaintiffs, while protecting corporate insiders who had no role in the reorganization of the company. Yet, the Bankruptcy Court — acting with its limited Article I powers — extinguished these claims with little or no analysis. In doing so, the Bankruptcy Court exceeded the constitutional limits of its authority as delineated by the Supreme Court in *Stern v. Marshall*, 564 U.S. 462 (2011), ignored the mandates of the Fourth Circuit in *Behrmann*, and offended the most fundamental precepts of due process.

Likewise, the Bankruptcy Court erred by approving an overly broad Exculpation Provision that exceeds the bounds of similar provisions approved in other cases. However, unlike the Third-Party Releases that must be voided and severed from the reorganization plan, redrafting can salvage the Exculpation Provision on remand.

Accordingly, this case will be remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

## I.     FACTUAL BACKGROUND[5]

Ascena provided specialty retail apparel for women and girls, operating approximately

2,800 stores in the United States, Canada and Puerto Rico, which served more than 12.5 million

customers and employed nearly 40,000 employees.  Debtors held a portfolio of recognizable

brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey and

Cacique.

Beginning in March 2020, Debtors had to temporarily close all of their retail stores due to

the COVID-19 pandemic, and in so doing, furloughed nearly all of their store-level workforce as

well as a substantial portion of their corporate workforce.  At the time, Debtors had

approximately $1.6 billion in secured debt and $700 to $800 million in unsecured debt.

(USTAPP 1592, 1599.)  Before filing for bankruptcy, Debtors negotiated with many of their

secured lenders to arrive at a restructuring support agreement, which formed the basis of the

original chapter 11 plan.  (USTAPP 1591.)  Then, on July 23, 2020, Debtors commenced the

Bankruptcy Cases that ultimately were consolidated into Case No. 20bk33113 in the Bankruptcy

Court.  However, rather than reorganize, Debtors ultimately largely liquidated the businesses,

selling substantially all of the assets for a total sale price of $651.8 million.  (USTAPP 2259-61,

2262-64, 2265-67, 2320.)  Thereafter, they filed an amended chapter 11 plan.  (Amended Joint

Chapter 11 Plan of Reorganization of Mahwah Bergan Retail Group, Inc. and Its Debtor

Affiliates (the "Plan") (USTAPP 2410-2529).)

---

[5]     Unless otherwise cited, the Court takes these facts from the Bankruptcy Court's Opinion
("Bankr. Confirm. Op.") explaining its reasoning for confirming the Plan, found at pages
USTAPP 2837-2876 of the Trustee's Appendix (("USTAPP") (ECF Nos. 35-1 through 35-3)).
In citing pages contained in the Trustee's Appendix, the Court will cite to the page numbers
following "UST" in the Trustee's Appendix.

## A.    The Plan

The Plan provided that some secured lenders would be paid in full, general unsecured creditors would receive pro rata payments from a trust funded by $7.25 million in cash and the remaining class of secured claims would receive the remainder of Debtors' cash. (USTAPP 2621-36.) The shareholders would receive nothing and the Plan would extinguish their equity interest. (USTAPP 2634.)

On February 25, 2021, the Bankruptcy Court conducted an evidentiary hearing to consider the Debtors' Plan in addition to the unresolved objections filed by the SEC and the Trustee, as well as those raised by Joel Patterson and Michaella Corporation, the lead plaintiffs in a securities fraud action against Ascena and two of its former executives pending in the United States District Court for the District of New Jersey (the "Securities Litigation"). The Bankruptcy Court overruled the objections and confirmed the Plan and, on February 25, 2021, entered the Confirmation Order confirming the Plan. Then, on March 9, 2021, the Bankruptcy Court entered its Memorandum Opinion to supplement its findings of facts and conclusions of law in the Confirmation Order.

Before confirming the Plan, the Bankruptcy Court had to first approve a Disclosure Statement that would supply creditors and interest holders with information about the proposed plan as a part of the solicitation process. Accordingly, on September 10, 2020, the Bankruptcy Court held a hearing regarding the Disclosure Statement. In response to objections by the SEC, the Bankruptcy Court required Debtors to amend the Disclosure Statement to include language recommended by the SEC, so that the notice would more clearly convey information to non-voting equity holders about the provisions of the Plan, including the inclusion of Third-Party Releases, the right of each non-voting equity holder to opt out of the Third-Party Releases and

the process for doing so. Additionally, in response to objections by the Securities Litigation

Lead Plaintiffs, the Bankruptcy Court adopted additional steps to effectuate notice of the

Disclosure Statement. However, the Bankruptcy Court overruled the Trustee's objections, which

closely resembled the issues that he raises in this appeal.

The sale of Debtors' brands for $651 million allowed their brands to continue under new

ownership and brought proceeds into Debtors' estate for the benefit of creditors. Debtors' term

lenders and the Creditors' Committee endorsed the Plan. The Plan provided for certain payment

structures to Debtors' creditors. The unsecured creditors also received a waiver of any

avoidance actions that Debtors' estate could bring against them. The holders of equity interest in

Ascena were not projected to receive any distribution and, therefore, were deemed to reject the

Plan. The Plan also included broad releases that form the basis of this appeal.

### B. The Releases Contained in the Plan

As part of the Plan, the major stakeholders negotiated and included extremely broad and

convoluted releases and an exculpation provision. Specifically, the Plan provides for the

following Debtors' Releases:

> [E]ach Released Party is conclusively, absolutely, unconditionally, irrevocably,
> and forever released and discharged by each and all of the Debtors, the
> Reorganized Debtors, and their Estates . . . from any and all Causes of Action,
> including any derivative claims, asserted or assertable on behalf of any of the
> Debtors . . . based on or relating to, or in any manner arising from, in whole or in
> part, the Debtors (including the management, ownership, or operation thereof),
> the purchase, sale, or rescission of any Security of the Debtors or the Reorganized
> Debtors, the subject matter of, or the transactions or events giving rise to, any
> Claim or Interest that is treated in the Plan, . . . or any other related agreement, or
> upon any other act, omission, transaction, agreement, event, or other occurrence
> (in each case, related to any of the foregoing) taking place on or before the
> Effective Date.

(USTAPP 2460-61.) The Plan further provides for the following Release by holders of Claims

or Interests ("Third-Party Releases"):

Effective as of the Effective Date, each Releasing Party in each case except for Claims arising under, or preserved by, the Plan, Each Releasing Party (other than the Debtors and the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

(USTAPP 2461.)

The Plan defines "Releasing Party" broadly to include:

[C]ollectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Lenders; (n) all holders of Impaired Claims who voted to accept the Plan; (o) all holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan but did not timely opt out of or object to the applicable release; (p) all holders of Unimpaired Claims who did not timely opt out of or object to the applicable release; (q) all holders of Interests; (r) the Plan Administrator; (s) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (t); (t) each Related

Party of each Entity in the foregoing clause (a) through clause (t); and (u) the
Creditors' Committee; *provided* that, in each case, an Entity shall not be a
Releasing Party if it: (x) elects to opt of the releases contained in the Plan, or (y)
timely objects to the releases contained in the Plan and such objection is not
resolved before Confirmation; *provided further* that any such Entity shall not
receive the Avoidance Action waiver.

(USTAPP 2427.)  Thus, Releasing Parties includes all holders of claims and interests who do not

timely opt out of or object to the Third-Party Releases.

Likewise, the Plan defines "Released Party" broadly, to include:

[C]ollectively, each of the following in their capacity as such:  (a) each of the
Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders;
(d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term
Loan Lenders; (h) the lenders and administrative agents under the Exit
Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL
Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) the Plan
Administrator; (o) each current and former Affiliate of Each Entity in the
foregoing clause (a) through this clause (p); (p) each Related Party of each Entity
in the foregoing clause (a) through this clause (p); and (q) the Creditors'
Committee; *provided* that any holder of a Claim or Interest that opts out of the
releases shall not be a "Released Party."

(USTAPP 2427.)

In turn, the Plan then defines the term "Related Party" to include:

[W]ith respect to any person or Entity, each of, and in each case in its capacity as
such, current and former directors, managers, officers, investment committee
members, special or other committee members, equity holders (regardless of
whether such interests are held directly or indirectly), affiliated investment funds
or investment vehicles, managed accounts or funds, predecessors, participants,
successors, assigns, subsidiaries, Affiliates, partners, limited partners, general
partners, principals, members, management companies, fund advisors or
managers, employees, agents, trustees, advisory board members, financial
advisors, attorneys (including any other attorneys or professionals retained by any
current or former director or manager in his or her capacity as director or manager
of an Entity), accountants, investment bankers, consultants, representatives, and
other professionals and advisors of such person or Entity, and any such Person's
or Entity's respective heirs, executors, estates, and nominees.

(USTAPP 2426.)

Finally, the Plan provides for the following Exculpation Provision:

[N]o Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, Cash Collateral Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omissions that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(USTAPP 2461-62.)

The Plan defines "Exculpated Parties," in turn, to include:

(a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; the Creditors' Committee and its members; (e) the Term Loan Agent; (f) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (g) each Related Party of each Entity in clause (a) through this clause (g).

(USTAPP 2422.)

**C.    The Notice**

Any reasonable review of the Third-Party Releases leads to a conclusion that the releases cover any type of claim that existed or could have been brought against anyone associated with

Debtors as of the effective date of the plan. Yet, the Bankruptcy Court (and now Debtors as well) only focused on one claim against Ascena and two of its former corporate officers: a putative class action alleging securities fraud brought against Ascena, former CEO David Jaffe and former CFO Robert Giammatteo. By doing so, the Bankruptcy Court ignored all of the other potential claims (both federal and state claims) released against others covered by the releases, as well as neglected to address any other potential claims against Jaffe and Giammatteo. This tunnel vision proves fatal to any notions of proper notice (as well as consent) in this case.

With its focus on the securities fraud litigation, the Bankruptcy Court approved a disclosure statement for dissemination to creditors and shareholders after a hearing. (USTAPP 0942, 0980-82.) The Bankruptcy Court required a Notice of Non-Voting Status to be sent to both current and former shareholders of Ascena during the Putative Class Period. The Notice of Non-Voting Status informed the recipients that they could opt out of the Third-Party Releases by returning an enclosed form no later than November 15, 2020. The Notice of Non-Voting Status stated in bold and underlined text that, under Debtors' Plan, "**you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed 'Release Opt-Out Form'.**" The recipient could return a hardcopy form in the pre-addressed, pre-paid envelope or electronically through an online portal, which would effectuate the opt-out.

The Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders. Nor did it even examine other possible causes of action released. Prime Clerk — essentially a middleman in this process — bore responsibility for notifying the equity holders. Prime Clerk sent the notice and

opt-out forms by first-class mail to all current and former registered holders identified by
Ascena's transfer agent, American Stock Transfer & Trust Company, LLC ("AST"). As to the
beneficial holders, Prime Clerk served the notice and opt-out forms on the list of Nominees with
instructions to forward the materials to their beneficial holder clients as of the voting record date
and their beneficial holder clients who had purchased or otherwise acquired the equity interest
during the Putative Class Period. Additionally, the Bankruptcy Court ordered publication of a
general notice of the confirmation hearing in *USA Today* and *The New York Times*. (USTAPP
0985-86.) This notice ran for one day and included the day and time of the hearing, the deadline
by which to object to the Plan and that the Plan contained a third-party release. (USTAPP 1559.)

Throughout this process, Debtors sent notice of the Third-Party Releases and the opt-out
procedure to roughly 300,000 parties believed to be potential members of the putative class
action case pending in the New Jersey district court. The record lacks any information about
how many of the parties actually received the notice or any mention of efforts to determine the
success of the attempts at notice regarding the securities fraud litigation. As of November 18,
2020, Debtors had received approximately 596 Release Opt-Out Forms — approximately 0.2%
of those targeted by the notice.

### D.    The Securities Litigation

Although not directly related to the procedural or factual history of the bankruptcy
proceeding, the Third-Party Releases essentially thwart a lawsuit filed in a separate federal court.
In June 2019, the Securities Litigation Lead Plaintiffs filed a federal securities putative class
action in the United States District Court for the District of New Jersey.[6] On November 21,
2019, the Securities Litigation Lead Plaintiffs filed a Consolidated Amended Complaint against

---

[6]        *Newman v. Ascena Retail Group, Inc., et al.*, 2:19cv13529 (D.N.J.).

Debtors and the Individual Defendants, which included Debtors' former CEO (Jaffe) and CFO
(Giammatteo). The proposed class included all persons, other than the defendants, who
purchased or otherwise acquired Debtors' common stock between December 1, 2015 and May
17, 2017. The Amended Complaint asserts claims under the Securities Exchange Act of 1934
and generally alleges that the defendants engaged in a deceptive scheme and made false and
misleading statements and omissions that artificially inflated the price of the common stock
during the class period.

The Securities Litigation Lead Plaintiffs objected to the Third-Party Releases, but the
Bankruptcy Court overruled their objections. Moreover, they attempted to opt out of the Third-
Party Releases on behalf of the putative class, but the Bankruptcy Court denied that request. The
Securities Litigation Lead Plaintiffs now appeal those decisions, as the Third-Party Releases in
this case has halted the New Jersey case before reaching the class certification stage.

## II.    PROCEDURAL HISTORY

On March 12, 2021, the Securities Litigation Lead Plaintiffs filed two notices of appeal
of the Confirmation Order to this Court.[7] In their appeals, the Securities Litigation Lead
Plaintiffs argue that the Bankruptcy Court erred in approving the Third-Party Releases to the
extent that the Third-Party Releases relate to the claims asserted in the Securities Litigation.
(Opening Br. of Appellants Joel Patterson and Michaella Corp. ("Appellants' Br.") at 7 (ECF
No. 30).) The Securities Litigation Lead Plaintiffs further argue that the Bankruptcy Court erred
in finding that they lack standing to object to the Third-Party Releases and that they could not
opt out on behalf of the class that they seek to represent. (Appellants' Br. at 7-8.)

---

[7]     The Securities Litigation Lead Plaintiff's other notice of appeal initiated Case No.
3:21cv166, which the Court then consolidated into this action.

On March 26, 2021, the Trustee filed a notice of appeal of the Confirmation Order to this Court.[8] The Court consolidated the Trustee's appeal with the other pending appeals into this case and set a briefing schedule. (ECF Nos. 11, 15.) In his appeal, the Trustee argues that the Bankruptcy Court erred by approving the Third-Party Releases and Exculpation Provision contained in the Plan and approved by the Confirmation Order. (Br. of Appellee [*sic*] John P. Fitzgerald, III, Acting United States Trustee For Region 4 ("Trustee Br.") at 2 (ECF No. 35).) The Trustee further argues that the Bankruptcy Court erred in the manner in which it conducted the confirmation approval process. (Trustee Br. at 47-50.)

After filing the appeal, the Trustee filed a motion to stay in the Bankruptcy Court, asking the Bankruptcy Court to stay the application of the Plan's exculpation and release provisions pending the adjudication of this appeal. On May 13, 2021, the Bankruptcy Court conducted a hearing on the stay motion below. Then, on May 28, 2021, the Bankruptcy Court denied the Trustee's stay motion and entered a Memorandum Opinion ("Bankr. Stay. Op." (USTAPP 2877-2904)) setting forth its findings of facts and conclusions of law.

On June 2, 2021, the Trustee filed a Motion to Stay in this Court (ECF No. 18), in which the Securities Litigation Lead Plaintiffs joined. (ECF No. 28.) Debtors opposed the stay. (ECF No. 27.) On June 28, 2021, the Court denied the Motion to Stay, finding that the Trustee had failed to meet the high burden required for a party seeking a stay. (ECF Nos. 33-34.)

On September 10, 2021, Debtors filed their Response Brief for Appellee Mahwah Bergen Retail Group, Inc. (("Appellee Br.") (ECF No. 43).) On October 11, 2021, the Securities Litigation Lead Plaintiffs and the Trustee each filed a reply brief, respectively. (("Trustee Reply

---

[8]    The Trustee's notice of appeal initiated Case No. 3:21cv205, which the Court then consolidated into this action.

Br.") (ECF No. 45); (Reply Br. of Appellants Joel Patterson and Michaela Corp.) ("Appellants' Reply Br.") (ECF No. 46).) On December 20, 2021, the Court held oral argument on this appeal, rendering it ripe for review. For the reasons stated below, the Court finds that the Bankruptcy Court erred in its approval of the Third-Party Releases and the Exculpation Provision.

## III.  STANDARD OF REVIEW

"When reviewing a decision of the bankruptcy court [rendered in a core proceeding], a district court functions as an appellate court and applies the standards of review in federal courts of appeal." *Paramount Home Ent. Inc. v. Cir. City Stores, Inc.*, 445 B.R. 521, 526-27 (E.D. Va. 2010) (citing *In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)). Specifically, "[t]he district court reviews the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Serv. US, LLC*, 578 B.R. 325, 328 (E.D. Va. 2017) (citing *In re Harford Sands Inc.*, 327 F.3d 637, 639 (4th Cir. 2004)). Clear error exists when the district court "'is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). In cases involving questions of law and fact, the Court reviews findings of fact under the clearly erroneous standard and reviews *de novo* the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Rsv. Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996).

Conversely, if the proceeding before the Bankruptcy Court constitutes a non-core proceeding and the parties did not consent to the Bankruptcy Court's jurisdiction, "the district court . . . undertake[s] de novo analysis of both the factual findings to which [the appellant] objected and the law." *In re Apex Express Corp.*, 190 F.3d 624, 630 (4th Cir. 1999). Indeed, 28 U.S.C. § 157(c)(1) directs:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

Relatedly, Bankruptcy Rule 8018.1 provides that:

If, on appeal, a district court determines that the bankruptcy court did not have the power under Article III of the Constitution to enter the judgment, order, or decree appealed from, the district court may treat it as proposed findings of fact and conclusions of law.

Fed. R. Bankr. P. 8018.1. The district court then reviews such proposed findings of fact and conclusions of law *de novo*. Fed. R. Bankr. P. 9033(d).

## IV.    ANALYSIS

This appeal requires the Court to first determine whether the Bankruptcy Court exceeded its authority under the Constitution when it released the claims included in the Third-Party Releases. This analysis will encompass whether the Releasing Parties consented to the jurisdiction of the Bankruptcy Court. Next, the Court must determine whether the Bankruptcy Court erred in approving the Third-Party Releases under applicable Fourth Circuit standards. This, again, will require an analysis of whether the parties consented to the Third-Party Releases. Then, the Court will address Appellee's argument that the Court must dismiss this appeal on equitable mootness grounds. Finally, the Court will examine the challenge to the Exculpation Provision. However, before addressing the merits of the appeal, the Court will address whether Appellants have standing to press this appeal.

A.     **Standing to Appeal**

1.     **The United States Trustee's Standing to Appeal**

During oral argument, Debtors' counsel conceded that Debtors have no challenge to the

standing of the Trustee to appeal. (Arg. Tr. at 20:10-11.) Debtors make this concession for good

reason. The Bankruptcy Code gives the United States Trustee standing, providing that the

Trustee "may raise and may appear and be heard on any issue in any case or proceeding under

this title but may not file a plan pursuant to section 1121(c) of this title." 11 U.S.C. § 307. The

Trustee serves the role of "protecting the public interest and ensuring that bankruptcy cases are

conducted according to law." *In re Clark*, 927 F.2d 793, 795 (4th Cir. 1991) (quotations

omitted). Given their role, the Fourth Circuit has recognized that a trustee could never satisfy the

"person aggrieved standard," discussed below, but still has standing to appeal adverse

bankruptcy decisions in its role as a "public watchdog" over bankruptcy proceedings. *See id.* at

796 ("[S]tanding to appeal under the Bankruptcy Act as a 'party aggrieved' may arise from a

party's official duty to enforce the bankruptcy law in the public interest."). The Fourth Circuit

noted that, "had Congress intended to prohibit U.S. trustees from appealing adverse bankruptcy

court rulings, it would have done so explicitly." *Id.* Accordingly, the Trustee has standing to

appeal to this Court. And, his appeal of the Third-Party Releases encompasses the appeal

advanced by the Securities Litigation Lead Plaintiffs. This leaves the Court with no reservations

that it can consider the merits of the appeal regardless of whether the Securities Litigation Lead

Plaintiffs have standing.

2.     **The Securities Litigation Lead Plaintiffs' Lack of Standing to Appeal**

The Debtors do, however, challenge the Securities Litigation Lead Plaintiffs' standing to

prosecute this appeal. (Appellee Br. at 48.) Specifically, Debtors argue that by objecting to the

Third-Party Releases, the Securities Litigation Lead Plaintiffs opted out of the release and, therefore, it has no impact on them. The Court agrees and finds that the Securities Litigation Lead Plaintiffs lack standing to prosecute this appeal.

"The test for standing to appeal a bankruptcy court's order to the district court is well-established: the appellant must be a *person aggrieved* by the bankruptcy order." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Serv. US LLC*, 469 F. Supp. 3d 505, 523 (E.D. Va. 2020) (internal quotations omitted). To satisfy the person aggrieved standard, "the appellant must show that the order diminishes its property, increases its burdens, or impairs its rights." *Id.* (internal quotations omitted).

Here, the Securities Litigation Lead Plaintiffs argue that they were placed in a "death trap" by being forced to choose between either not opting out, and thereby waiving significant rights, or opting out (as they ultimately chose) and risking a challenge to their standing. Although the Court is sympathetic to the conundrum in which they were placed, tough strategic decisions do not confer standing. Moreover, this tough strategic decision resulted in the Third-Party Releases having no binding effect on them as individuals. They may still pursue any and all claims that the Third-Party Releases purport to release. Thus, they cannot complain of any diminution of property, increase in burden or impairment of rights in their individual capacity. Although they claim that the Third-Party Releases inhibit their ability to enlarge their recovery in the Securities Action (Appellants' Reply at 18), they actually seek to enlarge the recovery of the putative class — *i.e.,* more class members obtaining a recovery, leading to a greater overall class recovery — not necessarily their own personal recovery. As such, the Securities Litigation Lead Plaintiffs must pin their hopes of establishing standing on harm suffered in their capacity as putative representatives of the class.

However, the Securities Litigation Lead Plaintiffs' capacity as putative representatives of a class in the District of New Jersey does not confer standing to appeal in this Court. The Securities Litigation Lead Plaintiffs claim that they have standing "because they are fiduciaries for the Class, have rights closely aligned with those of Class members, and are the court-appointed advocate for Class members' rights." (Appellants' Reply at 19.) However, this argument puts too much weight on their role as putative class representatives. As lead plaintiffs in a *putative* class action, the Securities Litigation Lead Plaintiffs have no special status; consequently, they must establish individualized harm. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016) ("While a class lacks independent status until certified, . . . a would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted."). As the Fourth Circuit has noted, "[n]ot every effort to represent a class will succeed; the representative is an agent only if the class is certified." *Gentry v. Siegel*, 668 F.3d 83, 90 (4th Cir. 2012). Accordingly, the Securities Litigation Lead Plaintiffs' argument that their representative capacity confers standing on them relies on the speculation that they will eventually represent a certified class. But, "[s]peculation and conjecture do not give rise to bankruptcy appellate standing." *Mar-Bow*, 469 F. Supp. 3d at 532.

Two appellate decisions support this conclusion. In *Gentry*, the Fourth Circuit concluded that the named plaintiffs in putative classes lacked standing to challenge the notice procedures employed by the bankruptcy court. 668 F.3d at 95. The plaintiffs had received the actual notice, such that they could not challenge the notice on behalf of themselves, and the Fourth Circuit concluded that they did "not have standing to assert the due process rights of others who are not parties." *Id.* Similarly, here, the Securities Plaintiffs cannot challenge on their own behalf the

Third-Party Releases that no longer (due to the opt out) release their own individual claims, and they lack standing to challenge the Third-Party Releases on behalf of others who are not parties.

Likewise, the Second Circuit encountered a nearly identical circumstance to the facts here in *In re Dynegy, Inc.*, 770 F.3d 1064 (2d Cir. 2014). There, a named plaintiff in a putative securities class action sought to challenge the third-party releases in a confirmation plan that would release non-debtor officers. *Id.* at 1067. The Second Circuit agreed with the district court that the named plaintiff lacked standing to personally challenge the plan, because he had opted out of the release. *Id.* Likewise, the Second Circuit found that he lacked standing to opt out of or object to the releases on behalf of the putative class, because the class had not been certified in either the trial court or the bankruptcy court. *Id.* at 1068-70. The same facts exist here, and the Court reaches the same conclusion.

Accordingly, the Court finds that the Securities Litigation Lead Plaintiffs lack standing to prosecute this appeal.[9] Again, however, the Court stresses that the Trustee has standing to raise the same challenges to the Third-Party Releases as the Securities Litigation Lead Plaintiffs have raised.

## B. The Constitutional Implications of the Third-Party Releases

In assessing whether the Bankruptcy Court erred in approving the Third-Party Releases, the Court will begin with a discussion of the jurisdiction of bankruptcy courts generally and whether they have the constitutional power to approve such releases. The Court will then

---

[9] The Securities Litigation Lead Plaintiffs have raised additional issues in this appeal. Specifically, they claim that the Bankruptcy Court erred in finding that they lacked the authority to opt out on behalf of the putative class and in declining to certify the class for the limited purpose of opting out on behalf of the class. (Appellants' Br. at 82-85.) However, the Court's ultimate conclusion that the Third-Party Releases are unenforceable renders moot the question of whether the Bankruptcy Court should have provided some mechanism to opt out of the class from the Third-Party Releases.

examine whether the Releasing Parties consented to adjudication of their claims by an Article I court. The Court answers both questions in the negative.

### 1.    The Limitations of the Jurisdiction of the Bankruptcy Courts

Federal district courts exercise "original and exclusive jurisdiction of all cases" under the Bankruptcy Code. 28 U.S.C. § 1334(a). District courts may refer all bankruptcy matters to bankruptcy judges, which this District has done as a matter of course since 1984. 28 U.S.C. § 157(a); *see In the Matter of: The Administration of the Bankruptcy Courts and Reference of Bankruptcy Cases and Proceedings to the Bankruptcy Judges of this District* (E.D. Va. Aug. 15, 1984) (Standing Order referring all bankruptcy matters to Bankruptcy Court). District courts retain the authority to withdraw, in whole or in part, any case or proceeding that they had referred. *See Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 481 (4th Cir. 2015) (citing 28 U.S.C. § 157(d)). "In short, while the district courts were given jurisdiction over bankruptcy cases, Congress also delegated to the bankruptcy courts, 'as judicial officers of the district courts,' . . . adjudicatory authority, subject to the district courts' supervision as particularized in § 157 and the limits imposed by the Constitution." *Id.* (quoting *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 679 (2015)). This case implicates those limits imposed by Article III of the Constitution.

Article III provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Congress has established 94 District Courts and 13 Courts of Appeals, "composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished." *Wellness Int'l*, 575 U.S. at 668. The Supreme Court has long recognized that "Congress may not withdraw from" the Article III courts "any matter which, from its nature, is the subject of a suit

at the common law, or in equity, or admiralty." *Stern*, 564 U.S. at 484. This limitation finds its

basis in the protections of life tenure and against salary diminution that Article III provides,

which "help to ensure the integrity and independence of the Judiciary." *Wellness Int'l*, 575 U.S.

at 668. In authorizing the appointment of bankruptcy judges (who do not enjoy the Article III

protections), Congress has attempted to align the responsibilities of bankruptcy judges with the

boundaries set by the Constitution. However, as discussed below, the Supreme Court has found

that Congress violated Article III in authorizing bankruptcy judges to decide certain claims for

which litigants enjoy an entitlement to an Article III adjudication.

### 2.    *Northern Pipeline* and Congress' Reaction

In *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, the Supreme Court

considered the constitutionality of the Bankruptcy Reform Act enacted by Congress in 1978, and

specifically whether the bankruptcy court had the judicial authority to adjudicate a state-law

contract claim filed by the debtor against a third party. 458 U.S. 50, 54 (1982). The Bankruptcy

Reform Act gave the newly created bankruptcy courts power "much broader than that exercised

under the former" system and enabled bankruptcy courts to decide "all civil proceedings arising

under title 11 or arising in or related to cases under title 11." *Id.* at 55. Thus, Congress vested

the bankruptcy judges with most of the "powers of a court of equity, law, and admiralty" without

affording them the protections of Article III. *Id.* Because the Bankruptcy Reform Act vested

"the essential attributes of the judicial power" in a non-Article III adjunct, the Supreme Court

held that "[s]uch a grant of jurisdiction cannot be sustained as an exercise of Congress' power to

create adjuncts to Art. III courts." *Id.* at 87. Thus, it found the "broad grant of jurisdiction to the

bankruptcy courts" unconstitutional and concluded that the bankruptcy court lacked jurisdiction

to adjudicate the state-law contract claim against an entity not otherwise part of the bankruptcy proceedings. *Id.* at 69-72, 87.

Following the decision in *Northern Pipeline*, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"), revising the statutes governing bankruptcy judges and their jurisdiction. Pub. L. No. 98-353, 98 Stat. 333. Under the 1984 Act, "[t]he manner in which a bankruptcy judge may act . . . depends on the type of proceeding involved." *Stern*, 564 U.S. at 473. "Congress has divided bankruptcy proceedings into three categories: (1) those that arise under title 11, (2) those that arise in a title 11 case, and (3) those that are related to a case under title 11." *Chesapeake Tr. v. Chesapeake Bay Enters., Inc.*, 2014 WL 202028, at *2 (E.D. Va. Jan. 17, 2014) (citing *Stern*, 564 U.S. at 473). The first two categories constitute "core proceedings" such that a bankruptcy judge has the statutory authority to "hear and enter final judgments." *Stern*, 564 U.S. at 474. With respect to the third category, non-core proceedings, a bankruptcy judge may hear a "proceeding that is not a core proceeding but that is otherwise related to a case under title 11," but, unless the parties consent, the bankruptcy judge cannot enter final judgments and instead must submit "proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1).

Section 157 sets forth a non-exhaustive list of examples of core proceedings. The list includes, for example, "the allowance or disallowance of claims against the estate," and "counterclaims by the estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(B)-(C). A party may appeal the final judgment of a bankruptcy court to the district court, which reviews it under traditional appellate standards. 28 U.S.C. § 158(a); Fed. R. Bankr. Proc. 8013. However, when a bankruptcy judge determines that a "proceeding . . . is not a core proceeding but . . . is otherwise related to a case under title 11," the bankruptcy judge may only

"submit proposed findings of fact and conclusions of law to the district court," which then

reviews de novo any matter to which a party objects. 28 U.S.C. § 157(c)(1).

### 3. *Stern v. Marshall*

The Supreme Court took up the constitutionality of the 1984 Act in *Stern v. Marshall*.

564 U.S. at 471. There, the Court faced the issue of whether the bankruptcy court had

jurisdiction to enter a final judgment on a counterclaim brought by the debtor against an

individual who had filed a proof of claim in the bankruptcy action. *Id.* The Court noted that the

debtor's counterclaim plainly constituted a "core" proceeding under the statute, thus giving the

bankruptcy judge the *statutory* authority to enter a final judgment on the claim. *Id.* at 475.

However, the Court concluded that Article III of the Constitution did not permit the bankruptcy

court to enter final judgment on the counterclaim. *Id.* at 482. The counterclaim "[was] a state

law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling

on the creditor's proof of claim in bankruptcy." *Id.* at 487. The Supreme Court reaffirmed that

"Congress may not bypass Article III simply because a proceeding may have some bearing on a

bankruptcy case . . . ." *Id.* at 499. Instead, "the question is whether the action at issue stems

from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.*

The Court found that the bankruptcy court had gone beyond constitutional limits when it

"exercised the 'judicial Power of the United States' in purporting to resolve and enter final

judgment on a state common law claim." *Stern*, 564 U.S. at 487. Accordingly, the bankruptcy

court lacked the constitutional authority to adjudicate the claim. *Id.* at 503.

In sum, the Supreme Court mandates that bankruptcy courts only have the constitutional

authority to adjudicate core claims, even if Congress has granted them the statutory authority to

resolve other claims. Naturally, this constitutional limitation applies to a bankruptcy court's

authority to grant releases. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137 (holding

that an approval of releases by a bankruptcy court is only "permissible if it involves a matter

integral to the restructuring of the debtor-creditor relationship"); *In re Purdue Pharma, L.P.*,

2021 WL 5979108, at \*40 ("Nothing in *Stern* or any other case suggests that a party otherwise

entitled to have a matter adjudicated by an Article III court forfeits that constitutional right if the

matter is disposed of as part of a plan of reorganization in bankruptcy.  Were it otherwise, then

parties could manufacture a bankruptcy court's *Stern* authority simply by inserting the resolution

of some otherwise non-core matter into a plan.").

    Here, by granting the Third-Party Releases, the Bankruptcy Court took jurisdiction over

and extinguished the liability of an extraordinarily vast range of claims held by an immeasurable

number of individuals against a broad range of potential defendants.  However, before doing so,

the Bankruptcy Court took no steps to determine if it had the power to extinguish the liability on

any particular claim.  Indeed, the only extinguished claims that the Bankruptcy Court considered

were the securities fraud claims against the Individual Defendants (Jaffe and Giammatteo), and it

ignored all of the other potential claims that it terminated by approving the releases.  In so doing,

the Bankruptcy Court failed to take the proper steps to ensure that it had the authority to grant the

releases.

### 4.    Classification of Core v. Non-Core

    A bankruptcy court has the responsibility to properly classify the claims before it based

on the content of the claims and adjudicate them according to those classifications.  "It is the

bankruptcy court's responsibility to determine whether each claim before it is core or non-core."

*Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33 (2014).  "A cause of action is

constitutionally core when it 'stems from the bankruptcy itself or would necessarily be resolved

in the claims allowance process.'" *Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436, 448

(E.D. Va. 2019) (quoting *Stern*, 564 U.S. at 499). A bankruptcy estate's claim against a creditor

"would necessarily be resolved in the claims allowance process when it shares common

questions of fact and law with the creditor's claims and when it seeks to directly reduce or

recoup the amount claimed." *Id.* (internal quotations omitted). A claim can become core when it

"become[s] integral to the restructuring of the debtor-creditor relationship." *Stern*, 564 U.S. at

497. Conversely, claims by the bankruptcy estate that seek to "augment the estate" but do not

"directly modify the amount claimed" do not qualify as a core claim "to be resolved in ruling on

the proof of claim." *Allied Title Lending, LLC*, 420 F. Supp. 3d at 448.

When confronted with a so-called *Stern* claim — "a claim designated for final

adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that

way as a constitutional matter," — the bankruptcy court should proceed with the claim as it

would for non-core claims. *Exec. Benefits Ins. Agency*, 573 U.S. at 35-36. That requires the

bankruptcy court to "determine whether the claim may be adjudicated as a non-core claim —

specifically, whether it is 'not a core proceeding' but is 'otherwise related to a case under title

11.'" *Id.* at 36. If it satisfies the "otherwise related to a case under title 11" as required by 28

U.S.C. § 157(c)(1), then the bankruptcy court "should hear the proceeding and submit proposed

findings of fact and conclusions of law to the district court for *de novo* review and entry of

judgment." *Id.* at 36. Of course, if the claim has no relation to a case under title 11, then the

bankruptcy court lacks any authority to act on it.

*Stern* teaches that courts should focus on the content of the proceeding rather than the

category of the proceeding when determining whether a bankruptcy court has acted within its

constitutional authority. The *Stern* Court explained that counterclaims that do not "stem[] from

the bankruptcy itself or would [not] necessarily be resolved in the claims allowance process"

must be decided by Article III courts. *Stern*, 564 U.S. at 497. The Court never declared that all

counterclaims by a debtor fall outside of a bankruptcy court's jurisdiction. Instead, the Court

looked to the content of the debtor's counterclaim and compared the factual and legal

determinations necessary to resolve the counterclaim to those necessary to resolve the original

claim. *Id.* at 498-99. It did so to assess whether the counterclaim would necessarily be resolved

in the claims-allowance process. *Id.* In doing so, the Court focused on the basis for the

counterclaim to determine whether it stemmed from the bankruptcy itself. *Id.* Given *Stern's*

focus on the content of the claim over its categorization, courts cannot bypass the constitutional

limitations simply by categorizing a widely varying swath of claims as "core" and then assuming

jurisdiction over them.

> **a.    The Bankruptcy Court Failed to Identify Whether it had
> Jurisdiction Over the Claims That it Released.**

Here, the Bankruptcy Court engaged in none of the content-based analysis demanded by

*Stern*. The Bankruptcy Court did not parse the content of the claims that it purported to release

to determine if each claim constituted a core claim, a non-core claim or a claim unrelated to the

bankruptcy case. The sheer breadth of the Third-Party Releases renders this a herculean

undertaking and underscores the constitutional questionability of the Bankruptcy Court's actions.

However, the enormity of the task does not absolve the Bankruptcy Court of its responsibility to

properly identify the content of the claims before it and ensure that it has jurisdiction to rule on

each of them. In fact, because of the constitutional implications of extinguishing these claims,

this undertaking carries even greater import. As an appellate court, this Court will not speculate

as to the claims released and then parse each purportedly released claim to determine whether the

Bankruptcy Court had the power to extinguish that claim — that was the responsibility of the

Bankruptcy Court. *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases — fairness, necessity to the reorganization, and specific factual findings to support these conclusions — are all absent here."). The sheer breadth of the releases and the lack of findings with respect to each released claim renders appellate review virtually impossible and speaks to the impropriety of the approval of the Third-Party Releases.

**b.    The Bankruptcy Court Lacks Jurisdiction Over Many Released Claims.**

Although the Court cannot determine precisely which Released Claims the Bankruptcy Court could have adjudicated, it takes only a cursory review of the Third-Party Releases and the Releasing Parties to find released claims that the Bankruptcy Court lacked the authority to adjudicate. The universe of released claims includes claims between non-debtors which may have no connection to the property of Mahwah's bankruptcy estate or the administration of the Bankruptcy Proceeding. For example, the Third-Party Release would bar securities claims, such as those brought by the Securities Plaintiffs, against former directors and officers of Mahwah, even if the claims arose before Mahwah filed for bankruptcy and those directors and officers had no involvement in the Bankruptcy Proceeding. And it bears noting that "federal courts disfavor indemnity for federal securities law violations, calling into question the enforceability of these obligations." *In re Continental Airlines*, 203 F.3d at 216 (citing cases). Thus, the only type of released claim that the Bankruptcy Court actually considered finds antipathy in the case law.

The Trustee points out numerous other potential claims that the Bankruptcy Court released. (Trustee Br. at 33.) These include hostile work environment claims by a former Mahwah employee against another Mahwah employee; negligence by a Mahwah employee against a consultant hired by Mahwah to counsel employees on retirement plans; slander by a former employee of Mahwah's term lenders against a current employee of the lender for remarks

that the former employee mishandled the lender's deal with Mahwah; a breach of contract action

by an accountant of one of Mahwah's loan agents against the agent for failure to pay for the

work that the account performed on the agent's transaction with Mahwah; and malpractice by an

affiliate of Mahwah against its law firm for the firm's simultaneous representation of both the

affiliate and Mahwah when their interests diverged. (Trustee Br. at 33.) None of these claims

appear even related — much less integral — to the restructuring of the debtor-creditor

relationship, such that the Bankruptcy Court could adjudicate them without running afoul of the

Constitution. And, given the breadth of the releases, the above examples likely represent only a

fraction of the purportedly released claims that lack an integral connection to the bankruptcy

process, such that the Bankruptcy Court lacked the power to release them.

### 5.    The Implication of *Stern's* Constitutional Analysis on the Released Claims

Debtors' argument that the Third-Party Releases do not implicate *Stern's* constitutional

limitations fails. Essentially, Debtors ask the Court not to parse the released claims in any way

and, instead, find that the Bankruptcy Court had constitutional authority based on the inclusion

of the Releases in the Plan. (Appellee Br. at 57-59.) This argument would require the Court to

conclude that only the Plan Confirmation Order constitutes a judgment and that jurisdiction over

confirmation proceedings cures any jurisdictional defects within those proceedings. The Court

concludes neither.

### a.    The Bankruptcy Court Must Have Jurisdiction Over a Claim to Release it.

First, the releases here implicate the constitutional limits on the Bankruptcy Court's

ability to adjudicate claims, even if they do not constitute a judgment following a hearing on the

merits of the claim. Once the Plan became final, the provisions therein, including the Third-

Party Releases, became *res judicata* for subsequent parties trying to bring the claims. *Travelers*

*Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009); *In re Purdue Pharma, L.P.*, 2021 WL 5979108,

at \*41 ("Nor is there any doubt that the entry of an order releasing a claim has former

adjudication effects, which is a key attribute of a final judgment. The Supreme Court has twice

held that non-consensual third-party releases confirmed by final order are entitled to *res judicata*

claim preclusion barring any subsequent action bringing a released claim . . . ."). Likewise,

when the Bankruptcy Court declared the releases consensual settlements of the claims, they

became final judgments on the merits for purposes of further litigation. *See Larken, Inc. v.*

*Wray*, 189 F.3d 729, 732 (8th Cir. 1999) (stating that a voluntary dismissal with prejudice

"constitutes a final judgment on the merits"); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050

(5th Cir. 1987) (holding that order confirming plan that released creditor's claims against

guarantor was a final judgment on the merits of those claims); *see also In re Digital Impact, Inc.*,

223 B.R. 1, 12, 13 n.6 (Bankr. N.D. Okla. 1998) ("A release, or permanent injunction, contained

in a confirmed plan . . . has the effect of a judgment — a judgment against the claimant and in

favor of the non-debtor, accomplished without due process.").

    At bottom, the Bankruptcy Court extinguished the Released Claims, which amounts to

adjudication of the claim for *Stern* purposes. *In re Purdue Pharma, L.P.*, 2021 WL 5979108, at

\*41 ("There really can be no dispute that the release of a claim 'finally determines' that claim. It

does so by extinguishing the claim, so that it cannot be adjudicated on the merits. A

nonconsensual third-party release is essentially a final judgment against the claimant, in favor of

the non-debtor, entered 'without any hearing on the merits.'"). To claim that the Bankruptcy

Court can fully extinguish these claims based solely on their inclusion in the Plan — without any

hearing on them or any findings about them —amounts to arguing that courts need not have the

authority to extinguish claims so long as they provide no procedural safeguards in extinguishing the claims. Obviously, this cannot be.

Likewise, the argument that the Bankruptcy Court possesses the power to extinguish these claims based only on its jurisdiction over confirmation proceedings misses the mark. True, bankruptcy courts have jurisdiction over Chapter 11 proceedings under 28 U.S.C. § 157(a), and plan confirmation proceedings constitute core proceedings that the bankruptcy court may adjudicate on a final basis. 28 U.S.C. § 157(b)(2)(L). Further, 11 U.S.C. § 105(a) permits the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." But, this grant of authority has limits.

Although § 105 permits a bankruptcy court to issue orders necessary or appropriate to carry out the provisions of the Bankruptcy Code, that section does not provide an independent source of federal subject matter jurisdiction. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 224-25 (3d Cir. 2004) ("But as the statute makes clear, § 105 does not provide an independent source of federal subject matter jurisdiction."). Thus, independent statutory basis must exist for the bankruptcy court to exercise jurisdiction over the claims. *See In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately . . . .").

Without an independent source of jurisdiction, a bankruptcy court must rely on its own jurisdiction, which comes in the form of *in rem* jurisdiction over the debtor's property and the disposition of that property. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006) ("Bankruptcy jurisdiction, at its core, is *in rem*."). It is certainly true "that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990). Yet, third-party claims belong to third parties,

not the debtor's estate. "As a general rule, a bankruptcy court has no power to say what happens to property that belongs to a third party, even if that third party is a creditor or otherwise is a party in interest." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) (*citing Callaway v. Benton*, 336 U.S. 132, 136-41 (1949)).

Similarly, although a bankruptcy court's *in rem* jurisdiction gives it authority over claims against the estate, it has no *in rem* jurisdiction over third-party claims not against the estate or property of the estate. *See In re Johns-Manville Corp.*, 600 F.3d at 153-54 (holding that a bankruptcy court did not have *in rem* jurisdiction over a third party's direct claims against a non-debtor insurer). Additionally, bankruptcy courts have subject matter jurisdiction over "civil proceedings" that are "related to" a bankruptcy case. 28 U.S.C. §§ 157, 1334. However, the Third-Party Releases here purport to release claims that may not yet constitute any pending civil proceeding.

Additionally, many of the claims lack any relation to the bankruptcy case, even affording "related to" jurisdiction the most liberal reading. Debtors' argument that bankruptcy courts must be able to confirm plans even if those plans affect other cases has it backwards. (Appellee's Br. at 59.) The Plan confirmation does not merely have a "tangential effect" on the Securities Litigation and other claims. Rather, the Plan has the ultimate effect — extinguishment — on the claims despite having — at most — a tangential effect on the bankruptcy estate. Therefore, the bankruptcy court has no independent authority on which to rely.

Indeed, as discussed above, *Stern* and its progeny stand for the proposition that Congress cannot enlarge the subject matter jurisdiction of the bankruptcy courts beyond permissible constitutional limits. Thus, Congress could not eviscerate the limits of Article III jurisdiction by enacting § 105. Article III simply does not allow third-party non-debtors to bootstrap any and all

of their disputes into a bankruptcy case to obtain relief. *See In re Midway Gold US, Inc.*, 575
B.R. 475, 519 (Bankr. D. Colo. 2017) ("If proceedings over which the Court has no independent
jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply
by including their release in a proposed plan, this [Bankruptcy] Court could acquire infinite
jurisdiction.") (citations omitted).  Moreover, the Court does not view releasing a claim held by a
third-party non-debtor against another third-party non-debtor as an "appropriate" order to carry
out the Bankruptcy Code.  And certainly, given many of the released claims' complete
attenuation to the bankruptcy estate and proceeding, these releases cannot be considered
"necessary."  Any finding by the Bankruptcy Court otherwise constitutes a clear error.

> **b.**     **The Parties did not Consent to Article I Adjudication of Non-Core Claims.**

The Debtors further argue that the Third-Party Releases do not implicate the
jurisdictional constraints of *Stern*, because the parties consented to the Releases.  (Appellee Br.
at 55-56.)  This argument ignores the standard that the Supreme Court has set for consenting to
bankruptcy court jurisdiction.  Likewise, the Bankruptcy Court ignored the standard that must be
met to find that a party has consented to its jurisdiction.  As discussed below, the record contains
no evidence that could meet the Supreme Court's standard for consent to non-Article III
jurisdiction.

> **i.**     ***The Supreme Court's Standard for Consent***

Following *Stern*, the Supreme Court took up the issue of whether a party could consent to
having the bankruptcy court decide a *Stern* claim in *Wellness International Network, Ltd. v.
Sharif*, 575 U.S. 665 (2015).  The Court first answered the question of whether a litigant could
waive the right to an Article III court, concluding that "allowing bankruptcy litigants to waive
the right to Article III adjudication of *Stern* claims does not usurp the constitutional prerogatives

of Article III courts." *Id.* at 679.  In reaching this decision, the Court relied on the fact that

"*Stern* — like its predecessor, *Northern Pipeline* — turned on the fact that the litigant did not

truly consent to resolution of the claim against it in a non-Article III forum." *Id.* at 681

(quotations omitted).

However, the Court next determined what constituted valid consent to adjudication by a

bankruptcy court.  The Court rejected the argument that "such consent must be express." *Id.* at

683.  Instead, it held that "[t]he implied consent standard articulated in *Roell* supplies the

appropriate rule for adjudications by bankruptcy courts under § 157." *Id.* at 684.  Therefore, "the

key inquiry is whether the litigant or counsel was made aware of the need for consent and the

right to refuse it, and still voluntarily appeared to try the case before the non-Article III

adjudicator." *Id.* at 685 (cleaned up).  An understanding of the standard in *Wellness* necessitates

a brief review of *Roell v. Withrow*, 538 U.S. 580 (2003).

In *Roell*, the Supreme Court held that consent to proceedings before a magistrate judge

under 28 U.S.C. § 636(c) need not be express and instead can be inferred from a party's conduct

during litigation.  538 U.S. at 582.  In *Roell*, the plaintiff agreed orally and in writing to having

the magistrate judge preside over the entire case. *Id.* at 582-83.  The district judge then referred

the case to the magistrate judge for final disposition, but with the caveat that the defendants

would have the opportunity to consent and the referral order would be vacated if they did not

consent. *Id.* at 583.  The clerk then sent the referral order to the defendants with instructions to

submit a separate pleading indicating whether they consented or not. *Id.*  One defendant

consented to magistrate judge jurisdiction, but two others did not take a position at all. *Id.*  The

magistrate judge then proceeded to preside over a jury trial all the way to a verdict and judgment.

*Id.*  On at least three different instances, the parties did nothing when the magistrate judge stated

that the parties had consented to her jurisdiction. *Id.* at 584, n.1. Following the judgment, the defendants submitted their consent in writing, but the district court and the Fifth Circuit Court of Appeals nevertheless vacated the judgment, ruling that consent had to be express under § 636(c). *Id.* at 585.

The Supreme Court disagreed that consent to magistrate judge jurisdiction had to be expressly written. *Id.* at 586. Instead, it found that the parties had "clearly implied their consent by their decision to appear before the Magistrate Judge, without expressing any reservation, after being notified of their right to refuse and after being told that she intended to exercise case-dispositive authority." *Id.* The Court noted that allowing the conduct of the parties to determine consent "checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the magistrate judge's authority." *Id.* at 590. Accordingly, it concluded that "the better rule is to accept implied consent where, as here, the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the Magistrate Judge." *Id.*

In *Wellness,* the Supreme Court found that applying the same standard in the bankruptcy context possessed the same pragmatic virtues that motivated its adoption in the magistrate judge concept. 575 U.S. at 684-85. However, the Court made clear that this standard has teeth: "[i]t bears emphasizing, however, that a litigant's consent — whether express or implied — must still be knowing and voluntary." *Id.* at 685 (citing *Roell*, 538 U.S. at 587, n.5 ("notification of the right to refuse" adjudication by a non-Article III court "is a prerequisite to any inference of consent")).

### ii. The Bankruptcy Court Incorrect Application of the Standard for Consent

Applying this standard here, it becomes clear that the Bankruptcy Court erred as a matter of law in finding that failure to return the opt-out form could constitute consent to Article I adjudication. The Bankruptcy Court relied on the fact that the Releasing Parties received notice and an opportunity to opt out of the Third-Party Releases as the basis for consent. (Bankr. Confirm. Op. at 31-33.) But, the Bankruptcy Court made this determination in the context of whether the Releasing Parties consented to the Third-Party Releases, not the threshold question of whether they consented to having the Bankruptcy Court adjudicate the released claims.[10] This will not suffice to support a finding of consent to Article I adjudication for all of the Releasing Parties.

*Wellness* and *Roell* make clear that courts can discern the implication of consent to a non-Article III court based on a party's *actions*. However, they do not permit a finding of consent based on *inaction*. In finding consent to Article I adjudication, *Roell* relied on the litigation conduct of the parties and the fact that they appeared before the magistrate judge to try their case after notification of the referral. Indeed, the Court even cited the definition of an appearance as an "overt act by which a party submits himself to the court's jurisdiction." *Roell*, 538 U.S. at 586, n.3. This reliance on the overt act of appearing in the non-Article III court demonstrates the importance of actions over inactions. Likewise, *Wellness* cited to *Roell* for the proposition that "actions rather than words" can support a finding of consent and that "the key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still

---

[10] As the Bankruptcy Court made no attempt to discern whether the Releasing Parties consented to it adjudicating their non-core claims, the Court must assume that it would have relied on the same manner of consent that it relied on in finding that the Releasing Parties consented to the Third-Party Releases.

voluntarily appeared to try the case before the non-Article III adjudicator." *Wellness Int'l*, 575 U.S. at 684-85 (cleaned up). Importantly, any consent "must still be knowing and voluntary." *Id.* at 685.

Here, the Court cannot discern any actions undertaken by the Releasing Parties to support a finding that they knowingly and voluntarily consented to Article I adjudication of the claims that they released. Despite the enormous breadth of Releasing Parties deemed to have released claims, the Bankruptcy Court undertook no analysis to determine which Releasing Parties (if any) had consented to bankruptcy jurisdiction and which had not. Instead, as previously noted, the Bankruptcy Court took a myopic approach to the Releasing Parties, focusing only on the putative securities fraud class action members, ignoring all other Releasing Parties. And, because the Bankruptcy Court failed to parse the core claims from non-core claims in the Third-Party Releases, the Bankruptcy Court took no steps to determine which Releasing Parties needed to consent to Article I adjudication of their claims before the Bankruptcy Court could act on them. Rather, the Bankruptcy Court merely relied on the fact that a document was mailed out with the goal of reaching thousands of individuals. Then, without regard to whether those individuals received the document, and without regard as to whether those individuals took any overt actions in response to the document, the Bankruptcy Court determined that they had surrendered their constitutional right to an Article III court.

Again, the Bankruptcy Court ignored a wide swath of those releasing claims and, even for those targeted with the notice, the notice contained no information about agreeing to Article I adjudication. Indeed, counsel for Debtors conceded during oral argument that the distributed releases made no mention of agreeing to adjudication of their claims by an Article I court. (Arg. Tr. at 41:10-11.) In any event, the record is silent as to how many of the targeted shareholders

actually received the notice. Yet, hoping (without proving) that someone received a deficient document — without any further action from that person — does not meet the standard for knowing and voluntary consent to adjudication of a non-core claim by a bankruptcy court, as set forth by the Supreme Court in *Wellness*.

Additionally, the Supreme Court in both *Wellness* and *Roell* indicated that the implied consent standard that it set forth had its basis in the elimination of gamesmanship. *See, e.g., Wellness Int'l*, 575 U.S. at 685 (noting that "checking gamesmanship" motivated the adoption of the consent standard). Yet, allowing inaction to imply consent encourages the very gamesmanship that the Supreme Court intended to check. That is, non-debtors could tuck releases unrelated to a bankruptcy proceeding into bankruptcy plans, then secrete an opt-out opportunity into a convoluted legal document, send the document to non-parties previously unaware of the bankruptcy proceeding and use their non-response to extinguish all of their claims. This type of gamesmanship, aimed at extinguishing claims of unwitting individuals and providing a golden parachute to the parties drafting the plan, cannot be tolerated.

In words that apply equally well here, Judge McMahon wrote the following in *In re Purdue Pharma, L.P.*:

> The third-party claims at issue neither stem from [the debtor's] bankruptcy nor can they be resolved in the claims allowance process. Yet those claims are being finally disposed of pursuant to the Plan; they are being released and extinguished, without the claimants' consent and without any payment, and the claimants are being enjoined from prosecuting them. Debtors and their affiliated non-debtor parties cannot manufacture constitutional authority to resolve a non-core claim by the artifice of including a release of that claim in a plan of reorganization.

2021 WL 5979108, at *41. The Bankruptcy Court here exceeded its constitutional authority without any inquiry or factfinding. Accordingly, the Bankruptcy Court erred in adjudicating the *Stern* claims without the knowing and voluntary consent of the Releasing Parties.

### 6.    Consequence of a *Stern* Violation

Having determined that the Bankruptcy Court violated *Stern* by exceeding its authority, the Court must vacate the Confirmation Order and treat it as a Report and Recommendation with proposed findings of fact and conclusions of law, which the Court reviews *de novo*. *Purdue Pharma, L.P.*, 2021 WL 5979108, at *42; 28 U.S.C. § 157(c)(1); Bankruptcy Rule 8018.1. Here, unfortunately, the Bankruptcy Court's opinion lacks any meaningful factfinding, so the Court will need to set forth its own factual findings based on the record from the confirmation hearing. Bankruptcy Rule 9033(d).

Before turning to the factual findings in this case, the Court pauses for an observation about the procedure for the handling of third-party releases by bankruptcy courts going forward. Due to the substantial constitutional issues at play with the use of this perilous tool, it seems preferrable for a bankruptcy court to submit any third-party releases to the district court for approval via a Report and Recommendation in the rare and exceptional case that warrants the use of third-party releases. The Report and Recommendation should identify with specificity the claims and individuals released and provide detailed proposed findings of fact and conclusions of law to ensure that the released claims are truly integral to the reorganization. *See In re Seaside Engineering & Surveying, Inc.*, 780 F.3d at 1079 (noting that this "inquiry is fact intensive in the extreme"); *In re Dow Corning Corp.*, 280 F.3d at 657-58 (criticizing conclusory statements and mandating specific evidentiary findings with separate analysis for each individual release). This practice would necessarily avoid any *Stern* issues.

Moreover, it would serve as an extra safeguard to ensure that third-party releases are reserved for the truly appropriate case, mindful that the use of third-party releases should be

utilized "cautiously and infrequently." *Behrmann*, 663 F.3d at 712.  As one bankruptcy court has

observed:

> [t]hird-party releases are not a merit badge that somebody gets in return for
> making a positive contribution to a restructuring.  They are not a participation
> trophy, and they are not a gold star for doing a good job.  Doing positive things in
> a restructuring case — even important positive things — is not enough.
> Nonconsensual releases are not supposed to be granted unless barring a particular
> claim is important in order to accomplish a particular feature of the restructuring.

*In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 726-27.

### C.      Factual Findings Under Bankruptcy Rule 9032

The Court will now set forth its findings of facts in accordance with Rule 9033(d).  The

findings are based on the evidence submitted during the confirmation hearing.[11]  For the hearing,

Debtors tendered declarations from Carrie W. Teffner (President and Executive Chair of

Debtors), Gary W. Begeman (a disinterested director of the Board of Directors for Debtors),

Alex Orchowski (Director of Global Corporate Acts at Prime Clerk LLC), and William Kosturos

(Managing Director of Alvarez & Marsal North America, LLC, who served as Debtors' financial

advisor).  Teffner and Begeman also testified during the confirmation hearing on February 25,

2021.

The Court finds the following facts as relevant to the issues presented in this appeal:

1.      On June 7, 2019, Securities Litigation Lead Plaintiffs filed a complaint as a
putative class action in the District of New Jersey alleging securities fraud against Ascena
Retail Group, Inc., David Jaffe and Robert Giammatteo in *Newman v. Ascena Retail
Group, Inc., et al,* Case No. 2:19cv13529 (D.N.J.).  On August 23, 2019, United States
District Judge Kevin McNulty appointed Securities Litigation Lead Plaintiffs and their
counsel as lead plaintiff and lead counsel, respectively.  (Dkt. No. 26, *Newman v. Ascena
Retail Group, Inc., et al,* Case No. 2:19cv13529 (D.N.J.) ("D.N.J. Dkt.").)  On February
7, 2020, the defendants in that case filed a motion to dismiss that remains pending.
(D.N.J. Dkt. No. 47).  On July 27, 2020, the defendants in that case filed a pleading
entitled "Suggestion of Bankruptcy" (D.N.J. Dkt. No. 58) that resulted in a stay of all

---

[11]      Notably, the evidence was uncontroverted; therefore, there is no need to assess the
credibility of the witnesses.

proceedings in that case being entered the next day, July 28, 2020 (D.N.J. Dkt. No. 59). The case remains stayed as of the date of this Opinion.

2. David Jaffe previously served as the Chief Executive Officer of Debtors, while Robert Giammatteo previously served as Debtors' Chief Financial Officer. Both Jaffe and Giammatteo left their employment with Debtors several months before Debtors filed for bankruptcy. (USTAPP 0929, 1030.)

3. On July 23, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (USTAPP 0001-18.)

4. With the Bankruptcy Court's approval, Debtors consummated three transactions involving the sale of their businesses. On September 24, 2020, the Bankruptcy Court approved the sale of Debtors' Catherines enterprise. On November 12, 2020, the Bankruptcy Court approved the sale of Debtors' Justice enterprise. On December 8, 2020, the Bankruptcy Court approved the sale of Debtors' remaining businesses, including the sale of the Lane Bryant brand and the Premium business segment, which included Ann Taylor, LOFT, and Lou & Grey, to buyer Premium Apparel LLC. The last of these sales closed on December 23, 2020. These sales consisted of substantially all of the Debtors' assets. (Decl. of Carrie W. Teffner in Supp. of Confirmation of the Amended Joint Chapter 11 Plan ("Teffner Decl.") ¶ 5 (USTAPP 2318-2335).) The sale of the Debtors' Premium and Lane Bryant business resulted in Debtors receiving approximately $472 million in net cash proceeds. (Decl. of William Kosturos in Supp. of Confirmation of the Amended Joint Chapter 11 Plan ("Kosturos Decl.") ¶ 5 (Dkt. No. 1761, *In re Retail Group, Inc.*, Case No. 20bk33113 ("Bankr. Dkt.")).)

5. As a result of the sale of its assets, all that was left for the reorganization after December 23, 2020, was the distribution of Debtors' remaining estate cash. (Teffner Decl. ¶5.) By February 22, 2021, the Debtors had sold substantially all of their assets and all that remained was to distribute cash proceeds in accordance with the terms of the Plan. (Teffner Decl. ¶30.)

6. The Reorganization Plan reflects a global resolution with the Creditors' Committee and contemplates payment in full in cash of all allowed administrative and priority claims. The Reorganization Plan had the support of 97% of the Term Lenders. (Teffner Decl. ¶ 5.)

7. The Reorganization Plan resulted from the collaborative efforts between Debtors, their advisors and legal counsel, and their stakeholders. The Amended Plan reflects the wind down process and maximizes value to the Debtors' stakeholders. (Teffner Decl. ¶ 26.)

8. The Reorganization Plan contains third-party releases, an exculpation provision, and an injunction provision. According to Ms. Teffner, these provisions were the product of extensive good faith, arm's-length negotiations and were material inducements for the parties to enter into the comprehensive settlement embodied in the Plan. (Teffner Decl. ¶ 41.) The negotiations involved the Debtors and their lenders. (Tr. of Feb. 25, 2021

Hr'g ("Confirm. Tr.") at 22:24-25 (USTAPP 2673-2836).) None of the putative members of the securities fraud class action participated in the negotiation. And, Ms. Teffner acknowledged that none of the Releasing Parties had a seat at the table during the negotiations. (Confirm. Tr. at 23:5-10.)

9. David Jaffe and Robert Giammatteo did not participate in the negotiations involving the Third-Party Releases. Furthermore, the Third-Party Releases as they related to Jaffe and Giammatteo were not material inducements for the comprehensive settlement for the Reorganization Plan. (Confirm. Tr. at 23:11-24:2.). Moreover, neither Jaffe nor Giammatteo participated at all (directly or indirectly) in the Debtors' Chapter 11 process. Indeed, they were no longer employed by Debtors at the time of the reorganization. (Confirm. Tr. at 26:10-21.) Consequently, neither Jaffe nor Giammatteo played an integral (or any) role in the formulation and negotiation of the Debtors' plan. (Confirm. Tr. at 34:9-16; 48:20-23.) The Court therefore finds that the releases for Jaffe and Giammatteo were not integral to the reorganization.

10. The negotiations surrounding the Third-Party Releases were focused on all existing and prior officers and directors (including Jaffe and Giammatteo) and were designed to be broad. (Confirm. Tr. at 27:11-12; 32:23-25.) Ms. Teffner did not know whether the Third-Party Releases covered former employees and consultants. (Confirm. Tr. at 41:3-16.) Because the negotiations surrounding the Third-Party Releases were addressed to only officers and directors, the Third-Party Releases exceeded the terms of the negotiations.

11. At the time of the reorganization, Debtors had Director & Officer liability insurance coverage of at least $50 million. (Confirm. Tr. at 29:1-31:4.) No evidence exists in the record that any of the claims released by the Third-Party Releases would exceed the D&O insurance coverage and thereby cause a financial depletion of the estate.

12. The Third-Party Releases were designed to limit time spent defending any type of litigation, which would deplete assets and resources of the estate. (Confirm. Tr. 33:19-24.) The failure to approve the Third-Party Releases included in the Reorganization Plan could potentially increase the time and expense of the Debtors' wind-down process to the detriment of the Debtors' stakeholders. According to Ms. Teffner, the *quid pro quo* for the contributions, concessions and support offered by the Released Parties was the Third-Party Releases. (Teffner Decl. ¶ 45.)

13. Debtors created a Special Committee that consisted of Mr. Begeman and one other disinterested director. (Decl. of Gary D. Begeman in Supp. of Confirmation of Amended Joint Chapter 11 Plan ("Begeman Decl.") ¶ 1 (Bankr. Dkt. No. 1759).) The purpose of the Special Committee was to conduct and oversee an investigation into historical transactions and evaluate any proposed release of any claims or causes of actions by Debtors in connection with a future transaction. The Special Committee retained Kirkland & Ellis (Debtors' counsel) to investigate potential causes of action that the Debtors could bring against any of the Related Parties during a six-year lookback period.

(Begeman Decl. ¶¶ 6-8.)  The investigation found no material claims in favor of the Debtors. (Begeman Decl. ¶ 9.)

14.  After an extensive investigation, the Debtors were unable to uncover any material claims or causes of actions that could be brought against the Releasing Parties, and it is unlikely that the Debtors would recover material amounts, if any, from the Releasing Parties. (Teffner Decl. ¶ 42.)  As such, the release by the Released Parties of claims against the Releasing Parties (described as the "mutual release" in this appeal) has no value and is fictional.

15.  Mr. Begeman also reviewed the pending securities fraud class action filed in the District of New Jersey against the Debtor and its former directors and officers (Jaffe and Giammatteo) in Case No. 2:19cv12529.  The Special Committee (Mr. Begeman and one other disinterested director) determined that the claims in the class action lacked merit and had no material value as related to the Debtors' estates. (Begeman Decl. ¶ 14.)  Notably, the Bankruptcy Court did not accept this as an expert opinion; instead, it only received it as a report from the Special Committee. (Confirm. Tr. at 12:10-18.)  This Court gives no credit to Mr. Begeman's assessment for this reason.

16.  This Court explicitly rejects the Bankruptcy Court's finding that the Third-Party Releases were consensual. (Bankr. Confirm. Op. at 31.)  Instead, the Court finds the Third-Party Releases to be nonconsensual both as a matter of fact and as a matter of law.  In terms of factual grounds, the Bankruptcy Court's opt-out notice was directed only to the putative class members in the securities fraud case.  The Bankruptcy Court made no effort to provide notice and obtain consent from the numerous other Releasing Parties as described in the Third-Party Releases.

17.  As to the putative class members in the securities fraud case, the record fails to establish that *any* consented to the release of their claims against Jaffe and Giammatteo.  Debtors used Prime Clerk to ensure to the best of their ability to get access to putative members of the class action and to distribute the notices to the putative members. (Confirm. Tr. 21:3-16.)  Prime Clerk worked with third parties to attempt to identify putative members of the class action and then to communicate the Notice to them. (Decl. of Craig E. Johnson of Prime Clerk LLC in Supp. of the Debtors' Objection to Securities Lead Plaintiffs' Motion for Entry of an Order Authorizing Lead Plaintiffs to Opt Out of Third-Party Releases on Behalf of the Class ("Johnson Decl.") ¶¶ 7-9 (Bankr. Dkt. No. 947).)  Prime Clerk sent the notice to approximately 300,000 individuals; however, the record contains no information about the success of their efforts to reach this group. (Bankr. Confirm. Op. at 13.)  Indeed, Prime Clerk received only 596 opt-outs, which corresponds to 0.2% of those targeted. (Confirm. Tr. at 52:22-24.)  The Court therefore finds that this effort was insufficient to establish notice of the opt-out provision in the Notice.  Further, the record lacks any information establishing as a matter of fact that *any* of the targeted recipients of the Notice affirmatively consented to the release of their claims as provided in the Third-Party Release.

18. As to the shareholders who were putative class members in the securities fraud action, those who were deemed to have opted out did not receive anything of value for their releases. (Confirm. Tr. 18:13-22.)

19. There is no evidence in the record of any evaluation of any other potential claims that the Releasing Parties could have brought against the Debtors other than the securities fraud class action filed in the District of New Jersey, nor does the record contain any effort to provide notice of the releases to any Releasing Party beyond the securities fraud class action.

20. According to Ms. Teffner, the Exculpation Provision resulted from good faith, arm's-length negotiations and was designed to protect those who served and assisted with the restructuring process, including those who did not necessarily owe a fiduciary duty to the Debtors. (Teffner Decl. ¶ 47.)

Against this factual backdrop, the Court will now turn its attention to the propriety of the Third-Party Releases.

### D.     The Application of *Behrmann* to the Third-Party Releases

In addition to the factual and constitutional defects in the approval of the Third-Party Releases outlined above, Appellants argue that the Bankruptcy Court erred in approving the Third-Party Releases under the applicable standards in the Fourth Circuit for approving nonconsensual third-party releases as set forth in *Behrmann*. (Trustee Br. at 37; Appellants' Br. at 73.) Debtors respond that the Releasing Parties consented to the releases, rendering the *Behrmann* factors inapplicable. (Appellee Br. at 41.) Additionally, Debtors contend that the Third-Party Releases satisfy the *Behrmann* factors. (Appellee Br. at 75.)

Thus, beyond the *Stern* issues, this appeal boils down to two questions: (1) whether the Bankruptcy Court erred by finding the releases consensual, and (2) whether the Bankruptcy Court erred by failing to conduct the seven-factor *Behrmann* analysis. The Court finds that the Bankruptcy Court erred on both fronts.

## 1.   Third-Party Releases and *Behrmann* Generally

As previously noted, some Courts of Appeal have held that bankruptcy courts lack the

power to grant nonconsensual third-party releases of the kind approved here.  The Fifth, Ninth

and Tenth Circuits prohibit nonconsensual third-party releases.  *See, e.g., In re Pac. Lumber Co.,*

584 F.3d at 251-53; *In re Lowenschuss,* 67 F.3d at 1401-02; *In re W. Real Estate Fund, Inc.,* 922

F.2d at 600-02.  These Circuits generally base this prohibition on 11 U.S.C. § 524(e), which

states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or

the property of any other entity for, such debt."  *See, e.g., In re Pac. Lumber Co.,* 584 F.3d at 252

("In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-

liable third parties.") (collecting cases); *In re Am. Hardwoods, Inc.,* 885 F.2d 621, 626 (9th Cir.

1989) ("We therefore conclude that the specific provisions of section 524 displace the court's

equitable powers under section 105 to order the permanent relief sought by American.").

Other Circuits have held that bankruptcy courts have the power to impose involuntary

releases, but that such involuntary releases should be imposed in "only rare cases."  *See, e.g., In*

*re Metromedia Fiber Network, Inc.,* 416 F.3d at 141-43 (holding that involuntary releases should

only be approved if they form an important part of a reorganization plan, and that they are proper

"only in rare cases"); *In re Seaside Eng'g & Surveying, Inc.,* 780 F.3d at 1078 (permitting

releases and bar orders but cautioning that they "ought not to be issued lightly, and should be

reserved for those unusual cases in which such an order is necessary for the success of the

reorganization, and only in situations in which such an order is fair and equitable under all the

facts and circumstances"); *In re Dow Corning Corp.,* 280 F.3d at 657-58 ("Because such an

injunction is a dramatic measure to be used cautiously, we follow those circuits that have held

that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'").

The Fourth Circuit has joined the circuits that allow non-debtor releases, but only "cautiously and infrequently." *Behrmann*, 663 F.3d at 712. In *Behrmann*, the Fourth Circuit confirmed that it had previously "rejected the notion that 11 U.S.C. § 524(e) forecloses bankruptcy courts from releasing and enjoining causes of action against nondebtors." 663 F.3d at 710 (citing *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989)). It noted that it had "declined to retreat from this holding" in a subsequent opinion and then, again, rejected as "without merit" the "blanket assertion that equitable relief in the form of non-debtor releases is never permissible under the Bankruptcy Code." *Id.* In rejecting this blanket assertion, the Fourth Circuit adopted the Sixth Circuit's test for approving non-debtor releases outlined in *In re Dow Corning Corp.* The Fourth Circuit quoted in full from *In re Dow Corning Corp.*:

> We hold that when the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor:
>
> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (2) The non-debtor has contributed substantial assets to the reorganization;
>
> (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
>
> (4) The impacted class, or classes, has overwhelmingly voted to accept the plan;
>
> (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;
>
> (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and,
>
> (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Behrmann*, 663 F.3d at 711-12 (quoting *In re Dow Corning Corp.*, 280 F.3d at 658).

Given the dramatic effect of third-party releases and that they are to be approved only in unique circumstances, "the meaningful exercise of appellate review at a minimum requires that the court make specific factual findings in support of its decision to grant equitable relief." *Id.* at 712. Ultimately, the Fourth Circuit remanded the case, because the bankruptcy court's conclusory statements regarding the factors "[were] meaningless in the absence of specific factual findings explaining why this is so." *Id.* at 713. Underscoring the point that non-debtor releases only have a place in unique circumstances, the Fourth Circuit found that the bankruptcy court's "conclusions could apply just as well to any number of reorganizing debtors." *Id.* Therefore, it remanded the case "to set forth specific factual findings supporting its conclusions" that the debtor's circumstances entitled it to the non-debtor releases. *Id.*

Following remand, a different bankruptcy judge found the releases unenforceable and the district court affirmed the bankruptcy court. *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014). The Fourth Circuit affirmed, concluding that the debtor had "failed to carry its burden of proving that the facts and circumstances of this case justify the Release Provision." *Id.* at 347.

### 2. The Interrelationship Between *Stern* and *Behrmann*

The exacting caution and detailed findings demanded of a bankruptcy court in granting a non-debtor release in a unique circumstance stems from the constitutional limitations placed on the bankruptcy court's jurisdiction. As the *Stern* analysis demonstrates, the Constitution limits bankruptcy courts — as non-Article III courts — to adjudicating only matters integral to a bankruptcy proceeding. In essence, the *Behrmann* factors task a reviewing court with determining how integral the releases are to a bankruptcy plan. Indeed, one factor asks the court

to consider whether the release "is essential to the reorganization" such that the "reorganization hinges on the debtor being free from indirect suits." *Behrmann*, 663 F.3d at 711-12. Another factor requires that the non-debtor "contributed substantial assets to the reorganization." *Id.* at 711. Yet another examines the identity of interests between the debtor and the third party and the extent to which the suit against the third party would deplete the assets of the estate. *Id.* Clearly, these factors ask the bankruptcy court to determine the extent of the entanglement between the released claim and the bankruptcy case. Likewise, a bankruptcy court determining whether it has "core" constitutional authority over a matter looks to the same relationship. *See Allied Title Lending, LLC*, 420 F. Supp. 3d at 448 ("A cause of action is constitutionally core when it 'stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'") (quoting *Stern*, 564 U.S. at 499).

The Third Circuit's decision in *In re Millennium Lab Holdings II, LLC* illustrates this connection between the *Stern* analysis and the *Behrmann*-type analysis, and stands in stark contrast to what occurred here. There, the court examined a release in the debtor's restructuring agreement that released the debtor's two primary shareholders from conduct that occurred before the restructuring agreement. 945 F.3d at 131. Eventually, the bankruptcy court confirmed the plan that included the releases, over a lender's objection. *Id.* at 132. The bankruptcy court and district court both overruled the lender's objection that *Stern* prohibited the confirmation of a plan releasing its claims, stating that *Stern* did not apply to plan confirmation proceedings. *Id.* at 133. The lender appealed to the Third Circuit.

On appeal, the Third Circuit affirmed the confirmation, but not because it determined that *Stern* did not apply to plan confirmation proceedings.[12] Rather, the Third Circuit conducted an exhaustive discussion of *Stern* and the limitations that it places on the authority of bankruptcy courts. *Id.* at 133-37. It concluded its discussion as follows:

> In sum, *Stern* teaches that the exercise of "core" statutory authority by a bankruptcy court can implicate the limits imposed by Article III. Such an exercise of authority is permissible if it involves a matter integral to the restructuring of the debtor-creditor relationship. And, in determining whether that is the case, we can consider the content of the "core" proceeding at issue.

*Id.* at 137.

Applying those principles, the Third Circuit concluded that the bankruptcy court possessed constitutional authority to confirm the plan with the releases. Borrowing from its *Stern* analysis, the court stated that "the question is whether," in examining the release provisions at issue, "the Bankruptcy Court was resolving a matter integral to the restructuring of the debtor-creditor relationship." *Id.* at 137. Although it did not apply the facts to explicit factors like courts in the Fourth Circuit must, the court's reasoning closely resembles the *Behrmann* factors. For example, the court relied on the contributions made by the released parties — $325 million transfers of their equity to the lenders — and how the restructuring could not have occurred without those contributions. *Id.* at 137. The court noted how the releases resulted from protracted arm's-length negotiations in exchange for the contributions that allowed the debtor to continue operating. In short, "[r]estructuring in this case was possible only because of the release provision." *Id.* Ultimately, because the "Bankruptcy Court's conclusion that the release provisions were integral to the restructuring was well-reasoned and well-supported by the

---

[12] Indeed, in a footnote, the court acknowledged the appellees' argument that a bankruptcy court could always constitutionally confirm a plan. However, it stated that "[w]e have our doubts about so broad a statement but we do not need to address it to decide this case." *Id.* at 137, n.10.

record," the bankruptcy court "was constitutionally authorized to confirm the plan in which those provisions appeared." *Id.* at 140. But even then, the Third Circuit made clear that the situation was an outlier. *Id.* at 140 ("In short, our holding today is specific and limited. It is that, under the particular facts of this case, the Bankruptcy Court's conclusion that the release provisions were integral to the restructuring was well-reasoned and well-supported by the record.").

The Third Circuit's reliance on the detailed factual findings below supporting the releases underscore the importance of a bankruptcy court fully supporting its basis for approving a non-debtor release. The detailed factual findings in *In re Millennium Lab* further highlight the lack of factual findings in this case. Here, the Bankruptcy Court stated in conclusory fashion that the Third-Party Releases were integral to the Plan, but it based this only on the fact that the Plan stated as much. Thus, instead of making detailed factual findings as to whether unique circumstances warranted the inclusion of non-debtor releases, the Bankruptcy Court abdicated this crucial function to the negotiators of the Plan — the very negotiators who stood to benefit from the Releases. However, the Bankruptcy Court cannot delegate to private citizens the determination of whether a court has the constitutional power to approve the releases. Thus, the Bankruptcy Court's lack of explanation constitutes clear error, in addition to erring both factually and as a matter of law in its determination that the parties' consent obviated the need to conduct the *Behrmann* analysis, as explained below.

### 3.     Consent and the *Behrmann* Analysis

Debtors argue that *Behrmann* does not apply to consensual releases (Appellee Br. at 60), whereas the Trustee argues that consent does not obviate the need to conduct the *Behrmann* analysis. (Trustee Br. at 24.) Aside from adopting the Sixth Circuit's approach for

*nonconsensual* releases, the Fourth Circuit has not spoken directly on whether the *Behrmann* analysis applies to consensual releases. Again, courts around the country have split on the issue.

Several courts have found that a party can consent to a third-party release and eliminate the need for a *Behrmann* analysis. For example, the Seventh Circuit has noted approvingly that "courts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code." *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993). Likewise, the United States Bankruptcy Court for the District of Maryland distinguished consensual releases from those requiring a *Behrmann* analysis, because "[i]t is well recognized that, where the application of the *Dow Corning* or other applicable factors leads to the conclusion that the third party releases should not be approved, the court can nevertheless approve the releases with the consent of the releasing parties." *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 361 (Bankr. D. Md. 2014). The Second Circuit has also indicated that "[n]ondebtor releases may also be tolerated if the affected creditors consent." *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142. Similarly, the Northern District of Texas has noted that "[m]ost courts allow consensual nondebtor releases to be included in a plan." *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

a.   **Failing to Opt Out Does Not Rise to the Level of Consent Required to Obviate *Behrmann*.**

Even if consent can obviate the need for a *Behrmann* analysis, the level of consent required to eliminate the need for a *Behrmann*-type analysis varies. Debtors contend that failing to opt out of a release evidences consent to that release. (Appellee Br. at 41.) The Trustee argues that the Bankruptcy Court erred in finding that this type of implied consent suffices. (Trustee Br. at 24.) The Court agrees with the Trustee as a matter of law and as a matter of fact (as previously determined).

The Fourth Circuit does not appear to have spoken on the issue of whether implied consent can give rise to a consensual non-debtor release. *See In re Neogenix Oncology, Inc.*, 2015 WL 5786345, at *5 (Bankr. D. Md. Oct. 1, 2015) ("The Fourth Circuit has not expressly faced the issue presented here, whether a 'consensual' third party release must be express or whether implied consent can be sufficient."). Other courts have diverged on whether implied consent can suffice for a release.

Some courts, like the District of New Jersey, look to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent. For example, in *In re Congoleum Corp.*, the court determined that a creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt." 362 B.R. 167, 194 (Bankr. D.N.J. 2007). Likewise, in *In re Arrowmill Development Corp.*, the court held that it was "not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan." 211 B.R. 497, 507 (Bankr. D.N.J. 1997).

Yet, other courts have found that a creditor must individually consent by voting in favor of the plan. In *In re Coram Healthcare Corp.*, the court stated that "to the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the Noteholders, they are bound by that." 315 B.R. 321, 336 (Bankr. D.Del. 2004). Likewise, in *In re Washington Mutual, Inc.,* the court found the opt-out mechanism in the plan insufficient to support the third-party releases with respect to the parties who did not return a ballot. 442 B.R. 314, 355 (Bankr. D. Del. 2011).

However, other courts have determined that failure to return a ballot constitutes consent to a third-party release when the creditor received notice of implications of releasing parties. For example, in *In re Indianapolis Downs, LLC*, the court found that providing an opportunity to opt

out along with detailed instructions for how to opt out warranted approval of the releases. 486

B.R. 286, 305-06 (Bankr. D. Del. 2013). However, the court allowed the "deemed" acceptance

by the unimpaired creditors, because "these creditors are being paid in full and have therefore

received consideration for the releases." *Id.* at 305. Likewise, in *In re Sponsion, Inc.*, the court

found that parties who had accepted the plan and not opted-out would be bound by the release.

426 B.R. 114, 144 (Bankr. D. Del. 2010).

Still, other courts have allowed implied consent releases. In *In re DBSD North America,*

*Inc.*, the court approved third-party releases when the releasing parties received adequate notice

of the release and they had an opportunity to opt out of the release. 419 B.R. 179, 218-19

(Bankr. S.D.N.Y. 2009); *see also In re Calpine Corp.*, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec.

19, 2007) ("[parties] choosing not to opt out of the releases were given due and adequate notice

that they would be granting the releases by acting in such a manner"). Similarly, in *In re*

*Conesco, Inc.*, the court found that impaired creditors who did not opt out had impliedly

consented to the releases. 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003).

Debtors advance this last approach by comparing the opt-out provisions to contract law

and class action procedures. (Appellee Br. at 65.) However, both comparisons cut sharply

against their argument.

### i.      *Contract Law Does Not Support Consent by Failure to Opt Out.*

First, contrary to Debtors' statement that "actual principles of contract law have long

provided that the manifestation of assent may be made wholly by failure to act" (Appellee Br. at

65), black letter contract law dictates otherwise. *See Meekins v. Lakeview Loan Servicing, LLC*,

2020 WL 1922765, at *4 (E.D. Va. Apr. 21, 2020) ("A party's silence, however, is insufficient to

show its intention to be bound by the terms of a contract.") (quotations omitted). Indeed, in one

of the cases cited by Debtors for its acceptance-by-silence proposition, the First Circuit stated,

"it's basic contract law that an offeror cannot unilaterally impose on another party the obligation

to respond and reject their offer." *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d

200, 211 (1st Cir. 2019) (citing 1 Corbin on Contracts § 3.19 (2018) ("It should here be plainly

set forth that an offeror has no power to cause the silence of the offeree to operate as an

acceptance when the offeree does not intend it to do so."); 2 Williston on Contracts § 6:50 (4th

ed. 1993) ("Merely sending an unsolicited offer does not impose upon the party receiving it any

duty to speak or deprive the party of its privilege of remaining silent without accepting.")).

Limited exceptions to this rule exist, such as previous dealings or when an offeror gives the

offeree reason to believe that silence or inaction will manifest assent, and the offeree remains

silent or inactive with the intent to accept the offer.  Restatement (Second) of Contracts

§ 69(1)(b).  However, neither Debtors nor the Bankruptcy Court identified any facts that would

support the application of an exception to the general rule of contracts that silence cannot

manifest assent.  Nor does the record reveal any such facts.  Indeed, the Court has already found

as a matter of fact that consent did not occur.  Accordingly, any attempt to claim that contract

law supports a finding of consent to third-party releases based on inaction rings hollow.

### ii.    *Class Action Law Does Not Support Finding Consent by Failing to Opt Out.*

Likewise, Debtors' comparison to class actions falls short of providing support of their

contention that a failure to opt out constitutes consent to the releases.  In fact, the comparison to

class action litigation highlights the impropriety of finding releases consensual based merely on a

failure to opt out.  True, as noted by Debtors, courts (notably, Article III judges) may bind absent

class members to a judgment so long as they provide them notice of the action and the

opportunity to either opt out or participate. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797

(1985).  But to do so, courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure.

Importantly, Rule 23(a), in relevant part, allows an individual to sue on behalf of other class members only if he will "fairly and adequately protect the interests of the class" and his claims "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3)-(4).  Further, the class must be specifically defined to identify the class members and the class claims.  Fed. R. Civ. P. 23(c)(1)(B).  Moreover, the court must appoint class counsel that can best "represent the interests of the class."  Fed. R. Civ. P. 23(g).  Indeed, the court *must* appoint class counsel to represent the class, as pro se litigants cannot represent absent class members.  *See Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) ("Ability to protect the interests of the class depends in part on the quality of counsel, and we consider the competence of a layman representing himself to be clearly too limited to allow him to risk the rights of others.") (internal citations omitted).  And, the presiding court bears responsibility for ensuring compliance with all of the above requirements.  Most, if not all, of these requirements become heavily litigated throughout the life of a class action.

None of these protections exist in the context of a non-debtor release in a bankruptcy action.  First and foremost, no party litigates on behalf of the absent releasing party.  No party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party.  Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead.  Indeed, the facts of this case highlight that distinction.  The Bankruptcy Court expressly rejected the ability of certain absent releasing parties to have a party and counsel represent their best interests.  Yet, the Bankruptcy Court still sought to extinguish their claims.

Similarly, and importantly, any class settlement that would bind absent class members requires court approval. Fed. R. Civ. P. 23(e). After giving notice to all class members of the proposed settlement, the court may only approve the settlement "after a hearing and only on finding that it is fair, reasonable, and adequate" taking into account whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights . . . ." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (internal quotations omitted). And it is an Article III judge, acting with all of their powers and protections as described in *Stern*, that approves the settlement.

Conversely, if mere failure to opt out obviates the need to conduct a *Behrmann* analysis, then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties. The *Behrmann* analysis at least provides some oversight that resembles the scrutiny given by a court to class settlement under Rule 23, even if it falls short of ensuring that the release of the claims is fair, reasonable and adequate. Again, the facts of this case highlight the need for scrutiny of what Debtors call a "settlement" of the released claims. No court would find this "settlement" fair, reasonable and adequate under Rule 23, as application of those factors demonstrate. No party or counsel represented the interests of the class, much less represented them adequately. The settlement of the released claims did not result from any negotiation with the Releasing Parties, much less one that occurred at arm's length. Instead, it appears that negotiations only occurred between the individuals and entities

that would benefit from releases in an effort to shield themselves from any liability, not those who would confer the benefit in exchange for some other benefit.

Along those lines, the settlement of the released claims provides no relief to the Releasing Parties, much less adequate relief. The fact that the Releasing Parties also receive a release provides nothing more than illusory consideration. The Court cannot envision a potential claim that a former officer or director of Debtors could have against a former shareholder that would give a mutual release any real value. Indeed, the Court has already found as a matter of fact that the mutual release lacked any value and was purely fictional.

The protections provided to absent class members under Rule 23 highlight the lack of protections provided to absent releasing parties in this context. Moreover, the comparison to class actions also demonstrates the due process issues that result from releasing a claim based only on the failure to opt out.

> **b.    Releasing These Claims Raises Serious Due Process Concerns.**

Third-party releases in bankruptcy actions based only on a failure to opt out also raise serious due process concerns, because they lack the critical due process protections of Rule 23. *See Bell v. Brockett*, 922 F.3d 502, 511 (4th Cir. 2019) ("Rule 23's adequacy requirements provide critical safeguards against the due process concerns inherent in all class actions."). In the seminal case on due process in class actions, the Supreme Court held that when "a fully descriptive notice is sent [by] first-class mail to each class member, with an explanation of the right to 'opt out,' [that procedure] satisfies due process" even if the absent class member would be bound absent an affirmative opt in. *Shutts,* 472 U.S. at 812.

However, the Supreme Court's basis for this holding underscores the lack of due process present here. First, "[t]he notice must be the best practicable, reasonably calculated, under all

circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections." *Id.* at 812 (quotations omitted). Second, the "notice

should describe the action and the plaintiffs' rights in it." *Id.* Third, "an absent plaintiff [must]

be provided with an opportunity to remove himself from the class by executing and returning an

'opt out' or 'request for exclusion' form to the court." *Id.* Fourth, "the Due Process Clause of

course requires that the named plaintiff at all times adequately represent the interests of the

absent class members." *Id.*

In this case, the Third-Party Releases fail three of the four elements required to afford due

process. First, the Bankruptcy Court found the notice "sufficient." (Bankr. Confirm. Op. at 31.)

But, "sufficient" falls short of the "best practicable, reasonably calculated" standard set forth by

the Supreme Court. Although the Court will not now fully undertake the analysis of whether the

notice constituted the "best practicable, reasonably calculated" notice "under the circumstances,"

it seems unlikely that the notice would meet that higher standard. Second, the notice did not

describe the released claims or the rights given up by the absent Releasing Parties. Nor did it

mention the only purported benefit (the illusory "mutual release") to the Releasing Parties as

consideration for their release. Describing the bankruptcy action and generally stating that the

absent party would release all claims does not identify the specific claims subject to release. It

does not "describe the action and the plaintiffs' rights in it." The notice satisfies the third

element of providing the absent Releasing Parties the opportunity to opt out. Finally, as

discussed above, the absent class members had no one to adequately represent their interests.

Accordingly, allowing the release of claims based only on the failure to opt out does not comport

with due process.

In conclusion, the Court finds that the Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual. Failure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case there is a lack of sufficient affirmation of consent. *See In re Neogenix Oncology, Inc.*, 2015 WL 5786345, at *6 ("*Behrmann* provides sufficient guidance on whether a court should approve a release for which there is insufficient affirmation of consent, whether the release is said to be 'nonconsensual' or based on 'implied consent.'"). And, it bears emphasizing again that Debtors' argument about consent focuses only on the pending securities fraud case in the District of New Jersey, which constitutes only the tip of the release iceberg, as the Third-Party Releases cover far more than a single case against two former officers. No argument about consent can be raised about all of the other Releasing Parties that the Bankruptcy Court never even considered.

Accordingly, the mandates of *Behrmann* unquestionably apply, and the Bankruptcy Court should have conducted the *Behrmann* analysis to determine if this case constitutes the rare case warranting such third-party releases.

### 4. The Bankruptcy Court's Error in Failing to Conduct a *Behrmann* Analysis

*Behrmann* commands that a bankruptcy court may only grant nonconsensual non-debtor releases "cautiously and infrequently." *Behrmann*, 663 F.3d at 712. Because only cases with unique circumstances warrant granting such releases, a bankruptcy court must make "specific factual findings" demonstrating why the debtor's circumstances entitle it to the benefit of the releases. *Id.* at 712-13.

Here, the Bankruptcy Court failed to conduct any *Behrmann* analysis, precluding any meaningful appellate review. Indeed, the Bankruptcy Court addressed the *Behrmann* factors in a

single footnote — again, a single footnote — that merely said: "were the *Behrmann* factors

applicable to the Third-Party Releases, the Court would find the *Behrmann* factors were satisfied

for the reasons stated in the *Debtors' Memorandum of Law* . . . ." (Bankr. Confirm. Op. at 38,

n.28). It should be obvious that a court may not satisfy its judicial responsibilities by simply

incorporating by reference a party's brief. *Cuthbertson v. Biggers Bros.*, 702 F.2d 454, 458 (4th

Cir. 1983) ("We have previously condemned the practice of adopting the prevailing party's

proposed findings of facts and conclusions of law, and we repeat that admonition here."). As the

Third Circuit reminded in *Bright v. Westmoreland County*, 380 F.3d 729 (3d Cir. 2004):

> Judicial opinions are the core work-product of judges. They are much
> more than findings of fact and conclusions of law; they constitute the logical and
> analytical explanations of why a judge arrived at a specific decision. They are
> tangible proof to the litigants that the judge actively wrestled with their claims
> and arguments and made a scholarly decision based on his or her own reason and
> logic. When a court adopts a party's proposed opinion as its own, the court
> vitiates the vital purposes served by judicial opinions.

*Id.* at 732. And such a cursory consideration of the *Behrmann* factors disregards the Fourth

Circuit's command to limit the use of third-party releases to the exceptional case warranting

them.

Moreover, the vast Third-Party Releases broadly release a wide variety of claims, against

a wide variety of individuals, held by a wide variety of individuals. The variety of claims

released here necessarily means that the specific factual findings supporting the propriety of

releasing each type of claim will also vary. Accordingly, the Court cannot conduct meaningful

appellate review as a result of the Bankruptcy Court's failure to address that which has been

released, setting forth the specific factual findings for each type of claim released. Meaningful

review requires detailed findings of fact by the Bankruptcy Court. That did not happen here.

Indeed, the only identified claims released in this appeal are those against the Individual

Defendants (Jaffe and Giammatteo) as asserted in the putative class action filed in the District of

New Jersey.  Yet, by way of example, they demonstrate the Third-Party Releases' inability to

meet the *Behrmann* factors.  A brief examination of the *Behrmann* factors as applied to these

claims follows.

### a.      Identity of Interests

Under the first factor, "a court must consider whether there is an identity of interests —

usually an indemnity obligation — between the debtor and the released parties," such that the

"suit against the non-debtor may, in essence, be a suit against the debtor that risks depleting the

assets of the estate." *Nat'l Heritage Found., Inc.*, 760 F.3d at 348 (cleaned up).  Debtors claim

that they had an indemnification obligation to the Individual Defendants.  (Appellee Br. at 78-

79.)  But, Debtors have essentially liquidated and, therefore, it remains uncertain whether

Debtors have a continuing indemnification obligation to the Individual Defendants.  Moreover,

the Court agrees with the Third Circuit's view in *In re Continental Airlines*:

> We conclude that granting permanent injunctions to protect non-debtor parties on
> the bases of theoretical identity of interest alone would turn bankruptcy principles
> on their head.  Nothing in the Bankruptcy Code can be construed to establish such
> extraordinary protection for non-debtor parties.

203 F.3d at 217.  Consequently, this factor does not weigh in favor of the releases.

### b.      Substantial Contribution

The second factor requires Debtors "to demonstrate that the Released Parties made a

substantial contribution of assets to its reorganization." *Nat'l Heritage Found., Inc.*, 760 F.3d at

348.  The record does not support that the Individual Defendants made any financial contribution

to the reorganization or any other contribution.  Indeed, the Court has already made a factual

finding that the Individual Defendants played no role in the reorganization (they had already left

Debtors' employment) and their releases were not integral to the reorganization. The fact that they also provided releases to Debtors does not amount to a "substantial contribution of assets," especially given the illusory nature of the releases. Even if it could, the record does not support that the releases provided by the Individual Defendants could amount to a contribution of substantial assets. Accordingly, this factor weighs heavily against granting the release.

### c.    Essential to the Reorganization

To satisfy the third factor, "a debtor must demonstrate that the non-debtor release is essential to its reorganization, such that the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor." *Id.* As an initial matter, Debtor largely liquidated, rather than reorganized. This alone cuts against the essential nature of the releases. The third and final asset sale transaction closed on December 23, 2020 — well before confirmation of the Plan. That the deals closed and the assets changed hands well before any release was finalized or went into effect demonstrates that the Plan does not hinge on the inclusion of the releases.

Moreover, the record does not reveal that the Plan would be doomed if the Individual Defendants did not obtain a release. Indeed, as previously noted, the releases of the Individual Defendants were not integral to the reorganization. And, the Court cannot discern any reason why a lack of release for the Individual Defendants would prove fatal to the implementation of the Plan. Accordingly, this factor also weighs heavily against granting the release.

### d.    Approval by the Affected Class

The fourth factor requires Debtor "to prove that the class or classes affected by the Release Provision overwhelmingly voted in favor of the Plan." *Id.* at 350. Here, the Class Members, as a class receiving nothing under the Plan, were deemed to reject the Plan as a matter

of law. 11 U.S.C. § 1126(g). Debtors claim that the small number of opt outs satisfy this prong. However, for the reasons stated above, the Court gives little weight to the failure to opt out of the Plan and will not view it as analogous to an affirmative vote in favor of the Plan. Therefore, this factor also weighs heavily against the release.

### e.    Mechanism to Pay Substantially All of the Class Affected

Under the fifth factor, the court considers "whether the debtor's reorganization plan provides a mechanism to consider and pay all or substantially all of the class or classes affected by the non-debtor release." *Id.* at 350. Here, the Plan does not create a separate fund to pay the claims released or provide any other mechanism to consider or pay the securities claims. Indeed, the Third-Party Releases are so broad that there has been no effort to even discern the full extent of the claims. Because the Plan extinguishes these claims entirely without giving any value in return, this weighs strongly against granting the Release. *See id.* at 351 (concluding that "the absence of such a [channeling fund] can weigh against the validity of a non-debtor release, especially when the result is that the impacted class's claims are extinguished entirely").

### f.    Opportunity to Recover

The final substantive factor "is whether the plan provides an opportunity for those who chose not to settle to recover in full." *Id.* at 351. Here, the Plan provides the class members an opportunity to opt out of the Release and pursue the Securities claims. However, given the deficient notice, the Court has already found that here, as a matter of fact, notice did not occur. Accordingly, this factor also weighs against granting the Release.

In sum, the *Behrmann* factors clearly weigh against releasing the Individual Defendants from liability in the Securities Claims. As with the *Stern* analysis, these claims have no meaningful connection to the bankruptcy case. Indeed, the Court has already made a factual finding that these releases were not integral to the Plan. Therefore, they do not implicate the

unique circumstances that would warrant a bankruptcy court — or, at least one that grants non-debtor releases only cautiously and infrequently — to release these claims as part of the bankruptcy proceedings. Debtors' claim that "virtually every confirmed plan in every complex bankruptcy case [in the Eastern District of Virginia] includes consensual third-party release provisions of this variety" (Appellees' Br. at 8), harms, rather than helps, its argument. That the Bankruptcy Court grants such non-debtor releases as a matter of course, rather than "cautiously and infrequently" and only when warranted by unique circumstances, underscores the lack of specific factual findings supporting the releases here.

For these reasons, the Bankruptcy Court clearly erred in finding that the releases satisfied the *Behrmann* factors. Consequently, the Third-Party Releases must be voided and rendered unenforceable. The Court will now turn to the impact on the Plan of the voiding of the Third-Party Releases and whether the voided releases may be severed from the Plan.

### E.    Severability

The Court finds that it can sever the unenforceable releases from the Plan. Debtors argue that the nonseverability provision renders the Third-Party Releases nonseverable from the Plan. (Appellee Br. at 34-35.) The provision relied upon by Debtors follows in its entirety:

> If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted

Page **65** of **87**

or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

(the "Nonseverability Provision") (USTAPP 2528).) Boiled down to its essence, the Plan explicitly provides that the Bankruptcy Court could sever any provision before confirmation without it affecting the rest of the Plan, but following confirmation all provisions are integral and only the Debtors can consent to severance of a particular provision. It does not explain why each provision becomes integral only upon confirmation.

As explained above, after having found a *Stern* violation and vacated the Confirmation Order, the Plan now comes before the Court under Rule 8018.1 "as proposed findings of fact and conclusions of law." Therefore, the Court steps into the shoes of the Bankruptcy Court in terms of the Nonseverability Provision. That is, the first half of the Nonseverability provision remains the operative provision, and the Plan itself has not declared the Third-Party Releases nonseverable. Consequently, the Plan provides that the Court should sever the voided Third-Party Releases from the Plan. And the Court will do so. However, just as the Court would not find the Third-Party Releases nonseverable after confirmation based only on the boilerplate Nonseverability Provision, it will not rely solely on the Nonseverability Provision to find the provisions severable now that the Plan returns to the pre-confirmation phase. Instead, the Court will analyze the law surrounding severability and the record to determine that it can sever these Third-Party Releases that lack any connection to the reorganization.

### 1.    The Nonseverability Provision's Textual Support for Severability

As described above, the Nonseverability Provision provides that, before confirmation, the Plan remains in full effect in the event that the Bankruptcy Court finds any provision unenforceable. Having now vacated the Confirmation Order, the Court steps into the shoes of the Bankruptcy Court before confirmation, when the parties agreed that the Third-Party Releases

could be severed. Yet, Debtors maintain that the Nonseverability Provision reinforces that the Third-Party Releases carry too much import in the Plan for it to survive without the Releases.

However, the contradictory text and operation of the Nonseverability Provision belies the argument that the Plan cannot survive without the Third-Party Releases. The Nonseverability Provision expressly provides that, before confirmation, the Bankruptcy Court could find the Third-Party Releases (or any provision) unenforceable, as the Court is now doing. In the event of such a holding, the Plan would "in no way be affected, impaired, or invalidated." The fact that the Plan would have survived if the Bankruptcy Court had severed the Third-Party Releases just before confirmation, without any further changes, demonstrates that the Third-Party Releases are not inextricably tied to the rest of the Plan. Therefore, just as the Bankruptcy Court could sever the Third-Party Releases before confirmation, this Court can sever the Third-Party Releases after vacating the Confirmation Order.

Likewise, the Nonseverability Provision provides that a provision of the Plan can be deleted with Debtors' consent. Again, this demonstrates that the Plan could survive in the absence of any particular provision. Debtors attempted to reserve for themselves the right to sever provisions of the Plan — without the consent of any other affected parties — while arguing here that the Court lacks the same authority to sever legally unenforceable provisions. This confirms that the Nonseverability Provision amounts to nothing more than a hollow attempt to evade judicial review of the Third-Party Releases. The negotiating parties here have attempted to release a wide variety of claims of a wide variety of absent and nonconsenting individuals and then use a boilerplate Nonseverability Provision to constrain Article III review of those releases. The Court cannot let such gamesmanship occur. Therefore, the Court will look to the record in

determining that the releases do not form an integral part of the Plan and, consequently, the

Court may sever this provision without upending the entire Plan.

### 2. The Importance of the Provision to the Plan's Determination of Severability

In determining severability, courts must look to the evidence in the record and not simply

whether the parties state in a conclusory fashion that the provision cannot be severed. As the

Second Circuit has explained, "normally a nonseverability clause standing on its own cannot

support a finding of equitable mootness." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 485 (2d

Cir. 2012). The Second Circuit's reasoning in the equitable mootness context provides sound

guidance in examining severability generally. The Second Circuit explained that "[a]llowing a

boilerplate nonseverability clause, without more, to determine the equitable mootness question

would give the debtor and other negotiating parties too much power to constrain Article III

review," and would "moot virtually every appeal where a stay had not been granted." *Id.*

Importantly, "[w]hile a nonseverability clause may be one indication that a particular term was

important to the bargaining parties, a district court cannot rely on such a clause to the exclusion

of other evidence." *Id.*

The Second Circuit ultimately found the release provisions nonseverable, but only

because courts below "did not rest [their] decision exclusively on the nonseverability clause."

*Id.* at 486. Instead, it relied on specific testimony regarding the importance of the releases. *Id.*

This included an examination of how the releases induced a specific released party to settle and

an explanation of why the plan required that released party's contribution. *Id.* The court relied

on evidence that "these provisions could not be excised without seriously threatening Charter's

ability to re-emerge successfully from bankruptcy," because the parties would need to reenter

negotiations. *Id.*

Other circuits, including the Fourth Circuit, have followed a similar approach in looking

to the facts to determine severability. For example, in *Behrmann*, the Fourth Circuit rejected the

equitable mootness argument based not only on a severability provision, but also on the absence

of any factual support that the releases "[were] important to the overall objectives of the Plan" as

argued. 663 F.3d at 714. The debtor had "failed to demonstrate how the relief requested by

Appellants would jeopardize the success of the Confirmed Plan." *Id.* After explaining that the

importance of the releases to the overall plan lacked factual support, the Fourth Circuit "also

note[d]" the existence of a severability provision — allowing provisions to be severed, like the

posture here now — "suggests that the plan would remain viable absent the Release Provisions."

*Id.* Thus, the Fourth Circuit relied on the facts to determine the importance of a provision to the

plan, not just the provisions in the plan addressing severability.

Similarly, in the *In re Continental Airlines* case, the Third Circuit rejected an argument as

to the essential nature of third-party releases to a plan where the debtors presented "[n]o

evidence or arguments . . . that Plaintiffs' appeal, if successful, would necessitate the reversal or

unraveling of the entire plan of reorganization." 203 F.3d at 210. It explained that the debtors

had provided no evidence that "investors and creditors, in deciding whether to support the

Continental Debtors' plan, ever considered Plaintiffs' claims." *Id.* The Third Circuit ultimately

invalidated the releases. *Id.* at 217-18.

### 3. Other Areas of the Law's Support for Focusing on the Provision's Importance to the Plan

This focus on the overall importance of the provision proposed to be severed finds

support in other areas of severability. For example, when confronted with an unconstitutional

provision in a statute, courts typically "sever[] any problematic portions while leaving the

remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010).

This presumption operates in the presence or absence of a severability provision. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2352-53 (2020) ("Even if the severability clause did not apply to the government-debt provision at issue in this case (or even if there were no severability clause in the Communications Act), we would apply the presumption of severability as described and applied in cases such as *Free Enterprise Fund*. And under that presumption, we likewise would sever the 2015 government-debt exception, the constitutionally offending provision.").

With this presumption in mind, courts look to the importance of the provision to the overall statute. "The more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Indeed, if "the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," then courts will invalidate only the unconstitutional portion. *Free Enter. Fund*, 561 U.S. at 508. Thus, courts look to whether severing the offending provision would upend the entire statute and, if not, they default to severing the provision.

Likewise, contract law supports looking to the overall importance of the unenforceable provision. As the Fourth Circuit has described Virginia contract law: "Generally, when a contract covers several subjects, some of whose provisions are valid and some void, those which are valid will be upheld if they are not so interwoven with those illegal as to make divisibility impossible." *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 285 (4th Cir. 1974). Similarly, "Delaware law is clear that an invalid term of an otherwise valid contract, if severable, will not defeat the contract. Thus, a court will enforce a contract with an indefinite provision if the provision is not a material or essential term." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763

F.3d 273, 284-85 (3d Cir. 2014) (cleaned up). Thus, when faced with an unenforceable

provision in a contract, courts will look to whether severing the provision will upset the entire

contract.

### 4.  The Evidence in This Case Supports Severing the Third-Party Releases

Applying these principles, the Court finds that severing the Third-Party Releases at this

stage would not upset the viability of the Plan. In fact, the evidence demonstrates otherwise.

Indeed, Carrie Teffner testified that, as of February 22, 2021, "Debtors have sold substantially all

of their assets and all that remains is to distribute cash proceeds in accordance with the terms of

the plan." (Teffner Decl. ¶ 30.) To that end, the three main sales of the assets had all closed

months before the confirmation hearing. No evidence exists that severing the Third-Party

Releases would upset these already-closed sales, require Debtors to return any of the funds

generated by the sales or disrupt the distribution of the cash proceeds.

Teffner further testified that the various release provisions "are the product of extensive

good faith, arm's-length negotiations and were material inducements for the parties to enter into

the comprehensive settlement embodied in the plan." (Teffner Decl. ¶ 41.) Yet, this "arm's-

length" negotiation occurred without the Releasing Parties having a seat at the negotiating table.

Teffner admitted as much during cross-examination during the Confirmation hearing. (Confirm.

Tr. at 23:1-10.) Moreover, she did not describe how the releases operated as a material

inducement for the parties to enter into the settlement, especially given that many of the parties

did not enter into the settlement. Instead, she testified that it was the Debtors, not third parties,

who sought the broad releases. (Confirm. Tr. at 36:1-4.) Again, she admitted as much on cross-

examination. (Confirm Tr. at 23:21-24:2.) In fact, she admitted that with respect to her

statement regarding the material inducement, "the third-party releases were addressed in totality

with no specific individuals called out." (Confirm. Tr. 23:25-24:2.) The Court cannot agree that the Third-Party Releases provided a material inducement to such a broad array of individuals without examining the inducement to each individual. Additionally, Teffner admitted that the Releasing Parties had no participation in the bankruptcy process at all. (Confirm. Tr. at 26:10-14.)

Furthermore, Teffner claimed that not approving the Third-Party Releases "could potentially significantly increase the time and expense of the Debtors' wind down process, to the detriment of the Debtors' stakeholders." (Teffner Decl. ¶ 45.) On cross-examination, she expanded that this referred to the time and expense of engaging in discovery and defending litigation. (Confirm. Tr. at 33:19-22.) However, expending additional time and expense to respond to discovery does not amount to unwinding the Plan, especially with the presence of substantial insurance to offset certain litigation costs. Indeed, Debtors had in excess of $50 million in insurance, and perhaps in excess of $100 million dollars. (Confirm. Tr. 30:14-31:4.)

Critically, during the Confirmation Hearing, Teffner could not offer specific reasons why the Third-Party Releases comprised a necessary part of the Plan. (Confirm. Tr. at 36:1-4.) Instead, she offered only general statements that the overall intent of Debtors was to provide releases for everyone. (Confirm. Tr. at 36:1-4.) And she admitted that the negotiations focused only on past/current officers and directors, not the vast universe of Released Parties contained in the Third-Party Releases. (Confirm. Tr. at 27:19-24; 42:3-9.) She refused to answer whether the reorganization would fail absent the releases.[13] (Confirm. Tr. at 36:10-19.)

---

[13] Likewise, Gary Begeman refused to testify when asked whether the confirmation could proceed absent the Third-Party Releases. (Confirm. Tr. at 47:18-21.)

In fact, Teffner confirmed that the most important reasons for the inclusion of the Third-Party Releases — pushing the Plan to completion, playing an integral role in the bankruptcy, expending time and resources, and making concessions — would not apply to individuals or entities that worked for Debtors before the bankruptcy filing. (Confirm. Tr. at 42:3-44:6.) Yet, the only addressed Released Parties involves two former executives (Jaffe and Giammatteo) who had left their employment with Debtors months before the bankruptcy and played no role in the reorganization.

In sum, the record contains no evidence of how the Third-Party Releases induced specific releasing parties to settle, or why the Plan required that Releasing Party's contribution. It contains no evidence as to why the Court could not excise the Third-Party Releases without seriously threatening Debtors' ability to re-emerge successfully from bankruptcy. Nor does the record suggest that the parties would need to reenter any negotiations. Indeed, Debtors have made clear that the Plan "is substantially consummated — and then some." (Appellee Br. at 30.) Simply saying that the Third-Party Releases form an integral part after confirmation of the Plan does not make it so. And, by saying the Third-Party Releases do not form an integral part of the Plan before confirmation, Debtors essentially admit that they do not form an integral part at any time.

The Court will not allow parties who gifted themselves a release in the Plan to hold this appeal hostage with a Nonseverability Provision, especially when the parties have not articulated a sound basis for nonseverability. For these reasons, the Court has no difficulty in severing the voided Third-Party Releases from the Plan.

## F. Equitable Mootness

Debtors also argue that the Court should dismiss this appeal on the grounds of equitable mootness. (Appellee Br. at 30.) The Court declines the invitation to use its equitable powers to ignore the serious errors that have occurred here.

### 1. Equitable Mootness Doctrine Generally

"Equitable mootness is a pragmatic doctrine grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *In re Bate Land & Timber LLC*, 877 F.3d 188, 195 (4th Cir. 2017). The doctrine's application "is based on practicality and prudence, does not employ rigid rules, and requires that a court determine whether judicial relief on appeal can, as a pragmatic matter, be granted." *Id.* In making this determination, courts can examine the following relevant factors:

(1) whether the appellant sought and obtained a stay;

(2) whether the reorganization plan or other equitable relief has been substantially consummated;

(3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and,

(4) the extent to which the relief requested on appeal would affect the interests of third parties.

*Id.* The reviewing court has discretion whether to find an appeal equitably moot. *Behrmann*, 663 F.3d at 714 ("In sum, we decline to exercise our discretion to dismiss this appeal as equitably moot."). And, notably, "equitable mootness applies to specific claims, not entire appeals and must be applied with a scalpel rather than an axe." *In re Charter Commc'ns, Inc.*, 691 F.3d at 481-82 (cleaned up).

Before addressing the factors, the Court notes that four threshold issues weigh against a finding of equitable mootness. First and foremost, vacating the Confirmation Order undercuts the argument in support of equitable mootness. The Confirmation Order no longer constitutes a final judgment, such that the Court no longer faces "the passage of time after a judgment in equity and implementation of that judgment," *In re Bate Land & Timber LLC*, 877 F.3d at 195, that the equitable mootness doctrine is based upon. The inquiry could end here. However, the Court will continue its analysis of the equitable mootness doctrine and find that it does not apply even if the Confirmation Order had not been converted into a Report and Recommendation.

Second, the fact that the Trustee brings this appeal counsels against applying the equitable doctrine. The Trustee argues that equitable mootness should never apply against an appeal brought by the Government. (Trustee Reply at 30.) Although the Court need not adopt such an ironclad rule, the Court believes that equitable mootness should not lie against the Trustee under these or similar circumstances. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 423 (1990) ("But it remains true that we need not embrace a rule that no [equitable] estoppel will lie against the Government in any case in order to decide this case.").

As the Fourth Circuit has articulated, the equitable mootness doctrine applies especially "when a party, seeking a return to the status quo ante, sits idly by and permits intervening events to extinguish old rights and create new ones." *Mac Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002). This reasoning does not apply when the Trustee brings an appeal on behalf of absent individuals. The Trustee does not occupy the normal status as a "party" attempting to create or enlarge its own rights. Rather, the Trustee acts as a "watchdog" serving the role of "protecting the public interest and ensuring that bankruptcy cases are conducted according to law." *In re Clark*, 927 F.2d 793, 795 (4th Cir. 1991). As the Supreme Court has

recognized, when the public interest rather than private rights are at stake, equitable doctrines

take on a different role in favor of protecting the public interests. *See Kansas v. Nebraska*, 574

U.S. 445, 456 (2015) ("As we have previously put the point: When federal law is at issue and

'the public interest is involved,' a federal court's 'equitable powers assume an even broader and

more flexible character than when only a private controversy is at stake.'"); *Off. of Pers. Mgmt.*,

496 U.S. at 419 ("From our earliest cases, we have recognized that equitable estoppel will not lie

against the Government as it lies against private litigants.").

Here, a finding of equitable mootness would preclude the Trustee from fulfilling its duty

of protecting the public interest and preventing the abuse of the bankruptcy system. In fact, these

facts demonstrate the need for the Trustee to discharge his statutory responsibilities. Not only

did the parties craft a release that would extinguish the rights of countless individuals, they did

so in a way that would insulate the release from judicial review. As the Securities Litigation

Lead Plaintiffs' plight reveals, any party that challenges the Third-Party Releases loses standing

to challenge the Third-Party Releases. Indeed, Debtors have argued vehemently that the

Securities Litigation Lead Plaintiffs lack standing to challenge the releases. Without the

Trustee's ability to serve as a watchdog, the Court might not ever endeavor to conduct a merits-

based review of the Third-Party Releases that discharge the claims of thousands of absent

individuals. The Trustee must have the ability to speak for those parties affected by a

bankruptcy proceeding when the other interested parties have been effectively silenced from

speaking on behalf of themselves. Accordingly, the Court will not apply the doctrine of

equitable mootness against the Trustee when the Trustee seeks to protect the rights of absent

individuals.

Third, the seriousness of the Bankruptcy Court's errors counsels against a finding of

equitable mootness. As the Eighth Circuit recently explained in response to the assertion of

equitable mootness, "invoking this doctrine often results in the refusal of the Article III courts to

entertain a live appeal over which they indisputably possess statutory jurisdiction and in which

meaningful relief can be awarded. An Article III appellate court has a virtually unflagging

obligation to exercise its subject matter jurisdiction." *In re VeroBlue Farms USA, Inc.*, 6 F.4th

880, 883 (8th Cir. 2021) (cleaned up). Here, the Bankruptcy Court extinguished the claims of

absent and nonconsenting parties without the constitutional authority to adjudicate those claims.

Pragmatism does not outweigh the need to remedy constitutional errors. *See Stern*, 564 U.S. at

501 ("It goes without saying that the fact that a given law or procedure is efficient, convenient,

and useful in facilitating functions of government, standing alone, will not save it if it is contrary

to the Constitution.")(cleaned up). These constitutional errors directly concern the integrity of

the bankruptcy process. "Equity strongly supports appellate review of issues consequential to

the integrity and transparency of the Chapter 11 process." *In re Pac. Lumber Co.*, 584 F.3d at

251-53.

Fourth, the facts here do not suggest that "effective judicial relief is no longer practically

available." *In re Bate Land & Timber, LLC*, 877 F.3d at 195. Debtors have offered no reason

for the Court to conclude that it could not sever the Third-Party Releases here, and the Court has

already found them severable. Such relief would not alter any creditor's recovery or affect the

bankruptcy estate in any way. *Id.* Indeed, the overriding defect in the Third-Party Releases

arises from the fact that it releases claims entirely attenuated from the Bankruptcy Case —

claims that have no connection to the Bankruptcy Case against non-debtors held by third parties.

Although Debtors point to the Nonseverability Provision, the Court does not believe that this

provision constrains the ability to offer effective judicial relief. For one, without a valid

Confirmation Order in place, the Nonseverability Provision now provides that the Court can

sever the offending releases. In any event, a boilerplate nonseverability clause included by a

debtor and other negotiating parties must not preclude appellate review of provisions that

extinguish the rights of others in favor of those negotiating parties. *In re Charter Commc'ns,*

*Inc.*, 691 F.3d at 485 ("Allowing a boilerplate nonseverability clause, without more, to determine

the equitable mootness question would give the debtor and other negotiating parties too much

power to constrain Article III review.").

### 2.    Application of the Equitable Mootness Factors

Turning to the factors, they do not support a finding of equitable mootness and the Court

will decline to exercise its discretion to avoid reviewing the merits of this appeal. *See*

*Behrmann*, 663 F.3d at 711 ("[W]hether a court should lend its aid in equity to a Chapter 11

debtor will turn on the particular facts and circumstances of the case . . . .")

First, Appellants sought a stay in the Bankruptcy Court and this Court but failed in both

attempts. Although they failed to obtain a stay, they moved for one at both levels, so this differs

from the case where a party makes a strategic choice that "allow[s] the reorganization plan to go

into effect, taking the risks that attended such a decision." *Mac Panel Co. v. Virginia Panel*

*Corp.*, 283 F.3d 622, 625 (4th Cir. 2002) (moving for a stay in the bankruptcy court but choosing

not to in the district court weighs in favor of a finding of equitable mootness). Moreover, the

Trustee's requested relief does not seek to affect the recovery of any creditor; therefore, its

unsuccessful attempts to obtain a stay would not render it inequitable for the Court to rule on the

appeal. *See In re Bate Land & Timber, LLC*, 877 F.3d at 196 ("But because BLC merely seeks

to add to its recovery from the Debtor's pocket without affecting the recovery of any other

creditor, we conclude that BLC's unsuccessful attempt to obtain a stay would not render it inequitable for this court to provide the requested relief."). Additionally, this Court denied the request for a stay based on the high burden placed on a party requesting a stay. It expressly left open the door for Appellants to prevail on the merits. Closing that door now, simply because the Court did not previously grant a stay, would itself cause inequity.

Second, the substantial consummation of the Plan does not render it inequitable to rule on this appeal. When "the relief requested does not seek to undo any aspect of the Confirmed Plan that has been consummated, it would not be impractical, imprudent, or inequitable to allow the appeal to proceed." *Id.* The Plan is no longer in the post-confirmation phase. Moreover, the Trustee does not seek to undo any transactions that have occurred in the Plan's undertaking. Indeed, the requested relief — invalidating all or parts of the releases at issue — would only prospectively affect the ability of parties to bring suits based on past events. It would require no unwinding.

Similarly, the third factor, the extent to which the relief requested would affect the success of the reorganization plan, counsels against a finding of equitable mootness. Invalidating or altering the releases would not impact the recovery of any creditors. Indeed, the Plan itself states that the Third-Party Releases can be severed. The Plan would not be disturbed in any material way by allowing third parties to retain their causes of action against non-debtors.

The fourth — and most important — factor concerns the effect on the interests of third parties. *In re VeroBlue Farms USA, Inc.*, 6 F.4th at 889-90 (stressing that the most important factor in this analysis is the impact on third parties). As the releases here only apply to claims arising on or before the Effective Date, no post-confirmation transactions with third parties have occurred in reliance on the releases. Thus, considering the merits of the appeal would not

negatively affect any third parties who relied on the confirmation of the Plan. *See In re Bate Land & Timber, LLC*, 877 F.3d at 196 ("The Debtor has not engaged in significant transactions with third parties who relied on the Confirmed Plan's terms such that alteration of the Confirmed Plan would negatively impact the Confirmed Plan and the third parties who relied upon it."). Conversely, extinguishing the claims of thousands of individuals without compensation, without consent and without due process reeks of inequity to third parties. *See In re Continental Airlines*, 203 F.3d at 211 ("In balancing the policy favoring finality of bankruptcy court judgments — particularly reorganization plans — against other considerations, we note as well that the equities here would not dictate dismissal. Plaintiffs, who have never had their day in court, have been forced to forfeit their claims against non-debtors with no consideration in return.").

Finally, the doctrine of equitable mootness is all too often invoked to avoid judicial review, as Debtors seek to do here. *In re VeroBlue Farms USA, Inc.*, 6 F.4th at 889-91; *In re Charter Commc'ns, Inc.*, 691 F.3d at 485. That concern takes on greater import here with the shockingly broad releases and the inclusion in the Plan of an attempted "poison pill" Nonseverability Provision. The errors committed by the Bankruptcy Court here are serious and command review by an Article III court. That Debtors invoke an equitable principle designed to promote a fair outcome embodies the height of irony.

Consequently, the Court concludes that the equities strongly favor considering the merits of this appeal. Debtors' doomsday scenarios all stem from the inclusion of the Nonseverability Provision. However, the Court will not allow that provision or an equitable doctrine to preclude appellate review of plainly erroneous release provisions. Indeed, the Released Parties have given themselves broad releases and have sought to immunize the unconstitutional releases from

appellate review with the inclusion of an inflexible Nonseverability Provision (which no longer

has any effect). Equity does not support this.

### G.    The Exculpation Provision

The Trustee further argues that the Bankruptcy Court erred in approving the Exculpation

Provision. (Trustee Br. at 43.) First, the Trustee submits that the Bankruptcy Court should have

applied the *Behrmann* factors to the Exculpation Provision. (Trustee Br. at 43.) Second, the

Trustee asserts that the Exculpation Provision bars claims against an overly broad set of parties

and fails to include an exception for claims to proceed with court approval. (Trustee Br. at 44.)

The Exculpation Provision provides:

> [N]o Exculpated Party shall have or incur, and each Exculpated Party is hereby
> released and exculpated from any Cause of Action or any claim arising from the
> Petition Date through the Effective Date related to any act or omission in
> connection with, relating to or arising out of, the Chapter 11 Cases . . . except for
> claims related to any act or omission that is determined in a Final Order to have
> constituted actual fraud, willful misconduct, or gross negligence.

In contrast to third-party releases that offer protection to non-debtors for preconfirmation

liability, an exculpation provision serves to protect court professionals who act reasonably while

carrying out their responsibilities in connection with the bankruptcy case. Exculpation

provisions do not release parties, but instead raise the liability standard of fiduciaries for their

conduct during their case. *In re Health Diagnostic Lab. Inc.*, 551 B.R. 218, 232 (Bankr. E.D.

Va. 2016). Exculpation provisions "generally are permissible, so long as they are properly

limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D.

Va. 2012). To that end, courts will approve an exculpation provision "so long as it is limited to

those parties who have served the debtor, is narrowly tailored and complies with the applicable

standards." *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 260 (Bankr. E.D. Va. 2016). "Exculpation

is appropriate when it is solely limited to fiduciaries who have served a debtor through a chapter

11 proceeding." *In re Health Diagnostic Lab., Inc.*, 551 B.R. at 232-33.

Exculpation clauses have their genesis in two different sources:  the *Barton* Rule and

Section 1103(c) of the Bankruptcy Code. *In re Nat'l Heritage Found., Inc.*, 478 B.R. at 233.

Under the *Barton* Rule, based on *Barton v. Barbour*, 104 U.S. 126 (1881), a party cannot bring a

suit against a bankruptcy trustee or the trustee's attorneys for acts within the trustee's duties of

recovering assets for the estate without first obtaining leave of court. *McDaniel v. Blust*, 668

F.3d 153, 157 (4th Cir. 2012).  "The Barton doctrine serves the principle that a bankruptcy

trustee is an officer of the court that appoints him and therefore that court has a strong interest in

protecting him from unjustified personal liability for acts taken within the scope of his official

duties." *Id.*  In *McDaniel*, the Fourth Circuit affirmed dismissal of claims against the trustee's

counsel, because the plaintiff's allegations "can be considered by the bankruptcy court . . .  in its

role as gatekeeper." *Id.* at 157.

Under Section 1103(c) of the Bankruptcy Code, the Creditors' Committee possesses

broad authority to formulate a plan and perform "such other services as are in the interest of

those represented." 11 U.S.C. § 1103(c).  Courts have interpreted this section to imply both a

fiduciary duty to committee constituents and a limited grant of immunity to committee members.

*In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).  "This immunity covers committee

members for actions within the scope of their duties." *Id.*  "[A] proper exculpation provision is a

protection not only of court-supervised fiduciaries, but also of court-supervised and court-

approved transactions." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 721.  Thus, a

narrowly tailored exculpation provision serves only those aims of protecting parties who have

performed necessary duties in connection with the case.

### 1.    *Behrmann* **and Exculpation Provisions**

The Trustee argues that the Bankruptcy Court erred in failing to apply the *Behrmann*

factors to the Exculpation Provision. (Trustee Br. at 43.) However, he cites no case law in

support of his argument. Further, the Fourth Circuit in *Behrmann* did not analyze the

exculpation provision at issue; instead, the Court only mentioned it as being part of the plan.

Moreover, the purposes behind the *Behrmann* factors do not fully align with the purposes

of an exculpation provision. As discussed above, the *Behrmann* factors seek to determine the

necessity of a release to the ultimate success of a particular plan and the release's effect on the

impacted classes. Exculpation provisions, on the other hand, serve to ensure that court-

supervised parties can carry out transactions to effectuate the plan without fear of liability for

court-authorized actions. Accordingly, the Court concludes that the Bankruptcy Court did not

err by failing to apply the *Behrmann* factors to the Exculpation Provision. However, that does

not end the analysis of the Exculpation Provision.

### 2.    **The Bankruptcy Court's Error in Approving the Exculpation Provision**

On remand from the Fourth Circuit, the bankruptcy court in the *Behrmann* case approved

the exculpation provision there (but not the third-party release provision). *In re National*

*Heritage Found., Inc.*, 478 B.R. at 234.[14] Specifically, the bankruptcy court approved the

exculpation provision because it:

> (a) is narrowly tailored to meet the needs of the bankruptcy estate; (b) is limited to
> parties who have performed necessary and valuable duties in connection with the
> case (excluding estate professionals); (c) is limited to acts and omissions taken in
> connection with the bankruptcy case; (d) does not purport to release any pre-
> petition claims; and (e) contains a gatekeeper function by which the Court may, in
> its discretion, permit an action to go forward against the exculpated parties.

---

[14]     The parties thereafter did not appeal the approval of the exculpation provision.

*Id.* The Court finds these factors persuasive, with additional limitations found in the case law and the underpinnings of the bases for exculpation provisions. Therefore, an exculpation provision that "is limited to those parties who have served the debtor, is narrowly tailored and complies with the applicable standards," *In re Alpha Nat. Res., Inc.*, 556 B.R. at 260, must contain the following limitations:

> (a) it must be limited to the fiduciaries who have performed necessary and valuable duties in connection with the bankruptcy case;
>
> (b) is limited to acts and omissions taken in connection with the bankruptcy case;
>
> (c) does not purport to release any pre-petition claims;
>
> (d) contains a carve out for gross negligence, actual fraud or willful misconduct; and,
>
> (e) contains a gatekeeper function.

An exculpation clause narrowly tailored to these factors serves the purposes underpinning exculpation provisions. Additionally, adhering to these limitations ensures that a court need not test the exculpation provision against the *Behrmann* factors. The further that an exculpation provision stretches beyond these limitations, the closer that it becomes in substance to a more general non-debtor release to which the *Behrmann* analysis must apply.

Here, the Exculpation Provision satisfies some, but not all, of these limiting factors. In support of approval, it is limited to acts and omissions taken in connection with the bankruptcy case, does not release any pre-petition conduct and contains a carve out for gross negligence, actual fraud or willful misconduct. However, it extends beyond fiduciaries who have performed necessary and valuable duties. Instead, the "Exculpated Parties" include all current and former employees, attorneys, accountants, managers, financial advisors and consultants of every party being exculpated. Additionally, it lacks a gatekeeping function.

In conclusion, the Exculpation Provision extends beyond the permissible parties and fails to contain a gatekeeper function that would allow an avenue into court for some claims. Therefore, the Court concludes that the Bankruptcy Court clearly erred in approving the Exculpation Provisions. However, unlike the Third-Party Releases, the Court believes that this can be redrafted on remand to comply with the requirements outlined here.

## IV.    CONCLUSION

The Bankruptcy Court extinguished a broad swath of claims held by a wide variety of people. However, despite this drastic action, the Bankruptcy Court failed to determine whether it had the authority to rule on those claims or whether the facts supported extinguishing those claims. Indeed, the Bankruptcy Court plainly lacked the constitutional power to adjudicate many of the claims encompassed by the Third-Party Releases and to confirm the Reorganization Plan. Therefore, the Court VACATES the Bankruptcy Court's Order (Bankr. Dkt. No. 1811; USTAPP 2530-2672) confirming Debtors' Reorganization Plan, VOIDS the Third-Party Releases and RENDERS the Third-Party Releases UNENFORCEABLE. The Court FINDS the voided Third-Party Releases to be SEVERABLE from the Reorganization Plan and, therefore, SEVERS the voided Third-Party Releases from Debtors' Reorganization Plan.

Additionally, the Court FINDS the Exculpation Provision to be overly broad and, therefore, VOIDS the Exculpation Provision as currently drafted. However, the Court believes that the Exculpation Clause could be redrafted to comply with the applicable law in a manner consistent with this Opinion. Consequently, the Court hereby REMANDS this case to the Bankruptcy Court with instructions to redraft the Exculpation Provision in a manner consistent

with this Opinion and then to proceed with confirmation of the Plan without the voided Third-Party Releases.[15]

Finally, the Court FINDS that the interests of justice warrant reassigning this case to another Bankruptcy Judge in this district outside of the Richmond Division and therefore ORDERS the Chief Judge of the Bankruptcy Court for this district to REASSIGN this case on remand to another Bankruptcy Judge in this district outside of the Richmond Division.[16]  The Chief Judge may reassign the case to himself if he believes the interests of justice so warrant.[17]

Accordingly, this case will be remanded to the Bankruptcy Court in accordance with the instructions herein.  An appropriate order shall issue.

---

[15]    The Court notes that the Exculpation Provision does not implicate *Stern* issues, so the Bankruptcy Court possesses the constitutional authority to confirm Debtors' Reorganization Plan without the voided Third-Party Releases.  Additionally, no party objects to any other aspect of the Plan than addressed here.

[16]    The Court has considered the factors for reassignment as set forth in *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019), and believes that reassignment is warranted here due to the practice of issuing third-party releases in the Richmond Division in contravention of the Fourth Circuit's admonitions in *Behrmann*.  To be clear, the undersigned does not question the integrity or impartiality of Judge Huennekens.  Indeed, the contrary is true, as the undersigned holds Judge Huennekens in high regard.  However, the practice of regularly approving third-party releases and the related concerns about forum shopping call into question public confidence in the manner that these cases are being handled by the Bankruptcy Court in the Richmond Division.

[17]    Even though the case shall be reassigned to a Bankruptcy Judge outside of the Richmond Division, the case shall remain a Richmond Division case and any appeal after remand shall be assigned to the undersigned.

The Clerk is directed to file this Memorandum Opinion electronically, notify all counsel
of record and forward a copy to the chambers of Chief United States Bankruptcy Judge Frank J.
Santoro and United States Bankruptcy Judge Kevin R. Huennekens.

It is so ORDERED.

\_\_\_\_/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  January 13, 2022